## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

Chianne D., et al.,

      Plaintiffs,

v.                                                                    Case No.

Jason Weida, in his official capacity
as Secretary for the Florida Agency
for Health Care Administration, et al.,

      Defendants.

_____/

## PLAINTIFFS' MOTION FOR A
## CLASSWIDE PRELIMINARY INJUNCTION

**PLEASE TAKE NOTICE**, upon all the papers filed herein, Plaintiffs move

this Court for an order granting Plaintiffs' motion pursuant to Rule 65(a) of the

Federal Rules of Civil Procedure for entry of a classwide preliminary injunction.

## INTRODUCTION

Plaintiffs are Medicaid enrollees who have lost or are threatened with the

imminent loss of Medicaid. To alert Plaintiffs about the loss of coverage, Defendants

are sending termination notices that are confusing and do not adequately explain

why coverage is ending. This leaves Plaintiffs unable to understand why they no

longer meet Medicaid eligibility requirements and scrambling to figure out how to

pay for their necessary health care. Plaintiffs spent hours on the phone attempting to

obtain clarity. Despite these efforts, Plaintiffs Chianne D., C.D., and A.V. remain without Medicaid coverage.[1] Plaintiffs cannot afford necessary health care and services, such as medications, treatments for chronic illnesses, diagnostic screenings, postpartum care, and well-child visits and vaccines. In addition to limiting their access to health care, Plaintiffs Chianne D. and C.D. have incurred over $2,800 in medical debt, and their family is foregoing other necessary expenses to save money to pay the bill. The loss of coverage has increased Plaintiffs' stress and anxiety as they face uncertainty about how to pay for critical medical care.

Since at least 2018, Defendants have been "well aware" that their termination notices provide insufficient explanation and create confusion. The notices, which do not clearly state the reasons for the ineligibility determination or give any details about the eligibility factors supporting this determination, violate fundamental safeguards of the Due Process Clause of the Fourteenth Amendment and the Medicaid Act. Nonetheless, Defendants continue to rely on them to cut off coverage of hundreds of thousands of Medicaid enrollees. Due to the end of the COVID emergency, Defendants are redetermining nearly 5 million Floridians' eligibility for Medicaid, in the first three months terminating 182,857 individuals, including

---

[1] Upon filing this motion, Plaintiffs will immediately notify Defendants of the identities of each Plaintiff and Next Friend. Plaintiffs also intend to file a Motion to Proceed Anonymously imminently and to move to file under seal a document which identifies the full names of the Plaintiffs and their Next Friends.

Plaintiffs, during this "unwinding" process. Kaiser Fam. Found., Medicaid Enrollment and Unwinding Tracker (July 31, 2023), https://www.kff.org/report-section/medicaid-enrollment-and-unwinding-tracker-state-enrollment-and-unwinding-data/ (under "STATE DATA" tab, Figure 2).

Plaintiffs ask this Court to enter a preliminary injunction enjoining the Defendants from terminating Medicaid benefits to the named Plaintiffs and all others similarly situated until the Defendants provide adequate and timely notice and the opportunity for a de novo hearing prior to termination of Medicaid coverage.

## BACKGROUND: MEDICAID FRAMEWORK

The Medicaid program is designed to "furnish medical assistance" on "behalf of individuals whose incomes and resources are insufficient to meet the costs of necessary health care." 42 U.S.C. § 1396-1. A state's participation in Medicaid is voluntary. Participating states are reimbursed by the federal government for the majority of the costs of Medicaid benefits. *See id.* § 1396b. Once a state elects to participate, it must adhere to federal legal requirements as provided by the U.S. Constitution, the Medicaid Act, and the regulations and guidelines promulgated by the federal Medicaid agency. *Id.* §§ 1396-1396w-5; *see also Tallahassee Mem'l Reg'l Med. Ctr. v. Cook*, 109 F.3d 693, 702 (11th Cir. 1997).

Florida participates in the Medicaid program. As required by federal law, 42 U.S.C. § 1396a(a)(5), Florida designated the Agency for Health Care Administration

(AHCA) as the single state Medicaid agency. Fla. Stat. § 409.902(1). AHCA has delegated responsibility for processing Medicaid eligibility redeterminations to the Department of Children and Families (DCF). *Id.* AHCA, as the designated single state agency, is required to ensure DCF abides by federal Medicaid laws and regulations. Fla. Stat. § 409.902 (1). 42 C.F.R. § 431.10(c)(3); *see also Hernandez v. Medows,* 209 F.R.D. 665, 670 (S.D. Fla. 2002).

The Medicaid Act delineates the population groups that are eligible to receive Medicaid coverage using household income and other criteria (e.g., children, pregnant women, people with disabilities, older adults). *See* 42 U.S.C. §§ 1396a(a)(10)(A), (C). Each covered population group has its own income limits and, for disability-related Medicaid categories, resource/asset limits as well. *Id.*; *see also* 42 U.S.C. § 1396a(e)(14) (describing income eligibility based on modified adjusted gross income).[2] Some population groups, such as newborns and individuals who have recently given birth, receive 12 months of continuous coverage regardless of a change in circumstances. 42 U.S.C. § 1396a(e)(16) (describing postpartum coverage), *id.* § 1396a(e)(12) (describing continuous eligibility for children); Before

---

[2] For income limits related to pregnant women, children, and caregivers, including applicable disregards, *see* Dep't. of Children and Families, CFOP, 165-22, Economic Self Sufficiency Program Policy Manual, Appendix A-7, https://www.myflfamilies.com/services/public-assistance/additional-resources-and-services/ess-program-manual (last visited Aug. 21, 2023). For income and asset limits related to people with disabilities, *see id.*, Appendix A-9.

terminating Medicaid coverage, states must conclude that an individual is ineligible in any category. 42 C.F.R. §§ 435.930(b), 435.916(f)(1).

Typically, states are required to redetermine an individual's Medicaid eligibility every 12 months, or sooner if the individual experiences a change in circumstance affecting eligibility. *See* 42 C.F.R. § 435.916(a)(1), (b), and (d).

## ARGUMENT

Plaintiffs seeking a preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury will occur without an injunction; (3) the threatened injury to the Plaintiffs outweighs any injury to the Defendant; and (4) the issuance of an injunction will not disserve the public interest. *See, e.g., Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1273-74 (11th Cir. 2013). As established below, Plaintiffs meet these criteria.

## I.   Plaintiffs are Substantially Likely to Prevail on the Merits of Their Due Process Clause and Medicaid Act Claims.

Medicaid recipients have a statutory entitlement to benefits that is protected by the Due Process Clause of the Fourteenth Amendment. *O'Bannon v. Town Court Nursing Ctr.,* 447 U.S. 773, 787 (1980). Thus, before terminating coverage, the agency must send timely, adequate written notice that comports with the requirements of due process and the Medicaid Act. *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970); 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200-431.246. Adequate notice is "vital not only to communicate what action the state plans to take," but also

to provide the recipient with information sufficient to evaluate whether or not to challenge the state's decision. *Gaines v. Hadi*, No. 06-60129-CIV, 2006 WL 6035742, at *13 (S.D. Fla. Jan. 30, 2006). The Alaska Supreme Court has explained the role of the notice as follows:

> Due process notices are designed to protect recipients from erroneous deprivation of benefits by allowing them to assess whether or not the agency's calculations are accurate. . . . [A]gencies make mistakes. If a major purpose served by benefit change or denial notices is protecting recipients from agency mistakes, then it stands to reason that such notices should provide sufficient information to allow recipients to detect and challenge mistakes.

*Allen v. Alaska Dep't of Health & Soc. Servs.*, 203 P.3d 1155, 1167-68, n.61 (Alaska 2009) (collecting cases).

To be sufficient, the notice must "detail[] the reasons for the proposed termination," including both "the legal and factual bases" for the decision. *Goldberg*, 397 U.S. at 267-68; 42 U.S.C. § 1396a(a)(3); *see also* 42 CFR § 431.210. Notices must be "reasonably calculated under all circumstances to," give recipients "an opportunity to determine whether the facts on which the agency relied were correct and, if not, present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The notice must also "clearly" explain "the availability of an avenue of redress." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13-14, n.15 (1978).

Failure to include any of the required information offends due process, even if other aspects of the notice are sufficient. *See, e.g., Memphis Light*, 436 U.S. at 14

(finding a due process violation where notice, "while adequate to apprise the [plaintiffs] of the threat of termination . . . was not 'reasonably calculated' to inform them of the availability of 'an opportunity to present their objections'"). Similarly, to satisfy the Medicaid Act, notices must include a statement of what action the agency intends to take, as well as a "clear statement of the specific reasons supporting the intended action," an explanation of the right to a hearing, when benefits will continue pending the hearing, and the method for obtaining a hearing. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b)(2), 431.210; *see also id.* § 431.205 (incorporating *Goldberg*'s requirements). And where the required notice is not provided, due process and the Medicaid Act require the agency to reinstate coverage until pre-termination process is provided. *Goldberg*, 397 U.S. at 264; *Kimble v. Solomon*, 599 F.2d 599, 605 (4th Cir. 1979) (ordering "prospective reinstatement of [Medicaid] benefits . . .  until at least ten days after Maryland has mailed to each plaintiff a separate, timely and adequate notice"); 42 C.F.R. § 431.231(c)(1).

Here, plaintiffs have a substantial likelihood of success on the merits because Defendants' standardized notices fail to satisfy the most rudimentary requirements for adequate notice.

*First*, the notices do not clearly state what action Defendants are taking. As Plaintiffs' notices demonstrate, a single notice may include statements that an individual is both "eligible" and "ineligible." *See e.g.*, Exhibit 2, Chianne D. Decl.

at Ex. B; Exhibit 3, Jennifer V. Decl. at Ex. A; *see also* Exhibit 4, (Taylor notice). Adding to the confusion, Defendants routinely use phrases that an individual is "RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM" or "ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP" when coverage is actually ending altogether. *See e.g.*, Ex. 2, Chianne D. Decl. at Ex. B; Ex. 3, Jennifer V. Decl. at Ex. A; Ex. 4 (Taylor notice); Exhibit 5 (G.M. notice); Exhibit 6 (L.M.J. notice); Exhibit 7 (M.G. notice)). Plaintiff Chianne D., after reading the notice was not sure who in her family was losing coverage or when. Ex. 2, Chianne D. Decl., ¶¶ 13-16. Plaintiff A.V.'s mom was utterly confused by the notice and did not understand from this language that her daughter's coverage was ending. Ex. 3, Jennifer V. Decl., ¶¶ 8, 11 (stating she thought this language meant A.V. still had coverage).

Notices, like these, that do not communicate who is losing coverage or when are not "reasonably calculated" to inform Medicaid enrollees of "the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314; *see also Doston v. Duffy*, 732 F. Supp. 857, 872-73 (N.D. Ill. 1988) (noting a notice is inadequate if it is "unintelligible, confusing, or misleading" or does not "meaningfully inform" the recipient of their rights).

*Second*, the notices communicate only the ultimate conclusion and fail to detail the "legal and factual bases" for the decision. *Goldberg*, 397 U.S. at 267-68.

8

Defendants' notices do not advise recipients of the "applicable standards" for Medicaid eligibility, "list the various types of information relied on," or "identify those factors the Agency deems pertinent to the decision." *Gaines*, 2006 WL 6035742, at *17-18. Critically, in notice sections where some members of the household are listed as "eligible" or "enrolled" and others in the household are listed as "ineligible," there is *no* reason given for that decision. *See, e.g.*, Ex. 2, Chianne D. Decl. at Ex. B; Ex. 3, Jennifer V. Decl. at Ex. A; Ex. 4 (Taylor notice); Ex. 5 (G.M. notice); Exhibit 8 (L.S. notice).

In notice sections where all members of a household are identified as ineligible, the entire explanation of the Defendants' decision comes in the form of a standardized "reason code." These reason codes communicate only the ultimate conclusion and do not inform an individual of the basis for the Defendants' decision. As represented by Subclass A, DCF routinely uses reason codes that do not identify *any* eligibility factor Defendants used to find an individual ineligible for Medicaid. For example, Defendants use reason codes that state, "YOUR MEDICAID FOR THIS PERIOD IS ENDING" and/or "NO HOUSEHOLD MEMBERS ARE ELIGIBLE FOR THIS PROGRAM". Exhibit 9 (DCF reason codes list, codes 520 and 374); *see also, e.g.*, Ex. A of Jennifer V. Decl.; Ex. 6 (L.M.J. notice); Ex. 7 (M.G. notice); Exhibit 10 (F.M. notice); Exhibit 11 (A.H. notice). Notices such as these that "[i]n essence, . . . inform the recipient that [her] request for [Medicaid]

9

benefits was denied because she was not entitled to those benefits" are legally deficient because they provide "explanation without 'reasons.'" *C.R. ex rel. Reed v. Noggle,* 559 F. Supp. 3d 1323, 1339 (N.D. Ga. 2021) (quoting *Goldberg*, 397 U.S. at 267)).

As represented by Subclass B, some reason codes do identify income as a relevant eligibility factor. DCF reason code 241 is associated with the phrase: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM." Ex. 9; *see e.g.*, Ex. 2, Chianne D. Decl., at Ex. B; Ex. 4 (Taylor notice); Ex. 5 (G.M. notice). Other than this phrase, however, the notices are devoid of additional information needed to understand the reason for the state's action, such as the "calculations of income or resources involved . . . ,[or] explanations of what income and/or resources the agency considers available to the claimant . . . [or] the relevant eligibility limits. . . ." *Ortiz v. Eichler*, 616 F. Supp. 1046, 1061 (D. Del. 1985), *aff'd*, 794 F.2d 889 (3d Cir. 1986). Plaintiff Chianne D., for instance, did not understand how Defendant had reached its decision or calculated the "share of cost" listed in her notice or what "share of cost" meant. Ex. 2, Chianne D. Decl., ¶ 13. Declarant Taylor did not pursue an appeal in part because she assumed DCF was right that she was over-income. Exhibit 12, Decl. of Kimber Taylor, ¶¶ 17-18.

Further, the notices do not "fully inform []" individuals of the basis for Defendants' decision because they fail to identify the facts used to make the

10

eligibility decision. *Goldberg*, 397 U.S. at 266-67. The only household-specific information Defendants include in its notices are the names of the individuals in the household and some dates. What is missing is information regarding what age, pregnancy, postpartum, and disability status Defendants used to evaluate eligibility. Nor do Defendants provide any explanation of the various Medicaid eligibility categories or their applicable eligibility requirements, although the requirements vary significantly from one eligibility category to the next. For instance, Plaintiff Chianne D. did not realize that Defendants had not evaluated her for postpartum coverage, though she had given birth less than 12 months ago. Ex. 2, Chianne D. Decl., ¶¶ 30-31. Without "sufficient information to understand the basis for the agency's action," Medicaid enrollees "cannot know *whether* a challenge to an agency's action is warranted, much less formulate an effective challenge." *Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005). In sum, Plaintiffs are likely to succeed on their claims because Defendants notices fail to provide sufficient details for a "lay reader" to "understand on what basis the request for [Medicaid] was denied." *C.R.*, 559 F. Supp. 3d at 1339; *see also Barry v. Lyon*, 834 F.3d 706, 720 (6th Cir. 2016) (holding that notice must provide "specific, individualized reasons for the agency action").

*Third*, the notices do not "clearly" explain "the availability of an avenue of redress." *Memphis Light,* 436 U.S. at 13-14, n.15 (1978). Each notice includes the

same standard paragraph regarding how to request a hearing. The notice template reads: "If you want a hearing, you *must* ask for the hearing by writing, calling the call center or coming into an office within 90 days from the date at the top of this notice. . . ." Exhibit 13, DCF template notice of Medicaid ineligibility (emphasis added). The notices do not provide an address to deliver a written request, a phone number to call the "call center," or a physical address for any DCF office to visit. The ability to ask for a hearing is further complicated because there are few physical offices in the state, and the majority of these are in urban areas. *See* Fl. Dep't of Child. & Fam., "ESS Storefronts and Lobbies" https://www.myflfamilies.com/services/public-assistance/additional-resources-and-services/ess-storefronts-and-lobbies (last visited Aug. 21, 2023). Meanwhile, Florida's call center has the longest wait times (40 minutes) and highest abandonment rates (48%) of any state in the country. *See* CMS, *Medicaid and CHIP CAA Reporting Metrics* (July 28, 2023), https://data.medicaid.gov/dataset/7218cbef-f485-4daa-8f69-e50472eab416.[3]

Moreover, the notices omit any information about how to submit an appeal via online or email options. The Defendants' notices therefore do not set forth

---

[3] The wait times and abandonment rates are even worse for Spanish-language callers. The average Spanish-language caller has to wait nearly two and a half hours and 30% of Spanish-language calls are disconnected. *See* UnidosUS, "At Florida's Medicaid call center, long and discriminatory delays prevent eligible families from keeping their health care" (Aug. 2023), https://unidosus.org/publications/long-and-discriminatory-delays-at-floridas-call-center/.

necessary and accurate information about the right to appeal in a manner that "accurately inform[s] the person to whom it is given of how to take advantage of that opportunity." *Pickens v. Shelton-Thompson*, 3 P.3d 603, 607-08 (Mont. 2000); *Goldberg*, 397 U.S. at 266, 268; *Memphis Light*, 436 U.S. at 13-14 n. 15; *see also Gaines*, 2006 WL 6035742, at *19 (finding no due process violation where it was uncontested that notices provided "detailed" information on how to "request a fair hearing to present evidence and challenge the Agency's" decision); 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.206. *See also* Ex. 3, Jennifer V. Decl. ¶ 13 (stating she did not understand the fair hearing language).

Furthermore, the notice threatens that individuals who decide to request a hearing "will be responsible to repay any benefits if the hearing decision is not in your favor." Ex. 13 at 4. This is not an accurate statement of DCF policy, which only authorizes the recovery of overpayments for fraudulent or intentional program violations. *See* ESS Program Policy Manual §§ 3630.0200, 3630.0300, https://www.myflfamilies.com/sites/default/files/2023-02/3600.pdf. This erroneous language places financial pressures on Medicaid enrollees and discourages enrollees, like declarant Kimber Taylor, from exercising their constitutional right to appeal the agency action prior to the termination of benefits. Ex. 12, Taylor Decl., ¶ 17; *see also* 42 C.F.R. § 431.221(b) (stating an agency may not "interfere" with a "beneficiary's freedom to make a request for a hearing").

For years, Defendants have been aware of the deficiencies in the termination notices. In 2018, state officials reported "being well aware that notices sent to beneficiaries generate confusion" and that the "current notices that describe applicants as ineligible are considered to be not sufficiently explicit in terms of an explanation." State Health Access Data Assistance Center ("SHADAC"), *Medicaid Eligibility, Enrollment, and Renewal Processes and Systems Study: Case Study Summary Report - Florida*, 12-13 (Oct. 19, 2018), https://www.macpac.gov/wp-content/uploads/2018/11/Florida-Summary-Report.pdf. And although Defendant made minor revisions to the template termination notice at the beginning of the continuous coverage unwinding process, the revisions did not remedy the inadequate reason codes. Instead, Defendants continue to rely on the standardized reason codes it used before the pandemic to notify hundreds of thousands of Floridians that their coverage is ending. Plaintiffs are substantially likely to succeed on the merits of their claims that Defendants use of these notices violates the Constitution and the Medicaid Act.

## II.     Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.

In cases alleging a violation of "the federal Medicaid statute and requesting injunctive relief, irreparable harm nearly always follows a finding of success on the merits. . . . Denying a Medicaid recipient an essential medical service constitutes irreparable harm." *Smith v. Benson*, 703 F. Supp. 2d 1262, 1278 (S.D. Fla. 2010).

14

This is because the loss of Medicaid coverage places the health of those losing Medicaid at immediate risk. Without Medicaid coverage, Plaintiff and proposed class members are unable to timely access medically necessary treatment, prescription medications, and essential well-child and postpartum services.

Numerous courts have found irreparable harm where Medicaid beneficiaries face loss of Medicaid coverage for necessary health care services. Indeed, courts in the Eleventh Circuit have consistently found that "[t]he denial of medical benefits and resultant loss of essential medical services, constitutes an irreparable harm . . . " *Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (citations omitted); *C.R.*, 559 F. Supp. 3d at 1342 (finding reduction in the hours of authorized speech and rehabilitative therapies before a Medicaid recipient was given adequate notice of the reductions caused irreparable harm); *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1349 (S.D. Fla.1999) (finding cuts in funding for one Medicaid program, with simultaneous elimination of another program, placed plaintiffs at imminent risk of irreparable harm); *Dodson v. Parham*, 427 F. Supp. 97, 108 (N.D. Ga. 1977) (noting the court "would be blinking reality to conclude that Medicaid recipients . . . who are by definition the 'categorically needy', would have the financial capability to have diverse prescriptions filled" in the absence of an injunction restraining state from restricting drugs Medicaid would cover).

15

Courts in other circuits have reached the same conclusion. *See Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) (holding that the threat of losing needed medical care through Medicaid coverage constituted irreparable harm); *Mass. Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) ("Termination of [Medicaid] benefits that causes individuals to forego such necessary medical care is clearly irreparable injury."); *Caldwell v. Blum*, 621 F.2d 491, 498 (2nd Cir. 1980) (finding harm where Medicaid applicants would "absent relief, be exposed to the hardship of being denied essential medical benefits"); *Knowles v. Horn*, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010) (finding irreparable harm where Medicaid services terminated without due process); *Crawley v. Ahmed*, Case No. 08-14040, 2009 WL 1384147, *28 (E.D. Mich. May 14, 2009) (finding that irreparable harm because "it is undeniable that the unpaid bills, loss of needed medical assistance, and ultimately poor health suffered by Plaintiffs, cannot be adequately addressed by the promise of future Medicaid coverage").

As in the cases cited above, the Defendants here have terminated Plaintiffs' Medicaid coverage, the Plaintiffs cannot afford health care they need, and they have been forced to either forego that care or pay for it by sacrificing other essential needs or borrowing. Plaintiff Chianne D., who is just six months postpartum, has repeatedly been ill in recent months, but has been unable to see a doctor. Ex. 2, Chianne D. Decl., ¶¶ 21, 24, 32. She attributes her illness to the stress caused by her

16

two-year old daughter, Plaintiff C.D. losing Medicaid coverage. *Id.* C.D. was diagnosed with Cystic Fibrosis when she was an infant. *Id.* ¶ 3. For two years, she relied on Medicaid to pay for her medical care—daily medications, medical daycare, physician and therapy visits, and hospitalizations. *Id.* ¶ 4. After losing Medicaid coverage in June 2023, C.D. lost access to medical daycare, leaving Chianne to provide her daily care while also caring for her infant son and trying to attend school full time. *Id.* ¶¶ 20-21. C.D.'s family could not afford the medications that she needs, and without them, her health deteriorated. *Id.* ¶¶ 21-22. Chianne had to take her daughter to the hospital emergency room to get treatment for a persistent cough. *Id.* ¶ 22. The family received bills totaling over $2,800 from the hospital visit and incurred other medical debt during the month of June. *Id.* ¶ 22. They are unable to pay them, and the bills have gone to collection. *Id.* ¶¶ 22, 24. The family is saving money by avoiding spending on other basic necessities, including delaying introduction of solid foods for their six-month old. *Id.* ¶ 24.

Similarly, Plaintiff A.V. (aged one) lost Medicaid and is currently without health coverage. Ex. 3, Jennifer V. Decl., ¶¶ 7, 16. To date, she has missed one well-child visit and the vaccines that were supposed to be delivered during that visit. *Id.* ¶¶ 6, 16. Her mother remains without the ability to seek medical attention for inevitable childhood illnesses or accidents, causing her tremendous stress and anxiety. *Id.* ¶ 16.

The irreparable harm that the Plaintiffs are experiencing is representative of absent class members who have also lost coverage as a result of the deficient notices. *See* Kaiser Family Found., Medicaid Enrollment and Unwinding Tracker, (July 31, 2023), https://www.kff.org/report-section/medicaid-enrollment-and-unwinding-tracker-state-enrollment-and-unwinding-data/ (noting that 182,857 people lost Medicaid coverage in the first three months of redeterminations following the end of the COVID emergency). Like the named Plaintiffs, absent class members who lose Medicaid are likely to have health care needs that go unmet. Declarant Kimber Taylor and her son, for instance, were notified that their Medicaid coverage would end just weeks after her son was born (even though both of them qualified for continuous coverage, Kimber as a postpartum mother and her son as a newborn). Ex. 12, Taylor Decl., ¶¶ 3-8. Ms. Taylor did not understand Defendants' termination notice and did not challenge the action in a pre-termination hearing. *Id.* ¶¶ 9-13, 15-18. As a result, she lost Medicaid coverage and missed postpartum appointments. *Id.* ¶ 20. She managed to convince her pediatrician to provide her son's vaccines, despite lacking coverage, but incurred a $555 bill. *Id.* ¶¶ 14, 20. The experience of losing coverage for herself and her newborn has been extremely upsetting, causing Ms. Taylor to experience anxiety and panic attacks. *Id.* ¶¶ 13, 20. She spent hours on the phone trying to restore her family's coverage and ultimately gave up and filed a new application to get Medicaid coverage. *Id.* ¶¶ 15, 19.

Like Chianne and Ms. Taylor, the class includes other postpartum mothers and parents who, without coverage, will suffer harmful health impacts that can also affect their child's development and health trajectory. Medicaid covers 45 percent of all births in Florida, making Medicaid coverage vital for both postpartum parents and newborns. Kaiser Family Found., Births Financed by Medicaid (2021), https://www.kff.org/medicaid/state-indicator/births-financed-by-medicaid/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D. AHCA itself has acknowledged the significant harms that come from losing Medicaid coverage postpartum: it can "result in coverage loss for mothers who do not hav[e] the capacity or resources to seek out alternative coverage; and result in missed treatments for follow-up appointments due to coverage gaps or loss." Agency for Health Care Admin., Florida Managed Medical Assistance Waiver, Amendment Request, 10 (Sept. 3, 2021), https://www.medicaid.gov/sites/default/files/2022-03/fl-managed-medical-assistance-pa.pdf. And as AHCA notes, "even brief gaps in coverage can lead [to] otherwise preventable or treatable health problems, such as asthma, diabetes, and behavioral disorders, resulting in costly hospital admissions and emergency department visits." *Id.* For mothers with medical conditions or pregnancy-related complications, the consequences can be serious. "[P]erinatal depression is the most under-diagnosed obstetric complication in America . . . as many as 12% of all

pregnant or postpartum women experience depression in a given year, and for low-income women, the prevalence is doubled." *Id.* at 9. And "parental depression . . . can negatively affect a child's trajectory if unaddressed." *Id.* at 10.

The loss of coverage, along with the stress, anxiety, and confusion that Defendants' notices create, is causing irreparable harm. The record amply supports a finding that absent a class-wide preliminary injunction, class members will continue to suffer irreparable harm as a result of Defendants continued use of deficient termination notices. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (holding a court could use inductive reasoning to find all the members of a class suffered the threat of irreparable harm "so long as the plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated—in terms of irreparable harm—to all the other plaintiffs"); *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 58 (2d Cir. 2004) (quoting *Adams* and recognizing that a court could rely on representative evidence showing that irreparable harm was classwide); *Mitson v. Coler*, 670 F. Supp. 1568, 1577 (S.D. Fla. 1987) (finding irreparable harm where Medicaid class members were threatened with potential denial of nursing home service).

## III. The Balance of the Equities and Public Interest Weigh in Favor of Plaintiffs.

When the state is a party, the "balance of harms" and "public interest" factors of the preliminary injunction test merge such that the harm caused to the state in the

"balance of harms" prong is the same as the public interest. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020); *Eknes-Tucker v. Marshall*, No. 2:22-CV-184, 2022 WL 1521889, at *13 (M.D. Ala. May 13, 2022).

Here, both factors are sharply in Plaintiffs' favor. First, "[t]he vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *Colonel Fin. Mgmt. Officer v. Austin*, 622 F. Supp. 3d 1187, 1215 (M.D. Fla. 2022); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) (noting that the "[f]rustration of federal statutes and prerogatives [is] not in the public interest . . ."). Nor would the specific relief sought here be particularly burdensome: "adding at least a few sentences of reasoning to one or more . . . letters would not plausibly burden" Defendants. *C.R.*, 559 F. Supp. 3d at 1340-41; *see also Barnes v. Healy*, 980 F.2d 572, 579 (9th Cir. 1992) ("There is no significant administrative burden to outweigh the probable value of this additional safeguard . . . meaningful notice requires specific reasons."); *see also Haitian Refugee Center, Inc. v.* Nelson, 872 F.2d 1555, 1562-63 (11th Cir. 1989) (affirming district court's classwide preliminary injunction requiring government agency to "set forth the factual basis [in decisions about immigration applications] with sufficient specificity" and rejecting agency's argument that such a requirement "would entail significant administrative and financial burdens.").

In contrast, termination of Medicaid benefits is defined as *per se* irreparable harm for vulnerable Medicaid enrollees. The harm to plaintiffs thus "outweighs whatever minimal harm a preliminary injunction might visit upon the State." *Lebron v. Wilkins*, 820 F. Supp.2d 1273, 1293 (M.D. Fl. 2011), *aff'd*, *Lebron v. Sec'y, Fla. Dep't of Child. &* Families, 710 F.3d 1202 (11th Cir. 2013). As the *Goldberg* Court concluded, "the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens." 397 U.S. at 266.

## CONCLUSION

Plaintiffs ask the Court to issue a preliminary injunction ordering Defendants to: (1) prospectively reinstate Medicaid coverage for Plaintiffs and others similarly situated until Defendants provide them with adequate and timely written notice and the opportunity for a de novo fair hearing prior to termination of services and (2) cease further Medicaid terminations until such notice and opportunity for a hearing is provided.

Plaintiffs also request that the court waive or require only a nominal amount for security. *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., Liab. Ltd. Corp.*, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that 'the amount of security required by the rule is a matter within the discretion of

the trial court . . . [, and] the court may elect to require no security at all.'") (citation omitted).    Public interest litigation is a recognized exception to the bond requirement. *See Vigue v. Shoar*, No. 3:19-CV-186-J-32JBT, 2019 WL 1993551, at *3 (M.D. Fla. May 6, 2019) (citing *City of Atlanta v. Metropolitan Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981)).


Dated: August 22, 2023


Respectfully submitted,

**FLORIDA HEALTH JUSTICE PROJECT**

By: */s/ Katy DeBriere*

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 496-5419
debriere@floridahealthjustice.org

**Miriam Harmatz** (Fl. Bar No. 562017)
3793 Irvington Ave.
Miami, FL 33133
(786) 853-9385
harmatz@floridahealthjustice.org

**Lynn Hearn** (Fl. Bar No. 123633)
3606 Dexter Dr.
Tallahassee, FL32312
(754) 231-0106
hearn@floridahealthjustice.org

**NATIONAL HEALTH LAW PROGRAM**

**Sarah Grusin**\*\*
**Miriam Heard**\*\*
**Amanda Avery**\*\*
**Jane Perkins**\*\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
grusin@healthlaw.org
heard@healthlaw.org
avery@healthlaw.org
perkins@healthlaw.org


\*\* *Application for admission pro hac vice forthcoming.*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 22, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I served by process server the foregoing on the following non-CM/ECF participant:

Shevaun Harris, Secretary
Department of Children and Families
2415 N. Monroe St., Ste. 400
Tallahassee, FL 32303-4190
(850) 487-1111

Jason Weida, Secretary
Agency for Health Care Administration
2727 Mahan Dr.
Tallahassee, FL 32308
(888) 419-3456

*/s/Katy DeBriere*
Katy DeBriere