**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHIANNE D., *et al.*,

      Plaintiffs,

                                      Case No. 3:23-cv-00985-MMH-LLL

v.

JASON WEIDA, in his official capacity
as Secretary for the Florida Agency for
Health Care Administration, and
SHEVAUN HARRIS, in her official
capacity as Secretary for the Florida
Department of Children and Families,

      Defendants.

_____/

_____

**SECRETARY WEIDA AND HARRIS' RESPONSE**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

_____

## INTRODUCTION

Plaintiffs ask this Court to certify two subclasses of Medicaid recipients who have been or will be determined ineligible for Medicaid, to reinstate the Medicaid benefits of all subclass members despite those determinations of ineligibility, and to suddenly freeze all federally mandated eligibility redeterminations. Their request for these drastic actions relies chiefly on their assertion that the "reason codes" contained in the notices provided to class members do not sufficiently disclose the reasons for Florida's determination of ineligibility.

This case is ill-suited to class treatment, however, and the proposed subclasses are riddled with fatal defects.

*First*, the class representatives of Subclass B do not have standing. C.D. does not even claim to be Medicaid eligible and cannot therefore show that allegedly inadequate notice injured her. And contrary to her assertions, Chianne was told repeatedly the exact reason why she and her daughter were determined ineligible. Chianne even requested a fair hearing—and later canceled it. Any injury to Chianne and C.D. was caused not by DCF's notice, but by Chianne's decision to forego the hearing that DCF had scheduled for her.

*Second*, Plaintiffs have not established the numerosity of Subclass A. Subclass A consists of recipients whose notices do not include a reason code that references an eligibility factor. Relying on outdated data, Plaintiffs seek to prove the opposite: the number of notices that include a reason code that does not reference an eligibility factor. But

reason codes are often used in combination, and the pre-pandemic data on which Plaintiffs rely says nothing about current practice. That a notice includes a reason code of a particular kind does not establish that it does not also include a reason code of another kind.

*Third*, Plaintiffs have failed to establish commonality. Whether any class member received adequate notice depends on the totality of circumstances—not merely a reason code viewed in isolation. Class members received information through diverse channels, including other parts of the same notice (separate and apart from the reason code), other written notices, and oral communications. Reason codes differ from each other, as does each class member's actual knowledge. Many recipients have successfully requested fair hearings—a process that includes in-depth prehearing exchanges of information. Facts such as these are material to Plaintiffs' claims, and dissimilarities in these circumstances prevent the generation of common answers that will drive the Court's resolution of this action.

*Fourth*, for similar reasons, Plaintiffs have not established typicality. Because the evidence that might prove the inadequacy of notice to a class representative would not prove the inadequacy of notice to all class members, Plaintiffs' claims are not typical of those of the class.

This Court should therefore deny Plaintiffs' Motion for Class Certification (ECF No. 2).

## LEGAL STANDARD

Rule 23 is not a "mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A plaintiff must "affirmatively demonstrate" compliance with Rule 23. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Class certification is appropriate only if a "rigorous analysis" confirms that all prerequisites have been satisfied. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). This "rigorous analysis" often overlaps with the merits and requires courts to "probe behind the pleadings." *Wal-Mart*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 160).

At the class-certification stage, a complaint's allegations are not accepted as true, nor are doubts resolved in the plaintiff's favor. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016).

## ARGUMENT

## I.   CHIANNE AND C.D. HAVE NO STANDING.

Any analysis of class certification "must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). The court must consider whether at least one putative class representative has standing to raise each claim on behalf of the class or subclass. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279–80 (11th Cir. 2000).

To have standing, a plaintiff must have suffered an injury that is fairly traceable to the challenged conduct, and that a favorable decision will likely redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the class-certification stage, this "fact-specific inquiry" requires "factual proffers, through affidavits and other evidentiary documents."

*Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir. 2001). The plaintiffs must establish each element of standing with the same degree of evidence required to establish all other prerequisites to class certification. *Wasser v. All Mkt., Inc.*, 329 F.R.D. 464, 470 (S.D. Fla. 2018).

### A.   Because C.D. Does Not Claim to Be Eligible for Medicaid, the Challenged Notice Did Not Injure C.D.

C.D. lacks standing because she does not even *claim* to be eligible for Medicaid. Because she does not dispute DCF's determination of ineligibility, the challenged notice did not injure her, nor is the termination of her benefits traceable to the challenged notice or redressable by a different one.

As the Supreme Court recognized in *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), a "bare procedural violation, divorced from any concrete harm," does not alone establish an injury in fact for purposes of Article III standing. *Accord Doe v. Univ. of Mich.*, 78 F.4th 929, 944 (6th Cir. 2023) ("The deprivation of process alone, without some concrete harm flowing from that deprivation, cannot constitute an injury that conveys standing.").

Thus, a plaintiff who claims that a procedural deprivation injured her must assert "some basis for contesting" the merits of the underlying decision. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 943–44 (10th Cir. 2003); *accord Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision . . . ."). Otherwise, the plaintiff "has no occasion to

invoke" the deficient procedures and is not injured by them. *Rector*, 348 F.3d at 943–44; *accord Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.5 (1989) (plurality opinion) ("We cannot grasp the concept of a 'right to a hearing' on the part of a person who claims no substantive entitlement that the hearing will assertedly vindicate."). Unless the plaintiff contests the merits of the government's decision, a hearing would not "serve any useful purpose," and the denial of process inflicts no injury. *Codd v. Velger*, 429 U.S. 624, 627–28 (1977).

Thus, in *Rector*, the plaintiffs claimed that inaccurate information on parking tickets discouraged parties from contesting those tickets. 348 F.3d at 942. But the plaintiffs did not "assert any legal basis for challenging" or "contest the legitimacy" of the tickets issued to them. *Id*. at 944–45. Absent "some basis" to dispute the government's decision, there was "nothing for the hearing to accomplish," and the inaccuracy of the notice did not injure the plaintiffs. *Id*.; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").

The same is true here. C.D. does not allege that she is eligible for Medicaid. While C.D. need not prove that she would ultimately prevail at a fair hearing, she was required to present at least some basis to challenge DCF's termination of her benefits. Otherwise, neither a hearing nor a different notice would have made any difference. Because C.D. does not dispute DCF's determination of ineligibility and assert a claim of entitlement to Medicaid, the alleged denial of process did not injure C.D., and C.D. has no standing.

**B.      Because Chianne Knew the Precise Basis of DCF's Determination and Requested a Fair Hearing (Which She Later Canceled), the Challenged Notice Did Not Injure C.D. or Chianne.**

Chianne and her daughter, C.D., lack standing for an additional reason: Chianne was directly told, multiple times, precisely why she and C.D. were determined ineligible for Medicaid. She then requested a fair hearing and later *withdrew* her request. Therefore, C.D.'s and Chianne's alleged injuries are not traceable to DCF's notice, but to Chianne's own choice to forego a hearing despite her ample knowledge of the grounds for DCF's decision.

Chianne attests that she was "completely confused" by the notice and that a DCF representative "was unable to answer my questions." ECF No. 2-6 ¶¶ 13, 18. She claims it was "impossible for me to figure out the status of C.D.'s coverage and if I needed to do something to keep it." *Id.* ¶ 18. She also attests that, had she understood the status of C.D.'s coverage, "she would have submitted an appeal on C.D.'s behalf." ECF No. 1 ¶ 107.

Contrary to these representations, Chianne *did* submit an appeal—after *multiple* DCF representatives informed her of the *precise* basis for DCF's decision. Chianne then rescheduled the hearing and later withdrew her hearing request. She discloses none of these facts to the Court.

These are the facts: Chianne learned of DCF's ineligibility determination on May 29, 2023. ECF No. 2-6 ¶ 8. Over the next three days, she spoke by phone with DCF representatives at least five times for more than 90 minutes in total. Roberts Decl. ¶ 8.

DCF's representatives informed Chianne over and over that DCF's determination was based on Chianne's household's income:

- "your income is too high," Roberts Decl., Ex. D1 at 5:6–8;

- "it's because of the amount of income that you guys have coming in," Roberts Decl., Ex. D2 at 7:1–3;

- "[i]t was due to the income, so that's why she was removed, because you're over the income for regular Medicaid for her," *id.* at 7:23–25;

- "[h]ousehold income is too high," *id.* at 11:2–3;

- "due to income," Roberts Decl., Ex. D3 at 5:6–9;

- "[i]t's because of income, ma'am," *id.* at 11:16–17;

- "[t]he reason why she doesn't qualify is not based on her medical condition. It's based on income that your husband is making," *id.* at 12:6–10;

- "[y]our income is too high to receive full Medicaid," Roberts Decl., Ex. D4 at 9:23–24;

- "showing . . . income at $5,418. . . . It's too high for . . . Medicaid." Roberts Decl., Ex. D5 at 3:9–12.

DCF representatives even told Chianne the source and amount of income—*to the penny*—on which DCF relied: $5,418.28 of gross pay received by her husband over the four-week period preceding the application date. Roberts Decl., Ex. D3 at 5:12–13 ("We use your gross pay for the last four weeks before any deduction."), *id.* at 5:17–18 ("I have $5,418.28."); Roberts Decl., Ex. D4 at 3:14–18 ("Do you agree with the income level that we have calculated in your case here where . . . his income is $5,418 a month in income?"); *id.* at 4:21–25 ("What we did was we verified his income through a database, and this was reported income in the system. So we have to rely on that because that's

based on his employer. Based on his employer, that's what his earnings were."); *id.* at 5:6–11 ("[A]nd the income that we inputted into the system, that was his last four weeks of earnings based on the date of the application through his employer.").

In fact, one DCF representative provided Chianne with a weekly breakdown of the four-week income amount—an amount far in excess of what Chianne had reported:

> So on the application, . . . you reported $800 weekly, . . . but our system picked up his last four weeks before taxes. March 11th, check stub was $1,372.50, March 4th was $1,350.77, February 25 was $1,487, February 18 was $1,208.

Roberts Decl., Ex. D3 at 6:5–10. Another DCF representative even queried the database to determine the most up-to-date income figures for Chianne's husband:

> As of May 20th, his gross was $1,115, May 13th, $1,510, May 6th, $1,205, and April 22nd, $1,137. . . . The income level is $5,003 a month, and this is the last four weeks now based on today.

Roberts Decl., Ex. D4 at 6:20–7:7. Two DCF representatives then offered to request a fair hearing for Chianne. Roberts Decl. ¶ 16. One explained:

> So, ma'am, you have a couple options. If you want to request a fair hearing, I can submit that for you, and a hearing officer will contact you and go over your case. . . . If you want a hearing because you don't agree with the findings of your daughter's Medicaid ending due to income, that would have to go to the hearing department. Is that what you want to do?

Roberts Decl., Ex. D3 at 20:5–15. The DCF representative explained to Chianne what a fair hearing is: "They reevaluate it and go over everything with you. That's what a fair hearing is . . . . [T]he hearing officer will get in touch with you . . . ." *Id.* at 24:23–25:3. A second DCF representative confirmed Chianne's fair-hearing request. Roberts Decl., Ex. D4 at 14:12–16:14.

On June 2, DCF's Office of Appeal Hearings sent Chianne written confirmation of her fair-hearing request and provided information about the hearing. Sarmiento Decl. ¶ 13. On June 13, the Office of Appeal Hearings sent Chianne another notice scheduling the hearing for July 20 and providing more information. *Id*. ¶ 14. On June 16, Chianne asked to reschedule the hearing to an earlier date. *Id*. ¶ 15. The Office of Appeal Hearings granted the request and rescheduled the hearing to July 3. *Id*. ¶ 16. Then, five days before the scheduled hearing, Chianne emailed the Office of Appeal Hearings and withdrew her hearing request: "I would like to withdraw my appeal." *Id*. ¶ 17. Two months later, Chianne sued.

Somehow, all of these facts were omitted from the declaration in which Chianne claimed to have been confused and unable to pursue an appeal and defend her daughter's rights. *See* ECF No. 2-6.

The challenged notice did not injure C.D. or Chianne. Chianne was told the basis of DCF's decision. She was told repeatedly. She even allowed DCF to request a hearing for her—a hearing she later canceled. Any injury that Chianne and C.D. claim to have suffered is traceable to Chianne's decision to forego the hearing despite her knowledge— not to alleged deficiencies in a notice. *See Brody v. Vill. of Port Chester*, 261 F.3d 288, 290 (2d Cir. 2001) (explaining that the plaintiff, who received no notice of a hearing, suffered no injury because he had actual knowledge of the hearing); *Kalme v. W. Va. Bd. of Regents*, 539 F.2d 1346, 1349 (4th Cir. 1976) ("Although the letter did not inform Kalme of his right to demand a hearing, this oversight was not prejudicial, for he already knew of this right and immediately exercised it."). Chianne and C.D. do not therefore have standing.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THE NUMEROSITY OF SUBCLASS A.

Plaintiffs have not established that Subclass A is sufficiently numerous. In fact, to prove numerosity, Plaintiffs employ the exact method that precedent forbids: they begin with a robust starting number and then leave the rest to intuition, producing no evidence that the subclass is sufficiently numerous *after* all of the subclass definition's limitations are applied. Because Plaintiffs have not shown its numerosity, Subclass A should not be certified.

In *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), the plaintiff sued T-Mobile, a nationwide provider of cellular telephone services. The district court certified a class of T-Mobile's Florida employees who were charged back for commissions. *Id.* at 1264. To establish numerosity, the plaintiff produced evidence that T-Mobile employed thousands of people nationwide. *Id.* at 1267. The Eleventh Circuit concluded, however, that the number of employees nationwide did not establish the numerosity of a Florida-only class. *Id.* It noted that T-Mobile was "a large company" and found it "tempting to assume" that a Florida-only class was numerous enough, but any finding of numerosity was "sheer speculation." *Id.* A plaintiff must make "*some* showing" that would enable a district court to make factual findings with "support in the evidence." *Id.* (emphasis in original). Because the plaintiff did not establish how many of T-Mobile's many employees were employed in Florida, the Eleventh Circuit reversed. *Id.* at 1268; *accord Kelecseny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660, 669 (S.D. Fla. 2009) (denying class certification where the plaintiff established a "starting number" but offered no proof of the number of members in the ultimate class).

Here, Subclass A is limited to individuals whose notices do not contain a reason code that references an eligibility factor. To establish numerosity, Plaintiffs first point out that 182,857 people were deemed to be ineligible during the first three months of redeterminations. ECF No. 2 at 12. Of course, that number says nothing about reason codes.

Plaintiffs then point to pre-pandemic data showing that reason codes that do not reference eligibility factors were used many times. *Id*. This information is insufficient for two reasons. *First*, as redeterminations have resumed, DCF has made a point to instruct its processors to select the most specific reason code available. Zumaeta Decl. ¶ 4. Prepandemic data does not speak to current practice. *Second*, reason codes are often used in combination. *Id*. ¶¶ 5–6. In fact, DCF instructs its processors to use more specific reason codes *together* with less specific reason codes. *Id*. ¶ 7. The subclass definition recognizes as much: it refers to notices that contain "only" reason codes that do not reference an eligibility factor. ECF No. 2 at 1.

Thus, while the data indicates how often particular reason codes were used (years ago), it does not indicate how often they were used *alone*. Indeed, Plaintiffs' burden is not to demonstrate how often particular reason codes are used, but rather to demonstrate how often particular reason codes (those that reference an eligibility factor) are *not* used.

Like the plaintiff in *Vega*, Plaintiffs produce evidence of the number of people in the large pool from which the subclass is drawn, but no evidence of the final number of people who ultimately compose the subclass. Assumption is what *Vega* forbids. If a court

may not make the safe assumption that T-Mobile employs at least forty people in Florida, then it cannot make assumptions about the number of notices that do not contain a reason code that references an eligibility factor. Because *Vega* bars the precise method by which Plaintiffs seek to show numerosity, the Court should decline to certify Subclass A.

### III.   PLAINTIFFS HAVE NOT IDENTIFIED A COMMON QUESTION THAT WILL DRIVE THE RESOLUTION OF THIS LITIGATION.

Plaintiffs' assertion that all class members were denied procedural rights ignores dissimilarities and individualized circumstances that defeat any attempt to adjudicate the rights of all class members at once. It incorrectly assumes that the Court need only assess in isolation standard passages in the challenged notices to determine whether the State denied process to all class members. Because case-by-case variations are relevant, the rights of class members cannot be litigated as though they are not. Because Plaintiffs identify no common question that will drive the resolution of this litigation, their motion should be denied.

To establish commonality, Plaintiffs must identify a question that is common to all subclass members. But not any common question will do: any competently drafted complaint can raise common questions in droves. *Wal-Mart*, 564 U.S. at 349–50. A common question will suffice only if it generates common answers—and not any common answers, but answers apt to "drive the resolution of the litigation." *Id.* at 350. Stated differently, the claims of class members must depend on a common contention that will resolve in one stroke an issue "central to the validity" of each class member's claims. *Id.*

"Dissimilarities within the proposed class," therefore, "have the potential to impede the generation of common answers" and defeat class commonalities. *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

Here, the circumstances of class members are dissimilar in material ways. The due-process question is whether notice is "reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jordan v. Benefits Rev. Bd. of U.S. Dep't of Labor*, 876 F.2d 1455, 1459 (11th Cir. 1989) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)) (emphasis added). The totality of circumstances differs from notice to notice and from recipient to recipient. While Plaintiffs are laser-focused on the reason codes in the notices, due process is not so myopic. It considers in combination the totality of circumstances to determine whether the State provided adequate notice.

Reason codes are *not* the only communication that recipients receive and cannot be considered in isolation. While some elements of the State's communications with recipients are standard, others are not. The frequency and substance of communications surrounding the termination of Medicaid benefits vary from person to person. Roberts Decl. ¶ 20. Medicaid recipients receive a range of communications: some communications are provided to some recipients but not all, while others (such as communications by phone) are provided on an individual basis. *Id.* ¶¶ 26, 28. Due process does not limit itself to consideration of the standardized elements of classwide communications, but

considers the entire corpus of information provided to an individual: standardized and individualized.

1. Sometimes, the notice contains relevant information separate and apart from the reason code. Zumaeta Decl. ¶¶ 10–11. This was true in A.V.'s case. Her notice stated that her Medicaid benefits would terminate, but also that she would be enrolled in the Medically Needy program. ECF No. 2-5 at 9, 12. While the reason code itself did not reference an eligibility factor, the notice clearly explained that "[i]ndividuals enrolled in the Medically Needy Program have income or assets that exceed the limits for regular Medicaid." *Id*. at 10. It went on: "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid." *Id*. at 9. Thus, while the reason code did not reference an eligibility factor, other parts of the notice did. The notice made clear why A.V. was determined ineligible.

Neither due process nor Medicaid regulations are concerned with reason codes per se, but with notice. A blinkered review of reason codes in a vacuum cannot generate a common answer that spans the entire class.

2. Class members receive information through written communications outside the four corners of the challenged notices. Roberts Decl. ¶ 29. For example, some class members received prior communications in which DCF requested particular items of information needed to determine eligibility. *Id*. ¶ 30. Class members who did not provide that information then received notices informing them of the termination of their benefits. *Id*. While the reason codes in these subsequent notices might not have referenced eligibility factors, the recipients already knew from prior notices what information DCF

14

needed in order to confirm their eligibility. Those recipients had notice of the reason for DCF's determination, even if that reason was not repeated within the four corners of the challenged notice. "Due process does not require 'reasonably calculated' notice to come in just one letter, as opposed to two." *Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005).

3. Other class members—including Chianne—received information through oral communications. Roberts Decl. ¶¶ 25, 28. Chianne spoke with DCF representatives at length. In those phone conversations, DCF's representatives informed her that she was ineligible because her household's income exceeded Medicaid's limits. She was told the precise amount of income on which DCF relied and was offered a fair hearing, which she accepted. Oral communications—no less than written ones—are part of the totality of circumstances that due process considers. *Lehner v. United States*, 685 F.2d 1187, 1190–91 (9th Cir. 1982) (refusing to "elevate form over substance" and concluding that oral notice satisfied due process). They are relevant and individualized, and insusceptible to classwide treatment.

4. Reason codes also differ from notice to notice. DCF uses 86 different reason codes in connection with Medicaid ineligibility determinations. Zumaeta Decl. ¶ 3. The named Plaintiffs received only three of the 86. While focusing strictly on reason codes, Plaintiffs lump the recipients of many different reason codes into one subclass and ask the Court to assess the adequacy of scores of different reason codes. The sufficiency or insufficiency of one reason code does not demonstrate the sufficiency or insufficiency of another.

Subclass A, for example, includes individuals who received the following fully self-explanatory reason codes:

- "WE RECEIVED INFORMATION THAT A MEMBER OF YOUR HOUSEHOLD DIED AND WILL NO LONGER BE COVERED BY THIS PROGRAM."

- "NOT ELIGIBLE BECAUSE CHILD SUPPORT ENFORCEMENT HAS REPORTED YOU FAILED TO COOPERATE WITH THEM."

- "WE RECEIVED YOUR WRITTEN REQUEST TO REMOVE AN INDIVIDUAL FROM THIS PROGRAM."

Zumaeta Decl. ¶ 9. The adequacy of the challenged notices depends on the content of those notices, which differs from notice to notice, and cannot be determined all at once for all class members.

5. Class members are also differentiated by different degrees of actual knowledge of their rights. At least some class members understood their rights and requested fair hearings. When an individual first applies for Medicaid, DCF provides the individual a document entitled "Rights and Responsibilities," which outlines the fair-hearing rights of Medicaid recipients. Sarmiento Decl. ¶ 4. The same document is then presented and acknowledged electronically whenever an individual provides DCF with information through ACCESS Florida. *Id.* ¶ 5. DCF's public website also explains what fair hearings are and how recipients can request them. *Id.* ¶ 16. DCF representatives tell recipients (like Chianne) about fair hearings and file hearing requests on their behalf. *Id.* ¶ 8. Since April 2023, recipients have requested 4,027 fair hearings related to Medicaid eligibility. *Id.* ¶ 2.

When individuals have actual knowledge of their rights—no matter the source of that knowledge—the State does not violate due process: "the Due Process Clause does not require notice where those claiming an entitlement to notice already knew the matters of which they might be notified." *Moreau v. FERC*, 982 F.2d 556, 569 (D.C. Cir. 1983); *accord EEOC v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1508 (9th Cir. 1990) ("Actual knowledge of the pendency of an action removes any due process concerns."); *Rogerson v. Sec'y of Health & Hum. Servs.*, 872 F.2d 24, 28–29 (3d Cir. 1989) ("Rogerson had personal familiarity and experience with the options available for reconsideration, and administrative and judicial review. In these circumstances, the degree of detail in the denial notice was adequate to protect her due process rights."). Thus, in *Jordan*, in rejecting a claim of insufficient notice, the Eleventh Circuit explained that the plaintiff had "shown that he is familiar with the administrative procedures for seeking black lung benefits," having pursued a similar claim to a hearing before. 876 F.2d at 1460. Because the proposed subclasses here include subclass members who had actual knowledge of their rights, Plaintiffs' proposed classwide questions will not generate common answers.

Some class members not only requested fair hearings, but also prevailed and were reinstated to full Medicaid coverage. Sarmiento Decl. ¶ 3. Yet the proposed subclasses overlook the dissimilar circumstances of these recipients and assume the State violated their procedural rights.[1]

---

[1] For the same reasons, the subclass definitions are overbroad. For example, subclass members who requested fair hearings were not injured and should not be included in any subclass. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 678 (7th Cir. 2009) ("[I]f the definition is so broad that it sweeps within it persons who could not have been

6. Further, individuals who request fair hearings are provided with individualized information beyond that contained in the challenged notices. Sarmiento Decl. ¶ 9. Any person who requests a fair hearing is invited to participate in a prehearing conferral at which the parties discuss the challenged decision—and the grounds for that decision— and attempt to resolve the dispute. *Id.* ¶¶ 10–11; Fla. Admin. Code r. 65-2.049(2). The prehearing conferral affords the recipient an opportunity to ask questions and learn more about DCF's determination before the fair hearing even takes place. Sarmiento Decl. ¶ 10–11. This procedure mirrors a two-step process endorsed by the Supreme Court. *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) ("New York employs both a letter and a personal conference with a caseworker to inform a recipient of the precise questions raised about his continued eligibility. . . . This combination is probably the most effective method of communicating with recipients."); *see also Hames v. City of Miami*, 479 F. Supp. 2d 1276, 1289 (S.D. Fla. 2007) ("As such, the results of this preliminary hearing gave him the specific notice of the board's basis for seeking forfeiture in the later full hearing. This two-tiered system of hearings offered more than enough notice under the circumstances."). This avenue of communication also differentiates class members from each other.

---

injured by the defendant's conduct, it is too broad."); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) ("A court should deny class certification where the class definitions are overly broad, amorphous, and vague . . . .").

A plaintiff fails to establish commonality when the plaintiff alleges that an entire class received inadequate notice, but class members received information through various channels. In *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677 (S.D. Fla. 2008), two restaurant establishments alleged that the invoices of an equipment supplier contained an undisclosed fee. *Id.* at 679. The evidence indicated, however, that, while the invoices did not disclose the fee, the defendant had directed its sales representatives to disclose the fee to customers through oral communications. *Id.* at 682. Because the disclosures made to different customers might have differed, the circumstances regarding disclosure "could vary greatly." *Id.* at 683. The plaintiffs therefore failed to establish commonality.

In *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469 (S.D. Fla. 2006), the plaintiff alleged that the defendant, a hardware store, failed to disclose to customers who rent equipment that a particular charge was optional. *Id.* at 471. The defendants showed, however, that customers are informed of the optional nature of the charge through signs and sales representatives. *Id.* at 478. The "individual experiences" and "varied circumstances" of class members who might have received notice through different channels defeated any assertion that common answers could drive the resolution of the litigation. *Id.* at 478–79.

In *Marko v. Benjamin & Brothers, LLC*, No. 6:17-cv-001725, 2018 WL 3650117 (M.D. Fla. May 11, 2018) (Kelly, Mag.), the plaintiffs alleged that the defendant, a hotel reservation service, failed to disclose a non-refundable fee to its customers. *Id.* at *1. The evidence revealed, however, that some class members made their reservations by phone, rather than online, and that call-center agents sometimes, but not always, disclosed the

fee to customers. *Id*. at *3. That was enough to defeat commonality. Because class members "used different methods for booking their reservations, they received different disclosures." *Id*. at *6. Resolution of the class claims therefore entailed "significant individual issues." *Id*.

The same principle applies here. The means that DCF employs to provide information to recipients are diverse. Class members receive information through many channels. A reason code in isolation cannot prove that all class members uniformly received inadequate notice.

The questions that Plaintiffs propose fall well short of the standard that *Wal-Mart* established. *See* ECF No. 1 at 8–10; ECF No. 2 at 16–17. Most are variations on bottom-line liability questions: whether the challenged notices violate due process or Medicaid regulations. Those are precisely the questions that, under *Wal-Mart*, are always at hand, but never sufficient. In *every* case, a plaintiff could ask whether the challenged conduct violates a particular law. But the mere claim that all class members suffered a violation of the same law does not establish that the question will generate common answers and drive the resolution of the litigation—or that all class members' claims can be effectively litigated at once. *Wal-Mart*, 564 U.S. at 350 ("Quite obviously, the mere claim . . . that [class members] have suffered a Title VII injury . . . gives no cause to believe that all their claims can be productively litigated at once."); *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 598 (7th Cir. 2021) ("Superficial common questions like whether each class member 'suffered a violation of the same provision of law' do not suffice." (quoting *Wal-*

*Mart*, 564 U.S. at 350)); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (explaining that a mere "bottom-line liability question" cannot establish commonality).

Plaintiffs' proposed questions are also too abstract to drive the resolution of this litigation. For example, Plaintiffs ask whether numberless notices "create an unacceptable risk of confusion that denies recipients their ability to appeal an adverse action." ECF No. 1 at 10. Questions framed at a stratospheric level of generality are not well-defined or practically useful and ignore dissimilarities among class members. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) ("It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality."); *Stewart v. Winter*, 669 F.2d 328, 337 (5th Cir. 1982) ("A common question can be said to exist here only in the most abstract form: all of the putative class members are prisoners, and all may raise the question whether the conditions of their confinement violate a general legal standard."); *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 297 F.R.D. 64, 66 (S.D.N.Y. 2013) ("While one can phrase questions of law or fact in ways that make them 'common' to the class, in this case one can do that only at a level of generality which is useless in practical application."). Whether the challenged notices create an "unacceptable risk of confusion" is precisely such an abstract question, and whether that confusion "denies recipients their ability to appeal" is an individualized question—quite the opposite of a common one.

Plaintiffs have not done what *Wal-Mart* requires: identify a question that will generate a common answer and drive a classwide resolution of claims. The proposed ques-

21

tions overlook material dissimilarities among class members, are generic liability questions, or are too abstract to drive the resolution of a class action. Because Plaintiffs have not identified a common question as *Wal-Mart* demands, their motion should be denied.

## IV.   PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLAIMS OF CLASS MEMBERS.

For similar reasons, Plaintiffs have not carried their burden to establish that their claims are typical of the claims of class members. Because evidence of Plaintiffs' claims would not establish the claims of class members, Plaintiffs have failed to show typicality.

The typicality inquiry asks whether the proposed class representatives have "the same interest and suffer the same injury as the class members." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). The claims of proposed class representatives are atypical if the evidence that establishes their claims would not necessarily establish the claims of other class members. *Brooks v. S. Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 58 (S.D. Fla. 1990).

Thus, in *Pop's Pancakes*, *O'Neill*, and *Marko*, the plaintiffs failed to show typicality because different class members received different disclosures through different means. *See Marko*, 2018 WL 3650117, at *7; *Pop's Pancakes*, 251 F.R.D. at 683–84; *O'Neill*, 243 F.R.D. at 478–79. There, information was provided to some class members by phone or through signs. Evidence that the class representatives were not provided with adequate information did not prove that other class members were denied the same information.

In *Colomar v. Mercy Hospital, Inc.*, 242 F.R.D. 671, 677–78 (S.D. Fla. 2007), the court found that the plaintiff, who sought to represent a class of patients in a challenge

to the reasonableness of a hospital's rates, failed to prove typicality because the reasonableness of those rates differed over time and across patients and services. *See also DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 676, 687–88 (S.D. Fla. 2010) (concluding that the plaintiff, who challenged an insurance company's limits on reimbursement, failed to prove typicality because each class member would be required to prove its own entitlement to reimbursement).

The evidence here shows diversity, not typicality. Whether notice to one recipient was "reasonable under all the circumstances," *Arrington v. Helms*, 438 F.3d 1336, 1350 (11th Cir. 2006) (emphasis omitted), entails an inclusive consideration of the recipient's case-specific circumstances, including all information known or provided to the recipient, and not merely one reason code contained in one notice. Because proof of Plaintiffs' claims would not establish the claims of all class members, Plaintiffs have failed to show typicality.

## V.    THE CLASS DEFINITION IS UNCLEAR.

Finally, the scope of the subclasses is unclear. Rather than enumerate the reason codes that come within the subclass definitions, the subclass definitions try to describe the reason codes they include or exclude. The application of that definition to some of the State's many reason codes is unclear and leaves the scope of the subclasses, and class membership, in doubt.

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable.'" *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th

Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). At a minimum, the subclass definitions should be amended to enumerate specifically the reason codes they encompass. An enumeration of reason codes, rather than a general description, is far more likely to avoid disputes and uncertainty over the scope of the subclasses.

## CONCLUSION

The Court should therefore deny Plaintiffs' Motion for Class Certification (ECF No. 2).

Dated October 6, 2023.

/s/ Andy Bardos
Andy Bardos (FBN 822671)
James Timothy Moore, Jr. (FBN 70023)
Ashley H. Lukis (FBN 106391)
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
tim.moore@gray-robinson.com
ashley.lukis@gray-robinson.com
*Attorneys for Defendants*