UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case No. 3:23-cv-985-MMH-LLL


CHIANNE D., et al.,

      Plaintiffs,

v.

JASON WEIDA, in his official capacity
as Secretary for the Florida Agency
for Health Care Administration, et al.,

      Defendants.
_____/




REMOTE DEPOSITION OF

TONYALEAH M. VELTKAMP



VOLUME 1: (Pages 1 - 198)


Monday, March 18, 2024
9:01 a.m. - 3:46 p.m.


LOCATION:  REMOTE VIA ZOOM



Stenographically Reported By:
I. Iris Cooper
Stenographic Reporter

Job No.: 354345

```
 1          APPEARANCES: (All parties appeared remotely.)

 2
        FOR THE PLAINTIFFS
 3
        SARAH GRUSIN, ESQ. (admitted pro hac vice)
 4      OF:  NATIONAL HEALTH LAW PROGRAM
             FLORIDA HEALTH JUSTICE PROJECT
 5           1512 East Franklin Street, Suite 110
             Chapel Hill, North Carolina 27541
 6           Phone: 919-968-6308
             Email: grusin@healthlaw.org
 7

 8

 9      FOR THE DEFENDANTS

10      ASHLEY HOFFMAN LUKIS, ESQ.
        OF:  GRAYROBINSON
11           301 South Bronough Street, Suite 600
             Tallahassee, Florida 32301-1724
12           Phone: 850-577-9090
             Email: ashley.lukis@gray-robinson.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF PROCEEDINGS

2
Deposition of TONYALEAH M. VELTKAMP                    PAGE
3
      Direct Examination by Ms. Grusin                   5
4
      Cross Examination by Ms. Lukis                    190
5
      Redirect Examination by Ms. Grusin               193
6
      Certificate of Oath                              194
7
      Certificate of Reporter                          195
8
      Errata Sheet                                     196
9
      Witness Read Letter                              197
10

11
      PLAINTIFFS' EXHIBITS:                              PAGE
12
      Exhibit 1     Chianne D. 30(b)(6) Notice            9
13                  DCF 2024.03.04

14    Exhibit 2     Website - screenshots                14

15    Exhibit 3     Family-Related Medicaid Fact Sheet   20

16    Exhibit 4     Appendix A-7 Family-Related Medicaid 27
                    Income Limit Chart
17
      Exhibit 5     ESS Manual 1430                      34
18
      Exhibit 6     Medically Needy 2015 English         44
19
      Exhibit 7     Am I Eligible                        46
20
      Exhibit 8     Notice reason codes - TSRC Codes     62
21
      Exhibit 9     02-08 L.M.J. notice                  74
22
      Exhibit 10    2024-01-30 DCF's Amended Answers to  79
23                  First Set of Interrogatories (1)(1)

24    Exhibit 11    DCF-002046, Medicaid closure codes   80
                    error prone codes
25

1   I N D E X - (Continued)

2

PLAINTIFFS' EXHIBITS:                                    PAGE

3

Exhibit 12    DCF-000558                                  93

4

Exhibit 13    DCF-000341                                 102

5

Exhibit 14    DCF-002269                                 105

6

Exhibit 15    DCF-002049                                 107

7

Exhibit 16    ECF 02-06 Declaration of Chianne D.        118

8

Exhibit 17    DCF-000478                                 126

9

Exhibit 18    DCF-000361                                 131

10

Exhibit 19    DCF-000470                                 133

11

Exhibit 20    ECF 76-1. Decl. of Daniel Davis            152

12

Exhibit 21    Florida SHADAC Report                      155

13

Exhibit 22    AHCA-000385                                171

14

Exhibit 23    AHCA-000387                                172

15

Exhibit 24    AHCA-000392                                174

16

Exhibit 25    AHCA-002175                                174

17

Exhibit 26    Florida's plan for Medicaid               176
              Redetermination

18

Exhibit 27    Florida Medicaid Redetermination          178
              Plan - CMS (1)(1)

19

20

21

22

23

24

25

 1   Thereupon, proceedings began remotely at 9:01 a.m.:

 2            THE STENOGRAPHER:  Do you swear or affirm that

 3        the testimony you are about to give in this case

 4        will be the truth, the whole truth, and nothing but

 5        the truth?

 6            THE WITNESS:  Yes.

 7   Thereupon:

 8                    TONYALEAH M. VELTKAMP,

 9   under penalty of perjury, was examined and testified

10   as follows:

11                    DIRECT EXAMINATION

12   BY MS. GRUSIN:

13        Q    Can you please state and spell your name for

14   the record.

15        A    Yes.  It's Tonyaleah Veltkamp;

16   T-o-n-y-a-l-e-a-h, V-e-l-t-k-a-m-p.

17        Q    Thank you very much.  And have you given a

18   deposition before?

19        A    Yes.

20        Q    So you're probably familiar with the rules, so

21   I'll be brief.  Mostly, I say this one to remind myself

22   as much as you, which is we have to try not to talk over

23   each other.

24            You will probably know what I'm trying to ask

25   before I actually get the words out of my mouth.  And so

1   if you can just try to refrain from jumping in, that

2   would be great.  You understand that?

3         A     (Nods head up and down.)

4         Q     And then you're nodding.  It reminds me of the

5   other one, which is because we have a court reporter

6   here, we have to give verbal answers.  So let's just

7   jump right in.  What is your current job title?

8         A     My current job title is the Deputy Assistant

9   Secretary for the Economic Self-Sufficiency Operations.

10        Q     And how long have you been in that role?

11        A     Probably about a year and a half.

12        Q     Who was in your position before that?

13        A     Her name was Rae-Ann Bakus.

14        Q     And what was your position before your current

15  position?

16        A     I was the Chief of Policy.

17        Q     And is Julie Reed in that position currently?

18        A     Yes.

19        Q     And who was your supervisor when you were the

20  Chief of Policy?

21        A     Pat Grogan.

22        Q     Patti Grogan.  Do you know Nathan Lewis?

23        A     Yes.

24        Q     Did you work with him at all?

25        A     Yes.  I was his supervisor.

1    Q    You were his supervisor.  From what time
2 period were you his supervisor?
3    A    The beginning -- I'm not 100 percent sure when
4 he came back to the policy unit.  I would say maybe
5 2018, 2019, and then he retired in 2022.
6    Q    And is that while you were Chief of Policy
7 that you were his supervisor?
8    A    Yes.
9    Q    He also gave you that position in this case.
10 I don't know if you knew that.
11    A    Yes.
12    Q    Did you talk to Nathan about your deposition?
13    A    Yes.  I had a question about one of the
14 questions that I've been assigned.
15    Q    Can you tell me about the content of that
16 conversation?
17    A    It was just about the question that's related
18 to the SHADAC report and just trying to -- because it
19 was so long ago, trying to kind of put the pieces
20 together to see if he could help me.
21    Q    Was he able to help you?
22    A    Not much.
23    Q    And why did you talk to Nathan about that
24 particular question?
25    A    Well, whenever I was going back through and

1    trying to recall what had occurred, I had actually

2    assigned him lead on that -- I don't want to say it was

3    a survey, but on that project.

4        Q    And we will definitely talk about that.  Did

5    you talk to anybody else in preparation for your

6    deposition?

7        A    Yes.

8        Q    You can go ahead.

9        A    I spoke with Angela Prigen (phonetic) from the

10   policy team.  I spoke with Melissa Burns from training.

11   I spoke with Patti Grogan.

12       Q    Anyone else, other than your attorneys?

13       A    No, I don't think so.

14       Q    And then can you just give me a rough overview

15   of the topics you spoke with each one of those

16   individuals?  You can start with Angela.

17       A    With Angela, it was around the CMS, submitting

18   the CMS review.  I think there was a question on there

19   about the notices and if they reviewed our notices.  I

20   spoke with her about that.

21       Q    What about with Melissa?

22       A    Melissa, just about what training was provided

23   for reason codes.

24       Q    And Patti Grogan?

25       A    That was trying to determine who was

1   responsible, who submitted our plan to CMS.

2        Q     And I know that you mentioned Nathan is

3   retired.  Angela is still with DCF; is that correct?

4        A     Yes.

5        Q     What about Melissa?

6        A     Just can I clarify something?

7        Q     Yes, please.

8        A     With Nathan, he did retire, but he actually

9   came back in an OPS position, but in a different role.

10        Q     And Angela is currently working with DCF?

11        A     Correct.

12        Q     And what about Melissa?

13        A     Yes.  She is a current employee.

14        Q     And Patti Grogan?

15        A     She is retired.

16        Q     Do you know when she retired?

17        A     I know her last day in the office was December

18   15th.

19        Q     Of 2023?

20        A     Yes.

21              (Plaintiffs' Exhibit 1 was marked.)

22   BY MS. GRUSIN:

23        Q     So she just retired.  So you mentioned a

24   couple of times the question, so I'm just going to show

25   you.  Let me start out by sharing this.  This is

1    Exhibit 1.  This is the notice of deposition.

2            Attached to the notice is Exhibit A with the

3    list of topics.  Did you look at this list of topics in

4    preparation for your deposition today?

5        A    Yes.

6        Q    So we have been told that you've been

7    designated to testify on behalf of DCF on Topics Nos. 6,

8    7, 10, 16, and 17.  Are you prepared to do that today?

9        A    Yes.  There was also I think one other one.

10       Q    Oh, you're right.  And Sentence No. 2 of Topic

11   No. 5; right?

12       A    Yes.

13       Q    Thank you.  I have it in my outline, but not

14   in my intro questions.  So let's dig in.  I'm going to

15   stop sharing this.  I was going to start with Topic No.

16   16, the publicly-available information.

17           So I'll just ask the big question, which is

18   what information does DCF make publicly available about

19   eligibility requirements for Medicaid?

20       A    So there's a lot of information that is

21   publicly available.  They have customers and

22   constituents, anyone really has access to the same

23   information that we do.  It's in our Florida

24   Administrative Rule.

25           It's also our policy manual is posted out

```
 1    there.  The State laws, federal laws, all of that
 2    information is available.  We also provide information
 3    on our website.  There's some Medicaid fact sheets that
 4    individuals can go and view.
 5            There's information on their notices that
 6    points them back to their accounts.  We also include
 7    some additional information as far as QR codes that they
 8    can go and look at different things that can be done if
 9    they're not eligible for Medicaid.
10            We have on our website as well our
11    redetermination plan, so that tells an individual what
12    to expect, and updating your address, notifying the
13    Department.  Those are all some things that we have
14    available.
15        Q    Anything else that DCF makes available?
16        A    I mean, that's all available.
17        Q    Let me talk about a couple of the things that
18    you mentioned.  So the QR codes I believe you said are
19    about information if you're not eligible for Medicaid?
20        A    Correct.  Yes.
21        Q    So those wouldn't contain information about
22    the various requirements to be eligible for Medicaid,
23    right?  Sorry.  I didn't hear that.
24        A    No, they would not.
25        Q    Now, you mentioned information on the notices
```

1  about the accounts.  Are you referring to the MyACCESS
2  accounts?
3       A    Yes.
4       Q    Are you saying that within the MyACCESS
5  accounts, there is additional information about the
6  eligibility requirements for Medicaid?
7       A    Not the actual requirements on how to be
8  eligible, but information specific to their case.
9       Q    And I believe somebody else has been
10  designated to testify about what's in those accounts.
11  But just since you mentioned it, do you have a sense of
12  what kind of case-specific information is contained in
13  those accounts?
14       A    It relays their -- the Medicaid, if they're
15  eligible or not eligible and the program type, and it
16  provides them the history as well.
17       Q    Anything else that you are aware of that's in
18  those accounts?
19       A    I mean, there is the ability to do the
20  renewals.  They can add benefit, report a change.  That
21  kind of information is all available.  They can view
22  their notices.  They can view -- they can upload
23  documents.  They can see receipts of the documents
24  they've uploaded.  All that information is available in
25  their account.

1       Q       You said that it shows if they're eligible or

2    not eligible.  Would it tell them what eligibility

3    category they're enrolled in?

4       A       Yes, I believe it does.

5       Q       When I say eligibility category, what do you

6    understand that to mean?

7       A       So they -- and this is what I -- I'm not 100

8    percent sure on if it actually says like when we see

9    things in our eligibility system.  Just to give you an

10   example, like Medicaid for children, it would be MMC.

11              I don't know if we get into that level of

12   detail, just because a customer would not know the

13   difference between the category.  So it would say you're

14   Medicaid eligible, you're Medically Needy.  You might be

15   in the Family Planning or like the Medicare Savings

16   Plan, so buy, and that kind of thing.

17      Q       So it's your understanding that it

18   distinguishes between Medicaid, Medically Needy, Family

19   Planning, Medicare Savings Plan?

20      A       Yes.

21      Q       But it wouldn't get into the different

22   eligibility categories within, say, Medicaid?

23      A       I don't believe so, no.

24      Q       The redetermination plan that you mentioned,

25   does that contain information about the requirements for

```
 1   how to establish eligibility in Medicaid?

 2       A    I'm trying to think about everything that's in

 3   there.  I don't believe it talks about the actual

 4   eligibility, with the exception that we do need you to

 5   renew in order to start the process.

 6       Q    Would it be fair to say that the

 7   redetermination plan is focusing more on sort of the

 8   process piece, like what notices you'll get in the mail,

 9   where to submit information, as opposed to sort of the

10   substantive eligibility requirements?

11       A    Yes, I would agree with that.

12            (Plaintiffs' Exhibit 2 was marked.)

13   BY MS. GRUSIN:

14       Q    You also talked about the website.  I'm going

15   to show you another exhibit, which these are screenshots

16   that I took from the DCF website on March 14th.  If

17   they've changed, you can tell me, but it's pretty

18   recent.  Can you see this document?

19       A    Yes.

20       Q    So this is at MyFLfamilies.com./medicaid#ME.

21   Do you know what the ME stands for in that URL?

22       A    No.  No, I do not.

23       Q    And then is this the website that you were

24   referring to when you said that there's information on

25   the website?  Sorry.  I didn't hear an answer.
```

 1      A    I said yes.  I mean, yeah, this isn't -- it's
 2  been a long time since I went and played around on our
 3  website.  But we used to have information, and they've
 4  changed to more cascading and more, I guess, user
 5  friendly where we had some Medicaid fact sheets, which
 6  I'm not sure if there this is pulling from that exactly
 7  or not.
 8      Q    And I think we can get to the fact sheets.  I
 9  just wanted to ask you a couple questions about the
10  website language.  So just looking at this parents and
11  caretaker relatives section, do you agree that it
12  doesn't say what income limits apply for this category
13  on this section of the website?
14      A    Yes.  I mean, it doesn't report the income
15  limits on here, no.
16      Q    Do you know why not?
17      A    Because the -- probably because it's based on
18  household size, and so you couldn't just definitively
19  say if someone was looking at this that they -- you
20  know, here's the income limit for this house because we
21  don't know what the household size is.
22           It also depends a lot on how they answer
23  questions to the tax filing questions on our
24  application, so there's a lot of additional information
25  that is needed in order for us to say this is your

1    income limit.

2         Q    So would it be fair to say that the income

3    limit varies based on case-specific information?

4         A    Yes.

5         Q    Would you agree that this section of the

6    website doesn't link to a source to find the income

7    limits?

8         A    Not that I can see here.  I believe we had a

9    -- our policy manual, and then there are appendices

10   attached to that policy manual which would have the

11   income limits.

12        Q    And that's the place that you would direct

13   people to find the publicly-available information on

14   income limits?

15        A    Yes.

16        Q    I'm going on scroll to Page No. 2, which is

17   the children's section.  Again, same question, do you

18   agree that this did not state the income limits?

19        A    No, it does not.

20        Q    And would it be fair to say that it's for the

21   same reason that it didn't state it in the parent

22   caretaker section?

23        A    Yes.

24        Q    And that's because the income limits for

25   children vary based on the case-specific information?

 1      A      Yes.  They also are different based on the age

 2    of the child.

 3      Q      And once again, do you see any link to the

 4    sources for those income limits?

 5      A      No, not here.

 6      Q      But you would direct people who had questions

 7    about what income limits apply to the policy manual and

 8    the appendices?

 9      A      Yes.

10      Q      Looking at Page No. 3, this is the section on

11    pregnant women.  Once again, it doesn't state the income

12    limits?

13      A      No, it does not.

14      Q      And it doesn't include a link to find the

15    income limits?

16      A      No, it does not.

17      Q      And would the income limits for pregnant women

18    be in the same place as the policy manual and the

19    appendices?

20      A      I believe it is listed in the appendices, yes.

21      Q      At the end here, it does mention a

22    Family-related Medicaid fact sheet.  Is that one of the

23    fact sheets that you were referring to previously?

24      A      Yes.

25      Q      Do you know why there's not a hyperlink to

1    that fact sheet?

2        A    No, I do not.

3        Q    Does this section mention postpartum coverage?

4        A    No, it does not.

5        Q    Do you know why not?

6        A    No, I do not.

7        Q    I'm looking at the last section.  Well, I'm

8    going to skip.  This is former foster care individuals.

9    Would you call that another category of Medicaid, a type

10   of Medicaid?  What would you call that?

11       A    I mean, it can create another Medicaid

12   category.  It's just additional rules in order to

13   determine if these individuals are eligible.

14       Q    And here, it actually says there is no income

15   limit for this program; right?

16       A    That's correct.

17       Q    So this one actually does say the income

18   standard, and that's because -- would it be fair to say

19   that that's because there's just one standard, and the

20   standard is there is no income limit?

21       A    Right.  In order to be eligible for this

22   program, the requirement is you had to have aged out in

23   the system in order -- that's the eligibility

24   requirement, and there is no income limit on this

25   particular one.

 1      Q     The next section is non-citizens with medical

 2   emergencies.   Again, that's another type program.   What

 3   would we call that?

 4      A     It's another group of individuals that we

 5   determine eligibility for.

 6      Q     And I wanted to ask about the aged and

 7   disabled section.   I need to probably zoom in for you to

 8   read this, don't I?

 9      A     A little bit.

10      Q     Is that legible for you?

11      A     Yes.

12      Q     Apologies.   There's more text in this one.

13            So this one says Medicaid for low-income

14   individuals who are either aged 65 or older or disabled

15   is called SSI-related Medicaid.   Does this section

16   explain how disability determinations are made?

17      A     I mean, with the exception of SSI, I think it

18   does indicate that you're automatically eligible for

19   Medicaid if you are determined through the Social

20   Security Administration that everything else is not

21   going through eligibility requirements.

22      Q     And it's possible to be eligible for

23   SSI-related Medicaid if you're not receiving SSI;

24   correct?

25      A     Correct.   Correct.

```
 1      Q     You can be eligible just based on having a
 2 disability even if you're not receiving SSI?
 3      A     If you meet the other eligibility
 4 requirements.
 5      Q     And those would include things like income and
 6 assets?
 7      A     Yes.
 8      Q     Things like citizenship or immigration status?
 9      A     Yes.  Residency, like those kind of things.
10      Q     Here it looks like there is a link to the
11 SSI-related fact sheet.  Do you know why DCF included a
12 link here and not above?
13      A     No, I don't.  I mean, they've been redoing our
14 website, so they probably missed the above linkage.
15            (Plaintiffs' Exhibit 3 was marked.)
16 BY MS. GRUSIN:
17      Q     I'm going to stop sharing that.  I did find a
18 copy of the family-related fact sheet.  I'm going to
19 pull that up.  That will be Exhibit 3.  Is this the
20 Family-related Medicaid program fact sheet that you were
21 referring to?
22      A     Yes.
23      Q     Do you know when the last time this was
24 updated?
25      A     There should be a date on there.  Is there not
```

1   one?

2       Q    We can scroll through.  I didn't see one.  Is

3   there a place I should look?  I didn't see one when I

4   looked.

5       A    Normally, it's on the first page.

6       Q    I'll represent to you I pulled this from a

7   link on the 14th on the same day, so I think this is

8   recent.  Well, let's ask you some questions about this,

9   and then we can figure out the recency.

10          So I wanted to ask you about Page No. 2.  It

11  says, coverage for pregnant women.  Medicaid is provided

12  for the pregnant woman for the duration of her pregnancy

13  and two months postpartum.  Is that accurate?

14      A    No, it's not.

15      Q    The current eligibility rules grant women 12

16  months postpartum coverage; correct?

17      A    Yes.

18      Q    Do you know why DFC hasn't updated this fact

19  sheet?

20      A    I do not.

21      Q    This document links to an income chart, so I

22  was just going to click on that link.  I was sharing

23  just the document, and I realized it wasn't going to

24  show the whole screen.

25          Can you see the screen with the document now?

1     A     Yes.

2     Q     So I was going to click on this link.  Do you

3  see it says, sorry this page is not available?

4     A     Yes.

5     Q     So the income limit -- so there is a link to

6  the income chart here, but the link doesn't work; is

7  that fair to say?

8     A     Yes.

9     Q     Does DCF review these documents on a regular

10  basis to determine whether the links are working or not?

11     A     No.  I mean, that's not really -- I mean, we

12  send the information to our webmaster, and the

13  assumption is they're going to do what they've been

14  asked to do.

15     Q     Let's pull up another exhibit.  I think what

16  we're trying to get to is the policy manual; right?  Is

17  that where you think that that link should have taken us

18  to?

19     A     Or just the appendix itself, I mean.

20     Q     Those are available at different links?

21     A     They were previously done that way, yes.

22     Q     Actually, before we get into the appendix, I

23  just wanted to ask you some questions about the ESS

24  manual.  First question is when was the ESS manual

25  developed?

1       A    I mean, we've always had a policy manual for

2   as long as I've been here.

3       Q    And how long have you been there?  I'm sorry

4   if you said that already and I forgot.

5       A    No.  Twenty-three years.

6       Q    So it was developed at least 23 years ago?

7       A    At least.  It was paper then, but yes.

8       Q    Fair enough.  What was the purpose of the ESS

9   manual?

10      A    For staff to have a way to go look up

11  policies.  You know, to be able to look at all the

12  rules.  We don't expect our staff to remember

13  everything.  So if they had questions, they would be

14  able to go and read on it and apply the policies.

15      Q    So is it fair to say that the primary audience

16  for the ESS manual are staff?

17      A    Yes.

18      Q    It wasn't written with the public in mind?

19      A    No.

20           MS. LUKIS:  Objection to form.  You can

21      answer.

22  BY MS. GRUSIN:

23      Q    Do you know if the notices of case action link

24  to the ESS manual?

25      A    No, they do not.

```
 1       Q     Do you know how long the ESS manual is?

 2       A     No.  I haven't printed it off since it went

 3    online.

 4       Q     Any rough estimate?

 5       A     No.

 6       Q     I mean, is it more than 50 pages?

 7       A     Yes.

 8       Q     More than 100?

 9       A     I would say yes, but that is because it

10    includes all of our programs.

11       Q     And when you say programs, what do you mean?

12       A     So food assistance, refugee assistance,

13    Family-related Medicaid, SSI-related Medicaid.

14       Q     Do you know if the ESS manual is text

15    searchable?

16       A     Like if you just did a search in the document,

17    yes.

18       Q     Can you search the whole thing at once?

19       A     Yes, I believe so.

20       Q     Do you know if the ESS manual is available in

21    a mobile-friendly format?

22       A     No, I don't know that.

23       Q     You don't know one way or the other?

24       A     No, I don't.

25       Q     When I was looking at it -- and I can find the
```

```
 1    website again.  When I was looking at it, it looked like
 2    you had to download different sections and look at each
 3    second individually.  Is that right, or is there a way
 4    to download the whole thing at once?
 5         A    I don't know.  I mean, normally when I'm
 6    looking at it, I guess it's displayed differently on the
 7    intranet instead of the internet.
 8         Q    The intranet, that's a website that's
 9    available for DCF staff only?
10         A    Yes.
11         Q    And that's typically where you access the ESS
12    manual?
13         A    Yes.
14         Q    And you're familiar with the version of it
15    that's on that website; right?
16         A    Yes.
17         Q    Do you know if the ESS manual has ever been
18    evaluated for readability?
19         A    I don't know.  I would think it hasn't because
20    it's developed for staff and not for like, you know, a
21    seventh grade reading level.
22         Q    So you don't know what grade level it reads
23    at?
24         A    No, I don't.
25         Q    And similar question, has it undergone any
```

1  plain language analysis?

2      A    I would definitely say no just because there's

3  a lot of, you know, acronyms and things like that that

4  are in there.

5      Q    So I have a 2-year-old daughter.  If I wanted

6  to figure out whether she was eligible for Medicaid in

7  Florida, where in the ESS program manual would I look?

8      A    I mean, I don't have it in front of me, so I

9  can't really point to that.  But, I mean, we do have a

10 prescreening tool online that individuals can use.

11     Q    That's helpful.  I'm going to come back to the

12 prescreening tool.  I don't have this as an exhibit.  I

13 was just going to go to the website.  I take it you

14 don't have all the sections memorized?

15     A    No, I don't.

16     Q    Let me share this.  So this is at the URL

17 https://www.myflfamilies.com/services/public-assistance/

18 additional-resources-and-services/ess-program-manual.

19          Is this the ESS program policy manual that you

20 were referring to?  I'm sorry.  Did you say yes?  I'm

21 sorry.  I'm having a hard time hearing some of your

22 answer.

23     A    Yes.

24     Q    So back to my question.  I have a 2-year-old

25 daughter.  If I wanted to figure out if she was eligible

```
 1   for Medicaid in Florida, where would I start?
 2         MS. LUKIS:  Objection to form.  You can
 3      answer.
 4         THE WITNESS:  So I would actually go to the
 5      appendices and look at the income limits first.
 6         (Plaintiffs' Exhibit 4 was marked.)
 7   BY MS. GRUSIN:
 8      Q   Okay.  Let's do that.  So here's the appendix.
 9   This is Appendix A-7.  I'm going to mark Appendix A-7 as
10   Exhibit 4.  I have that as a separate PDF.  Let's look
11   at that.  This is the appendix.  Can you see that?
12      A   Yes.  I mean, I can see it, but I can't read
13   it.
14      Q   I'll zoom in.  So this one has an updated
15   date.  It looks like it was updated February 3, 2023.
16   So can you explain how to read this document?
17      A   Yes.  You would go to the family size and find
18   out how many individuals are in your household.  And
19   then you would need to go to the age that you're looking
20   for under the children's section, if you're looking for
21   our daughter.
22      Q   So she's 2, so that would be in this 1 through
23   5 section; right?
24      A   Uh-huh.  And then based on the household size,
25   you would determine if you were above or over -- if you
```

1    were over or under that income limit.

2         Q    So couple of questions.  One, how do I know

3    what family size to use.

4              MS. LUKIS:  I'm going to object to form and to

5              this line of questioning being outside the scope of

6              Topic No. 16.  You can answer.

7              THE WITNESS:  So, I mean, I think you would

8              decide what is your family size.  I mean, that's

9              just like to me the first step in order to decide

10             if you need to apply or would like to apply.  So,

11             yes, there's lots of rules.

12             Again, I think that would mean you would have

13             to go through all the policies to say, okay, is

14             this person included, not included looking at the

15             IRS tax rules, that kind of thing.  But at first

16             glance, most people know what their household size

17             is.

18   BY MS. GRUSIN:

19        Q    And so I guess my question within the scope

20   within Topic No. 16 is where does DCF make publically

21   available information about how to determine what family

22   size I should use to read this chart?

23        A    I don't think there is any one clear spot that

24   says this is how you determine family size.  I'm trying

25   to remember if there's something in the fact sheet or

1  not.

2       Q    I'm going to make a note, and we can go back

3  and look at the fact sheet as well.

4            MS. LUKIS:  I'm also going to object to the

5            characterization of 16 as the information that DCF

6            makes available.  It's information that's

7            publically available that the DCF expects

8            individuals to be able to locate, which is slightly

9            different.

10           MS. GRUSIN:  That's fair.  Actually, I was

11           imagining that there -- I was starting with a

12           subset of that, which is I assume that DCF what

13           information it makes available it would expect

14           people to find.

15           And I believe we established earlier that the

16           appendix is the source that Ms. Veltkamp would

17           expect individuals to turn to to find the income.

18           That's why I'm asking questions on this topic.

19  BY MS. GRUSIN:

20      Q    But you answered that question.  This chart,

21  to your point, it doesn't direct you to a single source

22  to determine how to identify your family size; correct?

23      A    Correct.

24      Q    So I'm going to assume three because there's

25  three of us in the house.  So looking at this, does this

1    chart, it looks like it says $2,756.  Does the chart say

2    what frequency that income limit that number is?  Is

3    that monthly, bi-weekly?

4         A    Can you make that chart bigger?

5         Q    Yes.  You need to look at the bottom?

6         A    Yes.  Can you scroll up?

7         Q    Scroll up?

8         A    Yes.  No, it doesn't specifically state here

9    how often that is.

10        Q    And then is $2,756 the right number to use, or

11   do I have to do something with the disregard numbers

12   here?

13        A    It would be those numbers added together.

14        Q    So you have to add $2,756 and $145?

15        A    Yes.

16        Q    Does it say on the chart that you have to add

17   those together?

18        A    There is a note, I believe, at the bottom

19   where it talks about who's allowed to get the standard

20   disregard.

21        Q    It says children aged 6 through 18 do not

22   receive the standard disregard.  So that means that

23   children ages 1 to 5 do get the standard disregard?

24        A    Yes.  And I believe -- is there an asterisk on

25   the top of that?  No.  Okay.  I believe the note at the

```
 1   bottom is that if you meet -- if you're meeting the

 2   income limit without the standard disregard, we're

 3   supposed to determine eligibility at that level first.

 4           And then if you're over that, then we look at

 5   the additional standard disregard.  I think that's one

 6   of the -- it doesn't necessarily say it like that, but

 7   there are some comments or notes at the bottom.

 8      Q    Now, one question that I had for you about

 9   this chart is the federal -- this FPL here, that means

10   federal poverty level; right?  Sorry.  When you're

11   saying just yes, for some reason I like --

12      A    Yes.

13      Q    And then it looks like several of these are

14   calculated based on the federal poverty level; is that

15   right?

16      A    Yes.  Yes.

17      Q    And every year, the federal poverty levels are

18   updated; right?

19      A    They are.

20      Q    So for Family-related Medicaid, are the 2024

21   poverty levels in effect currently?

22      A    I would say not yet based on the dates on the

23   bottom being April 2023, so we should be getting those

24   soon.

25      Q    So you're looking at this effective date
```

1   column?

2       A    Correct.  And that's normally a --

3       Q    I'm sorry.  I'm talking over you.  I told you

4   I was bad at this.  Please finish your answer.

5       A    Yeah.  I mean, that's just we wait for the

6   guidance to come out from CMS.  And once that happens,

7   then we update it.  Normally, it's about the same time

8   every year, so that's why I would assume it's not -- we

9   haven't received it yet.

10      Q    So currently based on the this effective date

11  on Appendix A-7, that's how you're communicating that

12  we're still using the 2023 poverty levels?

13      A    Yes.

14      Q    Is there anywhere else where DCF would

15  communicate publicly about the change in income limits

16  besides this Appendix A-7?

17      A    I'm thinking they're supposed to be updating

18  -- they being our policy team should be updating the

19  fact sheet as well, but I'm not -- because I haven't

20  looked at that in a while, so I'm not sure if we've --

21      Q    Sorry.  Please finish your answer.

22      A    I'm not 100 percent sure that we refer to any

23  of the income limits specifically.

24      Q    I had a question about this MNIL column.  It

25  say see note below.  And it says the Medically Needy

1    income limit includes the appropriate standard

2    disregard.  No additional disregards should be applied

3    to establish a share of cost.  It says, formula is

4    adults plus standard disregard.

5            So let's say that I figure out that my child's

6            income is above this income limit for 1 through 5

7            and so I want to try to figure out what share of

8            cost we might have.  Can you explain how to do

9            that, based on this chart?

10   A    So we would take the income -- let me try to

11   remember how to do all these.

12           So basically what we would end up doing is

13   based on the income in your household, you would get a

14   disregard or, I guess, the MNIL.  We would subtract all

15   $486, and then that would be your share of cost.

16   Q    So we would take whatever our household's

17   total accountable income is and then subtract $486 for a

18   household of three?

19   A    Yes.

20   Q    And then I think we talked about this before.

21   Can you explain the role of the MAGI disregard column?

22   A    It's an additional disregard that is with the

23   Affordable Care Act rules that we allow or are required

24   to allow.

25   Q    Let's go back and look at the fact sheet to

1    see if we can figure out whether it says anything about

2    family size or the federal poverty level.  I'll pull up

3    Exhibit 3 again.  That's the first page.  I'll just

4    scroll through it.  If you see anything that touches on

5    either family size or the federal poverty level

6    question, just let me know, tell me where you see that?

7         A    The only area would be, again, that link for

8    the income, the appendix.

9         Q    The Appendix A-7 is really the primary source

10   of information about the income limits and the federal

11   poverty level?

12        A    Yes.

13        Q    Now, there are additional -- I think we sort

14   of alluded to this.  There are addition requirements

15   beyond income, right, that individuals have to meet in

16   order to be eligible for Medicaid; right?

17        A    Yes.

18        Q    Does DCF refer to those as technical

19   requirements?

20        A    Yes, we do.

21             (Plaintiffs' Exhibit 5 was marked.)

22   BY MS. GRUSIN:

23        Q    I wanted to ask you to look at the ESS manual

24   section describing those technical requirements.  This

25   can be Exhibit 5.  So this is Exhibit 5, technical

1    requirements.  It looks like this section alone is 60

2    pages, so I think your estimate of over 100 pages is

3    probably pretty accurate.

4            So is this a comprehensive list of all of the

5    technical requirements for Family-related Medicaid under

6    Section 1430?

7    A    Yes.

8    Q    And would it be fair to say that technical

9    requirements are basically all of the requirements,

10   except for income and assets?

11   A    I would say yes, but I know that with the IRS

12   tax rules, it's, you know, developing who is going to be

13   counted.

14   Q    And the developing who is going to be counted,

15   that would go to the family size that would determine

16   the income standard; right?

17   A    Yes.

18   Q    There's these sort of parentheses after it.

19   It says (MFAM).  What does that refer to?

20   A    That's just family Medicaid.

21   Q    So in thinking about the ESS manual, we would

22   definitely need to look at the appendix and the

23   technical requirement section to determine someone's

24   eligibility; right?

25   A    Yes.  I mean all of those requirements would

1    need to be met -- or not all of them -- if you're

2    pregnant versus -- those are some of the technical

3    factors that have to be reviewed in order to see if you

4    meet those requirements.

5         Q    Now, you mentioned administrative rules and

6    State and federal laws.  Let me start with

7    administrative rules.  Do you know what the sites are in

8    the administrative rules that contain the Medicaid

9    eligibility requirements?

10        A    No, not off the top of my head.  I know our

11   rule is 65-A.  But as far as the one specific to

12   Medicaid, no.

13        Q    That's helpful.  Do you see a link to those

14   administrative rules from its website anywhere?

15        A    No.  Well, I'm going to say I'm not 100

16   percent sure, but I do not believe they do.

17        Q    And then the State and federal laws, similar

18   questions.  Do you know roughly the sites that lay out

19   the eligibility requirements; let's start with State

20   law?

21        A    Not specifically.  I mean, there's rules that

22   are, I guess, governed in the State law that I'm not

23   sure what chapter it is.

24        Q    And are those linked in DCF's website

25   anywhere?

 1       A    No.

 2       Q    Sometimes a citation does appear in a notice

 3  of case action; right?

 4       A    Yes.

 5       Q    Other than that placeholder for a citation, is

 6  there anywhere else where DCF communicates which

 7  administrative rule, State or federal law might apply in

 8  a given case?

 9       A    Not that I'm aware of.

10       Q    Does DCF have an opinion about whether the

11  administrative rules are written in plain language?

12       A    I don't have an opinion.

13       Q    We've been going for about an hour.  We can

14  take a little break.

15            (Recess 9:53 a.m. until 10:01 a.m.)

16  BY MS. GRUSIN:

17       Q    So I want to talk about several different

18  sources of information that contain the eligibility

19  requirements for Medicaid in Florida.

20            My question is which of those does DCF expect

21  Medicaid enrollees to be able to locate?

22            MS. LUKIS:  I'm going to object to this

23        question for the same grounds that are articulated

24        in some of our conferral correspondence, to the

25        extent that it asks for litigation position or

 1          anything that comes from a privileged

 2          communication.

 3               But otherwise, you can answer the question.

 4               THE WITNESS:  Can you repeat the question,

 5          please?

 6     BY MS. GRUSIN:

 7          Q    Of the sources of information about Medicaid

 8     eligibility that we have talked about, which of those

 9     does DCF expect Medicaid enrollees to locate?

10          A    I don't think I -- I don't expect them to, you

11     know -- the information is available, right, and so they

12     can go and find it.  It's out there and available.  But

13     the expectation that I'm going to assume every person is

14     going to go and look for it, I don't have that

15     expectation.

16          Q    Now, in talking through what information is

17     available, I notice that you didn't mention the call

18     center.  And so my question is does DCF make general

19     Medicaid eligibility information available through the

20     call center?

21          A    Yes.

22          Q    Does DCF expect the call center to be a

23     primary source of information about general Medicaid

24     eligibility requirements?

25          A    No, I don't expect them to be the primary.

1      Q     Why not?

2      A     Because there is other information available,

3   and they can look at it at their own leisure.  You know,

4   they can -- the policy manual is out there, the

5   appendix, the screening tool, all that information is

6   there.

7      Q     So what information does DCF expect the call

8   center could provide?

9      A     So there is -- there were scripts developed

10  that will assist with basic questions.  They had FAQ's

11  they could rely on to answer the questions.  They are

12  not eligibility specialists.  They are call center

13  agents, so they're not going to be able to get into a

14  budget and that kind of information.

15     Q     Couple of things.  You said they're not able

16  to get into a budget.  What does that mean?

17     A     So just when we were talking earlier about how

18  do we determine eligibility and into the details that

19  you were asking, the call center agent would only be

20  able to relay information, case notes and stuff that

21  were provided if it's case specific, but they could give

22  general information how to apply, what to expect, time

23  frames.  That kind of information could be answered by a

24  call center agent.

25     Q     When you said they couldn't give you a budget

```
 1    or that kind of information, that would include like how
 2    to calculate family size.  That would be the kind of
 3    thing that would be sort of beyond the call center?
 4        A    It depends.  Like we have what we call our
 5    tier 2 call center agents where they do have that full
 6    level of training would be routed to a tier 3 who would
 7    be able to answer more of the specific questions, but
 8    those are limited in numbers.  So, you know, if someone
 9    was requesting additional information, we could transfer
10    them.
11        Q    To a tier 3?
12        A    Correct.
13        Q    And then I've seen this reference to
14    Lighthouse.  Is that one of the tiers?
15        A    So they are a vendor, and they are tier 2s.
16    They answer basic questions about Medicaid.  And if they
17    can't answer the question, then they can transfer them
18    to the tier 3.
19        Q    And so if Lighthouse is tier 2, who is tier 1?
20        A    That has kind of gone away.
21        Q    So would you expect Lighthouse or a tier 2
22    person to be able to sort of walk through that Appendix
23    A-7 we were walking through?
24             MS. LUKIS:  Object to form.
25             THE WITNESS:  I think they could reference it,
```

1          and they could at a high level basically tell, you

2          know, how you can gauge if you were to be

3          potentially eligible.  This would be the first step

4          I think that they could refer to, yes.

5     BY MS. GRUSIN:

6          Q    Would they be able to explain how countable

7     income is calculated?

8          A    Say that again.

9          Q    Would they be able to explain to somebody how

10    countable income is calculated?

11         A    No.

12         Q    So other than the sources of information that

13    we talked about which DCF makes available, does DCF

14    expect Medicaid enrollees to find any other sources of

15    information about Medicaid eligibility that are publicly

16    available?

17         A    Again, just what's on our internet and going

18    back to the policy manual and the appendix.

19         Q    Has DCF ever researched whether there are

20    additional sources of information regarding Medicaid

21    eligibility in Florida from sources other than DCF?

22         A    Are you like going and doing Google searches

23    to see if other individuals -- I mean, I don't believe

24    we're actively doing that.  Sometimes we get information

25    or we come across news articles that information may not

1   be accurate.

2          And so at that point, we reach out to our

3   communications team to, you know, fix any issues that we

4   see that may be giving individuals incorrect

5   information.

6      Q   So can you just give me an example of what you

7   just described?

8      A   So sometimes we have -- we'll see a news

9   article, and it will for some reason, let's say, they

10  had the wrong income limits for a household four.  We go

11  and check and make sure that any information that is

12  being published out there that it is accurate.

13         If it was inaccurate, we would have our

14  communications team reach out to that source to fix or

15  correct the issue.

16     Q   So it sounds like DCF is aware that sometimes

17  there's Medicaid eligibility information distributed in

18  newspapers; right?

19     A   Yes.  I mean, yes, there's things out there

20  that healthcare.gov publishes as well.  I mean, there's,

21  you know, you see commercials on TV, other things,

22  sources.  So, yes, there is other entities that are

23  displaying information.

24     Q   But DCF doesn't do a comprehensive review of

25  all of those sources to determine their accuracy; right?

1        A      I don't believe theres any way that we could

2    capture everything that's out there on social media.

3        Q      But when something inaccurate does come to

4    your attention, you attempt to get it corrected; is that

5    fair?

6        A      Yes.  Yes.

7        Q      Does DCF ever direct Medicaid enrollees to

8    publically-available information about Medicaid

9    eligibility from sources other than DCF's own sources?

10       A      No.

11       Q      Does DCF make public any explanation or

12   definition of the reason codes that are used in the

13   notices?

14       A      No, I don't believe so.

15       Q      Do you know whether a sort of public

16   explanation of the reason codes is currently being

17   developed?

18       A      For all the reason codes?

19       Q      Or any of the reason codes?

20       A      Not at this time.

21       Q      Is DCF aware of any publicly-available

22   explanations of the reason codes from a source, other

23   than DCF?

24       A      Can you ask that one more time?

25       Q      Is DCF aware of any publicly-available

 1    explanation of the reason codes from a source, other

 2    than DCF?

 3         A    I'm not, no.

 4         Q    Other than the Appendix A-7 that we looked at,

 5    does DCF make publicly-available an explanation of how

 6    the Medically Needy share of cost is calculated?

 7         A    Yes.  There is a Medically Needy brochure out

 8    there.

 9         Q    Anything else?

10         A    No.

11              (Plaintiffs' Exhibit 6 was marked.)

12    BY MS. GRUSIN:

13         Q    Let's make Exhibit 6 the Medically Needy

14    brochure.  Is this the Medically Needy brochure you were

15    referencing?

16         A    Yes.

17         Q    This one does have a date.  It says July 2015.

18    To your knowledge, is that the most recent version?

19         A    Yes.

20         Q    Can you show me -- I'll scroll to the second

21    page in a second.  But can you show me where in here it

22    explains how the Medically Needy share of cost is

23    calculated?

24         A    Can you make that bigger, please?

25         Q    Absolutely.  Is that better?

```
 1        A     Yes.  It doesn't discuss how they budgeted it
 2   or came up with it.  It's more explaining to them how to
 3   use the program and what the program covers.
 4        Q     I just wanted to scroll down to the bottom to
 5   make sure you saw everything.  Same answer?
 6        A     Yes.
 7        Q     Somebody else referenced a Medically Needy
 8   budget sheet that case processors use.  Are you familiar
 9   with that?
10        A     No, I'm not.
11        Q     And so you don't know whether or not the
12   budget sheet is publicly available?
13        A     No, I don't know.
14        Q     You mentioned the prescreening tool.  Where is
15   that located?
16        A     It's on the internet.
17        Q     The internet, not the intra?
18        A     It's probably on both, but it is on the
19   internet, yes.
20        Q     Do you know where?
21        A     I don't.
22        Q     I admit that during the break, I Googled
23   prescreening tool.  I had trouble finding it.  Do you
24   know if it's a link from DCF's website?
25        A     It should be.  I mean, that's where it's
```

1    always been housed.

2         Q    I'm going to ask you if you can help me find

3    it.  This is the DCF Florida home page.  Can you see

4    that?

5         A    Yes.

6         Q    So where should we go to try to locate this?

7         A    Scroll down.  Where it says under public

8    assistance, view more resources.  Can you look at start

9    my application.

10        Q    Here?

11        A    Yes.  See if you qualify, right there.

12        Q    Okay.  So if we do am I eligible -- okay.

13   That's helpful.  I'll stop sharing but leave that open.

14   So we got it on the website.  Does DCF publicize the

15   availability of that tool in any way?

16        A    It's been on out there for a while, so I'm not

17   sure if there is anything new.  Even in our old system,

18   our old customer portal, it's been out there.  So the

19   tool's been out there.  I don't know if there is

20   anything recent I would say that we've done to publicize

21   it.

22             (Plaintiffs' Exhibit 7 was marked.)

23   BY MS. GRUSIN:

24        Q    I'm going to print to PDF and mark "Am I

25   Eligible" as Exhibit 7.  I would like to turn to Topic

1    No. 7 at the moment, the meaning and intended use of the

2    reason codes.

3            The first question is, is there any single

4    document with an explanation of each reason code and

5    when they should or shouldn't be used?

6    A    I don't think there is a document that speaks

7    to every reason code.  I know we have trainings and

8    policies that may address a handful of them.  But for

9    the most part, there's a list of reason codes that the

10   staff can select from that list.  And there's common

11   ones, that kind of thing.  There are, you know, more

12   common ones that we use day in and day out.

13   Q    So is it fair to say that the instructions

14   about when to use the reason codes are distributed

15   across policy transmittals, trainings, et cetera?

16   A    Yes, on some, not all.

17   Q    And so I think is what you're saying that not

18   every reason code has training or a policy transmittal

19   about its use?

20   A    Correct.

21   Q    But to the extent that such training and

22   policy transmittals does exist, it's distributed in

23   multiple places, rather than located in one single

24   document?

25   A    I mean, there might be times where a memo has

1    been -- a transmittal has been completed, and there may

2    not necessarily be a training document to go along with

3    it.

4        Q    So in general, when there's is a policy

5    transmittal, there's a training that goes with it?

6        A    I would say there is something, whether it's a

7    postcard.  Depending on the difficulty of what's

8    changing, then it will depend upon what happens.

9        Q    What I'm trying to ask is those policy

10   transmittals and trainings and postcards, are those all

11   compiled in a single place?

12       A    The transmittals are located in our knowledge

13   bank, which is a repository of information for our staff

14   to use.  And the trainings are -- they have all been

15   moved to MyFLLearn platform, which is where staff can go

16   to do the trainings.

17       Q    And so I guess if I'm a case processor and I

18   have a question, is there any training about X, this

19   particular reason code?  Would I be able to go and find

20   all the existing either policy transmittals or trainings

21   about that particular reason code?

22       A    I don't know if they're -- like usually the

23   reason codes are associated when there's transmittals

24   which drive the trainings are around a certain topic or

25   something that's happened, not necessarily it's a reason

1   code issue and that we're doing a transmittal specific

2   to reason codes.

3        Q    So it would be more organized by the topic, so

4   postpartum and continuous coverage would be the topic,

5   for instance, rather than organized by reason code?

6        A    Yes.

7        Q    I'm going to ask you about just the meaning

8   and intended use of some particular reason codes.  So

9   there's a reason code that says you are receiving the

10  same type of assistance from another program.  What does

11  that reason code mean?

12       A    Well, that would mean that you are already

13  receiving that benefit, and that can be used, I believe,

14  in any of our programs.  It's not just specific to

15  Medicaid.  And so you're basically saying you're already

16  receiving, and we're moving you to a different program.

17       Q    So what does -- because you were saying the

18  same type of assistance, what does type of assistance

19  mean?

20       A    That you're already receiving whether it's

21  you're already on food stamps, you're already on cash

22  assistance for that particular month.  And so our system

23  prevents duplication.  So if you're already receiving it

24  for that particular month, then we're saying you can't

25  receive it again.  We're putting you in a different

1   group.

2        Q    And within the context of Medicaid, what would

3   type of assistance mean?

4        A    That you were in one Medicaid type, and we're

5   moving you to another Medicaid type.

6        Q    And then when you say type, can you just give

7   me an example of what you mean by type?

8        A    It could be any -- it's like it could be your

9   family planning.  It could be your Medically Needy.  It

10  could also be just another category of Medicaid just

11  because our system has a lot of categories like you're

12  changing from infant Medicaid to now child Medicaid.

13  And so the system requires us to close one to open

14  another one.

15       Q    So you mentioned moving infant to child, that

16  could be covered by this reason code?

17       A    Yes.  Yes.

18       Q    Do you know the number that is associated with

19  that language, you are receiving the same type of

20  assistance from another program?

21       A    I believe it's 249.

22       Q    It's just sometimes easier to refer to it by

23  number in the deposition.  So could using code 249 cover

24  a move from full Medicaid to Medically Needy?

25       A    Yes.

1        Q     Could it cover a move from full Medicaid to
2    family planning?
3        A     Yes.
4        Q     Could it cover a move from full Medicaid to
5    emergency Medicaid?
6        A     Probably not.
7        Q     Why not?
8        A     Well, emergency Medicaid is for non-citizens.
9    And so the likeliness that they're on full Medicaid to
10   begin with is it's just not a scenario.
11       Q     Florida covers lawfully-residing children,
12   right, under that CHIP option?
13       A     Yes.
14       Q     So if there was a child who was in a
15   lawfully-residing status and then their immigration
16   status changed to be a not-lawfully-residing status,
17   would they move from full Medicaid to emergency
18   Medicaid?
19       A     If they had a qualifying that would put them
20   in there, then, yes, that scenario would be possible
21   with the children, yes.
22       Q     And so in that scenario, could reason code 249
23   be used to communicate the shift from full Medicaid to
24   emergency Medicaid?
25       A     (Nods head up and down.)

```
 1        Q    Sorry.  You said yes?

 2        A    Yes.  Sorry.

 3        Q    It's not you.  It's Zoom.  And what about full

 4   Medicaid to CHIP coverage or Florida Healthy Kids?

 5        A    No.  There's another reason code that we use

 6   to refer them.

 7        Q    So 249 is not supposed to be communicating a

 8   shift from full Medicaid to Florida Healthy Kids?

 9        A    Correct.

10        Q    Does DCF policy currently allow reason code

11   249 to be used alone?

12        A    Yes, it does.  We encourage to use other ones,

13   but it can be used by itself.

14        Q    Are there any plans to change that?

15        A    We are looking at some other usages of 249 to

16   see if there's -- we haven't approved anything to move

17   forward, but I know we're looking at the 249.  I just

18   can't recall exactly what we're planning on doing with

19   that.

20        Q    And what do you mean we're looking at it?

21        A    So 249, we know that we don't want staff to

22   use it by itself, and so we would like to -- it's also a

23   system-generated code, and so that's another thing that

24   we are researching to see how we can make sure that our

25   system is not using it by itself as well when they're
```

1    moving from one category to another.

2        Q    And I think you just said you don't want staff

3    to use it by itself.  Did I hear that?

4        A    No.  You did, yes.

5        Q    I did hear that?

6        A    Yes.

7        Q    So why don't you want staff to use it by

8    itself?

9        A    So we have done -- the policy team had done

10   some research based on some news articles, things that

11   have been in the media, to see why customers were, you

12   know, getting into the news clips, that kind of thing,

13   why are they calling the call center, to see how could

14   we do things better.

15            And their analysis showed that we needed to

16   use additional reason codes with the 249 so that, you

17   know, we could tell customers what's going on with their

18   cases.

19       Q    What was happening when 249 was being used

20   alone?

21            MS. LUKIS:  Object to form.  You can answer.

22            THE WITNESS:  Well, again, it wasn't -- you

23       know, there would be news articles.  You know,

24       people would be complaining that they didn't

25       understand, and they would be calling the call

1         center to get additional information.

2     BY MS. GRUSIN:

3         Q    When was that policy team review that you're

4     referencing?

5         A    I believe they did it in June of 2023.

6         Q    So that was in June of 2023, but there haven't

7     been any changes since that time in how 249 is used?

8         A    We did update the verbiage on those reason

9     codes.  I don't have it exactly.  I don't have it in

10    front of me.  But basically telling them that they could

11    be going into another coverage group, including

12    Medically Needy and referencing them to their check your

13    account.

14        Q    So it's my understanding that this one now

15    reads, you are receiving the same type of assistance

16    from another program.  You or a household member already

17    qualify for this requested benefit in another case or

18    another category.  Examples, receiving TCA or SNAP in a

19    different case.  Medicaid eligibility continues in

20    another category.

21             That's the new language?

22        A    Yes.

23        Q    Would it help to look at a document that

24    listed the language?

25        A    I mean, I know that's -- I mean, it sounds

1   what it -- yes.  I don't have it verbatim, but yes.

2        Q    Well, if you need to look at it, just let me

3   know.  So you said that that changed in language sort of

4   stemmed from the June 2023 review?

5        A    Yes.  I mean, there was a -- we also -- so the

6   analysis that was done in June was to give guidance to

7   our staff, first and foremost, and then taking it a step

8   further to modify the language to be clearer.

9        Q    Who decided on the new language?

10       A    It was a combination from my counterpart who

11  was the deputy assistant secretary for programs and

12  policy and then with our leadership.

13       Q    And can you just state the names and who those

14  people are?

15       A    Yes.  So Tera Bivens.  She is the other deputy

16  and then coordinating with Casey Penn.

17       Q    Anyone else?

18       A    I think those were the two main decision

19  makers.

20       Q    Was any readability testing done on the new

21  language?

22       A    No.

23       Q    Was any plain language analysis done on the

24  new language?

25       A    No.

```
 1      Q    When DCF changed the text of the reason code,
 2  did it intend to change how the reason code was used?
 3      A    No.
 4      Q    So it's still supposed to be used in all the
 5  circumstances you listed previously?
 6      A    Yes.
 7      Q    So a shift from one full Medicaid coverage to
 8  another full Medicaid coverage?
 9      A    Yes.
10      Q    Or a shift from full Medicaid to Medically
11  Needy?
12      A    Yes.
13      Q    Or a shift from full Medicaid to Family
14  Planning?
15      A    Yes.
16      Q    So if you were receiving the same type of
17  assistance from another program, do you agree that -- so
18  is it DCF's position that Medicaid and Medically Needy
19  provide the same type of assistance?
20      A    No.
21      Q    Is it DCF's position that full Medicaid and
22  Family Planning provide the same type of assistance?
23      A    No.
24      Q    Is it DCF's position that full Medicaid and
25  Emergency Medicaid provide the same type of assistance?
```

```
 1      A    Yes.
 2      Q    Sorry.  DCF thinks that full Medicaid and
 3  Emergency Medicaid for non-citizens provides the same
 4  type of assistance?
 5      A    Yes.
 6      Q    In what way is that the same?
 7      A    Well, I mean, it's Medicaid coverage.  It's
 8  just that the rules in order to be eligible are
 9  different.  You have to be -- you know, if you are a
10  non-citizen, you have to have a qualifying emergency and
11  meet the income limits and the technical requirements in
12  order to be eligible.
13           Let me rephrase.  I just thought about that.
14  So basically, it's covering the emergency, so yes.
15      Q    So under Emergency Medicaid, you couldn't get
16  prenatal care; right?
17      A    Yes.
18      Q    Let me ask my question again.  So is it DCF's
19  position that full Medicaid coverage, let's say,
20  pregnancy Medicaid and Emergency Medicaid coverage are
21  the same type of assistance?
22      A    No.  But I guess the way I interpret that is
23  that Medicaid will cover the emergency.
24      Q    And I think you said that full Medicaid and
25  Family Planning were not the same type of assistance.
```

1    Did I hear that correctly?

2         A    Yes.

3         Q    Why are those not the same type of assistance?

4         A    The Family Planning only covers specific

5    things related to family planning, contraceptives, that

6    kind of thing.  It is not a like you can walk into the

7    doctor's office for a cold.  It's different.

8         Q    Same question about full Medicaid and

9    Medically Needy.  Those I think you said are not the

10   same type of assistance?

11        A    They're not until you meet your share of cost.

12   If you meet your share of cost, then you will get the

13   Medicaid services.

14        Q    So they're different in that one has a share

15   of cost and one doesn't?

16        A    Correct.

17        Q    So if DCF thinks that full Medicaid and

18   Medically Needy are not the same type of assistance, why

19   would it permit a reason code that says you are

20   receiving the same type of assistance from another

21   program to be used when someone is moving from one to

22   the another?

23        A    Because it's another coverage group.

24        Q    And I think that you mentioned that you had

25   concerns about how this code was being used because it

1   was being used alone.  Is that an accurate

2   representation of your testimony?

3        A    I would like to say that I know we've done

4   some -- I say we.  I know there was a public records

5   request where we pulled the reason codes.

6   Unfortunately, they could not tell me if the reason

7   codes were used in conjunction with another reason code

8   or not.

9            When we did the case reviews trying to -- you

10  know, based on the news clips, media articles and stuff,

11  then it did reveal that in some instances, it was being

12  used by itself.

13           And so in order to reduce call center and

14  trying to give the best information to our customers,

15  we, you know, put out some guidance to use -- not use it

16  or use in another code with it.

17       Q    You said that you conducted some case reviews.

18  How many case reviews were conducted?

19       A    I wasn't able to get a final count number on

20  that.

21       Q    Are we talking dozens?  Are we talking

22  hundreds?

23       A    I don't know.

24       Q    You can't say whether it was 5 or 100?

25       A    I mean, I can tell you what they told me, and

```
 1   they said a lot.  I can't give a numerical value to
 2   that.
 3        Q    I'd like to ask you about another reason code.
 4   There's a reason code that says eligibility requirements
 5   not met.  What does that reason code mean?
 6        A    It would mean that you don't meet the
 7   technical factors.
 8        Q    And when you specify technical factors, what
 9   do you mean?
10        A    It could be that you don't have a child in
11   your house to drive your eligibility.  You don't meet
12   residency, citizenship.  It could be any of those
13   technical factors.  You're not disabled.
14        Q    I didn't mean to cut you off.
15        A    That's okay.
16        Q    Is there anything else?
17        A    No.
18        Q    Is it your understanding that the reason code
19   eligibility requirement is not met is used exclusively
20   to refer to the technical factors as opposed to say
21   income and assets?
22        A    I couldn't say that 100 percent, no.
23        Q    So you don't know whether the reason code
24   eligibility requirements not met might also be used to
25   communicate that someone was over income?
```

1     A    It could, yes.

2     Q    It could.  Okay.  And when that reason code is

3   used, eligibility requirements not met, how can an

4   individual determine which of the eligibility

5   requirements they didn't meet?

6     A    I'm trying to see if there's anything in their

7   account.  I don't think they would be able to without

8   call center or speaking to a worker.

9     Q    You said they could call the call center or

10  speak to a worker.  What's another way they could speak

11  to a worker, besides calling the call center?

12    A    So depending upon what cases they've applied

13  for.  But if they needed an interview, the caseworker's

14  number might be on the notice.

15    Q    Are interviews ever required for Medicaid

16  eligibility?

17    A    Usually only for the disability

18  determinations.  We have to gather more information.  If

19  things are questionable or if the application really

20  isn't clear, then we need to have a contact with them.

21    Q    So for Family-related Medicaid, there wouldn't

22  be an review requirement?

23    A    It's less likely.  I'm not going to say it

24  won't happen or never happens, but it's less likely.

25    Q    Does DCF policy allow this reason code,

1   eligibility requirements not met to be used alone?

2       A    I believe the system does allow it to be used

3   alone, yes.

4       Q    And do you know if this is a system-generated

5   or case processor generated code?

6       A    I believe it's case processer generated.

7       Q    Was this one of the reason codes that was

8   identified in the June 2023 review?

9       A    I don't recall if that one was or not.

10      Q    Do you know what number is associated with the

11  language eligibility requirements not met?

12      A    I want to say 350, but I'm not 100 percent

13  sure.

14      Q    I have in my notes that it's 290.  So if we

15  look at the TSRC table, would that help us figure it

16  out?

17      A    Yes.

18      Q    You're familiar with the TSRC table?

19      A    Yes.

20           (Plaintiffs' Exhibit 8 was marked.)

21  BY MS. GRUSIN:

22      Q    We'll mark this Exhibit 8.  Do you see that?

23      A    Yes.

24      Q    So there's two tabs here.  Do you understand

25  the difference between the two tabs?

1      A     I think I do, yeah.  One is probably what is

2   in our eligibility system, and then the other one is

3   actually what gets populated on the client notice.

4      Q     And so the one that says access-client

5   notices, that's the one that would be populated on the

6   client notice?

7      A     Yes.

8      Q     And the one that says FLODS-TSRC, that's the

9   eligibility system?

10     A     Yes.

11     Q     The language that appears on the FLODS tab

12  doesn't appear on the notices itself?

13     A     I mean, they could be exactly the same.

14     Q     So let's look at you said 350 was your guess?

15     A     Yes.

16     Q     And we are looking for eligibility

17  requirements not me.  So here it looks like 350 says, an

18  individual is in the same case but a different category,

19  so that's not it; right?

20     A     No.

21     Q     Let's try my notes which say 290.  So this one

22  says eligibility requirements not met, you do not or no

23  longer qualify for this benefit due to income and/or a

24  change in your household circumstances.

25            So was this actually one of the ones that was

1    recently changed, updated?

2         A    Yes, I believe so.

3         Q    In December of 2023?

4         A    Yes.

5         Q    So let's talk about this new language.  So it

6    says, you do not or no longer qualify for this benefit

7    due to income and/or change in your household

8    circumstances.  So I guess that clarifies that it can be

9    used to say that you're over income; right?

10        A    Yes.

11        Q    And when it says household circumstances, is

12   that a reference to the other technical factors you were

13   referring to previously?

14        A    It could be those.  It could also be, again,

15   like let's say your last child had turned 18 or someone

16   moved out of the home and you're no longer eligible with

17   those kind of household circumstances.

18        Q    And so the only way that someone, even with

19   this new language, can figure out which of the household

20   circumstances or which eligibility requirement isn't met

21   is to either call the call center or perhaps their

22   caseworker, if there's a phone number, for an interview;

23   is that right?

24        A    I mean, I'll say yes.  But I do believe that

25   if an individual has reported a change, then they should

1   be aware of their circumstances.

2        Q    So are you saying that this code is only

3   supposed to be used following a reported change?

4        A    No, I'm not saying that.

5        Q    So could it be used during an annual

6   redetermination?

7        A    It could.

8        Q    Could it be used in a denial of an initial

9   application?

10       A    I mean, it can be used.  I mean, it's

11  available for staff to use, so I'm not going to say it

12  can't be.

13       Q    So is it DCF's position that because it says

14  you no longer qualify due to income and/or a change in

15  your household circumstances that the individual should

16  be aware of which circumstances changed?

17       A    No, I'm not going to say that.

18       Q    Why not?

19       A    I mean, it's just there's information trying

20  to refer back to what they either reported on an

21  application or a change in their household.  That's when

22  they should be using it.  And I say they, being our

23  eligibility specialists.  But they -- I mean, they can

24  use it at any time.

25       Q    Does DCF policy allow this code to be used

    1   alone?

    2       A    Yes, I believe so.

    3       Q    Are there any plans to change that?

    4       A    I'm sorry.  What was that?

    5       Q    Sorry.  Are there any plans to change that?

    6       A    No, we have not talked about changing this

    7   one.

    8       Q    The new language, did that undergo any

    9   readability testing?

   10       A    No.

   11       Q    Did it undergo any plain language analysis?

   12       A    No.

   13       Q    Is it fair to say that none of the reason

   14   codes that were changed in December of 2023 went through

   15   readability testing?

   16       A    Yes, that would be correct.

   17       Q    And none of the reason codes that were changed

   18   in December of 2023 went through any plain language

   19   analysis?

   20       A    No, they were not.

   21       Q    And were the same individuals involved in

   22   drafting the language for all of the reason codes that

   23   were changed in December of 2023?

   24       A    Yes.

   25       Q    That will just short circuit some of the

1    questions as we go through these.

2              So did the change in text of this reason code

3    -- when DCF was changing the text of this reason code,

4    did DCF consider adding new reason codes to specify sort

5    of the different household circumstances that might be

6    included here?

7        A    Not that I'm aware of, no, we did not talk

8    about adding additional reason codes.

9        Q    Is there a reason code that says, you know,

10   your child turns 19 or moved out of the house?

11       A    Yes, I believe we have reason codes for each

12   of those.

13       Q    So why wouldn't the case processor just use

14   that reason code instead?

15       A    I can't speak to why they would use one versus

16   another.

17       Q    What would be the purpose of having sort of a

18   broad reason code like this when more specific ones

19   exist?

20       A    I mean, we only have the ability to have 999

21   reason codes.  Some of those reason codes have to be set

22   aside for other purposes, not just notices.  And I think

23   in order to identify every single situation and reason

24   for a denial is not possible.  So having something that

25   can be encompassed was built.

```
 1       Q     Why can DCF only have 999 reason codes?
 2       A     So we are dealing with almost a 40-year-old
 3  system.  When we are in our authorization screen,
 4  there's a three-digit code allowed.
 5       Q     And so because it only allows for three
 6  digits.  I got it.  Okay.
 7       A     Yes.
 8       Q     You said that the reason codes have other
 9  purposes, not just notices.  Can you explain what you
10  meant by that?
11       A     Yes.  So we have our benefit recovery office.
12  They use reason codes.  And when we do auxiliaries, we
13  have reason codes that we have to use.  So there's other
14  situations where the reason code is used in our system.
15       Q     What's an auxillary?
16       A     That's where it's used mostly in our food
17  stamps and cash assistance program where, let's say, you
18  reported a change and our system kind of thinks we're
19  months -- a month ahead and we need to give you
20  additional benefits, so we'll request additional
21  benefits be issued to your EBT card.
22       Q     And so the reason codes that are assigned for
23  use in the benefits recovery and the auxiliaries, are
24  those also going into communications sent to enrollees?
25       A     I'm not 100 percent sure how that all works on
```

1   that side.

2        Q    Are there any other purposes of the reason

3   codes within the Medicaid program that are not just

4   notices?

5        A    Ask that again, please.

6        Q    So you said there were other purposes that

7   were not just notices, and you referenced auxiliaries,

8   which seems to really most lead to SNAP and TANF.  So

9   I'm just wondering if within Medicaid the reason codes

10  are used for any other purposes besides notices?

11       A    I don't think so.

12       Q    Do you know when the reason codes were first

13  developed?

14       A    My assumption would be when we developed the

15  FLORIDA system, the eligibility system.

16       Q    And do you know when they were first developed

17  if they were developed for use in client notices?

18       A    Our system's been around -- I think we started

19  rolling it out in the early '90s.

20       Q    So do you know if their original purpose was

21  for client notices?

22       A    I don't know.

23       Q    Let's look at 350.  That one says, an

24  individual is in the same case but a different category.

25  So what does that code mean?

```
 1      A     It means that they're in a different Medicaid
 2   coverage category.
 3      Q     Does it have the same or different meaning
 4   than 249?
 5            MS. LUKIS:  You can answer.  I'm just going to
 6         note and object that this one is not highlighted on
 7         DCF 47-3.  You can answer.
 8   BY MS. GRUSIN:
 9      Q     And we can look back at 249, if you want.
10      A     No.  I'm just trying to look at 350, and I
11   don't see.
12      Q     Do you need me to zoom in?
13      A     Yes.  And I'm sorry.  What was your question
14   again?
15      Q     Does it have the same or a different meaning
16   than 249?
17      A     And what was the 249?
18      Q     Not a problem.  That was the first one we
19   talked about.  You are receiving the same type of
20   assistance from another program.
21      A     I mean, it could.  Another program, and I
22   think the other one said a category.  So, yes, it could
23   be used in that way as well.
24      Q     You referenced that one said program and one
25   said category.  What's the significance of that
```

1    distinction?

2        A    I'm not 100 percent sure.  But 249, like I

3    said before, can be used in different programs.  And I'm

4    not sure if 350 can only be used for Medicaid.  And I'm

5    thinking it is just because of the term category because

6    there are different Medicaid categories.

7        Q    So category is a term that DCF primarily uses

8    with Medicaid?

9        A    Yes.

10       Q    And program is a term that DCF uses to

11   distinguish between, say, Medicaid and SNAP and cash

12   assistance?

13       A    Yes.

14       Q    I wanted to ask you about the language, the

15   reason code that says no household members are eligible

16   for this program.  Are you familiar with that reason

17   code?

18       A    I think so.

19       Q    Do you know when that reason code should be

20   used?

21       A    When nobody is eligible?

22       Q    Would that be in the same circumstances or

23   different circumstances as 249?

24       A    What number is that one?

25       Q    I think it's 374.  You don't know the numbers

1  off of top of your head, I take it.  Is 374 one that was

2  recently updated in December of 2023?

3      A    I don't recall if this one was or wasn't.

4      Q    To the right, there is an updated date.  Does

5  that refresh your recollection?

6      A    It looks like that one was updated as well.

7      Q    So looking at 374, the new text says, no

8  household members are eligible for this program.  You do

9  not or no longer qualify for this benefit due to income

10  and/or a change in your household circumstances.

11         So same answers about readability and plain

12  language?

13      A    Yes.

14      Q    And I guess so now my question is when is 374

15  supposed to be used?

16      A    I mean, it can be used in circumstances where,

17  again, last child is leaving the household but that you

18  are no longer meeting the requirements for the program.

19      Q    And my question is how can an individual tell

20  which requirements they no longer meet?

21      A    They wouldn't be able to know.

22      Q    Does DCF allow this code to be used alone,

23  currently?

24      A    I believe so, yes.

25      Q    Are there plans to change that?

```
 1        A     We haven't talked about this one, no.

 2        Q     And then I guess the question is what is the

 3   purpose -- same question as before.  What is the purpose

 4   of having this broad reason code if there are more

 5   specific ones that say, for instance, your child moved

 6   out of the home?

 7        A     I would just have to provide the same answer

 8   as I did previous, that we're limited to the number of

 9   reason codes that we have.

10        Q     There is also a reason code that says your

11   Medicaid for this period is ending.  Do you know when

12   that reason code should be used?

13        A     That one, I believe -- is that one 520?

14        Q     I believe so.  Let's go take a look.

15              Here I've highlighted 520.  It looks like this

16   is one of the ones that was recently updated in December

17   of 2023?

18        A     Yes.  That one -- sorry.

19        Q     Please answer.

20        A     So that one is generated by the system so that

21   when somebody doesn't complete the renewal by the 15th

22   of the month, the system will auto generate that reason

23   code on the notice.

24        Q     So is this reason code always auto generated?

25        A     I believe so.  I'm not sure if it's one that's
```

1    allowable by staff to use as well.

2         Q    It says, your Medicaid for this period is

3    ending.  You or a household member's Medicaid review

4    period has expired due to failure to respond to a

5    redetermination request or has ended due to a change in

6    your household circumstances.

7              I guess my question is what is that last

8    clause supposed to mean, or has ended due to a change in

9    your household circumstances?

10        A    I'm just trying to think of what situation.

11   I'm not sure why that was added there.

12        Q    I had a question about when this reason code

13   520 is used in combination with 249.  So if someone got

14   a notice saying you are receiving the same type of

15   assistance from another program and your Medicaid for

16   this period is ending.

17             In what circumstances would someone receive

18   those two together?

19        A    I'm not aware of that happening.  If it is

20   system generated, I don't believe another code should be

21   generated with it.  I would have to -- the only other --

22   if that were to happen, I would think it would be a

23   potential error or fat finger on the worker's part.

24             (Plaintiffs' Exhibit 9 was marked.)

25

1   BY MS. GRUSIN:

2        Q    I just want to show you a notice and see if

3   looking at it in the notice gives you any additional

4   clarity.  This will be Exhibit 9.  This is a notice from

5   April 17, 2023.

6             It says, your Medicaid benefits for the

7   persons listed below end on April 30, 2023.  Reason, you

8   are receiving the same type of assistance from another

9   program.  Your Medicaid for this period is ending.

10            So first before I get into it, this one just

11  says your Medicaid for this period is ending.  Was that

12  the text of 520 before December of 2023?

13       A    Yes.

14       Q    And then you are receiving the same type of

15  assistance from another program, that was the text of

16  249 before December of 2023?

17       A    Yes.

18       Q    So here it is, 249 and 520 together.  Can you

19  discern from this what circumstances led this pair of

20  reason codes to be used together?

21       A    I can't because I didn't do the reviews of

22  these cases to see what the situation would warrant

23  using both of these reason codes.

24       Q    Can you tell just looking at this notice

25  whether this individual was losing Medicaid coverage or

1   not?

2           MS. LUKIS:  Object to form and outside the

3       scope of this topic.  You can answer.

4           THE WITNESS:  I cannot because this is just

5       the first page, and there might be additional

6       information about another category.

7   BY MS. GRUSIN:

8       Q    I'll scroll through.  I scrolled through all

9   six pages.  I can go back to any page.  So now having

10  looked at the full notice, can you tell whether this

11  individual is losing Medicaid coverage, LM in

12  particular?

13      A    Can you go up.  Yes, it would appear that the

14  Medicaid is ending.

15      Q    Earlier we said that 249 could indicate a move

16  from full Medicaid to full Medicaid; right?  So how do

17  we know that that's not the way 249 is being used in

18  this notice?

19      A    I wouldn't be able, unless I looked at the

20  circumstances in the case.

21      Q    And when you say looked at the circumstances

22  in the case, what do you mean?

23      A    Like going and reviewing the case to see what

24  actions we're taking.  Just, you know, kind of looking

25  at it from -- just right now, I don't feel that I can

1    answer without looking at the case entirely to say yes

2    or no.

3         Q    And the case entirely, would that be looking

4    in the FLORIDA system?

5         A    Yes, it would be the FLORIDA system or any of

6    the other additional systems that we would have

7    information, hard document imaging, or our case

8    management system, those things where we get our

9    applications at.

10        Q    And those systems that you're talking about,

11   those are not available to the clients?

12        A    No, they are not.

13        Q    I would like to ask about another reason code

14   that says you or a member of your household remain

15   eligible for Medicaid under a different Medicaid

16   coverage group.  Do you know what reason code number

17   that is?

18        A    Is that the 227?

19        Q    I think so.  So I want to show you the TSRC

20   table first, which is Exhibit 8.  Let's go to 227.

21             MS. LUKIS:  Why don't we take five.

22             (Recess 11:04 a.m. until 11:14 a.m.)

23   BY MS. GRUSIN:

24        Q    So I think we were talking about 227, and I

25   put up Exhibit 8, the reason code list again.  Actually,

1    what I was trying to figure out is there is a code that

2    says you or a member of your household remain eligible

3    for Medicaid under a different Medicaid coverage group.

4            And when we look at 227 on the TSRC table, it

5    says, we reviewed your case.  You are still eligible,

6    but in a different Medicaid coverage type.  In most

7    cases, your income exceeds the income limits for full

8    coverage.  Check in MyACCESS account to see if you

9    qualify for the Medically Needy program.

10           Was 227 one of the codes that was updated

11   recently in December?

12       A    Yes.

13       Q    What was the text of 227 prior to December of

14   2023?

15       A    I believe it was we reviewed your case.  You

16   are still eligible, but in a different Medicaid coverage

17   type.

18       Q    So was the text of 227 ever you or a member of

19   your household remain eligible for Medicaid under a

20   different Medicaid coverage group?

21       A    Can you say that one more time.

22       Q    Was the text of 227 ever, you or a member of

23   your household remain eligible for Medicaid under a

24   different Medicaid coverage group?

25       A    I don't know.

```
 1                 (Plaintiffs' Exhibit 10 was marked.)
 2     BY MS. GRUSIN:
 3         Q    I'm going to stop sharing Exhibit 8, and I'm
 4     going to mark something as Exhibit 10 which is
 5     defendant's amended answers to the first set of
 6     interrogatories.  I don't know if you've reviewed these.
 7     I'll share these.  This will be Exhibit 10.
 8                 And then if we go down and we look at number
 9     eight, there's a question that says, please explain the
10     meaning of the phrase a different Medicaid coverage
11     group as used in the reason code you or a member of your
12     household remain eligible for Medicaid under a different
13     medicaid coverage group.
14                 In the answer, it says DCF uses reason code
15     227 for MAGI and non-MAGI Medicaid eligibility
16     determinations.
17                 Does that clarify for you whether at one point
18     in time the reason code 227 was associated with the text
19     you or a member of your household remain eligible for
20     Medicaid under a different Medicaid coverage group?
21         A    I'm assuming it was that, if that's -- I mean,
22     can you go back to the Excel?
23         Q    Yes.  Back to Exhibit 8.
24         A    On the top it says slots TSRC, and go to 227.
25         Q    And that's all it says.  So can you tell me
```

1    whether 227 from those document whether 227 was ever

2    associated with the text you or a member of your

3    household remain eligible for Medicaid under a different

4    Medicaid coverage group?

5         A    Based on the interrogatories, I would say that

6    was the previous language before we made updates.

7              (Plaintiffs' Exhibit 11 was marked.)

8    BY MS. GRUSIN:

9         Q    Let me show you one more document and see if

10   it helps.  This will be Exhibit 11.  This has a Bates

11   stamp DCF-2046.  This is a document dated June 30, 2023.

12   It says Medicaid closure codes error prone codes.  First

13   of all, have you seen this document before?

14        A    Yes.

15        Q    Was this document created as part of that June

16   2023 you referenced earlier?

17        A    Yes.

18        Q    So here one of the codes it lists is 227, you

19   or a member of your household remain eligible for

20   Medicaid under a different Medicaid coverage group.

21   Does that clarify whether at one point in time 227 used

22   that language?

23        A    Yes.

24        Q    Between June of 2023 and December of 2023, did

25   the text of 227 change?

1      A     I'm sorry.  Repeat that.

2      Q     So I know the text of 227 was changed in

3    December of 2023; right?

4      A     Yes.

5      Q     We talked about earlier?

6      A     Yes.

7      Q     So prior to that December of 2023 change, was

8    there another change to 227?

9      A     Not that I'm aware of.

10      Q     Because earlier I thought you said that 227,

11    the text prior to the December change used the coverage

12    type language.  So do you know if immediately before the

13    December 2023 change -- let me ask this right.

14           Do you know what the language of 227 was

15    immediately before the December of 2023 change?

16      A     This should be the language here.  I was

17    using, from what I recall, that we had added a sentence.

18    I didn't realize we had changed group to type in that

19    update.

20      Q     So out of curiosity, is there a significance

21    to the change from group to type?

22      A     There isn't a significance.

23      Q     So is the phrase you or a member of your

24    household remain eligible for Medicaid under a different

25    Medicaid coverage group supposed to have the same

1  meaning as we reviewed your case, you are still eligible
2  for Medicaid but in a different Medicaid coverage type?
3       A    Yes.  And just to kind of give you some
4  history, these reason codes were developed a while ago.
5  And prior to our Affordable Care Act, we actually had
6  individuals -- all individuals were in a family group.
7            Now with the Affordable Care Act, we split it
8  up, and each individual has their own assistance group.
9  That's probably what made us do that change at the same
10 time.
11      Q    When you say that change at the same time,
12 which change and what time are you referring to?
13      A    So I guess with the December updates, we
14 updated the term group to type when we added the
15 additional sentence.
16      Q    At the time of the ACA implementation when you
17 switched from sort of household members from like family
18 cases to individual cases, did DCF go through like a
19 comprehensive review of the reason codes at that time?
20      A    I don't recall if we did or not.
21      Q    Let me ask you this.  In December of 2023 with
22 the text change to 227, was that supposed to change when
23 227 is used?
24      A    Say that again.
25      Q    Did the change in the language of 227 in

1   December of 2023 correspond to a change in the intended

2   use of reason code 227?

3       A    No.

4       Q    So 227 is supposed to be used the same way

5   before and after December of 2023?

6       A    Yes.

7       Q    So when is 227 supposed to be used?

8       A    It can be used whenever you're changing from

9   one coverage group type to another type.  And that can

10  occur whether it's from a full coverage group type to

11  another full type or if it's going to the Family

12  Planning or Medically Needy.

13      Q    And then we had talked earlier about going

14  from full to emergency Medicaid.  Could 227 also be used

15  in that circumstances?

16      A    Yes, in the same one that we discussed

17  earlier.

18      Q    And then what about full to Florida Healthy

19  Kids?

20      A    We've given instructions to not use that code.

21      Q    In that context, why not?

22      A    I just know there's a memo out there.  So no,

23  there's a -- because you're supposed to use a specific

24  code when you're going to Florida Healthy Kids and

25  getting referred over there.

1     Q    And why are you supposed to use a specific
2  code for Florida Healthy Kids?
3     A    So that it is automatically transferred to
4  Florida Healthy Kids so that they can begin their
5  process.
6     Q    So if a long reason code is used when somebody
7  is losings Medicaid eligibility, the transfer might not
8  happen; is that what you're saying?
9     A    Yes.  So we have to make sure that we're not
10 typing over any of the auto-generated codes for Florida
11 Healthy Kids.  If we want to add any additional reason
12 codes, those need to go on the second spot on our
13 authorization screen.
14    Q    Could 227 be used in the second spot when
15 somebody is being transferred to Florida Healthy Kids?
16    A    It could.
17    Q    Would that be consistent with DCF's intended
18 use of 227?
19    A    I mean, based on the description, yes.
20    Q    So how is a person supposed to figure out if
21 they're staying in full Medicaid or moving to one of
22 these other coverage types?
23    A    There's not very -- they can't tell from the
24 notice reason code.
25    Q    So is there anything they can do to figure

1   that out?

2       A    Again, they can contact a worker, call the

3   customer call center.  I didn't say this before, but

4   they could go to a local office, any number of ways.

5       Q    And then the call center is supposed to be

6   able to tell them whether they're moving from full to

7   Medically Needy, for instance?

8       A    Yes.  There should be enough information in

9   the case for them to provide that information to them.

10      Q    And when you say in the case, do you mean in

11  the FLORIDA system?

12      A    Yes, in the eligibility system.  You know, the

13  worker should have put case notes in there explaining

14  the reason.

15      Q    And so both before and after the text change

16  in December of 2023, reason code 227 can encompass

17  either moves from full Medicaid to full Medicaid or

18  moves from full Medicaid to a more limited coverage

19  type; right?

20      A    Yes.

21      Q    And the same answers about who was involved in

22  drafting a new language as before?

23      A    Yes.

24      Q    And same, 227 also didn't undergo readability

25  or plain language analysis?

1      A     It did not.

2      Q     Does DCF policy currently allow reason code

3    227 to be used alone?

4      A     Yes, it does.

5      Q     Are there any plans to change that?

6      A     Yes, there is.

7      Q     Who approved the plan to change the

8    functionality?

9      A     I guess I did.

10      Q     Why did you approve it?

11      A     We have been asked by our leadership to make

12    strides in communicating better, and so we have been

13    asked -- we're putting a limitation that the eligibility

14    workers to have to use another reason code if they use

15    the 227.

16      Q     What other reason codes should the caseworkers

17    use in addition to 227?

18      A     So we haven't defined those yet.  That's

19    something that we are looking at is what are the reasons

20    that they are currently using the 227 in identifying the

21    most appropriate reason codes that would be allowable or

22    needed like the income.

23            That's, I think, a 241 or maybe if someone

24    moved out of the household, those might be some of the

25    -- we're still working on analyzing which exactly

```
 1   additional reason codes will be used.

 2        Q    Do you have an estimate about when that change

 3   will be implemented?

 4        A    I believe we said April.

 5        Q    Of 2024?

 6        A    Yes.

 7        Q    So you're going to decide in the next couple

 8   of weeks which of the other reason codes should be

 9   paired with it?

10        A    Yes.  I'll be working with our policy unit in

11   order for them to determine what those codes are.

12        Q    Who in the policy unit will you be working

13   with?

14        A    More than likely, Julie Reed and Angela

15   Prigen.

16        Q    Are you planning to do any focus groups or

17   stakeholder feedback related to this change?

18        A    We haven't discussed that.

19        Q    Are there any circumstances where 227 would

20   apply that 249 does not apply?

21        A    I think they're pretty similar, and, you know,

22   workers may use them interchangeably.

23        Q    I'm going to ask it the other way, too, just

24   to make sure the record is clear.  Are there any

25   circumstances where 249 would apply that 227 would not
```

1    apply?  You said no?

2         A    No.

3         Q    Why have two different reason codes that

4    basically mean the same thing?

5         A    Like I said, reason codes have been around for

6    a long time.  These are not the only ones that are

7    duplicated.  We do know there are several that are

8    duplicated and trying to at some point be cleaning all

9    of this up.

10        Q    When you say at some point, we would be

11   cleaning all of this up, what do you mean?

12        A    So we are in the early stages, the first

13   couple of years of redoing our system, and part of that

14   is to do the notices and the reason codes.

15        Q    Is that the Access Modernization Project that

16   you're talking about?

17        A    Yes.

18        Q    So just because you said it, are the reason

19   codes still going to be used after the Access

20   Modernization Project is fully implemented?

21        A    I mean, we have to have reason codes to, you

22   know, generate -- you know, we don't have the intent to

23   do free format for staff because that can get a little

24   messy.  So, yes, we will be using reason codes but

25   determining, you know, what they are.

1          We had a project done I think a couple of
2    years ago in anticipation of when we would be able to
3    update our notices and our reason codes.  We had an
4    outside vendor who looked at all of our notices and our
5    reason codes.
6          That's where they identified the duplication,
7    and so we were going to use that as kind of a starting
8    point when we got to that point in the Access
9    Modernization Project.
10        Q    Who was the outside vendor that did that
11   analysis of the reason codes?
12        A    I don't have that information on me.
13        Q    When was that project completed?
14        A    I believe we did it in I want to say like
15   maybe September of 2021, possibly.
16        Q    The outside vendor wasn't Deloitte, was it?
17        A    No.
18        Q    And you say they looked at all of your
19   notices?
20        A    Yes.  We provided them in all our programs the
21   notices, and then they made I think some edits and
22   looked again at our reason codes.
23        Q    And they analyzed which reason codes were
24   duplicative?
25        A    Yes.

1    Q    Did they make any other comments on the reason
2    codes?
3    A    They did.  I haven't looked at it in a couple
4    years, so it's been a while.  But, yes, they had made
5    some recommendations to the verbiage as well.
6    Q    They made recommendations about the language
7    of specific reason codes?
8    A    Yes.
9    Q    Did DCF rely on any of those recommendations
10   in making the December 2023 reason code changes?
11   A    Not that I'm aware of.
12   Q    Why not?
13   A    I don't know.
14   Q    Do you recall whether any of the reason codes
15   that the vendor recommend be changed in 2021, whether
16   that included reason codes other than the ones that were
17   changed in December of 2023?
18   A    I'm sure it did.  You know, specifically, you
19   know, we only -- I think that we changed six reason
20   codes in December, and I'm sure that they made more
21   recommendations than those six.
22   Q    Do you know why DCF chose to only do six in
23   December of 2023 and didn't pursue changes more broadly
24   based on the recommendations from this vendor?
25   A    Well, these had also to do with the analysis

```
 1    that was done in June that these seemed to be the more
 2    problematic.  And in order to make adjustments as
 3    quickly as possible, we limited it to a handful.
 4         Q    So the December 2023 changes were sort of key
 5    to the June 2023 review?
 6         A    Yes.
 7         Q    And the vendor project was a broader set of
 8    recommendations?
 9         A    Correct.
10         Q    Did the vendor make recommendations on any of
11    the reason codes that we have talked about today?
12         A    Are you talking about the vendor we hired?
13         Q    Yes, the outside vendor that did the report in
14    2021.
15         A    Ask that one more time.
16         Q    I'm just trying to figure out did the vendor
17    -- you don't remember the name of the vendor; right?
18         A    I don't, no.  I know it wasn't Deloitte.
19         Q    Did the vendor in 2021 make recommendations
20    about the language for any of the reason codes that
21    we've talked about today?
22         A    I don't recall.
23         Q    Other than recommendations about the verbiage
24    of the reason codes, did that vendor make any other
25    recommendations about the notices?
```

```
 1        A        You mean in the notices and not the reason
 2   codes?
 3        Q        Either, really.
 4        A        I mean, they made other recommendations in the
 5   notices and stuff.
 6        Q        What kind of recommendations?
 7        A        They looked at it from verbiage.  They looked
 8   at it from, you know, appropriate reading level, those
 9   kind of things.
10        Q        Did they make a conclusion about appropriate
11   reading level?
12        A        I don't know -- I mean, they just gave us
13   mocked-up versions.  I don't know if they, you know,
14   gave me a final report and said this is the reading
15   level.
16        Q        Have any of those changes been implemented?
17        A        No, we have not implemented them.
18        Q        Why not?
19        A        Because in order to make changes to notices,
20   it's an extensive testing, and I don't know even if the
21   current software we have is appropriate.  And so it was
22   going to be part of the Access Modernization Project.
23        Q        Who from DCF was involved in interacting with
24   that outside vendor?
25        A        There was Patti Grogan.  And then we had a
```

1   couple of leads.  One was Vonsenita Tranquille.  I know

2   we had somebody else on the project, but I remember her

3   being like primary lead.

4            (Plaintiffs' Exhibit 12 was marked.)

5   BY MS. GRUSIN:

6        Q    I'm going to show you another exhibit.  This

7   will be Exhibit 12.  It's got a Bates stamp of DCF-558.

8   Can you see the exhibit?

9        A    If you can make it a little bigger.

10       Q    Is that better?

11       A    Yes.

12       Q    Do recognize this document?

13       A    Yes.

14       Q    Is this one of the policy transmittals that

15   you were referencing earlier?

16       A    Yes.

17       Q    Is it an example of the policy transmittal?

18       A    Yes.

19       Q    Are you familiar with the continuous Medicaid

20   eligibility change that's referenced or described in

21   this policy transmittal?

22       A    Yes.

23       Q    What is continuous Medicaid eligibility?

24       A    It's basically allowing 12 months of coverage

25   from the last date that eligibility was determined if

1    the individual becomes ineligible.  The individual in

2    this change was children up to age 19.  Previously, it

3    was only age 5.

4         Q    And so when somebody is continuously eligible,

5    if their income changes to go above the income limit for

6    their category, what happens?

7         A    So the system actually goes back and

8    determines the last time the eligibility was determined,

9    and it protects their Medicaid for 12 months from that

10   date.

11        Q    So within a 12-month continuous eligibility

12   period, could somebody be moved from Medicaid to

13   Medically Needy?

14        A    They could, but it would have to -- you know,

15   there's certain -- well, simple answer, yes, they could

16   if someone uses an incorrect reason code.

17        Q    But as a matter of policy, generally speaking

18   during the continuous coverage period, a child whose

19   income goes up above the full Medicaid would not be

20   moved from Medicaid to Medically Needy; right?

21        A    Correct.

22        Q    So the continuous coverage protection is

23   supposed to protect their full Medicaid coverage; right?

24        A    Yes.  And the system actually gives you an

25   alert if you try and do something.

```
 1        Q     If you try to move it and it shouldn't be
 2   moved?
 3        A     Right.
 4        Q     Now, you mentioned if somebody uses an
 5   incorrect reason code, then they might be moved sort of
 6   as an error, right, in contradiction to the policy?
 7        A     Yes.
 8        Q     What did you mean by using an incorrect reason
 9   code?
10        A     Well, I mean, there's reason codes that I
11   think they're limited on moving out of state.  So if the
12   person didn't move out of state, you know, it would
13   obviously cause issues there.  So there's certain reason
14   codes that have to be used in order to end the coverage.
15        Q     Who decided which reason codes were the right
16   ones to be used to end coverage?
17        A     I believe whenever we put the system
18   enhancement in, there were reason codes developed.  And
19   who decided who those were, I don't know.  I did try and
20   find a system memo to see if we could identify who the
21   author of that was.  It's based on what the system
22   people determined, so that's what we used.
23        Q     Did the policy office weigh in on which reason
24   codes would be appropriate to end coverage?
25        A     I don't know.  I mean if -- because the reason
```

1   codes in this memo seem to be repetitive of previous

2   memos when we talk about continuous Medicaid coverage.

3   And so going back again to the enhancement and if policy

4   was -- whoever the chief was or was in policy at that

5   time made that decision.

6       Q    So let's look at this memo.  I had a question.

7   This memo is dated December 19, 2023.  That's right at

8   the same time that the changes to those six reason codes

9   were taking place; right?

10      A    Yes.

11      Q    Were those changes to the six reason codes in

12  any way related to this policy transmittal change?

13      A    No.

14      Q    It just happened to be happening at the same

15  time?

16      A    Right.  It had to be effective January 1st.

17  And in order to do that -- again, our system is kind of

18  is a month ahead.  And so if we didn't get this out,

19  then we needed to tell staff what was going on so that

20  they were aware.

21      Q    So I wanted to look at this.  So here it says,

22  valid reasons to terminate Medicaid in the assistance

23  group authorization screen during the continuous

24  Medicaid period are limited to, and then there's four

25  bullets here.  So what does it mean to terminate

1    Medicaid on the assistance group authorization screen?

2        A    So to terminate would be to close their

3    Medicaid coverage.

4        Q    And then here it says, valid reasons to

5    change/close Medicaid on the AWAA screen during the

6    continuous Medicaid period or limited to.

7             What does change/close Medicaid on the AWAA

8    screen mean?

9        A    Well, closed would be terminated, in my

10   opinion.  Change means they're changing them from the

11   continuous Medicaid period to another coverage group.

12       Q    And through here, they list four reason codes

13   that can be used to change or close Medicaid during the

14   continuous Medicaid period; right?

15       A    Yes.

16       Q    So it's your interpretation of this policy

17   that the reason codes 227, 249, 255, or 350 could be

18   used to close Medicaid during the continuous Medicaid

19   period; right?

20       A    I don't like the term close because, I mean,

21   again, I think that's terminate, and I think that's

22   covered in the section above where this, you know, says

23   change in coverage category.

24            It doesn't say that we're closing them.  I

25   mean, the only one that would be a closure -- and

1    really, it's just a closure on our side when the person

2    says eligibility, and that's the one about the SSI

3    Medicaid.

4         Q    That's reason code 255?

5         A    Yes.

6         Q    So I wanted to ask about 227 and 249.  So

7    earlier I think you said that those could be used in a

8    circumstance where someone is moving from Medicaid to

9    Medically Needy; right?

10        A    Yes.

11        Q    But during the continuous coverage period,

12   individuals are not supposed to be moving from Medicaid

13   to Medically Needy; right?

14        A    But they -- correct.  But I mean, also I did

15   state that those codes can be used when you're moving

16   from one full Medicaid to another full Medicaid.  And so

17   like in a circumstance where this would be used would be

18   let's say the individual has had a change, and now

19   they're under the income limit.  So that might be one of

20   the reasons why that would drive us to use that 227 or

21   the 249.

22        Q    So your understanding is that even though 227

23   and 249 can apply to a switch from Medicaid to Medically

24   Needy, they're listed here because case processors would

25   know to only use them when they mean that somebody is

1    moving from one full coverage to another full coverage?

2        A    Yes.

3        Q    Is there anywhere in this memo where it makes

4    -- where it sort of says that?

5        A    No.

6        Q    And from a system perspective, does that mean

7    that -- let me say it a different way.  So you said

8    earlier that if the system actually gives you an error

9    message if you use a reason code that doesn't allow for

10   the ending of continuous coverage?

11       A    Yes.

12       Q    So when 227 or 249 is used, that error won't

13   pop up; right?

14       A    Correct, it won't.

15       Q    So the system is programmed to allow someone

16   to move from Medicaid to Medically Needy during the

17   continuous coverage period when 227 and 249 are used?

18       A    Can you repeat that.

19       Q    So the system is programmed to allow somebody

20   to move from Medicaid to Medically Needy during the

21   continuous coverage period when 227 or 249 is used?

22            MS. LUKIS:  I'm going to object to the

23            programming.  It's outside the scope, but you can

24            answer.

25            THE WITNESS:  And it's been a while since I

```
 1          saw one of these.  But I almost feel the reason we
 2          put the enhancement in is to prevent the coverage,
 3          Medically Needy coverage from building.  And so it
 4          recognizes they're in that continuous period and
 5          builds the correct category and protects it.
 6    BY MS. GRUSIN:
 7          Q    And will it build the correct category and
 8    protect it, even when reason code 227 or 249 is used?
 9          A    It should be building another pool of Medicaid
10    eligibility, if I remember correctly.
11          Q    Did DCF investigate whether that's happening?
12          A    Not that I'm aware of, but I'm not going to
13    say that it hasn't happened or that they haven't
14    investigated that.
15          Q    So let me just make sure I understand about
16    how 227 and 249 are supposed to be used.  So if I'm a
17    child in my continuous eligibility period and I'm
18    enrolled in, let's say, the 1 to 5 category.
19               My family's income increases, and I would then
20    without continuous coverage be moved to Medically Needy;
21    right?  So should the case processor in that
22    circumstance use 227?
23          A    Can you give me your scenario again?
24          Q    Yes.
25          A    Is this someone who is currently receiving
```

1    Medicaid?

2         Q    Currently receiving full-scope Medicaid, let's

3    say, in the children's 1 to 5 category.  The family's

4    income increases within the continuous coverage period

5    such that they would without continuous coverage be only

6    eligible for Medically Needy.

7              Should a case processor use 227 to close the

8    full Medicaid in that circumstance?

9         A    So what I recall is that the system will

10   continue to build the full Medicaid.

11        Q    Would you expect an individual to get a notice

12   at all in that circumstance?

13        A    We would reauthorize it.

14        Q    And so would they get a notification of case

15   action?

16        A    Yes.

17        Q    And what would you expect that notice of case

18   action to say?

19             MS. LUKIS:  Object to form.  Outside the

20        scope.  You can answer.

21             THE WITNESS:  That the child is eligible.

22   BY MS. GRUSIN:

23        Q    And would there be a reason code then in that

24   circumstances?

25             MS. LUKIS:  Same objection.

```
 1            THE WITNESS:  There will be a reason code, but
 2       I believe it's our standard.  I don't know if a
 3       reason code comes pre-populated in this situation
 4       saying that you're in a continuous period or not or
 5       if worker just uses the standard you're eligible.
 6            (Plaintiffs' Exhibit 13 was marked.)
 7  BY MS. GRUSIN:
 8       Q    I would like to look at another exhibit.  This
 9  is Exhibit 13.  It's Bates stamped DCF-341.  This is
10  another policy transmittal.  This one's from you; right?
11       A    Yes.
12       Q    This was your time as the policy chief?
13       A    Yes.
14       Q    This is discussing postpartum continuous
15  coverage; right?
16       A    Yes.
17       Q    And as a policy matter, does postpartum
18  continuous coverage operate the same way as kids
19  continuous coverage in that it protects full Medicaid
20  eligibility against changes in income that would
21  otherwise render someone ineligible?
22       A    Yes.
23       Q    And so were you involved in selecting the
24  reason codes that went into this memo?
25       A    No, I wasn't.
```

         1      Q     Who was involved in selecting the reason codes

         2    that went into this memo?

         3      A     I'm assuming systems.  I'm sure they provided

         4    these to me and I signed off on them.

         5      Q     And so here there's just one list, and it just

         6    talks about coverage being closed.  Is that more

         7    consistent with your understanding that closed and

         8    terminate mean the same thing?

         9      A     Yes, for the most part.

        10      Q     You said for the most part.  What is giving

        11    you pause?

        12      A     Well, there's obviously a couple reason codes

        13    on here that are not a termination.  Some obviously are

        14    valid reasons to terminate the Medicaid, and there are

        15    the few we have been discussing as far as they could be

        16    opened in a different coverage type.

        17      Q     When you say the few that we've been

        18    discussing, you're referring to 227, 249, and 350?

        19      A     Yes.

        20      Q     Any others?

        21      A     No.

        22      Q     And are you saying that those three codes, you

        23    said they're not for termination?

        24      A     I mean, they don't -- like everything else is

        25    more of like they're closing, you're not a resident.

1    These are, you know, reasons.  Whereas, those are not

2    necessarily we are terminating your coverage, so there

3    could be a change.  But, again, the system will build

4    the 12 months.

5         Q    Let me just make sure I understand.  So is it

6    your understanding that when 227 is populated, the

7    system will or will not keep the individual enrolled in

8    the protected postpartum coverage?

9         A    It will keep them -- so the system builds the

10   12 months based on the end of the pregnancy date and

11   will continue to build based on that date.  After that

12   12 months has passed, then we now have to close out the

13   pregnancy Medicaid and open them at a different

14   category.

15             And so in order to close out one, I have to

16   put a reason code, and these are the only reason codes

17   that we're using.

18        Q    So let me ask it a different way.  Should 227

19   be used to move somebody from Medicaid to Medically

20   Needy during the 12-month postpartum period?

21        A    Ask that one more time.  I didn't catch the

22   second part of that.

23        Q    That's okay.  Should 227 be used to move

24   somebody from Medicaid to Medically Needy during the

25   12-month postpartum period?

```
 1        A     No.

 2        Q     Should 249 be used to move somebody from

 3   Medicaid to Medically Needy during the 12-month

 4   postpartum period?

 5        A     No.

 6        Q     And then should 350 be used to move someone

 7   from Medicaid to Medically Needy during the 12-month

 8   postpartum period?

 9        A     No.

10        Q     And you don't know why these codes are listed

11   in this section of the memo, those three codes, 227,

12   249, and 350?

13        A     Well, I mean, after the 12 months is up, we

14   still have to take action on the program type in order

15   to close it.  We just can't leave it sitting there, so

16   we do have to take action.

17        Q     So is it your testimony that 227, 249, and 350

18   should only be used at the end of the 12-month

19   postpartum period?

20        A     Yes.

21              (Plaintiffs' Exhibit 14 was marked.)

22   BY MS. GRUSIN:

23        Q     I'm going to show you another document.  I

24   think we're a little bit into Topic No. 5, the sort of

25   training and policy part now at this point.  This will
```

```
1    be Exhibit 14.  It's Bates stamped DCF-2269.

2              Have you seen this document before?

3    A    Yes.

4    Q    What is this document?  It's just one page.

5    A    It's a document that was created for reason

6    codes.

7    Q    Is this one of the documents that would be in

8    the knowledge bank or in the learning portal that you

9    referenced?

10   A    I know it's not in the knowledge bank.  I

11   don't think it would be in the MyFLLearns, just based on

12   the date of this.

13   Q    Is this something that case processors would

14   have access to today?

15   A    Not that I'm aware of.

16   Q    Do you know who drafted this document?

17   A    No, I don't.

18   Q    Do you know which type of continuous Medicaid

19   eligibility it's referring to?

20   A    I would assume the continuous Medicaid

21   eligibility for children 0 to 5 and 6 to 19.  This was

22   prior to the changes that were made recently.

23   Q    And it says denial codes.  Do you have an

24   understanding of what that means?

25   A    That would be to deny the coverage in the
```

1   eligibility system.

2        Q    Does that have the same meaning as close or

3   terminate?

4        A    No.  I mean, you're denying one group.

5        Q    So can you explain what the difference is or

6   would mean to a DCF staff person?

7        A    Well, I mean, it could result in a

8   termination, but you're denying that coverage type.  I

9   mean, you could be opening something else, but you're

10  denying this particular, you know, coverage type.

11       Q    Can you explain to me the relationship between

12  denying a coverage type, terminating coverage, and

13  opening another coverage type?

14       A    So the eligibility system runs through, you

15  know, a multitude of different categories.  And if the

16  individual is open in a coverage type that they're no

17  longer eligible for, you have to take action on it.

18            You're closing, terminating that type of

19  coverage, but you could be opening them in another

20  coverage.  So I can't say that you're terminating

21  Medicaid coverage.  You're terminating that Medicaid

22  group or type.

23            (Plaintiffs' Exhibit 15 was marked.)

24  BY MS. GRUSIN:

25       Q    Let's do another exhibit.  It's going to be

1    Exhibit 15.  It's DCF-2049.  Can you see this document?

2         A    Yes.

3         Q    Who is Marissa Gimbel?

4         A    She is -- they just renamed themselves.  She

5    works for learning or workforce management, basically,

6    or training, so she's with that team who created this

7    document.

8         Q    Have you seen this document before?

9         A    Yes.

10        Q    What is this document?

11        A    This is a document that was pulled out of our

12   Medicaid unwinding training plan.

13        Q    And what was the Medicaid unwinding training

14   plan?

15        A    So basically, when we -- after the Continuing

16   Appropriations Act and it decoupled the end of the PHE,

17   we obviously had to train our staff to determine

18   eligibility using -- you know, we haven't -- it had been

19   three years.  We had new a staff who may have not even

20   been aware, so we had to basically train them on how to

21   determine eligibility and to do it correctly.

22        Q    Is part of this training down at the bottom on

23   Page No. 9 of this document, it says, following our best

24   practice tips of being accurate and specific, we should

25   avoid using the below reason codes, unless you're moving

1    the individual into a comparable category.  And then it

2    lists 227, 249, and 350.  So what is a comparable

3    category?

4         A    About the same Medicaid coverage that you

5    have.

6         Q    Is Medically Needy a comparable category to,

7    let's say, pregnancy Medicaid?

8         A    No.

9         Q    Is Family Planning Medicaid a comparable

10   category to, say, pregnancy Medicaid?

11        A    No.

12        Q    Earlier you said that 227 can be used when

13   moving somebody from Medicaid to Medically Needy; right?

14        A    Yes.

15        Q    I'm confused by this instruction.  Are case

16   processors supposed to use 227 when someone is moving

17   from Medicaid to Medically Needy or not?

18        A    They can, but the recommendation is that they

19   not.

20        Q    Why not?

21        A    Because we need to give a little bit better

22   direction.  And when you use this code and don't use

23   another code with it, then you're not providing the

24   information, enough information which will cause, you

25   know, customers to reach out to us.

 1      Q    And so that's helpful and an explanation about
 2  why you wouldn't want to use 227 alone.  So I guess my
 3  question is also is the recommendation that the case
 4  processors not use 227 to indicate a move from Medicaid
 5  to Medically Needy whether with another code or not?
 6      A    I think the reasoning is that if you can use
 7  one code to indicate what is needed, then one code is
 8  preferable.  But these have historically been codes
 9  that staff rely on and use.  And whether it's moving it
10  from full Medicaid to another full group or moving it
11  from full to Medically Needy.
12           And so sometimes your fingers do the talking,
13  and those are the codes they enter.  Again, I want to
14  say I thought we had different trainings where we told
15  them they needed to use other reason codes with these
16  codes.
17      Q    What reason code would be appropriate to use
18  when someone is moving from Medicaid to Medically Needy?
19      A    Well, that would depend upon the circumstance.
20  If we had a reason code where we could specify, then
21  that would be the best reason code to use.
22      Q    But DCF in this training is suggesting that
23  227 would not be used to communicate that someone is
24  moving from Medicaid to Medically Needy; right?
25      A    Yes, that would

1    Q    I want to go back to the text update of 227

2    that happened in December of 2023.  Do you remember we

3    talked about that earlier?

4    A    Yes.

5    Q    So the new text of 227 says, we reviewed your

6    case.  You are still eligible, but in a different

7    Medicaid coverage type.  In most cases, your income

8    exceeds the income limits for full coverage.  Check your

9    MyACCESS account to see if you qualify for the Medically

10   Needy program.

11        So I'm a little confused about now 227

12   specifically references moving from Medicaid to

13   Medically Needy; right?

14   A    What was the beginning of that sentence?

15   Q    It says, we reviewed your case.  You are still

16   eligible, but in a different Medicaid coverage type.  In

17   most cases, your income exceeds the income limit for

18   full coverage.  Check your MyACCESS account to see if

19   you qualify for the Medically Needy program.

20        And the question on the table is 227 now

21   specifically references moving from Medicaid to

22   Medically Needy; right?

23   A    It says in most cases.  And so I believe

24   after, you know, we did analysis and looked at cases,

25   that is what we found.  But it's not every situation

1    that it's over the income.

2        Q    So is this training in Exhibit 15 still

3    accurate that 227 would not be used to indicate a move

4    from Medicaid to Medically Needy, or is it now

5    appropriate to use 227 in that circumstance?

6        A    It's appropriate, but another reason code

7    needs to be used with it.

8        Q    And the other reason code needs to be used

9    with it to indicate what?

10       A    Depending upon the situation.  If it's over

11   the income, someone left the household, whatever last

12   child turns 18, whatever that situation may be.

13       Q    So to give them a more specific reason that

14   somebody is moving from Medicaid to Medically Needy?

15       A    Yes.

16       Q    So I wanted to ask you about another reason

17   code.  I think you referenced it once before.  But the

18   reason code says, your household income is too high to

19   qualify for this program.

20            Do you know what number is associated with

21   that language?

22       A    I believe it's 241.

23       Q    Is this one of the codes that there's

24   duplication?

25       A    Possibly.  I don't recall without looking at a

1    list.

2         Q    Let's start with 241.  When should 241 be

3    used?

4         A    Household income is over.

5         Q    What does program mean in that reason code,

6    your household income is too high to qualify for this

7    program?

8         A    So that reason code can be used for all the

9    programs.  And so if it's attached to food stamps, then

10   it would be referencing that particular program.

11        Q    If somebody's income was too high to qualify

12   for, let's say, the parent caretaker group but they

13   still qualify for Medically Needy, would it be

14   appropriate to use 241?

15        A    Yes, because you would be closing out one

16   group, and you would have to open or enroll in the

17   Medically Needy group.

18        Q    So in that circumstance, are Medicaid and

19   Medically Needy considered different programs?

20        A    I mean, yes, they're different programs.  I

21   mean, well, it's all -- I'll say yes.  I mean, it's not

22   Medicaid full coverage, but it is still a Medicaid, I

23   guess, type.

24        Q    Let's say someone was in the parent caretaker

25   group, their income had gone up so that they were no

1    longer eligible in the parent caretaker group, but then

2    they report they're pregnant, so they are eligible in

3    the pregnancy group, right.  Does that scenario make

4    sense because pregnancy has a higher income limit?

5         A    Yes.

6         Q    So in that circumstance where they were moving

7    from parent to pregnancy, should they get a notice of

8    case action informing them of the ending the parent

9    caretaker coverage?

10             MS. LUKIS:  Object to form.  You can answer.

11             THE WITNESS:  This is probably where some of

12        my policy people disagree that if you're moving

13        from one full coverage to another full coverage, I

14        don't think you should because our notices say

15        Medicaid.

16             It doesn't say parent caretaker and pregnancy

17        Medicaid, so they should be suppressing the notice

18        for one coverage type and opening the other one and

19        letting that notice go out.

20    BY MS. GRUSIN:

21        Q    Because they're moving from full coverage to

22    full coverage?

23        A    Yes.

24        Q    Does program in this reason code have the same

25    meaning as program in 249, you are receiving the same

1  type of assistance from another program?

2      A    Yes.

3      Q    And when the income code is used 241, is there

4  any placeholder anywhere in the notice of case action

5  that specifies the actual accountable income used?

6      A    No.

7      Q    And is there any placeholder in the notice of

8  case action that specifies the income standard used?

9      A    Not for Medicaid, I don't believe.

10     Q    You sort of hesitated and you said not for

11  Medicaid.  In other programs, is there a placeholder for

12  income standard?

13     A    I don't think there's -- so for the food

14  assistance program, I think what I recall is that based

15  on their household size, it tells them that -- and not

16  so much in the -- I'm not 100 percent sure on the

17  denial.

18          But on the approval, they have to report

19  changes if their income exceeds a certain threshold.

20  And I believe we say this is your threshold, report

21  changes at that point.

22     Q    Does it also report their household size, in

23  some circumstances on the food stamp --

24     A    It has all of the individuals listed that's in

25  there and says if they're eligible or not eligible.

1      Q    On the food stamp notices?

2      A    Yes.

3      Q    Did DCF decide against including that kind of

4  case-specific income standard information in the

5  Medicaid notices?

6      A    I'm not sure if that was option under the

7  software that we use.

8      Q    Do you know why it would be an option for food

9  stamps but not for Medicaid?

10      A    No, I don't.

11      Q    We talked a lot about different coverage

12  types, coverage groups, programs, and categories.  I'm

13  just wondering if you can help me understand the meaning

14  of those words or if they're synonyms, et cetera.  So

15  what is a coverage type?

16      A    And I know I use the terms interchangeably.

17  So to me -- and to me, they are interchangeably.  But

18  the type is the Medicaid category program that you are

19  in or, you know, whatever we're determining.  To me,

20  they're all -- I know we say programs a lot.

21           But programs, again, is more Medicaid, SNAP,

22  TANF, whichever those programs are.  And then coverage

23  categories, types, groups is more specific to the

24  Medicaid category that is building and that you're

25  eligible for.

```
 1       Q    So program is the biggest umbrella; is that
 2   fair to say?
 3       A    Yes.  I guess, yeah.
 4       Q    And then coverage type, a coverage group, or a
 5   category would be more specific?
 6       A    To the Medicaid.
 7       Q    And is coverage type, coverage group, and
 8   coverage category, are those synonyms?
 9       A    Yes.
10       Q    Are any of those terms defined in a
11   publicly-available document?
12       A    I'm not sure.
13       Q    Now, we talk about sometimes it's better to
14   use reason multiple reason codes together, right, to
15   pair reason codes?
16       A    Yes.
17       Q    And DCF policy says that that can often be
18   more specific; right?
19       A    Yes.
20       Q    So what does it mean if an individual receives
21   reason code 241 paired with reason code 249?  So they
22   get a notice that says, your household income is too
23   high to qualify for this program and you are receiving
24   the same type of assistance from another program?
25       A    To me, that would be an indication that
```

1   they're telling them they're over the income limit and

2   that they are being moved to another group, more than

3   likely in this situation, Medically Needy just because

4   they've been told that they were over the income.

5         Q    And so what is the significance of the phrase

6   same type of assistance from another program, in that

7   scenario?

8         A    That it just says same type of assistance.  It

9   doesn't have anything about another assistance group

10  or --

11        Q    Would it help to look at an example?

12        A    I was just thinking about the words.

13             (Plaintiffs' Exhibit 16 was marked.)

14  BY MS. GRUSIN:

15        Q    I'll mark this as Exhibit 16.  This was filed

16  on the docket 2-6.  This is the declaration, and the

17  notice is attached to this.  So this is the notice from

18  April 24, 2023 sent to Chianne D.  Have you looked at

19  this notice before?

20        A    No.

21        Q    There is a food assistance section, and then I

22  wanted to go to this section, which is Page No. 2 of the

23  notice.  So here under a Medicaid section, the reason

24  codes are your household income is too high to qualify

25  for this program and you are receiving the same type of

 1   assistance from another program.

 2          What is the meaning of same type of assistance

 3   in this context?

 4      A    Again, this would be moved from Medicaid to

 5   Medically Needy.

 6      Q    And earlier, I asked you if Medicaid and

 7   Medically Needy are the same type of assistance, and I

 8   believe you said no; right?

 9      A    Yes.

10      Q    I guess the question is why does DCF use a

11   reason code that says you're receiving the same type of

12   assistance from another program when somebody is, in

13   fact, not receiving the same type of assistance?

14          MS. LUKIS:  Object to form.  You can answer.

15          THE WITNESS:  It's the reason code previous

16      language outdated.  Can you scroll back up?

17   BY MS. GRUSIN:

18      Q    Yes.

19      A    Right there.  I was just wondering from our

20   reason codes above that because we switched to

21   individual assistance groups that if we're putting,

22   let's say, for person number one, we said that you're

23   over the income and person number two we said the same,

24   and it's just showing both of those reason codes.

25      Q    Are you suggesting that there's two reason

1    codes because one reason code might apply to one

2    household member and the other reason code might apply

3    to another household member?

4         A    I would have to check with our systems.  That

5    might be a possibility, just the way that I see this.

6         Q    And then I wanted to look at I think the same

7    pair of reason codes appears again later on in the

8    notice?  No, it doesn't.  Let me ask you then about this

9    section of Page No. 25.

10             So looking at this section on Page No. 25,

11   this one just says you are receiving the same type of

12   assistance from another program.  So do you know why the

13   income reason code wouldn't be repeated here?

14        A    Again, I think it goes back to the other

15   situation has four household members listed.  It might

16   be that it's reporting all the reason codes used for all

17   household members.

18        Q    So we're on Page No. 8 of the notice in the

19   Medicaid section that says your Medicaid benefits for

20   the persons listed below will end May 31, 2023.

21             There's only one reason code here and only

22   three household members; right?

23        A    Yes.

24        Q    And then you're saying that it's possible that

25   the reason there are two reason codes in the Medicaid

1    section on Page No. 2 of the notice is because the

2    additional reason code your household's income is too

3    high to qualify applies to the household member that

4    isn't listed below?

5         A    That's what I'm saying without looking at the

6    actual case and going in to see what reasons codes were

7    there is the best I can assume.

8         Q    Back down to the Medicaid section on Page No.

9    8.  This reason code, you are receiving the same type of

10   assistance from another program is one of the codes that

11   can be used to end postpartum coverage during the

12   postpartum period; correct?

13        A    Yes.

14        Q    So can you tell from this notice whether

15   Chianne D. was evaluated for postpartum coverage?

16        A    No, I can't tell from this notice.

17             MS. GRUSIN:  Well, this is actually a good

18        breaking point.

19             (Recess 12:27 p.m. until 1:17 p.m.)

20   BY MS. GRUSIN:

21        Q    I wanted to go back to the prescreening tool

22   real quick.  I have the website up.  I'm going to share

23   my screen with you.  So this is the prescreening tool

24   that we looked at before.  I clicked again, and then

25   nothing happened.  So I was just wondering, do you know

1    what's supposed to happen?

2         A    I believe it's supposed to go through -- like

3    I don't know how specific it gets with the like

4    household members and providing all the names, but just,

5    you know, high level trying to gather information to

6    determine if you're potentially eligible.

7              When you do the drop-down for Medicaid, what

8    does it show you, just to get an idea?

9         Q    I was just curious, do you know if there's

10   planned work on this?

11        A    They just did work on it last week.  I'll have

12   to check with IT to see why it's not working.

13        Q    Is there any other place where the

14   prescreening tool would be available that we could look

15   at today?

16        A    No.

17        Q    So I wanted to go to Topic No. 5, the second

18   sentence about policies and training and just ask you

19   what training do case processors receive regarding the

20   meaning of the different reason codes?

21        A    So they don't really receive a lot of

22   training.  So when individuals are hired, they go

23   through a preservice.  There is reference to the table

24   and how to get to it.  They put a pound sign in the

25   system.  It gives them a list of the tables.  But that's

1    pretty much the extent, unless we've specified in a memo

2    somewhere about the reason codes.

3        Q    When you say specify in a memo somewhere, that

4    means like a continuous coverage memo as we looked at

5    earlier?

6        A    Yes.  Those transmittals where we reference

7    reason codes and specific ones that have to be used in

8    specific situations.

9        Q    Did the postpartum and children's continuous

10   coverage transmittals have trainings associated with

11   them?

12       A    I don't think so because they're not new

13   policies.  They're just extensions of current policies.

14       Q    And then maybe this will sound like the same

15   question to you, but do case processors get training on

16   when to populate certain reason codes?  Does that sound

17   like the same question to you?

18       A    I mean, no, it doesn't sound the same.  If

19   it's in the memo and if we develop a training to go

20   along with that transmittal, then, yes, there would be

21   probably some references to those reason codes and

22   putting them on the eligibility screen or the

23   determination screen.

24       Q    Can you tell me a little bit more about the

25   preservice training and where it touches on reason

1   codes?

2       A    It's probably throughout.  I'd have to -- I'm

3   trying to visualize where I know I've seen them at.

4   Normally under certain screens, I think that we

5   reference go see I think it's the TSRC table, but that's

6   about the extent of it.  That's in different areas, I

7   think, throughout the preservice modules.

8       Q    It just says go reference the TSRC table, and

9   then the case processors are expected to understand what

10  the reason codes mean just based on the text of the

11  reason codes themselves?

12      A    Yes.  And I do believe there's been different

13  documents about like common reason codes that are used

14  as far as like approvals and things like that.

15      Q    So the preservice training, you said that

16  that's before when a new case processor is hired?

17      A    Uh-huh.

18      Q    So there is a preservice training when they're

19  first hired.  Is there any other periodic training

20  related to the reason codes after that preservice

21  training?

22      A    It would just be we would call in-service

23  training, which would be any of these trainings that are

24  developed because of the policy transmittals.

25      Q    And those would be one-time training about a

1   new policy transmittal?

2       A   Yes, they are one-time trainings, but they can

3   go and redo them whenever they want.  They are

4   available.

5       Q   You also mentioned earlier I think that there

6   was an unwinding training?

7       A   Yes.  And I know that what you shared from

8   Marissa Gimbel, that was a piece of it.  I haven't

9   looked at the entire thing.  I just looked at that one

10  section.  But, yes, there was a training developed.

11      Q   Any other trainings that you can think of

12  related to reason codes, other than the preservice, the

13  in-service related to specific policy transmittals and

14  the unwinding training?

15      A   No.

16      Q   As part of your training, are case processors

17  instructed to review a NOCA before it is sent to a

18  client?

19      A   No.

20      Q   Why not?

21      A   Well, it's auto generated by the system, and

22  so they actually don't see it until it's already

23  produced.

24      Q   So they actually can't see it before it goes

25  to the client?

```
 1      A      No.

 2             (Plaintiffs' Exhibit 17 was marked.)

 3    BY MS. GRUSIN:

 4      Q      You mentioned a common reason code list.  I'm

 5    going to show that to you.  It will be Exhibit 17.  It

 6    has date stamped DCF-478.  Is this the common reason

 7    codes document that you were referring to before?

 8      A      Yes.

 9      Q      Do you know what this at the top goes to?

10      A      Yes.  So this is on the call center intranet

11    page where these are -- where their call center tools

12    are listed.  So, I mean, it does say call center in the

13    middle, so that's my assumption where it's going.

14      Q      So is this common reason code list used by

15    call center staff?

16      A      I mean, it's available for anyone, but I think

17    this is where this one is housed.  And so, yes, the call

18    center staff could use it if they're at the level where

19    they can determine eligibility because we do have some

20    like the tier 3 again that can do changes and make --

21    and take those changes over the phone.

22      Q      And are case processors, are they -- so it

23    sounds like some tier 3 call center staff are case

24    processors; right?

25      A      They can be, yes.  They've gone through the
```

 1  entire training to where they have the ability and

 2  expertise to make those decisions.

 3       Q    But not all case processors work at the call

 4  center?

 5       A    Correct.

 6       Q    Do case processors also use this common reason

 7  codes list?

 8       A    I don't know for sure.  But if they do, I'm

 9  sure it's available if they wanted to.  But this is --

10  this is just located on that call center website or

11  page.

12       Q    Let me ask it a different way, which is what

13  is the purpose of this document?

14       A    It is --

15       Q    Do you need me to zoom in?

16       A    Just a little bit.  Because we have so many

17  reason codes to use, these are the common ones.  You can

18  see them identified a positive and a negative.  The

19  reason they're identified that way is that our system,

20  when it's a negative case action, you can only use

21  negative reason codes.  So they've separated them into

22  the positive and the negative.

23       Q    And is it accurate that the negative reason

24  code start at reason code 150; do you know that?

25       A    I don't think -- again, because there's kind

1    of -- you would have positive negative reason codes for

2    case actions, but then you have another group that might

3    be positive negative for the benefit recovery.  So I'm

4    not going to say from 150 to 999 that they're all

5    negative.

6        Q    Up to 150, are they all positive?

7        A    I don't know that without looking at the

8    actual reason code list.

9        Q    I thought I read that somewhere, but I maybe

10   made it up.  So is this a list of reason codes that are,

11   in fact, common or that should be commonly used?

12       A    Can you zoom in?

13       Q    Sorry it's a little blurry.

14       A    It's grainy on the scans.  I mean, I would say

15   these are common.  Again, there are still several here,

16   but it's still limited to more than the whole, you know,

17   999 of them.

18       Q    So I guess what I'm trying to get at is, is

19   DCF suggesting or encouraging case processors to use the

20   codes on this list?

21       A    I don't think we're suggesting.  I think we're

22   pointing out some common things that come up.  This is a

23   tool they can easily get to in order to find that reason

24   code.  Instead of on the eligibility system, if they put

25   a pound sign, you're just paging, paging, paging,

1    paging, and so it's not very efficient.

2            Whereas, it's easier to have a cheat sheet to

3    go to and say, oh, that's the reason code I'm looking

4    for.

5        Q    There is an asterisk next to a few of these.

6    Do you know what that means?

7        A    I do not.

8        Q    I was trying to look on here to see if it

9    says, but I didn't see anything.  There's a note here

10   that says all system-generated codes should be

11   overwritten, parenthesis, cannot be deleted, closed

12   parenthesis, unless they are appropriate.  The notice

13   will print duplicate reason codes only once.

14           Can you explain what that note means?

15       A    No, I cannot.

16       Q    What is the column eligibility area indicate?

17       A    So this would kind of go hand in hand with our

18   policy manual.  We have an incoming budgeting area in

19   our policy manual, assets.  It's not a one for one, but

20   a lot of that does seem to be kind of following that.

21       Q    And what does it mean general is listed under

22   eligibility area?

23       A    That's the only one, isn't it?  No; there's

24   another one.  I think because it can be used in all of

25   the programs.  It's not specific to one program.

1      Q      If we look at 374, the technical general says,

2    no HH members are eligible, dash, use with another code.

3    So is that an instruction to case processors that they

4    should not be using 374 alone?

5      A      Yes.

6      Q      Now, it looks like 227 and 249 don't have that

7    same instruction; right?

8      A      No, it doesn't.

9      Q      So we talked earlier about how in June of

10   2023, there was a memo sent out instructing case

11   processors not to use 227 and 249 alone; right?

12     A      Yes.  I don't think it was in a memo.  It was

13   just that document.

14     Q      Right.  I think it was error prone codes?

15     A      Uh-huh.

16     Q      Was that the first time that case processors

17   had been instructed not to use those two codes alone,

18   247 and 249?

19     A      I feel like there's been another time that we

20   have instructed them, but I could not locate any

21   trainings or memos, so it could have been just a

22   discussion that we had internally and then, you know,

23   getting to this point in June.

24     Q      So you thought that there was one other time

25   where that instruction was given prior to June of 2023?

```
 1        A     Yes.

 2        Q     But you couldn't find anything in writing to

 3   indicate that?

 4        A     No, we couldn't.

 5              (Plaintiffs' Exhibit 18 was marked.)

 6   BY MS. GRUSIN:

 7        Q     I'm going to show you another training

 8   document.  I'm going to mark as Exhibit 18 a document

 9   that's Bates stamped DCF-361.  Do you recognize this

10   document?

11        A     No, I do not.

12        Q     I'm going to scroll through this to see if it

13   jogs your memory.  It looks to me like a training

14   document.  Does it look to you like a training document?

15        A     Yes.

16        Q     But you're not familiar with this particular

17   training document?

18        A     No.  I'm sure I've seen it at some point.

19   Does it have a date on it in the beginning?

20        Q     Good question.  I did not see one.  This isn't

21   part of like the standard preservice training?

22        A     No, this isn't part of the preservice.

23        Q     And it doesn't look like it's particular to a

24   policy transmittal; right?

25        A     I mean, it looks like it's grabbing, you know,
```

1    different information from some of our appendices.

2        Q    Do you know if it was possibly part of the

3    unwinding training?

4        A    This is old.  The only reason I say that is

5    because of the second bullet.  It talks about Medicaid

6    coverage and retroactive, and that policy has been

7    changed, I think, since 2019.

8        Q    That's helpful.  I have a question about Page

9    No. 22.  Here it says Medicaid category types.  Next to

10   it, it says Medicaid coverage groups and category codes.

11   So I just was wondering if you know where this like

12   screenshot on this is coming from?

13       A    Can you make that larger?

14       Q    Yes, I sure can.

15       A    This looks like just a list that they put

16   together as far as -- again, not knowing how old this

17   document is, it's the different -- what the coverage

18   types would be in our Florida eligibility system based

19   on the group that it's -- so basically parents and

20   caretaker relative.

21            That's an MAR group.  Pregnant women is MMP.

22   That's all this is really saying, that this is a

23   coverage group it should be building based on the

24   category.

25       Q    This is consistent with your testimony earlier

1  that category Medicaid type and Medicaid coverage group

2  are all sort of interchangeable terms?

3       A    Yes.

4       Q    What I wanted to ask about was here it looks

5  like Emergency Medicaid for non-citizens and Medically

6  Needy are considered a different Medicaid type category

7  or group.  Is that consistent with your understanding of

8  those terms?

9       A    Yes.

10      Q    So Medically Needy is considered a type of

11  Medicaid, rather than its own program?

12      A    Yes.  I think I said before, to us it is a

13  Medicaid program, but they have different types and I

14  guess different levels of service.

15      Q    I was just a little confused because we had

16  talked about programs like Medicaid, SNAP, and cash

17  assistance, and I didn't know if Medically Needed sort

18  of fit in that level of categorization or if Medically

19  Needy is considered like a subcategory type or group of

20  Medicaid?

21      A    I would put the Medically Needy as subtype

22  under Medicaid.

23           (Plaintiffs' Exhibit 19 was marked.)

24  BY MS. GRUSIN:

25      Q    That's all I wanted to ask about that.  Let's

    1    do another document which will be 19.  It has Bates

    2    stamp DCF-470.  Have you seen this document before?

    3         A    No, I don't think so.

    4         Q    So do you know what a PE-like case is?

    5         A    I do.  PE stands for presumptive eligibility.

    6    And so there are situations where the system will

    7    automatically build the Medicaid based on the

    8    presumptive eligibility application.  And we have one

    9    that's through the hospitals, and we have another that's

   10    through the health departments to build presumptive

   11    eligibility for pregnant women.

   12         And so once all the information is gathered,

   13    then it runs through our eligibility system, and it

   14    temporarily builds Medicaid for two months.  I think

   15    this in here is a little bit different.  They open the

   16    Medicaid for up to two months while the Department is

   17    determining eligibility on their application.

   18         And so what the PE-like process does, we

   19    utilize the PE process in order to automatically reopen

   20    Medicaid eligibility so that if we had terminated them

   21    incorrectly or something happened, we use this process

   22    when ACHA, they determined we had closed cases, but they

   23    still had them only in the FMMIS system.

   24         And we use this process to reopen them in

   25    order to generate a letter, a notice of their expiration

1   notice so that they could come in and apply.

2       Q    I had a question about one comment in here.

3   There is a sentence here that says if Medicaid fails

4   with code 249 for eligibility, review, research the

5   individual to determine if active in another case.

6            I was just wondering if you could explain to

7   me what that means in this context?

8       A    Yes.  So as it's running through, again, our

9   system will not allow duplication.  And so if it appears

10  that the case or the individual is open in another

11  Medicaid type, then it's going to fail in trying to push

12  open this through like the PE process.

13      Q    So if somebody found that the Medicaid failed

14  with code 249 and they reviewed and researched and

15  determined that they were still active in a Medically

16  Needy case, what would they do next?

17      A    Well, this would get -- we wouldn't open the

18  Medicaid coverage.  They would need to look at the other

19  case to see if it was denied or if their coverage ended

20  incorrectly and/or if we had already completed the

21  redetermination process and determined they should be in

22  the Medically Needy program.

23      Q    This PE-like process, was this something that

24  was just happening during the public health emergency?

25      A    Yes.  This is the first time that we utilized

1    this process.

2         Q    Is it still being utilized today?

3         A    We did this in December.  I think we also

4    utilized it in the Family Planning because the

5    individuals who were on Family Planning when the PHE

6    started, that program was actually being handled by the

7    Department of Health.

8              And during that transition, it got moved over

9    to the Department of Children and Families.  And so

10   there were, I want to say, around 30,000 individuals

11   that needed to be given a notice and the opportunity to

12   submit an application through the Department.

13        Q    So is it fair to say that this is a process

14   that's used on sort of a one-time batch basis to create

15   new accounts with DCF, but it's not something that's

16   used as part of the annual determination process?

17        A    Correct.

18        Q    I would like to turn to Topic No. 6 regarding

19   monitoring and oversight of the reason codes.  So for

20   this question, does DCF monitor how the reason codes are

21   being used?

22        A    I think the simple answer is no, with the

23   exception of that June analysis that was done.  That was

24   kind of a one time let's look at the reason codes.  But

25   other than that, we don't look at the reason codes.

1  Prior to the public health emergency, we did monthly

2  samples.

3         We call them standard case reviews on all the

4  programs.  It changes from what we're going to review.

5  We had paused those because of the work that needed to

6  get done, and we had to have all hands on deck.

7         But there is a piece on there that reviews the

8  notices, but it doesn't speak to like did you use the

9  right reason code or not.  It was more like did you send

10  a notice or not in the right language.

11     Q    That was really helpful, and I'm going to have

12  just a few follow-ups.  So you mentioned that before the

13  PHE, you did monthly case reviews.  Since unwinding

14  began, have you restarted monthly case reviews?

15     A    Not yet.  That is going to be starting soon.

16  One of the other things that it doesn't really address

17  the reason codes, but we have the PERM review, which is

18  the payment error rate for Medicaid.  That's on an

19  every-three-year cycle.

20         Again, that one just speaks to eligibility,

21  not necessarily proper reason code, notices or anything.

22  But we also have the Medicaid quality control reviews

23  that we are waiting on some additional guidance from

24  CMS.  And from what my team is telling me, that will

25  include looking at the notices, which could also include

1    looking at the reason code and appropriate language.

2         Q    So you're planning to restart the monthly case

3    reviews soon.  Do you have any approximate date when?

4         A    No, I don't.

5         Q    Why didn't the monthly case reviews start when

6    terminations started again?

7         A    Because of the influx or the significant

8    number of people that were completing their renewals.

9         Q    A workload issue?

10        A    Yes.

11        Q    When the monthly case reviews were conducted

12   previously before the public health emergency, you said

13   they looked at notices, but not really the reason codes,

14   more just did you send a notice or not; is that right?

15        A    Yes.

16        Q    And then right at the end, you said and sort

17   of whether there was the right language.  I didn't know

18   what you meant by that?

19        A    So did we mail the notice in the language that

20   the customer had selected.

21        Q    Like English, Spanish, Creole?

22        A    Uh-huh.

23        Q    So other than just was a notice sent and what

24   language was it in before the public health emergency,

25   di the monthly case reviews evaluate any other aspects

1    of the notice?

2        A    I know there was like five or six different

3    things that are listed.  I believe we provided it.  You

4    know, it also addresses like the pending notice, did we

5    open pend, under pend, things like that.

6        Q    What is over pend and under pend?

7        A    So if we needed information and we didn't do

8    it accurately, like we didn't ask for everything up

9    front and we had to send another pending notice, then

10   that could be under pending.  And then over pending

11   would be we asked for information that we didn't need

12   like we can verify it ourselves using data matches or

13   whatever the situation may be.

14       Q    But you said it didn't look at whether they

15   used the right reason code?

16       A    No, it does not.

17       Q    Did it look at whether they made the right

18   eligibility decision?

19       A    Overall, yes.  The whole case review is was it

20   right or not, yes.

21       Q    So if someone was incorrectly terminated from

22   postpartum continuous coverage, that would be evaluated?

23       A    Yes, they would.  So the case reviews are

24   historically part of the eligibility specialist's

25   performance evaluation and that if you determine someone

1   incorrectly, then that would count against you.

2       Q    And so earlier with respect to continuous

3   coverage, we talked about how there are some correct

4   reasons to terminate continuous coverage and some

5   incorrect reasons to terminate continuous coverage.

6           So let's say that a case came up in the

7   monthly case review before the public health emergency

8   and it was an instance where continuous coverage had

9   been terminated.  How would DCF evaluate whether it was

10   an appropriate termination or not?

11       A    So based on the policies, they would evaluate

12   was it appropriate or not.  We have a system that's

13   called Quality Management System.  We refer to it as

14   QMS.  That's where we track all our case readings.  And

15   if one is an error, then it gets sent back to the region

16   or to the worker to correct.  And then we track it to

17   make sure it's been corrected.

18       Q    So you talked about we would look at the

19   policies.  And then where in the specific case would you

20   look to figure out the reason that that person had been

21   terminated?

22       A    I'm not sure I'm understanding the question.

23       Q    I'm imagining a scenario where one of the

24   cases that comes up for case review is a child who lost

25   continuous coverage within the continuous coverage

1    period.  So you know what the policy says when it's

2    supposed to happen, when it's not supposed to happen.

3            Looking at the individual case in a specific

4    case, how would you determine the reason that the

5    termination occurred?

6    A    Well, I mean, you would have to review -- one,

7    basically the standard case review it pulled based on

8    whatever it is, that this one got pulled because we just

9    pulled a case category sequence, which is basically the

10   case number, the category sequence which is basically

11   the case number, the category which is MMC, NAR,

12   whatever it is, and then the sequence number.

13           So if there were multiple children, they would

14   have 01, 02, 03.  And so that individual or that

15   assistance group gets pulled, and then we review it from

16   beginning to end to see if it was done correctly or not.

17   And if there is something in there like if the child

18   should have been covered another two months under the

19   continuous policy, then there would be an error cited.

20   Q    What's the beginning to end that you're

21   talking about when you say you're looking at the case

22   from beginning to end?

23   A    So it goes from the beginning, meaning from

24   the application.  Was an application submitted?  Did we

25   have the right application date in there or the renewal,

1    you know, whatever day they submitted it.  Do we have

2    all the household members listed correctly because

3    that's going to impact the income limits?

4              Did we code everything correctly for tax

5    filing purposes?  Did we do the income correctly?  Did

6    we do the assets correctly, which doesn't matter with

7    children's Medicaid.  Just all of these things we step

8    through the review tool in order to say, okay, was the

9    eligibility determination correct or not.

10       Q    And so when you say did we have all the

11   household members listed correctly, where are you

12   talking about?  Where are the household members listed?

13       A    So we look at the application, and we compare

14   it to what's in the eligibility system.

15       Q    And that's Florida?

16       A    Yes.

17       Q    So did we code everything for tax filing

18   status?  You can go back in a case and see that in

19   Florida?

20       A    Yes.

21       Q    Same for did we do the income calculations

22   correct, can you go back and look at the income

23   calculations that were used in a particular case?

24       A    So the way it shows in Florida is there's just

25   like for the Medicaid, I'll call it a bucket, we have

1    the amount listed there.  But there should be a way

2    based on the information we verify whether it's through

3    the work number or data or through the federal hub.

4            You know, more likely the situation, the hub.

5    Did we calculate it correctly?  Did we use reasonable

6    compatibility?  The worker should put any notes saying

7    how they used the income or didn't use the income.

8    Maybe they got overtime and it should not

9    representative, it should be excluded.  So all of that

10   going into consideration when making sure the income was

11   calculated correctly.

12       Q    So very practically speaking, can you go back

13   and see the literal calculation that was used, or are

14   you in part of this review basically reconstructing the

15   calculations from the inputs that are available in the

16   case?

17       A    With reconstructing.

18       Q    Because the actual calculation isn't stored?

19       A    Right.  I mean, they can do it on a

20   calculator.

21       Q    And you mentioned that the worker should put

22   notes in, right, about I disregarded this overtime

23   because it's not representative.  Where would those

24   worker notes be?

25       A    They are in the CRC, which is the running case

1    record comments.

2         Q    And if the worker doesn't put those notes in,

3    then does that information live anywhere?

4         A    No.  The reader, the person reviewing the case

5    would try and based on the information they had, are

6    they able to get to the same calculation.  If they are

7    not and it's not explained as to why not, then it could

8    be cited as an error.

9         Q    Are there plans to change how the monthly case

10   reviews operate when they restart again in the future?

11        A    I'm sorry.  Can you repeat that?

12        Q    Are there any plans to change how the monthly

13   case reviews operate when they restart again in the

14   future?

15        A    No.  It's a random sample.

16        Q    So it's a random sample of all cases?

17        A    What we're trying to get back to is it's five

18   cases or five assistance groups per worker per month.

19   Now, that's a combination of all programs.  So it may be

20   two food assistance, two Medicaid, one TANF, whatever

21   the determination is.  That randomly gets pulled, and

22   they review those cases.  And then -- I'm sorry.  What

23   was your question again?

24        Q    I think my question was are there plans to

25   change how the case review operates when it restarts

 1    again in the future?

 2         A    Got me back on track.  Thank you.  So once --

 3    that's a random sample, so then the workers or the

 4    readers will -- it's pulled based on disposition for

 5    that month, so it will take a snapshot of -- let's see.

 6    We're still in March, so in February dispositions by

 7    that worker, pull those five cases based on the type of

 8    cases we're pulling.

 9         Q    Five assistance groups per worker per month.

10    Roughly, how many assistance groups would a worker

11    usually do in a month?

12         A    I would say probably 600.

13         Q    Do they have any quotas or targets?

14         A    We do in their performance evaluations.

15         Q    What are those quotas or targets?

16         A    I did not pull that information.  I think to

17    be a three, it's around that, you know, 400 to 600,

18    maybe.

19         Q    400 to 600?

20         A    Uh-huh.

21         Q    And the case review is going to follow not

22    just the same process of sort of looking at it from

23    beginning to end when they restart again?

24         A    Yes.

25         Q    Are there any plans to start monitoring more

1   of the content of the notices or are the same sort of

2   questions about was the notice sent and in the right

3   language still going to be the same notice-related

4   questions?

5       A    I mean, at this time, we haven't talked about

6   making any changes to that.  I will say probably once we

7   get guidance from CMS on the MEQC, then that can drive

8   or change.  Because if we're getting reviewed by the

9   feds, we want to make sure that we're doing it right in

10  the State.

11      Q    And the MECQ previously, I know that it got

12  paused during the unwinding or during the public health

13  emergency.  But before the public health emergency, the

14  MEQC, did that include looking at notices?

15      A    They did look at notices, but they were not

16  specific to reason codes.

17      Q    What do you mean by that?

18      A    The same thing, the way we were reading

19  internally.  We were looking at did the notice go out,

20  was it in the appropriate language, that kind of thing.

21      Q    So more process, less content; is that a fair

22  description?

23      A    Yes.

24      Q    Other than the monthly case reviews, is there

25  any other monitoring that DCF does related to how the

1    reason codes are used?  I know you said that they are

2    not really used in the case reviews.

3         A    There's nothing else I can think of.

4         Q    Do you think that it's important to monitor

5    how the reason codes are used in practice?

6         A    I mean, yes, I think it's important.

7         Q    Why?

8         A    Because we want to make sure that we're

9    getting clear information to our customers.

10        Q    Do you agree that the use of an incorrect

11   reason code can leave Medicaid enrollees confused?

12             MS. LUKIS:  Object to form.  Outside the

13        scope.  You can answer.

14             THE WITNESS:  Yes, I would agree with that.

15   BY MS. GRUSIN:

16        Q    Do you agree that the use of vague or

17   incorrect reason codes can increase DCF's workload?

18        A    Yes.

19        Q    Did you say yes?

20        A    Yes.

21        Q    How so?

22        A    Well, if we don't have, you know, information

23   that they can understand, then they're going to call the

24   call center.  They're going to possibly go into a

25   storefront.  They may keep applying, which generates

1   more applications when they really need to go to like

2   Florida Healthy Kids or the marketplace.

3          Q    You said that might generate more

4   applications.  Are new applications more work to process

5   than a renewal?

6          A    I think every -- the applications get

7   complicated based on household size.  If there's more

8   individuals, more complications.  That's when they get

9   difficult.  I think really the workload might be on the

10  client because they have to resubmit.

11         Q    I want to talk a little bit about that June

12  2023 review that we talked about.  You said that was

13  sort of a one-time thing.  I believe earlier you said

14  that it was triggered by some news reports and reports

15  in the media?

16         A    Yes.

17         Q    Were there any other reasons that the review

18  was done?

19         A    I mentioned one other thing, calls to the call

20  center.

21         Q    Calls to the call center.  Was the volume of

22  calls to the call center higher, is that what you mean?

23         A    It wasn't that they were higher.  We were just

24  because of the sheer volume and the size of the state in

25  trying to reduce the number of calls coming in, we were

1    evaluating anything we possibly could.

2        Q    And then as part of that review, DCF sent that

3    document that we looked at earlier, right, to -- well, I

4    guess I should ask.  Did DCF send information to case

5    processors as a result of the June 2023 review?

6        A    Yes, that document was created and

7    distributed.

8        Q    I'm trying to remember what exhibit it was.  I

9    think it was Exhibit 11, DCF-2046.  I'm going to put it

10   up on the screen again.  This is the document that was

11   sent out after the review?

12       A    Yes.

13       Q    And it sounds like DCF concluded that these

14   codes were being either used inappropriately or without

15   an accompanying code that explains the Department's

16   actions to the individual.  What does that mean?

17       A    So that would mean that there wasn't a

18   secondary code used, which would explain the

19   Department's actions to the individual.

20       Q    So did DCF conclude that these three codes

21   when used alone do not explain the Department's actions

22   to the individual?

23       A    Yes.

24       Q    So the first code is 374, and the letter is a

25   list of codes that can be paired with 374.  How would

1    you characterize the difference between the four codes

2    listed underneath reason code 374?

3         A    Can you repeat that, please.

4         Q    How you would characterize the difference

5    between the four codes that are suggested could be

6    paired with 374, like what's the difference?

7         A    The difference between each of those codes and

8    374 or the difference between those codes?

9         Q    The difference between these codes as a group

10   and 374?

11        A    They're definitely more specific.  You know,

12   if there's no eligible children in your home or your

13   youngest child turned 18, then these are just giving

14   more information why you're not meeting eligibility

15   requirements.

16             Child age 21 or older, we have individuals on

17   assistance for three years who may have turned 21 or may

18   be close to 24 or older that they didn't meet the

19   technical requirements.  This was the technical

20   requirement and the reason code they gave them.  These

21   could be used independent.

22             But again, the recommendation from the policy

23   team was if you use this code, you need to use another

24   one.  And based on their review, this was what stood

25   out.

```
 1        Q    We've talked a lot about 227, so I just want
 2   to ask you one other question about 249.  So the last
 3   sentence says that this code should also not be used
 4   when moving an individual from full coverage to
 5   Medically Needy.
 6             And I thought earlier you said that 249 could
 7   be used to move someone from full coverage to Medically
 8   Needy.  So I just want to make sure I understand what
 9   DCF's position is about when 249 should be used?
10        A    Well, the position is that it could be
11   recommended with another reason code.  This last
12   sentence, we should have, you know, probably vetted this
13   out a little bit more before it went out.
14        Q    Because that last sentence is inconsistent
15   with your understanding about how 249 should be used?
16        A    Sorry.  I cut you off.
17        Q    I'm going to do it again, just to make sure
18   the record is clear.  Because that last sentence is
19   inconsistent with your understanding of how 249 should
20   be used?
21        A    Yes.
22        Q    Now, when talking about pairing multiple codes
23   together, would it be appropriate to use 227 and 249
24   together?
25        A    No.
```

```
 1       Q     Would pairing reason code 520 with either 227
 2  or 249 resolve the concerns about lack of specificity?
 3       A     No, I don't believe it would.
 4       Q     Why not?
 5       A     Well, the 520 is more that your Medicaid
 6  eligibility period ended and you didn't renew.  And I
 7  think in our previous discussions I didn't understand
 8  and I couldn't explain why 249 was used with the 520.
 9       Q     After DCF sent out this document, Exhibit 11,
10  did DCF take any other steps to monitor how reason codes
11  were being used?
12       A     No, they did not.
13       Q     Do you know Mr. Daniel Davis?
14       A     Yes.
15       Q     Who is he?
16       A     He's part of the data team.  I don't know his
17  official title.
18       Q     Are you aware that he prepared a declaration
19  in connection with this lawsuit?
20       A     No.
21       Q     So you haven't reviewed his declaration?
22       A     No.
23             (Plaintiffs' Exhibit 20 was marked.)
24  BY MS. GRUSIN:
25       Q     I'm going to mark his declaration as
```

```
 1   Exhibit 20.  It's ECF Docket No. 76-1.  So I wanted to
 2   ask you about paragraph 4 where he says, during this
 3   period -- referencing the time period between the start
 4   of unwinding and December of 2023, he says, 771,043
 5   enrollees received a notice of case action that used
 6   only one or more of the following three reason codes,
 7   227, 249, and 520.
 8           Were you aware that over 771,000 enrollees
 9   received a NOCA with only one or more of those reason
10   codes?
11       A   Yes, I heard that number.
12       Q   How did you hear that number?
13       A   I'm sure we discussed it when we were talking
14   about the data pull.
15       Q   Is DCF concerned that so many NOCAs are going
16   out with only one or more of those three reason codes?
17       A   My concern with the data pull -- and I don't
18   think Daniel was able to pull the information the way we
19   were asking is that these reason codes were used, but we
20   don't know of that amount how many went out with a
21   secondary or even a third reason code attached to it was
22   my understanding.
23       Q   He said the notice of case action used only
24   one or more of the following three reason codes.  I will
25   say that I interpret that to mean that the notice of
```

1    case action included only one of these codes and didn't

2    have additional codes.  Are you interpreting that

3    differently?

4         A    Yes, I am.  The one or more, so to me this

5    code was at least listed once, but there could have been

6    another code, or it could have been the secondary code.

7         Q    So you don't interpret this when it says they

8    used only one or more of the following three reason

9    codes, you still think that that could mean that this is

10   counting a code that had 227 and 241?

11        A    Yes, possibly.

12        Q    And had you done anything since Mr. Davis's

13   declaration to clarify that data?

14        A    No.  I wasn't aware of the declaration.

15        Q    Since you heard the 771,000 number, have you

16   done anything to try to further clarify the data?

17        A    My recollection in my conversations with

18   Daniel Davis is that he was not able to determine or

19   present the data the way I asked, which was how many of

20   these had an additional -- or how many of these were

21   used in conjunction with another reason code?

22        Q    Since the June 2023 memo, has DCF done

23   anything to monitor whether case processors are, in

24   fact, using secondary reason codes with error-prone

25   codes?

1      A    No, I'm not aware of us pulling any other

2    additional data analysis on these.

3      Q    So DCF doesn't actually know whether case

4    processors are continuing to use those codes alone?

5      A    Correct.

6      Q    Has DCF done anything else to monitor the

7    actual NOCAs that are being sent to individuals?

8      A    No.

9      Q    And as part of the review that led to the June

10   30th memo, did DCF identify any other aspects of the

11   NOCAs that were creating confusion among enrollees?

12     A    That was not brought up in this, no.

13     Q    When you say that wasn't brought up in this,

14   what do you mean?

15     A    Like it was just a focus on the reason codes,

16   not the actual notices.

17     Q    You didn't inquire about that, the focus of

18   the review was on the reason codes?

19     A    Repeat that one more time.

20     Q    So the rest of the NOCAs weren't reviewed is

21   what you're saying?  The focus of the June review was on

22   the reason codes?

23     A    Correct.

24          (Plaintiffs' Exhibit 21 was marked.)

25

1    BY MS. GRUSIN:

2         Q    I would like to turn to Topic No. 10, the

3    SHADAC report.  This will be Exhibit 21.  When I say the

4    SHADAC report, are you familiar with this document?

5         A    Yes.

6         Q    On Page No. 1 numbered, Page No. 4 of the PDF,

7    it says, key informants in Florida included leadership

8    of the Medicaid agency, the Agency for Health Care

9    Administration, as well as policy, quality systems, and

10   information technology staff at the Department of

11   Children and Families responsible for determining

12   eligibility for Medicaid and other human service

13   programs in the state.

14              Who at DCF served as informants for this

15   report?

16        A    This would have been Nathan Lewis.  I think

17   William Martinez from the IT side and Suzanne Poirier

18   from IT as well.

19        Q    Are William and Suzanne still with DCF?

20        A    No, they are not.

21        Q    What information did DCF provide to the

22   authors of this report?

23        A    I wasn't involved in the conversations.  This

24   was an assignment that Nathan Lewis had lead on.  So as

25   far as what conversations occurred, I know there was a

1   telephone interview.  I know that they sent us a survey

2   to complete prior to the telephone interview.

3           It was my understanding they were also going

4   to be reaching out to our IT vendor, Deloitte, for some

5   feedback and conversations.  That's the extent of my

6   knowledge on the process.

7       Q    Does DCF have any knowledge of the substance

8   or the content of those conversations?

9       A    No, not that I can recall.

10      Q    The SHADAC authors provided a draft of the

11  report for DCF to review prior to publication; correct?

12      A    Yes.

13      Q    Did DCF review the draft?

14      A    Yes, we did.

15      Q    And did DCF make comments on the draft?

16      A    I went back to see if I could find anything

17  with comments, and I could not locate anything in my

18  emails.  I would have been asked to review it before it

19  being submitted.

20      Q    Did you review it before it was submitted?

21      A    Yes.  Almost positive, yes, I would have.

22      Q    Let's go to Page No. 12 of the report.  There

23  is a section that says, hope to establish a new more

24  robust notice platform that spans the bottom of Page No.

25  12 to the top of Page No. 13.  It says, State

 1   respondents reported being well aware that notices sent

 2   to beneficiaries generate confusion.

 3           So since at least 2018, DCF has been well

 4   aware of the notices sent to beneficiaries generate

 5   confusion?

 6           MS. LUKIS:  Object to form.  You can answer.

 7           THE WITNESS:  Can you ask the question again?

 8   BY MS. GRUSIN:

 9       Q   So since at least 2018, DCF has been well

10   aware that notices sent to beneficiaries generate

11   confusion?

12       A   Yes.

13       Q   When did DCF first become aware that notices

14   generated confusion?

15           MS. LUKIS:  Form.  You can answer.

16           THE WITNESS:  I don't know if I have a date

17       for you.  I know we changed different software over

18       time.  And, you know, if indications of customers

19       calling with questions is indicative that notices

20       are not where they need to be.

21   BY MS. GRUSIN:

22       Q   And you kind of implicitly started to answer

23   this.  But how did DCF first become aware that the

24   notices generated confusion?

25           MS. LUKIS:  Object to form.

```
 1              THE WITNESS:  I'm trying to recall back to
 2       2018.  I don't know if I can point exactly one
 3       thing or a specific item that would indicate it.  I
 4       would assume that if we were getting calls through
 5       our call center and questions about our notices,
 6       possibly even feedback from our own staff that
 7       there were individuals coming into the storefronts
 8       and needing assistance, then those would all be, I
 9       guess, indicators that the notices are not where
10       they need to be.
11  BY MS. GRUSIN:
12       Q    Which parts of the notices is DCF aware
13  generate confusion?
14       A    I really, from this report, I don't -- I can't
15  tell or answer that.
16       Q    The report goes on to say they emphasize the
17  need to establish a new more robust notice platform.
18  They need the system that generates the notices when
19  resources become available.  Respondents pointed out
20  that discussions are taking place regarding this new
21  platform, which would ideally allow notices to be more
22  case specific.
23              For example, current notices that describe
24  applicants as ineligible are considered to be not
25  sufficiently explicit in terms of an explanation and
```

1   taken to consideration notice readability.

2          My question is in what way did DCF purport

3   that the notices are not sufficiently explicit in terms

4   of an explanation?

5     A    I mean, the notices, we attempted to combine

6   with all programs so that they would get one notice

7   because normally when we make a decision, we're making a

8   decision for all programs.

9          And so the way that it flows is not -- it's

10  very chunky is the only word I can describe it, where it

11  doesn't flow.  The customer can't like on the first page

12  answer what's going on.  They have to read and read.

13    Q    Did DCF report that it wanted to be able to

14  draw more information from the database to provide

15  recipients with specific information related to their

16  eligibility or ineligibility?

17    A    I don't think we necessarily pointed that

18  particular issue or concern out.

19    Q    Did DCF report that it wanted to tell someone

20  who is over income that this is the income we calculated

21  and this is the income threshold?

22    A    No, I don't recall that coming up.

23    Q    Did DCF report that the current notice do not

24  take notice readability into consideration?

25    A    I don't know.

         1        Q    I guess I was wondering about sort of the
         2   basis for the end of this sentence that says that
         3   discussions are taking place regarding a new platform
         4   which would ideally allow the notices, dot, dot, dot, to
         5   take into consideration notice readability?

         6        A    And I'm sorry.  When you said notice
         7   readability, I was thinking fifth grade or ninth grade
         8   reading level, whatever we're doing.  At one point, that
         9   had already been done is my understanding.

        10             When I think about notice readability, I think
        11   that goes back to my point of things are kind of chunked
        12   out, and it's not another succinct manner for a customer
        13   to review.

        14        Q    When was the analysis of the notices grade
        15   level reading done?

        16        A    I would have to say prior to 2012 before I
        17   came.

        18        Q    Do you know whether documentation still exists
        19   related to that analysis?

        20        A    I don't know if it does or not.  Probably
        21   individuals who are no longer with the Department.

        22        Q    Where is your understanding that that analysis
        23   was done?  Where does that come from?

        24        A    When I first started, there was talk of a
        25   notice project where -- I can't remember.  There was a

1    change in one of the governors, and that was a directive

2    is that we needed to review all our notices to ensure

3    they were at the appropriate reading level.

4        Q    And so it's your belief that DCF did that and

5    brought the notices to the appropriate reading level?

6        A    Yes.

7        Q    What is that appropriate reading level?

8        A    I believe it's seventh grade.

9        Q    Do you know if that analysis was done on

10   template notices or production notices?

11       A    I do not know.

12       Q    Since 2012 when you started, has DCF analyzed

13   any notices for that grade reading level?

14       A    We haven't.

15       Q    I wanted to ask about another part of this

16   paragraph.  It says, respondents pointed out the

17   discussions are taking place regarding this new

18   platform.  So does that mean that in 2018 DCF reported

19   that a new notice platform was under discussion?

20       A    So we were attempting to do the Access

21   Modernization and submitting an LBR -- not an LBR --

22   probably an LVR, but a 4B feasibility study, and so high

23   hopes that we would have gotten approved for the money

24   and that this would be part of that project.

25       Q    You used a few acronyms in that answer.

```
 1        A    Legislative budget request.
 2        Q    So you were attempting to do the Access
 3   Modernization Project and get funding for it back in
 4   2018?
 5        A    Yes.
 6        Q    Did that happen?
 7        A    No, it did not.
 8        Q    Why didn't that happen?
 9        A    The legislature did not pick up our request.
10        Q    Has the legislature since picked up your
11   request?
12        A    Yes.  That's what's kind of funding the Access
13   Modernization.
14        Q    And is that Access Modernization fully funded
15   through the whole several-year period?
16        A    It's my understanding every year we are asking
17   for the money for the next year projects.
18        Q    After this report came out, did DCF do
19   anything else to monitor or review either the reason
20   codes or the notices more generally?
21        A    No.
22        Q    We've been going for about another hour.
23   Let's take our break.
24             (Recess 2:26 p.m. until 2:53 p.m.)
25
```

1    BY MS. GRUSIN:

2         Q    Ms. Veltkamp, we were talking about the Access

3    Modernization Project.  And I believe that you had said

4    that the plans that were under discussion mentioned in

5    the SHADAC report, sort of the prior, earlier version of

6    the Access Modernization Project?

7         A    Sorry.

8         Q    We were talking about the SHADAC report;

9    remember?

10        A    (Nods head up and down.)

11        Q    And in that report, it references that there

12   are discussions taking place about a new notice

13   platform?

14        A    Yes, if we get the budget or find the funds, I

15   believe.

16        Q    And I believe that you characterized those

17   discussions as being sort of a prior iteration of the

18   Access Modernization Project?

19        A    Yes, they are.  We were in the process as we

20   have numerous times before we actually got the money, we

21   do what's called a 4B feasibility study.  It's something

22   that has to be done if the project is over a million

23   dollars, and so having that and then going to the

24   legislature to ask for the money in order to fund the

25   project.

1      Q     You said that the legislature did not fund the

2   project in 2018?

3      A     No, they did not.

4      Q     When did they initially fund the project?

5      A     I believe 2022.  That's when we started

6   developing the new customer portal, which is the first

7   step in our modernization efforts.

8      Q     And what goes into a 4B feasibility study?

9      A     I don't write it, so there's a lot of

10  background data supporting -- explaining our current

11  system and how it's outdated, the number of systems that

12  go into it.  That's what's previously been on the ones I

13  saw years and years ago.

14     Q     And then you mentioned earlier the report done

15  by an outside vendor that looked at the notices and

16  reason codes; correct?

17     A     Yes.

18     Q     Was that done as part of the feasibility

19  study?

20     A     No, it was not.

21     Q     Why was that review initiated?

22     A     Honestly, we had some extra funds that needed

23  to be used up before the State fiscal year, and so this

24  was a project that my boss at the time, Patti Grogan,

25  had wanted to do.  And knowing that we were trying to do

1    Access Modernization in the future and utilizing the
2    funds to the best of our ability at that time.
3         Q    And then you just said that knowing that you
4    were trying to do Access Modernization in the future,
5    why did you reference that in connection with the 2021
6    report?
7         A    Don't quote on the 2021.  I'm not 100 percent
8    sure of that.  But we knew we were going to ask again
9    for modernization, and so the point of that project was
10   to utilize the funds that we had at the time to identify
11   or have an outside vendor who doesn't know our
12   operations look at the notices and make recommendations.
13        Q    And was the understanding that those
14   recommendations would then be used to inform the changes
15   that would be requested as part of the Access
16   Modernization Project?
17        A    They would be a starting point, as far as not
18   for the actual project.  But what usually happens is
19   that IT, obviously they do the platforms, so they
20   determine that.  But they'll come do the policy in order
21   to work on the verbiage.  And so this was in examples,
22   recommendations that we could use and build from when we
23   got to the point when we wanted to review the notices.
24        Q    So when the report was -- when DCF
25   commissioned the outside vendor to do this review and

1    this report, the intention was that it would be used to

2    help inform the Access Modernization Project when it got

3    to notices?

4        A    Correct, when we got there.

5        Q    So I understand that you're not there

6    currently, but the expectation is that will be reviewed

7    and help guide the development of notices under the

8    Access Modernization Project?

9        A    From my perspective, I would say yes.  We're

10   under different leadership now, so they may disagree

11   with that, but I'm not going to say we wouldn't take

12   another look at it and consider it.

13       Q    Actually, I don't know -- I mean, I feel like

14   that's pretty clearly related to the RFP-3 without any

15   document that describes a change or plan change due to

16   Access Modernization.

17           MS. LUKIS:  I think saying we were going to

18           take a look at something that was done three years

19           ago before we had funding for our current project

20           is different -- coming from someone who wasn't

21           designated on Topic No. 11 is different than a

22           change, which is something that has happened, or a

23           planned change, which is a change that is planned

24           to be made.

25               I don't think either of those boxes are

1        checked, which is why I think that probing the

2        person who is designated on Topic No. 11, which is

3        exactly on this point, is probably the right way to

4        go.

5            MS. GRUSIN:  I will also ask Andrea Latham,

6        but I do feel like the record is pretty clear at

7        this point.  So unless --

8            MS. LUKIS:  I think it's clear on

9        Ms. Veltkamp's personal belief.

10           MS. GRUSIN:  Perspective.  Okay.  Well, I

11       guess we'll ask Andrea.  But I do think for

12       purposes of an RFP, it was created with the intent

13       of the Access Modernization in mind.  We can

14       resolve this when we get to Ms. Latham's testimony,

15       but I don't think we're in agreement currently.

16           MS. LUKIS:  I understand.

17   BY MS. GRUSIN:

18       Q    Let's move to Topic No. 17, which is about the

19   SMS review of unwinding.  So can you just start by

20   giving me just an overview of what the conversations

21   with CMS were, an overview of the conversations with CMS

22   with regard to unwinding?

23       A    I wasn't involved in those conversations, but

24   we were looking at the email sweeps.  I am aware that

25   Casey Penn had shared a draft of our unwinding plan with

1    CMS.  I think it was in the middle of January.  This was

2    after the Continuing Appropriations Act and I think the

3    initial guidance from CMS, and we were still awaiting

4    additional guidance from CMS.

5             And then after that was released, we completed

6    our plan based on the format they had asked us to do and

7    to submit it to the appropriate email account.  The

8    Department of Children and Families did submit that plan

9    to CMS.

10            A couple weeks after that, we had some

11   follow-up emails between CMS and Tom Wallace, as far as

12   confirming some of the information.  And once we

13   confirmed that everything was understood, they had

14   approved our plan.

15       Q    After they approved the plan, was there any

16   additional monitoring or oversight from CMS about the

17   implementation of that plan?

18       A    There was not directly to us, but I know they

19   talked about some states being on mitigation plans.

20   Florida was not one of them.  The only follow-up that

21   was brought to my attention was a conversation with CMS,

22   I believe, in May of 2023 where there was a concern or

23   complaint that came in about some hearing language on

24   our notice.

25            And there's ascendance in the hearing language

1    that says if you disagree with this decision, it
2    previously said you may have your benefits restored
3    while you're waiting the decision.  I know that's not
4    verbatim.  And then the concern was that it shouldn't
5    say may; it should say will.  And so they asked us to
6    make those updates, and we did make those updates.
7          Q    Is it possible that the switch was actually
8    from will to may?
9          A    I'm sorry?
10         Q    Is it possible that, in fact, the switch was
11   the other way around, the language to say will, and now
12   it's may?
13         A    From what I'm seeing when I looked at the
14   hearing language from notices like in April and stuff,
15   it said may, and they asked us to say will.  I would
16   have to look at a current notice to make sure, but I'm
17   pretty sure the notices back in that time before that
18   change and before that conversation said may.
19         Q    And you said when CMS reached out in May of
20   2023 or that conversation was due to a concern or a
21   complaint, did CMS ever tell you where that concern or
22   complaint came from?
23         A    No, they didn't.
24         Q    Did DCF inquire?
25         A    I wasn't part of the conversation, so I'm not

 1   sure if we inquired or not.

 2        Q    Prior to that conversation in May of 2023, had

 3   DCF and CMS had any conversations about the content of

 4   the notices?

 5        A    No, not that I'm aware of.

 6        Q    When DCF submitted the draft unwinding plan,

 7   did that include any discussion of the notices?

 8        A    No.

 9        Q    When you submitted the redetermination plan in

10   the format that CMS wanted, did that include any

11   discussion of the notices?

12        A    No.

13        Q    Did you ever submit copies of notices to CMS

14   for review prior to approval of the redetermination

15   plan?

16        A    Not that I'm aware of.  When we did the

17   search, there were no other documents attached to the

18   plan.

19             (Plaintiffs' Exhibit 22 was marked.)

20   BY MS. GRUSIN:

21        Q    We'll look at those documents just to make

22   sure we've got them.  I'm going to mark what is Bates

23   stamped AHCA-385.  This is an email from Jessica

24   Stephens at CMS to Tom Wallace.  So I think you

25   referenced that there were some emails back and forth

1    with Tom confirming information.  Is this one of the

2    emails that you were referring to?

3        A    Yes.

4        Q    So in this email, there is a chart at the

5    bottom that includes a couple of categories of

6    requirements.  Do you see that?

7        A    Yes.

8        Q    Sorry.  It's hard to both make it big enough

9    to read and see it all on one page.  So is it your

10   understanding that these were the areas of compliance

11   that CMS was evaluating when it was reviewing the

12   redetermination plan?

13       A    Yes.

14       Q    Do any of these requirements concern the

15   content of termination notices?

16       A    I don't feel like they do.

17            (Plaintiffs' Exhibit 23 was marked.)

18   BY MS. GRUSIN:

19       Q    And then it looks like there are two

20   attachments, a mitigation framework for states and the

21   CAA mitigation strategy for states.  I'm just going to

22   show you a couple of documents and ask you to confirm if

23   these were the attachments.  This will start with

24   Exhibit 23, and it will be Bates stamped AHCA 387.  Is

25   this the mitigation framework for states attachment to

 1   the email?

 2        A    I did not see the attachment to the email.  I

 3   was just forwarded the email.

 4        Q    So you can't confirm whether this is the

 5   attachment?

 6        A    No, I can't.

 7        Q    So I won't show you the other one that I'm

 8   pretty sure is the attachment.

 9             MS. GRUSIN:  Ashley, you wouldn't be willing

10        to stipulate, would you, that these were the

11        attachments?  They're sequential.  They have in

12        them Bates stamps.

13             MS. LUKIS:  Sorry.  I was admittedly passing a

14        note, and there's nothing on the share screen.

15             MS. GRUSIN:  I'm just trying to nail down --

16        I'm just trying to figure out -- this document is

17        Bates stamped 385 to 386, and it has two

18        attachments.  I was just trying to confirm what the

19        attachments are.  The next document in the

20        production is this one, framework for ensuring

21        compliance.

22             MS. LUKIS:  So it's sequential to AHCA.  It's,

23        what, 385, 386, 387?

24             MS. GRUSIN:  Yes.  And then this one is 391.

25             MS. LUKIS:  Yes, that's fine.

1          MS. GRUSIN:  And then this is 392.

2          MS. LUKIS:  Yes, we can stipulate to that.

3          MS. GRUSIN:  Great.  I appreciate that.  So

4      I'm going to mark the document labeled 392 as

5      Exhibit 24, and we've stipulated that those are the

6      attachments to this email.

7          (Plaintiffs' Exhibit 24 was marked.)

8  BY MS. GRUSIN:

9      Q    And so these attachments, these are documents

10  provided by CMS; right?

11     A    Yes, it appears to be.

12     Q    Have you reviewed these documents previously?

13     A    No.  No, I haven't.

14     Q    So you don't know whether these documents

15  mention notices at all?

16     A    No.

17     Q    Would it be fair to say that notices were not

18  a focus of CMS's review of Florida's compliance with the

19  Consolidated Appropriations Act?

20         MS. LUKIS:  Object to form.  You can answer.

21         THE WITNESS:  That was my understanding.

22         (Plaintiffs' Exhibit 25 was marked.)

23  BY MS. GRUSIN:

24     Q    I'm going to mark as Exhibit 25 a document

25  with a Bates stamp ACHA 2175.  So here is Tom

1    responding.  He says, please find attached Florida's

2    confirmation of renewal requirements per your request.

3    Please let us know if you have any questions or would

4    like to get on a call with us to discuss.

5            So my question is did DCF participate in

6    drafting answers to the questions that CMS had?

7        A    I do not know.

8        Q    I'm going to show you the attachments, what I

9    believe is sequential.  I hope we can stipulate it's the

10   attachment as well.

11           MS. GRUSIN:  Ashley, that was ACHA 2175 to

12       2176.  And this is ACHA 2177.  I see a thumbs up,

13       so we are stipulated that this was the attachment.

14   BY MS. GRUSIN:

15       Q    I'm just going to show you these and ask you

16   did DCF participate in drafting these responses?

17       A    I do not know if we did or not.

18       Q    You understand that you are designated to

19   testify on behalf of DCF regarding CMS's review of the

20   redetermination plan?

21       A    Yes.

22       Q    And so it's your position that the DCF doesn't

23   know if it was involved in drafting these answers to

24   CMS?

25       A    My assumption is yes, but I was not involved.

1    And the individual who was is retired.

2         Q    And who was that individual?

3         A    Patti Grogan.

4         Q    The other documents that you mentioned were

5    submitted to CMS were a draft of your unwinding plan

6    and the redetermination plan; right?

7         A    Yes.

8              (Plaintiffs' Exhibit 26 was marked.)

9    BY MS. GRUSIN:

10        Q    So I just want to show you those documents and

11   make sure we're talking about the same thing.  Let's

12   find first the draft.  I think this might be the final

13   version of the unwinding plan.  We will mark this as

14   Exhibit 26.

15             I don't know if this was actually produced in

16   discovery or it has a Bates stamped version.  But it's a

17   document titled Florida's Medicaid redetermination plan.

18   It's a 43-page document.  Is this the unwinding plan

19   that you were referencing?

20        A    Yes, a draft of it.  I believe this is the

21   final.  When we did the email sweep and clicked on the

22   link, that was sent to CMS.  It was no longer available.

23        Q    But this is the final version of the draft?

24        A    Yes.

25        Q    Do you know whether this draft talks anywhere

1    about the content of adverse action notices?

2        A    I ran through it, but I'm not recalling where

3    it talks about adverse action notices.

4        Q    And when I say adverse action notices, do you

5    understand that term?

6        A    Yes.

7        Q    Could you just tell me what your understanding

8    is so we can make sure we're on the same page?

9        A    That action has been taken that was not, I

10   guess -- I don't want to say positive.  But, you know,

11   adverse action, basically, normally it means that you

12   were not eligible, or we were giving you ten days'

13   notice before changing or making a change.

14       Q    So that could be like a termination or a

15   negative change, a reduction in benefits; right?

16       A    Yes.

17       Q    To your knowledge, Florida's Medicaid

18   Redetermination Plan didn't discuss the content of

19   notices that would be used to communicate when someone's

20   coverage was ending or being reduced; is that fair?

21       A    No.

22       Q    Sorry.  No, the plan doesn't discuss it, or,

23   no, what I said is not fair?

24       A    No, it doesn't discuss it.

25       Q    Do you know why not?

```
 1        A    The plan focused more on communications,
 2   outreach, the steps we were going to take in order to
 3   inform individuals about the upcoming changes, since,
 4   you know, they hadn't done renewals in several years.
 5   That was the point of this, really.
 6             (Plaintiffs' Exhibit 27 was marked.)
 7   BY MS. GRUSIN:
 8        Q    And then you also mentioned a redetermination
 9   plan in the format that CMS had asked for it.  So I want
10   to show you a document and ask you if that's what you're
11   referring to.
12             So we'll mark this as Exhibit 27.  This was
13   produced by defendants, but the version wasn't Bates
14   stamped at the time.
15             MS. GRUSIN:  I think, Ashley, that you all
16        produced last night probably Bates stamped
17        versions.  Andy sent an email, but I haven't
18        managed to go through them all.  So we'll just mark
19        this as Exhibit 27.
20   BY MS. GRUSIN:
21        Q    Is this the redetermination plan that you were
22   referring to sort of in the format that CMS had wanted
23   it?
24        A    Yes.
25        Q    Now, I wanted to ask you one question about
```

1    something that was on here.  It's on Page No. 7.  Under

2    Section C, it says, improved consumer outreach

3    communication and assistance.

4           The first one says, revised consumer notice

5    language to ensure that information is communicated in

6    plain language, including that it clearly explains the

7    appeals process, also known as the Medicated Fair

8    Hearing and CHIP review process as applicable.

9           And then underneath there is a checkmark that

10   says, planning or considering to adopt.  Why did the

11   redetermination plan check planning or considering to

12   adopt under this bullet?

13      A     If I recall, we were looking at our footer

14   language, and that included the hearings information and

15   a multitude of things that were in what we call our

16   footer.  We were reviewing all of that information.

17      Q     So when you were reviewing -- when you talk

18   about the footer language, that's the sort of standard

19   language that's included at the bottom of most notices

20   of case action?

21      A     Yes.

22      Q     And are you referring to the project where

23   they added QR codes, for example?

24      A     I think that was later on in the process, but

25   we did that.  And then, yes, we did later on add the QR

1    codes.

2        Q    So when you talked about planning or

3    considering to adopt revised consumer notice language,

4    that was limited to the footer text?

5        A    Yes.

6        Q    Did Florida conduct any other revisions to

7    notice language to ensure the information is

8    communicated in plain language?

9        A    No.

10       Q    When reviewing the footer language or the

11   footer text for plain language, what plain language

12   standards did DCF apply?

13            MS. LUKIS:  Is this on 17 still?

14            MS. GRUSIN:  Yes.  I'm asking about what the

15            basis for this report to CMS was.

16            MS. LUKIS:  You can answer.

17            THE WITNESS:  Can you ask the question again,

18            please.

19            MS. GRUSIN:  Could you just read it back,

20            Iris.  Would that be okay.

21            (The following was read into the record by the

22            reporter:  When reviewing the footer language or

23            the footer text for plain language, what standards

24            did DCF apply?")

25

1    BY MS. GRUSIN:

2        Q    Do you need clarification?

3        A    Yeah.  I mean, because I thought I heard you

4    say something else than what she had said.

5        Q    I'm just trying to ask when you reviewed the

6    footer text and revised the footer text, what plain

7    language standards did DCF apply?

8        A    I mean, I don't know if there is a certain

9    thing that has to be done for plain language.  But I

10   know when we were doing this footer, we had actually

11   shared the language with outside individuals for their

12   feedback and review.

13       Q    Which outside individuals?

14       A    I think the Florida Justice Project.

15       Q    Anyone else?

16       A    No, not that I'm aware of.

17       Q    You referenced a call with CMS in May of 2023

18   where they had raised a concern or a complaint about the

19   fair hearing language.  In that discussion or in

20   follow-up to that conversation, did DCF provide CMS with

21   any copies of a notice?

22       A    Not that I am aware of.

23       Q    So to your knowledge, DCF never provided CMS

24   with a termination or a denial notice?

25       A    Not that I'm aware of, no.

1    Q    Do you understand why CMS asked for the change

2    in the fair hearing text?  Do you understand what their

3    concern was about the fair hearing language?

4    A    Yes.  The policy is that if someone is

5    requesting that -- requesting a hearing, we are to

6    automatically restore them.  They don't have to ask us

7    to restore them, but that we will restore them while

8    we're waiting on a hearing decision.

9    Q    And so why did that require a change to the

10   fair hearing text?

11   A    Well, if it said may, now that kind of alludes

12   to maybe, maybe not.  And so will is more direct that we

13   will do this.

14   Q    Do you know when CMS first asked DCF to make

15   the change in the fair hearing paragraph?

16   A    Like actual date?

17   Q    Well, like was it in that May call?

18   A    Yes.

19   Q    May 2023 call?

20   A    (Nods head up and down.)

21   Q    I realize that "May" can be vague because

22   we're talking about will to may or may to will.

23        Did CMS first ask DCF to make the change to

24   the fair hearing text in the month of May 2023; is that

25   right?

1    A    Yes.

2    Q    Do you know when the change was ultimately

3  implemented?

4    A    October.

5    Q    So is it fair to say that there were at least

6  five months when DCF knew that the notices had language

7  that CMS wanted changed, but the notices kept going out?

8    A    Yes.

9    Q    Did CMS and DCF ever talk about sending

10  corrective notice to individuals who had received the

11  prior version of the language?

12    A    Not that I'm aware of, no.

13    Q    Did DCF ever consider sending corrective

14  notice?

15    A    Can you repeat that?

16    Q    Did DCF ever consider sending corrective

17  notice?

18    A    No.

19    Q    Why not?

20    A    It just wasn't something in order for us to

21  regenerate a notice that would probably take another

22  system enhancement.

23    Q    Did CMS and DCF ever discuss whether the MAGI

24  termination notices include basic information about the

25  non-MAGI bases of eligibility?

1      A    Can you ask that again?

2      Q    Did DCF ever discuss with CMS whether the MAGI

3    termination notices include basic information on

4    non-MAGI bases of eligibility?

5      A    I'm not sure I'm understanding or following.

6      Q    Did CMS and DCF ever discuss whether the

7    termination notices for Family-related Medicaid describe

8    the availability of other categories of eligibility,

9    such as the SSI-related eligibility categories?

10     A    So you're saying that if we took action on a

11    family-related, did we provide any information about

12    the, I guess, SSI-related in that denial?

13     Q    Yes.

14     A    No, we didn't have discussion on that.

15     Q    Did DCF and CMS ever discuss whether adverse

16    action notices include information regarding the

17    services and benefits that might be available to

18    individuals who are eligible in other eligibility

19    categories?

20     A    Not that I'm aware of.

21     Q    Did CMS and DCF ever discuss whether the

22    adverse action notices include information regarding the

23    process for requesting a determination under the

24    SSI-related categories?

25     A    Not that I'm aware of.

```
 1        Q     Has DCF ever discussed the Access

 2    Modernization Project with CMS?

 3        A     Yes.

 4        Q     Did they discuss it as part of the

 5    conversations around unwinding?

 6        A     No.

 7        Q     I think you said this already, but just to

 8    make sure.  Other than the concern about the fair

 9    hearing language which came from a complaint raised to

10    CMS, did CMS ever raise any other concerns about DCF's

11    notices of adverse action?

12        A     Not that I'm aware of.

13        Q     Did CMS ever review any of DCF's notices of

14    adverse reaction?

15        A     Not that I'm aware of.

16              MS. GRUSIN:  Can we take a five-minute break.

17              (Recess 3:29 p.m. until 3:34 p.m.)

18    BY MS. GRUSIN:

19        Q     We discussed earlier about reason code 350, an

20    individual is in the same case but a different category.

21    Is that a negative reason code?

22        A     Yes.

23        Q     So can that code be used to move someone from

24    Medicaid to Medically Needy?

25              MS. LUKIS:  Same objection as earlier about
```

1          this reason code not being highlighted on DCF 473,

2          but you can answer.

3               THE WITNESS:  Yes.

4               MS. GRUSIN:  Candidly, I think it wasn't --

5          because I didn't realize it was a negative reason

6          code.

7     BY MS. GRUSIN:

8          Q    So individuals in the same case but a

9     different category can be used to move somebody from

10    Medicaid to Medically Needy?

11         A    Yes.

12         Q    Can it also be used to move someone from

13    Medicaid to Family Planning?

14         A    Yes.

15         Q    And Medicaid to emergency Medicaid?

16         A    Yes.

17         Q    We talked earlier about reason code 241.

18    There are also some reason codes that seem to use the

19    same language but have different numbers.  We can look

20    at Exhibit 8, the reason code list again.  I just want

21    to ask if there are different purposes for -- if there

22    are any different purposes for other reason codes that

23    have similar language.

24               So let's look at -- so remember 241.  We're

25    looking at Exhibit 8.  Reason code 241 says, your

1    household's income is too high to qualify for this

2    program.  242 also says your household's income is too

3    high to qualify for this program.

4              What's the difference between those two, or is

5    there any difference?

6        A    There isn't.

7        Q    There's no difference in intended use or

8    intended meaning?

9        A    Can you give me -- I want to check one thing

10   on the other tab on the TSRC.  Will you go to the top

11   and let me see what those headers are?

12       Q    They just say description.  There's a

13   different version of the reason code list that has those

14   filled in.  Would you like to see that?

15       A    No.  Sometimes the only reason I can think

16   that maybe they created another one is that -- and I

17   don't think that's the case.  But sometimes it will say

18   used for this program specifically.  But to me, it looks

19   like a duplicated reason code.

20       Q    And then 482, I think it's the same language.

21   Your household income is too high to qualify for this.

22   And if we look at the one that actually goes to the

23   clients, it says your household's income is too high to

24   qualify for this program.  So is 482 another duplicate?

25       A    Yes.

1    Q    And then same question about 502, your

2    household's income is too high to qualify for this

3    program, is that another duplicate?

4    A    This is where it might be in the 500s, we

5    might be getting more into like the benefit recovery.

6    So, yes, it appears to be a duplicate, but it might be

7    used for a different purpose.

8    Q    And why would you need a different reason code

9    to be used for a different purpose when you already have

10   three that say the same thing?

11   A    I know that we have different things assigned

12   to different areas, and I don't know the background

13   behind that that is more of an IT.  It's probably how

14   the system was built.

15   Q    I want to look at 240 because to be looking at

16   ones that say your household income is too high to

17   qualify for this program, and 240 says your income is

18   too high to qualify for this program.  What's the

19   significance between those two reason codes?

20   A    There's not really much significance in the

21   difference.

22   Q    And then 244 also says your income is too high

23   to qualify for this program.  Is that just a duplicate?

24   A    Yes.

25   Q    And then 253 also says your income is too high

 1  to qualify for this program, so that's another

 2  duplicate?

 3      A   Yes.

 4      Q   And then same with 522, your income is too

 5  high to qualify for this program.  Is that a duplicate

 6  or maybe because it starts with 500, it might be for a

 7  different purpose?

 8      A   It might be for a different purpose.

 9      Q   But you can't tell what that purpose is,

10  looking at the TSRC table?

11      A   Not at this version, no.

12      Q   Is there a version where you would be able to

13  tell?

14      A   If I was actually in our eligibility system.

15      Q   What would you be able to see in your

16  eligibility system?

17      A   Again, which programs it's assigned to be used

18  for.

19      Q   Would you be able to tell that based on the

20  column headers in this FLODS version?  If these

21  descriptions up here had programs, would that help

22  clarify that for you?

23      A   It wouldn't look it the way I would look at it

24  in the system.

25      Q   We'll ask the IT folks.  Okay.  I think that's

1    all I have for you.

2                        CROSS EXAMINATION

3    BY MS. LUKIS:

4         Q    Going back to the beginning of your

5    conversation with Ms. Grusin, we're going to talk a

6    little bit about the ESS policy manual.  Is the ESS

7    policy manual available on DCF website?

8         A    Yes.

9         Q    And do you recall looking at Appendix A-7, the

10   income charts that are part of that ESS policy manual,

11   do you recall looking at those during your earlier

12   conversation?

13        A    Yes.

14        Q    And are those available on the DCF website?

15        A    Yes.

16        Q    Is there a section of the ESS policy manual

17   that addresses the standard filing?

18        A    Yes.

19        Q    And is that available on the DCF website?

20        A    Yes.

21        Q    Is there a section of the ESS policy manual

22   that addresses income, limits for Family-related

23   Medicaid?

24        A    Yes.

25        Q    And is that available on DCF website?

1      A     When you say income limits or determining?

2   There is an income section in the policy manual.

3      Q     Is the income section of the policy manual

4   available on the DCF website?

5      A     Yes.

6      Q     Were you designated as DCF's representative to

7   testify about the call center?

8      A     No.

9      Q     Were you designated as DCF's representative to

10  talk about the circumstances of any individual

11  recipients or plaintiffs?

12     A     No.

13     Q     Were you designated to testify as DCF's

14  representative with regard to the Access Modernization

15  Project?

16     A     No.

17     Q     I want to talk a little bit about the 2021

18  vendor -- we'll say roughly 2021 because I think you

19  said you think it was 2021 -- recommendations that you

20  discussed earlier.

21         Do you recall your testimony about this 2021

22  vendor recommendations regarding the notices?

23     A     Yes.

24     Q     Have you had any conversations about

25  implementing any of the vendor recommendations in 2021

1   into the presently-funded Access Modernization Project?

2       A    No.

3       Q    Are you aware of any plan changes to NOCAs or

4   reason codes that implement the 2021 recommendations?

5       A    No.

6       Q    The last thing I want to talk about is the

7   SHADAC report.  Do you recall in your earlier testimony

8   observing the statement in the SHADAC report that the

9   notices were reported to generate confusion?  Do you

10  recall talking about that earlier?

11      A    Yes.

12      Q    What is the basis of your understanding of

13  that observation in the SHADAC report that the notices

14  cause confusion?

15      A    That there isn't anything specific that comes

16  to mind as far as what exactly is causing confusion.

17  It's just the general idea thought of customers asking

18  questions, calling the call center for clearer

19  information.

20      Q    Can the Department today pinpoint what in the

21  NOCAs cause confusion that was reported in the SHADAC

22  report?

23      A    No.

24          MS. LUKIS:  That's all I have.  Thank you.

25

```
 1                    REDIRECT EXAMINATION

 2   BY MS. GRUSIN:

 3        Q    I just have two follow-ups.  Does standard

 4   filing unit mean the same thing as family size?

 5        A    Yes.  It could be determined that way, yes.

 6        Q    So standard filing unit, and so somebody would

 7   have to determine that to figure out their family size,

 8   they need to look at the chapter of the ESS manual

 9   titled standard filing unit; right?

10        A    Yes.

11        Q    Since the SHADAC report was issued, has the

12   Department attempted to pinpoint what part of the NOCAs

13   are causing confusion?

14        A    No, we haven't.

15             MS. GRUSIN:  That's it.

16             MS. LUKIS:  We will read.

17             (Thereupon, the taking of the deposition

18        concluded at 3:46 p.m)

19

20

21

22

23

24

25
```

1                     **CERTIFICATE OF OATH**

2

3    **STATE OF FLORIDA**

4    **COUNTY OF LEON**

5

6              I, I. Iris Cooper, Notary Public, State of

7    Florida, certify that TONYALEAH M. VELTKAMP

8    remotely appeared before me on March 18, 2024 and

9    was duly sworn.

10

11             Signed this 21st day of March, 2024.

12

13

14

15    _____
       I. Iris Cooper, Stenographic Reporter
16     Notary Public, State of Florida
       Commission No. 1366674
17     Expires: February 7, 2028

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

**STATE OF FLORIDA**

**COUNTY OF MIAMI-DADE**

       I, I. IRIS COOPER, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition of TONYALEAH M. VELTKAMP; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

       I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

       Dated this 21st day of March, 2024.


_____
I. Iris Cooper
*Stenographic Reporter*
Notary Public, State of Florida
My Commission No. 1366674
Expires: February 7, 2028

```
 1                          ERRATA SHEET
           DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
 2
           Deponent:  TONYALEAH M. VELTKAMP
 3         Date:      March 18, 2024
           CASE NO.:  3:23-cv-985-MMH-LLL
 4         CASE:      Chianne D. vs. Jason Weida (OAG)

 5         PAGE   LINE        REMARKS

 6         _____

 7         _____

 8         _____

 9         _____

10         _____

11         _____

12         _____

13         _____

14         _____

15         _____

16         _____

17         _____

18         _____

19
           Under penalties of perjury, I declare that I have read
20         the foregoing document and that the facts stated in it
           are true.
21
           Signature of Witness _____
22
           Dated this _____ day of _____, _____.
23
24         Job No. 354345

25
```

```
 1   March 21, 2024

 2   Ashley Hoffman Lukis, Esq.
     GrayRobinson
 3   Phone: 850-577-9090
     Email: ashley.lukis@gray-robinson.com
 4
     WITNESS:   TONYALEAH M. VELTKAMP
 5   CASE NO.:  3:23-cv-985-MMH-LLL
     Date:      March 18, 2024
 6   CASE:      Chianne D. vs. Jason Weida (OAG)

 7   The transcript of the above proceeding is now available
     and requires signature by the witness.  Please e-mail
 8   fl.production@lexitaslegal.com for access to a read-only
     PDF transcript and PDF-fillable errata sheet via
 9   computer or use the errata sheet that is located at the
     back of the transcript.
10
     Once completed, please print, sign, and return to the
11   email address listed below for distribution to all
     parties.  If you are in need of assistance, please
12   contact Lexitas at 888-811-3408.

13   If the witness does not read and sign the transcript
     within a reasonable amount of time (30 days if Federal
14   court), the original transcript may be filed with the
     Clerk of the court.
15
     If the witness wishes to waive his/her signature now,
16   please have the witness sign on the line at the bottom
     of this letter and return to the email address listed
17   below.

18   Very truly yours,

19


20   _____
     I. Iris Cooper, Stenographic Reporter
21   Lexitas
     fl.production@lexitaslegal.com
22

23   I do hereby waive my right to read and sign.

24
     _____
25   TONYALEAH M. VELTKAMP
```