# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

Chianne D., et al.,

      Plaintiffs,

v.                                                          Case No. 3:23-cv-00985-MMH-LLL

Jason Weida, in his official capacity
as Secretary for the Florida Agency
for Health Care Administration, et al.,

      Defendants.

_____/

## JOINT PRETRIAL STATEMENT

Plaintiffs, Chianne D., C.D., A.V., and Kimber Taylor, and Defendants, Jason Weida, in his official capacity as Secretary for the Florida Agency for Health Care Administration ("AHCA") and Shevaun Harris, in her official capacity as Secretary for the Florida Department of Children and Families ("DCF"), jointly submit this Joint Pretrial Statement pursuant to the Court's Scheduling Order dated January 4, 2024 (ECF No. 72).

### I.   Basis of Federal Jurisdiction

The parties agree this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under the Constitution and the laws of the United States, which Plaintiffs seek to enforce pursuant to 42 U.S.C. § 1983.

## II.  Concise Statement of the Action

The question presented is whether certain notices that DCF issues to Medicaid recipients to inform them of DCF's determination of their ineligibility for Medicaid and the termination of their Medicaid benefits complies with the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1396a(a)(3).

## III.   Concise Statement of Each Party's Position

### A. Plaintiffs' Statement

On behalf of the certified class (ECF No. 122), Plaintiffs contend that Defendants' Medicaid termination notices violate the Medicaid Act by failing to provide a statement of the action, the specific reasons supporting the action, the specific regulations that support the action, or the individual's hearing rights. 42 U.S.C. § 1396a(a)(3), 42 C.F.R. §§ 431.205, 431.206(b), 431.210.

Plaintiffs further contend that the identified deficiencies in Defendants' notices violate class member's constitutional due process rights because the notices are not "reasonably calculated, under all the circumstances," to inform the recipients of the action being taken and "afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 316, 314 (1950).

Both the statute and the Constitution require DCF's income-based termination notices to identify (1) income as the criteria on which the State relied on in reaching a determination of Medicaid ineligibility, (2) the individualized income and income standard used in the ineligibility determination, and (3) the population group in which the individual was evaluated and population groups through which they could establish eligibility. DCF's notices uniformly omit this information and other communications do not reasonably apprise Medicaid enrollees of the reason for the State's action.

Plaintiffs seek a declaratory judgment that the notices violate the Medicaid Act and Due Process Clause of the Fourteenth Amendment, an injunction prohibiting Defendants from issuing the challenged notices, and prospectively reinstating Medicaid coverage to affected class members until legally adequate notice is provided, and other appropriate relief.

B. <u>Defendants' Statement</u>

Plaintiffs' claims ask two questions:

1. Whether, under due process, the State provides notice reasonably calculated under all the circumstances to apprise Medicaid recipients of the termination of their coverage and to afford them an opportunity to object; and

2. Whether, under federal regulations, the State's Medicaid termination notices provide recipients with a "clear statement of the specific reasons supporting the intended action," 42 C.F.R. § 431.210(b), and inform them of their "right to a fair hearing" and "the method by which [they] may obtain a hearing," *id*. § 431.206(b).

The answer to both questions is yes. The State's notices are a permissible and reasonable means of communicating with millions of recipients. Neither due process nor federal regulations require termination notices to recite the individualized facts (such as the amount of income the State calculated or the income standard the State applied) that Plaintiffs contend a notice must contain. Nor does due process require notices to summarize the substance of laws that the public is presumed to know. The notices invite recipients who seek more information to call or visit DCF and enable recipients to challenge DCF's decisions. The fair-hearing language in the State's notices has always advised recipients of their hearing rights, and recent revisions to that language provide even more information.

The question for this Court is not whether the notices can be improved, but whether they satisfy the baseline requirements of due process and Medicaid regulations. The State's notices clear these minimum legal thresholds.

## IV.   Exhibit List

Plaintiffs' exhibit list, with a notation of each of Defendants' objections, is attached to this Joint Pretrial Statement as Appendix [1]. Defendants' exhibit list, with a notation of each of Plaintiffs' objections, is attached to this Joint Pretrial Statement as Appendix [2].

## V.  Witness List including Expert Witness

Plaintiffs' witness list is attached to this Joint Pretrial Statement as Appendix

[3]. Defendants' witness list is attached to this Joint Pretrial Statement as Appendix

[4].

## VI.   Breakdown of the Type and Amount of Monetary Damages

No monetary damages are requested.

## VII.   Deposition Designations

Plaintiffs intend to rely on the deposition testimony of the below witnesses

who were identified by Defendants as designees under Fed. R. Civ. P. 30(b)(6). *See*

Fed. R. Civ. P. 32(a)(1) & (3).

- Hari Kallumkal (March 5, 2024)
- Tonyaleah Veltkamp (March 18, 2024 & April 17, 2024)
- Karina Sarmiento (March 18, 2024)
- James Garren (March 18, 2024)
- Andrea Latham (March 18, 2024)
- William Roberts (March 19, 2024) (transcript marked confidential)
- Ann Dalton (March 19, 2024)
- Christopher Presnell (March 19, 2024)
- Robyn Goins (March 19, 2024) (transcript marked confidential)
- LaQuetta Anderson (March 19, 2024)
- Nichole Solomon (March 21, 2024)

Defendants will counter-designate portions of the depositions on which

Plaintiffs intend to rely.

### VIII.  Concise Statement of Each Admitted Fact

A.  <u>Medicaid's Federal Framework</u>

1.     Medicaid is a federal-state cooperative health care program jointly funded by the states and the federal government.

2.     The Centers for Medicare & Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) is the agency that administers Medicaid at the federal level.

3.     As a state that participates in the Medicaid program, and as required by the Medicaid Act, Florida has developed a Medicaid State Plan that describes the nature and scope of its Medicaid program.

4.     States receive federal matching funding, called Federal Financial Participation (FFP), for Medicaid services provided to eligible enrollees. The federal government matches the state's Medicaid expenditures at a specified rate. Florida currently receives a federal matching rate of approximately 60% (60 cents of every dollar spent) for Medicaid services.

B.  <u>Florida's Medicaid Program</u>

5.     Florida participates in Medicaid.

6.     AHCA is the single state agency designated to administer or supervise the administration of Florida's Medicaid program. *See* 42 C.F.R. § 431.10(b)(1); Fla. Stat. § 409.902(1).

7.     The Florida Legislature has vested DCF with responsibility for Medicaid eligibility determinations, which includes the issuance of notices of those determinations. Fla. Stat. § 409.902(1).

8.     DCF does not determine eligibility for Florida's Children's Health Insurance Program (CHIP) under Title XXI of the Social Security Act, which Florida refers to as KidCare. The entity responsible for determining KidCare eligibility is the Florida Healthy Kids Corporation (FHKC).

9.     DCF uses the term "Notice of Case Action" or "NOCA" to refer to the notices that DCF uses to notify customers of actions taken related to its customers' cases. DCF uses NOCAs for all of the benefit programs for which it determines eligibility, including food assistance, temporary cash assistance, Medicaid, and the Medically Needy program. As it relates to this case, one way that DCF uses NOCAs is to advise customers of their eligibility or ineligibility for Medicaid benefits.

10.     DCF has approximately forty-one customer-service office locations across Florida known as Family Resource Centers (and formerly known as ESS Storefronts and Lobbies).

11.     DCF maintains a document called the Economic Self-Sufficiency (ESS) Program Policy Manual (the "Manual"). Among other things, the Manual describes the rules that govern Medicaid eligibility determinations and defines terms used in Florida's Medicaid program.

12.     DCF's Manual also has appendices, such as Appendix A-7, which is a chart entitled "Family Related Medicaid Income Limits."

13.     "Family-Related Medicaid" refers to Medicaid provided to children, parents and other caretakers of children, pregnant women, and individuals under age 26 who were enrolled in Medicaid when they aged out of foster care. In contrast, "SSI-Related Medicaid" refers to Medicaid provided to needy individuals who are aged, blind, or disabled in the community or with special living arrangements.

14.     Florida operates a Medically Needy program for individuals who would be eligible for Medicaid except that their income or assets exceed established limitations. Fla. Stat. § 409.904(2). Each month, coverage through the Medically Needy program begins when the medically-needy assistance group incurs allowable medical expenses equal to its share of cost. Once an individual enrolled in the Medically Needy program reaches his or her share of cost for the month, the individual (and other enrolled individuals in the household) receive full Medicaid coverage for the remainder of the month.

15.     In Florida's Medicaid program, a person who has been found eligible for Medicaid on the basis of pregnancy remains eligible through the pregnancy regardless of increases in income. Fla. Stat. § 409.903(5).

16.     Effective in 2022, Florida extended post-partum Medicaid eligibility for pregnant women from 2 months to 12 months from the last day of the pregnancy.

Ch. 2021-41, § 5, Laws of Fla. (codified at Fla. Stat. § 409.903(5)). Individuals who are enrolled in Medicaid while pregnant are eligible for 12 months of post-partum coverage, regardless of increases in income. *Id*.

            C. <u>Medicaid & the Public Health Emergency "Unwind"</u>

17.    During the COVID-19 pandemic, federal legislation increased the federal medical assistance percentage, or FMAP, by 6.2 percentage points. *See* Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008(a), 131 Stat. 178, 208 (2020). The FMAP is the rate that determines the amount of FFP that a State receives.

18.    To receive the increase in the federal matching rate, Congress required States to treat any person who was enrolled in Medicaid on March 18, 2020—or who enrolled between March 18, 2020, and the end of the month in which the emergency period ended—as eligible for Medicaid until the end of the month in which the emergency period ended (unless the person requested voluntary termination of eligibility, ceased to be a resident of the State, or is deceased). *Id*. § 6008(b)(3), 131 Stat. 208–09.

19.    To obtain the enhanced funding, DCF implemented processes to maintain Medicaid eligibility pursuant to the continuous enrollment condition under the Families First Coronavirus Response Act.

20.     In December 2022, Congress provided that the continuous enrollment condition would end on March 31, 2023. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 5131(a)(2)(C)(iv), 136 Stat. 4459, 5949 (2022). As a result, federal law required States to resume Medicaid redeterminations and otherwise return to normal eligibility and enrollment operations.

21.     This process is commonly called "unwinding."

22.     In response to the federal directive to resume redeterminations, Florida elected to begin that process in March 2023.

### D. DCF's Technology Systems

23.     The ACCESS Florida System refers to an environment of 28 interconnected software applications and components across various platforms. The ACCESS Florida System supports DCF's Economic Self Sufficiency (ESS) program, which is responsible for administering several federal and state public-assistance programs, including cash assistance (TANF) and food assistance (SNAP), and enables eligibility determinations for Medicaid.

24.     Part of the ACCESS Florida System is FLORIDA. FLORIDA is the legacy mainframe system that is utilized by case workers to collect and verify client information, determine benefit eligibility, and perform related functions. DCF's legacy mainframe system is more than thirty years old.

25.     Another part of the ACCESS Florida System is the Client Notices (ExStream) System, which is used to create, manage, and deliver printed customer notifications, including NOCAs.

26.     The MyACCESS Customer Portal is a system within the ACCESS Florida System that is intended to enable users to apply online for benefits, view NOCAs and other notices, report changes to their household circumstances, renew benefits, apply for new benefits, upload documents, and request Medicaid cards.

27.     The Florida Operational Data Store (FLODS) is a part of the ACCESS Florida System that operates as a consolidated source of data supporting several customer- and staff-facing web applications requiring access to data.

28.     The ACCESS Management System (AMS) is a system used by staff to track assignments and progress of work items throughout the eligibility process. It contains new, recertification, and additional-benefit applications; reported changes; calls; notices; and other links and data to support work management.

29.     Separate from the ACCESS Florida System, the Florida Medicaid Management Information System (FMMIS) is a system used and maintained by AHCA for Medicaid claims processing. FMMIS also stores information about the status and eligibility history of Florida Medicaid enrollees.

30.     DCF has contracted with Deloitte to perform maintenance, operations, and enhancements for the ACCESS Florida System.

31.     Reason codes and the associated text that appears in NOCAs are housed in a table in an Oracle database.

32.     DCF has undertaken a modernization project to incrementally replace the ACCESS Florida System. The overall project roadmap timeline is reflected in Version 3.0 of DCF's Operational Work Plan for ACCESS Florida System Modernization Project, which is the latest Operational Work Plan submitted to the Florida Legislature for the modernization project.

33.     The current ACCESS modernization project has been funded since 2022. DCF is now in year two of the project's six-year timeline. The first two years of the modernization project were funded by state and federal partners on an annual basis.

34.     On December 5, 2023, a new MyACCESS Customer Portal was released to replace the legacy ACCESS Self-Service Portal used by customers to apply for and manage their benefits. In addition, the first phase of a new Management Portal was released for staff, with the remaining phases of the new portal to be implemented later in the ACCESS modernization project.

E.     DCF's Medicaid Notices

35.     NOCAs contain some uniform elements and are system-generated in whole or in part. NOCAs are based on templates. There are approximately 50 English-language NOCA templates covering approvals, denials, changes, and

terminations. Each NOCA template contains the same "footer" text, which includes a paragraph concerning fair hearings.

36.    NOCAs also include some dynamic language, that is, language that varies based on case-specific information. For dynamic language to appear in a NOCA, there must be a placeholder for case-specific information in the template.

37.    Reason codes are examples of dynamic language in the NOCAs. Some reason codes are system-generated, while others are manually selected by DCF's eligibility specialists. Some reason codes can be either system-generated or manually selected.

38.    DCF uses a finite number of reason codes.

39.    In December 2023, DCF revised six reason codes as reflected in Def. Ex. 123.

E. <u>Plaintiff & Declarant Facts</u>

***Chianne D. & C.D.***

40.    Chianne D. and her daughter, C.D., were first enrolled in Medicaid before February 2023.

41.    On March 20, 2023, DCF sent Chianne D. a Medicaid renewal request. Chianne D. filed a renewal application on March 21, 2023.

42.     On April 4, 2023, DCF issued a NOCA requesting Chianne D. provide information about the income of C.D.'s father and her husband, Chandler D. On April 11, 2023, Chianne D. provided the information requested by DCF.

43.     On April 24, 2023, DCF issued a NOCA to Chianne D. that contained information about Chianne D.'s and C.D.'s Medicaid.

44.     DCF terminated Chianne D.'s Medicaid coverage on May 31, 2023.

45.     DCF terminated Chianne D.'s Medicaid coverage because it determined that Chianne D.'s household income exceeded the applicable income limit for a parent or caretaker.

46.     In September 2023, DCF reinstated Chianne D. to Medicaid, effective retroactive to June 1, 2023, because it determined that Chianne D.'s Medicaid coverage had been erroneously terminated.

47.     Chianne D. was no longer eligible for Medicaid as of March 1, 2024, and is currently ineligible for Medicaid.

48.     DCF terminated C.D.'s Medicaid coverage on May 31, 2023. DCF terminated C.D.'s Medicaid coverage because C.D.'s household income exceeded the applicable income limit.

49.     C.D. does not dispute that DCF's determination that she was over income for Medicaid on May 31, 2023, was correct.

50.    On June 1, 2023, after a telephone conversation with Chianne D., DCF call-center staff submitted a fair-hearing request on Chianne D.'s behalf. The hearing request was entered into the FLORIDA system on June 1, 2023, and received by DCF's Office of Inspector General, Appeal Hearings Section, on June 2, 2023. The appeal was exported into the Appeal Hearings Case Management System (AHCMS) and assigned appeal number 23F-06007. On June 2, 2023, an Acknowledgement of Hearing Request notice was mailed to Chianne D. at the address on record and transmitted by electronic transfer to DCF's Office of Economic Self-Sufficiency. On that same date, the appeal was assigned to Hearing Officer Carter to schedule a hearing. On June 13, 2023, a Notice of Hearing by Telephone was sent to both parties notifying them that a hearing was scheduled for 11:00 a.m. on July 20, 2023.

51.    On June 16, 2023, Chianne D. emailed the Office of Appeal Hearings (OAH) to advise she would not be able to attend the hearing on July 20, 2023, and to request an earlier hearing date. The hearing officer granted Chianne D.'s request and rescheduled the hearing for 1:15 p.m. on July 3, 2023.

52.    On June 20, 2023, a Notice of Continuance and Rescheduling was sent to both parties notifying them of the new hearing date and time.

53.    On June 28, 2023, the OAH emailed Chianne D. to notify her that the July 3, 2023, hearing was cancelled because state offices would be closed for the July Fourth holiday, and that the hearing was rescheduled for July 13, 2023.

54.     Also on June 28, 2023, Chianne D. emailed the OAH requesting to withdraw her appeal. On June 29, 2023, the hearing officer processed Chianne D.'s withdrawal, and the appeal was closed on the same date.

**A.V.**

55.     A.V.'s Medicaid coverage began in May 2022. A.V. remained enrolled in Medicaid through May 31, 2023.

56.     On May 16, 2023, DCF issued a NOCA to A.V.'s mom, Jennifer V., that included information about A.V.'s Medicaid.

57.     DCF terminated A.V.'s Medicaid coverage effective June 1, 2023, because DCF determined that A.V.'s household income exceeded the applicable income limit.

58.     On December 18, 2023, Henry V. filed an application for health insurance coverage through the Federally Facilitated Marketplace (FFM). This application was forwarded to DCF for a determination of the household members' Medicaid eligibility.

59.     On January 18, 2024, DCF issued two notices to the family: one NOCA to Henry V. and one NOCA to Jennifer V. Neither NOCA stated A.V. was eligible for Medicaid.

60.     Subsequently, DCF found A.V. Medicaid eligible effective December 2023.A.V. is currently enrolled in full Medicaid.

### Kimber Taylor & K.H.

61.    Ms. Taylor was a Medicaid recipient during part of her pregnancy with K.H.

62.    K.H. was born in May 2023 and enrolled in Medicaid on May 22, 2023.

63.    On June 8, 2023, DCF issued a NOCA to Ms. Taylor and K.H. "because your income exceeds the limit for Medicaid."

64.    DCF terminated Ms. Taylor's Medicaid coverage because DCF found that Ms. Taylor's household income exceeded the income limits for parents and caretakers of children.

65.    DCF terminated K.H.'s Medicaid coverage because DCF found that K.H.'s household income exceeded the income limit for infants under age one.

66.    Ms. Taylor's and K.H.'s Medicaid coverage terminated on June 30, 2023.

67.    On August 5, 2023, DCF reinstated Ms. Taylor and K.H.'s Medicaid coverage, effective retroactive to July 1, 2023, because it determined that their Medicaid coverage had been erroneously terminated.

### Lily Mezquita

68.    Before July 2023, Ms. Mezquita was enrolled in Medicaid as a pregnant woman.

69.     On July 20, 2023, DCF issued a NOCA to Ms. Mezquita that contained information about her Medicaid.

70.     DCF terminated Ms. Mezquita's Medicaid coverage because DCF found that Ms. Mezquita's household income exceeded the applicable income limits for a person newly applying as pregnant.

71.     With the assistance of counsel, Ms. Mezquita requested a fair hearing to dispute DCF's determination of ineligibility for full Medicaid.

72.     DCF terminated Ms. Mezquita's Medicaid's coverage on July 31, 2023.

73.     On August 10, 2023, DCF reinstated Ms. Mezquita's Medicaid coverage effective retroactive to August 1, 2023, because it determined that their Medicaid coverage had been erroneously terminated.

## IX.    Concise Statement of Each Agreed Principle of Law

1.     The Medicaid Act, 42 U.S.C. §§ 1396–1396w-7, establishes a medical assistance program cooperatively funded by the federal and state governments.

2.     The purpose of the Medicaid program is to enable each state, "as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such

families and individuals attain or retain capability for independence or self-care." *Id.*
§ 1396-1.

3.    The Medicaid Act requires each participating state to designate a single
state agency to administer and supervise the administration of the state's Medicaid
State Plan. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b)(1).

4.    A Medicaid State Plan is a "comprehensive written statement submitted
by the [single state] agency describing the nature and scope of its Medicaid program
and giving assurance that it will be administered in conformity with" applicable
Medicaid laws and regulations. 42 C.F.R. § 430.10.

5.    Between April 1, 2023, and December 31, 2023, after expiration of the
continuous enrollment condition, States that conducted Medicaid eligibility
redeterminations consistent with all federal requirements received an enhanced
federal medical assistance percentage, or FMAP. Consolidated Appropriations Act,
2023, Pub. L. No. 117-328, § 5131(a)(4), 136 Stat. 4459, 5950 (2022).

6.    The Medicaid Act lists the population groups that must be covered by
the state, as well as options for states to extend Medicaid to additional population
groups. 42 U.S.C. § 1396a(a)(10)(A), (C).

7.    For most Medicaid enrollees, states are required to conduct a
redetermination of their eligibility (sometimes referred to as "renewal") once every
12 months, unless there is an earlier change in circumstance affecting eligibility. 42

C.F.R. § 435.916(a)(1), (b), and (d). States must attempt to renew individuals based on information already available to the agency without requesting additional information from the individual, a process known as "ex parte" redetermination. *Id*. § 435.916(a)(2).

8.    Before a state determines that an individual is ineligible for Medicaid, it "must consider all bases of eligibility." *Id*. § 409.916(f)(1).

9.    To state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must allege: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)). In this case, Defendants do not contest that Plaintiffs satisfy the first two elements set forth above.

10.    "To determine what type of notice is adequate to satisfy the Due Process Clause," the Eleventh Circuit applies the test set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). *Arrington v. Helms*, 438 F.3d 1336, 1349 (11th Cir. 2006). Under this standard, "notice must be 'reasonably calculated, under all the circumstances, to apprise intended parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id*. at 1349–50 (quoting *Mullane*, 339 U.S. at 314).

11.     "Due process is a flexible concept that varies with the particular circumstances of each case, and myriad forms of notice may satisfy the *Mullane* standard." *Id*. The question is not whether the notice is "ideal under all the circumstances, but rather whether the notice [Plaintiffs] currently receive is reasonable under all the circumstances." *Id*. at 1350. Moreover, the relevant question "is not whether a particular individual failed to understand the notice but whether the notice is reasonably calculated to apprise intended recipients, as a whole, of their rights." *Jordan v. Benefits Review Bd. of U.S. Dep't of Labor*, 876 F.2d 1455, 1459 (11th Cir. 1989).

12.     The Medicaid Act requires each state's Medicaid State Plan to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under this plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

13.     CMS regulations provide that, when a state denies a Medicaid beneficiary's claim for eligibility, benefits, or services, it must inform the beneficiary "in writing" of "his or her right to a fair hearing and right to request an expedited fair hearing," and "the method by which he may obtain a hearing." 42 C.F.R. § 431.206(b)(1)–(2). The notice must contain:

> (a) A statement of what action the agency, skilled nursing facility, or nursing facility intends to take and the effective date of such action;

(b) A clear statement of the specific reasons supporting the intended action;

(c) The specific regulations that support, or the change in Federal or State law that requires, the action;

(d) An explanation of—

(1) The individual's right to request a local evidentiary hearing if one is available, or a State agency hearing; or

(2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

*Id*. § 431.210.

## X. Concise Statement of Each Disputed Issue of Fact

A. <u>Plaintiffs' Statement</u>

*Facts related to DCF's NOCAs Generally*

1.     The reason codes [in DCF NOCAs] do not include any placeholders for individualized information. *See* First Amended Complaint (Doc. 77; FAC) ¶ 73; Defendants' Answer and Affirmative Defenses (Doc. 82; Answer) ¶ 73.[1]

2.     [DCF's]…termination notices do not indicate that household members were evaluated to determine whether they come within any other covered population

---

[1] For the paragraphs in Plaintiffs' Concise Statement of Disputed Facts that reference an admitted allegation in Plaintiffs' FAC, Plaintiffs asked Defendants to include the allegation in the Parties' Concise Statement of Each Admitted Fact. Defendants declined on the basis that the proposed stipulations presented an incomplete picture. Plaintiffs maintain that each of these facts is admitted and undisputed, but given Defendants' position, and out of an abundance of caution, have included them in the statement of disputed facts.

groups prior to being terminated. *See* FAC ¶ 83; Answer ¶ 83.

3.    [DCF] Notices do not provide the applicable income limit or the calculation of an individual's income. *See* FAC ¶ 75; Answer ¶ 75.

4.    Termination notices [i.e., NOCAs] do not identify the Medicaid eligible population group to which the individual belonged before the individual became ineligible. *See* FAC ¶ 81; Answer ¶ 81.

5.    The termination notices [i.e., NOCAs] do not indicate that household members were evaluated to determine whether they come within any other covered population groups prior to being terminated. *See* FAC ¶ 83; Answer ¶ 83.

6.    DCF's income-based Medicaid termination NOCAs that incorporate certain Designated Reasons do not identify income as a criteria on which the state relied in determining a Florida Medicaid enrollees' ineligibility.

7.    DCF's income-based Medicaid termination NOCAs do not identify the individualized income information on which DCF based its ineligibility determination.

8.    DCF's income-based Medicaid termination NOCAs do not identify the income standard, as determined by the household's SFU, on which DCF based its ineligibility determination.

9.    DCF's income-based Medicaid termination NOCAs do not identify the population group on which DCF evaluated a Medicaid enrollee's eligibility in

reaching its ineligibility determination.

10.    Information available to Medicaid enrollees through Florida's statutes, regulations, websites, ACCESS account system, Community Partner Networks, Family Resource Centers, and other sources is insufficient to fill in the uniform omissions of DCF's income-based Medicaid termination NOCAs.

11.    DCF does not have enough call center staff to answer the incoming volume of calls.

12.    DCF directs all calls regarding Florida Medicaid to Lighthouse call agents who can only help with simple password resets, telephonic applications, and setting up a MyACCESS account.

13.    MyACCESS accounts do not contain the countable income on which DCF relied to determine Medicaid eligibility.

14.    MyACCESS accounts do not always contain copies of applications or recertifications that Medicaid enrollees previously filed.

15.    MyACCESS accounts do not contain the standard filing unit (SFU) on which DCF relied to determine Medicaid eligibility.

16.    MyACCESS accounts do not contain the income standard on which DCF relied to determine Medicaid eligibility.

17.    There are limited numbers of Community Partners. Not all community partners provide assistance to every Medicaid enrollee who contacts them. The

degree of assistance with Medicaid that Community Partners provide is not standard. Community Partners do not have access to information in the FLORIDA system.

18.    There are limited numbers of Family Resource Centers. Family Resource Centers are not in every city or town in Florida.

19.    DCF's income-based Medicaid termination NOCAs footer include standardized fair hearing language.

20.    Before October 4, 2023, the fair hearing paragraph in the footer of the NOCAs stated: "You will be responsible to repay any benefits if the hearing decision is not in your favor." That footer paragraph now states that "You may be responsible to repay any benefits if the hearing decision is not in your favor."

21.    The October 2023 revisions do not appear in all DCF communications that relay information about fair hearings right to Medicaid enrollees.

22.    Effective April 2024, DCF purports to now include an email address and an online link to request a fair hearing in the fair hearing footer text.

23.    Prior to updates DCF purported to make in April 2024, DCF's income-based Medicaid termination NOCAs, in combination with other publicly available information, did not reasonably apprise Medicaid enrollees of their hearing rights.

24.    DCF has not committed to maintaining its October 2023 and April 2024 revisions to the fair hearing footer text.

25.    DCF has not begun to rely on the changes it made to the fair hearing

footer text in April 2024.

26.     DCF policy only authorizes the recovery of overpayments in Family-Related Medicaid that are the result of "fraud or intentional program violation." *See* FAC ¶ 92; Answer ¶ 92.

*Plaintiff & Declarant Facts*

27.     In reaching a determination of Chianne D.'s Medicaid ineligibility for June 2023, DCF considered the fact that Chianne D. was a parent and had a standard filing unit (SFU) size of four, and that the SFU's gross income was $5,418 in the four-week period preceding Chianne D.'s application date. DCF applied the income limit for parents and caretakers, which is $710 a month ($364 plus a standard disregard of $221 and an additional MAGI disregard of $125). *See* DCF Program Policy Manual Appendix-7 (2023).

28.     In reaching a determination of C.D.'s Medicaid ineligibility for June 2023, DCF considered the fact that C.D. was a child between the ages of one and five and had an SFU size of four, and that the SFU's gross income was $5,418 in the four-week period preceding C.D.'s application date. This gross income exceeded the applicable income limit for children ages one through five, which was $3,625 (133% of the Federal Poverty Level ($3,325) plus a standard disregard of $175 and an additional MAGI disregard of $125). *See* DCF Program Policy Manual Appendix A-7 (2023).

29.    The NOCA dated April 24, 2023 issued to Chianne D. did not state what income DCF believed Chianne D.'s household had earned or how that amount was calculated.

30.    The April 24th NOCA did not state the Medicaid income standard for each person in Chianne D.'s household based on number of individuals in Chianne D.'s SFU.

31.    The April 24th NOCA did not identify the population group in which each individual in Chianne D.'s household was evaluated.

32.    The April 24th NOCA issued to Chianne D. did not reference post-partum coverage.

33.    The April 24th NOCA did not state C.D. would be transferred to FHKC for a determination of KidCare eligibility. DCF did not transfer C.D. to FHKC for a determination of her KidCare eligibility prior to termination of her Medicaid benefits.

34.    In reaching a determination of A.V.'s Medicaid ineligibility for June 2023, DCF considered the fact that A.V. was a child between the ages of one and five and had an SFU size of six, and that the SFU's gross income was $6,456.99 in the four-week period preceding the application date. This gross income exceeded A.V.'s applicable income limit for a child age one to five in a SFU of six, which is

$4,868 ($4,465 plus a standard disregard of $235 and an additional MAGI disregard of $168). *See* DCF Program Policy Manual Appendix A-7 (2023).

35.    In April 2023, DCF did not use the correct SFU to determine A.V.'s Medicaid eligibility for June 2023.

36.    A.V.'s correct SFU in April 2023 was eight people. *See* Sec. Harris' Resp. to Pls' RFAs, Request No. 11.

37.    DCF did not count A.V.'s household member, N.C., who receives Medicaid based on her receipt of Supplemental Security Income (SSI), in the SFU when it determined A.V. was not eligible for Medicaid. DCF also failed to recognize that another child in the family was a tax-dependent.

38.    The NOCA dated May 16, 2023 that DCF issued to A.V. did not state what income DCF believed A.V.'s household had earned or how that amount was calculated.

39.    The May 16th NOCA did not state the Medicaid income standard for each person in A.V.'s household based on number of individuals in A.V.'s SFU.

40.    The May 16th NOCA did not state what SFU size DCF used or which individuals it included and excluded from the SFU.

41.    The May 16th NOCA did not identify the population group in which each individual in A.V.'s household was evaluated.

42.    In reaching a determination of Kimber Taylor's Medicaid ineligibility

for July 2023, DCF considered the fact that Ms. Taylor was a parent and had an SFU size of two, and that the SFU's gross income was $4,031.13 in the four-week period preceding Kimber Taylor's application date. DCF applied the income limit for parents and caretakers' income limit in an SFU of two, which was $469 a month ($241 plus a standard disregard of $146 and an additional MAGI disregard of $82).

43.     Ms. Taylor submitted a statement on May 8, 2023 that she was making $0.00 and working zero hours because she was taking FMLA and that [d]ue to having a high risk pregnancy I am starting my leave on May 11 and will be out longer than 6 weeks."

44.     DCF did not rely on Ms. Taylor's statement when determining her or K.H.'s income.

45.     In reaching a determination of K.H.'s Medicaid ineligibility for July 2023, DCF considered the fact that K.H. was under one year of age and had an SFU size of two, and that the SFU's gross income was $4,031.13 in the four-week period preceding the application date. DCF applied the income limit for a child under one in an SFU of two which is $3,468 a month ($3,287 plus a standard disregard of $99 and an additional MAGI disregard of $82).

46.     The NOCA dated June 8, 2023 that DCF issued to Kimber Taylor did not state what income DCF believed Ms. Taylor had earned or how that amount was calculated.

47.   The June 8th NOCA did not state the Medicaid income standard for each person in Ms. Taylor's household based on number of individuals in Ms. Taylor's SFU.

48.   The June 8th NOCA did not identify the population group in which each individual in Ms. Taylor's household was evaluated.

49.   The June 8th NOCA issued to Ms. Taylor did not reference post-partum coverage.

50.   The June 8th NOCA did not alert Ms. Taylor that K.H. could remain eligible for continued Medicaid eligibility for children under age five.

51.   In reaching a determination of Lily Mezquita's Medicaid ineligibility for August 2023, DCF considered the fact that Ms. Mezquita was pregnant and had an SFU size of five and calculated the SFU's gross income to be $5,776 in the four-week period preceding Lily Mezquita's application date.

52.   DCF issued two NOCAs dated July 20, 2023 in Lily Mezquita's case number. One NOCA was addressed to Ms. Mezquita, the other to her child, G.M.

53.   The two July 20th NOCAs that DCF issued did not state what income DCF believed Ms. Mezquita had earned or how that amount was calculated.

54.   The two July 20th NOCAs did not state the Medicaid income standard for each person in Ms. Mezquita's household based on number of individuals in Ms. Mezquita's SFU.

55. The two July 20th NOCAs did not identify the population group in which each individual in Ms. Mezquita's household was evaluated.

56. Ms. Mezquita gave birth on September 23, 2023 and reported this birth to DCF.

57. DCF issued two NOCAs dated October 19, 2023 in Lily Mezquita's Medicaid case number. One NOCA was addressed to Ms. Mezquita, the other to her child G.M.

58. The two October 19th NOCAs that DCF issued did not state what income DCF believed Ms. Mezquita had earned or how that amount was calculated.

59. The two October 19th NOCAs did not state the Medicaid income standard for each person in Ms. Mezquita's household based on the number of individuals in Ms. Mezquita's SFU.

60. The two October 19th NOCAs did not identify the population group in which each individual in Ms. Mezquita's household was evaluated.

61. With the assistance of counsel, Ms. Mezquita filed an appeal and requested that benefits continue pending the appeal.

62. On or around October 24, 2023, DCF restored Ms. Mezquita's Medicaid eligibility.

63. DCF issued two NOCAs dated March 29, 2024 – both NOCAs were addressed to Ms. Mezquita.

64.     The two March 29th NOCAs that DCF issued did not state what income DCF believed Ms. Mezquita had earned or how that amount was calculated.

65.     The two March 29th NOCAs did not state the Medicaid income standard for each person in Ms. Mezquita's household based on the number of individuals in Ms. Mezquita's SFU.

66.     The two March 29th NOCAs did not identify the population group in which each individual in Ms. Mezquita's household was evaluated.

67.     Ms. Mezquita filed an appeal by herself.

68.     On or around April 2024, DCF restored Ms. Mezquita's Medicaid eligibility.

  B. Defendants' Statement

1.     Whether C.D. has standing.

2.     Whether Chianne D.'s claims are moot.

3.     Whether Plaintiffs and witness Lily Mezquita had actual knowledge of the grounds for termination of their Medicaid coverage and of DCF's fair-hearing procedures.

4.     Whether the challenged notices injured class and subclass members who have actual knowledge or access to alternative sources of information, such as the call center and state offices.

5.      Whether class or subclass members who have no basis to contest DCF's determination of ineligibility have standing to challenge the sufficiency of notice. *See Rector v. City & Cnty. of Denver,* 348 F.3d 935, 943–44 (10th Cir. 2003).

6.      Whether the class and subclass definitions are overly broad. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1275–77 (11th Cir. 2019).

7.      Whether the challenged notices provide notice reasonably calculated, under all the circumstances, to apprise class and subclass members of the termination of their Medicaid benefits and afford them an opportunity to present their objections—*i.e.*, whether the notices reasonably convey the required information and afford reasonable time for those interested to make their appearance. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

8.      Whether the challenged notices satisfy due process in light of other available sources of information, such as the call center and state offices. *See Arrington v. Helms,* 438 F.3d 1336, 1350–51 (11th Cir. 2006).

9.      Whether statutes, agency rules and regulations, case law, and other published, generally available sources of information provide class and subclass members with notice of the law, including notice of fair-hearing rights and of Medicaid eligibility categories and requirements. *See Grayden v. Rhodes*, 345 F.3d 1225, 1238–44 (11th Cir. 2003).

10.     Whether the challenged notices contain a statement of what action DCF intends to take. *See* 42 C.F.R. § 431.210(a).

11.     Whether the challenged notices contain a clear statement of the specific reasons that support the intended action. *See id*. § 431.210(b).

12.     Whether the challenged notices inform class and subclass members of their right to a fair hearing and of the method by which they may obtain a hearing. *See id*. §§ 431.206(b)(1)–(2), 431.210(d)(1).

13.     Whether the challenged notices issued to class and subclass members— whose Medicaid coverage was terminated, and who were therefore enrolled in the Medically Needy program—contain the following statements: (1) "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid"; and (2) "Individuals enrolled in the Medically Needy Program have income or assets that exceed the limits for regular Medicaid."

14.     Whether the absent class and subclass members have suffered an injury sufficient to confer constitutional standing and entitle them to relief. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019).

15.     Whether any injury suffered by the absent class or subclass members is fairly traceable to the challenged notices. *See id*.

16.     Whether any injury suffered by the absent class or subclass members is likely to be redressed by a favorable decision. *See id*.

17.     Whether Plaintiffs have proven that class or subclass members will suffer irreparable injury unless a classwide injunction issues. *See KH Outdoor*, *LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

18.     Whether Plaintiffs have proven that any threatened injury to class or subclass members outweighs any damage the proposed classwide injunction may cause Defendants. *See id*.

19.     Whether Plaintiffs have proven that the proposed classwide injunction would not be adverse to the public interest. *See id*.

20.     Whether the public has a weighty interest in minimizing unnecessary cost and in the efficient allocation of the government's fiscal resources. *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017); *Baker Elec. Co-op*., *Inc. v. Chaske*, 28 F.3d 1466, 1474 (8th Cir. 1994).

21.     Whether Plaintiffs have proven the entitlement of class or subclass members to prospective reinstatement to Medicaid coverage.

22.     Whether the relief that Plaintiffs seek is narrowly tailored to proven legal violations and restrains no more conduct than reasonably necessary. *See Fin. Info. Techs.*, *LLC v. iControl Sys.*, *USA*, *LLC*, 21 F4th 1267, 1280 (11th Cir. 2021).

23.     Whether the relief that Plaintiffs seek is consistent with principles of comity and federalism. *See Rizzo v. Goode*, 423 U.S. 362, 379 (1976).

24.     Whether the relief that Plaintiffs seek intrudes into state affairs no more than is absolutely necessary. *See Morrow v. Harwell*, 768 F.2d 619, 628 (5th Cir. 1985).

25.     Whether the relief that Plaintiffs seek is the least intrusive, expensive, and burdensome means of redressing any violation the Court identifies. *See id*.

26.     Whether the issuance of an injunction that imposes on the public the massive cost of reinstating the Medicaid coverage of class or subclass members—all of whom have been found ineligible for Medicaid—is consistent with the injunction factors and principles of comity and federalism.

27.     Whether the relief that Plaintiffs seek is appropriate to and compatible with the technical limitations of the ACCESS Florida System and the ongoing ACCESS Modernization Project.

## XI.     Concise Statement of Each Disputed Issue of Law

### A. Plaintiffs' Statement

1.     A state's participation in Medicaid is voluntary. Once a state elects to participate, it must adhere to all federal legal requirements, as provided by the United States Constitution, the Medicaid Act, and the regulations promulgated by CMS.

2.     Medicaid enrollees have a statutory entitlement to Medicaid benefits

36

protected by the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1; *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980).

24. The Due Process Clause guarantees individuals the right to a meaningful written notice and an opportunity for a hearing before being deprived of property. U.S. Const. amend. XIV, § 1. Medicaid enrollees must be given timely and adequate notice detailing the reasons for a proposed termination and how they can challenge the action, and they must be given an opportunity to make their case before an impartial decision-maker prior to termination of their Medicaid coverage. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970).

3.     A state Medicaid agency must use a method of notice that someone "who desires to actually inform the [recipient] might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315. To provide an "adequate statement of the basis," for the state's determination, the notice must "be sufficiently specific for it to enable an applicant to prepare rebuttal evidence to introduce at" the hearing. *Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980).

4.     While a state may delegate certain responsibilities to other entities, such as other state or local agencies, the single state agency remains responsible for ensuring compliance with all aspects of the Medicaid Act. *See, e.g.*, 42 C.F.R. § 438.100(a)(2), 438.100(d(b)(1).

5.     For administrative expenses, including those related to the

redetermination process, states generally receive a matching rate of 50%. 42 U.S.C. § 1396b(a)(7); 42 C.F.R. § 435.1001.

6.      States receive a 75% match for expenses related to the operation of a computerized eligibility determination system and a 90% match for expenses related to the design and development of a computerized eligibility determination system. 42 U.S.C. § 1396b(a)(3)(B).

7.      States must make Medicaid available to all individuals who meet the eligibility criteria. 42 U.S.C. § 1396a(a)(10).

8.      The mandatory population groups include: low-income children; parents and other caretaker relatives; pregnant women; the elderly, blind, or disabled; individuals under age 26 who were in foster care until age 18; and adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household incomes below 133% of the federal poverty level (FPL) (this last group is often referred to as the "expansion population"). 42 U.S.C. § 1396a(a)(10)(A)(i), (e)(14). In addition, individuals who receive Supplemental Security Income are automatically enrolled in Medicaid. 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(aa); 42 C.F.R. § 435.120.

9.      Florida also extends one-year continuous coverage, regardless of changes in circumstance, to children under age five and extends six-month continuous coverage to children under age 19. 42 U.S.C. § 1396a(e)(12); Fla. Stat.

§ 409.904(6).

10.     Income eligibility for Medicaid is established using one of two sets of rules: (1) Modified Adjusted Gross Income (MAGI) rules, which count income based on federal tax rules and does not include an asset or resource test, or (2) non-MAGI rules, which follow the Medicaid eligibility rules in place before implementation of the Affordable Care Act in 2014 and can include an asset or resource test. 42 U.S.C. § 1396a(e)(14); 42 C.F.R. § 435.603.

11.     MAGI rules apply to most children, pregnant women, parents, and adults with low incomes. Income eligibility is based on taxable income, and the household size is determined based on the number of people in the tax household. 42 U.S.C. § 1396a(e)(14)(A); 42 C.F.R. § 435.603(b).

12.     Non-MAGI rules apply to individuals who qualify for Medicaid based on blindness, disability, or age (65 or older), certain foster care children, and certain working individuals with disabilities. 42 C.F.R. § 435.603(j).

13.     The income limits to qualify for Medicaid coverage vary between population groups. In Florida, among the MAGI groups, the income limit for pregnant women is 196% of the federal poverty level (FPL), for children under age 18 one it is 211%, for children ages one to five it is 145%, and for children ages six to 18 it is 138%. The income limit for parents and caretakers and young adults aged 19-20 is calculated based on the Aid to Families with Dependent Children payment

levels in 1996 (when AFDC was repealed and replaced by Temporary Aid for Needy Families). This income limit is currently approximately 28% FPL. This income limit is currently approximately 28% FPL. Fla. Admin. Code R. 65A-1.707; *see also* Dep't of Children & Families, CFOP 165-22, Economic Self Sufficiency Program Policy Manual, Appendix A-7.

14.     For the non-MAGI groups, the income limits range between 88% to 300% FPL. The income-counting rules are based on the income counting rules of the cash assistance program most closely related to the individual's status (e.g., disabled, older adult). These income rules disregard some types of income, for example the earned income of a dependent child who is a student and not a full-time employee is disregarded before comparing a household's income against the income standard. 45 C.F.R. § 233.20(a)(3)(xix). The non-MAGI groups are also subject to a resource/asset limit. Fla. Admin. Code R. 65A-1.712-.713; *see also* Dep't of Children and Families, CFOP 165-22, Economic Self Sufficiency Program Policy Manual, Appendix A-9.

15.     States are required to administer Medicaid in "the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

16.     During redetermination, if the state determines an individual is no longer eligible in their current population group, then the state must evaluate the individual in all other groups before terminating coverage. This includes maintaining

Medicaid coverage while requesting additional information necessary to evaluate eligibility in other groups. 42 C.F.R. §§ 435.911(c)(2), 435.916(f)(1), 435.930(b).

17.     If the state determines that the enrollee is not eligible for Medicaid on any basis, it must send advance written notice prior to termination. *Goldberg v. Kelly*, 397 U.S. 254 (1970); 42 C.F.R. § 431.205(d) (state must "meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970)"). The notice must "detail[] the reasons for the proposed termination," including both "the legal and factual bases" for the decision. *Goldberg v. Kelly*, 397 U.S. at 267-68.

18.     Notices must "clearly" explain "the availability of an avenue of redress." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13-14 n.15 (1978).

19.     Upon timely request by the enrollee, the state must ensure that Medicaid coverage is maintained pending a pre-termination hearing. *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970); 42 C.F.R § 431.230.

20.     The state must provide the individual an opportunity for a pre-termination evidentiary hearing to contest the termination. The hearing must provide an "effective opportunity" to challenge a termination "as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970). See also 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.205.

21.     For persons who are determined ineligible for Medicaid, the agency

must assess the individual's potential eligibility for other insurance affordability programs, including CHIP and as appropriate transfer the individual's account to the Marketplace. 42 U.S.C. § 18083; 42 C.F.R. § 435.1200(e).

22.     The notice regulations, including 42 C.F.R. §§ 431.206, 431.210 define the scope of the enforceable right under section 42 U.S.C. 1396a(a)(3).

23.     Under federal Medicaid law, in order to state the "specific reasons" for the action, DCF's NOCAs finding an individual ineligible due to income must include (a) the individualized income information on which DCF based its ineligibility determination, (b) the income standard, as determined by the household's SFU, on which DCF based its ineligibility determination, and (c) the population group on which DCF evaluated a Medicaid enrollee's eligibility in reaching its ineligibility determination.

24.     DCF's income-based Medicaid termination NOCAs are not reasonably calculated to apprise intended recipients, as a whole, of their rights, in light of other information available to Medicaid enrollees.

B. Defendants' Statement

1.     Whether a court must determine whether each named plaintiff has standing and asserts a live claim where, as here, the plaintiffs seek person-specific relief (such as reinstatement of Medicaid coverage), rather than indivisible relief

(such as removal of a monument, *see Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003)).

2.     Whether a court, before it may grant relief to members of a class or subclass certified under Rule 23(b)(2), must determine which class or subclass members actually suffered injury and have standing to seek relief. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019) (applying Article III principles to a Rule 23(b)(3) class).

3.     Whether 42 U.S.C. § 1396a(a)(3) confers a federal right enforceable under 42 U.S.C. § 1983, *see Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 331 (2015) (concluding, for reasons equally applicable to section 1396a(a)(3), that section 1396a(a)(30)(A) does not confer an implied right of action); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–86, (2002) (equating the implied-right-of-action analysis with the section 1983 analysis) and, if so, whether the federal regulations on which Plaintiffs merely explicate the specific content of that right or instead impose distinct obligations to further the statute's broad objectives, *see Harris v. James*, 127 F.3d 993, 1009 (11th Cir. 1997).

4.     Whether the remedy that Congress expressly provided for violations of section 1396a(a)(2)—the withholding of federal financial participation by the Secretary of Health and Human Services, 42 U.S.C. § 1396c; 42 C.F.R. §§ 430.32, 430.35—is exclusive, *see Armstrong*, 575 U.S. at 331–32.

5.     Whether a standardized notice satisfies due process, or whether due process requires notice of individualized facts. *See Jordan v. Benefits Rev. Bd. of U.S. Dep't of Labor*, 876 F.2d 1455, 1459 (11th Cir. 1989).

6.     Whether actual notice precludes a due-process violation. *See id*. at 1460.

7.     Whether the class and subclass members are charged with knowledge of the law, including statutes, rules, and regulations. *See Atkins v. Parker*, 472 U.S. 115, 130–31 (1985).

8.     Whether the class and subclass members have a duty of inquiry and are charged with knowledge of facts that reasonably diligent inquiry would develop. *See Jordan*, 876 F.2d at 1459; *Soberal-Perez v. Heckler,* 717 F.2d 36, 43 (2d Cir. 1983).

9.     Whether the "clear statement" regulation codified at 42 C.F.R. § 431.210(b) requires a Medicaid termination notice to contain, in addition to the specific reasons that support the intended action, the individualized facts that support those reasons.

10.     Whether the prospective reinstatement of class or subclass members to Medicaid coverage is consistent with 42 C.F.R. § 431.231(c), which prescribes the conditions of reinstatement in case of inadequate notice.

11.    Whether, under 42 C.F.R. § 435.930(b), a State may provide Medicaid coverage to individuals who have been found ineligible, except in accordance with 42 C.F.R. §§ 431.230 and 431.231.

12.    Whether a requirement to disclose Medicaid eligibility requirements on all Medicaid termination notices is consistent with 42 C.F.R. § 435.905(a)(1), which requires States to disclose Medicaid eligibility requirements only upon request.

### XII.   List of Pending Motions and Other Unresolved Issues

None, although the parties intend to file a Joint Motion to Seal, and Plaintiffs may file a Motion for Judicial Notice after they have reviewed Defendants' objections to their exhibit list.

### XIII.   Settlement Statement

As set forth in the Joint Motion to Dispense with Mediation (ECF No. 109), the parties agreed that mediation could have little likelihood of achieving resolution. The court granted the motion and thereby released the parties from further mediation obligations. (ECF No. 110).

Dated: April 29, 2024.

/s/ *Katy DeBriere*
Katherine DeBriere
FBN: 58506
Florida Health Justice Project
3900 Richmond Street
Jacksonville, Florida 32205

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
James Timothy Moore, Jr. (FBN 70023)
Ashley H. Lukis (FBN 106391)
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600

debriere@floridahealthjustice.org
*Attorneys for Plaintiffs*

Tallahassee, Florida 32301
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
tim.moore@gray-robinson.com
ashley.lukis@gray-robinson.com
*Attorneys for Defendants*