# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

Chianne D., et al.,
        Plaintiffs,

     v.                               Case No. 3:23-cv-985-MMH-LLL

Jason Weida, et al.,
        Defendants.
_____/

### Plaintiffs' Trial Brief

The fundamental purpose of notice in Medicaid is to protect vital health coverage by apprising individuals of their impending coverage loss and enabling them to identify—and if necessary, correct—errors in the decision. The question here is whether Defendants' notices achieve this basic goal. They do not: DCF made multiple errors in determining eligibility for individuals in this case. Yet none of their notices contain the information necessary to identify those mistakes. These notices, like all DCF termination notices, did not specify the income DCF used, the income limit DCF applied, or the population group DCF considered; nor did they describe other population groups through which an individual can otherwise establish eligibility. Without this information, Medicaid enrollees cannot effectively challenge terminations, resulting in confusion, lost health care coverage, and other harms.

## FACTS

### I.    Florida Medicaid redeterminations

Generally, individuals must renew their Medicaid eligibility once every 12

months, though these renewals were paused during the COVID-19 pandemic. Doc. 128 § IX ¶ 7, § VIII ¶¶ 17-20. After Congress announced the end of this continuous coverage requirement, DCF elected to restart redeterminations at the earliest possible date and began terminating individuals effective March 31, 2023. *Id.* § VIII ¶ 123.

During the renewal process, DCF re-verifies income by gathering data from third-party, electronic databases including the Federal Data Services Hub (FDSH) and State Wage Information Collection Agency (SWICA). Anticipated Test. of William Roberts ("Roberts Test."). If DCF cannot verify income electronically, it asks Medicaid enrollees to send proof of income. *Id.* Once proof is returned, a randomly-assigned DCF case processor determines what income data to input in the FLORIDA computer system (FLORIDA), which processes DCF's eligibility determinations. *Id.*

DCF case processors have some discretion in selecting the income data to input, which can impact the final eligibility decision. *Id.* For instance, the specific pay periods DCF uses depends on when a case processor reviews a case. *Id.*; PX187 at DCF-3042 (directing use of most recent four weeks' pay or "best available information"). Case processors also use judgment to review income fluctuations. Roberts Test; PX187 at DCF-3042-43. Income must be converted to a monthly amount if reported as weekly, biweekly, or annually and errors can occur during the conversion. Roberts Test; Anticipated Test. of LaQuetta Anderson ("Anderson Test."); PX187 at DCF-3044.

Once all income and other data is entered, FLORIDA automatically applies the Medicaid eligibility rules to determine each person's eligibility for a full Medicaid population group or Medically Needy coverage. Dep. Designation of Hari Kallumkal

("Kallumkal Dep.") at 108:10-20, 108:25-109:17. The specific income limit for each person is based on what DCF calls a "standard filing unit," or "SFU" size, which is not necessarily the number of people in the household. PX189 at DCF-3136, -3139. Once FLORIDA reaches a conclusion, a case processor reviews and "authorizes" the case, triggering DCF's action approving, denying, or terminating coverage. Anderson Test.; Dep. Designations of LaQuetta Anderson ("Anderson Dep.") at 19:16-20:11.

Individuals who meet all technical requirements but are over-income for the applicable Medicaid population group(s) are eligible for Medically Needy. Doc. 128, § VIII ¶ 14. Medically Needy is not comparable coverage to full Medicaid. Dep. Designations of William Roberts ("Roberts Dep.") at 23:10-12; Dep. Designations of Tonyaleah Veltkamp, Vol. 1 ("Veltkamp Dep.") at 56:18-23. Instead, individuals must incur medical expenses each month—called a "share of cost"—to have coverage. Doc. 128, § VIII ¶ 14. DCF calculates the share of cost by deducting an amount (based on SFU size) from the total countable income. *Id.* PX178 (MNIL column); Roberts Test. DCF uses the same SFU and countable income to calculate Medicaid eligibility and share of cost. Roberts Dep. at 17:18-18:4; PX186 at DCF-002953, -002980.

## II.   DCF maintains case-specific information about Medicaid eligibility decisions.

DCF maintains information about the basis for its eligibility decisions in FLORIDA. Roberts Test.; Anderson Test.; Dep. Designations of Robyn Goins ("Goins Dep.") at 13:12-14:5. Within FLORIDA, there are several screens that store and display case-specific information, including screens identifying income types and

sources, different household members' relationships, SFU size, income standards, and more. Roberts Test.; Anderson Dep. at 47:5-14; Anderson Test. One key FLORIDA screen is the "Budget Screen." Before a case processor authorizes benefits, the final information used to evaluate each person's eligibility is displayed on a "Budget Screen." Roberts Test. Anderson Test. That screen displays the population group, gross income, countable income, SFU size, and income standard. PX157 at DCF-1697-98, 1707-08, 1892 (Figure 2-99); Anderson Dep. at 47:5-14.

If an individual moves from Medicaid to Medically Needy, the case processor will see multiple Budget Screens. For instance, if a person is evaluated for pregnancy Medicaid but found over-income, they will then be evaluated for Medically Needy. While working the case, the case processor will see a Budget Screen for the pregnancy group and later a Budget Screen for Medically Needy. Anderson Test. Roberts Test. After the case is "authorized," however, only the last Budget Screen is saved. Roberts Dep. at 14:22-15:11, 21:21-22:4; Kallumkal Dep. at 184:8-185:8. Thus, the actual SFU size, income limit, and calculations used for the earlier determinations (in the example, for pregnancy coverage) are deleted and only the Medically Needy Budget Screen is saved. Roberts Dep. at 14:22-16:10, 61:4-21; Kallumkal Dep. at 184:8-185:8.

Although the Medicaid Budget Screen is deleted, the inputs are saved: *e.g.*, the income screens showing the income amounts for each person remain visible in FLORIDA. Roberts Test; Anderson Dep. at 47:5-14; Kallumkal Dep. at 185:9-187:7. Thus, calculations can be re-constructed. Roberts Test. Goins Dep. at 36:18-38:18, 39:2-16. Moreover, DCF routinely relies on the SFU and countable income displayed

4

in the Medically Needy Budget Screen to determine what DCF used to reach the Medicaid ineligibility determination. Roberts Dep. at 17:18-18:4; 21:21-22:4, 61:4-21. To determine the income limit, DCF relies on a policy document: Appendix A-7 of the ESS Policy Manual. *Id.* at 15:22:16:10, 44:15-22, 47:1-9. The "IQEL" screen saves a history of when DCF opened and closed an individual's coverage in specific population groups. Roberts Test. In sum, for individuals found over-income for Medicaid and enrolled in Medically Needy, FLORIDA retains the case-specific data showing the individuals' countable income, SFU size, and prior population group.

### III. Medicaid termination notices omit the case-specific information DCF used to make the eligibility decision.

Although DCF maintains case-specific information about the basis of its Medicaid eligibility decisions, that information is not set forth in their Notices of Case Action (NOCAs). The NOCA is the only communication DCF affirmatively sends to a person losing Medicaid. The NOCA omits case-specific information regarding individual countable income, applicable income limits, SFU size, and population groups. Instead, DCF relies on generic and vague "reason codes" to explain its action.

#### A. Medicaid termination NOCAs have no placeholders for case-specific information, though other notices do.

The process for generating a NOCA is almost entirely automated. In fact, no human reviews a NOCA before it is sent to a Medicaid enrollee. Kallumkal Dep. at 40:14-16; Veltkamp Dep. 125:16-126:1. Instead, once a case is authorized, FLORIDA exports data to another system (called ExStream) that generates the NOCA. Kallumkal Dep. at 46:10-47:10, 50:16-51:17.

NOCAs are based on templates, which include both static text (that does not vary based on case-specific information) and dynamic text (which does vary). Anderson Dep. at 5:10-7:6, 13:4-14:13. For example, all NOCAs have the same static "footer" which includes the fair hearing paragraph. *Id.*

DCF can update static text. For example, prior to October 4, 2023, the fair hearing paragraph inaccurately stated that individuals "will" have to pay back benefits if they lose a hearing. Now, "will" has been replaced with the word "may." Anderson Dep. at 103:22-24. DCF purportedly updated the fair hearing paragraph again in April 2024, to add a link to the online fair hearing form and email address. *See* DX121; Anderson Dep. 106:22-25. Changes to the static text only appear where the template contains the static text, even if other portions of a notice address the same topic. Thus, even after DCF replaced "will" with "may" in the fair hearing paragraph, the body of notices confirming a request for continuing benefits pending a hearing still say "will." PX251. This is because no request was made to update the body of that particular notice. Anderson Dep. at 103:22-24, 104:8-105:1.

For dynamic text, data from FLORIDA is populated into a placeholder in the NOCA template. Anderson Dep. at 13:4-14:13; Kallumkal Dep. at 65:18-66:25. Current examples include the case number, mailing address, and names of individual household members. *Id.* Any data stored in FLORIDA could be populated into a NOCA if the template had an appropriate placeholder. Kallumkal Dep. at 127:17-20, 177:1-4. In fact, other DCF NOCA templates already include placeholders for dynamic, case-specific information. LaQuetta Dep. at 15:25-16:21; Dep. Designations

6

of Tonyaleah Veltkamp Vol 2 ("Veltkamp Vol. 2 Dep.") at 9:23-10:3, 59:12-16. Medically Needy approval notices list the specific share of cost via a dynamic placeholder. PX156 at DCF-743, -761, -917. Certain food assistance NOCAs list a household size and the specific individuals counted in the household. *Id.* at DCF-833, -941; PX273; Veltkamp Dep. Vol. 2 at 61:11-62:6. Other food assistance NOCAs state the applicable income limit and the dollar amounts are updated each year. PX267; Veltkamp Dep. Vol. 2 at 60:4-61:10. And Medicaid approval notices for the Institutional Care Program (ICP) contain multiple case-specific income placeholders, including for gross income and other specific dollar amounts. PX156 at DCF-923.

Medicaid termination notices include no placeholders for this type of dynamic, case-specific information, although the underlying data is available in FLORIDA. Anderson Dep. at 16:9-17:3; Kallumkal Dep. at 124:22-125:18, 126:17-127:5, 127:17-20. Previously, DCF added at least one dynamic field to Medicaid termination notices: around 2011 DCF added a dynamic field to display the date that "your Medicaid benefits will end." Anderson Dep. at 14:18-15:11. Medicaid termination notices lack other dynamic fields because DCF has not requested them. *Id.* at 15:25-17:7.

It is impossible to infer or deduce the underlying case-specific information from the current organization and structure of the notices. For instance, DCF uses the same section heading, "Medicaid," for all populations groups. Anderson Dep. at 33:13-34:10. But different NOCA sections often contain different combinations of household members, and the number of individuals does not necessarily reflect the SFU size. *Id.* at 34:11-35:10; Kallumkal Dep. at 80:4-22, 115:6-116:8. DCF also believes the NOCA

sections should appear alphabetically, but could not explain why, in practice, they do not. *Id.* at 93:2-15, 94:5-14; Anderson Dep. at 27:24-28:18. Finally, DCF NOCAs often refer to "your Medicaid application/review dated [date]," but the dates do not necessarily correspond to the date an individual actually submitted an application or review. *See* Kallumkal Dep. at 94:16-95:1, 95:12-96:5. The haphazard way the NOCAs are organized further obfuscates the actual basis for DCF's eligibility decisions.

Without case-specific information, individuals cannot effectively identify mistakes made during the eligibility process. Multiple DCF witnesses testified that, to understand the reason for a Medicaid termination, they would have to look at the whole case, including Budget Screens, case comments, and other information unavailable to Medicaid enrollees. Goins Dep. at 14:10-15:15; Veltkamp Dep. at 140:2-144:8. Without that case-specific information, even DCF witnesses with deep knowledge of Medicaid eligibility could not interpret notices. Veltkamp Dep. at 75:18-77:12, 120:24-121:16. Kallumkal Dep. at 82:2-4, 91:15-23, 99:9-16, 100:12-101:6, 101:15-102:1 (discussing ECF 2-3), *id.* at 117:9-118:21 (discussing PX81).

## B. The reason codes are generic, vague, and unclear.

Rather than provide case-specific information, DCF elects to use a finite set of generic "reason codes" to communicate the reasons for its decision. For example, DCF uses the phrase "YOUR HOUSEHOLD INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM" without specifying the income limit, countable income, or SFU size it relied on. Veltkamp Dep. at 112:16-22, 113:2-23, 115:3-9.

Other reason codes provide even less information, obfuscating whether income

was even the reason for ineligibility. Evidence shows that each of the following reason codes can be—and is—used to move someone from full Medicaid to Medically Needy: 227, 249, 290, 350, and 374. *See* Appendix A.

It is not self-evident these reason codes refer to income. *See, e.g.*, Veltkamp Dep. at 72:7-21 (code 374 does not inform recipient which eligibility requirement they failed). There is even disagreement among DCF staff about what these reason codes mean. For instance, one DCF training warns case processors not to use 227, 249, or 350 unless moving "the individual to a comparable category." PX166; *see also* Anticipated Test of Nathan Lewis ("Lewis Test."); PX161 (characterizing 227 & 249 as "Individual in another FULL Medicaid AG"); PX147, 194 (describing codes 227, 249, & 350 as a "Change in Coverage Category"); PX169 (227 used when "[m]oving individual to a different full coverage AG"); PX160 (code 249 "should also not be used when moving an individual from full coverage to Medically Needy"). Mr. Lewis believes that code 290 refers to denials based on technical requirements, not income. Lewis Test. Mr. Lewis and Mr. Roberts each believe code 374 describes technical failures, *not* income-based terminations. *Id.* Roberts Test. That DCF's own staff disagree about reason code meanings underscores their confusing nature.

## IV. Case-specific information is not reliably available outside NOCAs.

### A. DCF's customer call center is unreliable.

Instead of providing information in NOCAs, DCF relies on its call center to supply case-specific information. Reaching the call center is difficult. It is only open

from 8:00 am to 5:00 pm.[1] Dep. Designations of Nicole Solomon ("Solomon Dep.") at 21:9-13. Nearly half of callers never make it to the hold queue, instead receiving the message "All lines are busy. Please call back."[2] *Id.* at 37:6-11; PX262 (Blocked). For those that do get to the queue, wait times average 42 minutes and can last two and half hours. PX245; *see also* Anticipated Test. of Jarvis Ramil ("Ramil Test."); Solomon Dep. at 85:21-23, 92:2-8, 105:12-25; PX262 (ASA column). As a result, each month between 32% and 49% percent of calls are abandoned. PX262 (Aban %); Solomon Dep. at 102:6-103:5; PX245. DCF does not have the "capacity to answer . . . as many calls as we would like to be able to answer." Solomon Dep. at 110:23-111:5. Of one million calls, only 300,000 to 400,000 reach a live person. *Id.* at 44:15-25.

If an individual does reach a live person, there is no guarantee they will obtain accurate or specific information. Ramil Test. All Medicaid calls are initially answered by a Tier 1 representative, who can perform only basic tasks, such as resetting a password, or transcribing answers for a telephonic application. Solomon Dep. at 14:5-24. They "are not eligibility specialists. . . so they're not going to be able to get into a budget and that kind of information" or explain how someone's countable income is calculated. Veltkamp Dep. at 39:7-14, 41:9-11. Those questions must be routed to a Tier 3 agent, who are far fewer in number and, thus, are harder to reach. Solomon Dep. at 11:23-12:14 (of 600 total DCF call center employees, 475 positions are Tier 1

---

[1] In her errata sheet, Ms. Solomon lists the hours of the call center as 7:00 am to 6:00 pm.
[2] In her errata sheet, Ms. Solomon states the message is "We are currently busy assisting other callers . . . . [P]lease try your call again later."

agents); *id.* at 15:13-22. Tier 3 representatives also give variable and unreliable information: there are no scripts regarding DCF's continuous coverage policies and DCF's corporate designee was unsure whether unborn children count in the family size or whether to apply the "standard disregard" when reading the income limit chart. *Id.* at 65:17-66:1, 66:8-10, 67:13-68:23, 69:16-71:2, 72:24-73:8, 76:8-22; PX128.

### B. Case-specific information is not available in MyACCESS Accounts.

Although NOCAs encourage individuals to look at their MyACCESS accounts, there is no additional case-specific information available there. NOCAs remain the only place to find a statement of the reasons for DCF's decision. Dep. Designations of James Garren ("Garren Dep.") at 20:5-19, 21:8-11. The MyACCESS accounts do not specify population groups, instead referring solely to "Medicaid." *Id.* at 14:2-5, 15:2-6; Veltkamp Dep. at 13:21-23. In fact, the accounts add confusion by referring to Medically Needy coverage under the heading "Medicaid"—only distinguishing Medically Needy by listing a "share of cost" and using the term "enrolled" (rather than "open"). Garren Dep. at 22:21-23:2, 23:21-24:17, 27:14-28:17; PX252 at 2-3, 19-27. The term "enrolled" is not defined anywhere. Garren Dep. at 28:18-29:5.

MyACCESS accounts also do not list the countable income used to evaluate an individual's eligibility or show an individual what data DCF obtained from third-party databases. Garren Dep. at 11:18-12:16; Ramil Test. An individual can see the income they listed on their renewal application, but nothing more. Garren Dep. at 11:18-12:16; Ramil Test. Nor do the accounts list the applicable income standard for each individual. Garren Dep. at 13:7-14:1; Ramil Test. The accounts do not state the SFU

size. Garren Dep. at 12:19-22. DCF asserted an individual might be able to determine an "implied SFU" from the household members listed—but that is not always an accurate representation. *Id.* at 12:19-13:3, 22:7-17.

Finally, MyACCESS accounts present misleading information about the ongoing status of an enrollee's coverage. The "Details" page lists a "Coverage End Date," but DCF testified the "Coverage End Date" is not necessarily the date coverage will end. Garren Dep. at 24:18-25:18; PX252 at 31-32. Rather the "renewal date" is the actual date coverage will end. *Id.* In sum, the MyACCESS accounts do not explain the reason for DCF's decision. Ramil Test.

## C. The remaining public information is incomplete and confusing.

NOCAs do not direct individuals to public sources of information regarding Medicaid-eligibility rules or income limits and, for those who search anyway, there is only incomplete information available. For example, there are no publicly available explanations of the meaning of reason codes. Veltkamp Dep. at 43:11-20, 43:23-44:3. And while DCF's website provides a general overview of the Medicaid eligibility population groups, it omits descriptions of continuous coverage available to pregnant and postpartum enrollees and children. *Id.* at 18:3-6; PX260. The Family Related Fact Sheet incorrectly lists postpartum coverage as lasting only two months. PX253 at 2; Veltkamp Dep. at 20:19-22, 21:10-20. Although DCF purportedly updated the fact sheet just before trial, *see* DX28, that fact sheet was not available online at least as of April 18, 2024. PX260 at 11-18; *see also* Veltkamp Dep. at 17:21-18:2.

The information that is available is, at best, extremely complex. For instance,

12

the ESS policy manual has never been evaluated for readability, rather "it's developed for staff and not for like, you know, a seventh grade reading level," and there are "a lot of, you know, acronyms and things like that." Veltkamp Dep. at 25:8-26:4; Ramil Test. Appendix A-7 of that manual (PX178) is the only publicly available source for income-standards. Veltkamp Dep. at 14:20-17:20, 34:9-12. That chart is opaque: it does not state whether the income limits listed are weekly, biweekly, or monthly. *Id.* at 29:4-30:9. Discerning the actual income limit requires adding up numbers from different columns, but DCF employees disagreed about which columns should be included. *Compare id.* at 30:10-31:7 (adding two columns) *with* Roberts Dep. at 45:7-17, 46:11-47:9, 60:18-61:3 (adding three columns).

Further, identifying the income limit on the chart requires knowing the applicable "family size." PX178. There is "no one clear spot that says this is how you determine family size" and no section of the ESS Manual describes "family size." Veltkamp Dep. at 28:19-29:1, 29:20-23. To discover what rules govern the "family size" enrollees must divine that "family size" means the same as "standard filing unit" and then locate the rules for computing the SFU. Even when an individual actively searches for information outside the NOCAs, the information available is widely dispersed, requires piecing together disparate information, and making numerous inferences about an incredibly complex program.

## V. Defendants have been well aware for years that the notices are confusing and not sufficiently specific yet have failed to address the problem.

In 2018, DCF was "well-aware" that notices "generate confusion" and are not

13

"not sufficiently explicit in terms of an explanation." PX238 at AHCA-2071-72; Veltkamp Dep. at 158:9-12. At that time, DCF knew that the notices are "chunky" meaning that "it doesn't flow. The customer can't like on the first page answer what's going on. They have to read and read." *Id*. at 159:16-160:12. DCF also understood that adding more specific information such as the income DCF used and the income threshold would help Medicaid beneficiaries understand DCF's decision. Lewis Test.

Since then, DCF has acknowledged the confusion caused by using reason codes to communicate agency action. DCF has advised caseworkers that "[v]ague or incorrect reason codes leave our customers confused and increases our own workload when customers contact us." PX165; PX166; Veltkamp Dep. at 147:10-148:10. DCF also acknowledged that when codes 374, 227, and 249 are used alone they do not "explain[] the Department's actions to the individual." PX160; *see also* Veltkamp Dep. at 52:10-54:1, 149:13-23. Further, "a person cannot tell from the notice reason code" 227 whether they are moving from full Medicaid to Medically Needy. Veltkamp Dep. at 84:14-24. And 249 refers to Medicaid and Medically Needy as the "same type of assistance" when they are not. *Id.* at 119:2-16.

Despite this longstanding knowledge of the inadequate explanation in the NOCAs, DCF has chosen to continue using them. AHCA has acquiesced. AHCA provides no oversight of the NOCAs and did nothing in response to the 2018 SHADAC report identifying problems. Dep. Designations of Ann Dalton ("Dalton Dep.") at 11:16-18, 36:5-17. Some DCF employees have, over the years, initiated efforts to replace FLORIDA and revise the notices, but those attempts have been

14

repeatedly stymied. Lewis Test.; Veltkamp Dep. at 163:2-21; Anderson Dep. at 112:6-13. Even now that DCF has initiated the ACCESS Modernization project, there is still no guarantee DCF will meaningfully revise the notices. Dep. Designations of Andrea Latham ("Latham Dep.") at 39:22-40:8. DCF has consistently neglected changes to NOCAs in favor of other initiatives.

## VI.   DCF notices cause significant harm.

### A. A.V.

DCF terminated A.V.'s Medicaid coverage on May 31, 2023. Doc. 128, § VIII, ¶ 77. DCF applied the incorrect SFU size, counting six individuals instead of eight, thereby erroneously lowering the applicable income limit. Roberts Dep. at 39:15-23; PX70; PX2 No. 11. But A.V.'s NOCA does not state what SFU size or income limit DCF used to terminate her coverage. PX81. Nor can the SFU size be inferred: the only "Medicaid" section in the NOCA lists seven people. PX81 at DCF-5728-29. DCF did not supply these facts to Jennifer V. through any means. Roberts Dep. at 41:3-18.

The Designated Reason for A.V.'s Medicaid termination is "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." PX81. From this, Jennifer V. could not tell A.V. was losing coverage, let alone why. Anticipated Test. of Jennifer V. ("Jennifer V. Test."). Consequently, A.V. lost Medicaid. Without Medicaid, A.V. missed well-child visits, and her parents had to make difficult decisions to skip important tests—such as lead screening—due to cost. *Id.* The family also lived with stress that A.V. would become sick or injured while without coverage. *Id.*

The family sought out other coverage for A.V. by applying to the Federally Facilitated Marketplace in December 2023 *Id.* Based on income, A.V.'s application was referred to DCF to evaluate her Medicaid eligibility. DCF once again found her ineligible. PX83; PX84. This time, it used an SFU of seven, which was still incorrect. Roberts Dep. at 43:15-44:14; PX73. The case processor also chose to rely on a prior quarter's income information from SWICA, which was higher than the client-reported income. Roberts Dep. at 43:15-24, 47:13-17. As a result, DCF denied A.V.'s Medicaid application for being over income and issued a NOCA dated January 18, 2024. PX83; Roberts Test. Like the May 2023 NOCA, the January 2024 NOCA does not specify the SFU size or income limit. PX83; PX84; Roberts Dep. at 48:11-49:1. Nor does it identify the household income DCF counted. DCF did not provide Jennifer V. these facts through any other means. Roberts Dep. at 49:1-15. It was only through the intervention of counsel that DCF used the correct SFU size and more recent paystubs to find A.V. eligible. *Id.* at 47:10-24; Jennifer V. Test.

### B. Kimber & K.H.

DCF sent Kimber a NOCA dated June 8, 2023 finding her and her weeks-old infant son ineligible for Medicaid. Stips; Taylor Test; PX112; Roberts Dep. at 49:16-22. According to DCF, there were multiple mistakes. First, FLORIDA did not recognize that Ms. Taylor was within the protected post-partum period. Roberts Dep. at 50:14-21, 61-62. Nor did it recognize K.H. was in the protected continuous coverage period for infants. Roberts Test. DCF went on to evaluate Ms. Taylor in the parent-caretaker category and K.H. as a child under age one. Roberts Dep. at 51:23-52:5;

Roberts Test. Ms. Taylor had reported on May 8, 2023 that she was taking unpaid FMLA leave due to her pregnancy. Roberts Dep. at 53:7-13; PX106. But when the case processor worked her case on June 7, 2023, they saw active income reported through a third-party database called "The Work Number." Roberts Dep. at 52:18-53:6; PX99. Rather than give Ms. Taylor a chance to explain this discrepancy, the case processor simply concluded she was over-income and terminated the household's Medicaid. *Id.* at 53:18-54:25, 55:16-56:21; PX99.

The June 8th NOCA does not state DCF found a discrepancy between reported income and The Work Number data. PX112; Roberts Dep. at 56:25-57:4. The NOCA did tell Ms. Taylor she and K.H. "remain[ed] eligible under a different Medicaid eligibility group" even though DCF did not find them "eligible for any other coverage." Roberts Dep. at 63:6-64:1; PX112. The call center told Ms. Taylor she was over income without providing the specific income information. Anticipated Test. of Kimber Taylor ("Taylor Test."). As a result, she did not feel confident challenging DCF's decision and declined to appeal, given the risk of repaying benefits. *Id.*

### C. Chianne D. & C.D.

In April 2023, DCF terminated Chianne D.'s Medicaid coverage in error, due to a "system problem" that was authorizing only two months of postpartum coverage instead of 12. Roberts Dep. at 10:6-24, 18:15-19:1; at DCF-2019. DCF then evaluated Chianne D. in the parent/caretaker group. Roberts Dep. at 17:5-17. It also evaluated C.D. as a child between the ages one and five. Roberts Test. DCF found Chianne and C.D. ineligible for Medicaid based on her husband's income. Roberts Dep. at 12:13-

13:2; PX29. As documented on C.D.'s budget screen, DCF calculated her share of cost by subtracting the standard disregard for an SFU of four ($585) from the countable income. Roberts Dep. at 21:2-20; PX29; PX178. But the NOCA does not explain how the Medically Needy share of cost was calculated. PX40. Nor does the NOCA explain what income information, SFU size, or population group and associated income limit DCF used. PX40; Roberts Dep. at 22:9-20. The NOCA does not tell Chianne she was denied postpartum coverage. PX40; Roberts Dep. at 22:9-23:12, 27:8-10. Finally, there is no way to tell from the NOCA whether DCF referred C.D. to Florida Healthy Kids. PX40; Roberts Dep. at 35:16-18.

The NOCA does tell Chianne she and C.D. are receiving "the same type of assistance from another program," which should mean "you're eligible for a similar coverage in another category type." PX40; Roberts Dep. at 22:21-23:12. But they were not, in fact, eligible for "similar coverage." Roberts Dep. at 22:21-23:12.

From the NOCA, Chianne D. did not understand she and C.D. were losing coverage. Anticipated Test. of Chianne D. ("Chianne Test."); PX65. The call center further confused her. On the morning of May 30, a DCF representative told Chianne, "the Medicaid was to renew – it shows that you're over income to receive Food Assistance" but that for her and C.D. "yes, the Medicaid has been extended" and "benefits will continue." DX73 at 9:14-28, 10:49-10:54, 12:26-12:47. It was not until after their Medicaid coverage had ended that anyone gave Chianne specific income information, and even then, no one explained the income limits DCF applied or mentioned postpartum coverage. Roberts Dep. at 27:3-10; PX62; PX64.

A DCF representative did eventually submit a fair hearing request on Chianne's behalf but not until coverage had already ended. *Id.* at 30:18-22. This left C.D., who has cystic fibrosis, without coverage while Chianne gathered the information necessary to decide whether to proceed with the hearing or enroll C.D. in Florida Healthy Kids. Chianne D. Test.; PX53. Once that was resolved, Chianne withdrew the hearing, unaware from any of her communications with DCF she remained Medicaid-eligible. Chianne D. Test. DCF did not restore Chianne's coverage until she filed this case. *Id.*

### D. Lily Mezquita

DCF sent two NOCAs to class member Lily Mezquita on July 20, 2023, one addressed to her son, G.M., and one to her. PX122; PX123. One NOCA said "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." PX123. The other stated "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM" and "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." PX122. Ms. Mezquita was pregnant at the time, but the NOCAs do not mention pregnancy coverage. Anticipated Test. of Lily Mezquita ("Mezquita Test."); PX122; PX123.

In reaching its eligibility decision, DCF made multiple mistakes. First, it failed to evaluate her for pregnancy coverage. Roberts Dep. at 70:12-71:1. Then, when considering her income, DCF erred: it concluded Ms. Mezquita's SFU's countable income was $5,776 by relying on data from SWICA which reported wages in the first

quarter of 2023. *Id.* at 71:21-72:4; PX136. But Ms. Mezquita's pay fluctuates, and she had submitted more recent paystubs showing lower income for May and June 2023. Mezquita Test.; PX129 at Resp. to L.M. Subpoena for Docs 000074-75. DCF, however, relied on SWICA instead. Roberts Dep. at 72:14-19, 73:14-74:9. Neither NOCA set out this information. *Id.* at 74:10-13.

## LAW

### I.   Defendants' notice policies violate due process.

To avoid erroneous property deprivations, the Constitution demands that notices be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Where vital benefits, like Medicaid, are terminated, the notice must make clear benefits are ending, and "detail[] the reasons for the proposed termination," so the individual can challenge a decision as "resting on incorrect or misleading factual premises or on misapplication of rules to . . . the facts of particular cases." *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970).

Unless a state agency discloses the "factual premises" it relied on and which rules it applied in a "particular case," such a challenge is impossible. *Id.* Thus, notices—like DCF's Medicaid termination notices—that obfuscate the action and omit this critical information do not accomplish the most basic purpose of due process. *See Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980) (notice "must be sufficiently

specific for it to enable an applicant to prepare rebuttal evidence to introduce at his hearing appearance."); *Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005) ("Without "sufficient information," Medicaid enrollees "cannot know *whether* a challenge to an agency's action is warranted, much less formulate an effective challenge.").

### A. DCF notices are not reasonably calculated to inform recipients of the reasons for the agency's action.

*Ortiz v. Eichler* addressed notices very similar to DCF's. 94 F.2d 889 (3d Cir. 1986). It held that notices must state the specific calculations used to compute the countable income and explain the relevant income limits—emphasizing that this requirement was "amply supported by a formidable array of case law." *Id.* at 893 (collecting cases). This information is necessary: "without these calculations, plaintiffs have little protection against errors." *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir. 1980). The Eleventh Circuit, in *Arrington v. Helms*, found notices adequate where they included three different individualized dollar amounts, which enabled custodial parents to "compar[e] the dollar figure[s]" to a case-specific court order listing the individual amount to be paid and to a paystub specifying the amount actually paid, which was issued simultaneously to the challenged notice. 438 F.3d 1336, 1350 (11th Cir. 2006).

DCF's NOCAs, however, provide no equivalent information. As a result, they simply do not enable recipients to discern the basis for DCF's decision (and in many cases *what* action DCF is taking): Jennifer V. could not identify DCF's error in SFU size and erroneous income limit. Ms. Taylor was never told DCF rejected her report

that she was on unpaid leave. Ms. Mezquita could not know DCF chose to rely on older wage data, rather than the paystubs she submitted. Without this case-specific information, DCF's NOCAs are not reasonably calculated to provide enrollees the information necessary to identify and correct DCF's errors.

Because there are many population groups in the Medicaid context, courts have also held that adequate notice must include a description of the eligibility categories an individual was previously enrolled in, as well as a description of other categories for which they could establish eligibility. In *Hamby v. Neel*, the Sixth Circuit concluded that notices were inadequate because "[t[here is no mention of an applicant's status as an 'uninsurable applicant,' when the applicant is issued a denial," and thus recipients were not "fully informed as to why" they were ineligible. 368 F.3d 549, 561 (6th Cir. 2004). Here, DCF's notices do not mention an enrollee's status as a child, parent or caretaker, pregnant or postpartum person, or person with a disability. For instance, Chianne D., Ms. Taylor, and Ms. Mezquita had no notice whether DCF considered their pregnancies or postpartum status (or what that status would mean for their eligibility). As a result, individuals are deprived of information about the "applicable standards" or the "factors the Agency deems pertinent" to their case. *Gaines v. Hadi*, No. 06-60129-CIV, 2006 WL 6035742, at *17-18 (S.D. Fla., Jan. 30, 2006).

**B. Other communications do not remedy the inadequate notices.**

**i. Communications before DCF's final decision and after a Medicaid termination has been appealed are not relevant.**

For the due process analysis, the relevant communications are those between the

DCF's eligibility decision and when a hearing can be requested because this is the time in which an individual must "choose . . . whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314. Communications issued come before DCF makes an eligibility determination cannot offer an enrollee a "specific" explanation for "why they are being disenrolled," *Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005), because at the time these prior communications are sent, DCF has not yet made its eligibility decision. *See C.R. ex rel. Reed v. Noggle*, 559 F. Supp. 3d 1323, 1340 (N.D. Ga. 2021) (rejecting reliance on prior document because it "was not a final decision" of a Medicaid denial). Information provided only *after* filing an appeal does not allow an individual to make an informed choice about whether to appeal in the first place. *See K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 973–74 (9th Cir. 2015) ("It would be illogical if the availability of a hearing deprived the Plaintiffs of their right to receive the notice they need to challenge benefits reductions at that hearing."). In that window, DCF sends only the NOCA.

### ii.  It is unreasonable to rely on the call center or online accounts.

To defend a "chosen method" of providing notice, the state must show the method is "reasonably certain to inform those affected." *Mullane*, 339 U.S. at 315. Defendants cannot make that showing. For starters, MyACCESS accounts merely collect NOCAs and the information the enrollee provided; they contain no description of the relevant facts DCF actually relied on to make the eligibility decision.

With respect to the call center, courts have repeatedly rejected the argument that information available through phone calls obviates the need for adequate written

notice. *See Barry v. Lyon,* 834 F.3d 706, 720 (6th Cir. 2016) ("defendant cannot satisfy due process by requiring notice recipients to call elsewhere.") (quote omitted); *Schroeder v. Hegstrom*, 590 F. Supp. 121, 128 (D. Or. 1984) (opportunity to "ask for assistance from welfare caseworkers in understanding why the reduction or termination occurred does not remedy the shortcomings of an inadequate notice."). That is because this approach "improperly places on the recipient the burden of acquiring notice whereas due process directs [Defendant] to supply it." *Murphy by Murphy v. Harpstead*, 421 F. Supp. 3d 695, 708 (D. Minn. 2019). As a result, "only the aggressive receive their due process right to be advised of the reasons for the proposed action." *Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974).

Even if a call center could remedy inadequate notices, it does not here, where DCF admits that many individuals are not able to speak with someone. Solomon Dep. at 110:21-111:5. *Cf. Arrington,* 438 F.3d 1336 (emphasizing availability of 24-hour hotline). Nor is it "reasonably certain" any information provided will be accurate and complete. For example, Chianne was incorrectly told "Medicaid has been extended," and was never informed of the income limit DCF used or availability of postpartum coverage. These outcomes are entirely foreseeable given DCF routes all Medicaid calls to Tier 1 agents who cannot explain the budget used to calculate income.

### iii.   It is unreasonable to rely on publicly available information.

Nor is it reasonable to rely on publicly available information. First, it will never

provide information used in a "particular case."[3] *Goldberg*, 397 U.S. at 267-68. Second, the information DCF makes available is incomplete, dispersed, and confusing, *see supra* at XX, which is not what someone "desirous of actually informing" Medicaid recipients would choose. *Mullane*, 339 U.S. at 315. Finally, it is unreasonable for DCF to rely on statutes and regulations. "[T]here is no presumption that all of the citizens actually know all of the law all of the time," *Grayden v. Rhodes*, 345 F.3d 1225, 1243 (11th Cir. 2003), particularly for Medicaid, where even the Supreme Court has observed that "[b]yzantine construction," of the Act makes it "almost unintelligible to the uninitiated." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (quote omitted).

### C. The purported administrative burden of updating notices is not decisive here.

Defendants have made much of the administrative burden of updating the notices. But administrative burden is one of the *Mathews v. Eldridge* factors. 424 U.S. 319, 335 (1976). In a case like this, which addresses the adequacy of the notices, the Eleventh Circuit "eschew[s] the balancing test in *Mathews*," and applies the "more straightforward approach set forth in *Mullane*." *Arrington*, 438 F.3d at 1349 n.13 (quote omitted). Thus, the burdens Defendants assert simply are not relevant to the straightforward question of whether the notices are "reasonably calculated" to apprise Medicaid recipients of the action being taken and the reasons for the action.

---

[3] Notably, *Arrington* only addressed publicly available information when considering whether notices must include individualized description of hearing rights. 438 F.3d at 1350-52I. Its discussion of whether notices sufficiently enabled custodial parents to check the accuracy of the individualized child support payments did not turn on or reference statutes, regulations, or policy manuals. *Id.*

Moreover, Defendants' claim that it would require 28,000 hours to update notices is speculative and overstated. That estimate was done in a rushed manner, outside the usual process, and without the typical refinement of the specific changes actually required. *Compare* Kallumkal Dep. at 27:24-29:9 (describing usual process) *with id.* at 189:8-25; PX140; *see also* PX139 (describing usual process). The estimate also assumes that FLORIDA would need to be re-programed to store new data not currently saved. Kallumkal Dep. at 189:8-19. But DCF already stores the countable income, SFU size, and eligibility category for each individual found over income. *Id.* at 192:4-17, 192:25-193:8, 192:18-194:16, 197:18-200:3, 204:24-205:15, 226:15-21, 232:6-15, 234:4-8, 234:10-14. And DCF has conceded that any information stored in the database can be added to a placeholder in the NOCAs. *Id.* at 127:17-20, 177:1-4, 225:6-18. Moreover, when making the estimate, Deloitte was unaware that some NOCAs already include placeholders for case-specific information. *Id.* at 227:23-228:1, 228:11-229:8. DCF has offered no explanation for why it is administratively feasible to include case-specific dynamic information in some NOCA templates but not in Medicaid termination templates. *See id.* at 229:24-230:8.

Moreover, since that estimate was produced at the outset of this case, DCF has twice made changes to the fair hearing text in the "footer" of the NOCAs, revealing that these are readily achievable changes. The process for adding any static text to the footers of a NOCA is the same. *See* Anderson Dep. at 105:6-106:25, 107:22-24, 108:24-109:10. Thus, adding new static text to the footer of Medicaid termination NOCAs—*e.g.*, a description of the Medicaid population groups—would be a similarly light lift.

Finally, Defendants' longstanding neglect of its notice infrastructure should not permit them to circumvent their constitutional and statutory obligations. Defendants have had ample opportunities to update their computer systems—with 90% of the costs matched with federal dollars (Latham Dep. at 12:16-19)—but have not done so. In these circumstances, the state, not Medicaid enrollees should bear the burden of the state's inaction.

## II.    Defendants' Notices Violate the Medicaid Act requirements.

### A. Medicaid Act Requirements

To satisfy the Medicaid Act, notices must include a statement of what action the agency intends to take, as well as a "clear statement of the specific reasons supporting the intended action, . . .[t]he specific regulations that support . . . the action," and an explanation of the right to a hearing, and the method for obtaining a hearing. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b)(2), 431.210; *see also id.* § 431.205 (incorporating *Goldberg*'s requirements). Medicaid regulations demand that DCF provide all required information "in writing . . . at the time the agency denies an individual's claim for eligibility." 42 C.F.R. §§ 431.206(b), 431.210. Any information from the call center, MyACCESS accounts, or on public websites is irrelevant.

DCF's "notices violate § 431.210(b) for the same reason they violate the Due Process Clause: They completely fail to state specific reasons supporting the denial." *C.R. ex rel. Reed v. Noggle*, 559 F. Supp. 3d 1323, 1341 (N.D. Ga. 2021). And, as in the due process context, courts have held that Medicaid eligibility notices must provide an explanation of all population groups. *See Dozier v. Haveman,* No. 14-12455, 2014 WL

27

5480815, at *10-11 (E.D. Mich. Oct. 29, 2014) (finding notice inadequate under § 431.210(b) where it omitted "information regarding *all* eligibility categories."); *Crawley v. Ahmed*, No. 08-14040, 2009 WL 1384147, at *26 (E.D. Mich. May 14, 2009).

Further, NOCAs with reason codes like 227, 249, and 350 actually obfuscate the action, and DCF often includes blanks or "XXXXX" instead of a regulation cite. Anderson Dep. at 70:23-71:1, 71:5-71:9; PX210; *see also* Kallumkal Dep. at 142:7-24. Thus, DCF's NOCAs also violate the Medicaid Act by not reliably stating the action or providing the specific regulations supporting the action, 42 C.F.R. § 431.210(a), (c).

### B. The Medicaid Act's requirements are privately enforceable.

When a regulation fleshes out the content of a statutory right, it may be considered in the § 1983 claim to enforce that statutory provision. *Yarborough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1325–27 (11th Cir. 2019) (en banc). Here, 42 U.S.C. § 1396a(a)(3) creates an enforceable right to a "fair hearing," but that "right to be heard has little reality or worth" absent adequate notice. *Mullane*, 339 U.S. at 314; *Cf.* 42 C.F.R. § 431.205(d), (f). Thus, courts have consistently concluded that the notice regulations are part and parcel of that hearing right. *See K.B. ex rel. T.B. v. Mich. Dep't of Health & Hum. Servs.*, 367 F. Supp. 3d 647, 661–62 (E.D. Mich. 2019); *Crawley,* 2009 WL 1384147, at *26 & n.7; *Guadagna v. Zucker*, 2021 WL 11645538, at *13 (E.D.N.Y. Mar. 19, 2021); *see also Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1056 (11th Cir. 2001) (Medicaid Act grants "individuals denied services . . . a right to notice and an opportunity to be heard"); *C.R.,* 559 F. Supp. 3d at 1341 (notice regulations inform

28

scope of § 1396a(a)(3)); *Hernandez v. Medows*, 209 F.R.D. 665, 670 (S.D. Fla. 2002) (notice regulations "implement the federal statutory requirement").

### III.   Relief must include pausing terminations and, for those without coverage, prospective reinstatement until adequate notice is provided.

DCF must amend the NOCAs so they clearly communicate the specific reasons for its decisions. *Hamby*, 368 F.3d at 560. Where DCF terminates Medicaid due to income, notices must explain: (1) what eligibility category the member was previously enrolled in and the applicable income limit; (2) the individualized income and SFU size DCF used ineligible; and (3) a short description of the other population groups under which an individual might establish eligibility. *See Ortiz*, 94 F.2d at 889; *Crawley*, 2009 WL 1384147, at *30; *Dozier*, 2014 WL 5480815, at *10.

Furthermore, until the NOCAs are amended, DCF must pause terminations and reinstate coverage for those who remain without. "[I]n suits concerning a state's payment of public benefits under federal law, a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forward[.]" *Price v. Medicaid Dir.*, 838 F.3d 739, 746-47 (6th Cir. 2016). Where adequate notice has not been provided, relief should include ordering a state to pay for Medicaid benefits until it has mailed each plaintiff a separate, timely and adequate notice of the reduction. *Kimble v. Solomon*, 599 F.2d 599, 605 (4th Cir. 1979); *Barry*, 79 F. Supp. 3d at 752 (permanently enjoining "denying, reducing, or terminating public assistance," until "detail[ed]" notice is provided).

Relief should include prospective reinstatement for those who remain without

coverage. "[W]here [a state] failed to comply with the notice regulations, it has not instituted a legally effective reduction in its Medicaid benefits," and the right to Medicaid continues until such process is provided. *Kimble*, 599 F.2d at 604-605. Without reinstatement, the injunction itself would provide only *post*-termination notice and do nothing to even partially redress the injury *Goldberg* warned of: "depriv[ing] an eligible recipient of the very means by which to live while he waits." 397 U.S. at 264.

Finally, the equities weigh in favor of reinstatement. Defendants can claim no burden from reinstating coverage for those who are eligible, as DCF is required to provide them benefits. As for those ultimately found ineligible, the burden can "be speedily remedied by compliance with the [] injunction. *Banks v. Trainor*, 525 F.2d 837, 843 (7th Cir. 1975). Both the public and the class have an interest in Defendants complying with federal obligations, and costs, simply "do not excuse a violation of federal law." *Smith v. Benson*, 703 F. Supp. 2d 1262, 1277–78 (S.D. Fla. 2010).

Dated: May 7, 2024

Respectfully submitted,

By: /s/ Sarah Grusin

**NATIONAL HEALTH LAW PROGRAM**
Sarah Grusin (admitted *pro hac vice*)
Jane Perkins (admitted *pro hac vice*)
Miriam Heard (admitted *pro hac vice*)
Amanda Avery (admitted *pro hac vice*)
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
grusin@healthlaw.org

**FLORIDA HEALTH JUSTICE PROJECT**
Katy DeBriere (FBN 58506)
Miriam Harmatz (FBN 562017)
Lynn Hearn (FBN 123633)
Ronnie C. Graham (FBN 1032153)
Jerron R. Wheeler (FBN 1032240)