# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

Chianne D., et al.,
                Plaintiffs,

      v.                                 Case No. 3:23-cv-985-MMH-LLL

Jason Weida, et al.,
                Defendants.

_____/

## **<u>Plaintiffs' Proposed Findings of Fact and Conclusions of Law</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... vi

INTRODUCTION ............................................................................................. 1

PROPOSED FINDINGS OF FACT ................................................................... 1

    I.      Florida's Medicaid program ................................................................ 1

    II.     Medicaid eligibility in Florida ........................................................... 2

    III.    Florida Medicaid eligibility redeterminations .................................... 5

    IV.   DCF maintains case-specific information about Medicaid eligibility
           decisions. ........................................................................................... 8

    V.     Medicaid termination notices omit the case-specific information DCF
           used to make the eligibility decision and are vague and confusing........... 11

         A.  Case-specific information cannot be deduced or inferred from the
               Medicaid termination notices. .......................................................... 12

         B.  The reason codes are generic, vague, and unclear............................. 15

         C.  The Medicaid termination notices do not reliably include citations
               to the applicable statutes and regulations. ........................................ 20

    VI.   Case-specific information is not reliably available outside of the
           Medicaid termination notices. ............................................................ 21

         A.  DCF's customer call center is unreliable. ......................................... 21

         B.  Case-specific information is not available in MyACCESS
               Accounts. ....................................................................................... 29

         C.  Family Resource Centers, DCF Offices, and community partner
               agencies are not reliable sources of case-specific information. ............ 32

D. The remaining publicly available information does not provide case-specific information and is otherwise incomplete, inconsistent, and confusing. ................................................................. 35

    i.  Medicaid eligibility information. ............................................. 35

    ii.  Publicly available information on fair hearings is conflicting. ...................................................................... 42

E. Supervisory review & fair hearing packets do not provide sufficient explanation. ................................................................. 43

VII.  Defendants have been well aware for years that the notices are confusing and not sufficiently specific yet have failed to address the problem.................................................................... 49

VIII.  DCF notices cause significant harm........................................ 53

A. Kimber Taylor & K.H................................................................ 53

B. Chianne D. & C.D.................................................................... 61

C. A.V. ....................................................................................... 71

D. Lily Mezquita.......................................................................... 81

IX.  Many class members are likely to have been erroneously terminated without adequate notice. .................................................................... 93

X.  Revisions to the Medicaid termination notices are feasible using DCF's current technology.................................................... 99

A. Deloitte's typical estimation process. ..................................102

B. Deloitte's estimates are based on the assumption that new data would have to be stored in the FLORIDA system. ..........104

C. DCF and Deloitte have not seriously explored any other alternatives to identify more efficient ways to update notices. ..........107

D. Adding case-specific information that is currently stored in the FLORIDA system is feasible, as DCF already does in other notices of case actions. ....................................................109

E. Adding the applicable income limit to the notices is feasible. ............112

F. Editing the text of reason codes and the statutory and regulatory cites in the TSRC table is feasible. ....................................................113

G. Changes to current notices would not disrupt modernization............114

PROPOSED CONCLUSIONS OF LAW...........................................................115

I.   Defendants' Medicaid termination notices violate due process. .............115

A. DCF's Medicaid termination notices are not reasonably calculated to inform recipients of the action taken. ...........................119

B. DCF's Medicaid termination notices do not explain the reasons for the agency's action. ..................................................................121

C. Other communications do not remedy the inadequate notices. .........126

i.   Communications before DCF's final decision and after a Medicaid termination has been appealed are not relevant. ......126

ii.  It is not reasonable to rely on the MyACCESS accounts, call center, or Family Resource Centers to supply case-specific information. ....................................................127

iii. It is unreasonable to rely on publicly available information.....134

D. The purported administrative burden of updating notices is not decisive to the Due Process claim. ..................................................138

II.  Defendants' Medicaid termination notices violate the Medicaid Act requirements. ........................................................................................140

A. Medicaid Act requirements. ..........................................................140

B.  The Medicaid Act's requirements are privately enforceable. .............142

III.  Relief must include revising notices, pausing terminations and, for
      those without coverage, prospective reinstatement until adequate
      notice is provided. ................................................................................145

   A.  Plaintiffs have shown irreparable harm and there is no adequate
       remedy at law. ....................................................................................145

   B.  The balance of equities and public interest factors weigh in favor
       of Plaintiffs. .......................................................................................149

   C.  The Court has authority to order revisions to the notices, a pause
       in terminations, and reinstatement pending receipt of new notices. ...153

        i.   Defendants must revise the Medicaid termination notices.......154

        ii.  Defendants must pause terminations until notices are
             revised. ........................................................................................158

        iii. Defendants must prospectively reinstate class members
             who remain without Medicaid coverage. ..............................159

        iv.  Defendants must supply *Quern* notice regarding existing
             state procedures for retroactive restoration of coverage. ..........162

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*A.M.C., v. Smith,*
   No. 3:20-CV-00240, 2024 WL 3956315 (M.D. Tenn. Aug. 26, 2024) .............*passim*

*Adams v. Harris,*
   643 F.2d 995 (4th Cir. 1981) ...........................................................................119

*Allen v. Alaska Dep't of Health & Soc. Servs.,*
   203 P.3d 1155 (Alaska 2009)................................................................ 118, 122

*Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.,*
   721 F.3d 871 (7th Cir. 2013) ...........................................................................156

*Ancata v. Prison Health Servs., Inc.,*
   769 F.2d 700 (11th Cir. 1985)..........................................................................151

*Arizona Dream Act Coalition v. Brewer,*
   855 F.3d 957 (9th Cir. 2017) ...........................................................................149

*Arrington v. Helms,*
   438 F.3d 1336 (11th Cir. 2006)...................................................................*passim*

*Atkins v. Parker,*
   472 U.S. 115 (1985)...........................................................................................119

*Banks v. Trainor,*
   525 F.2d 837 (7th Cir. 1975) ...........................................................................152

*Barrett v. Walker Cnty. Sch. Dist.,*
   872 F.3d 1209 (11th Cir. 2017)........................................................................145

*Barry v. Corrigan,*
   79 F.Supp.3d 712 (E.D. Mich. 2015)..........................................120, 139, 154, 158

*Barry v. Lyon,*
   834 F.3d 706 (6th Cir. 2016) ......................................................................*passim*

*Bd. of Regents v. Roth,*
   408 U.S. 564 (1972) ..........................................................................................149

*Beltran v. Meyers,*
   677 F.2d 1317 (9th Cir. 1982)..................................................................147

*Billington v. Underwood,*
   613 F.2d 91 (5th Cir. 1980) ...................................................................117

*Bonner v. City of Prichard,*
   661 F.2d 1206 (11th Cir. 1981)..............................................................117

*Brown v. Plata,*
   563 U.S. 493 (2011) ...............................................................................153

*C.R. ex rel. Reed v. Noggle,*
   559 F. Supp. 3d 1323 (N.D. Ga. 2021) ..........................................*passim*

*Caldwell v. Blum,*
   621 F.2d 491 (2nd Cir. 1980) ................................................................147

*Cherry v. Tompkins,*
   No. C-1-94-460, 1995 WL 502403 (S.D. Ohio Mar. 31, 1995) ............141

*Chisholm ex rel. CC v. Kliebert,*
   No. CIV.A. 97-3274, 2013 WL 4089981 (E.D. La. Aug. 13, 2013) ....150

*City of West Covina v. Perkins,*
   525 U.S. 234 (1999) ....................................................................... 134, 135

*Colonel Fin. Mgmt. Officer v. Austin,*
   622 F. Supp. 3d 1187 (M.D. Fla. 2022) ...............................................149

*Cramer v. Chiles,*
   33 F. Supp. 2d 1342 (S.D. Fla. 1999)...................................... 144, 146

*Crawley v. Ahmed,*
   No. 08-14040, 2009 WL 1384147 (E.D. Mich. May 14, 2009).......*passim*

*Cryder v. Oxendine,*
   24 F.3d 175 (11th Cir. 1994) ................................................................115

*Davis v. Shah,*
   821 F.3d 231 (2d Cir. 2016) .................................................................143

*Detgen v. Janek,*
   945 F. Supp. 2d 746 (N.D. Tex. 2013) ............................................................. 143

*Dilda v. Quern,*
   612 F.2d 1055 (7th Cir. 1980) ......................................................................... 122

*Dodson v. Parham,*
   427 F. Supp. 97 (N.D. Ga. 1977) ..................................................................... 146

*Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush,*
   261 F.3d 1037 (11th Cir. 2001) ....................................................................... 144

*Doston v. Duffy,*
   732 F. Supp. 857 (N.D. Ill. 1988) .................................................................... 121

*Dozier v. Haveman,*
   No. 14-12455, 2014 WL 5480815 (E.D. Mich. Oct. 29, 2014) ...... 141, 150, 156, 158

*Duffy v. Bates,*
   No. 1:15-cv-00037, 2015 WL 1346196 (N.D. Fla. Mar. 24, 2015) ...................... 117

*Edmonds v. Levine,*
   417 F. Supp. 2d 1323 (S.D. Fla. 2006) ..................................................... 146, 149

*Ex parte Young,*
   *209 U.S. 123 (1908)* ....................................................................................... 148

*Febus v. Gallant,*
   866 F. Supp. 45 (D. Mass. 1994) ............................................................. *passim*

*Flynn v. Doyle,*
   630 F. Supp. 2d 987 (E.D. Wis. 2009) ............................................................. 152

*Fuentes v. Shevin,*
   407 U.S. 67 (1972) .......................................................................................... 123

*Gaines v. Hadi,*
   No. 06-60129-CIV, 2006 WL 6035742 (S.D. Fla., Jan. 30, 2006) ....................... 125

*Garrett v. Puett,*
   707 F.2d 930 (6th Cir. 1983) ........................................................................... 118

*Garrido v. Dudek,*
    731 F.3d 1152 (11th Cir. 2013) ..........................................................153

*Gean v. Hattaway,*
    330 F.3d 758 (6th Cir. 2003)) ...........................................................143

*Goldberg v. Kelly,*
    397 U.S. 254 (1970) ..................................................................*passim*

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002) ............................................................... 142, 143

*Grayden v. Rhodes,*
    345 F.3d 1225 (11th Cir. 2003) ............................................... 115, 135

*Green v. Mansour,*
    474 U.S. 64 (1985) ...........................................................................153

*Guadagna v. Zucker,*
    2021 WL 11645538 (E.D.N.Y. Mar. 19, 2021) ...................................144

*Guggenberger v. Minn.,*
    198 F.Supp.3d 973 (D. Minn. 2016) ..................................................143

*Hamby v. Neel,*
    368 F.3d 549 (6th Cir. 2004) ........................................... 116, 125, 127

*Hames v. City of Miami,*
     479 F. Supp. 2d 1276 (S.D. Fla. 2007) ..............................................117

*Haskins v. Stanton,*
    794 F.2d 1273 (7th Cir. 1986) ..........................................................151

*Haymons v. Williams,*
    795 F. Supp. 1511, 1525 (M.D. Fla. 1992) .................................. 159-60

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
    599 U.S. 166 (2023) ............................................................... 142, 143

*Hernandez v. Medows,*
    209 F.R.D. 665 (S.D. Fla. 2002) ............................................. 144, 145

*Holmes v. Knodell,*
No. 2:22-CV-04026, 2024 WL 2097081 (W.D. Mo. May 9, 2024) ..................... 130

*In re Alton*,
837 F.2d 457 (11th Cir. 1988) ............................................................................. 117

*In r Le Ctr. on Fourth, LLC,*
No. 19-cv-62199, 2020 WL 12604348, (S.D. Fla. June 30, 2020) ....................... 117

*JL v. N.M. Dep't of Health,*
165 F. Supp. 3d 1048 (D. N.M. 2016) ................................................................. 143

*Jordan v. Benefits Review Bd of U.S. Dep't of Labor,*
876 F.2d 1455 (11th Cir. 1989) ............................................................ 116, 119, 126

*K.B. ex rel. T.B. v. Mich. Dep't of Health & Hum. Servs.,*
367 F. Supp. 3d 647 (E.D. Mich. 2019) .............................................................. 144

*K.C. ex rel. Afr. H. v. Shipman,*
716 F.3d 107 (4th Cir. 2013) ...................................................................... 159, 160

*K.W. ex rel. D.W. v. Armstrong,*
298 F.R.D. 479 (D. Idaho 2014) .................................................................. 118, 158

*K.W. ex rel. D.W. v. Armstrong,*
789 F.3d 962 (9th Cir. 2015) ............................................................ 127, 141, 159

*Kapps v. Wing,*
283 F.Supp.2d 866 (E.D.N.Y 2003) ............................................................ 125, 155

*Kapps v. Wing,*
404 F.3d 105 (2d Cir. 2005) ......................................................................... *passim*

*Kimble v. Solomon,*
599 F.2d 599 (4th Cir. 1979) ...................................................................... 159, 160

*Knowles v. Horn,*
2010 WL 517591 (N.D. Tex. Feb. 10, 2010) ...................................................... 147

*Koss v. Norwood,*
305 F. Supp. 3d 897 (E.D. Ill. 2018) .................................................................. 143

x

*LeBeau v. Spirito,*
   703 F.2d 639 (1st Cir. 1983) .................................................................118-19, 123

*M.A. ex rel. Avila v. Norwood,*
   No. 15 C 3116, 2016 WL 11818203 (N.D. Ill. May 4, 2016) .............................159

*M.G. through Garcia v. Scrase,*
   No. 122CV00325, 2023 WL 3686751 (D.N.M. May 26, 2023) ..........................151

*M.G. through Garcia v. Armijo,*
   No. 23-2093, 2024 WL 4206966 (10th Cir. Sept. 17, 2024) ...............................156

*M.R. v. Dreyfus,*
   697 F.3d 706 (9th Cir. 2012) .............................................................................153

*Mass. Ass'n of Older Americans v. Sharp,*
   700 F.2d 749 (1st Cir. 1983) .............................................................................147

*Mathews v. Eldridge.*
   424 U.S. 319 (1976) ..........................................................................................137

*Mayhew v. Cohen,*
   604 F. Supp. 850 (E.D. Pa. 1984) .....................................................................137

*Mitnor Corporation v. Club Condominiums,*
   339 F.R.D. 312 (N.D. Fla. 2021).......................................................................... 8

*Mitson v. Coler,*
   670 F. Supp. 1568 (S.D. Fla. 1987)...................................................................147

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ................................................................................*passim*

*Murphy ex rel. Murphy v. Harpstead,*
   421 F. Supp. 3d 695 (D. Minn. 2019) ...............................................................129

*O'Bannon v. Town Court Nursing Ctr.,*
   447 U.S. 773 (1980) ..........................................................................................115

*Ortiz v. Eichler,*
   616 F. Supp. 1046 (D. Del. 1985) .....................................................................128

*Ortiz v. Eichler,*
  794 F.2d 889 (3d Cir. 1986) ..................................................... 122, 156

*Pashby v. Delia,*
  709 F.3d 307 (4th Cir. 2013) ...................................................146

*Price v. Medicaid Dir.,*
  838 F.3d 739 (6th Cir. 2016) ...................................................159

*Quern v. Jordan,*
  440 U.S. 332 (1979) ................................................................. 162, 164

*Reams v. Irvin,*
  561 F.3d 1258 (11th Cir. 2009) ...............................................134

*Rock River Health Care, LLC v. Eagleson,*
  14 F.4th 768 (7th Cir. 2021) ......................................116, 123, 126, 149

*Rodriguez By & Through Corella v. Chen,*
  985 F. Supp. 1189 (D. Ariz. 1996) ..........................................*passim*

*Romano v. Greenstein,*
  No. 12-469, 2012 WL 1745526 (E.D. La. May 16, 2012) ....................................143

*Rosen v. Goetz,*
  410 F.3d 919 (6th Cir. 2005) ...................................................126

*Schroeder v. Hegstrom,*
  590 F. Supp. 121 (D. Or. 1984) ...............................................128

*Schweiker v. Gray Panthers,*
  453 U.S. 34 (1981) ..................................................................135

*Shakhnes v. Berlin,*
  689 F.3d 244 (2d Cir. 2012) .....................................................143

*Smith v. Benson,*
  703 F. Supp. 2d 1262 (S.D. Fla. 2010) .....................................145

*Swain v. Junior,*
  958 F.3d 1081 (11th Cir. 2020) ...............................................149

*Turner v. Ledbetter,*
    906 F.2d 606 (11th Cir. 1990)...................................................... 159, 160

*Vargas v. Trainor,*
    508 F.2d 485 (7th Cir. 1974) ...................................................... 129, 132

*Walters v. Reno,*
    145 F.3d 1032 (9th Cir. 1998)...........................................................137

*Washington v. DeBeaugrine,*
    58 F. Supp. 2d 1332 (N.D. Fla. 2009)..............................................158

*Watson v. Memphis,*
    373 U.S. 526 (1963) .........................................................................151

*Whelan v. Colgan,*
    602 F.2d 1060 (2d Cir. 1979).............................................................147

*Wylie v. Kitchin,*
    589 F.Supp. 505 (N.D.N.Y. 1984).....................................................147

*Yarbrough v. Decatur Hous. Auth.,*
    931 F.3d 1322 (11th Cir. 2019)......................................................142, 144

## Statutes and regulations

28 U.S.C. § 2201(a) .......................................................................145

42 U.S.C. § 1396a(a)(3) ............................................................*passim*

42 U.S.C. § 1396a(a)(5) ................................................................... 1

42 U.S.C. § 1396b(a) ....................................................................... 2

42 U.S.C. § 1396d(b) ....................................................................... 2

42 U.S.C. § 1983 .......................................................................142, 143

Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008, 134 Stat.
178, 208-209................................................................................... 6

42 C.F.R. § 431.205..........................................................................140

42 C.F.R. § 431.205(d)........................................................................144

42 C.F.R. § 431.205(f) ........................................................................144

42 C.F.R. § 431.206(a)........................................................................140

42 C.F.R. § 431.206(b)........................................................................140

42 C.F.R. § 431.206(b)(2)....................................................................140

42 C.F.R. § 431.206(c)(1).....................................................................140

42 C.F.R. § 431.206(c)(2).....................................................................140

42 C.F.R. § 431.210 ...................................................................... 140, 141

42 C.F.R. § 431.210(a).........................................................................141

42 C.F.R. § 431.210(b)................................................................... 141, 142

42 C.F.R. § 431.210(c).........................................................................142

42 C.F.R. §§ 431.210–214 ...................................................................158

42 C.F.R. § 431.231(c).........................................................................144

42 C.F.R. § 431.246.............................................................................163

42 C.F.R. § 431.250.............................................................................150

42 C.F.R. § 431.250(b)(2)....................................................................150

42 C.F.R. § 438.100(a)(2)........................................................................ 2

42 C.F.R. § 438.100(d)............................................................................. 2

Federal Rule of Civil Procedure 30(b)(6) ................................................ 8

Federal Rule of Civil Procedure 30(c)(2)................................................. 8

Federal Rule of Civil Procedure 65(d) ......................................... 153, 155

Fla. Stat. § 409.902 ................................................................................. 1

Fla. Stat. § 409.902(1) ............................................................................ 2

Fla. Stat. § 409.903(3) ........................................................................... 36

Fla. Stat. §§ 409.901-.9205 ..................................................................... 1

Fla. Stat. § 409.963 ................................................................................. 1

Fla. Stat. § 414.095 ............................................................................... 21

Fla. Admin. Code. 65A-1.702(6) ........................................................ 163

## INTRODUCTION

The fundamental purpose of notice in Medicaid is to protect vital health coverage by apprising individuals of their impending coverage loss and enabling them to identify—and if necessary, correct—errors in the decision. The question here is whether Defendants' notices achieve this basic goal. They do not: DCF made numerous errors in determining eligibility for individuals in this case, yet none of their notices contain the information necessary to identify those mistakes. These notices, like all DCF termination notices, did not specify the income DCF used, the income limit DCF applied, or the population group DCF considered; nor did they describe other population groups through which these individuals might otherwise establish eligibility. Without this information, Medicaid enrollees cannot effectively challenge terminations, resulting in confusion, lost health care coverage, and other harms.

## PROPOSED FINDINGS OF FACT

### I.   Florida's Medicaid program.

1.    Florida participates in the federal Medicaid program. Fla. Stat. §§ 409.901-.9205.

2.    Defendant Jason Weida is the Secretary of the Florida Agency for Health Care Administration (AHCA). AHCA is designated as the "single state agency" to administer the state's Medicaid plan. 42 U.S.C. § 1396a(a)(5); Fla. Stat. §§ 409.902, 409.963 (2024); FAC ¶ 17; Answer ¶ 17.

3.    Although AHCA is the single state agency, the Department of Children

and Families (DCF) is responsible for all aspects of Medicaid eligibility decisions and redeterminations, including issuing notices regarding eligibility decisions. Answer ¶ 18; Fla. Stat. § 409.902(1); Dep. Designations of Ann Dalton ("Dalton Dep."), ECF No. 167-3 at 9:2-7, 9:23-10:11, 10:19-11:1, 12:21-25, 56:10-19.

4.      While a state may delegate certain responsibilities to other entities, such as other state or local agencies, the single state agency remains responsible for ensuring compliance with all aspects of the Medicaid Act. 42 C.F.R. § 438.100(a)(2), 438.100(d).

5.      States receive federal matching funding, called the Federal Medical Assistance Percentage (FMAP), for Medicaid services provided to eligible enrollees. The federal government matches the state's Medicaid expenditures at a specified rate. 42 U.S.C. §§ 1396b(a), 1396d(b). Florida currently receives a federal matching rate of approximately 60% (60 cents of every dollar spent) for medical services. Testimony of Matthew Cooper ("Cooper Test."), Trial Tr. Vol. 3, ECF No. 163 at 205:2-7.

## II.      Medicaid eligibility in Florida.

6.      To be eligible for Medicaid in Florida, an individual must meet certain "technical" requirements, such as being a resident of the state, having citizenship or a qualifying immigration status and falling within a covered population group (*i.e.*, be a child, a parent or caretaker of a child, pregnant, disabled, over 65, receiving Supplemental Security Income (SSI), or have previously been in foster care). Testimony of William Roberts ("Roberts Test."), Trial Tr. Vol. 2, ECF No. 162 at 11:23-12:22; Deposition Designations of Tonyaleah Veltkamp Vol. 1 ("Veltkamp Dep.

Vol. 1"), ECF No. 167-11 at 34:13-20; PX192.

7.      If an individual meets all technical requirements, DCF evaluates their income eligibility. Roberts Test., Tr. Vol. 2 at 12:23-13:1.

8.      Each population group has different income limits that are based on a percentage of the federal poverty level; the limits change annually. Roberts Test., Tr. Vol. 2 at 15:3-14, Tr. Vol. 4 at 263:19-264:5.

9.      Certain types of income will not count towards the income limits. For instance, in the family-related eligibility groups (*e.g.*, children, parents/caretakers, and pregnant people), child support income does not count. Likewise, a child's SSI will not count towards the income of other family members. Roberts Test., Tr. Vol. 2 at 27:15-28:14, Tr. Vol. 4 at 264:9-20.

10.     Moreover, some population groups retain eligibility notwithstanding fluctuations of income, including children and individuals who are enrolled while pregnant. Roberts Test., Tr. Vol. 2 at 40:22-24, 41:18-42:4; PX143; PX147.

11.     The specific income standard used to evaluate a person's eligibility is determined based on what DCF calls an individual's "standard filing unit" or "SFU" size. Roberts Test., Tr. Vol. 4 at 259:16-21; PX189 at DCF-3136, -3139.

12.     The SFU is not always equal to the number of people in the household or the family size. Roberts Test., Tr. Vol. 2 at 19:10-20:18, Tr. Vol. 4. at 258:12-259:11; PX189.

13.     For instance, in the family-related eligibility groups, SFU is based on the tax household, which may include individuals who do not reside in the house. PX189

at DCF-3136; Roberts Test., Tr. Vol. 2 at 19:10-20:18.

14.     Individuals who meet all technical requirements but are over-income for the applicable Medicaid population group are eligible for the Medically Needy program (Medically Needy). Doc. 128, § VIII ¶ 14; Roberts Test., Tr. Vol. 2 at 13:2-6; Testimony of LaQuetta Anderson ("Anderson Test."), Trial Tr. Vol. 4, ECF No. 164 at 120:25-121:7, 121:15-122:22; PX188 at DCF-3083; PX190 at DCF-3170; Deposition Designations of Hari Kallumkal ("Kallumkal Dep."), ECF No. 167-6 at 86:1-10.

15.     Medically Needy is not full Medicaid and it is not comparable coverage to full Medicaid. Roberts Test., Tr. Vol. 2 at 13:7-17; Testimony of Nathan Lewis ("Lewis Test."), Trial Tr. Vol. 4, ECF No. 164 at 9:4-22, 13:9-12; Anderson Test., Tr. Vol. 4 at 120:13-20; Veltkamp Dep. Vol. 1 at 56:18-20.

16.     To qualify for Medically Needy, individuals must incur medical expenses each month in order to have coverage for that month. PX188 at DCF-3083.

17.     The amount of medical expenses an individual must incur each month is called a "share of cost," and DCF calculates the share of cost amount by deducting an amount—based on the SFU size—from the SFU's total countable income. PX188 at DCF-3083; PX178; Roberts Test., Tr. Vol. 2 at 13:21-14:3. For example, the disregard amount for an SFU of four is $585. PX178 at MNIL column.

18.     Once an individual submits bills for medical expenses equaling the share of cost for the month, Medically Needy coverage opens for that month. The share of cost must be re-established each month in order to re-open coverage for the month.

4

PX188 at DCF-3083. The share of cost can be met with bills that were paid or are "unpaid and still owed." PX186 at DCF-002955, DCF-002983.

19.     Florida offers family planning coverage to women between the ages of 18 and 50 who are otherwise ineligible for full Medicaid. Family planning coverage is not full Medicaid and covers a very limited scope of services, such as birth control. Roberts Test., Tr. Vol. 2 at 14:11-24.

**III.    Florida Medicaid eligibility redeterminations.**

20.     Generally, individuals must renew their Medicaid eligibility once every 12 months. ECF No. 128 § IX ¶ 7, § VIII ¶¶ 17-20; Roberts Test., Tr. Vol. 2 at 10:13-15; Anderson Test., Tr. Vol. 4 at 121:8-14.

21.     Redeterminations also occur every time a change is reported, whether or not the reported change includes a change in income. Roberts Test., Tr. Vol. 2 at 10:16-18; Lewis Test., Tr. Vol. 4 at 20:7-15 (change report will be treated as an application).

22.     For instance, Medicaid eligibility is reviewed every time an individual reapplies for food or cash assistance. There is no way to apply only for food or cash assistance without triggering a review of Medicaid eligibility. Roberts Test., Tr. Vol. 2 at 10:19-11:6.

23.     Food and cash assistance benefits are reviewed every six months. Thus, practically speaking, for individuals who apply for Medicaid and cash or food assistance, Medicaid eligibility will be reviewed more frequently than every 12 months. Roberts Test., Tr. Vol. 2 at 11:7-22.

24.     During the COVID-19 pandemic, although Defendants continued to

conduct Medicaid eligibility reviews, Medicaid terminations were paused pursuant to the federal "continuous coverage" requirement. ECF No. 128 § IX ¶ 7, § VIII ¶¶ 17-20. Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008, 134 Stat. 178, 208-209; FAC ¶ 2; Answer ¶ 2.

25.     After Congress announced the end of this continuous coverage requirement, DCF elected to restart redeterminations at the earliest possible date and began terminating individuals effective March 31, 2023. ECF No. 128 § VIII ¶¶ 20-23.

26.     During the renewal process, DCF re-verifies income by gathering data from third-party electronic databases, including the Federal Data Services Hub (FDSH) and State Wage Information Collection Agency (SWICA). Roberts Test., Tr. Vol. 2 at 8:15-9:7, 21:5-17.

27.     The third-party data from SWICA reports gross-income and does not take into account any pre-tax income exclusions. Roberts Test., Tr. Vol. 2 at 22:16-23:5.

28.     If DCF cannot verify income electronically, it asks Medicaid enrollees to send proof of income. *Id.* at 22:3-5.

29.     Once proof is returned, a DCF case processor is randomly assigned to review the case. *Id.* at 23:15-20.

30.     The DCF case processor determines what income data to input in the FLORIDA computer system (FLORIDA), which is the mainframe computer system that processes DCF's eligibility determinations. Anderson Test., Tr. Vol. 4 at 116:4-19; Testimony of Andrea Latham ("Latham Test."), Trial Tr. Vol. 5, ECF No. 165 at

6

120:17-121:12.

31.     Eligibility decisions are dependent on what a case processor enters into the FLORIDA system. Roberts Test., Tr. Vol. 2 at 23:6-14.

32.     DCF case processors have some discretion in selecting the income data to input, which can impact the final eligibility decision. *Id.* at 26:7-10.

33.     For instance, the specific pay periods DCF uses depends on when a case processor reviews a case. *Id.* at 24:3-20; PX187 at DCF-3042 (directing use of most recent four weeks' pay or "best available information").

34.     Case processors also use judgment to review income fluctuations. Roberts Test., Tr. Vol. 2 at 24:21-26:10; PX187 at DCF-3042-43.

35.     Errors are also possible during an eligibility determination. For instance, income must be converted to a monthly amount if reported as weekly, biweekly, or annually, and errors can occur during the conversion. Roberts Test., Tr. Vol. 2 at 26:13-27:6; PX187 at DCF-3044.

36.     Case processors must also consider pre-tax income exclusions, such as deductions for 401k retirement accounts. Failure to subtract pre-tax income exclusions from an individual's gross pay can result in incorrect income calculations. Roberts Test., Tr. Vol. 2 at 126:9-11.

37.     A simple typographical error in inputting income information can result in errors. *Id.* at 27:7-12.

38.     Once all income and other data is entered, FLORIDA automatically applies the Medicaid eligibility rules to determine each person's eligibility for a full

Medicaid population group or, if not eligible for full Medicaid, then Medically Needy coverage. Kallumkal Dep. at 108:10-20, 108:25-109:17; Testimony of Hari Kallumkal ("Kallumkal Test."), Trial Tr. Vol. 5, ECF No. 165 at 223:2-228:3; Anderson Test., Tr. Vol. 4 at 116:4-19.

39.     Once FLORIDA reaches a conclusion, the case processor reviews and "authorizes" the case, triggering DCF's action approving, denying, or terminating coverage. Dep. Designations of LaQuetta Anderson Vol. 1 ("Anderson Dep. Vol. 1"), ECF No. 167-1 at 19:16-20:11; Kallumkal Test., Tr. Vol. 5 at 235:18-23.

## IV.   DCF maintains case-specific information about Medicaid eligibility decisions.

40.     DCF maintains information about the basis for its eligibility decisions in FLORIDA. Roberts Test., Tr. Vol. 2 at 9:8-10:7, 28:15-25; Dep. Designations of Robyn Goins ("Goins Dep."), ECF No. 167-5 at 12:17-13:19.

41.     Within FLORIDA, there are several screens that store and display case-specific information, including screens identifying income types and sources, different household members' relationships, SFU size, income standards, and more. Roberts Test., Tr. Vol. 2 at 9:8-10:7; Anderson Dep. Vol. 1 at 47:5-14[1]; PX206 (collecting

---

[1] Defendants have belatedly objected to certain deposition designations as outside the scope of the witness's designated topic. *See* ECF No. 167-13. Federal Rule of Civil Procedure 30(c)(2) requires all objections to be stated concisely and on the record during depositions. The Rule does not exempt scope objections and the fact that a deponent is testifying as a designated corporate representative under Rule 30(b)(6) does not fundamentally change the procedure regarding objections. *See Mitnor Corp. v. Club Condominiums*, 339 F.R.D. 312, 320 (N.D. Fla. 2021). The purpose of raising an objection at the time of deposition is to inform the deposing attorney of the need to cure any defect and scope objections can be readily cured during the deposition. In fact, the depositions here reflect counsel's ability to resolve scope objections that were timely raised. *See, e.g.*, Veltkamp Dep. Vol. 1 at 28:2-29:1 (resolving scope objection with subsequent question). Defendants' belated scope objections that were

FLORIDA screens).

42.     One key FLORIDA screen is a "Budget Screen." Before a case processor authorizes benefits, the final information used to evaluate each person's eligibility is displayed on a "Budget Screen." Roberts Test., Tr. Vol. 2 at 28:15-29:23.

43.     That screen displays the population group, gross income, countable income, SFU size, and income standard. PX157 at DCF-1697-98, 1707-08, 1892 (Figure 2-99); Anderson Dep. Vol. 1 at 47:5-14; Roberts Test., Tr. Vol. 2 at 28:15-29:23, 45:17-47:8 (discussing PX100).

44.     If an individual moves from Medicaid to Medically Needy, only the last Budget Screen—for the Medically Needy determination—is saved. Roberts Test., Tr. Vol. 2 at 32:11-33:3; Kallumkal Dep. at 184:8-185:8; Kallumkal Test., Tr. Vol. 5 at 228:2-233:17.

45.     In these cases, the actual SFU size, income limit, and calculations used for the full Medicaid determination are deleted; only the Medically Needy Budget Screen is saved. Roberts Test., Tr. Vol. 2 at 32:20-25; Kallumkal Dep. at 184:8-185:8; Kallumkal Test., Tr. Vol. 5 at 228:2-233:17.

46.     Although the Medicaid Budget Screen is deleted, the inputs are saved, *e.g.*, the income screens showing the income amounts for each person remain visible in FLORIDA. Roberts Test., Tr. Vol. 2 at 29:24-30:17; Anderson Dep. Vol. 1 at 47:5-14; Kallumkal Dep. at 185:9-187:7; Kallumkal Test., Tr. Vol. 6 at 50:10-51:25.

---

not made at the time of the deposition are, thus, waived.

47.   Thus, calculations can be re-constructed. Goins Dep. at 36:18-38:18, 39:2-16; Veltkamp Dep. Vol. 1 at 143:12-20; Roberts Test., Tr. Vol. 2 at 48:4-49:25, 67:19-25, 95:22-96:5, 96:25-97:23, 106:2-108:1 (reconstructing income calculations for individual cases based on available inputs).

48.   DCF relies on the same SFU size and countable income to determine eligibility for full Medicaid and to calculate the Medically Needy share of cost. Roberts Test., Tr. Vol. 2 at 20:23-21:4, 30:18-31:3, 177:3-6; PX186 at DCF-002953, -002980.

49.   That countable income number is represented on the "MAGI" field of the Budget Screen. Roberts Test., Tr. Vol. 2 at 177:3-178:15, 179:10-13; Lewis Test., Tr. Vol. 4 at 47:4-7.

50.   DCF staff routinely rely on the countable income information and SFU size contained in the Medically Needy Budget Screen to determine why an individual was found over income for full Medicaid. Roberts Test., Tr. Vol. 2 at 29:7-23, 30:18-31:3, 42:25-43:8, 45:17-47:8, 89:13-25, 91:5-15, 94:4-20, 103:9-17, 109:10-23, 118:15-22, 134:9, 171:18-172:4; Testimony of Robyn Goins ("Goins Test."), Trial Tr. Vol. 5, ECF No. 165 at 65:14-66:9 ("I would have to look at a budget screen to see exactly what was used."), 66:20-67:4.

51.   Mr. Roberts confirmed that the budget screen is "the only way to determine the SFU size," Roberts Test., Tr. Vol. 2 at 105:3-5, and "we can't tell . . . without the budget screen what income was used." *Id.* at 121:8-11, 146:21-25 ("without looking at the budget screen, you can't tell what income DCF used to find her ineligible").

10

52.     When someone is found over-income for full Medicaid and is enrolled in Medically Needy, FLORIDA identifies the applicable income limit from a table of income limits that is currently stored in the FLORIDA system. Kallumkal Test., Tr. Vol. 6 at 32:4-5.

53.     For any individual case, the actual income limit DCF relied on for the full Medicaid ineligibility finding is not saved on the Medically Needy Budget Screen. Roberts Test., Tr. Vol. 2 at 31:4-32:10; Kallumkal Test., Tr. Vol. 6 at 80:16-81:15.

54.     To determine the income limit DCF applied, DCF makes an inference based on a policy document: Appendix A-7 of the ESS Policy Manual. Roberts Test., Tr. Vol. 2 at 16:2-11, 33:4-10; PX178.

55.     The "IQEL" screen saves a history of when DCF opened and closed an individual's coverage in specific population groups. Roberts Test., Tr. Vol. 2 at 33:12-34:23, 60:10-14; PX103.

56.     For individuals found over-income for Medicaid and enrolled in Medically Needy, FLORIDA retains the case-specific data showing the individuals' countable income, SFU size, and prior population group.

**V.     Medicaid termination notices omit the case-specific information DCF used to make the eligibility decision and are vague and confusing.**

57.     Although DCF maintains case-specific information about the basis of its Medicaid eligibility decisions, that information is not set forth in their Notices of Case Action (NOCAs). Roberts Test., Tr. Vol. 2 at 35:5-12.

58.     The NOCA is the only communication DCF affirmatively sends to a

11

person losing Medicaid. *Id.* at 34:20-35:4.

59.   The NOCA omits case-specific information regarding individual countable income, applicable income limits, SFU size, and population groups. *Id.* at 35:5-12; FAC ¶¶ 75, 81, 83; Answer ¶¶ 75, 81, 83.

60.   DCF relies instead on "reason codes" to explain its action. Roberts Test., Tr. Vol. 2 at 35:13-15.

### A. Case-specific information cannot be deduced or inferred from the Medicaid termination notices.

61.   It is impossible for the reader to infer or deduce the underlying case-specific information from the current organization and structure of the Medicaid termination NOCAs. DCF uses the same section heading, "Medicaid," for all populations groups. Anderson Dep. Vol. 1 at 33:13-34:10; Goins Test., Tr. Vol. 5 at 67:5-69:12. Thus, an individual may receive a notice with multiple sections labeled "Medicaid," where the same person is listed as "eligible" in one section and "ineligible" in another. This makes it extremely confusing to determine what action each section of the notices is describing. Roberts Test., Tr. Vol. 2 at 144:4-146:3.

62.   Individual sections routinely refer to "your" benefits without specifying whose benefits are actually being described in the action statement. *See, e.g.*, PX156 at DCF-000887, -000995. And while there is a list of names under each action statement, that does not necessarily mean that the action applies to everyone listed. *See, e.g.*, PX81 at DCF-005728-29 (listing seven names under statement "Your Medicaid benefits for the person(s) listed below will end . . ." but not all seven individuals were losing

12

coverage); PX130 at -000007 (listing two names under "Your Medicaid application/review . . . is denied" because "The Medicaid Coverage for your pregnancy has ended" when only one individual was enrolled in pregnancy coverage).

63.     Instead, as DCF witnesses explained, each section of the NOCA might refer to a different "primary" person, but there is no indication on the NOCA about which individual is "primary" in each section. *See, e.g.*, Roberts Test., Tr. Vol. 2, at 117:20-118:14; Anderson Dep. Vol. 1 at 32:25-34:10. This makes it impossible to identify which individual(s) a reason code in any given section applies to. Testimony of Jarvis Ramil ("Ramil Test."), Trial Tr. Vol. 4, ECF No. 164 at 62:1-11; Anderson Test., Tr. Vol. 4 at 182:12-20.

64.     DCF NOCAs routinely refer to "your Medicaid application/review dated [date]," but the dates do not necessarily correspond to the date an individual actually submitted an application for review. Kallumkal Dep. at 94:16-95:1, 95:12-96:5. The use of the phrase "application/review" obscures whether the section is describing a decision to terminate existing Medicaid benefits or deny new benefits. Anderson Test., Tr. Vol. 4 at 181:17-182:11 (interpreting PX40).

65.     DCF believes the NOCA sections should appear alphabetically (*i.e.*, Medicaid sections before Medically Needy sections). DCF could not explain why, in practice, they do not. Kallumkal Dep. at 93:2-15, 94:5-14; Anderson Dep. Vol. 1 at 27:24-28:18.

66.     Different NOCA sections often contain variant combinations of household members, and the number of individuals does not necessarily reflect the

SFU size. Anderson Dep. Vol. 1 at 34:11-35:10; Kallumkal Dep. at 80:4-22, 115:6-116:8; Ramil Test., Tr. Vol. 4 at 64:5-13.

67.    Without case-specific information, DCF witnesses with deep knowledge of Medicaid eligibility could not interpret notices. Veltkamp Dep. Vol. 1 at 75:18-77:12, 120:24-121:16; Kallumkal Dep. at 82:2-4, 91:15-23, 99:9-16, 100:12-101:6, 101:15-102:1 (discussing ECF 2-3), 117:9-118:21 (discussing PX81); Roberts Test., Tr. Vol. 2 at 64:25-65:7 (unable to identify population group Chianne D. evaluated for from PX40).

68.    Multiple DCF witnesses testified that, to understand the reason for a Medicaid termination, they would have to look at the whole case, including Budget Screens, case comments, third-party verifications, and other information unavailable to Medicaid enrollees. Roberts Test., Tr. Vol. 2 at 42:25-43:8, 45:17-47:8, 47:9-50:23, 57:5-19, 80:17-25, 89:13-25, 91:5-15, 94:4-20, 95:15-97:23, 103:9-17, 109:10-23, 118:15-22, 134:9, 143:6-144:1, 146:21-25, 171:18-172:4; Goins Test., Tr. Vol. 5 at 56:20-58:14; Goins Dep. at 14:10-15:15; Veltkamp Dep. Vol. 1 at 140:2-144:8.

69.    Mr. Jarvis Ramil, a community health educator who works at Wolfson Children's Hospital and has helped over 500 families with Medicaid eligibility issues, stated that he has to help families understand whether the notice is telling them they are eligible for Medicaid or not. Ramil Test., Tr. Vol. 4 at 60:6-10. He testified that it would be helpful to include a combination of the household size and income limit used to reach the eligibility decision. *Id.* at 104:12-14.

70.    Mr. Lewis, whose job responsibilities within DCF included evaluating

14

the sufficiency of notices, believes it would be helpful to the recipient to "reflect[] back" the income that DCF relied on to reach the eligibility decision because it would enable individuals to better identify mistakes DCF made. Lewis Test., Tr. Vol. 4 at 35:6-20.

71.     Ms. Anderson acknowledged that adding individualized information to the NOCAs "will make the notices to Medicaid recipient easier to understand." PX141.

### B. The reason codes are generic, vague, and unclear.

72.     Rather than provide case-specific information, DCF elects to use a finite set of generic "reason codes" to communicate the reasons for its decision. Roberts Test., Tr. Vol. 2 at 35:13-15; Kallumkal Test., Tr. Vol. 6 at 84:5-13 (describing reason codes as "generic"); PX210 (listing finite set of reason codes).

73.     For instance, DCF uses the phrase "YOUR HOUSEHOLD INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM" without specifying the income limit, countable income, or SFU size it relied on. Veltkamp Dep. Vol. 1 at 112:16-22, 113:2-23, 115:3-9; PX210 (reason code 241).

74.     A notice can include up to three reason codes in one section. Anderson Dep. Vol. 1 at 36:9-25; PX206 at DCF-6138; *see, e.g.*, PX40.

75.     Which reason codes appear in a notice depends on which numerical codes appear on the "AWAA" screen in FLORIDA. Anderson Dep. Vol. 1 at 36:9-37:3; Kallumkal Test., Tr. Vol. 6 at 37:15-38:25; PX206 at DCF-6138 (showing AWAA screen). The reason codes can be automatically populated by the FLORIDA system or manually added by a caseworker. Anderson Dep. Vol. 1 at 36:9-37:3;

Kallumkal Dep. at 132:4-17, 219:16-220:13; Kallumkal Test., Tr. Vol. 6 at 18:10-14, 37:1-2 ("the reason codes are actually populated by the system, by EDBC or by the worker.").

76.     Even when a reason code is automatically populated, a case worker can manually add reason codes in addition to those that are automatically populated or overwrite the automatically-populated code. Kallumkal Dep. at 132:4-17.

77.     At her deposition in March 2024, Ms. Anderson testified that the FLORIDA system already automatically populates Reason Code 241 when an individual is found over-income for full Medicaid. Anderson Dep. Vol. 1 at 49:22-50:5.

78.     NOCAs sent to Medicaid enrollees reflect that the system does not always work as intended; individuals are terminated from full Medicaid due to income *without* receiving Reason Code 241. PX81; PX112; Kallumkal Test., Tr. Vol. 6 at 16:5-16. The record shows that individuals who are found over-income can, instead, receive a reason code that provides less information than code 241 and obfuscates whether income was even the reason for ineligibility. *See, e.g.*, PX81; PX112; Anderson Test., Tr. Vol. 4 at 183:5-184:2 ("I can't say for sure what 'another program' refers to in reason code describing receiving "same assistance from another program.""); Roberts Test., Tr. Vol. 5 at 35:3-18, 37:16-39:9 (Mr. Roberts assumed that because reason codes did not mention income, notices were not describing income terminations).

79.     In fact, DCF, through Ms. Veltkamp, its corporate representative on the topic of the meaning of reason codes, confirmed that 241 is not the only reason code used to communicate an income-termination and that each of the following reason

codes can be—and is—used to move someone from full Medicaid to Medically Needy: 227, 249, 290, 350, and 374.

| No. | Reason Code Text (*see* DX123) | Exhibit or Veltkamp Dep. Cite |
|---|---|---|
| 227 | *Pre-December 2023*: WE REVIEWED YOUR CASE, YOU ARE STILL ELIGIBLE FOR MEDICAID, BUT IN A DIFFERENT MEDICAID COVERAGE GROUP<br><br>*Current:* We reviewed your case, you are still eligible, but in a different Medicaid coverage type. In most cases, your income exceeds the income limits for full coverage, check your MyAccess account to see if you qualify for the Medically Needy program. | Vol. 1 82:25-83:12, 85:15-20, PX160 |
| 249 | *Pre-December 2023*: YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM<br><br>*Current:* You are receiving the same type of assistance from another program. You or a household member already qualify for this requested benefit in another case or another category. Examples: receiving TCA or SNAP in a different case, Medicaid eligibility continues in another category, etc. | Vol. 1 50:18-51:3, 56:1-15, 87:19-88:2, 151:1-21 |
| 290 | *Pre-December 2023*: ELIGIBILITY REQUIREMENTS NOT MET<br><br>*Current:* Eligibility requirements not met. You do not or no longer qualify for this benefit due to income and/or a change in your household circumstances | Vol. 1 60:3-61:8, 63:21-64:10 |
| 350 | *Current:* AN INDIVIDUAL IS IN THE SAME CASE BUT A DIFFERENT CATEGORY | PX161, Vol. 2. 70:4-9 |
| 374 | *Pre-December 2023*: NO HOUSEHOLD MEMBERS ARE ELIGIBLE FOR THIS PROGRAM<br><br>*Current:* No household members are eligible for this program. You do not or no longer qualify for this benefit due to income and/or or a change in your household circumstances. | Vol. 1 71:14-21, 72:7-21 |

80.    There is disagreement among DCF staff about what these reason codes

17

mean. Two different DCF witnesses with more than 25 years of experience, Mr. Roberts and Mr. Lewis, had different interpretations from Ms. Veltkamp on the meaning of reason codes. Mr. Roberts testified that only Reason Code 241 should be used for income terminations and that none of the reason codes identified by Ms. Veltkamp would refer to income terminations. Roberts Test., Tr. Vol. 2 at 36:4-37:9.

81.     Mr. Lewis believed that codes 227 and 249 refer to moving individuals between comparable categories and would not be used to move someone between full Medicaid and Medically Needy. Lewis Test., Tr. Vol. 4 at 13:21-14:15, 17:6-21. Mr. Lewis understands codes 290 and 374 to refer to denials based on technical requirements, not income. *Id.* at 19:7-23.

82.     DCF's policy documents reflect conflicting interpretations. One DCF training aligns with Mr. Roberts and Mr. Lewis's understanding, warning case processors not to use 227, 249, or 350 unless moving "the individual to a comparable category." PX166 at DCF-002057; *see also* PX161 (characterizing 227 & 249 as "Individual in another FULL Medicaid AG"); PX147 at DCF-000491-92; PX194 at DCF-003701 (describing codes 227, 249, & 350 as a "Change in Coverage Category"); PX169 (227 used when "[m]oving individual to a different full coverage AG"); PX160 (code 249 "should also not be used when moving an individual from full coverage to Medically Needy").

83.     Yet, in December 2023 DCF changed the text of several of these reason codes to explicitly mention income, but maintains that these changes did *not* alter the prior meaning of the codes. DX123; Dep. Designations of LaQuetta Anderson Vol. 2

18

("Anderson Dep. Vol. 2"), ECF No. 167-2 at 101:4-9; Veltkamp Dep. Vol. 1 at 82:25-83:12, 85:15-20 (discussing 227 specifically).

84.    These text changes in December 2023 did nothing to alleviate the confusion. Even after these changes, Mr. Roberts maintained that none of these reason codes—even those that now reference income—should be used for terminations based upon income. Roberts Test., Tr. Vol. 2 at 37:10-38:25. And Ms. Veltkamp admitted that, even after the changes, code 374 does not inform recipients which eligibility requirement they failed. Veltkamp Dep. Vol. 1 at 72:7-21.

85.    Rather than rely on the reason codes printed in the notices, DCF seems to believe that the better indicator of whether an individual was found over-income for full Medicaid is the presence of a Medically Needy approval section in the NOCA. Roberts Test. Tr. Vol. 5 at 36:8-37:13; Testimony of Daniel Davis ("Davis Test."), Trial Tr. Vol. 5, ECF No. 165 at 182:18-183:8.

86.    On August 24, 2024, after trial was completed, DCF updated its software in an effort to ensure that Reason Code 241 actually does automatically populate for every individual who is moved from Medically Needy to full Medicaid. Kallumkal Test., Tr. Vol. 5 at 207:20-208:19, 261:13-17, Tr. Vol. 6 at 18:10-19:19, 88:25-89:3, 92:10-14; Stipulation, ECF No. 172. That change was undergoing testing at the time of trial. Kallumkal Test., Tr. Vol. 6 at 19:17-19, 75:19-22.

87.    The record contains no evidence of the impact of this change. Stipulation, ECF No. 172. It remains to be seen whether this change will ultimately accomplish DCF's goal of including Reason Code 241 for every income termination, whether case

19

workers may still overwrite Reason Code 241, or whether individuals will continue to receive 241 in combination with other, less-specific reason codes, such as 227, 249, or 350 (*i.e.*, PX40 at DCF-5272, PX130 at -000005).

**C. The Medicaid termination notices do not reliably include citations to the applicable statutes and regulations.**

88.     The NOCAs contain placeholders where the statutory or regulatory cite should appear. Anderson Test., Tr. Vol. 4 at 162:20-22.

89.     Those fields are not populated from screens in FLORIDA, but rather from a table, specifically, the TSRC table. *Id.* at 162:20-163:12.

90.     Which statutory or regulatory cite will appear depends on the reason code used. For each reason code, the TSRC table lists corresponding statutory or regulatory cites in columns to the right of the particular reason code. There are different columns for different Medicaid population groups. The Medicaid columns are those with "MA" in the title, including: ADC-MA, DA-MA, and SSI-MA. SSI-MA is for the SSI-related population groups, while the other two are for the family-related population groups. *Id.* at 163:13-164:9.

91.     Therefore, which statutory or regulatory cite will appear in the notice depends on which population group an individual is enrolled in. PX158; Anderson Test., Tr. Vol. 4 at 163:5-164:21.

92.     Some of the cells on the TSRC table are blank. When that reason code and population group combination is used, no citation will appear in the NOCA. Anderson Test., Tr. Vol. 4 at 165:1-14, 165:22-166:8; PX122 at DCF-005389.

93.     Some of the cells on the TSRC contain "Xs." When that reason code and population group combination is used, Xs will appear in the notice. Anderson Test., Tr. Vol. 4 at 165:15-21; PX122 at DCF-005390.

94.     Moreover, some Medicaid NOCAs cite sections of the statute for other DCF benefits. In Chianne D.'s notice, underneath the Medicaid section that states "Your Medicaid benefits for the person(s) listed below will end on May 31, 2023," is a citation to "S414.095." PX40 at DCF-5278. That section of the Florida Statutes describes "Determining eligibility for temporary cash assistance." Fla. Stat. § 414.095. The notice does not explain why that provision would be relevant to Chianne D.'s Medicaid eligibility. PX40.

## VI.     Case-specific information is not reliably available outside of the Medicaid termination notices.

### A. DCF's customer call center is unreliable.

95.     Instead of providing information in NOCAs, DCF relies almost exclusively on its call center to supply case-specific information. Ramil Test., Tr. Vol. 4 at 103:16-22 (call center is only method available to obtain specific income information).

96.     Ms. Anderson initially asserted that NOCAs contain a phone number to contact an assigned case worker in the top right corner of the first page. Anderson Test., Tr. Vol. 4 at 126:25-128:14. There is no text at all to explain what this phone number is or who can be reached there. When Chianne D. asked the call center for the name and contact information of the caseworker who worked her case, she was told

"we don't give out case workers' names." DX76 at 14:38-15:05.

97.    Ms. Anderson does not generally review notices actually sent to enrollees as part of her job. Anderson Test., Tr. Vol. 4 at 169:13-18. Ms. Anderson eventually admitted that the NOCAs frequently list only the call center phone number in that spot. *Id.* at 169:19-171:1 (discussing PX20; PX32; PX 85; PX86; PX87; PX105; PX120; and PX121).

98.    Reaching the call center is difficult. It is only open on weekdays from 7:00 am to 6:00 pm. Testimony of Nichole Solomon ("Solomon Test."), Trial Tr. Vol. 4, ECF No. 164 at 194:12-14, 218:3-6.

99.    When the call center is open, it can be nearly impossible to reach a live person. When an individual first calls the call center they hear an automated menu, called an interactive voice response (IVR). *Id.* at 195:9-16.

100.   In the IVR, an individual can ask to hear the status of their case, and if they do, the IVR merely repeats the language of the reason codes listed in the NOCAs. For example, if the notice uses the reason code that "you are receiving the same type of assistance from another program," that is what the IVR will say. *Id.* at 196:7-10, 219:5-220:4.

101.   The IVR had periods of instability spanning September 2023 through March of 2024 when all of the functions were not available. *Id.* at 197:8-198:5.

102.   If an individual wants additional information, beyond the reason codes that the IVR provides, they can select the options within the IVR to speak to a live person. *Id.* at 195:20-196:2.

103.    Not all callers who request to speak to a live person can reach one. To manage hold times—a metric which the federal Centers for Medicare & Medicaid Services (CMS) monitors—DCF affirmatively "blocks" some calls. *Id.* at 239:23-241:5, 242:3-19, 248:16-19.

104.    In those instances, the caller receives a busy message that says something to the effect of "All lines are busy. Please call back." *Id.* at 218:15-20, 241:6-14; PX284 ("Blocked" column); Ramil Test., Tr. Vol. 4 at 87:12-17 (heard message "All lines are busy" the day before his testimony).

105.    CMS does not monitor data regarding blocked calls. But DCF does track the number of calls that it blocks each month. Solomon Test., Tr. Vol. 4 at 242:17-19; PX284 (tracking blocked calls).

106.    According to DCF's data, as of April 2024, it blocked 744,000 calls. Solomon Test., Tr. Vol. 4 at 244:10-12; PX284 (blocked calls column).

107.    That represents more than half of callers who requested to speak to a live person. Thus, more than fifty percent of all people who sought to speak to a live person never made it to the hold queue. Solomon Test., Tr. Vol. 4 at 243:20-247:12.

108.    DCF does not maintain any performance standards for blocked calls. *Id.* at 247:16-22.

109.    For those that do make it to the hold queue, wait times can be prohibitive. Over the last year DCFs data shows that the average wait time has ranged between 20 and 45 minutes. PX284 (ASA column); Solomon Test., Tr. Vol. 4 at 207:4-18.

110.    Evidence shows that the wait times can be significantly longer than those

23

averages. For instance, Mr. Ramil has experienced wait times up to six hours and, in his experience, the average wait time is one hour. Ramil Test., Tr. Vol. 4 at 86:14-20, 103:23-2. Ms. Solomon, the head of the call center, testified that she was herself aware of wait times as long as two hours and twenty minutes. Solomon Test., Tr. Vol. 4 at 248:23-249:6; Dep. Designations of Nichole Solomon ("Solomon Dep."), ECF No. 167-10 at 85:21-23, 92:2-8, 105:12-25; DX75 at 0:25-40 (DCF agent stating "you were probably on hold for, I don't know, two hours"); DX105 (call logs from Ms. Mezquita showing long call times); Testimony of Lily Mezquita ("Mezquita Test."), Trial Tr. Vol. 3, ECF No. 163 at 133:2-17, 133:25-134:3 (describing long hold times); Testimony of Jennifer V. ("Jennifer V. Test."), Trial Tr. Vol. 3, ECF No. 163 at 70:9-20 (describing long hold times).

111.    Some calls are dropped—whether due to network issues or because the caller cannot continue waiting. Solomon Test., Tr. Vol. 4 at 241:20-242:2, 249:18-25. DCF's data shows that each month, of the calls that do make it into a hold queue, abandonment rates have been in the 30 to 40 percent range. *Id.* at 250:4-6, 253:1-4; PX284 (Aban %).

112.    DCF does not have the "capacity to answer . . . as many calls as we would like to be able to answer." Solomon Dep. at 110:23-111:5; Solomon Test., Tr. Vol. 4 at 241:15-19.

113.    Of well over one million calls each month, only between 300,000 to 450,000 reach a live person. Solomon Test., Tr. Vol. 4 at 207:24-208:2; PX284 (Calls Answered column). In April 2024, of more than 1.3 million people who wanted to

speak to a live agent only 444,319 actually spoke to one. PX284; Solomon Test., Tr. Vol. 4 at 252:23-25.

114.   While DCF is hiring new staff for the call center, the additional positions will not solve the problem of the large number of blocked calls. Solomon Test., Tr. Vol. 4 at 200:3-20, 256:7-9.

115.   Even if an individual does manage to reach a live person, there is no guarantee they will obtain accurate or specific information. Individuals "sometimes come out more confused than they are going in." Ramil Test., Tr. Vol. 4 at 83:3-11.

116.   Call center agents can give incorrect information regarding an individual's eligibility status, the applicable income limits, and method for calculating an individual's income. *Id.* at 85:20-86:13. Mr. Ramil has asked the call center for an explanation of what a standard filing unit is but has never received one. *Id.* at 104:3-8.

117.   During the unwinding, DCF relied on a third-party contractor called Lighthouse to handle Medicaid unwinding calls. Solomon Test., Tr. Vol. 4 at 210:3-14, 233:17-237:12. Lighthouse was only able to answer "simpler call types," which included giving "general information" about whether a case was pending, transcribing answers for a telephonic application, and resetting a password. *Id.* at 210:22-211:6, 233:1-13; Solomon Dep. at 14:5-24.

118.   Lighthouse could not answer questions about why an action was taken and they did not have access to any of the resources or tools that DCF employees have to answer case-specific inquiries. Solomon Test., Tr. Vol. 4 at 233:11-16.

119.   When Lighthouse could not answer a question, the caller would be

routed back to another hold queue to speak with a DCF employee. *Id.* at 211:17-22, 238:7-12. DCF's hold time data does not track this secondary hold time when an individual needed to be transferred to another agent. *Id.* at 239:10-18.

120.    Not all DCF employees are trained to answer Medicaid questions. The initial training of DCF's own frontline call center employees—to serve as a Tier 1 call center agent—is a "one-week interview training class." That class covers how to conduct interviews for food assistance benefits and is not specific to Medicaid. *Id.* at 200:24-201:3, 202:25-203:12, 204:4-25, 223:14-17.

121.    During unwinding, Tier 1 agents took Medicaid calls but could only handle limited Medicaid questions, such as taking an application over the phone or helping set up a MyACCESS account, or resetting a password. *Id.* at 231:11-232:25.

122.    At any point in time, Tier 1 agents "are not eligibility specialists. . . so they're not going to be able to get into a budget and that kind of information" or explain how someone's countable income is calculated. Veltkamp Dep. Vol. 1 at 39:7-14, 41:9-11.

123.    Those questions must be routed to a Tier 3 agent. Solomon Test., Tr. Vol. 4 at 238:13-15; Ramil Test., Tr. Vol. 4 at 87:18-21 (testifying that he has been told he needs to speak to a different type of agent to get the requested information).

124.    Ms. Solomon gave different testimony about the precise number of Tier 3 agents employed by DCF. At her deposition, she explained that, of 600 total frontline DCF call center employees, 475 were Tier 1 agents, leaving at most 125 Tier 3 positions. Solomon Dep. at 11:23-13:3. At trial, she testified that, of the 521 DCF

positions that are currently filled, approximately 60% (or roughly 313) are Tier 3 trained. Solomon Test., Tr. Vol. 4 at 223:5-13.

125.    There is also no guarantee that, even if a caller reaches a live person, they will receive the case-specific income information DCF used in the decision. Mr. Ramil, who has called the call center more than a hundred times, has found that he has to use "specific language" to ascertain the income DCF uses for his clients. Ramil Test., Tr. Vol. 4 at 85:12-19, 103:9-15. Specifically, Mr. Ramil refers to the "budget" when he wants to obtain specific income information. *Id.* at 105:11-24.

126.    Tier 3 representatives give variable and unreliable information. There are no standardized instructions or scripts regarding how to respond to various Medicaid inquiries. Solomon Test., Tr. Vol. 4 at 226:23-227:1. There are no scripts regarding DCF's continuous coverage policies for pregnancy or children. *Id.* at 231:5-13.

127.    DCF's corporate designee regarding the call center, Ms. Solomon, was unsure whether unborn children count in the family size or whether to apply the "standard disregard" when reading the income limit chart. Solomon Dep. at 65:17-66:1, 66:8-10, 67:13-68:23, 69:16-71:2, 72:24-73:8, 76:8-22. She was not aware that there had been any computer system errors in how postpartum coverage was implemented. Solomon Test., Tr. Vol. 4 at 230:16-231:3.

128.    Ms. Solomon testified that there are "tools and resources . . . to be able to respond to customers' inquiries," *Id.* at 214:20-25, but there is no single comprehensive training manual or reference document. *Id.* at 227:2-9. Call center agents might need to review various policy transmittals and supplemental

27

communications from DCF. *Id.* at 229:25-230:15 (discussing PX143).

129.    To provide case-specific information, call center agents currently have to navigate multiple computer systems and multiple screens within those systems. For example, they might need to review the recent notices, and within FLORIDA they might need to review the case running records (CLRC) screens, the budget screens, the screens showing what income DCF had verified from third-party sources, and cross-reference whether the screens in FLORIDA reflect the available inputs. They might also have to look at the Appendix A-7 income chart. *Id.* at 227:10-229:3.

130.    All call center agents are measured on their "average handle time." *Id.* at 208:15-23. To answer specific questions from an individual about the income determination DCF made in their case, call center agents must navigate disparate resources, review policy transmittals, navigate multiple screens in FLORIDA and the Access Management system, and the ESS Policy Manual, including Appendix A-7, all of which "takes a few minutes and some thinking and some reading of footnotes to process," while being evaluated for the length of time they take to complete the call and their follow-up notes. *Id.* at 215:1-25, 229:8-24, 251:3-8; Latham Test., Tr. Vol. 5 at 124:3-14 (describing the "multiple systems" and "many different components" employees have to "navigate between" to work a case); DX76 at 24:28-24:35 ("listen, ma'am 24 minutes going in, I'm not getting anywhere on this call"), 26:06-26:15 ("I said there's other people that are waiting. I can't stay on the phone with you for 20 minutes").

131.    Even when the income information is shared, the information is subject

to the vagaries of telephone communication. As reflected in the call recordings, the call quality can be variable. As counsel and witnesses' own experiences at trial show, hearing numbers orally can be difficult and result in miscommunications. Trial Tr. Vol. 2 at 84:25 ("I'm sorry, I didn't hear that number"); Trial Tr. Vol. 4 at 245:25-246:1 ("oh, I apparently misstated that [number]"); Trial Tr. Vol. 5 at 81:4-8, 98:15-99:1, 256:18-257:2.

### B. Case-specific information is not available in MyACCESS Accounts.

132.   NOCAs encourage individuals to look at their MyACCESS accounts to obtain case-specific information. *See, e.g.*, PX18 at 2 ("To see what information we used when we reviewed your Medicaid case . . . use your on-line My Access account"); PX87 at -000357, -000361) (same); PX121 at DCF-005325 (same); PX130 at -000007 (same); DX121 at 3 ("For information about your case, you may access your case information quickly and securely: through My ACCESS Account."); DX123 (current Reason Code 227 encourages individuals to "check your MyAccess account to see if you qualify for the Medically Needy program").

133.   Yet, there is no additional case-specific information available there. The NOCAs are the only place to find a statement of the reasons for DCF's decision. Dep. Designations of James Garren ("Garren Dep."), ECF No. 167-4 at 20:5-19, 21:8-11.

134.   MyACCESS accounts do not clearly present an individual's eligibility status. At trial, while looking at the accounts, Mr. Ramil and Ms. Taylor could not accurately determine coverage dates. PX280A at 29:00-36:1; Ramil Test., Tr. Vol. 4 at 68:12-16, 69:5-70:14, 71:5-12; PX279A at 36:21-37:41; Testimony of Kimber Taylor

29

("Taylor Test."), Trial Tr. Vol. 1, ECF No. 143 at 43:12-47:8; *see also* PX278A at 46:08-50:45; Jennifer V. Test., Tr. Vol. 2 at 79:3-83:21; *infra* at ¶¶ 381-82.

135.    Although the "Details" page lists a "Coverage End Date," DCF testified the "Coverage End Date" is not necessarily the date coverage will end. Garren Dep. at 24:18-25:18. DCF testified that the "renewal date" is the actual date coverage will end. *Id.*

136.    The MyACCESS accounts do not specify population groups, instead referring solely to "Medicaid." *Id.* at 14:2-5, 15:2-6; Veltkamp Dep. Vol. 1 at 13:21-23; PX278A at 46:10-49:50; PX279A at 36:20-40:28; PX281A at 40:41-45:22.

137.    The MyACCESS accounts add confusion by often referring to Medically Needy coverage under the heading "Medicaid"—only distinguishing Medically Needy by listing a "share of cost" and using the term "enrolled" (rather than "open"). Garren Dep. at 22:21-23:2, 23:21-24:17, 27:14-28:17. The term "enrolled" is not defined anywhere. *Id.* at 28:18-29:5.

138.    Individuals cannot obtain the specific income information DCF relied on through the MyACCESS accounts. MyACCESS accounts do not list the countable income used to evaluate an individual's eligibility or show an individual what data DCF obtained from third-party databases. *Id.* at 11:18-12:16; Ramil Test., Tr. Vol. 4 at 71:16-21, 91:17-24.

139.    The only income information individuals can see is the income they listed on their renewal application. Garren Dep. at 11:18-12:16. Individuals cannot review copies of the income verification documents they previously uploaded. Ramil Test.,

30

Tr. Vol. 4 at 65:10-15.

140.    Individuals cannot see the version of the application that DCF relies on which includes the third-party income data DCF receives. As a result, individual Medicaid enrollees cannot see the third-party income data that DCF receives. Roberts Test., Tr. Vol. 2 at 21:18-22:2, 65:5-66:24 (comparing PX37 and PX66).

141.    MyACCESS accounts do not list the Medicaid income standards applicable to each household member. Garren Dep. at 13:7-14:1; Ramil Test., Tr. Vol. 4 at 72:1-3. MyACCESS accounts do list case-specific income-reporting thresholds for SNAP and cash assistance. PX279A at 35:28-36:10; PX281A at 38:53-39:45.

142.    The accounts do not state the SFU size DCF used. Garren Dep. at 12:19-22; Ramil Test., Tr. Vol. 4 at 71:22-25; PX278A; PX278B; PX279A; PX279B; PX280A; PX280B; PX281A; PX281B.

143.    DCF asserted an individual might be able to determine an "implied SFU" from the household members listed—but that is not always an accurate representation. Garren Dep. at 12:19-13:3, 22:7-17.

144.    The MyACCESS accounts do not identify or explain the different population groups through which individuals can establish Medicaid eligibility. *Id*. at 16:9-12.

145.    The MyACCESS accounts do not explain the reason for DCF's decision or provide the case specific information DCF relied on beyond the reason codes contained in the notices. Ramil Test., Tr. Vol. 4 at 68:1-4, 71:16-72:9, 91:17-24; Garren Dep. at 20:5-19, 21:8-11. The MyACCESS accounts do not explain what the reason

31

codes mean. Ramil Test., Tr. Vol. 4 at 72:7-9.

**C. Family Resource Centers, DCF Offices, and community partner agencies are not reliable sources of case-specific information.**

146.   DCF maintains that its physical offices, which it refers to as Family Resource Centers, can supply individuals the case-specific information that is missing from the notices. Testimony of Tonyaleah Veltkamp ("Veltkamp Test."), Trial Tr. Vol. 5, ECF No. 165 at 185:17-186:25.

147.   There are only 40 Family Resource Centers throughout the entire state of Florida. *Id*. at 195:17-22.

148.   Some geographic areas do not have a Family Resource Center nearby. There is only one Family Resource Center in Jacksonville, which serves five counties. Anderson Test., Tr. Vol. 4 at 173:1-4; Ramil Test., Tr. Vol. 4 at 78:2-14.

149.   Family Resource Centers have limited availability. They are open from 8 am to 5 pm on weekdays. Veltkamp Test., Tr. Vol. 5 at 197:3-6.

150.   Most services provided by the Family Resource Centers now require appointments, making assistance more difficult to access. *Id*. at 189:18-22, 198:21-24; Anderson Test., Tr. Vol. 4 at 173:5-8 (discussing PX90, Family Resource Centers Video at 0:50 to 2:10); Ramil Test., Tr. Vol. 4 at 77:15-78:1. Ms. Veltkamp did not know whether appointments could be made by calling a Family Resource Center. Veltkamp Test., Tr. Vol. 5 at 198:25-199:2.

151.   The primary purpose of the Family Resource Centers appears to be to provide individuals access to the internet, phones, and other technology so that they

may complete benefits applications and renewals. *See id.* at 185:25-186:12; Ramil Test., Tr. Vol. 4 at 75:21-77:2.

152.    The language in the footer of the NOCAs describes the purpose of Family Resource Centers as a place where an enrollee can receive "help completing your review online." PX40 at DCF-5278. There is no indication that an individual may be able to get help understanding the reason for DCF's termination decision after a renewal has been completed. Anderson Test., Tr. Vol. 4 at 171:2-172:8.

153.    DCF's website does not include any suggestion that an individual could ask questions about a Medicaid termination notice. The website's list of services offered at the Family Resource Centers does not mention Medicaid at all. *See* PX286 at 0:25-2:10 ("Contact Us" video); Anderson Test., Tr. Vol. 4 at 175:24-176:13.

154.    DCF requires each Family Resource Center to have one "self-service representative" who is supposed to be able to answer questions. The training self-service representatives receive is shorter than that of Tier 3 call center agents and covers all of the different benefits programs that DCF administers. Veltkamp Test., Tr. Vol. 5 at 196:11-197:2.

155.    DCF does not know how many Medicaid enrollees obtain case-specific information from Family Resource Centers each month. But, statewide, the Family Resource Centers serve only 105,000 individuals each month and this includes individuals enrolled or applying for any one of DCF's benefit programs. *Id.* at 197:7-23.

156.    The total Medicaid population in Florida at the start of the unwinding

33

was 5.5 million individuals. Today, the total Medicaid population is over 3 million. *Id*. at 197:24-198:19.

157.  The NOCAs reference community partners, DX121 at DCF-7410, which are independent organizations that can assist individuals with benefits applications. There was only limited testimony from Defendants regarding the reach of community partner agencies. *See* Veltkamp Test., Tr. Vol. 5 at 193:3-11.

158.  The language in the footer of the NOCAs only directs Medicaid enrollees to community partner agencies for assistance in applying for benefits and in completing eligibility reviews. PX18 at 3; PX83 at 1; Anderson Test., Tr. Vol. 4 at 171:18-172:8. The notices do not state that individuals should contact community partners to determine whether DCF reached a correct decision about their Medicaid eligibility. Anderson Test., Tr. Vol. 4 at 171:18-172:8.

159.  The language in the NOCAs reflects the role of community partners to assist individuals with applying for benefits. Ramil Test., Tr. Vol. 4 at 78:15-21; Veltkamp Test., Tr. Vol. 5 at 193:3-15. Individuals like the class members, who have already been terminated from Medicaid after completing a renewal, do not need assistance with applying for or renewing benefits. Anderson Test., Tr. Vol. 4 at 172:1-4.

160.  Community partners can limit the categories of individuals they serve and are not required to assist every person who requests it. Ramil Test., Tr. Vol. 4 at 81:22-24; Veltkamp Test., Tr. Vol. 5 at 193:12-22.

161.  DCF does not give community partners access to FLORIDA. Ramil

Test., Tr. Vol. 4 at 81:2-4.  If community partners contact the call center, they, like all callers, must contend with receiving inaccurate information about customers' income calculations, applicable income limits, and individual eligibility status. Ramil Test., Tr. Vol. 4 at 85:20-86:13.

162.   Ms. Anderson highlighted that the NOCAs contain a link to contact legal aid. Anderson Test., Tr. Vol. 4 at 176:14-16. Ms. Anderson never tested whether an attorney could be reached through the link, did not know the number of legal aid offices available in the state, did not know how many individuals those legal aid offices could serve in a year, did not know if all legal aid offices had a public benefits unit, and did not know whether there were income or other restrictions limiting who could be assisted by legal aid. Anderson Test., Tr. 4 at 176:17-177:10.

### D. The remaining publicly available information does not provide case-specific information and is otherwise incomplete, inconsistent, and confusing.

#### i. Medicaid eligibility information.

163.   DCF NOCAs have limited references to public sources of information. The notices include links to DCF's general website and intermittent citations to certain statutes and regulations. DX121; *supra* ¶¶ 92-93 (describing missing statutory and regulatory cites).

164.   When the notices include a citation to a statute or regulation, there are no instructions about how the recipient can locate a copy of the relevant statute or regulation. *See, e.g.*, PX81 at DCF-5729.

165.   DCF does not maintain any publicly available explanations of the

meaning of reason codes. Veltkamp Dep. Vol. 1 at 43:11-20, 43:25-44:3.

166.   DCF maintains some information on its website that is not directly referenced or linked in the NOCAs, including language on the website itself, fact sheets, the ESS Policy Manual and its Appendix A-7, and a Medically Needy brochure. Roberts Test., Tr. Vol. 5 at 7:11-10:19. DCF waited until the end of the PHE unwind to add links from the DCF website to those materials. *Id.* at 33:5-15.

167.   According to Mr. Ramil, who has assisted with over 500 Medicaid eligibility cases, Ramil Test., Tr. Vol. 4 at 56:5-8, it is not easy to find Medicaid eligibility information on DCF's general website, and the information that can be found (excluding the ESS Policy Manual) is "very superficial…." *Id.* at 72:13-18.

168.   Mr. Ramil never refers to the DCF general website when assisting individuals with their Medicaid eligibility. *Id.* at 72:19-21.

169.   While DCF's website provides a general overview of eligibility requirements for certain Medicaid population groups, until spring of 2024, it omitted descriptions of continuous coverage available to postpartum enrollees. *Compare* Veltkamp Dep. Vol. 1 at 18:3-6 *with* PX285 at 10:04.

170.   In some instances, information in the Florida Statutes appears to conflict with information on DCF's website regarding eligibility requirements for Medicaid population groups. For example, DCF's website states that, regarding Medicaid eligibility for children, "[t]here is no requirement for a child to reside with an adult caretaker to qualify for Medicaid." PX285 at 9:35. In contrast, Florida Statute § 409.903(3) provides that a child is eligible for Medicaid when they are:

under age 21 *living in a low-income, two parent family*…[or]…a child under age 7 *living with a non relative* if the income and assets of the family or child, as applicable, do not exceed the resource limits under the Temporary Cash Assistance program.

(emphases added).

167.    At least one DCF call center agent appeared to obliquely reference this "intact family" requirement to Ms. Mezquita, stating, "And because you are an intact family, that is another reason, because the child will have [the] same mother and father in the same household, well mother and father in the same household." PX128 at 8:08-8:20.

168.    DCF posts fact sheets on its website about Family Related and SSI Related Medicaid. PX253; DX27; DX28; Anderson Test., Tr. Vol. 4 at 144:25-145:3.

169.    Those fact sheets were revised in April 2024. DX27; DX28. Like the website itself, the prior version of the Family Related Fact Sheet incorrectly listed postpartum coverage as lasting only two months. PX253 at 2; Veltkamp Dep. Vol. 1 at 20:19-22, 21:10-20; Roberts Test., Tr. Vol. 5 at 31:19-21; Mezquita Test., Tr. Vol. 3 at 130:22-23, 131:2-25 (describing PX253 as the fact sheet she located). The earlier Family Related Fact Sheet included several broken links, including to the Community Partner network. Roberts Test., Tr. Vol. 5 at 30:19-31:8.

170.    According to Mr. Roberts, the updated Family Related Fact Sheet (DX28) gives only a general overview of Medicaid population groups. Roberts Test., Tr. Vol. 5 at 30:12-15.

171.    Although not mentioned in the notices, the ESS Policy Manual is

37

available on DCF's website and appears to be the primary source of information regarding DCF's Medicaid eligibility rules and income requirements. Roberts Test., Tr. Vol. 2 at 8:10-14, 95:4-8, 153:16-154:16, Tr. Vol. 4 at 259:22-261:7, Tr. Vol. 5 at 7:11-9:2; Anderson Test., Tr. Vol. 4 at 144:22-145:6.

172.   The link to the ESS Policy Manual as a whole was not added to DCF's Medicaid homepage until spring of 2024. Roberts Test., Tr. Vol. 5 at 12:24-13:4.

173.   The information contained in the ESS Policy Manual is, at best, extremely complex. The primary audience for the ESS Policy Manual is DCF staff. Veltkamp Dep. Vol. 1 at 23:8-19. The manual was not written with the public in mind. *Id.* The manual has never been evaluated for readability, rather "it's developed for staff and not for like, you know, a seventh grade reading level," and there are "a lot of, you know, acronyms and things like that." *Id.* at 25:8-26:4.

174.   It took Mr. Ramil, who has a master's degree, months to understand the ESS Policy Manual, including Appendix A-7 (PX 178). Ramil Test., Tr. Vol. 4, 73:12-22.

175.   During the months it took Mr. Ramil to understand the information set forth in the ESS Policy Manual, he had other resources available to him to explain the manual, including a colleague who worked at DCF on Medicaid eligibility matters and attorneys at Jacksonville Area Legal Aid. *Id.* at 74:23-75:20.

176.   Mr. Roberts, a DCF employee who uses the manual daily, could not tell from the chapter titles which of the three chapters would explain how to calculate a family's income to determine eligibility. Roberts Test., Tr. Vol. 5 at 28:17-29:19.

177.   The ESS Policy Manual can only explain what rules DCF *should* use to determine Medicaid eligibility for any given applicant. It cannot explain what DCF actually did in a given case. *Id.* at 25:18-26:9.

178.   Mr. Roberts admitted that to understand whether DCF took correct action in an individual case, he must use the manual in combination with information in FLORIDA. *Id.* at 26:2-17. Of that information necessary to determine whether DCF took correct Medicaid action, only the ESS Policy Manual is online and available to enrollees. *Id.* at 26:18-20.

179.   The chapters of the ESS Policy Manual do not provide the specific income limits for each Medicaid population group. According to DCF, for family-related Medicaid population groups, Appendix A-7 of the ESS Policy Manual (PX178) is the only publicly available source for the applicable income standards. Veltkamp Dep. Vol. 1 at 14:20-17:20, 34:9-12.

180.   Appendix A-7 is difficult to locate. The prior version of the Family Related Fact Sheet included a broken link to the Appendix A-7 income chart. *Id.* at 22:2-8.

181.   Even after updating the website language in the spring of 2024, the "Medicaid Eligibility" section of DCF's general website contains no income limits or links to the Appendix A-7 chart of income limits in the website's description of certain population groups like parent/caretakers, children, or pregnant women. Anderson Test., Tr. 4 at 178:21-180:22; PX285.

182.   DCF's Medically Needy brochure (PX255) does not identify income

39

limits for full Medicaid eligibility, does not link to Appendix A-7, and does not explain how share of cost is calculated. PX255; Roberts Test., Tr. Vol. 5 at 33:12-34:12.

183.    There is no link to Appendix A-7 in the NOCAs. DX121; PX17, PX18, PX19, PX20, PX21, PX32, PX35, PX40, PX52, PX81, PX83, PX84, PX85, PX86, PX87, PX105, PX108, PX112, PX116, PX118, PX120, PX121, PX122, PX123, PX130, PX131, PX261.

184.    The notices do sometimes refer to certain statutes and regulations. For instance, individuals receiving Reason Code 241—YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM—may receive a citation to Rule 65A-1.703 of the Florida Administrative Code. PX158 (Reason Code 241, ADC-MA column); PX130 at 000005; PX131 at 000010.

185.    That Rule states that the general income limit for children aged one through age nineteen is less than or equal to 133% of the federal poverty level (FPL) but does not provide the specific dollar amount connected to the FPL or include the applicable disregards which increase the 133% income limit. Rule 65A-1.703.

186.    A different rule in the same chapter, Rule 65A-1.716, does contain a chart with specific Medicaid and Medically Needy income limits. However, those numbers do not match the income limits on Appendix A-7. *Compare* Rule 65A-1.716 *with* PX178. The Rule has not been updated since September 22, 2021 and does not reflect updates to the federal poverty level since that time. Rule 65A-1.716.

187.    Once an individual locates the Appendix A-7 income chart, it is difficult to understand. Mezquita Test., Tr. Vol. 3 at 142:1-13. For example, until May 2024,

Appendix A-7 did not state whether the income limits listed represented weekly, biweekly, or monthly limits. *Compare* Roberts Test., Tr. Vol. 2 at 16:2-17:8, 29:4-30:9 *with* DX8 (A-7 updated 2/3/23).

188.    Using the updated May 2024 chart still requires adding up numbers from multiple, different columns to determine the actual income limit. Roberts Test., Tr. Vol. 2 at 17:9-18:18, 43:21-45:16.

189.    DCF witnesses disagreed about which columns should be included. *Compare* Veltkamp Dep. Vol. 1 at 30:10-31:7 (adding two columns) *with* Roberts Test., Tr. Vol. 2 at 18:9-11 (adding three columns); Solomon Dep. at 69:16-70:23; *infra* at ¶¶ 466-67, 470 (call center employees misreading income chart).

190.    DCF could not explain why—to avoid this confusion—the income chart at Appendix A-7 does not simply add up the relevant columns to display only the upper-most income limit, since everyone who is found over-income will be found over-income after taking the disregards into account. Roberts Test., Tr. Vol. 2 at 44:5-10, Tr. Vol. 4 at 267:8-21.

191.    Identifying the income limit on the chart also requires knowing the applicable "family size." PX178; Roberts Test., Tr. Vol. 2 at 19:4-15.

192.    There is "no one clear spot that says this is how you determine family size" and no section of the ESS Policy Manual describes "family size." Veltkamp Dep. Vol. 1 at 28:19-29:1, 29:20-23; PX177-PX192.

193.    To discover what rules govern the "family size," enrollees must figure out that "family size" means the same as "standard filing unit" and then locate the

41

rules for computing the SFU. *Compare* PX178 (using the term "family size") with PX187, PX189 & PX191 (using the term "standard filing unit"); Ramil Test., Tr. Vol. 4 at 63:23-24 (testifying he was not confident what a standard filing unit is).

194.    Mr. Roberts testified that family size and standard filing unit are not, in fact, always the same. Roberts Test., Tr. Vol. 2 at 19:4-20:18.

> ### ii.    Publicly available information on fair hearings is conflicting.

195.    Before October 2023, the footer of the NOCAs stated that "You will be responsible to repay any benefits if the hearing decision is not in your favor." PX112 at DCF-5667. In October 2023, DCF updated the fair hearing paragraph in the footer of the NOCAs so that it says "may" rather than "will." Anderson Dep. Vol. 2 at 103:22-24.

196.    DCF has not made corresponding changes in any of the other places where information about fair hearings is communicated to enrollees. Anderson Test., Tr. Vol. 4 at 156:23-157:10, 161:14-16.

197.    Even after DCF replaced "will" with "may" in the fair hearing paragraph, the body of notices sent to individuals who request a hearing with continuing benefits says on the first page "Important: If you lose the hearing, you will have to pay us back for these benefits." PX251; Anderson Test., Tr. Vol. 4 at 158:7-160:18.

198.    No request was made to DCF's Office of Information Technology to update the body of that particular NOCA. Anderson Dep. Vol. 2 at 103:22-24, 104:8-105:1; Anderson Test., Tr. Vol. 4 at 160:19-161:5.

199.    DCF did not update its Rights and Responsibilities document, which still informs individuals that they "will" have to repay benefits. DX38 at l; Anderson Test., Tr. Vol. 4 at 157:11-158:6, 161:6-13. DCF emphasized that enrollees must acknowledge that they reviewed the Rights and Responsibilities document whenever they submit an application. Testimony of Brandy Jones ("Jones Test."), Trial Tr. Vol. 5, ECF No. 165 at 78:16-79:22.

200.    Each time an individual logs into their MyACCESS account, a pop-up appears displaying their Rights and Responsibilities. Although the MyACCESS accounts were launched in December 2023 (after the NOCA footers were changed), Latham Test., Tr. Vol. 5 at 163:9-18, the Rights and Responsibilities pop up still includes the statement that individuals "will" have to repay benefits. PX278A at 2:45-2:50; PX279A at 2:18-2:46; PX280A at 2:17-2:50.

201.    The information contained in the Help Center within the MyACCESS accounts still states that an individual "will" have to repay benefits. PX279A at 31:00-34:15; PX280A at 53:44-53:53.

202.    DCF's publicly available information regarding fair hearings is inconsistent and still repeatedly incorrectly informs individuals that they "will" have to repay benefits if they lose the hearing.

### E. Supervisory review & fair hearing packets do not provide sufficient explanation.

203.    DCF purportedly offers some additional case specific information through its supervisory review process and fair hearing packets that are offered to

43

Medicaid enrollees who do actually request a fair hearing. DX10 at 002438-39; Goins Test., Tr. Vol. 5 at 59:24-60:11.

204.   Enrollees are effectively discouraged from requesting a fair hearing by DCF's repeated admonition that if they request a hearing and lose, they will have to pay back benefits received during the appeal. *Supra* ¶¶ 196-202.

205.   This admonition dissuaded plaintiff Kimber Taylor from requesting a fair hearing. Taylor Test., Tr. Vol. 1 at 32:16-33:15.

206.   Enrollees who request a fair hearing are then issued a personal notice threatening that they "will" have to pay back benefits if they lose, which may engender fear and prompt some to withdraw their request. PX251.

207.   Although supervisory reviews are purportedly mandatory, Goins Test., Tr. Vol. 5 at 44:11-12, DCF does not always perform them. Ms. Mezquita was not contacted by a supervisor after requesting an appeal of the July 20, 2023 NOCAs terminating her pregnancy Medicaid. Mezquita Test., Tr. Vol. 3 at 143:18-21.

208.   Although supervisory reviews are purportedly conducted by a "supervisor or hearing designee that has a higher-level position with a larger knowledge base," Goins Test., Tr. Vol. 5 at 44:13-22, these individuals sometimes provide inaccurate information. The DCF employee who called Chianne D. following her hearing request told her that only $20 of income is disregarded in calculating share of cost, but the correct amount that should be subtracted is $585. DX77 at 18:30 to 19:54; Roberts Test., Tr. Vol. 2 at 71:21-72:13. The supervisor did not recognize that Chianne D.'s own coverage had been erroneously terminated. *See generally* DX77.

44

209.   No written materials are provided to the enrollee at the time of the supervisory review, unless specifically requested. Goins Test., Tr. Vol. 5 at 48:14-18, 54:19-55:4, 58:11-14; DX10 at DCF-02438-39.

210.   DCF should provide a fair hearing packet, though that can occur long after the request for a hearing and well after benefits end. DCF's policy only requires providing the hearing packet seven days prior to the hearing. Goins Test., Tr. Vol. 5 at 48:10-13.

211.   Hearing packets are not reliably provided. After some rescheduling, Chianne D.'s hearing was at one point scheduled for July 3, 2023. Testimony of Chianne D. ("Chianne D. Test."), Trial Tr. Vol. 3, ECF No. 163 at 14:7-24. Her hearing packet was due seven days earlier: June 26, 2023. *See* Goins Test., Tr. Vol. 5 at 48:10-13. Chianne D. never received a fair hearing packet. Chianne D. Test., Tr. Vol. 3 at 16:12-14. She did not withdraw her hearing until June 28, 2023, two days after the packet was due. *See* PX48.

212.   When it is provided, the fair hearing packet is unlikely to provide the case-specific information missing from the NOCAs. The fair hearing guide relied upon by DCF employees identifies just four items that should be included in the fair hearing evidence packet prepared following the supervisory review: (1) The notice to the customer/NOCA; (2) the "RFA/CAFEQ" or application; (3) verification provided; and (4) any applicable policy from the ESS Policy Manual. DX10 at DCF-002439.

213.   Item (1), the notice, was already issued to the customer and is available in their MyACCESS account. Garren Dep. at 18:11-13.

45

214.   Item (2), the request for assistance or application, was submitted by the customer and is also available in their MyACCESS account. *Id.* at 11:18-25. Even when the packet includes DCF's version of the application (which contains the third-party income verification sources), that application "does not necessarily tell [the reader] that that's what [income] we used." Goins Test., Tr. Vol. 5 at 65:14-66:9 (reviewing application contained in PX129).

215.   Item (3), verification provided, could include verification of income provided by a customer, or third-party verifications that DCF used. *Id.* at 51:1-7, 51:5-19.

216.   Even if the verification itself is included, it is of limited value because it is not accompanied by any explanation of the process DCF uses to verify income from third-party databases or any explanation of which verifications it relied on. *Id.* at 61:17-19.

217.   For instance, the packet sent to Ms. Mezquita contains copies of pay stubs as well as information from SWICA and FDSH. There is no explanation of which of those verifications DCF relied on or why. PX129. The budget screen for Ms. Mezquita's case—which is not included in the packet—shows a third number not reflected on either verification source. Roberts Test., Tr. Vol. 2 at 133:11-135:17.

218.   Item (4), applicable policy provisions, may include a screen print from the ESS Policy Manual, a transmittal printout, or an income chart. Goins Test., Tr. Vol. 5 at 51:7-14. Bare policy printouts, with no explanation of how the policies are being applied to the facts of the specific case, are unhelpful. PX129 at 000106-000113.

219.   Other supporting documents, such as the case running (CLRC) records and budget screens, might also be included in an evidence packet. Goins Dep. at 7:8-22, 11:19-12:1, 28:13-17.

220.   The fair hearing guide does not require that CLRC screens be included in a fair hearing packet. DX10 at DCF-002439; Goins Dep. at 42:16-22.

221.   Even when included, the running record comments are difficult to comprehend because they contain numerous acronyms, and there is no written explanation of them in the fair hearing packet. Goins Dep. at 28:13-17, 28:23-29:2, 29:3-13; 36:6-9.

222.   The CLRC screens do not always explain the basis of DCF's decision. Roberts Test., Tr. Vol. 2 at 50:18-23 (utility of the CLRC screens depends on the quality of the comments entered by the case worker). The CLRC screens for Ms. Mezquita did not explain what income was used to find her ineligible for Medicaid as of July 20, 2023. PX127 at DCF-006335; PX129 at 000073; Roberts Test., Tr. Vol. 2 at 129:7-24.

223.   Even when relevant, the budget screens are not always included in a fair hearing packet. The evidence packet issued to Ms. Mezquita did not contain a budget screen. PX129; Goins Test., Tr. Vol. 5 at 65:14-66:19.

224.   When the budget screen is included, it is literally a screen print from DCF's FLORIDA computer system used by case processors. Goins Dep. at 9:9-15.

225.   The budget screen and other income screens are not, by themselves, expected to be understandable to an enrollee. They require verbal explanation. *Id.* at

16:10-17:1.

226.   No written explanation of the budget or income screens is provided with the fair hearing packet. *Id.* at 17:2-4. For instance, the budget screen contains the abbreviation for the assistance group that was evaluated, *e.g.*, "MMC" for children, but the fair hearing packet does not contain any explanation for what the abbreviations mean. *Id.* at 25:5-21.

227.   Enrollees often have questions about the meaning of budget screens or running record comments in the fair hearing packets. *Id.* at 29:19-24.

228.   To demonstrate which family members were included in the standard filing unit, a fair hearing packet might also include the "AGCD" screen which contains only codes and abbreviations. *Id.* at 33:20-34:4; PX206 at DCF-006105.

229.   The fair hearing packets do not contain any glossary of the acronyms used. Goins Dep. at 32:6-9.

230.   The fair hearing packet does not display the mathematical calculation performed to reach the monthly countable income DCF used in its eligibility determination. *Id.* at 37:23-38:18; 39:2-16.

231.   DCF policies do not require its representatives to discuss the contents of the hearing packet with the claimant before the hearing; the claimant's first opportunity to ask questions about the hearing packet is at the fair hearing itself. Goins Test., Tr. Vol. 5 at 60:22-25, 61:7-12.

232.   DCF makes no effort to convey the basis for its eligibility decision in the fair hearing packet in a manner that would be understandable to the claimant through

48

a plain language explanation and clear reporting of countable income and applicable income standards, but instead repeatedly places the burden on the claimant to seek out this information from DCF. *Id.* at 48:14-18, 48:19-49:3, 58:11-20, 59:24-60:11, 60:21-61:12.

233.   The hearing packets are difficult for DCF staff to understand. Despite her extensive experience preparing fair hearing evidence packets and explaining them to customers, Ms. Goins could not ascertain from the packet issued to Ms. Mezquita—after having been given unrestricted time to review its contents—whether the action related to a denial or a termination, what countable income was used in the eligibility determination, or which type of Medicaid coverage the case pertained to. *Id.* at 61:20-71:18.

234.   Ms. Goins expressly disclaimed any ability to interpret the evidence packet because she did not prepare it. *Id.* at 68:3-4 ("I didn't put the packet together, so I can't really testify to what's in this packet.").

235.   Mr. Roberts, too, was unable to explain based on the contents of the packet alone how DCF arrived at its eligibility decision for Ms. Mezquita. Roberts Test., Tr. Vol. 2 at 121:8-127:22, 133:5-135:6.

**VII.   Defendants have been well aware for years that the notices are confusing and not sufficiently specific yet have failed to address the problem.**

236.   In 2018, DCF was "well-aware" that notices "generate confusion" and are not "not sufficiently explicit in terms of an explanation." Veltkamp Dep. Vol. 1 at 158:9-12; PX238 at AHCA-2071-72.

49

237.   At that time, DCF knew that the notices are "chunky" meaning that "it doesn't flow. The customer can't like on the first page answer what's going on. They have to read and read." Veltkamp Dep. Vol. 1 at 159:16-160:12.

238.   Since then, DCF has acknowledged the confusion caused by using reason codes to communicate agency action. DCF has advised caseworkers that "[v]ague or incorrect reason codes leave our customers confused and increases our own workload when customers contact us." PX165; PX166; Veltkamp Dep. Vol. 1 at 147:10-148:10.

239.   DCF acknowledged that when codes 374, 227, and 249 are used alone they do not "explain[] the Department's actions to the individual." PX160; Veltkamp Dep. Vol. 1 at 52:10-54:1, 149:13-23.

240.   DCF acknowledged "a person cannot tell from the notice reason code" 227 whether they are moving from full Medicaid to Medically Needy. Veltkamp Dep. Vol. 1 at 84:14-24.

241.   DCF acknowledged that code 249 refers to Medicaid and Medically Needy as the "same type of assistance" when they are not. *Id.* at 119:2-16.

242.   Ms. Latham acknowledged that, when considering whether the current notices are "human centric" that "they could be improved." Dep. Designations of Andrea Latham ("Latham Dep."), ECF No. 167-7 at 33:6-10.

243.   DCF has consistently neglected changes to NOCAs in favor of other initiatives and priorities. Lewis Test., Tr. Vol. 4 at 47:25-49:14; *see also* Kallumkal Test., Tr. Vol. 5 at 207:13-19 (describing process of prioritizing various software changes). Ms. Latham testified that DCF uses its annual budget of hours to update the

50

FLORIDA system to focus on "what's essential, what needs to be done" and DCF determines "what's most important." Latham Test., Tr. Vol. 5 at 158:16-159:25, 165:13-166:10.

244.    Addressing the known confusion that the NOCAs cause has never risen to the priority level: DCF has already budgeted out all of its hours for the 2024-2025 fiscal year with other enhancements it deems more essential. *Id.* at 160:1-10, 165:21-25. Deloitte is currently working on a project related to modifying the current interface with The Work Number, a third-party database that DCF uses for income-verification. Kallumkal Test., Tr. Vol. 5 at 207:20-208:10.

245.    Some DCF employees have, over the years, initiated efforts to replace FLORIDA and revise the notices, but those attempts have been repeatedly stymied. Lewis Test., Tr. Vol. 4 at 40:25-42:11; Veltkamp Dep. Vol. 1 at 163:2-21; Anderson Dep. Vol. 2 at 112:6-13.

246.    AHCA provides no oversight of the NOCAs. AHCA did nothing in response to the 2018 SHADAC report identifying problems. Dalton Dep. at 11:16-18, 13:19-24, 27:11-16, 30:23-31:6, 36:5-17.

247.    Even now that DCF has initiated the ACCESS Modernization project, there is still no guarantee DCF will meaningfully revise the notices to include case-specific information. Latham Dep. at 18:4-12, 26:22-25, 28:19-29:7, 39:22-40:8; Latham Test., Tr. Vol. 5 at 167:9-14; Lewis Test., Tr. Vol. 4 at 51:19-52:3.

248.    DCF has not begun the process of planning, analysis, and design related to the eligibility notices and cannot say "what we want [the notices] to look like" or

what specific changes will be made to the notices. Latham Test. Tr., Vol. 5 at 151:13-152:21, 154:19-25; Latham Dep. at 22:13-15, 30:9-11.

249.   DCF does not plan for Medicaid enrollees to actually start receiving any modernized notices for approximately three and a half years. Latham Dep. at 27:13-28:4.

250.   Past experience suggests that the content of the notices may not meaningfully change. The MyACCESS accounts have already gone through modernization. Latham Test., Tr. Vol. 5 at 135:20-136:18, 155:6-156:1, 163:9-18. That process did not result in any meaningful changes to the case-specific information available. The changes were largely cosmetic. Taylor Test., Tr. Vol. 1 at 41:8-42:13; Garren Dep. at 20:9-19; PX278, PX279, PX280, PX281;[2] *see also* Latham Dep. at 30:12-18 (DCF considering improvements to "readability, formatting arrangements" of the notices).

251.   Any changes that do occur to the notices will not take place for approximately three more years, assuming that the project is not delayed and continues to receive funding—neither of which is guaranteed. Latham Test., Tr. Vol. 5 at 149:6-11, 164:4-6.

---

[2] The exhibits displaying the MyACCESS accounts—PX278A, PX278B, PX279A, PX279B, PX280A, PX280B, PX281A, PX281B—were each created in May 2024, *see* ECF No. 152, after the MyACCESS accounts were modernized.

**VIII.   DCF notices cause significant harm.**

   **A. Kimber Taylor & K.H.**

252.   Plaintiff Kimber Taylor was first enrolled in Medicaid coverage when she became pregnant with her first child in fall of 2022. Taylor Test., Tr. Vol. 1 at 18:8-25.

253.   At that time, Ms. Taylor was working at a group home for individuals with disabilities where she provides various services including helping with hygiene and daily routines and planning outings into the community. *Id.* at 15:22-25, 16:16-20.

254.   Ms. Taylor relied on Medicaid to cover all of her prenatal care and medical services for the birth of her son, K.H., in May 2023. *Id.* at 18:21-19:5.

255.   Ms. Taylor also received food assistance benefits from DCF. *Id.* at 20:9-11.

256.   On March 20, 2023, DCF sent Ms. Taylor a notice asking her to renew food and cash assistance benefits. *Id.* at 19:6-20:8; PX105.

257.   Ms. Taylor completed the food assistance renewal as directed, but, based on the language in the notice, did not expect it to trigger a review of her Medicaid eligibility. Taylor Test., Tr. Vol. 1 at 20:4-21:2.

258.   DCF reviewed Ms. Taylor's Medicaid eligibility following the food and cash assistance renewal. On April 26, 2023, DCF sent Ms. Taylor a notice stating that she was eligible for Medicaid. *Id.* at 21:16-24; PX108.

259.   The April 26, 2023 notice mentions coverage for an unborn baby but does not state how long coverage for Ms. Taylor or the infant should last or whether any income limits apply to infants. Taylor Test., Tr. Vol. 1 at 21:25-22:13; PX108 at DCF-

53

005671.

260.    Ms. Taylor was still working in April 2023. Taylor Test., Tr. Vol. 1 at 22:24-23:11.

261.    Due to her pregnancy and the physically demanding nature of her work, Ms. Taylor stopped working on May 11, 2023 and started taking unpaid leave *Id.* at 23:6-14.

262.    On May 8, 2023, Ms. Taylor reported her plan to take unpaid leave to DCF and explained that she would be out of work for at least six weeks. *Id.* at 23:15-24:4, 24:16-25; PX106.

263.    Ms. Taylor's son was born in May and Ms. Taylor promptly reported his birth to DCF on May 22, 2023. Taylor Test., Tr. Vol. 1 at 25:6-26:5; Roberts Test., Tr. Vol. 2 at 55:7-16; PX111.

264.    Following these two reported changes, on June 7, 2023, DCF again evaluated Ms. Taylor's Medicaid eligibility and issued a notice the next day, June 8, 2023. Roberts Test., Tr. Vol. 2 at 39:15-40:4; Taylor Test., Tr. Vol. 1 at 26:8-27:24; PX112.

265.    K.H. was less than one month old at the time. Taylor Test., Tr. Vol. 1 at 27:23-24.

266.    The June 8, 2023 notice states on page two, under a section titled Cash Assistance, that: "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid." PX112 at DCF-005660-61.

54

267. In addition to the Cash Assistance section, the notice contains two Medically Needy sections and one Medicaid section. In the first Medically Needy section, the notice states that "Your application for Medically Needy dated May 08, 2023 is **approved**. You are enrolled with an estimated share of cost for" the month of "Jul, 2023 Ongoing." *Id.* at DCF-005661. This section lists K.H. as Enrolled and Taylor as Ineligible. *Id.*

268. The next Medically Needy section states that "Your Medically Needy application/review dated May 08, 2023 is **denied**" for the months of May and June 2023. *Id.* at DCF-005662-63. This section lists both K.H. and Taylor as Ineligible, with the Designated Reason: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." *Id.*

269. In the Medicaid section of the notice, which starts on the fifth page, it states that "Your Medicaid benefits for the person(s) listed below will end on June 30, 2023." *Id.* at DCF-005664. Both K.H. and Taylor are listed. The Designated Reason is: "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." *Id.*

270. Nothing under the Medicaid section references Taylor's income. *Id.*

271. Ms. Taylor promptly reviewed and read the whole notice on her MyACCESS account. Taylor Test., Tr. Vol. 1 at 26:8-27:5.

272. After reading the notice, Ms. Taylor was "really confused. Kind of set

back," and "frustrated because I wasn't quite understanding . . . why I was denied." *Id.* at 27:14-22.

273.    Ms. Taylor did not understand what "Medically Needy" meant. She thought that it meant K.H. still had Medicaid, but that DCF had assigned a cost of medical services that his care could not exceed. *Id.* at 28:8-21, 57:2-8.

274.    Ms. Taylor did not understand the statement "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM" or how it related to the statement on a different page that her and K.H.'s benefits would end on June 30, 2023. She did not understand what the statement you "REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP" meant. At first, she was not sure whether she and K.H. were actually losing coverage. *Id.* at 29:5-30:18.

275.    Ms. Taylor could not find any additional information to explain DCF's decision in her MyACCESS account. *Id.* at 30:25-31:3, 42:20-43:7.

276.    Ms. Taylor called the DCF call center, and although it took a while, she was eventually able to get through and speak to a call center agent. *Id.* at 31:13-23.

277.    The call center agent told her that she and K.H. were losing coverage and that they were not eligible because Ms. Taylor's income was too high. The call center did not disclose what household income DCF used to reach the determination or what income limits DCF applied.  *Id.* at 32:1-15, 53:16-22.

278.    After reviewing the notice and talking to the call center, Ms. Taylor "a first-time mom," was "very frustrated," and "concerned about [her] son because . . .

he had an upcoming appointment," and a "circumcision appointment," and without coverage "he couldn't receive proper medical care." *Id.* at 31:4-12. Although she was also concerned about her own coverage, K.H. "he was my -- the most important person." *Id.* at 33:17-22.

279.   Although Ms. Taylor wanted coverage for her son and herself, she did not submit a request for a fair hearing because the notice said that "You will be responsible to repay any benefits if the hearing decision is not in your favor," and she was not confident she would win. *Id.* at 32:16-33:15.

280.   Instead, Ms. Taylor sought out coverage from the Marketplace for herself and from Florida KidCare for K.H. The Marketplace initially told Ms. Taylor that she should qualify for Medicaid and KidCare denied K.H. because he was not yet one-year-old. *Id.* at 34:14-35:3.

281.   Ms. Taylor began talking to friends and family about how to obtain coverage, including a nurse conducting a postpartum home visit. *Id.* at 34:14-35:10, 57:18-58:13.

282.   It was only after being connected to counsel in this case—the Florida Health Justice Project—that Ms. Taylor was able to get K.H.'s Medicaid coverage restored. *Id.* at 34:14-35:5.

283.   DCF acknowledged that Ms. Taylor's and K.H.'s coverage had been erroneously terminated. Dkt. 128, § VIII, ¶ 67.

284.   According to DCF, there were multiple mistakes leading up to the June 8, 2023 notice. First, due to a known computer error, the FLORIDA computer system

did not recognize that Ms. Taylor was within the protected postpartum period. Roberts Test., Tr. Vol. 2 at 40:5-15, 40:25-41:5.

285.    DCF did not recognize K.H. was in the protected continuous coverage period for infants. *Id.* at 41:9-42:4.

286.    DCF evaluated Ms. Taylor in the parent-caretaker category and K.H. as a child under age one. *Id.* at 40:16-24, 42:5-16.

287.    DCF did not correctly count Ms. Taylor's income. The DCF case processor reviewed Ms. Taylor's case on June 7, 2023—after she had reported taking unpaid leave and after reporting the birth of her son—yet the case processor did not credit those reported changes. Instead, the case processor saw active income reported through a third-party database called "The Work Number." *Id.* at 49:13-50:5, 51:2-23, 54:25-56:5; PX99 (06072023 entries).

288.    The data from The Work Number showed pay dates of April 21 and May 5, 2023, before Ms. Taylor reported taking unpaid leave. Roberts Test., Tr. Vol. 2 at 49:13-25. Rather than credit Ms. Taylor's report of unpaid leave or provide Ms. Taylor a chance to explain or provide additional verification, the case processor simply relied on the third-party information, concluded that Ms. Taylor was over-income, and terminated the household's Medicaid. *Id.* at 56:1-58:4; PX99 at DCF-006349.

289.    Had the case processor credited Ms. Taylor's report of unpaid leave and entered zero income, Ms. Taylor and K.H. would have been found eligible notwithstanding the error in applying the continuous coverage policies. Roberts Test., Tr. Vol. 2 at 56:1-18.

290.   The June 8th NOCA does not explain what population groups DCF considered Ms. Taylor and K.H. in. Rather, that information is only available through the FLORIDA computer system which Medicaid enrollees cannot access. *Id.* at 42:5-24.

291.   The June 8th NOCA does not state what SFU size DCF used. That information is only available through the Budget Screen in the FLORIDA computer system. *Id.* at 42:25-43:8, 45:17-46:2.

292.   The June 8th NOCA does not state what income information DCF relied on or explain why DCF found a discrepancy between reported income and The Work Number data. PX112; Roberts Test., Tr. Vol. 2 at 58:13-22.

293.   The NOCA does tell Ms. Taylor she and K.H. "remain[ed] eligible under a different Medicaid eligibility group." PX112 at DCF-005664. DCF did not, in fact, find them "eligible for any other coverage." Roberts Test., Tr. Vol. 2 at 58:23-8.

294.   Once DCF discovered its mistake, DCF reinstated Ms. Taylor's and K.H.'s coverage retroactive to July 1, 2023, pursuant to DCF's standard practice. Doc. 128 ¶ 67; Roberts Test., Tr. Vol. 2 at 59:19-25.

295.   Both K.H.'s and Ms. Taylor's coverage should have continued through at least May 2024, pursuant to the continuous coverage policies. Roberts Test., Tr. Vol. 2 at 60:1-4.

296.   DCF issued a notice to Ms. Taylor dated August 7, 2023, which states that Ms. Taylor is Medicaid eligible "Sep, 2023 Ongoing." PX116 at DCF-005640. Yet, following this notice, the status of Ms. Taylor's coverage remained unclear.

59

Taylor Test., Tr. Vol. 1 at 35:21-36:17.

297. Unlike K.H., she did not receive any paperwork or materials from a managed care plan. In January 2024, after becoming pregnant with her second child, Ms. Taylor received a bill for an obstetrician's visit, reinforcing her belief that she was not covered by Medicaid, since all her prior prenatal care had been paid for by Medicaid. *Id.* at 36:18-37:22, 38:21-39:3; PX119.

298. Accordingly, Ms. Taylor submitted a new application for Medicaid coverage in January of 2024. Taylor Test., Tr. Vol. 1 at 36:18-22.

299. Although Ms. Taylor believes she was approved following that application, she is still working to pay off the January 2024 bill. *Id.* at 39:4-13.

300. DCF's records add little clarity about the dates Ms. Taylor has been covered. Her IQEL screen in FLORIDA shows that Ms. Taylor's pregnancy coverage (MM P) had the status "fail" from December 12, 2023 through February 14, 2024. DCF could not explain what caused that. Roberts Test., Tr. Vol. 2 at 60:10-61:15; PX103.

301. At trial, Ms. Taylor's MyACCESS account showed that Ms. Taylor has a coverage begin date of April 1, 2024 and a coverage end date of June 30, 2024. Taylor Test., Tr. Vol. 1 at 43:20-45:18; PX279B at 10:40-11:35.

302. Data produced for this lawsuit reveals that Ms. Taylor was *not* enrolled in Medicaid as of May 2024. Cooper Test., Tr. Vol. 3 at 192:4-193:23, 194:20-195:20, 196:16-198:8, 207:18-208:13; DX133.

303. The history of Ms. Taylor's Medicaid coverage is unclear. No notices or

information in her MyACCESS account provide a coherent explanation. Taylor Test., Tr. Vol. 1 at 44:15-22, 47:2-8; Roberts Test., Tr. Vol. 2 at 61:16-62:10 (discussing PX118).

### B. Chianne D. & C.D.

304.    Chianne D. is 25 years old and has two children, C.D. age three and S.D. age one. Chianne D. and C.D. enrolled in Medicaid around 2021. Testimony of Chianne D. ("Chianne D. Test."), Trial Tr. Vol. 2, ECF No. 162 at 187:10-18.

305.    C.D. has cystic fibrosis, a condition which impacts the functioning of her pancreas and causes mucus to build up in her lungs. The condition requires a complex schedule of daily medications and treatments, which are necessary to prevent flare ups which can take the form of serious coughs, fevers, or pneumonia. *See id.* at 183:12-187:8.

306.    While she was enrolled in Medicaid, her coverage paid for C.D.'s medications, medical equipment, doctor's visits, and for her to attend a specialized daycare for children with disabilities and complex medical conditions. *Id.* at 183:12-16, 188:14-22.

307.    Following requests from DCF in March of 2023, Chianne D. promptly completed a renewal application for the family's Medicaid benefits, including providing verification that her husband no longer worked at a particular job. *Id.* at 189:5-193:17.

308.    The family's income fluctuates regularly. Chianne D. does not generally track her family's gross income, instead she makes sure they have enough money

coming in to pay the various bills. *Id.* at 188:2-13. Accordingly, when she completed the renewal application, she estimated the household had around $800 in take-home pay income a month. Chianne D. Test., Tr. Vol. 3 at 42:2-10, 45:17-46:16.

309.   After reviewing the renewal application, DCF determined that Chianne D. and C.D. were no longer eligible for Medicaid effective May 31, 2023, based on third-party data sources showing the family was over-income and enrolled Chianne and C.D. in Medically Needy coverage. Roberts Test., Tr. Vol. 2 at 62:25-63:5.

310.   DCF terminated Chianne D.'s Medicaid coverage in error, due to a "system problem" that was authorizing only two months of postpartum coverage instead of 12. *Id.* at 63:6-18; PX161.

311.   Chianne's youngest child, S.D., was just over two months old at the time. Chianne D. Test., Tr. Vol. 2 at 195:12-18.

312.   Under the postpartum continuous coverage policies, Chianne D.'s income was irrelevant to her Medicaid eligibility during the 12-month period. Roberts Test., Tr. Vol. 2 at 63:19-21.

313.   As a result of the error, instead of considering Chianne D. for postpartum coverage, DCF evaluated her in the parent/caretaker population group which does have an income limit. *Id.* at 63:22-64:4.

314.   DCF also calculated a share of cost for Chianne and C.D. As documented on C.D.'s budget screen, DCF calculated her share of cost by subtracting the standard disregard for an SFU of four ($585) from the SFU's countable income. *Id.* at 66:25-67:25; PX31; PX178.

315.    Had the countable income been lower, the share of cost would also have decreased. Roberts Test., Tr. Vol. 2 at 68:4-6.

316.    DCF sent a notice, dated April 24, 2023, that was intended to communicate that Chianne and C.D.'s Medicaid benefits were ending on May 31, 2023. PX40; Roberts Test., Tr. Vol. 2 at 62:14-63:5.

317.    The NOCA does not tell Chianne D. that she was denied postpartum coverage. PX40; Roberts Test., Tr. Vol. 2 at 63:6-64:7.

318.    The NOCA does not explain what income information, SFU size, or population group and associated income limit DCF used. PX40.

319.    The NOCA does not explain how the Medically Needy share of cost was calculated. PX40; Roberts Test., Tr. Vol. 2 at 68:1-3.

320.    The NOCA contains two sections labeled "Medicaid." The first one, on page two, states that all four members of the household were ineligible for Medicaid in April, May, and June of 2023. The Designated Reason in this section of the notice states: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM YOU ARE RECEIVING THE SAME TYPE OF ASSITSTANCE FROM ANOTHER PROGRAM." PX40 at DCF-005272.

321.    The second section of the notice labeled "Medicaid" appears on page eight and advises that "Your Medicaid benefits for the person(s) listed below will end on May 31, 2023." This section then lists C.D., Chianne. D. and her husband, but not S.D. The Designated Reason provided in this section is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." Nothing

in this section mentions income. *Id.* at DCF-005278.

322.   Although the NOCA states that "DCF is required to forward potentially eligible applications to Florida KidCare . . . for review," there is no way to tell from the NOCA whether DCF in fact referred C.D. to Florida KidCare. *Id.* at DCF-005272; Roberts Test., Tr. Vol. 2 at 64:24-65:2.

323.   Although the NOCA twice states that Chianne and C.D. are receiving "THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM," neither Chianne D. nor C.D. were actually receiving the same type of assistance from another program. Roberts Test., Tr. Vol. 2 at 64:8-65:2.

324.   The NOCA does not allow the reader to determine whether DCF made a mistake in its eligibility decision. Ramil Test., Tr. Vol. 4 at 90:24-91:7.

325.   Chianne made numerous calls to the call center to try to understand whether DCF was terminating their Medicaid benefits and, if so, why. *See* DX73, DX74, DX75, DX76, DX77; Chianne D. Test. Tr. Vol. 2 at 194:8-202:2, Tr. Vol. 3 at 6:25-9:22.

326.   The call center confused Chianne, and she received conflicting explanations about her and C.D.'s eligibility status. Starting on the morning of May 30, a DCF representative told Chianne, "the Medicaid was to renew – it shows that you're over income to receive Food Assistance" but that for her and C.D. "yes, the Medicaid has been extended" and "benefits will continue." DX73 at 9:14-31, 10:49-10:54, 12:26-12:47.

327.   Chianne was further informed that there was a problem in the system and

that a senior agent would be able to make the corrections and "get everything continued the way it needs to be." *Id.* at 12:26-13:05.

328.   Chianne believed that this first agent was correct and that she and C.D. were still approved for Medicaid. Chianne D. Test., Tr. Vol. 2 at 194:22-195:11.

329.   Nonetheless, Chianne persisted in calling the call center, to make sure that C.D.'s Medicaid coverage would continue, given C.D.'s medical complexity and substantial medical needs. *Id.* at 195:19-21, 196:22-197:3, 199:11-16. Given C.D.'s needs, during these subsequent calls, Chianne focused on C.D.'s coverage loss, rather than her own. *Id.* at 196:12-15, 202:7-9.

330.   On subsequent calls with Tier 1 agents, she was told she was over income. DX74. But she did not accept that explanation, since she had previously been informed that only a Tier 3 agent would be able to remedy the error. *Id.* at 195:22-11.

331.   When she did connect with a Tier 3 agent, that agent told her that her newborn son was also ineligible due to income. DX75 at 19:50-20:30.

332.   The Tier 3 agent could not tell Chianne D. what the income limits were for full Medicaid coverage, responding "I'm not qualified to answer that question." *Id.* at 20:31-20:45.

333.   After completing multiple calls on May 30th and May 31st, with no clarity from the call center, Chianne D. went back to the notice to try to understand it. She reviewed "every single thing that was on that notice," and wrote down her questions. Chianne D. Test., Tr. Vol. 2 at 199:22-201:5, Tr. Vol. 3 at 48:3-11.

334.   She had questions about what receiving same "assistance from another

65

program" meant and what "mystery program" that sentence referred to. Chianne D. Test., Tr. Vol. 2 at 201:7-16.

335.    She had questions about why the family's income was reported as too high and how the share of cost was calculated, including "what amount of income was reported." *Id.* at 201:7-13.

336.    She wanted to know who the case manager working on the case was and how long they'd been handling their case. *Id.* at 201:17-18.

337.    She had questions about why various family members were listed as eligible in some sections and ineligible in others and how to reconcile the information in the notice with the information she had been given by the call center that her son was also ineligible due to income. *Id.* at 201:19-24.

338.    She had questions about whether C.D. had actually been referred to Florida KidCare. *Id.* at 201:25-202:2.

339.    She did not ask questions about the standard filing unit size because she does not know what that is. Chianne D. Test., Tr. Vol. 3 at 34:24-35:5.

340.    In the next call, Chianne attempted to get answers to her questions, but the call became contentious and left Chianne feeling angry, hopeless, and unsure where to turn. *See* DX76; Chianne D. Test., Tr. Vol. 3 at 6:25-7:6, 7:22-8:5.

341.    Following that call, the DCF representative did submit a fair hearing request on Chianne's behalf, noting that Chianne disagreed with how DCF had calculated the share of cost for C.D. PX25 at DCF-006308 ("SHE DOES NOT AGREE WITH SOC FOR HER DAU"); Roberts Test., Tr. Vol. 2 at 81:1-83:9. And

66

that fair hearing request triggered another call from a DCF supervisor. DX77; Goins Test., Tr. Vol. 5 at 44:5-45:19, 46:16-47:12, 47:19-48:1 (describing practice of supervisor calls following fair hearing requests).

342.   Defendants highlighted isolated snippets of the various calls to suggest that DCF clearly communicated the income information it used to reach its eligibility decision. Chianne D. Test. Tr. Vol. 3 at 27:1-30:21, 32:13-34:20.

343.   The evidence as a whole, including the notes Chianne D. wrote contemporaneously, shows that Chianne D's confusion was palpable. DX73-DX77; Chianne D. Test., Tr. Vol. 2 at 199:22-201:24.

344.   One call agent documented in the running record comments that Chianne did not appear to understand the NOCA or why C.D. was now on share of cost. PX25 at DCF-006308 ("SHE DOES NOT SEEM TO UNDERSTAND THE NOCA"); Roberts Test., Tr. Vol. 2 at 81:1-83:9.

345.   At trial, one DCF witness, Mr. Roberts, agreed that the information Chianne received from the call center was conflicting and confusing. Roberts Test., Tr. Vol. 2 at 78:14-20, 79:5-8. He could not explain how Chianne should be able to determine which of two different agents was providing her accurate information. *Id.* at 79:24-80:16.

346.   While DCF did eventually supply Chianne with specific dollar amounts, it was not until after Chianne's and C.D.'s Medicaid coverage had ended. Even then, no one explained the income limits DCF applied or mentioned postpartum coverage. Roberts Test., Tr. Vol. 2 at 71:12-20; Chianne D. Test., Tr. Vol. 2 at 199:1-7; PX62;

67

PX64.

347.   When DCF did discuss the dollar amounts of income with Chianne, the call center agents made incorrect statements. For example, on both June 1, 2023 calls, the DCF agents told Chianne that DCF uses the family's gross pay. In the first call, DCF told Chianne that "we use your gross pay for the last four weeks before any deductions." *See* DX76 at 4:15-4:25. On the second call, initiated by the DCF supervisor following the fair hearing request, DCF told Chianne that "it's always based on gross when it comes to state programs. So you're looking at the gross income and we add those four weeks up . . . that would be the countable income." DX77 at 14:38-14:58.

348.   Mr. Lewis testified that "[t]he gross income is not ultimately what we use to make our determination." Lewis Test., Tr. Vol. 4 at 47:4-7. For instance, any pre-tax income exclusions must be subtracted from gross-pay to reach a correct calculation. Roberts Test., Tr. Vol. 2 at 126:9-11.

349.   The supervisor who called Chianne made additional misstatements. She stated that to calculate the share of cost it is "legislative policy and procedure" that only $20 of income is subtracted, when the amount that should be subtracted is $585. DX77 at 18:30 to 19:54; Roberts Test., Tr. Vol. 2 at 71:21-72:13.

350.   The supervisor maintained that "we have to count that [overtime] income," even after Chianne explained that her husband worked additional hours in February to make up for time he took off when their son was born. DX77 at 4:47-5:34. When Chianne asked whether there was a "different way of calculating this for people

who get paid commission," the call center agent responded "No, ma'am." *Id.* at 21:13-21:27.

351.   The ESS Policy Manual states that in certain circumstances, such as receipt of commission or overtime, income should be averaged and that "[w]hen using an average, use only the weeks in the average that represent the ongoing pattern of employment." PX187 at DCF-003051-52.

352.   Even after stating that C.D. was over-income for Medicaid, the supervisor insisted to Chianne that C.D. was "covered all the way around" and that "she's covered regardless." DX 77 at 24:28-25:04.

353.   By the time the DCF submitted the fair hearing request, Chianne and C.D.'s full Medicaid coverage had already ended. They could not receive benefits pending the fair hearing. Roberts Test., Tr. Vol. 2 at 71:17-19. Chianne struggled during the month of June to care for her two-month old son and manage C.D.'s medical condition without any health insurance. Chianne D. Test., Tr. Vol. 3 at 9:23-25, 13:13-21.

354.   During June, C.D. had a flare up and had to go to the emergency room when she developed a 106-degree fever and became non-responsive. *Id.* at 10:5-13.

355.   The family incurred a medical bill for the hospital visit, which they still have not been able to establish coverage for. *Id.* at 11:25-12:25. The family also incurred bills for prescription drugs and C.D.'s nebulizer. *Id.* at 13:1-9.

356.   During this time, Chianne D. was still attempting to find coverage for C.D. and determine whether C.D. should be enrolled in Medicaid or CHIP. She

contacted an advocate, Mr. Jarvis Ramil, to help her evaluate C.D.'s eligibility for health coverage. *Id.* at 9:13-15, 42:14-23. At that time, arranging coverage for C.D. was Chianne and Mr. Ramil's main concern and neither one focused on whether Chianne's own termination was correct. Ramil Test., Tr. Vol. 4 at 93:12-94:3; Chianne D. Test., Tr. Vol. 2 at 196:12-15, 202:7-9.

357.    She also attempted to reschedule the Medicaid fair hearing for an earlier date, and after some back and forth, it was eventually scheduled for July 13, 2023. Chianne D. Test., Tr. Vol. 3 at 14:3-16:5.

358.    Before the hearing could take place, through Mr. Ramil's assistance, C.D. was enrolled in CHIP coverage, starting July 1st, and so Chianne D. withdrew the hearing request. *See id.* at 9:13-15, 10:1-4.

359.    When she withdrew the hearing request, Chianne D. believed she was correctly found ineligible for Medicaid coverage and had no reason to know that DCF had terminated her in error. *Id.* at 16:22-17:2, 17:8-13.

360.    Chianne D. never received a fair hearing packet. *Id.* at 16:12-14.

361.    DCF did not restore Chianne's coverage until she filed this case. Roberts Test., Tr. Vol. 2 at 83:19-21; Chianne D. Test., Tr. Vol. 2 at 18:3-11.

362.    When DCF did restore Chianne's coverage it did so retroactively, pursuant to its standard practice to restore coverage when an error is discovered. Roberts Test., Tr. Vol. 2 at 83:22-84:6, 84:13-21. When DCF provides retroactive coverage, that means that an individual can submit any medical expenses they incurred during the lapse in coverage to AHCA to be paid. *Id.* at 84:7-12.

### C. A.V.

363.   Plaintiff A.V. was first enrolled in Medicaid shortly after she was born in May 2022. Jennifer V. Test., Tr. Vol. 3 at 65:4-7.

364.   A.V. relies on Medicaid to cover her medical and dental care, including well-child visits and vaccinations. *Id.* at 65:8-10, 67:6-16.

365.   On April 3, 2023, A.V.'s mother, Jennifer V., submitted an application to the Federally Facilitated Marketplace (Marketplace). *Id.* at 65:11-14; PX97 at -000070-89.

366.   At the time of the application, A.V. lived at home with her parents and five of her six siblings. Jennifer V. Test., Tr. Vol. 3 at 53:24-54:9. However, she was not listed as a household member on the application. *Id.* at 65:20-66:20; PX97 at -000070-89.

367.   DCF reviewed A.V.'s Medicaid eligibility following the submission of the Marketplace application and issued a notice on May 16, 2023. PX81.

368.   The May 16, 2023 notice includes one section entitled Medicaid, which begins on page five and states: "Your Medicaid benefits for the person(s) listed below will end on May 31, 2023." *Id.* at DCF-005728. This section lists A.V.'s name along with the names of six other household members. *Id.* at DCF-005728-29. The Designated Reason is "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." *Id.* at DCF-005729.

369.   The notice contains seven Medically Needy sections, addressing various

71

members of the household. *Id.* at DCF-005724-28.

370.   In the sixth Medically Needy section, the notice states "Your application for Medically Needy dated April 07, 2023 is **approved**" for the months of June 2023 ongoing. *Id.* at DCF-005726. This section lists A.V. as "Enrolled." *Id.* There is no Designated Reason in this section. *Id.*

371.   The seventh Medically Needy section states "Your Medically Needy application/review dated April 07, 2023 is **denied**" for April and May 2023. *Id.* at DCF-005728. This section names A.V. and states she is "Ineligible." *Id.* The Designated Reason is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." *Id.*

372.   DCF terminated A.V.'s Medicaid coverage on June 1, 2023. Doc. 128, § VIII ¶ 57.

373.   DCF applied the incorrect SFU size, counting six individuals instead of eight, thereby erroneously lowering the applicable income limit. Roberts Test., Tr. Vol. 2 at 91:5-20, 92:23-94:3; PX70; PX2 No. 11.

374.   According to DCF, the SFU mistake resulted from two errors. First, a computer system error related to SSI recipients excluded one of A.V.'s siblings from the SFU. Roberts Test., Tr. Vol. 2 at 92:23-93:4, 149:12-23. Second, the case processor failed to count another one of A.V.'s siblings who was tax dependent. *Id.* at 93:5-94:3.

375.   In addition to using the wrong SFU size, the DCF case processor chose to rely on income information from electronic data sources that significantly differed

from the more recent, client-reported income on the April 3, 2023 Marketplace application. PX78; Roberts Test., Tr. Vol. 2 at 97:24-99:20.

376.   Despite this discrepancy, DCF did not ask the family for more recent pay information. Roberts Test., Tr. Vol. 2 at 99:17-100:1.

377.   The case processor concluded that A.V. was over income using information reported from SWICA for late 2022, as well as FDSH wage data that included pay dates from February and March of 2023. PX79; PX80; Roberts Test., Tr. Vol. 2 at 96:13-18, 96:25-97:20.

378.   The May 16, 2023 eligibility decision may have come out differently if DCF had requested more recent pay information from April and May of 2023. Roberts Test., Tr. Vol. 2 at 111:9-18. DCF, however, has not gone back to re-evaluate that decision. *Id.* at 111:4-18.

379.   The May 16, 2023 notice does not state what SFU size, income limit, or household income DCF used to terminate A.V.'s coverage. PX81; Roberts Test., Tr. Vol. 2 at 89:22-25, 100:10-13. The NOCA does not specify the earned and unearned income DCF counted. Roberts Test., Tr. Vol. 2 at 88:20-25, 100:6-13.

380.   The SFU size cannot be inferred from the notice. The only "Medicaid" section in the notice lists seven people. PX81 at DCF-5728-29; Roberts Test., Tr. Vol. 2 at 89:1-25.

381.   The MyACCESS account provides no further insight regarding the SFU size. The Case Details page of Jennifer V.'s MyACCESS account introduced into evidence at trial listed individual names and displayed different icons next to each

name—including checkmarks (✓), plus signs (+), and cross marks (X). Nowhere in the account did it explain what those icons meant or if, and how, they related to the SFU size. PX278A at 46:12-46:18; Jennifer V. Test., Tr. Vol. 3 at 79:3-80:3.

382.    The MyACCESS account also displays inaccurate information regarding individual household member's case history. At trial, the account showed A.V.'s sister, N.C., as being enrolled in Medically Needy with a coverage begin date of April 1, 2023 and a coverage end date of January 31, 2024. Jennifer V. Test., Tr. Vol. 3 at 81:21-82:14; PX278A at 50:40-50:43. N.C. is an SSI recipient who has been enrolled in SSI Medicaid since February 2023. Jennifer V. Test., Tr. Vol. 3 at 80:17-21.

383.    From the notice, Jennifer V. could not tell what income DCF relied upon to determine the family was over income. *Id.* at 77:7-9. From the family's perspective, the family's income includes both parents' pay, which fluctuates, as well as unearned income, such as N.C.'s SSI payments. *Id.* at 56:25-57:6, 57:11-14. Because the notice did not include any specific income information, Jennifer V. could not tell which particular pay periods DCF relied upon or whether DCF considered N.C.'s SSI payments when calculating the family's total household income. *Id.* at 77:7-12.

384.    Jennifer V. learned that there was an issue with A.V.'s Medicaid when her pediatrician's office called her in June 2023 to cancel A.V.'s vaccination appointment. *Id.* at 66:25-67:14, 106:1-4.

385.    After speaking with the pediatrician's office, Jennifer V. viewed and read the notice on her MyACCESS account. *Id.* at 71:18-72:1, 107:4-15.

386.    From the notice, Jennifer V. could not tell A.V. was losing coverage. *Id.*

74

at 74:5-14, 77:3-6.

387.    Upon first reading the notice, Jennifer V. found it "very confusing because of the way it's laid out" with "redundant" sections. *Id.* at 74:5-11.

388.    Jennifer V. initially thought that DCF was changing the share of cost for individuals in her family who were Medically Needy. *Id.* at 73:13-17. After reviewing the notice, Jennifer V. believed that A.V. should still be eligible for Medicaid. *Id.* at 113:24-114:1. However, based on her past experiences, she also thought that A.V. could be being transferred from Medicaid to KidCare. *Id.* at 74:15-25, 77:18-25, 111:20-112:1.

389.    Jennifer V. did not understand the statement: "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." *Id.* at 76:6-16. She did not know what the "different types of Medicaid coverage groups were." The notice did not clarify what this statement meant. *Id.* 76:24-77:2.

390.    In addition to viewing the notice on her MyACCESS account, Jennifer V. looked at other sections of the account, including the help center, for an explanation of A.V.'s Medicaid status. *Id.* at 71:18-72:12. She did not find the information she was looking for. *Id.* at 72:7-12.

391.    Jennifer V. and her husband, Henry V., spent numerous hours making phone calls to various organizations—including DCF, the Marketplace, and A.V.'s HMO—in an effort to find out what happened to A.V.'s Medicaid coverage and what they should do next. *Id.* at 68:6-23, 71:7-11.

392.    Between June and July of 2023, Jennifer V. called the DCF call center two to three times regarding A.V.'s Medicaid coverage. *Id.* at 69:25-70:8.

393.    For each of these calls, Jennifer V. waited on hold for at least 45 minutes before the calls were dropped. *Id.* at 70:9-20. She was never able to get through and speak to an actual person. *Id.* at 70:21-22.

394.    Jennifer V. eventually felt overwhelmed and asked her husband to assist with making calls because she could not "handle all of them by [herself]." *Id.* at 70:23-71:2. She could not "sit on the phone" and "spend hours" trying to reach the DCF call center because of her family and work responsibilities. *Id.* at 71:3-6.

395.    Jennifer V. previously experienced difficulty reaching the DCF call center in early 2022, after losing insurance while pregnant with A.V. *Id.* at 98:11-99:7. At that time, Jennifer V. called the DCF call center for assistance, but she could not get through to an actual person. *Id.* at 60:12-19. She sought assistance by visiting the physical locations of two DCF offices or DCF Community Partners. *Id.* at 60:12-19, 98:7-19; Veltkamp Test., Tr. Vol. 5 at 190:7-16, 191:13-192:25, 193:23-194:11. However, hours-long wait times and a language barrier prevented her from getting any help at these locations. Jennifer V. Test., Tr. Vol. 3 at 62:22-64:17, 100:11-101:6. Having to "jump through hoops and deal with the back-and-forth" of making phone calls and office visits led Jennifer V. to prefer to stay on her private insurance plan because "it was much easier for [her] to navigate." *Id.* at 62:9-21, 100:8-10.

396.    After experiencing dropped calls and extended wait times again in the summer of 2023, Jennifer V. "gave up" on trying to contact DCF about A.V.'s

76

coverage and decided to reach out to counsel for help. *Id.* at 71:12-17.

397.   Without more information about the basis of DCF's decision, Jennifer V. did not file a fair hearing request. She still "wasn't sure what I was supposed to be doing," "wanted advice," and "clarification" about A.V.'s coverage. *Id.* at 115:6-20.

398.   DCF never informed Jennifer V. of the SFU size or household income it used to make its decision through any means. *See* Roberts Test., Tr. Vol. 2 at 105:3-106:1.

399.   Jennifer V. did not file a fair hearing request to challenge the May 16, 2023 decision. Jennifer V. Test., Tr. Vol. 3 at 115:18-20.

400.   A.V. went without coverage. Without Medicaid, A.V. missed well-child visits and her parents had to make difficult decisions to delay needed care—such as vaccinations and her 15-month checkup—due to cost. *Id.* at 83:25-84:19, 85:1-11.

401.   The family also lived with stress that A.V. would become sick or injured without coverage. *Id.* at 83:25-84:17.

402.   On December 18, 2023, the family sought out other coverage for A.V. by submitting a Marketplace application. *Id.* at 85:12-16; PX71.

403.   A.V.'s application was referred to DCF to evaluate her Medicaid eligibility. PX83; PX84. Her application was also referred to Florida Healthy Kids. PX95.

404.   Florida Healthy Kids issued a notice dated January 9, 2024. PX95. The notice states that A.V. "does not qualify for health services through Florida KidCare because: [she] has been referred to Medicaid. Children cannot get health services

through Healthy Kids or MediKids at the same time they are referred to Medicaid."
*Id.*

405.   After receiving this notice, Jennifer V. believed that A.V. would be enrolled in Medicaid because she did not qualify for KidCare. Jennifer V. Test., Tr. Vol. 3 at 88:1-13.

406.   DCF once again found A.V. ineligible for Medicaid and issued two separate notices to the family on January 18, 2024. PX83; PX84.

407.   There are seven Medically Needy sections contained between the two January 18, 2024 notices. PX83; PX84. The one Medically Needy section that mentions A.V. states "Your Medically Needy Share of Cost will increase" as of February 1, 2024. PX84. This section names A.V., as well two of her siblings, and states she is "Enrolled." *Id.* The Designated Reason is: "Your child(ren) are not eligible for Medicaid due to your family[']s income but they may be able to get health insurance through Florida KidCare. Most families pay $20 or less per month for coverage. Florida KidCare is already processing the application for your child(ren). To learn how you can enroll them, please call 1-800-821-5437. Make this call soon since their Medicaid is ending." *Id.* Underneath the Designated Reason, the section states: "Account Transfer to Florida Healthy Kids/Federally Facilitated Marketplace." *Id.*

408.   From looking at the notice, Jennifer V. could not tell if the statement "Make this call soon since their Medicaid is ending" applied to A.V., who had been terminated from Medicaid, or to one of the other children named in the section.

Jennifer V. Test., Tr. Vol. 3 at 89:17-24.

409.   Jennifer V. was confused by the statement that A.V.'s account was being transferred to KidCare because of the earlier notice from Florida Healthy Kids stating that A.V. was being referred to Medicaid. *Id.* at 86:9-17, 91:23-92:10. She could not figure out why her one-and-a-half-year-old child was not receiving insurance or how long her child would continue to be without health coverage. *Id.* at 91:23-92:10.

410.   This time, when evaluating A.V.'s Medicaid eligibility, DCF used an SFU of seven, which was still incorrect. Roberts Test., Tr. Vol. 2 at 103:16-104:10; PX73.

411.   Once again, this error was due to the computer system error that excluded SSI recipients from the SFU size. Roberts Test., Tr. Vol. 2 at 104:11-20, 149:12-22.

412.   The case processor also chose to rely on a prior quarter's income information from SWICA, which was higher than the client-reported income. PX72; Roberts Test., Tr. Vol. 2 at 108:2-8.

413.   As a result, DCF denied A.V.'s Medicaid application for being over income and issued two notices dated January 18, 2024. PX83; PX84; Roberts Test., Tr. Vol. 2 at 109:13-23.

414.   Like the May 16, 2023 notice, the January 18, 2024 notices do not specify the SFU size or income limit. PX83; PX84; Roberts Test., Tr. Vol. 2 at 103:2-6; Jennifer V. Test., Tr. Vol. 3 at 91:20-22. Nor do the notices identify the household income DCF counted. Roberts Test., Tr. Vol. 2 at 103:7-8; Jennifer V. Test, Tr. Vol. 3

79

at 91:15-19. DCF did not provide Jennifer V. these facts through any other means. Roberts Test., Tr. Vol. 3 at 104:21-106:1.

415.    It was only following the intervention of counsel in this case that DCF used the correct SFU size and more recent paystubs to find A.V. eligible. Roberts Test., Tr. Vol. 2 at 109:24-111:3; Jennifer V. Test., Tr. Vol. 3 at 94:17-24.

416.    DCF issued a notice on February 2, 2024 determining A.V. was Medicaid eligible and restoring her coverage back to December 2023, pursuant to its standard practice of retroactively restoring coverage upon discovering an error. PX86; Roberts Test., Tr. Vol. 2 at 111:19-112:9.

417.    The February 2, 2024 notice includes one section entitled Medicaid, which begins on page five and states: "Your application for Medicaid dated January 30, 2024 is **approved**." PX86 at DCF-005877. The notice lists A.V. as "Eligible" from December 2023 through March 2024 ongoing. *Id.*

418.    Although Jennifer V. felt relieved that her daughter finally had health coverage, she could not tell from the notice how long A.V.'s Medicaid coverage would last. Jennifer V. Test., Tr. Vol. 3 at 94:3-8.

419.    Nowhere in the notice did it explain why A.V. was previously found ineligible for Medicaid or why her coverage was reinstated. *Id.* at 94:9-16; PX86.

420.    Nor did DCF inform Jennifer V. of the reason for the reinstatement through any other means. Jennifer V. Test., Tr. Vol. 3 at 95:2-8.

421.    Without this information, Jennifer V. does not believe she could identify the mistake that led to this error if it were to happen again. *Id.* at 95:9-11.

80

422.   A.V.'s Medicaid coverage will be up for renewal again, no later than one-year after her most recent eligibility decision. Roberts Test., Tr. Vol. 2 at 112:24-113:6.

423.   Jennifer V. feels "intimidated" and "anxious" about A.V. going through the renewal process again.   Jennifer V. Test., Tr. Vol. 3 at 96:18-21.   Her "overwhelming" experiences have made Jennifer V. "afraid to make a mistake" when the time comes for A.V.'s Medicaid renewal. *Id.* at 97:1-5.

### D. Lily Mezquita.

424.   Class member Lily Mezquita was approved for Medicaid coverage after becoming pregnant with her third child in December 2022. Mezquita Test., Tr. Vol. 3 at 120:7-8, 120:16-18.

425.   Her two minor children, G.M. and E.M. were also enrolled in Medicaid at that time. *Id.* at 120:16-21.

426.   Ms. Mezquita completed a renewal in the spring of 2023. *Id.* at 120:22-24, 121:8-15. Ms. Mezquita always uploads her recent pay stubs as soon as she submits a renewal application through the online portal. *Id.* at 121:5-7; *see also* PX129 at 000073-74.

427.   At that time, Ms. Mezquita was approved for continued Medicaid but her son G.M.'s Medicaid was terminated. Mezquita Test., Tr. Vol. 3 at 121:8-15.

428.   Ms. Mezquita called DCF and also went to DCF's offices. *Id.* at 121:25-122:1. DCF told her G.M. lost coverage because there was a difference in income between G.M. and her youngest child. *Id.* at 121:16-20. She was not clear exactly what

the income difference was, but she accepted the determination because "everyone was telling" her that he was not eligible. *Id.* at 121:16-122:8.

429.   Ms. Mezquita applied for KidCare coverage for G.M. in the summer of 2023. *Id.* at 122:9-10, 122:18-24.

430.   Ms. Mezquita did not believe that her application for G.M.'s KidCare would cause DCF to review her own Medicaid eligibility. *Id.* at 123:11-14.

431.   Ms. Mezquita received two NOCAs on July 20, 2023, one addressed to her son, G.M. and one to her. *Id.* at 123:3-10; PX122; PX123. Both notices addressed Ms. Mezquita's Medicaid eligibility. Mezquita Test., Tr. Vol. 3 at 123:3-10; PX122; PX123.

432.   One NOCA said that Medicaid benefits for Ms. Mezquita, her husband Jimardo, and G.M. would end on July 31, 2023 because "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." PX123 at DCF-005403.

433.   This was confusing because Ms. Mezquita's husband was not on Medicaid at that time. Mezquita Test., Tr. Vol. 3 at 124:10-11. Ms. Mezquita also had no idea what "other program" the NOCA language was referring to. *Id.* at 124:12-18.

434.   The second NOCA stated "Your Medicaid application/review dated June 19, 2023 is denied" for June through August 2023 with the reasons: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM" and "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." PX122 at DCF-005389.

435.    Although both notices stated that Ms. Mezquita was "receiving the same type of assistance from another program," Ms. Mezquita was not receiving the same type of assistance from another program. Roberts Test., Tr. Vol. 2 at 116:2-9.

436.    The second NOCA contained a separate section titled "Medicaid" which stated Ms. Mezquita was "Ineligible" with no reason. PX122 at DCF-005393; Roberts Test., Tr. Vol. 2 at 117:20-118:14.

437.    This NOCA also stated Ms. Mezquita would be enrolled in Medically Needy with a share of cost of $5,092. PX122 at DCF-005391.

438.    Ms. Mezquita had previously been enrolled in Medically Needy with a share of cost. Her understanding was that it would require her to pay the share of cost and Medicaid would cover everything else. Mezquita Test., Tr. Vol. 3 at 126:10-18.

439.    Ms. Mezquita did not understand the "other program" referenced in the NOCA to mean Medically Needy, because she believed she had pregnancy Medicaid. *Id.* at 126:19-127:3.

440.    Ms. Mezquita was seven months pregnant at the time. The NOCAs did not mention pregnancy coverage. *Id.* at 123:15-17; PX122; PX123.

441.    When Ms. Mezquita had been pregnant before, the notices from DCF had always included a reference to "Baby of Lily Mezquita," so she was concerned that these NOCAs did not. Mezquita Test., Tr. Vol. 3 at 124:23-125:5, 129:18-22.

442.    Ms. Mezquita was confused by these notices. *Id.* at 124:12-18, 126:19-127:16. She thought that DCF had made a mistake, but she did not know what kind of mistake. *Id.* at 129:23-130:9.

83

443.    She thought perhaps DCF thought that she had applied for KidCare. *Id.* at 129:23-130:3. She also thought perhaps DCF had not included her unborn child in the household size, since the "Baby of Lily Mezquita" was not mentioned. *Id.* at 124:23-125:5. But she was not sure what mistake had been made. *Id.* at 130:4-9.

444.    Ms. Mezquita could not tell from the NOCAs what income DCF was using or what the income limit was that she had supposedly exceeded. *Id.* at 129:11-17.

445.    She was scared and desperate to find out or fix it because she was so far along in her pregnancy. *Id.* at 130:10-15.

446.    In determining Ms. Mezquita ineligible for Medicaid, DCF made multiple mistakes. First, it evaluated Ms. Mezquita as a person newly applying as pregnant. Dkt. 128 ¶ 70. This was the result of a computer error that was not reliably providing coverage to pregnant and postpartum women. Roberts Test., Tr. Vol. 2 at 115:5-12.

447.    If DCF had correctly applied its rules, Ms. Mezquita's income would not have mattered in the eligibility determination. *Id.* at 115:13-16.

448.    When considering her income, DCF determined that Ms. Mezquita's household income was only $36 over the income limit for pregnancy Medicaid. *Id.* at 125:7-9.

449.    But to reach that number, DCF ignored the pay stubs Ms. Mezquita had submitted and instead relied upon SWICA data showing income of $2,568.49 per month. *Id.* at 121:12-123:10; PX129 at DCF-000062.

450.   Yet the pay stubs, which reflected more recent income, showed that Ms. Mezquita's countable income was lower than that. First of all, the paystubs Ms. Mezquita submitted from June 2023, showed income of just $1,415.00, which is over $1,000 less than the SWICA income. Roberts Test., Tr. Vol. 2 at 123:20-124:24; PX129 at DCF-000074-75.

451.   Had DCF relied on the paystubs, it would have found Ms. Mezquita eligible, even though it incorrectly applied an income limit. Roberts Test., Tr. Vol. 2 at 125:10-14.

452.   In relying upon the SWICA data, DCF failed to exclude Ms. Mezquita's pre-tax income exclusions for 401K contributions which equaled $48.68 and $36.23 in the two most recent paystubs. *Id.* at 126:6-15; PX129 at 000074-75.

453.   Neither of the NOCAs issued to Ms. Mezquita on July 20, 2023 identified the source, timing, or calculation of income used to calculate her eligibility. PX122; PX123.

454.   After she received the two NOCAs on July 20, 2023, Ms. Mezquita conducted Google searches regarding the eligibility requirements for pregnancy Medicaid in Florida. Mezquita Test., Tr. Vol. 3 at 130:18-23.

455.   She found a DCF fact sheet that said Medicaid was provided for the duration of a woman's pregnancy and two months postpartum. *Id.* at 130:22-23, 131:2-25; PX253.

456.   Ms. Mezquita also found a federal statute that said a pregnant woman is eligible to remain on Medicaid up to 60 days after her pregnancy ends, without regard

85

to a change in income. Mezquita Test., Tr. Vol. 3 at 132:12-16; DX103.

457.   She later learned that post-pregnancy Medicaid extended for twelve months, but she did not learn this through any person or document from DCF. Mezquita Test., Tr. Vol. 3 at 139:6-17.

458.   Ms. Mezquita attempted to reach DCF numerous times after receiving these notices. She called seven times on July 20, 2023, with the two longest calls lasting 153 minutes and 131 minutes, respectively. *Id.* at 133:2-17, 133:25-134:3; DX105.

459.   DCF's phone system gave her the option to request a call back, but then said no dates or times were available when she tried to use that option. Mezquita Test., Tr. Vol. 3 at 134:17-22.

460.   Ms. Mezquita experienced having her call disconnected before she could even get on hold. *Id.* at 134:14-16.

461.   All this call time impacted Ms. Mezquita's ability to work. She had to ask her manager to go in later so she could finish the call she was on because she was on hold and did not want to hang up and have to start over again. *Id.* at 134:6-13.

462.   On July 20th, she did get through to an agent. That agent could not answer her questions and, though they tried to connect Ms. Mezquita with a supervisor, it was late in the day and there was no supervisor available. *See id.* at 135:18-136:7; PX127 at DCF-6334-35.

463.   Ms. Mezquita kept calling and got through to another agent the next day, July 21, 2023. During that call, Ms. Mezquita told the agent that she was seven months pregnant and had had Medicaid since the beginning of her pregnancy, but the agent

maintained that she was over income for Medicaid coverage. PX128 at 00:06-00:14.

464.   In responding to Ms. Mezquita's questions about the reason her Medicaid was being terminated, the call agent made a series of incorrect statements and omissions.

465.   The agent told Ms. Mezquita the wrong income limit, stating "For a household of five people . . . for a pregnant woman to have . . . pregnancy Medicaid, the household cannot make over $684." PX128 07:50-08:08.

466.   That number appears under the Appendix A-7 columns for parents and caretakers, not pregnancy Medicaid. The income limits for pregnancy are much higher. *See* PX178.

467.   The $684 number does not account for the applicable disregards, and so is an inaccurate statement of the income limit even for parents and caretakers. The correct limit for parent/caretakers in a household of five, including applicable disregards, is $830.  Roberts Test., Tr. Vol. 2, at 131:21-132:11.

468.   When Ms. Mezquita questioned whether individuals already enrolled in pregnancy Medicaid are subject to an income limit, the agent responded affirmatively. She asserted that the income limits now applied even to Ms. Mezquita because the "COVID mandate" was over and "now they are back to going based off of the income." PX128 09:35-09:47. Ms. Mezquita told the agent about the statutes and fact sheet she found stating that pregnancy Medicaid remains effective regardless of a change in income, but the agent insisted "those documents have not been updated because, again, that was done when the COVID mandate was intact. Now the COVID

mandate has been lifted so now they [] upon your income." *Id.* at 10:00-10:31.

469.   The agent reached out for additional support from more knowledgeable DCF call center employees. *Id.* at 10:32; *id.* at 16:33-16:45. They all erroneously confirmed that Ms. Mezquita was still subject to an income limit now that the COVID mandate had ended. *Id.* at 10:32 ("My support queue is still letting me know that it is because of that."); *Id.* at 16:33-16:45 (reporting after conferring with support queue "I know that you said you are reading the statutes and everything, the only thing is, that was before they lifted the COVID mandate.").

470.   Eventually, after pushback from Ms. Mezquita, the agent attempted to supply the income limit for pregnancy Medicaid, but once again failed to account for the applicable disregards, stating that "Now, for a pregnant woman, in order for you to receive Medicaid, you can't make over . . . $5,418." *Id.* at 16:50-17:02.

471.   The correct limit for a pregnant person in a household of five, including applicable disregards, is $5,740.  Roberts Test., Tr. Vol. 2, at 118:23-119:8, 132:18-24.

472.   The agent incorrectly described the Medically Needy program, stating that Ms. Mezquita "would have to pay $5,092 before the Department of Children and Families . . . helps out." PX128 at 08:56-09:07. "With share of cost or Medically Needy you have to come out of pocket." *Id.* at 22:09-22:18. Contrary to the agent's representation, share of cost can be met with bills that are merely incurred but are unpaid. *See* PX186 at DCF-002955, -002983 ("allowable medical expenses" that can be used to meet share of cost include "medical expenses that are...unpaid and still owed...").

88

473. The agent did eventually tell Ms. Mezquita the total income DCF used, stating that "For the whole household . . . you bring in $5,776.66 for the month. . . . Jimardo . . . brings in $3,913.80 and then you bring in . . . and then if you want you can add $1,862.26 and that's how they came to the $5,776.66." PX128 at 17:16-18:11.

474. Mr. Roberts could not explain how DCF arrived at the $1,862.26 number based on the available information in the FLORIDA system and agreed that the number reflected neither the SWICA data nor the income reflected in Ms. Mezquita's paystubs. Roberts Test., Tr. Vol. 2 at 133:11-135:17.

475. After the call Ms. Mezquita did not doubt the income limits quoted by the DCF call agent. She believed they had accurate information. Mezquita Test., Tr. Vol. 3 at 141:21-25.

476. She did try to research the income limits herself but found DCF's Family-Related Medicaid Income Limit Chart [Appendix A-7] hard to read and was not sure where her family fell on that chart. *Id.* at 142:1-13; PX178.

477. By the end of the call, Ms. Mezquita doubted the validity of her prior research that had led her to believe she was entitled to continued coverage even if her income went up. Mezquita Test., Tr. Vol. 3 at 138:21-24.

478. Every time she called DCF she doubted herself more and more. *Id.* at 170:10-19.

479. She was scared, because coming up with $5,000 in the two months left in her pregnancy seemed impossible. *Id.* at 139:18-140:1. She knew that doctor's offices would not see her without insurance. *Id.*

480.    At the suggestion of the agent, Ms. Mezquita uploaded a letter to DCF about having a high-risk pregnancy. *Id.* at 140:2-16. In that letter she also stated that her family was struggling financially because their rent had increased, there was no money to pay for doctor's visits, and they recently had to take out loans to afford groceries. *Id.* at 140:2-24; DX102.

481.    Ms. Mezquita uploaded a letter to DCF with the U.S. Code provision she had found, "because everyone I spoke to over the phone had no idea what I was talking about or what I was referring to." Mezquita Test., Tr. Vol. 3 at 141:5-15; DX103.

482.    Ms. Mezquita never received a response or any indication from DCF that it had received or considered these letters. *Id.* at 141:17-20.

483.    Ms. Mezquita kept searching for help and consulted a Facebook group for mothers who suggested she contact the Florida Health Justice Project. *Id.* at 142:15-23.

484.    The Florida Health Justice Project confirmed she had been correct all along about her eligibility; that she was entitled to continuous coverage because of her pregnancy. *See* Dkt. 128 ¶ 71; Mezquita Test., Tr. Vol. 3 at 139:6-17. With the assistance of counsel, Ms. Mezquita requested a fair hearing to dispute DCF's determination of her ineligibility for full Medicaid. Dkt. 128 ¶ 71; Mezquita Test., Tr. Vol. 3 at 170:10-19.

485.    Ms. Mezquita only appealed on behalf of herself and not on behalf of her son G.M., because she had already tried to see if anything could be done for G.M. and

90

she felt there was nothing. She did not believe she had any reason to question whether G.M. was entitled to full Medicaid. Mezquita Test., Tr. Vol. 3 at 143:8-17.

486.   After filing the appeal, Ms. Mezquita did not receive a call from a supervisor to discuss the reason for termination or appeal. *Id.* at 143:18-21.

487.   Ms. Mezquita's Medicaid coverage terminated on July 31, 2023. *Id.* at 143:22-23.

488.   While she was without Medicaid coverage, Ms. Mezquita went into preterm labor. *Id.* at 144:4-5.

489.   To obtain medication needed to stop contractions following her discharge from the hospital, Ms. Mezquita worked something out with the pharmacist to pay for a few of the pills out of pocket. *Id.* at 144:20-145:2.

490.   DCF reinstated Ms. Mezquita's Medicaid on August 10, 2023, retroactively to August 1, 2023, because it determined that coverage had been erroneously terminated. Dkt. 128 ¶ 73.

491.   At that time DCF also re-evaluated the household's income and, based on that evaluation found Ms. Mezquita's son G.M. income-eligible and re-enrolled him in Medicaid. PX127 at DCF-006333; Roberts Test., Tr. Vol. 2 at 136:6-138:2.

492.   Ms. Mezquita's coverage should have continued for 12 months after the birth of her daughter, I.M., in August 2023. Roberts Test., Tr. Vol. 2 at 138:3-8.

493.   Ms. Mezquita received another set of NOCAs on October 19, 2023, informing her that her Medicaid was being terminated. Mezquita Test., Tr. Vol. 3 at 146:22-147:12; PX120, PX121.

494.   The computer system once again erroneously failed to recognize her eligibility for 12-months continuous postpartum coverage. Roberts Test., Tr. Vol. 2 at 139:16-25.

495.   Now that Ms. Mezquita knew about her eligibility for 12-months postpartum coverage, she believed that this was a mistake. Mezquita Test., Tr. Vol. 3 at 148:2-14.

496.   She filed an appeal, and a supervisor called her back to say that her Medicaid would not be taken away. *Id.* at 149:1-19.

497.   In response to a renewal for food assistance less than six months later, Ms. Mezquita received another set of NOCAs on March 29, 2024, informing her that her Medicaid was being terminated again. *Id.* at 150:9-16; PX130, PX131.

498.   Although she was still within the twelve-month period after the delivery of I.M., one of the NOCAs stated "THE MEDICAID COVERAGE FOR YOUR PREGNANCY HAS ENDED." PX130 at 000008.

499.   The other NOCA stated: "We reviewed your case, you are still eligible, but in a different Medicaid coverage type. In most cases, your income exceeds the income limits for full coverage, check your MyAccess account to see if you qualify for the Medically Needy program." PX131 at 000015.

500.   Ms. Mezquita thought there had been a mistake like the other times, but she could not tell the exact nature of the mistake and "it was very confusing." Mezquita Test., Tr. Vol. 3 at 152:6-14.

501.   Mr. Roberts could not tell from the face of the notice what mistake DCF

made this time, remarking "that's pretty wide open." Roberts Test., Tr. Vol. 2 at 143:6-144:1.

502.    Ms. Mezquita again contacted counsel and filed an appeal. Mezquita Test., Tr. Vol. 3 at 152:18-25.

503.    After filing the appeal, Ms. Mezquita was contacted by someone at DCF who explained their system does not have a way to automatically renew pregnancy Medicaid and so the person reviewing the case has to continue the coverage manually. *Id.* at 153:1-10. Because that case processor did not manually renew her pregnancy Medicaid, it was set to be terminated yet again. *Id.*

504.    The DCF representative also told Ms. Mezquita that if she renewed for Food Assistance again she would probably receive another Medicaid termination notice, and "to maybe . . . not renew for Food Assistance if [she] wanted to keep [her] Medicaid." *Id.* at 153:11-14.

505.    At trial, Ms. Mezquita did not know if she would decide to keep renewing for food assistance in the future, because "it's a long process to have to go through each time." *Id.* at 153:21-154:2.

## IX.    Many class members are likely to have been erroneously terminated without adequate notice.

506.    DCF agrees that when DCF realizes it made a mistake in an individual case, it should fix that mistake. Roberts Test., Tr. Vol. 2 at 174:20-22. So does AHCA. Cooper Test., Tr. Vol. 3 at 206:15-20.

507.    DCF has acknowledged multiple systemic errors that have resulted in

incorrect eligibility determinations. Roberts Test., Tr. Vol. 2 at 147:1-150:6.

508.   Mr. Roberts testified that there was an error following the extension of postpartum coverage from two to 12 months, which DCF became aware of in April 2023. *Id*. at 147:1-19.

509.   In April 2023, DCF issued a policy document outlining certain "SYSTEM PROGRAMMING ISSUES" which explained that "[i]n some instances, the system is not recognizing to keep MM P [pregnancy coverage] open for 12-months postpartum coverage from the end date of the pregnancy." PX161 at DCF-002019; Roberts Test., Tr. Vol. 2 at 147:20-148:12.

510.   This issue, though identified in April 2023, was not addressed until April or May of 2024. Kallumkal Test., Tr. Vol. 6 at 14:9-13; Roberts Test., Tr. Vol. 2 at 148:13-18.

511.   Even at that time, the solution implemented was not to ensure the computer system actually built 12 months of coverage but rather was to display the end date of the pregnancy to the worker, so that the worker could, hopefully, more easily identify eligibility for 12-months postpartum coverage and re-enter the pregnancy dates on a particular screen within the FLORIDA system. *See* Kallumkal Test., Tr. Vol. 6 at 12:12-13:25, 15:1-14; *cf.* PX161 (directing workers to "re-enter the pregnancy with the <u>same</u> pregnancy dates on the AIIM [screen] to maintain coverage," when the computer system does not build postpartum coverage) (emphasis in original).

512.   This solution is likely to be imperfect as case workers may continue to fail to manually adjust the postpartum coverage dates. *See* Mezquita Test., Tr. Vol. 3

at 153:1-14.

513.    Deloitte also discovered another defect affecting postpartum individuals unrelated to the two to 12-month policy change. This defect was due to the database's inability to load more than 24 rows of "historical information . . . required to determine postpartum coverage." Kallumkal Test., Tr. Vol. 6 at 9:8-10:13; *id.* at 11:9-12:8 (confirming that PX161 is describing "something different" than the historical information error).

514.    The historical information error was not fixed until November 2023. *Id.* at 14:9-13.

515.    Mr. Hari Kallumkal, a Managing Director from Deloitte, was not sure whether that error loading historical data could have impacted other categories of Medicaid coverage, because he did not know if other Medicaid eligibility categories depend on prior eligibility. *Id.* at 10:22-11:8.

516.    Children's continuous coverage—like postpartum continuous coverage—does depend on prior eligibility. Roberts Test., Tr. Vol. 2 at 42:1-4. DCF could not explain why DCF failed to find Ms. Taylor's son, K.H., eligible for continuous coverage as an infant. *Id.* at 41:6-25.

517.    Mr. Roberts testified that there is a system error that incorrectly removes individuals receiving SSI benefits from the SFU—resulting in the application of lower income limits for other family members applying for coverage. *Id.* at 149:12-23. This same error impacted A.V. in May 2023 and again in January 2024. *Id.* DCF presented no evidence that this error has been fixed.

518.    Mr. Roberts testified that DCF is aware of other system errors that could result in erroneous eligibility decisions but could not recall any more specifics about those other system errors. *Id.* at 149:5-11, 149:24-150:6.

519.    Errors can occur for reasons other than faulty computer-programming. For instance, failing to count pre-tax income exclusions can result in DCF relying on income that is too high. *Id.* at 126:9-11.

520.    DCF's application, computer system, and income-verifications are not set up to reliably capture that information. DCF's witnesses had differing views about where an individual is supposed to report information about pre-tax income exclusions. *Compare id.* at 127:19-128:19 *with* Veltkamp Test., Tr. Vol. 5 at 194:12-195:7. DCF often relies on third-party income verifications such as SWICA and FDSH which do not subtract pre-tax income exclusions when reporting gross income. Roberts Test., Tr. Vol. 2 at 8:24-9:7, 21:5-24, 22:16-23:5, 126:6-16. The FLORIDA system's automated income calculations do not mention subtracting pre-tax income exclusions. PX157 at DCF-1708; Kallumkal Test., Tr. Vol. 6 at 52:16-53:15.

521.    Even when Ms. Mezquita provided pay stubs documenting pre-tax income exclusions, those amounts were not subtracted. Roberts Test., Tr. Vol. 2 at 126:12-19. Had they been, her income would have been under the income limit for a newly-applying pregnant person. *Id.* at 125:7-9, 125:23-126:19.

522.    Errors can result from case processors simply mistyping a number or accidentally marking income as being received more frequently than it is. These types of human errors are inevitable in any large program. DCF imposes quotas on its case

workers to process 400 to 600 cases per month. *See* Veltkamp Dep. Vol. 1 at 145:9-20.

523. Ultimately, DCF does not know from its data how many people who have lost coverage during the unwinding based on income lost their coverage erroneously. Cooper Test., Tr. Vol. 3 at 205:16-206:1.

524. DCF does not know how many of the individuals who lost coverage prior to October 2023 were wrongly deterred by the language in the fair hearing paragraph threatening that they "will" have to repay benefits. DX132 (which identifies the month in which an individual moved from Medicaid to Medically Needy).

525. Of the individuals who have lost coverage due to income, nearly 500,000 remained without Medicaid coverage as of March 2024. Davis Test., Tr. Vol. 55 at 177:7-178:13.

526. DCF has the ability to identify each of those individuals by name. *Id.* at 180:3-181:9.

527. DCF is able to determine how many of those individuals were previously enrolled in a particular population group, for instance how many people—and who— were previously enrolled in pregnancy coverage or enrolled as a child. *Id.* at 181:21- 182:17.

528. If DX135 is filtered by the "pgmcd," or coverage category, that would show the number of individuals who lost pregnancy coverage during the time-period reflected in the spreadsheet. Cooper Test., Tr. Vol. 3 at 199:17-25; PX254 (listing the codes that are also listed in the "pgmcd" column in DX135). When filtered as described, DX135 shows 19,802 individuals who lost pregnancy coverage as of March

2024. DX135.

529.   AHCA has acknowledged that when individuals lost coverage during their 12-month post-partum period this impacts the health and wellbeing of mothers and their children and increases costs for the state. *See* PX247 at -000028. This is because without coverage, conditions like postpartum depression, cardiomyopathy, and substance use disorder go unaddressed. *Id.* at -000034-35, 37. "[E]ven brief gaps in coverage can lead [to] otherwise preventable or treatable health problems, such as asthma, diabetes, and behavioral disorders, resulting in costly hospital admissions and emergency department visits." *Id.* at -000036.

530.   AHCA has explained that "[s]witching coverage at 60-days postpartum also adds new risks onto an already medically vulnerable time," noting that one likely consequence is "coverage loss for mothers who do not having the capacity or resources to seek out alternative coverage." *Id.* at -000035-36. AHCA noted how postpartum depression can have long-term consequences for a child's development and that preserving coverage for postpartum mothers increases the likelihood that children attend well-child visits. *Id.* at -000036-37.

531.   Coverage loss can result in greater costs to the State. AHCA has explained that "[t]he churn from losing Medicaid coverage 60-days postpartum not only may result in unaddressed health conditions for mothers, but also more broadly impacts Medicaid in that the mothers will become eligible for Medicaid again if they become pregnant again, but with potentially increased long-term costs due to the impact of the mother's untreated conditions on her children, both born and unborn."

*Id.* at -000028. AHCA predicted that providing postpartum coverage "is anticipated to result in *lower* average monthly per capita spending in Medicaid." *Id.* at -000029 (emphasis added).

## X.    Revisions to the Medicaid termination notices are feasible using DCF's current technology.

532.    The process for generating a NOCA is almost entirely automated. No human reviews a NOCA before it is sent to a Medicaid enrollee. Kallumkal Dep. at 40:14-16; Veltkamp Dep. Vol. 1 at 125:16-126:1.

533.    Once a case is authorized, FLORIDA exports data to another system (called "ExStream") that generates the NOCA. Kallumkal Dep. at 46:10-47:10, 50:16-51:17; Kallumkal Test., Tr. Vol. 5 at 245:18-246:13; Latham Test., Tr. Vol. 5 at 153:12-154:21.

534.    All NOCAs—for Medicaid and other DCF programs—are based on templates, which include both static text (that does not vary based on case-specific information) and dynamic text (that does vary). Anderson Dep. Vol. 1 at 5:10-7:6, 13:4-14:13; Kallumkal Test., Tr. Vol. 5 at 219:23-220:9, 245:18-246:13.

535.    All NOCAs have the same static "footer" which includes the fair hearing paragraph. Anderson Test., Tr. Vol. 4 at 135:24-136:16.

536.    DCF can update static text relatively easily. *See* Latham Test., Tr. Vol. 5 at 168:22-169:12. *See, e.g.*, PX234 (Deloitte estimate for 48 hours to alter static text on Institutional Care Program approval notices, *i.e.*, PX236, PX237). For example, prior to October 4, 2023, the fair hearing paragraph inaccurately stated that individuals

"will" have to pay back benefits if they lose a hearing. Anderson Test., Tr. Vol. 4 at 139:10-19; FAC ¶ 92; Answer ¶ 92 (DCF policy only authorizes recovery in as a result of "fraud or intentional program violations").

537.   Now, "will" has been replaced with the word "may." Anderson Dep. Vol. 2 at 103:22-24.

538.   DCF updated the fair hearing paragraph again in the spring of 2024, adding a link to the online fair hearing form and email address and information regarding the option to request an expedited fair hearing. DX121; Anderson Test., Tr. Vol. 4 at 142:17-144:7; Anderson Dep. Vol. 2 at 106:22-25; Jones Test., Tr. Vol. 5 at 89:25-91:12.

539.   DCF has also recently updated other static text in its notices, specifically the section titled "DCF Services," to add a hyperlink to DCF's main webpage regarding Medicaid eligibility. Anderson Test., Tr. Vol. 4 at 137:2-5, 144:8-145:3.

540.   DCF moved the location of a sentence from above the "Medically Needy" heading to below that heading. *Id.* at 145:7-22, 153:24-154:10 (noting change took less than 1,000 hours).

541.   In 2023, DCF added a page of QR codes that appears at the end of most NOCAs. *Id.* at 155:15-19.

542.   To include dynamic text in a notice, data from FLORIDA is populated into a placeholder in the NOCA template. Anderson Dep. Vol. 1 at 13:4-14:13; Kallumkal Dep. at 65:18-66:25.

543.   Current examples of dynamic text in Medicaid termination notices

100

include the case number, mailing address, names of individual household members, and the date that the Medicaid benefits will end. Anderson Dep. Vol. 1 at 13:4-15:11.

544.   Other DCF NOCA templates already include placeholders for dynamic, case-specific income information. *Id.* at 15:25-16:21; Dep. Designations of Tonyaleah Veltkamp Vol. 2 ("Veltkamp Vol. 2 Dep."), ECF No. 167-12 at 9:23-10:3, 59:12-16.

545.   Medically Needy approval notices list the specific share of cost via a dynamic placeholder. PX156 at DCF-743, -761, -917; Anderson Test., Tr. Vol. 4 at 166:20-167:1 Kallumkal Test., Tr. Vol. 6 at 63:15-25.

546.   Certain food assistance NOCAs list a household size and the specific individuals counted in the household. PX156 at DCF-833, -941; PX273; Veltkamp Dep. Vol. 2 at 61:11-62:3; Kallumkal Test., Tr. Vol. 6 at 70:23-72:24.

547.   Other food assistance NOCAs state the applicable income limit, and the dollar amounts are updated each year. PX156 at DCF-834; Veltkamp Dep. Vol. 2 at 60:4-61:10. Kallumkal Test., Tr. Vol. 6 at 65:23-69:10 (reviewing PX156 at DCF-834, DCF-774).

548.   Medicaid approval notices for the Institutional Care Program (ICP) contain multiple case-specific income placeholders, including for gross income and other specific dollar amounts. PX156 at DCF-749, -767, -791, -803, -923, -925, -977, -989; PX236; PX237; Kallumkal Test., Tr. Vol. 6 at 64:7-65:22.

549.   Previously, DCF added at least one dynamic field to Medicaid termination notices. Around 2011 DCF added a dynamic field to display the date that "your Medicaid benefits will end." Anderson Dep. Vol. 1 at 14:18-15:11; Anderson

Test., Tr. Vol. 4 at 156:1-8.

550.   Any data stored in FLORIDA could be populated into a NOCA if the template had an appropriate placeholder. Kallumkal Dep. at 127:17-20, 177:1-4.

551.   Medicaid termination notices include no placeholders for dynamic, case-specific household size and income information, although the underlying data is available in FLORIDA. Anderson Dep. Vol. 1 at 16:9-17:3; Kallumkal Dep. at 124:22-125:18, 126:17-127:5, 127:17-20.

552.   Medicaid termination notices lack these dynamic fields because DCF has not requested them. Anderson Dep. Vol. 1 at 15:25-17:3.

### A. Deloitte's typical estimation process.

553.   DCF relies on Deloitte Consulting, a third-party contractor, to implement changes FLORIDA and the other software that generates notices. Kallumkal Test., Tr. Vol. 5 at 205:6-207:7, 213:15-18.

554.   Each quarter Deloitte has a fixed number of hours to make changes, which it refers to as "enhancements." *Id.* at 206:25-207:19.

555.   If a project, or combination of projects, requires more than the 3,150 hours allocated each quarter for enhancements a project will either be delayed to another quarter or DCF can execute an amendment to the contract to pay for the additional hours. *Id.* at 210:10-17; Latham Test., Tr. Vol. 5 at 161:11-162:7. This would mean additional revenue for Deloitte. Kallumkal Test., Tr. Vol. 6 at 21:9-12, 23:14-24.

556.   Deloitte only produces an hours estimate when DCF requests one. *Id.* at

102

30:21-23.

557.   DCF can request either a "T-shirt" estimate or a Rough Order of Magnitude (ROM). Kallumkal Test., Tr. Vol. 5 at 213:21-214:7.

558.   If DCF requests a T-shirt estimate, Deloitte will estimate whether the project is small (less than 500 hours), medium (500 to 2,000 hours), large (2,000 to 5,000 hours), or extra-large (more than 5,000 hours). *Id.* at 214:8-215:2.

559.   If DCF requests a Rough Order of Magnitude, Deloitte produces a more specific estimate of the number of hours the change is expected to take. *Id.* at 215:3-8.

560.   The typical process for producing a ROM estimate requires substantial back and forth conversation between Deloitte and DCF to ensure that Deloitte has a clear understanding of the precise changes DCF requires. Anderson Test., Tr. Vol. 4 at 118:5-16; Kallumkal Test., Tr. Vol. 5 at 216:15-217:17, Tr. Vol. 6 at 22:22-23:13; DX39.

561.   Clarity is necessary to produce an accurate estimate. Kallumkal Test., Tr. Vol. 6 at 21:20-22:10.

562.   Once Deloitte has an understanding of the necessary changes, it enumerates the required changes in the "Scope" section of its estimate. Each one of those changes is assigned a number of "construction hours"—the amount of time to develop the code to actually make the change. Then, a percentage of the total construction hours is calculated for other related tasks, including hours to "Develop and Validate Requirements," for "Integration and System Testing," "Implementation," "Technical Leadership" and "Project Management." DX39 at

103

DCF-000259; Kallumkal Test., Tr. Vol. 5 at 252:7-256:5, 257:6-11. Changing the scope and construction hours will also change the hours allocated to these related tasks. Kallumkal Test., Tr. Vol. 5 at 252:7-256:5.

563.   The typical process for producing an estimate can take weeks for a complex project. Kallumkal Test., Tr. Vol. 6 at 23:8-13.

564.   Once Deloitte produces an estimate, DCF does nothing to verify the accuracy of those estimates. Anderson Test., Tr. Vol. 4 at 191:6-8.

### B. Deloitte's estimates are based on the assumption that new data would have to be stored in the FLORIDA system.

565.   After this litigation was filed, at the request of DCF, Deloitte produced two different estimates regarding the number of hours it would take to update the existing Medicaid termination NOCAs with additional case specific information.

566.   The first estimate was produced in October of 2023 following DCF's request for a ROM. DX40; DX41.

567.   There were "not a lot of details in this for [Deloitte] to do an estimate." Kallumkal Test., Tr. Vol. 5 at 216:8-14. While Deloitte asked some follow up questions, the estimate was "done in kind of like a rush," so "there was not a lot of time for us to do this" or to "fully elaborate all the requirements." Kallumkal Test., Tr. Vol. 5 at 218:2-8, Tr. Vol. 6 at 24:2-25:16.

568.   Two days after DCF submitted the ROM, Deloitte returned an estimate that it would take 28,000 hours to add additional case-specific information to the notices. Kallumkal Test., Tr. Vol. 6 at 23:25-24:25; DX41.

569.   Deloitte cautioned that "[t]he estimate document is prepared on a very high level requirement scope and a compressed schedule to complete the estimate. The estimate will change when detail requirements and JAD sessions are conducted for the project scope." DX41.

570.   Deloitte's initial estimates assumed that changes would be needed to add multiple pieces of information including: age, citizenship status, and other case-specific information unrelated to income. Kallumkal Test., Tr. Vol. 5 at 219:6-17, Tr. Vol. 6 at 29:9-25. Deloitte also assumed that it would have to create new reason codes and save those new reason codes. Kallumkal Test., Tr. Vol. 6 at 26:16-25.

571.   DCF and Deloitte did not have further follow up conversations to refine or revise the estimate until a few weeks before the trial in this case. *Id.* at 30:12-31:3.

572.   At that point, DCF requested another estimate. This time, the request was just to add the income and income limit used in the eligibility determination. Kallumkal Test., Tr. Vol. 5 at 257:12-22, Tr. Vol. 6 at 31:18-21.

573.   DCF did not give Deloitte direction on where, within the FLORIDA system, it should pull the income and income limit data from. Kallumkal Test., Tr. Vol. 6 at 31:22-32:3.

574.   DCF did not tell Deloitte what the final notices should look like or where on the notices the new language should appear *Id.* at 32:6-11.

575.   Deloitte concluded that adding those two pieces of information (income and income limit) would require 12,000 hours. *Id.* at 30:1-11.

576.   Although Deloitte estimated the total number of hours required, it has

105

not determined the actual length of time the changes would take. *Id.* at 73:18-74:12.

577.   Each of Deloitte's estimates assumed that DCF would need to reprogram the FLORIDA system to store new data that is not currently saved. *Id.* at 26:10-25, 28:16-29:5, 33:22-36:6. That was "the purpose" of each of the two estimates. *Id.* at 81:16-22.

578.   Describing the first estimate, Mr. Kallumkal explained that while "the income budget, all of that data is in the FLORIDA system," Deloitte understood that DCF's first request was asking to store data that is currently deleted. Kallumkal Test., Tr. Vol. 5 at 220:14-221:8. Storing new data would require changes to multiple modules within the FLORIDA system and the creation of an entirely new database. *Id.* at 235:4-236:7, 237:22-239:12. The first estimate assumed that Deloitte might have to make changes to the "foundational architecture of this system." *Id.* at 232:20-234:15.

579.   In completing the second estimate, Deloitte again assumed that the FLORIDA system would need significant reprogramming to store new data. Kallumkal Test., Tr. Vol. 6 at 87:2-13. For instance, it assumed that the income limit—which is not currently stored—would have to be newly retained. *Id.* at 32:12-14. Deloitte assumed that it would need to retain the total countable income number from the full-Medicaid budget screen—a data element which is currently deleted by the system once it moves to the Medically Needy evaluation. *Id.* at 34:16-36:6.

580.   DCF's Office of Information Technology assumes that adding any information to the NOCAs would require modifying FLORIDA to store new data.

Anderson Dep. Vol. 1 at 43:12-44:9; Latham Test., Tr. Vol. 5 at 152:22-153:8, 156:16-18; Latham Dep. at 44:25-45:24.

581.    A substantial number of hours in each estimate stem from the assumption that the FLORIDA system would have to be modified to store new data. Kallumkal Test., Tr. Vol. 5 at 239:10-13. Of the 19 items listed in the "Scope" section of Deloitte's first estimate, eight of them were related to the need to store and save new data, and that the answer would be similar for the second estimate. Kallumkal Test., Tr. Vol. 6 at 45:9-46:15. Mr. Kallumkal affirmed that Deloitte's estimates turn on the fact that new data needs to be stored, emphasizing "that's a major factor." *Id.* at 73:8-16, 89:16-90:11.

## C. DCF and Deloitte have not seriously explored any other alternatives to identify more efficient ways to update notices.

582.    Without the necessary back and forth conversation, Deloitte acknowledges that its estimates will not be reliable or accurate. Kallumkal Test., Tr. Vol. 6 at 21:20-22:13. DCF and Deloitte have not engaged in this type of give and take to determine the necessary requirements to update Medicaid termination notices. *Id.* at 24:10-25:16, 30:1-20, 31:10-32:11.

583.    Deloitte and DCF have not considered whether it might be easier to create a new notice or new template, rather than modify the existing templates. Kallumkal Dep. at 230:10-233:4. In the last few years, DCF created an entirely new NOCA template for the Family Planning waiver. For individuals losing SSI, it created an entirely new notice—not based on the current NOCA templates at all. Anderson

Test., Tr. Vol. 4 at 154:11-23, 155:2-7. Neither DCF nor Deloitte has explained why a similar approach could not be adopted here.

584.   Deloitte and DCF have not explored how other Florida programs, like Florida Healthy Kids, or other state Medicaid programs populate case-specific information, even though Deloitte works with more than 20 other states to generate Medicaid notices. Kallumkal Test., Tr. Vol. 6 at 58:2-63:25; Kallumkal Dep. at 236:11-17.

585.   DCF and Deloitte have not considered the effort required to add information that is already saved in the FLORIDA system. That is because, Deloitte is firmly under the impression that—without storing the actual data used in the FLORIDA system—DCF simply cannot know what facts were actually relied on to deny someone's full Medicaid benefits. Kallumkal Test., Tr. Vol. 6 at 42:13-44:4, 46:16-24, 52:6-15, 74:13-22, 76:14-79:5, 88:3-21, 96:19-97:2.

586.   Contrary to Deloitte's belief, multiple DCF witnesses testified that, in practice, DCF routinely relies on information that is already stored in the database—including in the Medically Needy budget screen—to determine why someone was found ineligible for Medicaid. Roberts Test., Tr. Vol. 2 at 177:3-178:15, 179:10-13; Goins Test, Tr. Vol. 5 at 56:20-58:14; Goins Dep. at 14:10-15:15; Veltkamp Dep. at 140:2-144:8. Mr. Roberts testified that the method for computing an individual's total countable income is the same for Medicaid and Medically Needy. Roberts Test., Tr. Vol. 2 at 20:22-21:4.

587.   DCF has not asked Deloitte to investigate how many hours it would take

108

to simply add the existing data—which DCF currently relies on—to the notices. Kallumkal Test., Tr. Vol. 6 at 92:18-96:7.

> **D. Adding case-specific information that is currently stored in the FLORIDA system is feasible, as DCF already does in other notices of case actions.**

588.    Any information that is currently stored in the FLORIDA system can be populated into a notice. Kallumkal Test., Tr. Vol. 6 at 47:4-7.

589.    When an individual is terminated from full Medicaid due to income, a Medically Needy approval budget segment is stored and the information in that budget segment is displayed on the budget screen. *Id.* at 47:8-15, 76:18-78:14.

590.    The budget screen for a Medically Needy approval shows the SFU's total earned income, total unearned income, allowable deductions, total MAGI income and the SFU size. *Id.* at 52:1-10, 55:1-12; PX157 at DCF-1892; PX100; Kallumkal Dep. at 233:6-15, 234:4-14.

591.    Other screens show the inputs used to reach the totals on the budget screen. The FLORIDA system already saves information regarding the amount, source, and frequency of income from jobs and unearned income. Kallumkal Test., Tr. Vol. 6 at 50:10-51:25.

592.    A different screen, called IQEL, stores and displays an individual's historical eligibility, including which population group an individual was previously enrolled in. *Id.* at 53:16-54:24.

593.    Each of these case-specific data elements is already stored in the FLORIDA system. Kallumkal Test., Tr. Vol. 5 at (the "income budget, all of that data

is in the FLORIDA system.").

594.    These data elements can be populated into the NOCAs in combination with surrounding explanatory, static text. *See* Kallumkal Test., Tr. Vol. 6 at 55:13-57:1. For instance, a NOCA might say:

> **Here is the information we used to reach our decision about [Name]:**
>
> 1.  You were previously enrolled in [population group].
>
> 2.  We calculated your household's total countable income to be $[XX]. This is based on earned income of $[YY] and unearned income of $[ZZ].
>
> 3.  We determined your household size is [#].

595.    Other NOCAs that DCF sends already include individualized, dynamic information, including from the Budget Screen, using exactly the same software as the Medicaid termination notices. Anderson Test., Tr. Vol. 4 at 167:6-168:7. The Medically Needy approval notices pull the individualized share of cost from the Medically Needy approval budget screen and populates it into a NOCA. Kallumkal Test., Tr. Vol. 6 at 63:15-25.

596.    Using the existing software, the MyACCESS accounts display variable income limits for food and cash assistance based on data within the FLORIDA system. *Id.* at 69:11-70:22 (reviewing PX279A at 35:26 to 36:2).

597.    Mr. Kallumkal testified that Deloitte's estimation process typically includes "look[ing] at the system" to determine "what the system is currently doing," and that Deloitte brings "historical knowledge" and "technical expert judgment," Kallumkal Test., Tr. Vol. 5 at 218:15-20, 248:23-249:25.

598.   Even after completing two different estimates, Deloitte was still not aware that its existing system does currently populate several different case-specific data elements into various notices and could not explain how that had previously been accomplished. Kallumkal Test., Tr. Vol. 6 at 64:7-69:10 (reviewing PX156 at DCF-923, DCF-834, DCF-774), 70:23-82:24 (reviewing PX156 at DCF-833, DCF-94); *see also* Kallumkal Dep. at 228:11-229:8, 229:24-230:8.

599.   Because Deloitte was unaware that other notices populated income and household size information into dynamic fields, Deloitte did not research how the current software accomplishes that when making its estimate. Kallumkal Test. Tr. Vol. 6 at 68:6-18.

600.   DCF acknowledges that, even though Deloitte was not aware of it, the programming already exists to extract income, income limit, and household size data and populate it into a notice. *Id.* at 73:3-7.

601.   While DCF witnesses emphasized the difficulty of extracting data from the FLORIDA system, Latham Test., Tr. Vol. 5 at 120:2-12, 169:2-6, DCF witnesses nonetheless testified that they are able to "maintain daily, monthly, weekly reports, as well as any ad hocs that are requested," through a process of "query[ing] and extract[ing] data from DCF's databases." Davis Test, Tr. Vol. 5 at 171:2-16.

602.   For purposes of this litigation, Defendants were readily able to extract data from the FLORIDA system showing individualized information regarding the month individuals were terminated from full-scope Medicaid and the particular population group those individuals were previously enrolled in. Davis Test., Tr. Vol.

111

5 at 172:9-176:15, 179:18-180:7; DX132. The data in that report "comes from an extract from the FLORIDA system." *Id.* at 178:14-16.

603.    Defendants have offered no explanation for why it is feasible to extract data from FLORIDA for the Medically Needy share of cost, SNAP notices, and reports, but not for the Medicaid termination notices. *See generally* Kallumkal Test.; Latham Dep. at 17:2-6 (unaware of any limitations in ExStream for presenting dynamic information).

604.    Deloitte conceded that, if the notices only pulled data that was already stored, "we don't need to do the programming to keep the data that's currently being deleted" and that is "not as complex or as complicated as creating new systems to store data that's not retained." Kallumkal Test., Tr. Vol. 6 at 83:19-84:4.

605.    When questioned by the Court, Mr. Kallumkal affirmed it would be "much simpler" to rely only on existing data and, at least with respect to adding fields from the IQEL screen, posited that it would only be a "medium" project, *i.e.*, between 500 and 2000 hours. *Id.* at 57:2-9, 74:23-75:16, 92:18-96:7.

### E. Adding the applicable income limit to the notices is feasible.

606.    The FLORIDA system already has a table of income limits for the various population groups. *Id.* at 32:4-5.

607.    Dynamic information can be input into a notice through a table. For example, the notices currently populate the reason code text and the corresponding statutory cites from the TSRC table. So, for instance, individuals will receive different text when Reason Code 227 is used versus when Reason Code 241 is used. The table

allows the notices to vary the information provided to the customer, but the options for what can appear in a notice are limited to the information contained in the table. Anderson Dep. Vol. 1 at 37:1-24, 68:4-10; Anderson Test., Tr. Vol. 4 at 162:20-164:21; Kallumkal Test., Tr. Vol. 6 at 36:13-41:14.

608.    Deloitte did not consider whether, rather than storing the income limit used in the full-Medicaid determination for an individual case, it might require fewer hours to use the existing income limit table to populate the income limits based on the population group and SFU size already stored in FLORIDA. Kallumkal Test., Tr. Vol. 6 at 41:15-42:7.

609.    Alternatively, DCF and Deloitte could easily add a hyperlink to an income chart that clearly displays the applicable income limits, which would further reduce the number of hours required to fix DCF Medicaid termination notices. Anderson Test., Tr. Vol. 4 at 162:2-11; Kallumkal Test., Tr. Vol. 6 at 44:7-45:1; Latham Test., Tr. Vol. 5 at 168:22-169:12.

### F. Editing the text of reason codes and the statutory and regulatory cites in the TSRC table is feasible.

610.    The reason codes and statutory or regulatory cites that are populated into notices are based on entries in the TSRC table. *Supra* ¶¶ 89-93.

611.    Editing the text of tables are "simple changes." Anderson Dep. Vol. 2 at 98:17-25. Unlike other changes Deloitte implements, table changes do not necessitate hours for defining requirements. Anderson Dep. Vol. 2 at 102:3-9.

612.    The December 2023 changes to the text of six reason codes took only 80

hours. Anderson Dep. at Vol. 2 at 101:10-15; Kallumkal Dep. at 206:22-207:3, 207:15-208:21.

613.   DCF could easily update the TSRC table to remove the blank fields and "Xs" that appear and ensure that accurate statutory cites are included.

### G. Changes to current notices would not disrupt modernization.

614.   The funding and approval process for changes to the current system is distinct from the funding and approval process for modernization. Latham Test., Tr. Vol. 5 at 160:11-161:10 (describing planning and approval on "modernization side" and "legacy side"), 165:18-166:10 (federal government is currently funding both legacy enhancements and modernization).

615.   DCF can make changes to the current ACCESS system separate from its modernization efforts, and the two efforts are not mutually exclusive. *Id.* at 157:18-20, 165:13-17; Latham Dep. at 27:19-28:11.

616.   "[E]nhancements come up all the time," Latham Dep. at 31:3-7, and DCF has made numerous incremental changes to the notices during the past three years that modernization has been ongoing. Latham Test., Tr. Vol. 5 at 166:11-167:8; *supra* ¶¶ 536-541.

617.   DCF suggested that these incremental changes were possible only because they involved revisions to the static text of notices. Latham Test., Tr. Vol. 5 at 168:22-169:11. DCF has, in fact, recently completed an enhancement that involved programming to store new data elements, modifying the FLORIDA system to store Reason Code 241 when someone is moved from full Medicaid to Medically Needy.

That change took approximately 500 hours. Kallumkal Test., Tr. Vol. 5 at 209:5-21, 210:18-211:6, Tr. Vol. 6 at 18:15-20:14.

618.   The federal government funds 90 percent of the costs for updates to the state's computer systems. Latham Dep. at 12:16-19, 13:4-6.

## PROPOSED CONCLUSIONS OF LAW

### I.   Defendants' Medicaid termination notices violate due process.

619.   The standard for a constitutional violation under the Due Process Clause is well known.

> There can be no doubt that, at a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

*Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

620.   A violation of due process is found when the plaintiff establishes "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Id.* (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)).

621.   Medicaid enrollees have a constitutionally protected property interest in maintaining their Medicaid benefits. *See O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980). Thus, prior to terminating those benefits, Defendants must provide adequate notice. *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970).

622.   To be constitutionally adequate, notices must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action

and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Arrington v. Helms*, 438 F.3d 1336, 1349 (11th Cir. 2006) ("To determine what type of notice is adequate to satisfy the Due Process Clause," courts should apply the test set forth in *Mullane*).

623.    This is an objective standard. *See Jordan v. Benefits Review Bd. of U.S. Dep't of Labor*, 876 F.2d 1455, 1459 (11th Cir. 1989); *see Arrington*, 438 F.3d at 1349-50 (determining whether notices are adequate based on totality of information available without addressing the individual experience of any one plaintiff).

624.    "Even in cases involving relatively-minimal property interests, courts have recognized that due process at a minimum requires an opportunity to ascertain and confront the evidence in opposition." *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 778 (7th Cir. 2021).

625.    Where vital benefits, like Medicaid, are at stake, the Supreme Court has further specified that the notice itself must clearly state that benefits are ending, and "detail[] the reasons for the proposed termination." *Goldberg*, 397 U.S. at 267-68. *See Hamby v. Neel*, 368 F.3d 549, 560 (6th Cir. 2004) ("The Supreme Court further clarified the standard for adequate notice in *Goldberg . . .*"). The notice must be detailed enough to enable an individual to challenge a decision as "resting on incorrect or misleading factual premises or on misapplication of rules . . . to the facts of particular cases." *Goldberg*, 397 U.S. at 267-268.

626.    Indeed, the *Goldberg* court emphasized the uniquely heightened interest

116

that benefits termination notices protect.

> [T]he crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

397 U.S. at 264.

627.    Cases addressing less-essential property rights do not reflect the standard applicable to DCF's Medicaid termination notices and are, thus, distinguishable. *See, e.g.*, ECF No. 131 at 6, 8, 10 (citing *Hames v. City of Miami*, 479 F. Supp. 2d 1276, 1289 (S.D. Fla. 2007); *Duffy v. Bates*, No. 1:15-cv-00037, 2015 WL 1346196 (N.D. Fla. Mar. 24, 2015); *In re Alton*, 837 F.2d 457, 460-61 (11th Cir. 1988); *In re Le Ctr. on Fourth, LLC*, No. 19-cv-62199, 2020 WL 12604348, at *3 (S.D. Fla. June 30, 2020), *aff'd*, 17 F.4th 1326 (11th Cir. 2021)).

628.    The *Goldberg* standard requires disclosure of case-specific facts: an individual cannot challenge a decision as "resting on incorrect or misleading factual premises or on misapplication of rules . . . to the facts of particular cases," unless the notice discloses the specific factual premises the state agency relied on and which rules it applied in a particular case. *Goldberg*, 397 U.S. at 267-268; *see also Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980)[3] (notice "must be sufficiently specific for it

---

[3] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting, as binding precedent,

to enable an applicant to prepare rebuttal evidence to introduce at his hearing appearance."); *Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005) (without "sufficient information," Medicaid enrollees "cannot know *whether* a challenge to an agency's action is warranted, much less formulate an effective challenge."); *Allen v. Alaska Dep't of Health & Soc. Servs.*, 203 P.3d 1155, 1167-68, n.61 (Alaska 2009) (public benefits notices must "provide sufficient information" to "protect recipients from erroneous deprivation of benefits by allowing them to assess whether or not the agency's calculations are accurate," because "agencies make mistakes" and collecting cases).

629.   A notice describing an individualized eligibility decision must include individualized information about the reason for the decision. *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Idaho 2014) ("*Goldberg* requires a notice tailored to the individual."). Thus, in *Barry v. Lyon*, the Sixth Circuit found that a notice informing a food stamp recipient that "you . . . [are] not eligible for assistance due to a criminal disqualification" constitutionally inadequate because it did not explain the particular charge or law enforcement agency the notice was referring to in an individual case. 834 F.3d 706, 719-20 (6th Cir. 2016).

630.   *Goldberg*'s requirement for individualized information also stands in contrast to cases addressing across-the-board changes in policy or law where courts have applied "a lower standard for determining a notice to be adequate than where the reduction or termination of aid is on an individual basis." *LeBeau v. Spirito*, 703 F.2d

---

all decisions of the Fifth Circuit handed down prior to October 1, 1981).

639, 644-45 (1st Cir. 1983); *see also Garrett v. Puett*, 707 F.2d 930, 931 (6th Cir. 1983). The Supreme Court has made clear that cases involving "a legislatively mandated substantive change in the scope of the entire program," are "different" than cases "based on changes in individual circumstances, or . . . based on individual factual determinations." *Atkins v. Parker*, 472 U.S. 115, 129, 131 n.35 (1985).

631.    Likewise, the standard for an initial termination notice requires enough detail for an individual to determine "*whether* a challenge to an agency's action is warranted," in the first instance. *Kapps*, 404 F.3d at 124. As specified in *Goldberg*, it therefore, requires more individualized information than notices issued at other stages of proceedings. *Compare Goldberg*, 397 U.S. at 267-68, *with Adams v. Harris*, 643 F.2d 995, 996 (4th Cir. 1981) (addressing notice following reconsideration request), *and Jordan*, 876 F.2d at 1457-58 (considering notice following reconsideration request, which came *after* initial denial notice, which was not contested, and after evidentiary hearing). Notably, in *Jordan*, the Eleventh Circuit did not reference or apply *Goldberg* in its discussion of the notice's adequacy. 876 F.2d at 1459 (citing *Goldberg* only in discussion of whether applicants—rather than current enrollees—have a protected property interest).

### A. DCF's Medicaid termination notices are not reasonably calculated to inform recipients of the action taken.

632.    To enable an individual to identify an erroneous termination of Medicaid, the notices must first clearly indicate that an individual is, in fact, losing benefits. *See Mullane*, 339 U.S. at 314 (requiring "notice reasonably calculated, under

all circumstances, to apprise interested parties of the pendency of the action").

633.   DCF's notices do not clearly identify the action being taken. In the best case scenario, a Medicaid termination notice will include a section with the phrase "Your Medicaid benefits for the person(s) listed below will end on," a given date. *See, e.g.*, PX156 at DCF-995; PX40 at DCF-5278.

634.   Even looking at that section in isolation, however, the notice is not clear: the phrase "Your" benefits and "person(s)" does not state whose coverage is actually ending. *Supra* ¶¶ 408, 432-433. DCF witnesses confirmed that individuals may be listed in a section even though they did not have Medicaid coverage or their coverage is not ending. *Supra* ¶¶ 62-63. Notices like these, that refer generically to "'You or a member of your group'" impermissibly "fail[] to indicate whose conduct is at issue." *Barry v. Lyon*, 834 F.3d at 719 (quoting *Barry v. Corrigan*, 79 F.Supp.3d 712, 742-44 (E.D. Mich. 2015)).

635.   Other aspects of DCF's notice add to the confusion about the action being taken. For instance, notices routinely include multiple different "Medicaid" sections, which may refer either to actions taken for different population groups or to different "primary" persons. Yet, the notices refer to all population groups as "Medicaid" without differentiation. *Supra* ¶¶ 61-69.

636.   DCF also regularly relies on reason codes that communicate to an individual that their coverage is not actually ending. For instance, an individual may be told that their Medicaid benefits are ending, but that they are nonetheless "receiving the same type of assistance from another program" (Reason Code 249), "still eligible,

but in a different Medicaid coverage type" (Reason Code 227), or "IN THE SAME CASE BUT A DIFFERENT CATEGORY" (Reason Code 350). *Supra* ¶¶ 78-84.

637.   DCF tells enrollees they are "receiving the same type of assistance" or "remain eligible" when those statements are untrue because the person is actually losing full Medicaid and being transferred to Medically Needy. *Supra* ¶¶ 241, 293, 323, 389, 435, 499.  Such "flatly untrue" statements are "inherently misleading." *A.M.C., v. Smith*, No. 3:20-CV-00240, 2024 WL 3956315, at *48 (M.D. Tenn. Aug. 26, 2024); *see also Febus v. Gallant*, 866 F. Supp. 45, 46 (D. Mass. 1994) (finding due process violation where the "reason for termination *provided in the notice* misleadingly stated" something other than "the *actual* reason for issuance of the termination notice.").

638.   Notices, like these, that do not clearly communicate who is losing coverage are not "reasonably calculated" to inform Medicaid enrollees of "the pendency of the action." *Mullane*, 339 U.S. at 314; *see also Doston v. Duffy*, 732 F. Supp. 857, 872-73 (N.D. Ill. 1988) (noting a notice is inadequate if it is "unintelligible, confusing, or misleading.").

### B. DCF's Medicaid termination notices do not explain the reasons for the agency's action.

639.   Even if an individual can determine that they are losing Medicaid coverage, Defendants' notices are entirely devoid of the case-specific information needed to understand the reason for DCF's decision. *Supra* ¶¶ 57-59.

640.   There is no dispute that when DCF finds someone over income for Medicaid the notices do not inform them of what income DCF believed they had, the

number of people in the household, or the income limit for the applicable population group and SFU size. *Supra* ¶¶ 57-59.

641.    Yet these are precisely the types of "factual premises" that must be detailed in the notice for it to be adequate under *Goldberg,* 397 U.S. at 267-268. *See also Barry*, 834 F.3d at 720 (holding that notice must provide "specific, individualized reasons for the agency action"); *C.R. ex rel. Reed v. Noggle*, 559 F. Supp. 3d 1323, 1339 (N.D. Ga. 2021) (notices inadequate where they fail to provide sufficient details for a "lay reader" to "understand on what basis the request for [Medicaid] was denied.").

642.    When notices concern an income determination, in order to satisfy its obligation to detail the reasons for the agency action Defendants' notices must include "a statement of the calculations used by the agency." *Ortiz v. Eichler*, 794 F.2d 889, 893 (3d Cir. 1986) (noting that "this requirement is amply supported by a formidable array of case law"). This is because "without these calculations, plaintiffs have little protection against errors." *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir. 1980*); Allen*, 203 P.3d at 1167 ("Due-process-compliant notices are designed to protect recipients from erroneous deprivation of benefits by allowing them to assess whether or not the agency's calculations are accurate.").

643.    The decision in *Rodriguez By & Through Corella v. Chen*, 985 F. Supp. 1189, 1194-95 (D. Ariz. 1996), is also instructive. There, the court considered notices which (though they identified the Medicaid enrollee by name) nonetheless used generic language such as "Carlos Rodriguez is now in a new category for his age and no longer is eligible due to household excess income," and "net income exceeds maximum

allowable." *Id.* at 1194. The court concluded that "[t]hese reasons are so vague in as much as they fail to provide any basis upon which to test the accuracy of the decision." *Id.* On the other hand, the court found that "with careful aforethought, a simple explanation detailing the financial calculations relied upon by the agency provides . . . an effective opportunity to confront an adverse decision" and "conduct an initial evaluation as to the accuracy of the figures used by DES in order to prepare an appeal." *Id.* at 1195.

644.   It is particularly important to disclose the specific income calculations where, as here, DCF relies on third-party data that is otherwise unavailable to the notice recipient. *See Rock River Health Care*, 14 F.4th at 778; *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (noting that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights" and that the best instrument for arriving at truth is to provide notice of the case against him and an opportunity to meet it). Without disclosing the underlying facts DCF relied on, "[t]he recipient . . . has no basis for making an informed decision whether to contest the disqualification, nor what issues need to be addressed at a hearing." *Barry*, 834 F.3d at 719-20.

645.   Where, on the other hand, a notice enables the recipient to understand and confirm the "accuracy" of the agency's calculations in their particular case, the notice is adequate. *Arrington*, 438 F.3d at 1349. Thus, in *Arrington*, the Eleventh Circuit approved of notices that included three different individualized dollar amounts—the "amount paid to current," the "amount paid to arrears," and the "amount paid to family." *Id.* at 1350. By "comparing the dollar figure[s]" appearing in the various

123

columns of the notice, custodial parents could "confirm [Defendant] accurately" made the required payments. *Id.*; *see also LeBeau*, 703 F.2d at 641 (approving notices under lower standard for across-the-board changes where they included "a calculation of each recipient's grant and listing figures for the recipient's gross earned income, gross unearned income, deductions allowed, total deductions, net income, other adjustments and the standard of assistance for the recipient's family.").

646.   Thus, the standard that emerges from the case law is whether Defendants' Medicaid termination notices enable an individual to evaluate the accuracy of DCF's income calculations.

647.   They do not. Jennifer V. could not identify DCF's error in SFU size and application of an erroneous income limit. *Supra* ¶¶ 379-80, 383, 398, 414, 419-22. Ms. Taylor was never told DCF rejected her report that she was on unpaid leave, let alone why. *Supra* ¶¶ 290-92. Ms. Mezquita could not know DCF chose to rely on older wage data, rather than the paystubs she submitted. *Supra* ¶ 453. Chianne D. never learned how DCF actually calculated C.D.'s share of cost. *Supra* ¶¶ 318-19, 324.

648.   Not a single witness testified that the accuracy of DCF's decision could be determined from the notices. Instead, DCF witnesses consistently acknowledged that to determine the accuracy of DCF's decision they would need to examine case-specific information within the FLORIDA system, most significantly the budget screen, which is not supplied to Medicaid enrollees. *Supra* ¶¶ 67-68, 70-71.

649.   To know the basis for DCF's own decisions, DCF witnesses necessarily drew upon information DCF has but chooses not to provide to the enrollees. This is

not a process someone "desirous of actually informing" Medicaid recipients would choose. *Mullane*, 339 U.S. at 315; *see also Kapps*, 404 F.3d at 124 n.28 (finding notices "facially insufficient" to explain "the reasons for an agency's decision" where "'the defendants' own employees were unable to discern . . . what the basis for the agency's action was.'") (quoting *Kapps v. Wing*, 283 F.Supp.2d 866, 878 (E.D.N.Y. 2003)).

650.   Individuals in the Subclass who have or will receive a notice which does not include a Designated Reason that identifies income as the factor on which the State relied receive even less information regarding the reason for DCF's action.

651.   In the Medicaid context, because there are many population groups, courts have held that constitutionally adequate notice must include a description of the eligibility categories an individual was previously enrolled in, as well as a description of other categories for which they could establish eligibility. In *Hamby v. Neel*, for instance, the Sixth Circuit concluded that notices were inadequate because "[t]here is no mention of an applicant's status as an 'uninsurable applicant,' when the applicant is issued a denial," and thus recipients were not "fully informed as to why" they were ineligible. 368 F.3d at 561-62.

652.   Here, DCF's notices do not mention an enrollee's status as a child, parent or caretaker, pregnant or postpartum person, or person with a disability, obscuring the reason for the intended action, as well as a key fact in determining the applicable income limit. As a result, individuals are deprived of information about the "applicable standards," eligibility criteria, or the "factors the Agency deems pertinent" to their case. *Gaines v. Hadi*, No. 06-60129-CIV, 2006 WL 6035742, at *17-18 (S.D. Fla., Jan.

125

30, 2006). For instance, Chianne D., Ms. Taylor, and Ms. Mezquita had no notice whether DCF considered their pregnancies or postpartum status (or what that status would mean for their eligibility). *Supra* ¶¶ 67, 290, 318, 440; *contra Jordan*, 876 F.2d at 1459 (approving notices under lower standard where they listed the applicable eligibility criteria, specified which criteria the applicant did not meet and sent "an enclosed guide which discusses the type of evidence that could be used to meet" those criteria.)

653.   Medicaid enrollees are not "made aware of the evidence against them before the decision is made to recalculate" their Medicaid eligibility and are denied "any practical opportunity to mount a *factual* challenge to" DCF's termination decision. *Rock River Health Care*, 14 F.4th at 778. Florida's Medicaid enrollees are, thus, deprived of "a fundamental part of any due process inquiry, which is the opportunity to be presented with the evidence against the [enrollee] and an opportunity to respond." *Id.*

### C. Other communications do not remedy the inadequate notices.

#### i. Communications before DCF's final decision and after a Medicaid termination has been appealed are not relevant.

654.   For the due process analysis, the relevant communications are those between DCF's eligibility decision and when a hearing can be requested because this is the time in which an individual must "choose . . . whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314.

655.   Communications issued before DCF makes an eligibility determination

cannot offer an enrollee a "specific" explanation for "why they are being disenrolled," *Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005), because at the time these prior communications are sent, DCF has not yet made its eligibility decision. *See C.R.*, 559 F. Supp. 3d at 1340 (rejecting reliance on prior document because it "was not a final decision" of a Medicaid denial).

656.    Information provided *after* filing an appeal—such as the information contained in DCF's supervisory review and fair hearing packets—is not timed to allow the individual to make an informed choice about whether to appeal in the first place. *See K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 973-74 (9th Cir. 2015) ("It would be illogical if the availability of a hearing deprived the Plaintiffs of their right to receive the notice they need to challenge benefits reductions at that hearing."); *Hamby*, 368 F.3d at 561 ("Applicants eligible for TennCare's benefit were not adequately informed as to how to fully receive the benefits to which they were entitled, *at the time they were entitled to them*[.]") (emphasis added). In any event, the record does not suggest that DCF's supervisory review or hearing packets reliably provide a coherent explanation of the reason for the decision. *Supra* ¶¶ 203-35.

657.    In the window of time in which DCF must provide sufficient termination notice, the only communication DCF affirmatively sends is the NOCA. *Supra* ¶ 58.

     **ii.   It is not reasonable to rely on the MyACCESS accounts, call center, or Family Resource Centers to supply case-specific information.**

658.    Rather than supply the constitutionally required information in the

written NOCAs, Defendants require that Medicaid enrollees affirmatively seek out that information through a combination of dispersed sources—the call center or DCF offices, the individual's MyACCESS accounts, DCF's ESS Policy Manual, statutes and regulations, and various online fact sheets, FAQs or other generalized documents.

659.    Defendants must establish that their chosen method is "reasonably certain to inform those affected." *Mullane*, 339 U.S. at 315.

660.    Applying this standard, courts have repeatedly rejected the argument that requiring an enrollee to obtain information through phone calls—or other means— obviates the need for adequate written notice. *See Barry*, 834 F.3d at 720 ("defendant cannot satisfy due process by requiring notice recipients to call elsewhere.") (quote omitted); *Rodriguez*, 985 F. Supp. at 1195-96 (including legal aid phone number in notice does not remedy inadequate notice because "a low-income individual should not *have* to seek a lawyer in order to review the legal basis for an adverse decision."); *Febus*, 866 F. Supp. at 47 ("The possibility of an oral clarification (assuming the recipient is able to contact a welfare worker) and the existence of an appeals procedure are not enough to undo the mischief caused by the defective notice."); *Ortiz v. Eichler*, 616 F. Supp. 1046, 1062 (D. Del.), *aff'd*, 794 F.2d 889 (3d Cir. 1986) ("the burden of providing adequate notice rests with the state, and it cannot shift that burden to the individual by providing inadequate notice and inviting the claimant to call to receive complete notice."); *Schroeder v. Hegstrom*, 590 F. Supp. 121, 128 (D. Or. 1984) (opportunity to "ask for assistance from welfare caseworkers in understanding why the reduction or termination occurred does not remedy the shortcomings of an inadequate

notice.").

661.   That is because this approach "improperly places on the recipient the burden of acquiring notice whereas due process directs [Defendant] to supply it." *Murphy ex rel. Murphy v. Harpstead*, 421 F. Supp. 3d 695, 708 (D. Minn. 2019). As a result, "only the aggressive receive their due process right to be advised of the reasons for the proposed action." *Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974). Further, as the record here shows, oral communications are unpredictable and do not guarantee that accurate information will be provided. Thus, after observing that "the case worker contacted . . . was unable to give [a Medicaid enrollee] any specific information," about her "termination," the court in *Rodriguez* concluded that phone "numbers cannot . . . be a substitute for the required written reasons." 985 F. Supp. at 1195.

662.   Here, DCF's MyACCESS accounts provide scant information beyond what is already in the notices—and what information is available on the accounts only adds to the confusion about an individual's eligibility status. *Supra* ¶¶ 132-45; *contra Arrington*, 438 F.3d at 1350 (website provided a copy of a "'Court Order Payment Summary,' which provides a year-to-date summary of their payments and includes detailed information about the timing and accuracy of these payments.").

663.   The call center and DCF offices are the only places where individuals might be able to obtain case-specific information—if the enrollee can reach a live person. *Supra* ¶¶ 95, 154. However, unlike the automated call system the court described in *Arrington*, which provided individuals with "updated balance information," 438 F.3d at 1350, DCF's automated IVR system merely repeats the

129

reason codes listed in the notices. *Supra* ¶ 100.

664.   DCF employees at the call center are extremely difficult to reach. *Supra* ¶¶ 103-14. Jennifer V., for instance, was never able to get through to an agent following A.V.'s 2023 termination. *Supra* ¶¶ 392-94, 396.   Ms. Mezquita, Ms. Taylor, and Chianne D. testified that they had to call multiple times before reaching a live person, and even then, only after significant hold times. *Supra* ¶¶ 110, 276, 325, 458-61.

665.   DCF's data confirms that these are not isolated occurrences. When someone calls the call center, it is more likely than not they will be *unable* to be placed on hold, let alone reach a live person. *Supra* ¶¶ 103-07, 113. As recently as April 2024— after some of DCF's efforts to improve matters—744,000 calls were blocked and never placed in a hold queue. *Supra* ¶ 106. For those that do make it to a hold queue, the wait times can be prohibitively long. *Supra* ¶¶ 109-11. As the head of DCF's call center summarized, DCF simply does not have the "capacity to answer . . . as many calls as we would like to be able to answer," and that will not change any time soon, even with additional staffing. *Supra* ¶¶ 112, 114.

666.   In *Holmes v. Knodell*, a district court in Missouri recently considered similar statistics from a public benefits call center, noting that wait times averaged 50 minutes, "[t]hirty two percent of all calls that made it to the Tier 3 queue . . . were abandoned," and "64,053 calls were deflected from the queue." No. 2:22-CV-04026, 2024 WL 2097081, at *1 (W.D. Mo. May 9, 2024). It concluded that these "unacceptable statistics. . . are not merely inconveniences . . . but constitute actual

barriers to Plaintiffs receiving benefits they are entitled to." *Id.* at \*16.

667.   Where, as here, an individual is more likely to have their call blocked than reach a live person, DCF falls woefully short of the "reasonably certain" threshold required to satisfy the Constitution. *Mullane*, 339 U.S. at 315.

668.   Like the call center, the Family Resource Centers are not easy to reach: they are not open on evenings or weekends and there are only 40 locations throughout the state. *Supra* ¶¶ 146-49. Many individuals would have to travel significant distances to reach an office, which may be particularly challenging for individuals working typical business hours or who have caretaking responsibilities or complex health conditions. DCF data demonstrate that these offices are not heavily used. They serve only a small fraction of the Medicaid population each month, and these visits include requests for assistance with any one of DCF's benefit programs. *Supra* ¶¶ 155-56; *contra Arrington*, 438 F.3d at 1350 n.15 (noting that "record indicates custodial parents utilize these additional information sources").

669.   Nor does the record offer any assurance that individuals will receive complete and accurate information even if they are able to talk with a live person at the call center or office. Ms. Mezquita, for instance, visited an office and left without understanding the reason for her son, G.M.'s termination. As a result, she did not appeal that decision even though DCF subsequently determined that it was erroneous. *Supra* ¶¶ 428, 485.

670.   For her part, although Chianne D. made several calls before her coverage ended, she did not receive specific income information on those calls. In fact, it was

not until after she and C.D. had already lost benefits that she was provided a specific dollar amount. *Supra* ¶ 346. And even then, she was never informed of the income limit DCF used for her or C.D. nor informed of the availability of postpartum coverage. *Id.*

671.   Chianne D. and Ms. Mezquita did ultimately obtain some specific income information—but only after they argued and clashed with the call center agents or, in the case of Ms. Mezquita, broke down in tears. *Supra* ¶¶ 340, 470, 473. Ms. Taylor, on the other hand, simply accepted the agent's representation that she was over-income and never received the specific dollar information. *Supra* ¶ 277.

672.   Mr. Jarvis Ramil testified that he has to use specific words directing the call center agents to the "budget" in order to obtain the information—an approach he adopted after numerous frustrating interactions with DCF. *Supra* ¶ 125.

673.   It should not require the use of magic words or arguing with the call center to obtain constitutionally required information. This impermissibly establishes a system where "only the aggressive receive their due process right to be advised of the reasons for the proposed action." *Vargas*, 508 F.2d at 490. In fact, following her calls to the call center Ms. Mezquita began to doubt herself more and more, and it was only with the assistance of counsel that she felt confident enough to pursue a fair hearing. *See Goldberg*, 397 U.S. at 269 n. 16. ("[T]he prosecution of an appeal demands a degree of security, awareness, tenacity, and ability which few dependent people have.").

674.   Finally, even when individuals are persistent and tenacious enough to obtain the case-specific information, there is no guarantee that the information will be

accurate. *Supra* ¶¶ 115-30, 347-352, 464-474.

675.   The call recordings in this case are replete with examples of inaccurate information provided by the call center.

676.   Chianne was incorrectly told that her and C.D.'s "Medicaid has been extended," when in fact it was ending.  *Supra* ¶ 326. She was told—by a DCF call center supervisor—that the share of cost was calculated by subtracting $20 when the amount was in fact $585. *Supra* ¶¶ 208, 249.

677.   Ms. Mezquita was told that DCF had concluded that her income was $1,862.26, but Mr. Roberts could not explain how the agent arrived at that number based on the information in DCF's records. *Supra* ¶¶ 473-74. The call center agent Ms. Mezquita spoke with gave her the incorrect income limits for multiple population groups, reflecting a misunderstanding of the Appendix A-7 income limit chart. *Supra* ¶¶ 465-71.

678.   These types of mistakes are entirely foreseeable given the limited training call center and office staff receive. *Supra* ¶¶ 117-30. While it took Mr. Ramil months to begin to understand the ESS Policy Manual, the initial call center training is just one week and does not prepare agents to answer questions about specific Medicaid cases. *Supra* ¶¶ 120-22.

679.   Defendants' approach does not comport with due process. "when an enrollee is entitled to state-administered Medicaid it should not require luck, perseverance, and zealous lawyering . . . to receive that healthcare coverage." *A.M.C.*, 2024 WL 3956315, at *60.

680.   Yet that is precisely what Defendants require of Florida's Medicaid enrollees. As a consequence, DCF's decision to rely on an understaffed, undertrained call center and office staff is more "reasonably certain" to confuse than inform Medicaid enrollees about the reason for DCF's eligibility decision.

### iii.   It is unreasonable to rely on publicly available information.

681.   Nor is it reasonable to rely on publicly available information to provide constitutionally adequate notice. Defendants have offered no authority for the proposition that publicly available information can supplant the need for case-specific information about the eligibility requirements in a notice of an individual benefit termination. The case law discussing publicly available information does so exclusively in the context of hearing rights or other remedial procedures.

682.   For instance, in *City of West Covina v. Perkins*, the Supreme Court expressly distinguished between the need for "[i]ndividualized notice that the officers have taken the property" and notice of "state-law remedies, which . . . are established by published, generally available state statutes and case law." 525 U.S. 234, 241 (1999); *see also Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009) (discussing only whether horse owner was entitled to personal notice of right to challenge impoundment of horses).

683.   *Arrington* is likewise instructive on this point: the Eleventh Circuit only addressed publicly available materials when considering whether notices must provide "individualized, contemporaneous notice of the[] right to a hearing." 438 F.3d at 1351. Its preceding discussion of whether notices sufficiently enabled custodial parents to

check the accuracy of the individualized child support payments did not turn on or reference statutes, regulations, or policy manuals. *Id.* (relying only on the notice "coupled with the payment check stub, the 24-hour hotline, the [Customer Service Unit], and the Court Order Payment summary" to answer question regarding whether notices allow parents to check timing and accuracy of payments).

684.    This makes sense: publicly available information will never provide information used in a "particular case." *Goldberg*, 397 U.S. at 267-68. Nor can it explain how DCF applied the various eligibility rules in a given case. *Supra* ¶¶ 176-78. *Cf. City of West Covina*, 525 U.S. at 681 (without "individualized notice . . . the property owner would have no other reasonable means of ascertaining who was responsible for his loss"). Thus, in *Barry v. Lyon*, the Sixth Circuit concluded that even when the state listed the applicable eligibility rule in the notice, it was insufficient because an individual "still does not know anything about the outstanding warrant—not the underlying charge, nor which law enforcement agency issued the warrant." 834 F.3d at 719-20.

685.    Second, it is unreasonable for DCF to rely on Medicaid enrollees to locate and interpret the applicable statutes and regulations to explain Medicaid eligibility rules. "[T]here is no presumption that all of the citizens actually know all of the law all of the time," *Grayden*, 345 F.3d at 1243, particularly for Medicaid, where even the Supreme Court has observed that "[b]yzantine construction" of the Act makes it "almost unintelligible to the uninitiated." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (quote omitted).

686.   The record here shows that how the Medicaid eligibility rules are applied in a given case is far from intuitive. Ms. Goins, for instance, could not explain how DCF applied the various policies to Ms. Mezquita's case, even when reviewing Ms. Mezquita's fair hearing packet which listed various sections of the ESS Policy Manual. *Supra* ¶¶ 218, 233-34.

687.   Third, even if Defendants could rely on publicly available information to explain the eligibility requirements in a given case, the information DCF makes available must be compiled from many different locations, is sometimes conflicting, and requires piecing together disparate information and making numerous inferences about a complex program. *Supra* ¶¶ 163-94. *See Barry*, 834 F.3d at 719 (concluding notice is inadequate where, although notice referenced specific policy manual section, notice recipient still had to "determine that BEM 204" refers to a particular section of the policy manual, "determine the relevant" sub-sections applicable in their case, and "get access to the" manual).

688.   DCF appears to rely primarily on the ESS Policy Manual and Appendix A-7 to explain how to count income and what the applicable income limits are. However, neither one of these documents is explicitly mentioned or directly linked in the notices. *Supra* ¶¶ 166, 171-72, 180-83. It is not clear how notice recipients should even know to go looking for them.

689.   These documents are not easy to understand. *Supra* ¶¶ 173-76.  Starting with the applicable income limits: The Appendix A-7 chart (PX178) is unnecessarily complicated to interpret, as evidenced by DCF call center agents and policy experts

136

who offered different interpretations of the chart. *Supra* ¶¶ 187-94. If DCF's own employees cannot consistently understand the chart, it is unreasonable to expect Medicaid enrollees to interpret it correctly.

690.    Defendants did not explain how a Medicaid enrollee should reconcile the conflicting income limits presented in the State's regulations and the Appendix A-7 income chart. *Supra* ¶ 186.

691.    There is no clear, consolidated information regarding how DCF calculates an individual's countable income. Even Mr. Roberts, a 25-year veteran of DCF who uses the ESS Policy Manual daily, could not tell which of three different chapters from that manual he would need to look at to explain how DCF should count income in a particular case. *Supra* ¶176. Once again, if DCF's own staff, who have training and substantial experience with Medicaid, cannot readily understand and locate the necessary information, it is not reasonable to expect Medicaid enrollees to locate and interpret that information.

692.    With respect to the question of hearing rights, the publicly available information DCF presents actually creates, rather than remedies, confusion. Outside of the notice footer, DCF uniformly states that an individual "will" have to repay benefits if they lose the hearing—including in the notice sent to an individual to confirm their receipt of benefits following a fair hearing request. *Supra* ¶¶ 195-202.

693.    To the extent the Court considers the totality of publicly available information outside the notice regarding fair hearings, that publicly available information is likely to mislead individuals about their hearing rights and deter

137

individuals from pursuing appeals. *Supra* ¶¶ 195-202; *see, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998) (finding constitutional deficiency when "forms the government serves on the plaintiffs are not only confusing, they are affirmatively misleading"); *Mayhew v. Cohen*, 604 F. Supp. 850, 857 (E.D. Pa. 1984) (notice regarding recoupment "may have a confusing or intimidating effect that deters a recipient from pursuing appeal rights.").

### D. The purported administrative burden of updating notices is not decisive to the Due Process claim.

694.    Defendants have made much of the administrative burden of updating the notices. Administrative burden is one of the *Mathews v. Eldridge* factors. 424 U.S. 319, 335 (1976). In a case like this, which addresses the adequacy of the notices, the Eleventh Circuit "eschew[s] the balancing test in *Mathews*," and applies the "more straightforward approach set forth in *Mullane.*" *Arrington*, 438 F.3d at 1349 n.13 (quote omitted). Thus, the burdens Defendants assert simply are not relevant to the straightforward question of whether the notices are "reasonably calculated" to apprise Medicaid recipients of the action being taken and the reasons for the action.

695.    Moreover, as detailed above, Defendants' estimates of the hours required to update the notices are speculative and overstated. *Supra* ¶¶ 564-587. Their estimates assume that the FLORIDA system would need to be re-programed to store new data not currently saved and this assumption contributes to a significant number of the hours. *Supra* ¶¶ 565-81. But DCF already stores the countable income, SFU size, and population group for each individual found over income. *Supra* ¶¶ 589-93. DCF has

138

conceded that any information stored in the database can be added to a placeholder in the NOCAs. *Supra* ¶¶ 550, 588. Moreover, when making the estimate, Deloitte was unaware that some NOCAs already include placeholders for case-specific information. *Supra* ¶¶ 598-99. DCF has offered no explanation for why it is administratively feasible to include case-specific dynamic information in some NOCA templates but not in Medicaid termination NOCA templates. *See Barry v. Corrigan*, 79 F. Supp. 3d at 746, *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706 (ordering notice revisions where "Defendant already has access to at least some of this information" and "follows at least some of these requirements in" other cases, because "[t]he Court can discern no reason why defendant cannot similarly . . . communicate that information in the disqualification notice.").

696.    Deloitte's Managing Director for Florida's DCF contract, Mr. Hari Kallumkal conceded that adding information that is already stored in the FLORIDA system would likely be a "medium" project, ranging between 500 to 2,000 hours. *Supra* ¶¶ 605. Although he could not give an actual length of time this might take, *supra* ¶ 576, this equates to approximately three to 12 months of one full-time employee's time (assuming 40-hour weeks). That is not unreasonably burdensome. *See Kapps*, 404 F.3d at 125 (concluding that seven to 10 months required to modify a public benefits computer system was not unreasonably burdensome).

697.    While this case has been pending, DCF has made multiple changes to static text appearing in the "footer" of the NOCAs, revealing that these are readily achievable changes. *Supra* ¶¶ 535-41. The process for adding any static text to the

footers of a NOCA is the same. *See* Anderson Dep. at 105:6-106:25, 107:22-24, 108:24-109:10. Thus, adding new static text to the footer of Medicaid termination NOCAs—*e.g.*, a short description of the Medicaid population groups—would be a similarly light lift.

## II. Defendants' Medicaid termination notices violate the Medicaid Act requirements.

### A. Medicaid Act requirements.

698.   To satisfy the Medicaid Act, notices must include a statement of what action the agency intends to take, as well as a "clear statement of the specific reasons supporting the intended action, . . . [t]he specific regulations that support . . . the action," and an explanation of the right to a hearing, and the method for obtaining a hearing. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b)(2), 431.210; *see also id.* § 431.205 (incorporating *Goldberg*'s requirements).

699.   Medicaid regulations demand that DCF provide all required information "in writing . . . at the time the agency denies an individual's claim for eligibility." 42 C.F.R. § 431.206(b), (c)(2); *id.* § 431.210. There are no exceptions based on receipt of pre-termination communications or a recipient's actual knowledge or diligence. In fact, the regulations separately require the agency to "publicize its hearing procedures" and provide that information "at the time of application." *Id.* § 431.206(a), (c)(1).

700.   Thus, prior and public notice are independent requirements that do not excuse Defendants' failure to provide adequate notice at the time of the adverse action. Likewise, any information from the call center, MyACCESS accounts, or posted on

public websites is irrelevant for the Medicaid Act claim.

701.   DCF's notices fail multiple Medicaid requirements. First, as described above, they fail to state the intended action in a comprehensible manner as required by § 431.210(a). *See supra* ¶¶ 632-38; *See also Febus*, 866 F. Supp. at 46 (finding violation of § 431.210 for same reasons notices violated due process).

702.   Second, DCF's "notices violate § 431.210(b) for the same reason they violate the Due Process Clause: They completely fail to state specific reasons supporting the denial," *C.R.*, 559 F. Supp. 3d at 1341; *see also K.W.*, 789 F.3d at 971 (notices that "did not specify why individual budgets had decreased" violated § 431.210(b)); *Cherry v. Tompkins*, No. C-1-94-460, 1995 WL 502403, at *17 (S.D. Ohio Mar. 31, 1995) (notice that "merely states a generic reason . . . along with a legalistic citation. . . constitutes inadequate notice" under due process and § 431.210 "because it fails to detail the specific factual reasons supporting the proposed termination.").

703.   The omission of the case-specific information is further compounded by the failure to include a description of each population group that an individual could establish eligibility under. As in the due process context, courts have held that, to specify the reason for the action, Medicaid eligibility notices must provide an explanation of all population groups. *See Dozier v. Haveman,* No. 14-12455, 2014 WL 5480815, at *10-11 (E.D. Mich. Oct. 29, 2014) (finding notice inadequate under § 431.210(b) where it omitted "information regarding *all* eligibility categories") (emphasis added); *Crawley v. Ahmed*, No. 08-14040, 2009 WL 1384147, at *26 (E.D. Mich. May 14, 2009).

141

704.   Third, DCF does not reliably cite the specific regulation supporting the intended action as required by 42 C.F.R. § 431.210(c). DCF often includes blanks or "Xs" instead of a regulation cite, *supra* ¶¶ 92-93, and in other instances, cites statutes related to non-Medicaid benefits, *supra* ¶ 94. These failures violate the Medicaid Act. *See A.M.C.*, 2024 WL 3956315, at *48 (finding violation where Medicaid agency "knew that Medicaid regulations required it to cite a specific regulation when providing the reason for a termination . . . but continued to send [notices]" without the necessary citation); *Rodriguez*, 985 F. Supp. at 1195-96 (holding termination notices deficient where statutory citations were not "accurate and tailored to the individual case" and did not describe "where a copy of the cited legal authority c[ould] be located and reviewed").

### B. The Medicaid Act's requirements are privately enforceable.

705.   In the Eleventh Circuit, when a regulation fleshes out the content of an enforceable statutory right, it may be considered in the § 1983 claim to enforce that statutory provision. *Yarbrough v. Decatur Hous. Auth.*, 931 F.3d 1322, 1325-27 (11th Cir. 2019) (en banc).

706.   As the Supreme Court recently reiterated in *Health & Hospital Corp. of Marion County v. Talevski*, a statute creates an enforceable right when "Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." 599 U.S. 166, 183 (2023) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 285-86 (2002)). "[T]he *Gonzaga* test is satisfied where the provision in

question is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 284, 287).

707.   42 U.S.C. § 1396a(a)(3) meets this standard. The provision speaks with unmistakable individual-centric language, promising "an opportunity for a fair hearing . . . to *any individual* whose claim for medical assistance . . . is denied." 42 U.S.C. § 1396a(a)(3) (emphasis added). The fact that this provision appears in a list of requirements for a Medicaid state plan does not undermine this individual-centric focus. Indeed, the Supreme Court squarely rejected that argument in *Talevski*, concluding that similarly worded, individually focused Medicaid statutes that appear in "qualifying State Medicaid plans, which are approved by the Secretary of [HHS]" were privately enforceable under § 1983 and discerning "no incompatibility" between the statute's "remedial scheme and §1983 enforcement." 599 U.S. at 182, 187-88.

708.   Thus, courts applying the *Gonzaga* framework (which was reaffirmed by *Talevski*), have consistently held that the (a)(3) provision creates enforceable rights. *See Barry*, 834 F.3d at 717 ("[I]t is proper for plaintiffs to bring their [§ 1396a(a)(3)] claim for enforcement of their Medicaid rights under § 1983.") (quoting *Gean v. Hattaway*, 330 F.3d 758, 773 (6th Cir. 2003)); *Davis v. Shah*, 821 F.3d 231, 254 (2d Cir. 2016); *Shakhnes v. Berlin*, 689 F.3d 244, 254 (2d Cir. 2012); *Koss v. Norwood*, 305 F. Supp. 3d 897, 909 (N.D. Ill. 2018); *Guggenberger v. Minnesota*, 198 F.Supp.3d 973, 1022 (D. Minn. 2016); *JL v. N.M. Dep't of Health*, 165 F. Supp. 3d 1048, 1063-64 (D. N.M. 2016);

143

*Detgen v. Janek*, 945 F. Supp. 2d 746, 754 (N.D. Tex. 2013); *Romano v. Greenstein*, No. 12-469, 2012 WL 1745526, at *5 (E.D. La. May 16, 2012).

709.   As with the constitutional right to a hearing, for § 1396a(a)(3)'s "fair" hearing right to be meaningful, it must include adequate notice. *Cf.* 42 C.F.R. § 431.205(d), (f) (Medicaid hearing system must comply with *Goldberg* and U.S. Constitution); *Mullane*, 339 U.S. at 314 (finding the "right to be heard has little reality or worth" absent adequate notice); *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1347 (S.D. Fla. 1999) ("The purpose of the advance notice is to afford the recipient of the service an opportunity for a pre-termination hearing. 42 C.F.R. § 431.231(c)."").

710.   True, in *Yarbrough*, the court of appeals refused to allow enforcement of a regulation requiring a particular standard of evidentiary proof at the hearing. 931 F.3d at 1325-27. In reaching that conclusion, it emphasized that the statute creating the right to a written decision was not modified by terms like "reasoned" or "properly" that regulations might define. *Id.* at 1326-27.

711.   Here, however, the statute specifies that a hearing must be "fair" and courts have consistently concluded that the notice regulations are part and parcel of that *fair* hearing right. *See A.M.C.*, 2024 WL 3956315, at *49; *K.B. ex rel. T.B. v. Mich. Dep't of Health & Hum. Servs.*, 367 F. Supp. 3d 647, 661-62 (E.D. Mich. 2019); *Crawley*, 2009 WL 1384147, at *26 & n.7; *Guadagna v. Zucker*, CV-17-3397, 2021 WL 11645538, at *13 (E.D.N.Y. Mar. 19, 2021); *see also Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1056 (11th Cir. 2001) (Medicaid Act grants "individuals denied services . . . a

144

right to notice and an opportunity to be heard"); *C.R.*, 559 F. Supp. 3d at 1341 (notice regulations inform scope of § 1396a(a)(3)); *Hernandez v. Medows*, 209 F.R.D. 665, 670 (S.D. Fla. 2002) (notice regulations "implement the federal statutory requirement").

712.    Thus, "[t]he Medicaid Act requires [DCF] comply with the notice requirements fleshed out in 42 U.S.C. 1396a(a)(3)'s regulations." *A.M.C.*, 2024 WL 3956315, at \*49.

### III.    Relief must include revising notices, pausing terminations and, for those without coverage, prospective reinstatement until adequate notice is provided.

713.    A Court may order a permanent injunction where a plaintiff has demonstrated: "(1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (quote omitted).

714.    Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

#### A. Plaintiffs have shown irreparable harm and there is no adequate remedy at law.

715.    In cases alleging a violation of "the federal Medicaid statute and requesting injunctive relief, irreparable harm nearly always follows a finding of success on the merits. . . . Denying a Medicaid recipient an essential medical service constitutes irreparable harm." *Smith v. Benson*, 703 F. Supp. 2d 1262, 1278 (S.D. Fla. 2010).

145

716.    Here, the record demonstrates that as a result of Defendants' inadequate notices thousands of class members are likely to have suffered erroneous loss of Medicaid benefits without a meaningful opportunity to challenge their termination. This is particularly likely in light of DCF's admission to multiple computer errors that caused erroneous terminations of coverage—errors which are not identifiable from the face of the notice. *Supra* ¶¶ 506-18.

717.    Courts in the Eleventh Circuit have consistently found that "[t]he denial of medical benefits and resultant loss of essential medical services, constitutes an irreparable harm . . ." *Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (citations omitted); *C.R.*, 559 F. Supp. 3d at 1342 (finding reduction in the hours of authorized speech and rehabilitative therapies before a Medicaid recipient was given adequate notice of the reductions caused irreparable harm); *Cramer*, 33 F. Supp. 2d at 1349 (finding cuts in funding for one Medicaid program, with simultaneous elimination of another program, placed plaintiffs at imminent risk of irreparable harm); *Dodson v. Parham*, 427 F. Supp. 97, 108 (N.D. Ga. 1977) (noting the court "would be blinking reality to conclude that Medicaid recipients . . . who are by definition the 'categorically needy', would have the financial capability to have diverse prescriptions filled" in the absence of an injunction restraining state from restricting drugs Medicaid would cover).

718.    Courts in other circuits have reached the same conclusion. *See Pashby v. Delia*, 709 F.3d 307, 329 (4th Cir. 2013) (holding that the threat of losing needed medical care through Medicaid coverage constituted irreparable harm); *Mass. Ass'n of*

146

*Older Am. v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) ("Termination of [Medicaid] benefits that causes individuals to forego such necessary medical care is clearly irreparable injury."); *Caldwell v. Blum*, 621 F.2d 491, 498 (2d Cir. 1980) (finding harm where Medicaid applicants would "absent relief, be exposed to the hardship of being denied essential medical benefits"); *Knowles v. Horn*, No. 3:08-CV-1492, 2010 WL 517591, at *7 (N.D. Tex. Feb. 10, 2010) (finding irreparable harm where Medicaid services terminated without due process); *Crawley*, 2009 WL 1384147, at *28 (finding irreparable harm because "it is undeniable that the unpaid bills, loss of needed medical assistance, and ultimately poor health suffered by Plaintiffs, cannot be adequately addressed by the promise of future Medicaid coverage"); *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (irreparable injury is established when enforcement of a Medicaid policy "may deny needed medical care"); *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979) ("threatened termination of benefits such as medical coverage . . . raised the spectre of irreparable injury"); *Mitson v. Coler*, 670 F. Supp. 1568, 1577 (S.D. Fla. 1987) (potential denial of nursing home service irreparable injury).

719.   AHCA itself has acknowledged the irreparable harm that postpartum women are especially likely to suffer following a loss of Medicaid coverage. *Supra* ¶¶ 529-31. Given that DCF admitted to two different computer errors impacting pregnant and postpartum women, the record amply supports a finding of irreparable harm here. *Supra* ¶¶ 508-14.

720.   The record demonstrates additional types of irreparable harm. For instance, Ms. Mezquita testified that, to avoid navigating DCF's complicated notices,

147

she was considering foregoing food assistance for her family. *Supra* ¶¶ 504-05. Loss of vital food assistance benefits is likewise irreparable harm. *See, e.g.*, *Wylie v. Kitchin*, 589 F.Supp. 505, 507 (N.D.N.Y. 1984) ("The hunger or indignities that one may have to suffer from the unavailability of funds cannot be fully remedied by future payment of those sums.").

721.    The record demonstrates significant confusion, frustration, and emotional distress caused by the notices. The call recordings and testimony in this case highlight the emotional consequences that individuals experience when threatened with loss of essential health coverage for themselves and their children. Indeed, on the recorded calls, and in the courtroom, the Medicaid enrollees in this case were repeatedly brought to tears. PX128; Chianne D. Test., Tr. Vol. 3 at 10:20-22; Jennifer V. Test., Tr. Vol. 3 at 96:13-17.

722.    The record shows the significant time that enrollees must spend trying to understand the notices. The time spent reaching the call center alone is substantial. And each enrollee who testified spent yet further time researching and seeking out help from third parties to obtain the information missing from DCF's notices. *Supra* ¶¶ 280-81, 356, 454-56, 476-483.

723.    Because under *Ex parte Young*, 209 U.S. 123 (1908), Plaintiffs may only obtain prospective injunctive relief in this case, these time and emotional injuries have no adequate remedy at law, and are thus irreparable.

724.    Finally, every individual who received an inadequate notice was harmed by the inability to determine whether DCF's income termination was accurate or not.

148

Without adequate notice, each has been deprived of the very right due process is intended to protect: the ability to determine whether or not to lodge an appeal. Regardless of the ultimate outcome of a hearing, the inability to identify whether there is a ground to challenge DCF's decision is itself a cognizable injury, which is irreparable absent injunctive relief requiring revised notices. *See Rock River Health Care*, 14 F.4th at 775 ("the defendant's belief that the plaintiff cannot succeed on that claim does not eliminate the need to provide due process. . . . 'the recipients [in *Goldberg*] had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.'") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

### B. The balance of equities and public interest factors weigh in favor of Plaintiffs.

725.    When the state is a party, the "balance of harms" and "public interest" factors merge. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

726.    Here, both factors are sharply in Plaintiffs' favor. First, "[t]he vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition." *Colonel Fin. Mgmt. Officer v. Austin*, 622 F. Supp. 3d 1187, 1215 (M.D. Fla. 2022). Likewise, "an injunction to enforce the federal Medicaid Act is without question in the public interest." *Edmonds*, 417 F. Supp. 2d at 1342; *See also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) (noting that the "[f]rustration of federal statutes and prerogatives [is] not in the public interest . . ."); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) ("[I]t is clear that

it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available.").

727.   The administrative and financial burdens Defendants assert do not tip the equities away from an injunction. There is significant reason to doubt the estimates of the number of hours it would take to revise notices that Defendants have presented. *Supra* ¶¶ 564-587. And 90 percent of the financial costs associated with such a change would be provided by the federal government. *Supra* ¶ 618.

728.   Nor have Defendants acknowledged the substantial federal funds that would offset costs associated with any injunction ordering a pause in terminations or reinstatement. Though Defendants initially asserted it would cost $313 per person for each month of coverage, it turns out that more than half that cost would be reimbursed by federal financial participation. Cooper Test., Tr. Vol. 3 at 204:22-205:12; *see also* 42 C.F.R. § 431.250(b)(2); *Dozier*, 2014 WL 5480815, at *13 (state budgetary concerns were mitigated because "at least some of these expenses can be reimbursed by the federal government") (citing 42 C.F.R. § 431.250); *Chisholm ex rel. CC v. Kliebert*, No. CIV.A. 97-3274, 2013 WL 4089981, at *11 (E.D. La. Aug. 13, 2013) ("federal regulations implementing the Medicaid Act make it clear that CMS approval is not a prerequisite for obtaining federal financial participation in the cost of these services, because the services are being provided pursuant to this Court's . . . Order."). Indeed, at least one other state has paused terminations and reinstated coverage pending notice revisions, supporting the feasibility of such steps. *See* PX241.

150

729.    Regardless, even significant costs would not tip the scales in Defendants' favor in this case. First, these costs stem from the Constitution and the Medicaid Act itself—not this Court's injunction. As the Seventh Circuit stated in enforcing the Food Stamp Act, "[b]ecause the defendants are required to comply with the [ ] Act . . . we do not see how enforcing compliance imposes any burden on them. The Act itself imposes the burden; this injunction merely seeks to prevent the defendants from shirking their responsibilities under it." *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986); *M.G. ex rel. Garcia v. Scrase*, No. 122CV00325, 2023 WL 3686751, at *9 (D.N.M. May 26, 2023), *aff'd M.G. through Garcia v. Armijo*, No. 23-2093, 2024 WL 4206966, at *11 (10th Cir. Sept. 17, 2024) ("Because the state has opted into the federal Medicaid program, it is required to comply with this obligation—in other words, providing these services is no additional burden on top of what Defendants have already promised to do," thus "the threatened injury to Plaintiffs greatly outweighs any possible injury to Defendants.").

730.    Second, the *Goldberg* Court already considered the competing equities at issue here and concluded that "the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens." 397 U.S. at 266.

731.    And courts have likewise rejected administrative or financial burdens as barriers to injunctive relief when other important constitutional rights are at stake. *See Watson v. Memphis*, 373 U.S. 526, 537 (1963) ("[I]t is obvious that vindication of

151

conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them"); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates."); *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009) ("matters of administrative convenience must ultimately give way when constitutional rights are in jeopardy.").

732.    Third, the costs associated with the remedies in this case are in large part due to Defendants' own choices. Defendants have had ample opportunities to update their computer systems to produce legally sufficient notices over the years—with 90 percent of the funding supplied by the federal government. *Supra* ¶¶ 243-49, 618. Defendants have consistently neglected those changes in favor of other projects. *Supra* ¶¶ 243-49. Permitting Defendants to avoid an injunction due to inflated costs resulting from their own neglect would improperly condone their purposeful delay. *Cf. Banks v. Trainor*, 525 F.2d 837, 842-43 (7th Cir. 1975) (rejecting concerns that defendants "are presently forced to pay approximately 1.6 million dollars per month in food stamp benefits in excess of the amount to which food stamp recipients in Illinois are entitled" because the situation could be "speedily remedied by their compliance with the modified injunction").

733.    When balancing the equities in this case, the question the Court must address is not whether there is any cost to the injunction, but *who* must bear the costs of the State's longstanding neglect of its notice infrastructure. In the absence of an injunction there are still substantial costs flowing from the States' notices; they are

152

currently being borne by hundreds of thousands of low-income Medicaid enrollees. Someone must bear the costs—and without an injunction requiring revised notices, a pause in terminations, and reinstatement, the State will be permitted to keep shifting the burdens onto low-income Medicaid enrollees who have a "brutal need" for health coverage. *Goldberg*, 397 U.S. at 261. In these circumstances, the State, not Medicaid enrollees should bear the burden of the State's inaction. *See, e.g.*, *M.R. v. Dreyfus*, 697 F.3d 706, 737 (9th Cir. 2012) ("[T]he balance of hardships favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources.").

### C. The Court has authority to order revisions to the notices, a pause in terminations, and reinstatement pending receipt of new notices.

734.  "Once invoked, the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (internal quotes omitted). Under Federal Rule of Civil Procedure 65(d) the injunction must "state in specific terms and reasonable detail the conduct that it restrains or requires." *Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013). When a court enjoins state officials, it is also appropriate to give those officials "latitude to find mechanisms and make plans to correct the violations." *Brown*, 563 U.S. at 543. Nonetheless, "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

735.   Plaintiffs have standing to support the injunctive relief requested here. None of the named Plaintiffs received adequate notice of their terminations, and Ms. Taylor, K.H., and A.V. are currently Medicaid-eligible and therefore will receive inadequate notices the next time DCF finds them ineligible, absent an order requiring maintenance of Medicaid coverage until the notices are revised. A.V. still has a gap in coverage, stemming from the May 16, 2023 notice, which she has never had a meaningful opportunity to challenge. C.D. has remained without coverage since DCF first terminated her in June 2023, following the inadequate April 24, 2023 notice, supporting the need for reinstatement.

### i. Defendants must revise the Medicaid termination notices.

736.   To remedy the notice violations, DCF must amend the notices so they clearly communicate the action being taken and the specific reasons for the action.

737.   When ordering revisions to notices, courts routinely specify what information must be included without prescribing the precise notice language or directing state officials on precisely how to effectuate the changes.

738.   For example in *Barry v. Corrigan*, the court's permanent injunction directed the notices to include several pieces of information such as "[t]he nature of the intended action and its duration" and "[t]he factual and legal bases for the action," including: "which type of criminal justice disqualification (e.g., fugitive felon status) is at issue," "the name of the person whose alleged conduct has resulted in the disqualification," "the date of the relevant warrant or conviction," and "identifying information, including but not limited to a warrant number, case number, or National

Crime Information Center number," "the jurisdiction where the conviction occurred or the warrant was issued," and "the name of a specific person or entity with knowledge of the basis for the disqualification." 79 F. Supp. 3d at 752, *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706.

739.    In *Kapps*, the Second Circuit affirmed an injunction requiring the state to update utility-assistance notices to provide information about the agency's decision "in such detail as is necessary to permit a reasonable person to understand the basis for the agency's action, including: information about the household's annual income, annual energy costs, statewide energy cost standards, energy burden ratio, the presence of vulnerable household members, and income tier, as well as benefit computations in worksheet form." 404 F.3d 105, 123 n.27 (2d Cir. 2005) (quoting *Kapps*, 283 F.Supp.2d at 882).

740.    Other courts have taken similar approaches. *See, e.g.*, *Rodriguez*, 985 F. Supp. at 1196 (directing that Medicaid termination notices must contain "(1) a statement of what action the state intends to take; (2) a statement detailing the reason for the denial including specific financial information where applicable; and (3) the applicable financial eligibility standard and the legal authority for the decision"); *Crawley*, 2009 WL 1384147, at *30 (directing defendants to provide notice that "details the factual reasons why their eligibility ended under the category for which they previously had been eligible" and "the factual reasons why they are not eligible under other relevant eligibility categories, including disability-based categories" and lists "the policy items under which the eligibility criteria they failed to meet are spelled out.").

155

741.   To satisfy Rule 65(d) the Court need only specify the minimum notice requirements and need not draft specific language to be included in the notice. Likewise, the Court can safely specify what needs to go into the notice while leaving Defendants flexibility to determine how to get the information into the notices. *See, e.g., C.R.*, 559 F. Supp. 3d at 1344 (permanently enjoining defendant from Medicaid service denials "without providing an explanation for the denial that satisfies the requirements of the Due Process Clause . . . and 42 C.F.R. § 431.210(b)."). This approach balances the need for specificity in injunction with appropriate deference to operation of state agency. *See M.G. through Garcia v. Armijo,* No. 23-2093, 2024 WL 4206966, at *11, *13-14 (10th Cir. Sept. 17, 2024) (affirming preliminary injunction "tailored . . . in such a way as to preserve as much discretion as possible" for Medicaid agency in determining how to comply with injunction). *Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 873 (7th Cir. 2013) ("[A] district judge might spell out the minimum housing required by federal law and leave it to [the state] to determine how to fulfil its obligations.").

742.   To comply with due process and the Medicaid Act, following a decision to terminate coverage based on income, the notices must, at minimum, clearly state the action the state is taking with respect to each household member and explain: (1) the individualized income and SFU size DCF used to find the individual ineligible; (2) what eligibility category the member was previously enrolled in; (3) the applicable income limit for that category and SFU size; and (4) a short description of the other population groups under which an individual might establish eligibility. *See Ortiz*, 794

156

F.2d at 893; *Crawley*, 2009 WL 1384147, at *30; *Dozier*, 2014 WL 5480815, at *10; *Rodriguez*, 985 F. Supp. at 1196.

743.    Nonetheless, to provide specific guidance to Defendants, the Court may also suggest language that would satisfy the minimum requirements. For instance, the Court could suggest that DCF could revise the notices to state underneath the 241 Reason Code:

**Here is the information we used to reach our decision for [Name]:**

1. You were previously enrolled in [population group][4].

2. We calculated your household's total countable income to be $[XX][5]. This is based on earned income of $[YY][6] and unearned income of $[ZZ].[7]

3. We determined your family size is [#].[8]

4. The income limit we applied is $[AA] per month.[9]

For more information on who is eligible for Medicaid and what the applicable income limits are for each group visit: [hyperlink].[10]

For more information on how we calculate countable income visit: [hyperlink].[11]

---

[4] Drawn from IQEL screen. *See, e.g.*, PX103.
[5] Drawn from MAGI field on the budget screen. *See* PX157 at DCF-1892 (Figure 2-99); PX100.
[6] Drawn from the earned income field on the budget screen. *See* PX157 at DCF-1892 (Figure 2-99); PX100.
[7] Drawn from the unearned income field on the budget screen. *See* PX157 at DCF-1892 (Figure 2-99); PX100.
[8] Drawn from the SFU field on the budget screen. *See* PX157 at DCF-1892 (Figure 2-99); PX100.
[9] Drawn from the existing income table in FLORIDA. Kallumkal Test., Tr. Vol. 6 at 32:4-5.
[10] Defendants could create updated income charts, like Appendix A-7, but which provide additional clarity, for instance, by explaining what "family size" or SFU means, and listing the upper-most income limit and including a short description of the various population groups.
[11] Defendants could create a new Fact Sheet that clearly lays out the rules for budgeting income for the various population groups.

744.   Further, the Court can specify that for income-termination notices Defendants must cease using Reason Codes 227, 249, 350 or any similar codes that state an individual is "still eligible," "receiving the same type of assistance," or is in the "same case."

### ii.  Defendants must pause terminations until notices are revised.

745.   Until the NOCAs are amended, DCF must pause terminations using the inadequate notices. To permit Defendants to continue terminating benefits using the current notices would simply not address the ongoing harms to class members.

746.   Courts in notice cases have routinely entered injunctions (preliminary and permanent) prohibiting defendants from reducing or terminating benefits until adequate notice is provided. *See Barry*, 79 F.Supp.3d at 752 (permanently enjoining defendant from "[d]enying, reducing, or terminating public assistance . . . without first providing notice . . ."); *K.W.*, 298 F.R.D. at 494 ("The defendants are prohibited from reducing or terminating Medicaid services . . .  to any class member . . . unless and until the defendants first provide adequate advance notice, approved by this Court."); *Dozier*, 2014 WL 5480815, at *14 (defendants preliminarily enjoined "from terminating any class member's" Medicaid benefits until defendants "provide each class member notice of their Medicaid eligibility under 42 U.S.C. § 1396a(a)(3) and its implementing regulations, 42 C.F.R. §§ 431.210-214 . . ."); *Rodriguez*, 985 F. Supp. at 1196 (defendant "enjoined from terminating or denying [Arizona Medicaid] benefits without providing written notices that include" specified information); *see also Washington v. DeBeaugrine*, 658 F. Supp. 2d 1332, 1339 (N.D. Fla. 2009) (ordering that

defendant "must not terminate or reduce a plaintiff's benefits in respects at issue in this case prior to affording the plaintiff a hearing meeting the requirements of this order.").

747.    The required relief includes ordering Defendants to pause class members' future Medicaid terminations until it has mailed each Plaintiff a separate, timely, and adequate notice of the reduction. *Kimble v. Solomon*, 599 F.2d 599, 605 (4th Cir. 1979).

### iii.  Defendants must prospectively reinstate class members who remain without Medicaid coverage.

748.    Some individuals who lost coverage due to Defendants' inadequate notices may have mitigated their injuries by reapplying or otherwise finding their way back to coverage. However, the record shows there are nearly 500,000 individuals who lost coverage and have not regained Medicaid coverage. Davis Test., Tr. Vol. 5 at 177:7-178:13; DX132. For this group—who are still suffering an unlawful deprivation of their protected Medicaid benefits—relief properly includes prospective reinstatement.

749.    "[I]n suits concerning a state's payment of public benefits under federal law, a federal court may enjoin the state's officers to comply with federal law by awarding those benefits in a certain way going forward[.]" *Price v. Medicaid Dir.*, 838 F.3d 739, 746-47 (6th Cir. 2016).

750.    The Ninth Circuit affirmed an injunction to "restor[e] class members to the" Medicaid services "they had prior to the Department's defective . . . Notice." *K.W.*, 789 F.3d at 974 (citing *Turner v. Ledbetter*, 906 F.2d 606, 609-10 (11th Cir. 1990) and *Kimble*, 599 F.2d at 605). Likewise, in *Haymons v. Williams*, the court enjoined

159

defendant "to reinstate, within 21 days from the date of this Order, home health care benefits under the Florida Medicaid program to all members of the plaintiff class until they have received advance notice and the opportunity for a hearing." 795 F. Supp. 1511, 1525 (M.D. Fla. 1992); *see also M.A. ex rel. Avila v. Norwood*, No. 15 C 3116, 2016 WL 11818203, at *11 (N.D. Ill. May 4, 2016) ("[D]efendant shall restore any in-home skilled nursing services to the plaintiffs and class members that were denied, reduced, lowered, or terminated on or after January 1, 2014"); *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 111 (4th Cir. 2013) (dismissing appeal following grant of preliminary injunction "reinstating [class members'] services to previously authorized levels and enjoining defendants (and their agents) from reducing their services without complying with the notice and hearing requirements of the Medicaid statute and the Fourteenth Amendment").

751.   Reinstatement or restoration of benefits is appropriate because "where [a state] failed to comply with the notice regulations, it has not instituted a legally effective reduction in its Medicaid benefits," and the right to Medicaid continues until such process is provided. *Kimble*, 599 F.2d at 604-05.

752.   In *Turner v. Ledbetter*, the Eleventh Circuit adopted the reasoning of *Kimble* and held that "[b]ecause the state did not terminate the recipients in accordance with federal notice requirements, the recipients' entitlement to aid was not affected." 906 F.2d at 609. Critically in *Turner*—as in *Kimble*—there was no dispute that a change in law rendered the plaintiffs ineligible for benefits at the time the complaint was filed. *Id.* at 608. Nonetheless, the plaintiffs were entitled to prospective relief to remedy harm

160

from the failure to provide adequate notices. As the Eleventh Circuit articulated, to hold otherwise "would frustrate the federal regulations by allowing the state to violate the . . . requirement of adequate notice, and at the same time claim to have legally terminated [benefit] recipients." *Id.* at 609.

753.   Not only is prospective reinstatement within the Court's authority, it is also the remedy most closely tailored to the harm. The *Goldberg* court emphasized the importance of *pre*-termination process for public benefits decisions, which "provides the means to obtain essential . . . medical care." *Goldberg*, 397 U.S. at 264. The loss of benefits "adversely affects his ability to seek redress from the welfare bureaucracy." *Id.* Without reinstatement, however, the Court's injunction itself would provide only *post*-termination notice and would not redress the very injury *Goldberg* warned of: "depriv[ing] an eligible recipient of the very means by which to live while he waits." *Id.*

754.   Moreover, the group of individuals terminated and who have not regained coverage includes those whose termination notice incorrectly threatened that they "will" have to repay benefits if they lose the hearing. *See supra* ¶ 195. To remedy that harm, these individuals are entitled to corrected notice and a new opportunity for a pre-termination hearing. And the record demonstrates that when DCF makes changes to the fair hearing paragraph, enrollees respond to those changes: When DCF updated the expedited fair hearing language, it saw a substantial increase in the number of requests for expedited hearings, from one to two a month to ten a week. Jones Test., Tr. Vol. 5 at 91:13-16.

161

755.   It is true that some individuals who are reinstated may ultimately be found ineligible following revised notice and a hearing. Notably, the *Goldberg* Court found this concern did not tip the equities in favor of the state. 397 U.S. at 266 (acknowledging increased expense from "benefits paid to ineligible recipients pending decision," but concluding that "the stakes are simply too high for the welfare recipient," to forego *pre*-termination process).

756.   Until DCF provides adequate notice, there is simply no way for DCF or the enrollees themselves to know whether DCF's termination decision was accurate or not. As the court in *Febus* concluded, other, lesser remedies—such as providing revised notice absent reinstatement—are inadequate to remedy the violation:

> The court has carefully considered defendant's suggestion that persons already terminated as a result of the defective notice simply be re-noticed, without reinstatement, and has rejected the proposal for several reasons. First, re-notification may not be sufficient to insure that eligible persons find their way back onto the rolls. Their confusion may only be worse compounded. Second, . . . [the] state will not be prevented from promptly initiating proper termination procedures against ineligible persons. Third, it may not be assumed that persons terminated to date via the improper notice have, by not objecting, impliedly conceded their ineligibility. The defendant's notice was so misleading that any inferences of this sort would be pure speculation.

866 Supp. at 47.

### iv.   Defendants must supply *Quern* notice regarding existing state procedures for retroactive restoration of coverage.

757.   While the Court is limited to ordering prospective relief, in public benefits cases, the Supreme Court has endorsed injunctions that direct defendants to explain the existence of state administrative procedures which may enable class members to

obtain retroactive benefits. *Quern v. Jordan*, 440 U.S. 332, 347 (1979).

758.   As the Court explained, "mere explanatory notice to applicants advising them that there [was] a state administrative procedure available if they desire[d] to have the state determine whether or not they may be eligible for past benefits," as well as a "simple returnable notice of appeal form," would be permissible injunctive relief. *Id.* at 336.

759.   Here, there are at least two state administrative procedures that can offer retroactive benefits to class members. First, is the fair hearing process itself, which, under 42 C.F.R. § 431.246, requires that "if . . . [t]he hearing decision is favorable to the applicant or beneficiary," then the state "agency must promptly make corrective payments, retroactive to the date an incorrect action was taken." Furthermore, DCF regulations permit individuals to submit hearing requests after the deadline where there is "good cause" for not meeting that deadline. Fla. Admin. Code. 65A-1.702(6).

760.   Separately, Defendants testified that they have a standard practice of retroactively restoring benefits when an error is discovered. *Supra* ¶¶ 294, 362, 416, 490. Indeed, Defendants have at various times used that "standard practice"— separate and apart from the fair hearing process—to retroactively restore coverage for Chianne D., Kimber Taylor, K.H., and A.V. *Id.*

761.   As part of the relief here, Defendants must include in any class notice an explanation of these existing state procedures.

762.   In that instance, each class member should receive notice that: (1) explains that they received inadequate notice previously when their benefits were

terminated and were, thus, unlawfully denied the opportunity to pursue a fair hearing, (2) supplies the missing individualized information regarding the income, SFU size, and population group used to effectuate the termination, and (3) explains that, if they believe the initial termination was wrong, the state has existing administrative procedures—including the fair hearing process and DCF's separate "standard practice"—that permit retroactive restoration of coverage which enables past medical bills to be reimbursed.

763.    This is permissible, prospective injunctive relief. Items (1) and (2) are the primary injunctive relief necessary to redress the notice injuries suffered by the class— namely the receipt of an inadequate notice. Item (3) is the ancillary notice of already-existing state procedures contemplated by *Quern. See, e.g. Kapps*, 404 F.3d at 112 n.10 (affirming district court judgment ordering "*Quern* notice" that "informed class members of the district court's holding and notified them that they might be able to appeal prior years' determinations through the state fair hearing process.").

764.    Providing notice of the existing state procedures does not run afoul of the Eleventh Amendment. The federal court would play no role in each particular class member's decision to take advantage of the state procedures or in the state's eligibility determination for past benefits. *Quern*, 440 U.S at 349. The notice is therefore "properly viewed as ancillary to the prospective relief already ordered by the court," *id.*—namely the required revision of termination notices.

765.    Supplying *Quern* notice of these state procedures to the class would allow class members like Jennifer V. to ask DCF to review its prior decision terminating A.V.

in 2023 and, if DCF found a mistake, to close her coverage gap and cover any bills incurred during that time. *See supra* ¶ 378.

766.   Defendants' Medicaid termination notices are inadequate under both the Due Process Clause of the Fourteenth Amendment of the United States Constitution and § 1396a(a)(3) of the Medicaid Act because they do not enable Medicaid recipients to understand what action is being taken or evaluate the accuracy of the eligibility decision. As a consequence, Medicaid enrollees across the State have suffered significant harms to their health, finances, and emotional well-being. These harms will continue as long as Defendants continue to use the unlawful notices. Defendants must revise the notices to supply the necessary case-specific income information. Until Defendants can provide adequate notices, they must provide ongoing Medicaid benefits for the class by restoring benefits for individuals currently without Medicaid coverage and pausing future terminations to prevent continuing harm. Finally, when issuing notice to the class regarding this order, Defendants must explain their existing state procedures that could enable individuals to seek retroactive coverage. Each of these remedies is necessary to address the particular harms flowing from Defendants' longstanding neglect of their Medicaid termination notices.

Dated: September 18, 2024

Respectfully submitted,

*By: /s/ Sarah Grusin*

**NATIONAL HEALTH LAW PROGRAM**          **FLORIDA HEALTH JUSTICE PROJECT**

Sarah Grusin (admitted *pro hac vice*)
Jane Perkins (admitted *pro hac vice*)
Miriam Heard (admitted *pro hac vice*)
Amanda Avery (admitted *pro hac vice*)

1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308

grusin@healthlaw.org
perkins@healthlaw.org
heard@healthlaw.org
avery@healthlaw.org

Katy DeBriere (FL Bar No. 58506)
Miriam Harmatz (FL Bar No. 562017)
Lynn Hearn (FL Bar No. 123633)
Ronnie Graham (FL Bar No. 1032153)
Jerron Wheeler (FL Bar No. 1032240)

debriere@floridahealthjustice.org
harmatz@floridahealthjustice.org
hearn@floridahealthjustice.org
graham@floridahealthjustice.org
wheeler@floridahealthjustice.org

166