## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CHIANNE D., *et al.*,

     Plaintiffs,

                                No. 3:23-cv-00985-MMH-LLL

v.

JASON WEIDA, in his official capacity
as Secretary for the Florida Agency for
Health Care Administration, and
SHEVAUN HARRIS, in her official
capacity as Secretary for the Florida
Department of Children and Families,

     Defendants.

_____/

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants respectfully propose the following Findings and Fact and Conclusions of Law for the Court's consideration.

# TABLE OF CONTENTS

FINDINGS OF FACT ................................................................................... 8

I.   OVERVIEW OF THE FLORIDA MEDICAID PROGRAM AND MEDICAID
     UNWINDING. ................................................................................. 8

   a.   Florida's Medicaid Program. ................................................... 8

   b.   Public Health Emergency and Unwinding. ............................10

II.  MEDICAID ELIGIBILITY DETERMINATIONS. ...................................12

   a.   Family-Related and SSI-Related Medicaid. ..........................12

   b.   Medicaid Eligibility Categories and Requirements. ............12

III. THE ACCESS FLORIDA SYSTEM. .................................................13

   a.   Florida's Integrated System. ................................................13

   b.   Eligibility Determinations. ..................................................14

   c.   Income Calculation and Requirements. ...............................15

   d.   Operations, Maintenance, and Enhancements. ...................19

   e.   Overview of the FLORIDA System. ..................................... 20

   f.   The FLORIDA System's Modules. ...................................... 22

   g.   Income Calculations in FLORIDA. ..................................... 25

   h.   Stored and Unstored Information. ...................................... 26

   i.   The ROM Process. .............................................................. 29

   j.   The 28,072-Hour Estimate. ..................................................31

   k.   The 12,000-Hour Estimate. ................................................ 32

IV.  PLAINTIFFS AND CLASS MEMBERS. ........................................... 34

   a.   Chianne D. and C.D. ......................................................... 34

   b.   Kimber Taylor and K.H. ..................................................... 36

c.   A.V. ................................................................................. 38

d.   Lily Mezquita.................................................................. 39

e.   Class Definition. ............................................................. 40

f.   Ascertaining the Class and the Cost of Classwide, Prospective
     Reinstatement. ............................................................... 41

     i.    *Class Size*.............................................................. 41

     ii.   *Average Monthly Cost*.......................................... 42

g.   Post-Partum Coverage. .................................................. 44

V.   NOTICES OF CASE ACTION. ........................................................... 46

a.   Consolidated Notices. .................................................... 47

b.   Overview of Notices. ...................................................... 47

c.   P.O. Box and Other Contact Information. ...................... 48

d.   The Fair-Hearing Language and Other Footer Information. ............. 48

e.   Medically Needy Language. ........................................... 50

f.   Plaintiffs' Receipt and Understanding of NOCAs. ............... 51

     i.     *A.V.* ..................................................................... 51

     ii.    *Lily Mezquita.* ..................................................... 52

     iii.   *Chianne D. and C.D.* ........................................... 53

     iv.    *Kimber Taylor and K.H.* ...................................... 56

     v.     *Other NOCAs.* ...................................................... 57

     vi.    *The SHADAC Report.* ........................................... 57

g.   Information Plaintiffs Contend Must Be Added to NOCAs................ 59

     i.     *Income Limit*......................................................... 59

     ii.    *The Income Amount.* ........................................... 60

     iii.   *The SFU Size.* ....................................................... 61

VI.    RECENT CHANGES TO NOCAs AND THE ACCESS FLORIDA SYSTEM. .......... 63

    a.    Link to Webpage. ........................................................................ 63

    b.    Repayment of Benefits. ............................................................... 63

    c.    The Income Sentence. .................................................................. 64

    d.    The "Medically Needy" Heading. ............................................... 65

    e.    The Fair-Hearing Paragraph. ...................................................... 65

    f.    The Reason Code 241 Change. ..................................................... 65

    g.    ACCESS Modernization Project. ................................................. 67

VII.    DCF's FAIR-HEARING PROCESS. ............................................................ 72

    a.    The Fair-Hearing Language in All NOCAs. ................................. 73

    b.    Methods of Requesting a Fair Hearing. ...................................... 74

    c.    Supervisory Review and Acknowledgement of Hearing Request. ...... 75

       i.    *Supervisory Review and Conference.* ................................ 75

       ii.    *Fair-Hearing Packet.* ......................................................... 77

       iii.    *Acknowledgment of Hearing Request.* ............................ 78

    d.    Fair-Hearing Statistics. ............................................................... 79

    e.    Knowledge and Use of Fair-Hearing Procedures. ..................... 81

       i.    *Chianne D. and C.D.* ......................................................... 81

       ii.    *Lily Mezquita.* ................................................................... 83

       iii.    *A.V.* ..................................................................................... 84

       iv.    *Kimber Taylor and K.H.* .................................................. 84

VIII.    DCF's CALL CENTER. ............................................................................ 86

    a.    Overview of the Call Center. ....................................................... 86

    b.    Call-Center Operations. ............................................................... 86

c.      Increase in Call-Center Staffing. ......................................... 89

d.      The Customer's Experience. ................................................. 90

e.      Call-Center Metrics. ........................................................... 91

f.      Quality Assurance. ............................................................. 93

g.      Information Available to Call-Center Staff. ......................... 94

h.      Plaintiffs' and Other Witnesses' Use of the Call Center..................... 95

        i.      *Mr. Ramil.* ............................................................ 95

        ii.     *Chianne D. and C.D.* ............................................ 96

        iii.    *Kimber Taylor and K.H.* ...................................... 99

        iv.     *A.V.* .................................................................... 99

        v.      *Lily Mezquita.* ................................................... 100

IX.     OTHER PUBLICLY AVAILABLE SOURCES OF INFORMATION. ......................... 101

        a.      DCF's Website. .......................................................... 101

                i.      *Policy Manual.* ................................................ 102

                ii.     *Appendix A-7.* ................................................. 103

                iii.    *Medicaid Fact Sheets* ...................................... 103

                iv.     *Medically Needy Brochure.* ............................ 104

        b.      Family Resource Centers. ........................................... 104

                i.      *Overview.* ....................................................... 104

                ii.     *Locating and Visiting.* .................................... 105

                iii.    *Assistance* ...................................................... 106

                iv.     *Plaintiffs' and Other Witnesses' Use of Family Resource
                        Centers.* ......................................................... 107

        c.      State and Federal Law.................................................. 109

        d.      Acknowledgment of Fair Hearing. ............................... 109

e.      Free Legal Services...................................................................110

f.      Advocates. ..............................................................................110

CONCLUSIONS OF LAW ......................................................................112

I.      INTRODUCTION. ..................................................................112

II.     PLAINTIFFS' AND ABSENT CLASS MEMBERS' STANDING. ............113

    a.      C.D. and Chianne D. .....................................................114

    b.      Class Member Standing. .................................................115

III.    DUE PROCESS.....................................................................120

    a.      Legal Standard. ............................................................120

    b.      Standardized Notices Comply with Due Process. ..............122

    c.      Duty of Inquiry and Actual Knowledge. ..........................125

    d.      Other Publicly Available Sources of Information. ..............130

    e.      Fair-Hearing Procedures. ...............................................136

IV.     MEDICAID ACT REGULATIONS. .............................................139

    a.      Enforceability Under 42 U.S.C. § 1983. ..........................139

        i.      *The Medicaid Act Provision That Plaintiffs Seek to Enforce Is Not Enforceable Under Section 1983.* ...........................139

        ii.     *The Medicaid Regulations That Plaintiffs Seek to Enforce Are Not Enforceable Under Section 1983.* ...........................142

    b.      Compliance with 42 C.F.R. §§ 431.206(b) and 431.210(a)–(b)..........145

        i.      *Statement of Intended Action and Clear Statement of Specific Reasons.* ........................................................145

        ii.     *Right to Fair Hearing and Method of Obtaining Fair Hearing.*..150

V.      INJUNCTIVE RELIEF. ..........................................................151

    a.      Legal Standard. ............................................................151

b. Threat of Irreparable Injury Absent an Injunction..........................152

c. Potential Harm to Defendants and the Public Interest. ...................156

 i. *Reinstatement of Class Members and Pause in Terminations*. ...156

 ii. *Information Plaintiffs Contend Must Be Added to NOCAs*. .........160

  1. *The Income Limit.* ....................................................161

  2. *The Income Amount.* ...............................................162

  3. *The SFU Size.* .........................................................164

  4. *Eligibility Categories.* ..............................................165

  5. *Eligibility Categories Evaluated by DCF.* ...............................165

d. Plaintiffs Sought Only Prospective Relief. .........................................166

VI. Conclusion. ............................................................................170

## FINDINGS OF FACT

### I. OVERVIEW OF THE FLORIDA MEDICAID PROGRAM AND MEDICAID UNWINDING.

1.     Medicaid is a federal-state cooperative health care program jointly funded by the States and the federal government. ECF No. 128 at 6 ¶ 1.

2.     The Centers for Medicare and Medicaid Services ("CMS") of the United States Department of Health and Human Services administers Medicaid at the federal level. ECF No. 128 at 6 ¶ 2.

### a.     Florida's Medicaid Program.

3.     Florida participates in Medicaid. ECF No. 128 at 6 ¶ 5.

4.     As a State that participates in the Medicaid program, and as required by the federal Medicaid Act, 42 U.S.C. §§ 1396–1396w-7, Florida has developed a Medicaid State Plan that describes the nature and scope of its Medicaid program. ECF No. 128 at 6 ¶ 3; D. Ex. 42.

5.     Florida's Agency for Health Care Administration ("AHCA") is the single state agency designated to administer or supervise the administration of Florida's Medicaid program. 42 C.F.R. § 431.10(b)(1); Fla. Stat. § 409.902(1); ECF No. 128 at 6 ¶ 6.

6.     The Florida Legislature has vested the Department of Children and Families ("DCF") with responsibility to make Medicaid eligibility determinations, including the issuance of notices of those determinations. Fla. Stat. § 409.902(1); ECF No. 128 at 7 ¶ 7.

7.    DCF's Office of Economic Self Sufficiency ("ESS") is responsible for administering several federal and state public-assistance programs, including cash assistance (TANF) and food assistance (SNAP) and eligibility determinations for Medicaid. ECF No. 128 at 10 ¶ 23.

8.    ESS's Medicaid Policy Unit—or "Program Office"—is responsible for the DCF policies and procedures that govern public-assistance programs throughout Florida. T2 at 7:8–21; T4 at 115:7–10.

9.    DCF maintains a document called the Economic Self-Sufficiency Program Policy Manual (the "Policy Manual"). ECF No. 128 at 7 ¶ 11; D. Exs. 1–9; P. Exs. 177–192.

10.    Among other things, the Policy Manual describes the rules that govern Medicaid eligibility determinations and defines terms used in Florida's Medicaid program. ECF No. 128 at 7–8 ¶¶ 11–12.

11.    The Policy Manual also has appendices, such as Appendix A-7, which is a chart entitled "Family Related Medicaid Income Limits." ECF No. 128 at 7–8 ¶¶ 11–12.

12.    Within ESS, there are six regions that are responsible for oversight of daily operations, including eligibility determinations, staff training, and DCF's participation in the fair-hearing process. T5 at 42:7–20, 188:18-19.

13.    ESS also operates customer-service offices known as family resource centers, T5 at 185:4–24, and a customer call center, T4 at 193:6–9.

14.     Family resource centers are physical office locations across the State that DCF's customers can visit for information about all programs for which DCF determines eligibility. T5 at 185:17–24, 197:7–15.

15.     The call center serves as an access point that allows customers to ask questions about their public-assistance cases. T4 at 193:10–14.

16.     Florida Healthy Kids Corporation—not DCF—determines eligibility for KidCare, which is Florida's Children's Health Insurance Program under Title XXI of the Social Security Act. ECF No. 128 at 7 ¶ 8.

### b.     Public Health Emergency and Unwinding.

17.     During the COVID-19 pandemic, Congress enacted federal legislation that increased the federal medical assistance percentage, or FMAP, by 6.2 percentage points. *See* Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008(a), 131 Stat. 178, 208 (2020). The FMAP is the rate that determines the amount of federal financial participation, or FFP, that a State receives. ECF No. 128 at 9 ¶ 17.

18.     To receive the increase in the FMAP, Congress required States to treat any person who was enrolled in Medicaid on March 18, 2020—or who enrolled between March 18, 2020, and the end of the month in which the emergency period ended—as eligible for Medicaid until the end of the month in which the emergency period ended (unless the person requested voluntary termination of eligibility, ceased to be a resident of the State, or is deceased). Families First Coronavirus

Response Act, Pub. L. No. 116-127, § 6008(b)(3), 131 Stat. 178, 208–09 (2020); ECF No. 128 at 9 ¶ 18.

19.    To obtain the enhanced funding, DCF implemented processes to maintain Medicaid eligibility pursuant to the Families First Coronavirus Response Act's continuous enrollment condition. ECF No. 128 at 9 ¶ 19.

20.    In December 2022, Congress provided that the continuous enrollment condition would end on March 31, 2023. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 5131(a)(2)(C)(iv), 136 Stat. 4459, 5949 (2022). As a result, federal law required States to resume Medicaid redeterminations and otherwise return to normal eligibility and enrollment operations. *Id.*; ECF No. 128 at 10 ¶ 20.

21.    This process is commonly called "unwinding." ECF No. 128 at 10 ¶ 21.

22.    Millions of Floridians enrolled in Medicaid before unwinding began. T2 at 152:8–12.

23.    In Florida, the unwinding period began on April 1, 2023, and concluded in March 2024. T5 at 201:16–22. In mid-March 2023, DCF began to conduct eligibility redeterminations in advance of the commencement of the unwinding period. T5 at 201:16–22; ECF No. 128 at 10 ¶ 22.

24.    During the unwinding period, DCF redetermined the eligibility of more than 4 million Medicaid recipients. T5 at 201:8–11.

25.    Plaintiffs presented the testimony of four of the more than 4 million Medicaid recipients whose eligibility DCF redetermined during the unwinding period. T1 at 14; T2 at 181; T3 at 51; T3 at 118.

## II.   MEDICAID ELIGIBILITY DETERMINATIONS.

26.   A Medicaid recipient's eligibility for Medicaid is redetermined annually unless an eligibility review is triggered during the 12-month review period. T4 at 121:8–14; P. Ex. 179 at DCF-002639; ECF No. 128 at 19–20 ¶ 7.

### a.   Family-Related and SSI-Related Medicaid.

27.   Family-related Medicaid is Medicaid provided to individuals whose eligibility is predicated on family relationships: children, parents and other caretakers, pregnant women, and individuals under age 26 who were enrolled in Medicaid when they aged out of foster care. D. Ex. 1 at DCF-003169-70; ECF No. 128 at 8 ¶ 13.

28.   SSI-related Medicaid is Medicaid provided to individuals whose eligibility is predicated on Title XVI of the Social Security Act: needy individuals who are aged, blind, or disabled in the community or with special living arrangements. D. Ex. 1 at DCF-003171-72; ECF No. 128 at 8 ¶ 13.

### b.   Medicaid Eligibility Categories and Requirements.

29.   The eligibility requirements for family-related Medicaid ("MFAM") and SSI-related Medicaid ("MSSI") differ. *See* D. Exs. 1–9 (chapters of the Policy Manual distinguishing MFAM and MSSI); P. Ex. 177–192 (same); D. Ex. 27 (MSSI Fact Sheet); D. Ex. 28 (MFAM Fact Sheet).

30.   Within both family-related Medicaid and SSI-related Medicaid, individuals who seek coverage must come within defined eligibility categories (a.k.a. coverage groups). T4 at 119:4–20.

31.     Each eligibility category has its own eligibility requirements, such as age, citizenship, residency, and income limits[1] (and in MSSI, asset limits). T4 at 119:21–120:9.

32.     DCF refers to non-financial eligibility requirements such as citizenship status and state of residence—*i.e.*, eligibility requirements other than income and asset limits—as technical requirements. T2 at 11:23–13:1; T4 at 120:10–12.

33.     DCF evaluates all eligibility categories whenever it assesses an individual's eligibility for Medicaid. T4 at 123:20–23; 42 C.F.R. § 435.916(d)(1).

34.     A customer who would be eligible for Medicaid but for the income limit is enrolled in the Medically Needy program. Fla. Stat. § 409.904(2); T2 at 13:2–6, 180:3–8; T4 at 120:13–121:7. Each month, an individual's Medically Needy coverage begins when his or her assistance group incurs allowable medical expenses equal to its share of cost. ECF No. 128 at 8 ¶ 14; Fla. Admin. Code r. 65A-1.702(1)(d). The individual then receives full Medicaid coverage for the remainder of the month. ECF No. 128 at 8 ¶ 14.

## III.    THE ACCESS FLORIDA SYSTEM.

### a.      Florida's Integrated System.

35.     The ACCESS Florida System supports ESS's performance of Medicaid eligibility determinations. ECF No. 128 at 10 ¶ 23; T5 at 205:8–13.

---

[1] This brief uses "income limit" and "income standard" interchangeably.

36.     The ACCESS Florida System is Florida's integrated eligibility system for benefit programs, including Medicaid. T4 at 115:17–116:3; T5 at 116:18–21.

37.     The ACCESS Florida System consists of 28 different interconnected systems, including a mainframe system called FLORIDA, which is the primary system involved in Medicaid eligibility determination, authorization, and benefits issuance. T5 at 119:17–121:23. Other ancillary component systems built around the mainframe include a customer-facing portal, a worker portal used by DCF staff, and document management and imaging systems. T5 at 119:17–121:23, 124:2-8.

### b.   <u>Eligibility Determinations.</u>

38.     As federal law requires, 42 C.F.R. § 435.916(d)(1); ECF No. 128 at 20 ¶ 8, when the ACCESS Florida System determines a Medicaid recipient's eligibility, it evaluates all coverage groups—*i.e.*, all potential bases of eligibility—to determine whether the recipient remains eligible for Medicaid. T4 at 123:20–23.

39.     When DCF determines an individual's Medicaid eligibility, the ACCESS Florida System reviews technical requirements first. T4 at 121:15–20.

40.     If the individual does not satisfy all technical requirements, then the system does not evaluate compliance with the income limit. T4 at 19:1–8, 121:21–122:5.

41.     If the individual satisfies all technical requirements, then the system evaluates compliance with the income limit (and in MSSI, the asset requirement). T2 at 11:23–13:1; T4 at 122:6–9.

42.     Thus, when it determines eligibility for family-related Medicaid, the ACCESS Florida System reviews income last—and only if necessary. T4 at 121:21–122:9.

43.     Effective in 2022, individuals who are enrolled in Medicaid while pregnant are eligible for 12 months of post-partum coverage, regardless of increases in income. ECF No. 128 at 8–9 ¶ 16; Fla. Stat. § 409.903(5). Florida extended the post-partum period from 2 months to 12 months in 2022. ECF No. 128 at 8–9 ¶ 16; Ch. 2021-41, § 5, Laws of Fla.

44.     Florida also extends one-year of continuous coverage, regardless of changes in income, to children under age five and six-month of continuous coverage to children under age 19. ECF No. 128 at 38–39 ¶ 9; 42 U.S.C. § 1396a(e)(12); Fla. Stat. § 409.904(6).

**c.    Income Calculation and Requirements.**

45.     In assessing income eligibility for full Medicaid, DCF must count the total gross income of the standard filing unit, or SFU; subtract one or more deductions or disregards from gross income to arrive at the SFU's countable net income; and then compare the countable net income to the individual's applicable income limit, as found on Appendix A-7. T2 at 154:21–23, 155:16–22, 156:10–18, 156:25–160:11; T4 at 44:11–45:13.

46.     An individual's SFU consists of all individuals whose income is considered together in the determination of the individual's eligibility. D. Ex. 7 at DCF-002712.

47.    For family-related Medicaid, these income calculations are performed in five steps. P. Ex. 186 at DCF-002949; T2 at 156:25–160:11.

48.    In Step 1, the total gross income is identified; the total gross income is the sum of gross earned and gross unearned income. P. Ex. 186 at DCF-002949; T2 at 158:2–11. The Policy Manual defines the contours of "earned income" and "unearned income." D. Ex. 5 at DCF-003186 § 1830.0101.

49.    In Step 2, any verified pretax income exclusions are deducted, as are allowable income tax deductions from Line 22 of the Internal Revenue Service's Schedule 1 (Form 1040), and allowable tax deductions for financial aid or self-employment. P. Ex. 186 at DCF-002949; T2 at 158:15–21; D. Ex. 5 at DCF-003186 § 1830.0101 (defining pretax income exclusions); D. Ex. 5 at DCF-003187 § 1830.0122 (providing for verification of income).

50.    For example, child support payments are not considered "countable" income. T2 at 27:15–21; D. Ex. 5 at DCF-003186-92 (identifying items that are excluded from income)

51.    The output of Step 2 is referred to as Modified Adjusted Gross Income, or MAGI. P. Ex. 186 at DCF-002949.

52.    In Step 3, the appropriate standard disregard is deducted form MAGI. This results in the countable net income. P. Ex. 186 at DCF-002949; T2 at 158:25–159:7. The appropriate standard disregard comes from Appendix A-7. D. Ex. 8. Step 3 is only performed when evaluating eligibility for Medicaid; it is not done when

assessing eligibility for the Medically Needy program. T2 at 159:8–11; Fla. Admin. Code r. 65A-1.708(3).

53.    In Step 4, countable net income is compared to the individual's income standard from Appendix A-7. P. Ex. 186 at DCF-002949; T2 at 1159:12–22. If the countable net income is less than or equal to the income standard, then the individual is eligible for Medicaid. P. Ex. 186 at DCF-002949. If not, then the calculation proceeds to Step 5. P. Ex. 186 at DCF-002949; T2 at 159:23–160:1.

54.    An individual's income standard is based on the size of the individual's SFU. P. Ex. 187 at DCF-003042 ("Eligibility for Medicaid is determined by comparing the SFU's countable income to the appropriate income standard."). The individual's tax-filing status determines who the members of the individual's SFU are. 42 C.F.R. § 435.603(f); D. Ex. 6 at DCF-003136–37.

55.    The SFU is not always the same as the household size because some household members might not be included in the SFU. Each individual's SFU is determined by applying one of three tax-status rules: (1) the Filer Rule; (2) the Tax Dependent Rule; or (3) the Non-Filer Rule. D. Ex. 6 at 28–29. Each rule may result in a different SFU composition. D. Ex. 6 at DCF-003136–37.

56.    Income limits for Medicaid are based on a percentage of the federal poverty level, and each eligibility category has its own income limit. T2 at 15:3–14. Income limits are updated annually when the federal poverty level is updated. *Id.*

57.    In Step 5, if the individual is not eligible for full Medicaid after Step 4, the MAGI disregard (5 percent of the federal poverty level for the SFU size) is

deducted from countable net income. P. Ex. 186 at DCF-002949; T2 at 159:23–160:1. If the individual's income is less than or equal to the income standard, then the individual is eligible for Medicaid; if not, then the individual is ineligible for Medicaid but is enrolled in the Medically Needy program. P. Ex. 186 at DCF-002949; T2 at 160:5–11.

58.     If an individual satisfies all technical eligibility requirements but is over income, then the individual is ineligible for Medicaid, and instead is automatically enrolled in the Medically Needy program. T2 at 13:2–6, 180:3–8; T4 at 120:13–121:7; P. Ex. 186 at DCF-002949.

59.     Stated otherwise, if a Medicaid recipient is terminated from Medicaid because of income, then the recipient is simultaneously enrolled in the Medically Needy program. T4 at 122:19–22.

60.     At that point, the ACCESS Florida System generates a notice—called a Notice of Case Action, or "NOCA"—that informs the recipient in a "Medicaid" section that the recipient's Medicaid benefits will end on a date certain and in a "Medically Needy" section that the recipient is being enrolled in the Medically Needy program because the recipient's income exceeds the limit for full Medicaid benefits. T4 at 122:23–123:4, 145:23–146:6, 147:16–148:6; D. Ex. 98 at DCF-0005273.

61.     Unlike full Medicaid, an individual enrolled in the Medically Needy program must incur a certain amount of allowable medical expenses each month—known as a share of cost—before Medicaid eligibility begins. T4 at 120:18–24; Fla. Admin. Code r. 65A-1.701(64), 65A-1.702(1)(d).

18

**d.**   **Operations, Maintenance, and Enhancements.**

62.    DCF has approximately 20 staff members that provide IT support for the ACCESS Florida System, in addition to 18 outsourced staff from a vendor, Deloitte. T5 at 117:6–17.

63.    Deloitte assists DCF with the ACCESS Florida System's operation and maintenance. T4 at 116:20–24; ECF No. 128 at 11 ¶ 30.

64.    Mr. Hari Kallumkal is a managing director at Deloitte Consulting, and the sole managing director who oversees Deloitte's performance under a contract with DCF for operations, maintenance, and enhancements of the ACCESS Florida System. T5 at 204:9–205:7.

65.    Under that contract, Mr. Kallumkal manages a team that makes sure the ACCESS Florida System continues to operate correctly. T5 at 205:15–23.

66.    Deloitte's contract with DCF allocates a maximum of 3,150 hours per quarter to system enhancements, including changes to notices and modifications that account for federal and state legislative changes to public-assistance programs. T5 at 158:16–159:1, 206:25–207:19, 213:15–18.

67.    An enhancement is a change to the system that adds a functionality that does not exist in the system. T6 at 6:12–14.

68.    The time and technical skill required to make a system change varies from project to project. T4 at 190:1–6; T5 at 168:22–169:9.

69.     DCF and Deloitte work together to prioritize system enhancements in compliance with the contractual limit on enhancement hours. T5 at 158:21–159:25, 207:13–19.

70.     To exceed the contractual limit on enhancement hours, DCF and Deloitte must either execute a separate contract or amend their contract, T5 at 210:10–17, which involves a highly regulated procurement, an amendment to the planning document that DCF submits to its federal partners, and a legislative release of funds to DCF, T5 at 160:11–17, 161:11–162:18.

71.     Alternatively, the project may be performed over multiple quarters to ensure compliance with the contractual limit on enhancement hours. T6 at 20:25–21:8.

72.     Once the project becomes a priority, Deloitte executes the necessary changes to the system. T4 at 116:25–117:13.

**e.     Overview of the FLORIDA System.**

73.     The FLORIDA system is one of the 28 components that comprise DCF's ACCESS Florida System. T5 at 210:21–23.

74.     The FLORIDA system is the primary system involved in Medicaid eligibility determination, authorization, and benefits issuance. T5 at 119:17–121:12.

75.     The FLORIDA system is DCF's legacy mainframe system that was first deployed in Florida in 1991—about 33 years ago. Its functionality is limited in light of its age and antiquated technology. T5 at 122:5–123:20; ECF No. 128 at 10 ¶ 24.

76.     The FLORIDA system is built on technology that dates to the 1980s. T5 at 122:12–14. It relies on COBOL programming language and IMS hierarchical databases that computer systems built today do not utilize. T5 at 122:15–19, 236:14–237:21.

77.     For example, the FLORIDA system has more than 9 million lines of code. T5 at 122:24–25. If the same functionality were rewritten today with a modern programming language like .NET or Java, then it would not require anywhere near 9 million lines of code. T5 at 122:24–123:5. Visually, the user interface is an old-fashioned green screen navigated not with a mouse, but by pressing the "tab" key to move the cursor from field to field. T5 at 144:9–19.

78.     Because of the system's outdated technology, it is difficult even to find developers who can work on the system. T5 at 123:6–13.

79.     Deloitte helps to generate notices for more than 20 States. T6 at 59:1–5. Of those States, Florida is the only one with a system that employs 35- to 40-year-old technology. T6 at 59:17–60:1. For example, a few years ago, Oregon built a brand-new system that employs current technologies. T6 at 62:25–63:6, 82:14–24.

80.     These limitations aside, the FLORIDA system is critical to Medicaid eligibility determination, authorization, and benefits issuance, and is a key source of information about the basis of DCF's eligibility determinations. T2 at 10:4–7; T5 at 120:25–121:4.

81.     The FLORIDA system is the system in which customer information is entered and collected, cases are created and maintained, eligibility is determined,

benefits are calculated and issued, and DCF's eligibility specialists approve, deny, and terminate cases. T5 at 211:7–14.

82.     While the eligibility-determination process is automated, DCF's eligibility specialists engage with customers to collect information and review for accuracy and completeness the information that customers provide through their online applications. T4 at 116:4–19.

83.     Once an applicant's information is populated, the FLORIDA system automatically applies eligibility rules to generate an eligibility determination. T2 at 23:6–11.

### f.     <u>The FLORIDA System's Modules.</u>

84.     The FLORIDA system houses three modules that determine eligibility for Medicaid: the SFU module, the Eligibility Determination and Benefit Calculation ("EDBC") module, and the authorization module. T5 at 221:16–222:20.

85.     The eligibility determination process begins when automated processes read data from an application stored in a database outside the FLORIDA system. T5 at 223:22–224:12.

86.     If the available data is insufficient to determine eligibility, a record will be sent to an eligibility specialist to supply the additional information. T5 at 224:22–225:5.

87.     Once the necessary data is collected, the SFU module builds filing units, or groups of people who must be tested together to determine an individual's eligibility for Medicaid. T5 at 225:6–226:1.

88.     The SFU module then invokes the EDBC module to evaluate the filing units that the SFU module constructed, to read the collected data, and to determine the individual's eligibility. T5 at 226:2–5, 227:4–20.

89.     When the EDBC module evaluates an individual's income, it applies the income exclusions, deductions, and disregards required to determine eligibility. T5 at 229:24–230:5.

90.     If the EDBC module determines that the individual is ineligible because of income, a screen informs the eligibility specialist that the individual is ineligible for Medicaid. T5 at 231:14–21.

91.     When the eligibility specialist presses the enter key, the EDBC module invokes the SFU module to assess the individual's eligibility for other programs, and the income calculations generated in evaluating eligibility for Medicaid are deleted automatically. T5 at 220:25–221:8, 228:6–232:8.

92.     When the SFU and EDBC processes are complete and the system has determined eligibility, the eligibility specialist must approve, deny, or close the benefits in the authorization module. T5 at 235:18–23.

93.     Until the eligibility specialist approves, denies, or closes the benefits, the eligibility determination is not effectuated. T6 at 86:1–7.

94.     Next, several intermediate processes extract information stored in databases in the FLORIDA system to place that information on NOCAs. T5 at 239:14–18.

95.     The first is the process that extracts the data. T5 at 239:23–25.

96.     The authorization module creates notice triggers in the system to indi-cate to the system that a NOCA will be generated. T5 at 239:23–240:2, 241:5–7.

97.     A nightly process locates and extracts the triggers, and additional pro-gramming retrieves from the databases the rest of the information needed for the NOCAs. T5 at 241:8–242:9.

98.     Once the extract process gathers the information to be displayed on the NOCA, the data is sent to the notices system. T5 at 243:11–21.

99.     The notices system is one of the 28 systems that comprise the ACCESS Florida System. T5 at 243:22–25.

100.    The notices system processes the data and consolidates it to ensure that all information to be sent to an individual is packaged in a single notice. T5 at 244:7–20, 245:6–13.

101.    The data then undergoes a formatting process that organizes the output of the consolidation process in one or more files that ExStream—a third-party soft-ware product—can understand. T5 at 245:16–20, 246:10–13.

102.    ExStream then uses templates to prepare formatted NOCAs. T5 at 246:5–9.

103.    Finally, the client notices history process decides whether the NOCA must be printed and mailed or an email notification must be sent to the customer. T5 at 246:17–247:7. The customer elects to receive either a notification by email or a physical notice by mail; this election is made on the application. T4 at 123:6–19.

24

104.   Any change to the items of information displayed on NOCAs requires modifications to the entire process described above. T5 at 247:10–13.

**g.    Income Calculations in FLORIDA.**

105.   Currently, the FLORIDA system does not store all case-specific information used to determine an individual's eligibility for Medicaid. T5 at 220:14–221:8.

106.   When an individual is determined to be ineligible for Medicaid—or "fails" Medicaid—because the individual's income exceeds the income standard, the FLORIDA system proceeds to assess the individual's eligibility for the Medically Needy program. T5 at 220:14–221:8.

107.   When the EDBC module has determined that the individual is ineligible for Medicaid because of income and invokes the SFU module to assess the individual's eligibility for the Medically Needy program, the FLORIDA system deletes—or wipes out—the income calculations it performed to assess eligibility for Medicaid. T5 at 220:14–221:8, 228:7–24, 230:22–232:8.

108.   Because these income calculations are deleted, they cannot be retrieved and displayed on NOCAs. T5 at 242:17–243:5.

109.   The FLORIDA system was designed to delete income calculations at this stage of the process when the system was first developed in Ohio in the 1980s. T5 at 232:6–19.

110.   If the FLORIDA system were modified to not delete the income calculations, without creating a new database to store the information, then the SFU

25

module, the EDBC module, and the authorization module, as well as the subsequent processes, would fail. T5 at 232:20–25, 238:22–25; T6 at 87:7–10.

111.    To store the income calculations that the FLORIDA system currently deletes, it would be necessary to design a new database within the FLORIDA system to store the information. T5 at 236:2–7, 237:22–238:4; T6 at 87:7–13.

### h.    Stored and Unstored Information.

112.    In contrast to the income calculations performed by the EDBC module, the income that an individual initially reports to DCF—or that is reported to the FLORIDA system—is retained in the FLORIDA system. T2 at 28:15–25; T6 at 51:10–13.

113.    The applicant is the primary source of most information, though some information, including some income information, is sourced or gathered from third-party sources, such as The Work Number, the State Wage Information Collection Agency (SWICA), and the Federal Data Services Hub. T2 at 21:5–17, 174:23–176:2; T4 at 215:15–21.

114.    Thus, even if an individual fails Medicaid because of income, the FLOR-IDA system stores—and the budget screen for Medically Needy coverage displays—the individual's earned income and unearned income, as well as the individual's SFU size. T6 at 52:1–8, 77:7–10; P. Ex. 100.

115.    Earned income and unearned income together make up the individual's total gross income—*i.e.*, the individual's income before disregards and deductions are applied. P. Ex. 186 at DCF-002949. DCF's computation of total gross

income is the same for the Medicaid and Medically Needy programs. T2 at 158:12-14; T6 at 52:1–5.

116.   However, the countable net income that is compared to the income limit and is used to determine the individual's eligibility for Medicaid is part of the income calculations that are deleted when an individual fails Medicaid because of income. T2 at 160:12-162:4; T6 at 74:13–22, 78:15–22.

117.   While the budget screen for Medically Needy coverage displays countable net income for purposes of the Medically Needy program, that number differs from the countable net income for purposes of Medicaid. T2 at 158:25-160:4; T6 at 74:13–22, 78:15–22; D. Ex. 8; Fla. Admin. Code r. 65A-1.708(3).

118.   Specifically, the standard disregard and, in some cases, the MAGI disregard apply when calculating countable net income for purposes of Medicaid, but do not apply to the Medically Needy program. T2 at 158:25-160:4; T6 at 74:13–22, 78:15–22; D. Ex. 8; Fla. Admin. Code r. 65A-1.708(3).

119.   The budget screen therefore displays a standard disregard when an individual is determined to be eligible for Medicaid, but not when the individual fails Medicaid because of income and is enrolled in the Medically Needy program. P. Ex. 100; P. Ex. 101; T2 at 161:6–17; T6 at 79:6–80:5.

120.   Likewise, the budget screen displays the individual's income limit when the individual is determined to be eligible for Medicaid, but not when the individual fails Medicaid and is enrolled in the Medically Needy program, since the Medically

Needy program has no income limit. P. Ex. 100; P. Ex. 101; T2 at 31:21–32:10; T6 at 80:16–81:10.

121.   In sum, when an individual is found *ineligible* for Medicaid because of income, the FLORIDA system retains a Medically Needy budget screen, but not the failed full Medicaid screen. The Medically Needy budget screen does not retain the standard disregard amount, the MAGI disregard amount, the countable net income, and the income limit that was applied in determining the individual's eligibility for Medicaid. T2 at 31:4–33:10 (explaining that, if an individual passes for Medicaid, then the income limit is saved on the budget screen; otherwise, the budget screen reflects Medically Needy data and does not show an income limit, and DCF would look at Appendix A-7 to determine the income limit applied to find ineligibility for Medicaid); T2 at 160:5–162:4 (discussing P. Ex. 100 as an illustration); T6 at 76:18–81:15 (discussing P. Exs. 100 and 101 as illustrations).

122.   In contrast, when an individual is found *eligible* for Medicaid, the budget screen maintains a record of the countable net income; that is, the MAGI minus the standard disregard and, if applicable, the MAGI disregard. This countable net income number is compared to the applicable income limit. Likewise, the budget screen reflects the income limit when an individual "passes," or is found eligible for Medicaid. T2 at 161:6–13; T6 at 76:18–81:15 (discussing P. Exs. 100 and 101 as illustrations).

123.   In other words, unless the individual is determined to be eligible for Medicaid, the FLORIDA system does not retain the applicable income limit or the

countable net income that determines whether the individual satisfies the income limit for Medicaid.

### i. **The ROM Process.**

124. DCF and Deloitte follow an established process when DCF asks Deloitte to estimate the number of hours that an enhancement would require. T4 at 116:25–118:1; T5 at 213:19–21.

125. First, DCF can ask Deloitte for a "T-shirt estimate"—*i.e.*, whether the project is small, medium, large, or extra large. T5 at 213:19–214:7.

126. A project that requires fewer than 500 hours is considered a small project. T5 at 214:8–10.

127. A project that requires between 500 and 2,000 hours is considered a medium project. T5 at 214:21–22.

128. A project that requires between 2,000 and 5,000 hours is considered a large project. T5 at 214:23–24.

129. A project that requires more than 5,000 hours is considered an extra-large project. T5 at 214:25–215:2.

130. Alternatively, for a more specific estimate, DCF can send Deloitte a request for a Rough Order of Magnitude, or ROM. T5 at 215:3–8, 217:1–6; D. Ex. 40.

131. DCF's Office of Information Technology Services ("OITS") works together with the Program Office to develop a request for a ROM. T4 at 116:25–117:7, 118:2–4.

132.    The request outlines specific project requirements. T5 at 215:3–8, 217:1–6.

133.    Defendants' Exhibit 39 outlines the ROM process. T5 at 216:15–25.

134.    After it receives the request, Deloitte assesses whether the request provides enough information to enable it to develop an estimate. T5 at 217:7–17.

135.    If it does not, then DCF and Deloitte discuss the request to develop the necessary specificity. T4 at 118:11–16; T5 at 216:8–14; T6 at 23:2–4.

136.    Deloitte then performs an impact analysis to determine how each of the systems that comprise the ACCESS Florida System will be impacted and must be modified. T5 at 218:12–23; D. Ex. 39.

137.    Deloitte breaks down, at the module or component level, the pieces of the system that would require modification. T5 at 235:4–9, 248:13–16.

138.    Deloitte team members who have worked for years in those specific modules or components discuss the project and rely on their historical knowledge and technical expert judgment to estimate the number of construction hours the change will require. T5 at 248:13–249:21, 255:7–15.

139.    According to a proven industry standard, Deloitte then multiplies the estimated number of construction hours by fixed percentages to estimate the number of hours that the other phases of the software development life cycle will require. D. Ex. 39 at DCF-000259; T5 at 253:20–254:24, 257:9–11.

140.    Once Deloitte has prepared an estimate of the number of hours the project would require, OITS shares the estimate with the Program Office. T4 at 116:25–117:13, 118:5–10.

### j.    The 28,072-Hour Estimate.

141.    Defendants' Exhibit 40 is an example of a request for an estimate. T5 at 215:22–24.

142.    In that example, DCF asked Deloitte to estimate the number of hours required to modify denial and termination notices "to include eligibility information used in making the Medicaid determination," such as "Income, Assets, Age, Citizenship, etc." D. Ex. 40; T5 at 215:25–216:3.

143.    After receiving the ROM, Deloitte requested clarification from DCF and obtained clarification that assisted it in developing an estimate. T5 at 217:24–218:11.

144.    Defendants' Exhibit 41 is the ROM that resulted from Deloitte's project estimation process. T5 at 250:9–13.

145.    Deloitte estimated that, to make the requested modifications—including those necessary to enable the FLORIDA system to retain income calculations performed in determining Medicaid eligibility—would require 28,072 hours. T5 at 234:6–15; D. Ex. 41.

146.    The 28,072-hour estimate includes time both to modify the system to retain data that it does not currently retain and to make the changes necessary to display the additional information on NOCAs. T5 at 243:6–10; D. Ex. 41.

147.    To display on NOCAs the information described in the ROM, it would be necessary to modify various processes that extract the data and pass the data to the notices. T5 at 236:2–10.

148.    The last page of Defendants' Exhibit 41 sets forth at a high level the modules or components into which the project was divided and the number of construction hours—*i.e.*, programming and unit-testing hours—that Deloitte estimated each module or component would require. D. Ex. 41 at DCF-000263; T5 at 251:15–20, 252:18–21, 255:2–6.

149.    According to the T-shirt measurement scale, this project would have been an extra-large project. T5 at 234:6–15.

150.    The changes described in the ROM would have required modifications to the SFU, EDBC, and authorization modules. T5 at 235:10–236:1.

**k.    The 12,000-Hour Estimate.**

151.    More recently, Deloitte performed a similar estimate to determine how many hours would be required to display only two additional data points on NOCAs: the customer's countable net income and income limit. T5 at 257:15–25; T6 at 90:18–91:9, 92:18–21.

152.    Deloitte concluded that these modifications would require more than 12,000 hours—also an extra-large project. T5 at 257:15–25; T6 at 90:18–91:9, 92:18–21.

153.   The scope of the 12,000-hour project was narrower than the scope of the 28,072-hour project because the 12,000-hour project is limited to countable net income and income limits. T6 at 90:18–91:9, 92:18–21.

154.   Both the 28,072-hour estimate and the 12,000-hour estimate include time to modify the system to retain information that the system does not currently retain. T6 at 81:16–21.

155.   To display income and income limits on NOCAs, Deloitte would also need to modify the notice templates that reside in ExStream to create placeholders for dynamic data—data that varies from customer to customer—and to add static language to the notice templates to explain the newly added dynamic data. T5 at 258:1–24.

156.   It is much more complicated to program dynamic data to be displayed on a notice than to program static, or non-dynamic, information to be displayed on a notice. T5 at 219:18–13, 220:11–13.

157.   It would be relatively easier to place a link to an online chart of income limits onto NOCAs than to populate NOCAs with dynamic information. T6 at 44:10–20.

158.   While DCF's notices already display some dynamic information, placing countable net income and income limits on NOCAs not only would require case-specific information to be extracted from the FLORIDA system, but also would require Deloitte to modify the system to store information that is not currently stored. T6 at 73:8–13.

33

159.   For example, DCF's food-assistance notices contain dynamic dollar amounts, but those dollar amounts are already stored in the FLORIDA system and therefore can more easily be placed on notices than dollar amounts that are not. T6 at 83:23–84:4.

160.   Thus, the fact that some DCF notices already display items of dynamic information does not mean that it would be easy to create new dynamic fields. T6 at 82:4–8. The creation of new dynamic fields could still take significant time. T6 at 82:4–13.

## IV.   PLAINTIFFS AND CLASS MEMBERS.

### a.   Chianne D. and C.D.

161.   Chianne D. is 25 years old and lives in Jacksonville, Florida, with her husband and their two children, C.D. and S.D. T2 at 182:12–20. Both Chianne D. and C.D. are named Plaintiffs; Chianne D. is C.D.'s next friend in this litigation. T2 at 182:21–22.

162.   Chianne D. testified that her family first enrolled in Medicaid in 2021, T3 at 187:10–18, during the public health emergency.

163.   On April 24, 2023, Chianne D. received a NOCA that terminated her and C.D. from Medicaid because of the family's income. D. Ex. 98; ECF No. 128 at 14 ¶¶ 43–45. The NOCA stated that Chianne D.'s and C.D.'s Medicaid benefits would be ending, that they would be enrolled in the Medically Needy program, and that DCF had reviewed their eligibility and determined that their income exceeded the limit for full Medicaid. D. Ex. 98 at DCF-005272 ("YOUR HOUSEHOLD'S INCOME

34

IS TOO HIGH TO QUALIFY FOR THIS PROGRAM"); D. Ex. 98 at DCF-005273 ("We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid."); D. Ex. 98 at DCF-005273 ("Individuals enrolled in the Medically Needy program have income or assets that exceed the limits for regular Medicaid."); D. Ex. 98 at DCF-005275 (same with respect to C.D.); D. Ex. 98 at DCF-005278 (providing date that Medicaid benefits will end).

164.   In September 2023, DCF reinstated Chianne D. to Medicaid retroactive to June 1, 2023, because it determined that Chianne D.'s Medicaid coverage had been erroneously terminated. ECF No. 128 at 14 ¶ 46; D. Ex. 52.

165.   If DCF discovers that it erroneously terminated a Medicaid recipient's coverage, its standard practice is to restore Medicaid coverage retroactively. T2 at 59:19–25, 84:18–21, 111:19–112:9.

166.   While all members of Chianne D.'s household have been on Medicaid previously, none was enrolled in Medicaid at the time of trial. T2 at 187:10–20. No party contends that either Chianne D. or C.D. is currently eligible for Medicaid. ECF No. 128 at 14 ¶¶ 47–49; T3 at 18:13–14, 25:11–13, 42:11–13.

167.   Chianne D.'s coverage ended March 1, 2024; she acknowledges that, as of that date, she was no longer eligible for Medicaid and that she is currently ineligible for Medicaid. T3 at 18:13–14; ECF No. 128 at 14 ¶ 47.

168.   C.D. does not dispute the correctness of DCF's determination that she was over income for Medicaid, as stated in the NOCA dated April 24, 2023. ECF No.

128 at 14 ¶¶ 48–49. Chianne D. has never denied that her family made too much income for Medicaid. T3 at 25:11–13.

### b. __Kimber Taylor and K.H.__

169.   Kimber Taylor has a one-year-old son, K.H. T1 at 19:1–5. At the time of trial, Ms. Taylor was pregnant and expecting her second child. T1 at 17:7–12. Both Ms. Taylor and K.H. are named Plaintiffs; Ms. Taylor is K.H.'s next friend. T1 at 17:13–15.

170.   Ms. Taylor first applied for Medicaid in the fall of 2022 when she was pregnant with K.H. T1 at 18:8–19:5; ECF No. 128 at 17 ¶¶ 61-62.

171.   K.H. was approved for Medicaid in a NOCA dated April 26, 2023, T1 at 22:16–20; P. Ex. 108, in advance of his birth in May 2023, T1 at 19:1–5. K.H. was enrolled in Medicaid on May 22, 2023. ECF No. 128 at 17 ¶ 62. K.H.'s eligibility was reflected on Ms. Taylor's ACCESS account when she reviewed it two or three days after K.H.'s birth. T1 at 25:9–25.

172.   On June 8, 2023, DCF issued a NOCA terminating Ms. Taylor's and K.H.'s coverage effective June 30, 2023, on the ground that their income exceeded the limit for Medicaid. ECF No. 128 at 17 ¶¶ 63–66; T1 at 34:10–13; P. Ex. 112.

173.   DCF issued a NOCA dated August 7, 2023, that reinstated Ms. Taylor's and K.H.'s Medicaid coverage retroactive to July 1, 2023, because it determined that their coverage had been erroneously terminated. ECF No. 128 at 17 ¶ 67; P. Ex. 116; T1 at 35:21–36:13.

174.   From reading the August 7, 2023 NOCA, Ms. Taylor understood she was eligible for ongoing Medicaid coverage. T1 at 55:11–14. However, Ms. Taylor alleges that she came to question her reinstatement to Medicaid, so she reapplied in January 2024. T1 at 37:9–13. A February 15, 2024 NOCA informed Ms. Taylor that she and K.H. remained eligible for continued Medicaid coverage. D. Ex. 53 at DCF-006363; T1 at 39:14–17, 55:24–56:3.

175.   After she received the August 7, 2023 NOCA, and before filing the January application, Ms. Taylor did not contact the DCF call center to inquire about her eligibility. T1 at 55:15–23.

176.   Ms. Taylor and K.H. are presently covered by Medicaid. Despite Ms. Taylor's belief that led her to file an application for Medicaid in January 2024, the evidence did not show that either Ms. Taylor or K.H. lost Medicaid in December 2023 or at any time after their reinstatement in August 2023. T2 at 168:20–23; P. Ex. 103 (K. Taylor's IQEL screen).[2]

---

[2] When Ms. Taylor testified on July 11, 2023, her counsel showed her a video that purported to show Ms. Taylor's MyACCESS account and to display April 1, 2023, as the "begin date" and June 30, 2023, as the "end date" of coverage. P. Ex. 279B; T1 at 41:1–4, 43:17–47:4. It turned out later that the video was created on May 9, 2024—during the enrollment span—not after the purported end date. ECF No. 152. As explained by James Garren, the "coverage end date" in the MyACCESS account is designed to show month-to-month coverage to enable recipients to print temporary Medicaid cards. ECF No. 167-4 at 24:18–25:12, 26:19–27:13. There is no testimony to suggest that, before April 1, Ms. Taylor's ACCESS account showed an April 1 begin date, or that, after June 30, Mr. Taylor's MyACCESS account still showed a June 30 end date. Ms. Taylor expressly disclaimed any knowledge of what her MyACCESS account displayed at the time of trial. T1 at 56:4–13. She also acknowledged that she believes she is currently eligible for Medicaid. T1 at 56:2–3.

c.   **A.V.**

177.   A.V. is a two-year-old who currently receives full Medicaid coverage. Jennifer V., A.V.'s mother, testified on A.V.'s behalf at trial. Jennifer V.'s experience with Florida Medicaid began around 2010, and she and each of her seven children have been enrolled in Medicaid or Medically Needy at different times over the last 14 years. T3 at 101:25–102:21.

178.   Jennifer V. received a NOCA dated May 16, 2023, terminating A.V.'s Medicaid coverage effective June 1, 2023, and enrolling her in the Medically Needy program. P. Ex. 81. When she received this NOCA, Jennifer V. understood that A.V.'s Medicaid coverage was ending, T3 at 74:19–25, 75:18–24, and believed at the time that A.V. should have been eligible for Medicaid, T3 at 113:24–114:1.

179.   A.V. was terminated from Medicaid because her household income exceeded the limit for Medicaid. The NOCA stated that A.V.'s Medicaid benefits would be ending, that she would be enrolled in the Medically Needy program, and that DCF had reviewed her eligibility and determined that her income exceeded the limit for full Medicaid. P. Ex. 81; T3 at 109:2–21, 110:7–111:19 (discussing D. Ex. 54 and P. Ex. 81).

180.   However, DCF erred in determining that A.V.'s household income exceeded the limit for Medicaid because, in applying the income limit, DCF assessed A.V. using an SFU of six people, when the correct SFU size was eight. T2 at 90:25–91:23.

181.    On February 2, 2024, DCF retroactively restored A.V.'s Medicaid benefits effective December 2023. ECF No. 128 at 16 ¶ 60; D. Ex. 55.

182.    As of the date of trial, A.V. was receiving full Medicaid, T3 at 101:22–24, and both Jennifer V. and her husband, A.V.'s father, were enrolled in the Medically Needy program, T3 at 102:5–14. Due to a recent decrease in A.V.'s SFU and a corresponding decrease in her income limit, A.V.'s current Medicaid eligibility is the result of a continuous-coverage period based on a previous finding of income eligibility. T2 at 170:14–171:17.

### d.    **Lily Mezquita.**

183.    Lily Mezquita is not a named plaintiff, but is a class member who testified at trial. Ms. Mezquita's experience with Florida Medicaid began around 2013, when she was pregnant with her oldest son. T3 at 156:17–157:3. She received Medicaid during each of her three pregnancies, and her three children were each enrolled in Medicaid from birth. T3 at 118:24-25, 119:1–21, 156:17–157:3. At the time of trial, Ms. Mezquita and her three children were covered by full Medicaid. T3 at 156:17–19.

184.    In 2023, while Ms. Mezquita was pregnant with her third child, DCF terminated Ms. Mezquita's Medicaid coverage in error based on income. ECF No. 128 at 18 ¶¶ 69–70, 72–73. Specifically, DCF applied the income limit for a newly pregnant person to Ms. Mezquita rather than maintain continuous coverage for Ms. Mezquita, regardless of changes in income, due to her status as a pregnant woman. T2 at 114:14–115:16.

185.   On August 10, 2023, DCF retroactively reinstated Ms. Mezquita's Medicaid coverage effective August 1, 2023. ECF No. 128 at 18 ¶ 73.

186.   Ms. Mezquita testified about receiving notices (P. Ex. 120, P. Ex. 121, P. Ex. 130, and P. Ex. 131) in October 2023 and March 2024 again purporting to find her ineligible for Medicaid coverage. Ms. Mezquita believed DCF made a mistake in finding her ineligible because she was in her post-partum period. T3 at 148:7–17, 152:6–10. The October and March notices were indeed sent by DCF in error, and in both instances, DCF promptly corrected the error before Ms. Mezquita lost Medicaid coverage. T2 at 174:1–16; T3 at 147:3-14, 149:4–19, 150:1–7, 150:21-24, 153:1–20, 173:13–21.

### e.   **Class Definition.**

187.   On April 23, 2024, this Court modified Plaintiffs' proposed classes and certified the following class and subclass:

> All Florida Medicaid enrollees who on or after March 31, 2023, have been or will be found ineligible for Medicaid coverage based on a finding that the individual or household has income that exceeds the threshold for Medicaid eligibility, and were issued a written notice that does not identify the individualized income used in the eligibility determination or the income standard applied.
>
> **Subclass:** Members of the class whose written notice does not provide a Designated Reason or includes only Designated Reasons that do not identify income as the factor on which the State relied in finding the individual to be ineligible for Medicaid.

ECF No. 122 at 69.

**f.   Ascertaining the Class and the Cost of Classwide, Prospective Reinstatement.**

188.   As of March 2023, the class consists of 497,918 individuals, exclusive of class members who, as of March 2024, had regained full Medicaid coverage. T5 at 177:12–178:13; D. Ex. 132.

189.   The average monthly cost of Medicaid benefits provided to individuals who were found ineligible between April 2023 and May 2024 was $313.23. T3 at 184:13–185:7, 189:1–9, 191:20–192:3, 195:21–196:3.

190.   Therefore, the reinstatement of 497,918 recipients to Medicaid would cost more than $155 million per month.

**i.   *Class Size.***

191.   Daniel Davis offered testimony as to the size of the class. Mr. Davis has been employed by DCF for approximately 20 years and has managed DCF's data unit for the last three years. T5 at 170:12–171:1.

192.   Mr. Davis oversees the data that DCF collects and maintains with respect to Medicaid eligibility and queries and extracts data from DCF's databases. T5 at 171:5–11.

193.   Mr. Davis created Defendants' Exhibit 132 to determine how many individuals were terminated from Medicaid because of income between March 2023 and March 2024 and did not have Medicaid coverage as of March 2024. T5 at 171:17–172:19, 176:16–177:10.

194.   To identify all individuals who, between March 2023 and March 2024, were terminated from Medicaid because of income, Mr. Davis relied on data in the

FLORIDA system to identify everyone who moved from full Medicaid one month to Medically Needy coverage the next month. T5 at 171:17–172:19, 173:10-17, 176:16–177:10, 178:14–16.

195.    Defendants' Exhibit 132 uses coverage codes to indicate the type of coverage that each individual received each month from March 2023 to March 2024. T5 at 172:11-15, 174:20–175:18.

196.    Coverage codes that begins with the letter "M" refer to full Medicaid; coverage codes that begin with the letter "N" refer to Medically Needy coverage. T5 at 175:19–176:4.

197.    Thus, each row of the spreadsheet shows an "M" code one month followed by an "N" code the next month, which means that, at some point between March 2023 and March 2024, each individual on the spreadsheet was moved from full Medicaid one month to Medically Needy coverage the next month. T5 at 174:20–176:20.

198.    Mr. Davis excluded from the spreadsheet everyone who had full Medicaid as of the last month of the analysis (March 2024). T5 at 176:25–177:10.

199.    Mr. Davis' analysis reveals that 497,918 people were terminated from Medicaid because of income between March 2023 and March 2024 and did not have Medicaid coverage as of March 2024. T5 at 177:12–178:13.

### ii.    *Average Monthly Cost.*

200.    Matt Cooper, Assistant Deputy Secretary for Healthcare Data at AHCA, offered testimony as to the average monthly cost of Medicaid recipients.

201.   While DCF determines eligibility for the Florida Medicaid program, AHCA oversees the administration of Medicaid services and makes payment for Medicaid services provided to recipients. T3 at 182:9–24.

202.   The Florida Medicaid Management Information System ("FMMIS") houses information related to AHCA's administration of the Medicaid program, including claims, claim payments, and provider enrollment. T3 at 182:25–183:11; ECF No. 128 at 11 ¶ 29.

203.   Mr. Cooper oversees AHCA's Bureau of Medicaid Data Analytics, which is responsible for AHCA's data analysis, federal reporting, ad-hoc reports, and capitation rate setting. T3 at 181:11–23. Mr. Cooper also queries and extracts data from FMMIS and oversees the data that AHCA collects and maintains with respect to Medicaid expenditures. T3 at 183:12–18.

204.   Mr. Cooper created Defendants' Exhibit 135 with the assistance of AHCA's Bureau of Medicaid Data Analytics. T3 at 183:19–184:8.

205.   The monetary amounts displayed in Defendants' Exhibit 135 derive originally from FMMIS and include both the state and federal shares of Medicaid expenditures. T3 at 184:9–12, 188:22–25.

206.   Defendants' Exhibit 135 lists by Medicaid ID number all Medicaid recipients who, between April 2023 and May 2024, were determined ineligible for Medicaid, and who were not Medicaid recipients as of May 2024. T3 at 184:13–185:7, 191:20–192:3.

207.   Defendants' Exhibit 135 reveals that, during the six-month period preceding their eligibility redetermination dates, the average monthly cost of benefits provided to these recipients was $313.23. T3 at 189:1–9, 195:21–196:3.

208.   Specifically, Column M of the spreadsheet shows the total amount of expenditures that AHCA made for Medicaid services rendered during the six-month period preceding the recipient's eligibility redetermination date. T3 at 186:7–187:10.

209.   Column N then divides the total amount of expenditures in Column M by the number of months that the individual had Medicaid coverage during that six-month lookback period. T3 at 187:19–188:21.

210.    Column N therefore shows the average monthly cost of benefits provided to each recipient during the six-month period preceding the recipient's eligibility redetermination date. T3 at 188:13–16.

211.   The average of these per-person, monthly averages is $313.23. T3 at 189:1–9, 195:21–196:3.

### g.   __Post-Partum Coverage.__

212.   A recurring focus of the testimony offered by Plaintiffs centered on Plaintiffs and Lily Mezquita being incorrectly terminated while pregnant or during the 12-month post-partum coverage period.

213.   In Florida, a person who has been found eligible for Medicaid on the basis of pregnancy remains eligible for Medicaid through the pregnancy—and for a 12-month post-partum period—regardless of increases in the person's income. Fla. Stat. § 409.903(5).

214.    However, Plaintiffs offered no evidence that the erroneous termination of coverage during the pregnancy or the post-partum period was a classwide issue—nor could it be, given Medicaid's varying eligibility categories, P. Ex. 254 (identifying dozens of Medicaid eligibility categories); T2 at 12:5–22, 34:3–6.

215.    Moreover, this issue was not framed by the pleadings, ECF No. 77, or identified as a claim or issue for classwide resolution, ECF No. 122. Plaintiffs did not propose—and this Court did not certify—a class or subclass based on pregnancy or post-partum status or erroneous termination. ECF Nos. 77 & 122.

216.    While not relevant to a classwide issue, given the emphasis on this issue in Plaintiffs' case, it warrants a brief discussion.

217.    Mr. Kallumkal explained the cause of the erroneous termination of some Medicaid recipients who were entitled to post-partum coverage.

218.    As described by Mr. Kallumkal, programming in the FLORIDA system prevented historical information that was needed to determine eligibility for post-partum coverage from being loaded into the EDBC module. T6 at 9:8–10:4.

219.    The maximum number of rows of historical information that could be loaded into and read by the EDBC module was 24. T6 at 9:8–10:4.

220.    This limitation uniquely affected post-partum coverage because the EDBC module reviews historical information to determine eligibility only for post-partum coverage. T6 at 10:25–11:8.

221.    Deloitte resolved this system limitation in November 2023. T6 at 14:9–13.

222.    Separately, while the end date of a pregnancy was stored in the FLOR-IDA system, it was not displayed on a screen visible to eligibility specialists. T6 at 11:9–13:19.

223.    In April or May 2024, Deloitte made a change to ensure that the screen will display the end date of the pregnancy for the eligibility specialist to see. T6 at 12:12–13:5, 14:12–13.

224.    No evidence presented at trial suggests that the system features that caused the erroneous termination of some Medicaid recipients who were entitled to post-partum coverage remain unresolved.

225.    Likewise, Plaintiffs presented no evidence of the number of Medicaid recipients who were entitled to post-partum coverage, but whose Medicaid coverage was erroneously terminated.

## V.    NOTICES OF CASE ACTION.

226.    Once DCF makes an eligibility decision, it sends a NOCA to the applicant to explain that decision. T2 at 34:20–25.

227.    DCF uses NOCAs for all benefit programs for which it determines eligibility, including food assistance, temporary cash assistance, Medicaid, and the Medically Needy program. As it relates to this case, one way that DCF uses NOCAs is to advise customers of their ineligibility for Medicaid benefits. ECF No. 128 at 7 ¶ 9.

228.   DCF generates about 100,000 printed NOCAs each day, in addition to electronic NOCAs provided to recipients who choose that method of notification. T4 at 123:6–19; T5 at 148:17–24.

### a.   Consolidated Notices.

229.   Rather than send multiple NOCAs, and consistent with federal law, DCF includes all programs and multiple household members in a single NOCA. T4 at 129:12–14; 42 C.F.R. §§ 435.917(d), 435.1200(h)(1).

### b.   Overview of Notices.

230.   NOCAs contain some uniform elements and are system-generated in whole or part. NOCAs are based on templates. There are approximately 50 English-language NOCA templates covering approvals, denials, changes, and terminations. Each NOCA template contains the same "footer" text, which includes a paragraph concerning fair hearings. ECF No. 128 at 12–13 ¶ 35.

231.   NOCAs also include some dynamic language—*i.e.*, language that varies based on case-specific information. For dynamic language to appear in a NOCA, there must be a placeholder for case-specific information in the template. ECF No. 128 at 13 ¶ 36.

232.   Reason codes are system-generated, while others are manually selected by DCF's eligibility specialists. ECF No. 128 at 13 ¶ 37. Some can be either system-generated or manually selected. ECF No. 128 at 13 ¶ 37.

233.   DCF uses a finite number of reason codes. ECF No. 128 at 13 ¶ 38. The system will populate a reason code, and the text associated with that reason code is placed in the NOCA. T6 at 37:15–25.

### c.   P.O. Box and Other Contact Information.

234.   All Medicaid termination notices contain a Post Office Box number in the top, left-hand corner of the first page. T4 at 125:9–13.

235.   The Post Office Box number belongs to DCF's ACCESS Central Mail Center, to which all return mail is routed. T4 at 125:14–16.

236.   If a recipient sends a fair-hearing request to the Post Office Box number on the NOCA, then the request will be routed to the appropriate place. T4 at 126:13–17.

237.   All Medicaid termination notices contain a paragraph that provides customers with a link to information about DCF's family resource centers. T4 at 130:6–131:7.

238.   That paragraph states in part: "To locate a DCF Office, go to www.myflfamilies.com/access-service-centers." D. Ex. 98 at DCF-005278.

239.   All Medicaid termination notices provide the DCF call-center phone number multiple times. T4 at 131:8–13.

### d.   The Fair-Hearing Language and Other Footer Information.

240.   All Medicaid termination notices contain an identical "footer." T4 at 135:22–136:6, 136:14–16.

241.   The footer begins with the heading "DCF Services" and continues to the end of the notice. T4 at 135:18–136:7; D. Ex. 98 at DCF-005280-81; D. Ex. 121 at DCF-007410-12.

242.   The footer contains a paragraph entitled "Fair Hearings." T4 at 135:22–137:7.

243.   Defendants' Exhibit 121 displays the fair-hearing paragraph that has appeared in Medicaid termination notices generated since April 2024. T4 at 141:9–143:10.

244.   The first sentence of the fair-hearing paragraph informs recipients of their fair-hearing rights: "**If you disagree with our decision**, you have the right to ask for a hearing before a state hearings officer." D. Ex. 121 at DCF-007410.

245.   The bolded and underlined words are bolded and underlined in notices sent to customers, T4 at 143:11–16, which DCF calls "production notices," T4 at 142:4–9.

246.   The fair-hearing paragraph proceeds to explain how recipients can request fair hearings:

> You may ask for a hearing by emailing us at appeal.hearings@flfamilies.com ; by making a request online at https://www.myflfamilies.com/fairhearings ; by writing to us at Appeal Hearings Section, 2415 North Monroe Street, Suite 400-1, Tallahassee, Florida 32303-4190; by calling the call center; or by coming into a DCF office.

D. Ex. 121 at DCF-007410.

49

247.   It thus provides an email address to which fair-hearing requests can be sent, a web address at which fair hearings can be requested, and a physical address to which fair-hearing requests can be mailed. T4 at 143:17–144:7.

248.   If a recipient sends a fair-hearing request either to the Post Office Box number on the notice or to a DCF office identified at the link provided in the notice, then the request will reach its appropriate destination. T4 at 138:16–25.

249.   A recipient who wishes to request a fair hearing by calling the call center or coming into an office in person can call the call-center number provided in the notice or visit an office location identified at the link provided in the notice. T4 at 139:1–9; T5 at 80:7-13.

250.   Even before it was amended in April 2024, the fair-hearing paragraph explained how recipients can request fair hearings: "If you want a hearing, you must ask for the hearing by writing, calling the call center or coming into an office within 90 days from the date at the top of this notice." T4 at 138:9–15; D. Ex. 98 at DCF-005280.

251.   Under the fair-hearing paragraph, the footer provides a phone number and a web address at which individuals can find free legal services. T4 at 139:22–140:17; D. Ex. 98 at DCF-005280; D. Ex. 121 at DCF-007410.

### e.   **Medically Needy Language.**

252.   All Medicaid termination notices that inform recipients of their termination from Medicaid because of income—and therefore of their enrollment in the Medically Needy program—contain the following sentence: "We have reviewed your

eligibility for full Medicaid benefits and have determined you are not eligible be-cause your income exceeds the limit for Medicaid." T4 at 132:7–133:22; D. Ex. 98 at DCF-005275.

253.   This sentence communicates to recipients that their Medicaid benefits will be terminated because of income. T4 at 133:14–17.

254.   In addition, all Medicaid termination notices that inform recipients of their termination from Medicaid because of income—and therefore of their enroll-ment in the Medically Needy program—contain an explanation of the Medically Needy program. T4 at 134:14–135:6; D. Ex. 98 at DCF-005275–76.

255.   That explanation contains the following sentence: "Individuals en-rolled in the Medically Needy program have income or assets that exceed the limits for regular Medicaid." T4 at 135:7–12; D. Ex. 98 at DCF-005275.

256.   That sentence also communicates to recipients that their Medicaid ben-efits will be terminated because of income or assets. T4 at 135:13–17.

    **f.**   **Plaintiffs' Receipt and Understanding of NOCAs.**

       **i.**   ***A.V.***

257.   Jennifer V. is familiar with NOCAs, having possibly reviewed at least 30 NOCAs over the years. T3 at 102:22–103:7.

258.   She has previously received NOCAs describing the Medically Needy program and has understood for several years that the Medically Needy program serves individuals who earn too much income to qualify for Medicaid. T3 at 109:2–19.

259.   She has also received NOCAs in the past indicating that her income was too high for Medicaid. T3 at 109:17–19.

260.   Specifically, Jennifer V. confirmed that she has previously received NOCAs containing the Medically Needy language, *see supra* Part V.e., including the May 16, 2023 NOCA, and understands that this language is meant to communicate that her family's income was too high to qualify for full Medicaid. T3 at 109:2–21, 110:7–111:19 (discussing D. Ex. 54 and P. Ex. 81).

### ii.   *Lily Mezquita.*

261.   Ms. Mezquita received two NOCAs from DCF in July 2023. P. Exs. 122 & 123.[3] One of the NOCAs contained Reason Code 241, stating that her household's income was too high to qualify for Medicaid. P. Ex. 122 at DCF-005389; T3 at 129:7–10.

262.   Her NOCA also contained the Medically Needy language described above, *see supra* Part V.e., advising that her income exceeded the limits for Medicaid; explained the Medically Needy program; and enrolled her into the Medically Needy program for August 2023 forward. P. Ex. 122 at DCF-005391.

263.   Ms. Mezquita knew what the Medically Needy program was, having previously been enrolled along with her husband. T3 at 126:4–14, 162:14–16.

---

[3] In 2023, DCF mistakenly sent Ms. Mezquita's household two NOCAs (one addressed to her, and one to her son) rather than one. T2 at 113:20–114:13, 172:19–173:10; P. Ex. 122; P. Ex. 123. DCF has since resolved the error that caused two NOCAs to be sent, and Ms. Mezquita now receives a single, combined NOCA for her household. T2 at 173:3–10.

264.   Ms. Mezquita testified that when she received the July 20, 2023 NOCAs, she understood she was going to lose Medicaid. T3 at 157:18–25.

265.   She also understood from those NOCAs that DCF determined she had too much income to qualify for Medicaid, which she believed to be a mistake because she was pregnant, and her pregnancy was the basis of her Medicaid eligibility. T3 at 124:19–125:5, 129:18–130:9, 158:10–23, 161:2–162:5, 165:10–23, 166:17–19; P. Ex. 128.

### iii.   *Chianne D. and C.D.*

266.   On April 24, 2023, Chianne D. and C.D. received a NOCA terminating them from Medicaid and enrolling them in the Medically Needy program. D. Ex. 98.[4] Specifically, the NOCA stated that Chianne D.'s and C.D.'s Medicaid benefits would be ending, that they would be enrolled into the Medically Needy program, and that DCF had reviewed their eligibility and determined that their income exceeded the limit for full Medicaid. D. Ex. 98 at DCF-005273, DCF-005275, DCF-

---

[4] Plaintiffs offered evidence questioning the timeliness of DCF's referral of C.D.'s application to KidCare. Given the claims framed by the amended complaint, ECF No. 77, any findings on this front are not relevant. The NOCA, moreover, contained information about KidCare, along with a website and phone number to find additional information. T3 at 42:14–17; D. Ex. 98. Chianne D. acknowledged that five weeks was likely enough time to have secured alternative healthcare coverage for C.D. T3 at 42:24–43:22.

As this Court foreshadowed, T3 at 10:17–11:11, medical bills and out-of-pocket expenses incurred by Plaintiffs are not relevant considering the potential relief available in this case: prospective injunctive relief. Tellingly, when pressed to explain the relevance of medical bills and out-of-pocket expenses, Plaintiffs' counsel did not argue that they were relevant to the issue of remedies, but rather standing. T3 at 10:17–11:11. In light of the Eleventh Amendment, retrospective relief, such as the payment of medical bills, is unavailable. *See infra* Conclusions of Law, Part V.d.

005278. The NOCA also contained the text associated with Reason Code 241, stating that her household's income was too high to qualify for Medicaid. D. Ex. 98 at DCF-005272.

267.   Chianne D. acknowledged that, when she received NOCAs, she would only skim them and that, if she is "being perfectly honest," she "didn't really look at or read the notices" she received from DCF. T3 at 36:13–19.

268.   Even so, when Chianne D. read the April 24, 2023 NOCA, she understood it to mean that she and C.D. were being dropped from Medicaid, T3 at 20:17–21:18, 22:5–13, and she understood the date that Medicaid coverage would end, T3 at 22:14–21.

269.   When Chianne D. read the April 24, 2023 NOCA, she understood that she was being terminated because her income was too high. T3 at 23:6–8. She knew that because "it was stated on the paper." T3 at 23:18–24:8.

270.   Chianne D. understood the language in the notice that said "[w]e've reviewed your eligibility for full Medicaid benefits and determined that you're not eligible because your income exceeds the limit for Medicaid" to mean that she was not eligible because of her income. T3 at 24:9–15.

271.   Although not a classwide issue, and despite Chianne D.'s statements to the call center to the contrary,[5] D. Ex. 82 at 9:24–10:22 (stating that she requested

---

[5] While this incorrect statement seems to be a case of mistaken recollection, Chianne D. admits that, on her calls with the call center, she made a statement that she knew to be untrue when she made it. T3 at 45:13–16. Such an acknowledgment has bearing on Chianne D.'s credibility, as does her provision of inaccurate

paper notifications); D. Ex. 83 at 18:10–14 (indicating that she was not notified that C.D. was losing coverage), the evidence confirms that DCF notified Chianne D. by the method she requested. DCF emailed Chianne D. a notification to her husband's email address—the email address she requested in her application. T3 at 38:4–8, 39:6–10; D. Ex. 89 at P. Supp. 000003; D. Ex. 90 at DCF-007397 (indicating email as her preferred method and providing an email address); D. Ex. 96 at DCF-000255. Chianne D. was notified of her preference for email notifications in lieu of paper. T3 at 38:9–17; D. Ex. 93 (email notification from DCF to the email address Chianne D. provided stating that she elected to received notices online and will no longer receive paper notices); D. Ex. 91. No documentary evidence corroborates Chianne D.'s suggestion that she provided her husband's email account in response to a request by DCF for an alternative email address. T2 at 191:2–7.[6]

---

information when seeking public benefits. Chianne D. did not review any records when she informed DCF that her income was $800 per week, T3 at 45:17–46:11; D. Ex. 89 at P. Supp. 000009-10; it was simply "a guess" that turned out to be a low-ball estimate, T3 at 46:6–11. In fact, her husband's weekly paychecks ranged from about $1,200 to $1,800, T3 at 46:12–20, and their adjusted gross income for 2022 was $70,000, T3 at 46:21–23.

[6] That Chianne D. does not recall whether she saw an email from DCF in her husband's email account around April 24, 2023, T3 at 41:11–22, is understandable in light of her other testimony. Chianne D. readily acknowledges that, before she became a plaintiff in this case and discovery ensued, she was not even aware that she received emails from DCF. T3 at 41:6–10. Chianne D. did not check her husband's email account frequently before she lost access to it, T3 at 39:1–24, and her husband did not help to manage their household's benefits from DCF. T2 at 191:8–10. Chianne D. concedes that she might have seen the the email notification. T3 at 41:11–22.

272.   While Chianne D. testified that she first learned of the termination of her and C.D.'s coverage only a few days before their coverage ended, T2 at 193:18–194:4, the evidence—including Chianne D.s' concessions on cross examination—indicate that she logged into her ACCESS account and viewed the notice before then. While Chianne D. did not check her ACCESS account very frequently, T3 at 36:20–22, DCF records indicate that she logged into her ACCESS account several times between April 24, 2023, and May 30, 2024. D. Exs. 46–47. While Chianne D. recalls seeing the NOCA "most vividly" on May 29 or May 30, T3 at 37:10–13, she conceded that she might have seen the NOCA earlier in May—or even as early as April—because "she only skimmed those notices," T3 at 37:14–19. Chianne D.'s admission is consistent with DCF's records, D. Exs. 46–47, and with her acknowledgment that no one else had her login credentials, T3 at 36:23–25. In any event, there is no dispute that the NOCA was in her ACCESS account. T3 at 36:23–37:19; T4 at 101:14–23.

### iv.   *Kimber Taylor and K.H.*

273.   Ms. Taylor and K.H. received a NOCA on June 8, 2023, terminating them from Medicaid because of income. P. Ex. 112.

274.   When Ms. Taylor read the NOCA, she understood it to mean that her and K.H.'s Medicaid coverage was being cancelled and that they were losing Medicaid coverage. T1 at 29:16–22, 51:6–11.[7]

---

[7] When prompted by her attorney, Ms. Taylor testified that she did not know from the NOCA whether she and K.H. had Medicaid coverage. T1 at 30:8–18. But her initial response to the question, T1 at 29:16–22, and her admissions during cross-examination, T1 at 51:6–11, carry greater weight.

275.   When Ms. Taylor read the NOCA, she disagreed with the statement in the NOCA that her income was too high. T1 at 51:12–15.

276.   She believed that the statement was incorrect at the time she read the NOCA because she understood that there were no income limit either for a pregnant Medicaid recipient or for infants like K.H. T1 at 51:12–23.

### v.   *Other NOCAs.*

277.   In addition to the NOCAs in evidence related to Plaintiffs and Ms. Mezquita, Plaintiffs admitted several redacted NOCAs into evidence: P. Ex. 17, P. Ex. 18, P. Ex. 19, P. Ex. 20, and P. Ex. 21 (the "Redacted NOCAs"). Plaintiffs offered no evidence to establish that any of the Redacted NOCAs related to Medicaid terminations based on income, which is the subject of this case. To the contrary, a DCF witness testified that four of the five Redacted NOCAs, P. Exs. 17, P. Ex. 18, P. Ex. 20, and P. Ex. 21, are not related to income-based terminations. T5 at 20:18–22:11, 36:8–25. The Redacted NOCAs are therefore not relevant to the Court's resolution of Plaintiffs' claims.

### vi.   *The SHADAC Report.*

278.   Plaintiffs moved to admit the State Health Access Data Assistance Center Report (the "SHADAC Report") to prove that NOCAs generate confusion. T4 at 25:6–11. The SHADAC Report, P. Ex. 238, is inadmissible hearsay on multiple levels.

279.   Although commissioned by the Medicaid and CHIP Payment and AC-CESS Commission ("MACPAC"), the report was prepared by researchers at the

University of Minnesota. P. Ex. 238 at AHCA-002057, AHCA-002059. In fact, the SHADAC Report expressly states: "The findings, statements, and views expressed are those of the authors and do not necessarily represent those of MACPAC." P. Ex. 238 at AHCA-002059. The SHADAC Report is not a record or statement of a public office. *See* Fed. R. Evid. 803(8).

280.    The SHADAC Report, moreover, is based on information that the university researchers derived from unnamed "informants" and other sources, P. Ex. 238 at AHCA-002060—a second level of hearsay. The SHADAC Report does not identify the informants, nor does it identify which statement is attributable to which source, and Plaintiffs offered no evidence to show that the statements in the SHADAC Report that Plaintiffs ask this Court to consider were made by AHCA or DCF agents or employees who satisfy Federal Rule of Evidence 801(d)(2). In fact, the University of Minnesota researchers also spoke with individuals besides DCF and AHCA employees, P. Ex. 238 at AHCA-002060 ("We also spoke with two organizations with different perspectives on enrollment assistance in the state."), and gathered some of their information from unspecified data and documents, P. Ex. 238 at AHCA-002060. Given these evidentiary obstacles, the statements that Plaintiffs ask this Court to consider cannot be admitted as a statement by a party opponent.

281.    Nathan Lewis was one of the individuals who spoke with the University of Minnesota researchers. T4 at 21:21–23. When asked about a statement in the SHADAC report that "State respondents reported being well aware that notices sent

58

to beneficiaries generate confusion," Mr. Lewis did not believe the statement to be true. T4 at 28:8–15.

282.    Mr. Lewis understands the practical reality that "given the breadth of the population [that DCF serves,] there are going to be individuals within that [population] that are not going to understand the notices." T4 at 28:12–15. He does not believe that the initial response of a person who receives a notice will be that of confusion. T4 at 30:12–31:3.

283.    Tellingly, Plaintiffs elicited no testimony from Mr. Lewis as to what parts of the notice may or may not generate confusion, T4 at 47:9–13, nor does the SHADAC Report specify.

## g.    **Information Plaintiffs Contend Must Be Added to NOCAs.**

284.    NOCAs do not contain individualized, or case-specific, information regarding the amount of the individual's income, the SFU size, or the income limit applied to reach the eligibility decision. T2 at 35:5–12.

### i.    *Income Limit.*

285.    An individual's applicable income limit is determinable from publicly available sources, including DCF's website. T4 at 100:4–5.

286.    Despite being publicly available, several Plaintiffs did not inquire about their applicable income limits. When Chianne D. read her April 23, 2024 NOCA, she did not take any steps to look up the income limits. T3 at 24:21–25:5. Likewise, in her numerous calls with DCF's call center, Chianne D. did not ask what her or C.D.'s

income limit was. T3 at 34:21–23. When Ms. Taylor spoke with the call center about her June 8, 2023 NOCA, she did not inquire about the income limit. T1 at 53:23–25.

### ii.   *The Income Amount.*

287.   The rules by which gross income is turned into countable net income are complex, with many technical terms that are not self-explanatory. T4 at 49:11–14; 50:15–24.

288.   The income of all members of the customer's SFU is attributed to the customer. P. Ex. 187 at DCF-003042 ("Eligibility for Medicaid is determined by comparing the SFU's countable income to the appropriate income standard."). To confirm the accuracy of the income figure, the customer would need to know how to determine which household members comprise the customer's SFU. And the answer to that question depends on complex federal income tax principles. 42 C.F.R. § 435.603(f); D. Ex. 6 at DCF-003136–37.

289.   Other than by noting whether bills are paid, Chianne D. does not keep track of her family's income. T2 at 188:2–5; T3 at 42:2–5. When she read the April 24, 2023 NOCA, she did not have any idea of the ballpark of her household's gross income, T3 at 42:6–8, nor was she sure whether she could have found out, T3 at 42:9–10. Her ambivalence with respect to her ability to identify her gross income—her total income before any disregards and deductions are even applied—does not support a finding that including the countable net income amount on the April 24, 2023 NOCA would have been useful to Chianne D. or C.D.

290.   Tellingly, it was not until June 1, 2023—Chianne D.'s fourth call with the call center—that she even inquired about the income amount DCF had on file for her family. T3 at 35:6–8.

291.   Even if Chianne D. and others knew their gross income, providing the gross income on a NOCA along with the income limit would be confusing because the income limit is not applied to gross income, but rather to countable net income. T4 at 43:23–45:13, 46:23–47:7.

### iii.   *The SFU Size.*

292.   To verify one's SFU size, an individual must be familiar with complex federal eligibility rules that incorporate federal income tax principles. T4 at 260:18–261:7, 262:2–21; D. Ex. 6 at DCF-003136-38.

293.   By itself, the SFU size does not indicate *whose* income is considered when calculating a person's countable net income for Medicaid eligibility purposes. *See*, *e.g.*, D. Ex. 6 at DCF-003137 ("SSI recipients in the household are included in the Standard Filing Unit, but their SSI Income is excluded."); D. Ex. 6 at DCF-003138 § 2230.0403 ("When an individual lives with their parent, and is not expected to be required to file a tax return (income below the threshold), do not budget any of the individual's countable income for any assistance groups (AGs) in which the individual is either counted (CA, CC) or eligible (EA, EC). When determining the eligibility of the tax filer that does not have a parent to child relationship with the tax dependent, exclude all countable income of the tax dependent not expected to be required to file a tax return (income below the threshold).").

294.    The Court heard from a witness who serves as an advocate for families and assists them with Medicaid eligibility. Even this witness did not consider the SFU size as a useful piece of information to include on NOCAs. Mr. Jarvis Ramil is the manager of THE PLAYERS Center for Child Health at Wolfson's Children's Hospital—a health advocacy center for children in the Northeast Florida area. T4 at 54:18–24.

295.    Mr. Ramil called the DCF call center as an authorized representative of Chianne D. T4 at 95:2–19; D. Exs. 78, 85. Tellingly, Mr. Ramil did not ask the call center about the SFU, T4 at 98:15–18; D. Exs. 78, 85, suggesting that the SFU is not an item of information that Mr. Ramil finds useful in assessing DCF's eligibility determinations.

296.    Further underscoring this finding is Mr. Ramil's testimony that he does not fully understand what an SFU is. T4 at 63:23–24, 98:19–21. It comes as no surprise that Mr. Ramil does not think that including the SFU on the NOCAs would be helpful to Medicaid recipients. T4 at 98:22–99:1. While household size is not synonymous with SFU, T2 at 19:4–19:22; D. Ex. 6 at DCF-003136–37, Mr. Ramil also does not believe that including the household size on a NOCA would be useful, T4 at 104:9–11.

297.    Chianne D. did not ask DCF's call center for her and C.D.'s SFU sizes because she did not know what an SFU was. T3 at 34:24–35:5. In fact, the record does not reveal that any Plaintiff—or any other person—asked the call center for his

or her SFU size, or otherwise sought out any information from DCF about his or her SFU size or composition.

## VI.    RECENT CHANGES TO NOCAS AND THE ACCESS FLORIDA SYSTEM.

298.   DCF and Deloitte have made recent changes to the NOCAs and to the ACCESS Florida System.

### a.    Link to Webpage.

299.   At the top of the footer, under the heading "DCF Services," NOCAs generated since April 2024 have provided a link to the Medicaid page on DCF's website, https://www.myflfamilies.com/medicaid. D. Ex. 121 at DCF-007410; T4 at 144:8–24.

300.   The notice informs recipients that the Medicaid page provides "information about Medicaid eligibility and applying for Medicaid." D. Ex. 121 at DCF-007410.

301.   The Medicaid page contains information about Medicaid eligibility and provides access to DCF's Family-Related Medicaid Fact Sheet and SSI-Related Medicaid Fact Sheet and the Policy Manual, T4 at 144:22–145:6, which are described in more detail below.

### b.    Repayment of Benefits.

302.   The fair-hearing paragraph informs recipients of the circumstances in which their benefits will continue pending a fair hearing. D. Ex. 121 at DCF-007410.

303.   Before October 2023, Medicaid termination notices contained the following statement about the repayment of benefits paid during the fair-hearing

process: "You will be responsible to repay any benefits if the hearing decision is not in your favor." T4 at 139:10–13; D. Ex. 98 at DCF-005280.

304.   In October 2023, DCF substituted the word "may" for the word "will." T4 at 139:14–17.

305.   In April 2024, DCF added a sentence to explain that, absent fraud or intentional program violation, Medicaid recipients are not required to repay benefits paid during the fair-hearing process. T4 at 139:10–17, 141:9–143:10; Ex. 98 at DCF-005280; D. Ex. 121 at DCF-007410.

306.   Since April 2024, therefore, the fair-hearing paragraph has provided the following information about repayment of benefits: "You may be responsible to repay any benefits if the hearing decision is not in your favor. For Medicaid, you will not be responsible to repay benefits unless we find that you engaged in fraud or an intentional program violation." D. Ex. 121 at DCF-007410.

### c.   **The Income Sentence.**

307.   All Medicaid termination notices that inform recipients of their termination from Medicaid because of income contain the following sentence: "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid." T4 at 132:24–133:22; D. Ex. 98 at DCF-005275.

308.   Until April 2024, this sentence was located above the heading of the "Medically Needy" section that informed the recipient of his or her enrollment in the Medically Needy program. T4 at 133:23–25, 145:7–18; D. Ex. 98 at DCF-005275.

309.   Since April 2024, this sentence has appeared below the "Medically Needy" heading as the first sentence of that section. T4 at 134:1–4, 145:7–146:9; D. Ex. 121 at DCF-007410.

### d.   The "Medically Needy" Heading.

310.   DCF recently added the word "Program" to the "Medically Needy" heading in NOCAs. T4 at 148:11–14.

311.   The heading now reads as follows: "Medically Needy Program." T4 at 148:11–14.

### e.   The Fair-Hearing Paragraph.

312.   As explained above, *see supra* Part V.d., in April 2024, DCF amended the fair-hearing paragraph in the footer of its NOCAs to provide more specific information about the methods by which recipients may request fair hearings. *Compare* D. Ex. 98, *with* D. Ex. 121.

### f.   The Reason Code 241 Change.

313.   Reason Code 241 states: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM." D. Ex. 32.

314.   Reason Code 241 is used to communicate that a DCF customer was determined to be ineligible for Medicaid because of income. T2 at 36:9–12.

315.   As discussed above, *see supra* Part III.g., when an individual fails Medicaid because of income, the income calculations for Medicaid are deleted and replaced with the calculations for the Medically Needy program.

316. When the FLORIDA system deletes the Medicaid income calculations, it also deletes the system-generated reason code that accompanies those income calculations—specifically, Reason Code 241. T6 at 18:24–19:8, 84:14–25.

317. When a customer is terminated from Medicaid because of income, the eligibility specialist was expected to enter Reason Code 241 manually on the authorization screen. T6 at 18:10–14, 84:14–25, 85:4–25.

318. The evidence presented at trial therefore showed that the text associated with Reason Code 241 appeared in Medicaid termination notices in some but not all instances when a recipient was terminated for income. *Compare* P. Ex. 40 at DCF-005272 and P. Ex. 130 at P. Supp. 000004–5, *with* P. Exs. 81 & 112.

319. At the time of trial, however, Deloitte was modifying the ACCESS Florida System to retain the auto-generated Reason Code 241 in the existing database whenever a customer is terminated from Medicaid because of income. T5 at 207:20–210:5; T6 at 18:10–19:19.

320. The purpose of this enhancement is to ensure that the text of Reason Code 241 is displayed on NOCAs sent to individuals who are terminated from Medicaid because of income, T5 at 261:13–17, so that customers who are found ineligible for Medicaid because of income see the text of Reason Code 241 on their NOCAs, T6 at 88:25–89:3, 92:10–14.

321. The Reason Code 241 enhancement did not require Deloitte to build a new database to retain information that the FLORIDA system does not currently retain. T6 at 94:8–15.

322.   That is because the system already contains fields into which reason codes can be entered. T6 at 94:8–15.

323.   On August 2, 2024, Mr. Kallumkal testified that the Reason Code 241 enhancement was scheduled to be completed within three or four weeks. T5 at 209:25–210:5.

324.   The parties have stipulated that, on August 24, 2024, DCF put into production the system change regarding Reason Code 241 discussed in Mr. Kallumkal's trial testimony. ECF No. 172.

325.   Since the call center's self-service system can audibly read the text of a customer's reason code to the customer, *see infra* Findings of Fact, Part VIII.d., and thus explain the reason the customer was found ineligible for Medicaid, T4 at 220:1–4, the self-service system will read the text of Reason Code 241 to customers who fail Medicaid because of income.

326.   In light of the completion of the Reason Code 241 project discussed in Mr. Kallumkal's trial testimony, the evidence now indicates that the text of Reason Code 241 will automatically be placed on NOCAs provided to customers who are determined to be ineligible for Medicaid because of income.

**g.   ACCESS Modernization Project.**

327.   DCF is in the third year of a six-year project to incrementally replace the entire ACCESS Florida System, including the FLORIDA system. T5 at 123:6–125:9, 130:22–24; ECF No. 128 at 12 ¶ 32.

328.   DCF refers to this undertaking as the ACCESS Modernization Project. T5 at 123:6–124:14.

329.   The ACCESS Modernization Project began on July 1, 2022, concurrently with the State of Florida's 2022–23 Fiscal Year. T5 at 124:15–19, 131:2–5.

330.   The primary goal of the ACCESS Modernization Project is to replace the ACCESS Florida System's legacy infrastructure with a modern, streamlined, cloud-based solution. T5 at 123:6–124:1.

331.   In the sixth year of the ACCESS Modernization Project, DCF plans to change its eligibility notices, including Medicaid termination notices. T5 at 148:25–149:16, 150:15–153:8.

332.   However, because eligibility notices draw on data in other parts of the ACCESS Florida System, DCF must first replace other components of that system, including the FLORIDA system's eligibility determination processes, before it can change its eligibility notices. T5 at 150:15–153:8.

333.   The ACCESS Modernization Project is subdivided into 22 modules, each of which has submodules. T5 at 135:12–136:8. Each module and submodule involves all components of the software development life cycle: planning, analysis, design, development, testing, deployment, and maintenance. T5 at 135:12–138:17.

334.   The 22 modules that comprise the ACCESS Modernization Project are sequenced in a specific order, on a year-to-year basis, over the life of the six-year project. T5 at 135:12–138:17, 148:25–151:6.

335.   DCF has completed several modules already, including deployment of a new customer portal and a worker portal and document-management system. T5 at 135:20–23, 138:20–139:18; ECF No. 128 a 12 ¶ 34. The customer-portal module required a full year to complete and had 22 submodules. T5 at 135:20–23.

336.   Notices are included among the ACCESS Modernization Project's modules. T5 at 148:25–149:5; D. Exs. 33–36. This is reflected both in the documents that DCF submitted to the Legislature and in the testimony of Andrea Latham, who is DCF's IT Director over the ACCESS Florida System and manages the ACCESS Modernization Project. T5 at 117:16–20, 116:14–17, 148:25–149:5; D. Exs. 33–36.

337.   Ms. Latham explained that, while DCF plans to replace its Medicaid eligibility notices, several predecessor systems must be replaced first because the notices are dependent on those systems—most notably, the FLORIDA system. T5 at 149:6–153:8.

338.   Ms. Latham also testified at length about the various reports that DCF must submit to federal agencies and the Florida Legislature to maintain continued approval and funding for the ACCESS Modernization Project. T5 at 117:16–118:6, 124:15–127:16, 129:6–135:10, 140:10–144:8.

339.   Ms. Latham testified that the Legislature appropriated $16.5 million for the first year of the ACCESS Modernization Project, $20 million for the second year, and $36.625 million for the third year. T5 at 130:25–131:8; *see also* Ch. 2024-231, at 93, l. 307, Laws of Fla.; Ch. 2023-24, at 90, l. 301, Laws of Fla.; Ch. 2022-156, at

98, l. 345A, Laws of Fla. The total estimated cost of the project is $183 million. T5 at 132:15–24.[8]

340.   The Legislature and DCF's federal funding partners—CMS and the Food and Nutrition Service—fund the ACCESS Modernization Project annually. T5 at 126:1–5. DCF draws down the appropriated funds on a quarterly basis. T5 at 141:2–17.

341.   DCF must submit several reports to the Florida Legislature each year to explain its progress and justify its future use of project funds. T5 at 126:11–127:16.

342.   First, DCF submits a legislative budget request to the Legislature for the funding it needs for the coming fiscal year. T5 at 117:21–118:6. Thus far, the Legislature has granted in full each of DCF's requests for funding for the ACCESS Modernization Project. T5 at 131:6–132:14.

343.   DCF must also annually submit a Schedule IV-B feasibility report and project plan that describes in detail how DCF intends to use appropriated funds and justifies the requested appropriation. D. Exs. 34–36; T5 at 117:16–118:6, 124:15–127:16, 129:6–135:10, 140:10–144:8.

344.   DCF must submit similar reports to its federal funding partners for approval of federal funding. T5 at 129:6–130:16.

---

[8] Unlike other appropriated funds that are unspent and revert, the ACCESS funding will "revert and reappropriate" to the following year, meaning that unspent funds will be added to next year's appropriation. T5 at 131:16–132:5; Ch. 2024-231, at 486 § 94, Laws of Fla.

345.   Once funds are appropriated, DCF must submit quarterly reports, known as Operational Work Plans, to the Legislature describing how it has used the appropriated funds, as well as key dates and major deliverables. T5 at 117:16–118:6, 126:11–127:16, 129:6–135:10, 140:10–144:8. DCF's access to funding is contingent on the submission of these annual and quarterly reports, T5 at 141:2–17, which have consistently contemplated the replacement of DCF's eligibility notices, D. Exs. 33–36.

346.   Ms. Latham confirmed at trial that she had no reason to believe that DCF's plans to replace its notices will change—characterizing the suggestion of keeping the current notices while replacing the entire ACCESS Florida System as "insane"—and fully expects DCF to have new notices by the end of the ACCESS Modernization Project. T5 at 155:1–156:18. The purpose of the project is not "lift-and-shift"—*i.e.*, to use new technology to create a replica of the legacy system. T5 at 155:10–156:1.

347.   Ms. Latham's testimony is corroborated by consistent references to notices throughout the documents that DCF has submitted to the Legislature. *See* D. Exs. 33–36.

348.   Coupled with DCF's reporting to its state and federal partners and its continued receipt of requested funding, Ms. Latham's testimony demonstrates a broad commitment to the ACCESS Modernization Project and the various modules the project contemplates, including notices. While DCF has not yet defined the

content of its new Medicaid eligibility notices, its plan to deploy new notices as part of the ACCESS Modernization Project is in place and on track.

349.    Ms. Latham also testified that enhancements to the existing FLORIDA system—outside the ACCESS Modernization Project timeline and funding—have been limited to essential priorities because DCF's federal funding partners closely scrutinize expenditures for enhancements to the existing, legacy system with a new system in development. T5 at 158:16–159:1, 165:16–166:10.

## VII.   DCF'S FAIR-HEARING PROCESS.

350.    A customer who disagrees with an adverse determination made by DCF may invoke an administrative process known as the fair-hearing process to obtain an independent review of that determination by a neutral party. T5 at 42:25–43:5; *see generally* 42 C.F.R. pt. 431, subpt. E; Fla. Admin. Code r. 65-2.042–.069.

351.    The Office of Appeal Hearings (the "Hearing Office") in DCF's Office of the Inspector General conducts fair hearings. T5 at 43:6–8, 75:1–76:4.

352.    The Hearing Office is the neutral arbiter of the dispute. T5 at 76:5–8. It is independent of ESS and reports only to the Office of the Inspector General. T5 at 75:25–76:2.

353.    The Hearing Office employs 33 dedicated, full-time hearing officers and has an established process for receiving and tracking fair hearings, scheduling and conducting fair hearings, and issuing final orders. T5 at 75:14–24.

354.    The parties to a fair hearing are the Medicaid recipient and DCF. T5 at 76:5–8.

355.   ESS regional operations teams are responsible for participating in the fair-hearing process on DCF's behalf. T5 at 42:7–20.

356.   An ESS regional operations team's role is to accept and review fair-hearing requests, complete supervisory reviews and conferences, create fair-hearing packets, and represent DCF before the fair-hearing officer. T5 at 43:9–15.

357.   In performing its function in the fair-hearing process, the ESS regional operations teams find guidance in chapter 400 of the Policy Manual, as well as in the Economic Self Sufficiency Statewide Fair Hearings Procedural Guide. T5 at 43:16–44:4, 45:20–46:15; ECF No. 167-5 at 7:23–8:13; D. Ex. 2 at DCF-002741–42; D. Ex. 10.

### a.   <u>The Fair-Hearing Language in All NOCAs.</u>

358.   DCF amended the fair-hearing language in its NOCAs in April 2024. T4 at 141:9–143:10. The current language provides as follows:

> **Fair Hearings**: <u>**If you disagree with our decision**</u>, you have the right to ask for a hearing before a state hearing officer. You may be represented at the hearing by a lawyer, relative, friend, or anyone you choose. If you want a hearing, you must ask for the hearing within 90 days from the date at the top of this notice. You may ask for a hearing by emailing us at <u>appeal.hearings@myflfamilies.com</u>; by making a request online at <u>https://www.myfifamilies.comffairhearings</u>; by writing to us at Appeal Hearings Section, 2415 North Monroe Street, Suite 400-1, Tallahassee, Florida 32303-4190; by calling the call center; or by coming into a DCF office. If you ask for a hearing before the date your benefits are scheduled to end or change, your Medicaid benefits will continue at the prior level until the hearing decision; for all other programs, your benefits may continue at the prior level until the hearing decision. You may be responsible to repay any benefits if the hearing decision is not in your favor. For Medicaid, you will not be responsible to repay benefits unless we find that you engaged in fraud or an intentional program violation. Your appeal will be decided within

>90 days of your request. For Medicaid, if you have an urgent health care
>need (one that would result in serious harm to your health if not treated
>soon), you can ask for a faster appeal. Proof of your urgent health care
>need may be requested.

D. Ex. 121 at DCF-007410 (emphasis in original).

359.   During the revision to the fair-hearing language, DCF highlighted the option to request an expedited fair hearing. T5 at 89:25–91:12; D. Ex. 121 at DCF-00007410 ("For Medicaid, if you have an urgent health care need . . . , you can ask for a faster appeal."). Since then, the Hearing Office has seen a drastic increase in requests for expedited hearings, from one or two per month to about ten per week. T5 at 91:13–16. This demonstrates that recipients are reading and understanding the revised fair-hearing language.

### b.   <u>Methods of Requesting a Fair Hearing.</u>

360.   DCF informs recipients of the existence of the Hearing Office—and of their right to request a fair hearing—through its website, its NOCAs, the Rights and Responsibilities document that recipients receive and must acknowledge when they submit their applications, the Policy Manual, and chapter 65-2 of the Florida Administrative Code. T5 at 77:9–79:22; D. Ex. 2 at DCF-002741–43; D. Ex. 24; D. Ex. 38 at 1; D. Ex. 98 at DCF-005280.

361.   DCF provides a form that recipients may use to submit a fair hearing request, but use of the form is optional. T5 at 81:19–24. Any clear oral or written statement that the recipient disagrees with DCF's decision and wishes to present his

or her case to a higher authority is treated as a request for a fair hearing. D. Ex. 2 at DCF-002741 § 0430.0602; T5 at 79:23–80:3.

362.   Multiple sources inform recipients how to submit fair-hearing requests, T5 at 80:25–81:3, including DCF's website, D. Ex. 25, its NOCAs, *see*, *e.g.*, D. Ex. 98 at DCF-005280, and the Rights and Responsibilities document, D. Ex. 38.

363.   The Hearing Office can accept hearing requests by several means, including phone, email, mail, or online. T5 at 80:4–11, 97:9–13; D. Ex. 25. Recipients do not have to submit hearing requests to the Hearing Office; recipients can request fair hearings through DCF as well, including by calling the call center, mailing the Central ACCESS Mail Center in Ocala, or visiting a family resource center in person. T5 at 80:10–13; D. Ex. 98; D. Ex. 121; T4 at 138:16–139:9.

364.   If a request for a fair hearing is submitted to DCF, as opposed to the Hearing Office, DCF enters it into the ACCESS Florida System or emails the Hearing Office to notify the Hearing Office of the request. T5 at 80:14–24, 87:5–13. If emailed to the Hearing Office, the Hearing Office enters it in the ACCESS Florida System. T5 at 76:21–77:8. In either case, the Hearing Office enters the request into the Office of Appeal Hearings Case Management System (the "Case Management System"). T5 at 82:5–22.

### c.   Supervisory Review and Acknowledgement of Hearing Request.

#### i.   *Supervisory Review and Conference.*

365.   Once DCF receives a fair-hearing request, a supervisor conducts an independent review of the challenged determination to assess whether DCF took the

correct action and whether the supervisor agrees with the information that was used to make the determination. T5 at 46:16–47:7, 56:20–23; D. Ex. 10 at DCF-002438.

366.   The supervisor reviews, for example, the customer's application, the relevant NOCA, the case log running record comments (CLRC) in the FLORIDA system (which are manually entered notes of all actions taken with respect to an application), the budget screen and other screens that display information contained in the FLORIDA system (including the income that DCF used), income verifications provided by third-party sources, and applicable policies in the Policy Manual (including the income-limit chart in Appendix A-7) and in transmittals that update or make exceptions to those policies. T5 at 47:8–18, 50:15–19, 56:20–58:10.

367.   After the supervisor completes the supervisory review, the supervisor contacts the customer to conduct the supervisory conference required by DCF's administrative rules. T5 at 44:5–12, 46:16–47:7; D. Ex. 10 at DCF-002438–39; Fla. Admin. Code r. 65-2.042(4), 65-2.049(2).

368.   To ensure that the customer's concerns are addressed and that DCF makes the correct decision, the supervisory review and conference are conducted by a supervisor who has a higher-level position and larger knowledge base than the eligibility specialist who participated in the challenged eligibility determination. T5 at 44:13–22.

369.   DCF conducts supervisory conferences to initiate communication with the customer, to help the customer understand DCF's determination and the

reasons for the determination, and to review the determination to ensure its correctness. T5 at 44:23–45:8.

370. To address the customer's concerns and, if necessary, take corrective action, the supervisory review and conference occur as soon as possible after DCF receives a fair-hearing request. T5 at 47:19–48:1.

371. During the supervisory conference, the supervisor discusses with the customer the facts on which DCF relied to make the challenged determination, inquires whether the customer agrees that those facts are correct, and attempts to answer any questions the customer might have. T5 at 45:9–19, 46:16–47:7.

372. If the supervisory review or conference reveals that the facts on which DCF relied were incorrect, then DCF has an opportunity to reevaluate those facts and must take immediate action to rectify the erroneous decision. T5 at 45:9–19; D. Ex. 10 at DCF-002438; Fla. Admin. Code r. 65-2.049(2).

373. A supervisory conference can resolve the fair-hearing process in favor of either party: the customer might realize that DCF's determination was correct, or DCF might realize that its determination was incorrect. T5 at 53:9–21.

### ii. *Fair-Hearing Packet*.

374. DCF prepares a packet of the evidence it plans to present at the fair hearing and provides the packet to the customer and the hearing officer at least seven days before the scheduled date of the fair hearing. T5 at 48:2–13, 49:17–19; D. Ex. 10 at DCF-002439.

375.    The fair-hearing packet usually contains the customer's application, the relevant NOCA, the case log running record comments (CLRC), screen prints of budget and other screens in the FLORIDA system, income verifications provided by the customer (such as pay stubs) and by third-party sources (such as SWICA and The Work Number), and screen prints of transmittals or the Policy Manual, including the income-limit chart in Appendix A-7. T5 at 49:20–51:23; ECF No. 167-5 at 11:1–12:8.

376.    The Hearing Office informs recipients of their right to information held by the other party—*i.e.*, by DCF. The Hearing Office does so through its website, D. Ex. 26, and by requiring DCF to send the recipient all relevant documents before the hearing as set forth in Florida Administrative Code. T5 at 89:3–24.

### iii.    *Acknowledgment of Hearing Request.*

377.    Separate from the supervisory review and conference, when the Hearing Office receives a fair-hearing request, it issues an acknowledgment letter to both the recipient and DCF to inform them that the Hearing Office has received a fair-hearing request. T5 at 87:21–25.

378.    Defendants' Exhibit 66 provides an example of an "Acknowledgment of Hearing Request" issued by the Hearing Office. T5 at 88:1–13; D. Ex. 66 at DCF-005285.

379.    The Hearing Office includes in every acknowledgment letter the name and contact information of the DCF supervisor who is assigned to the case and

whom the recipient is invited to contact with questions or to attempt to resolve the case. T5 at 48:19–49:8, 88:14–89:2; D. Ex. 66 at DCF-005285.

380. At any time before or after the supervisory conference, the customer may contact the supervisor if the customer has any questions about the customer's case. T5 at 48:19–49:11, 60:21–61:1; D. Ex. 66 at DCF-005285.

381. The identity of the DCF contact depends on the recipient's geographic location. T5 at 88:23–89:2.

### d. Fair-Hearing Statistics.

382. The Hearing Office uses the Case Management System to track all fair hearings, including their dispositions. T5 at 82:5–22; P. Ex. 283.

383. A fair-hearing request can be granted, denied, partially granted and partially denied, abandoned, dismissed, withdrawn, or pending disposition. T5 at 82:23–83:3; P. Ex. 283.

384. Since the beginning of the unwinding period—from April 1, 2023, thought May 1, 2024—there have been 11,134 requests for fair hearings. T5 at 85:14–25, 98:6–11; P. Ex. 283. Of those requests, 484 have proceeded all the way to a fair hearing, T5 at 85:14–25; P. Ex. 283, with 52 being granted and 299 being denied, P. Ex. 283.

385. A disposition of "granted" means the hearing officer determined that DCF's action was incorrect. T5 at 83:14–17.

386. A disposition of "denied" means the hearing officer determined that DCF's action was correct. T5 at 83:7–13.

387.   "Pending disposition" means that a final disposition is still pending, such as where the hearing has not yet occurred. T5 at 99:12–100:3.

388.   Most fair-hearing requests do not result in a fair hearing because the recipient either withdraws or abandons the appeal. T5 at 85:6–12, 86:10–13; P. Ex. 283.

389.   A withdrawal occurs when the recipient informs the Hearing Office that the recipient no longer seeks a fair hearing. T5 at 84:13–16.

390.   A recipient may withdraw a fair-hearing request for any reason. T5 at 84:17–20. A recipient may, for example, withdraw a request because benefits were reinstated after the supervisory review, T5 at 84:17–22, or because the recipient comes to recognize that DCF's decision was correct. T5 at 84:23–85:1.

391.   Since unwinding began, 7,874 of 11,134 fair-hearing requests have been withdrawn. P. Ex. 283.

392.   A recipient need not explain why the recipient seeks to withdraw a fair-hearing request. T5 at 100:12–14.

393.   Although the Hearing Office attempts to track whether a change or corrective action was taken when a fair-hearing request was withdrawn, the "change" and "no change" designations in the Case Management System are based exclusively on information the recipient might or might not have provided to the Hearing Office about the reason for the withdrawal. T5 at 100:12–102:15, 103:9–14, 103:20–104:19.

394.    A fair-hearing request is considered abandoned when the recipient fails to appear at the scheduled hearing. T5 at 85:2–5.

395.    Since unwinding began, 1,978 of 11,134 fair-hearing requests have been abandoned. P. Ex. 283; T5 at 102:16–18.

396.    A fair-hearing request will result in a final order of disposition; in withdrawn or abandoned cases, the order takes the form of an order of dismissal that allows the recipient to seek to reopen the case. T5 86:14–22.

397.    The fact that customers successfully requested more than 11,000 fair hearings during a 13-month period indicates that DCF adequately informs recipients of their right to a fair hearing and of the method by which recipients may obtain fair hearings. T5 at 114:8–115:1.

### e.    <u>Knowledge and Use of Fair-Hearing Procedures.</u>

#### i.    *Chianne D. and C.D.*

398.    When Chianne D. read the fair-hearing language in her April 24, 2023 NOCA, she did not find it confusing or unclear. T3 at 25:14–23.

399.    Chianne D. agreed that the fair-hearing language informed her of her right to request a fair hearing. T3 at 25:24–26:2.

400.    She understood this before she called the call center on May 30 and 31, 2023. T3 at 26:20–22, 27:10–24, 28:17–29:13, 31:3–25.

401.    Chianne D.'s 90-day period to request a fair hearing in connection with the April 24, 2023 NOCA extended through July 24, 2023. P. Ex. 40. Her deadline

to request a fair hearing with continued benefits throughout the fair-hearing process was May 31, 2023. P. Ex. 40.

402.     Chianne D. was afforded more than five weeks to request a fair hearing and maintain benefits pending appeal. Although she was aware before that deadline that she and C.D. were being terminated because of income, she did not request a fair hearing until June 1. T3 at 25:24–26:25; D. Ex. 98 at DCF-005280 (providing deadline by which to request a hearing and maintain benefits until the hearing decision).

403.     A DCF call-center representative submitted a fair-hearing request on Chianne D.'s behalf, T3 at 32:6–12; T5 at 87:5–13; D. Ex. 66, and a fair hearing was scheduled for July 20, 2023, P. Ex. 43; T3 at 14:1–6.

404.     Chianne D. received an Acknowledgement of Hearing Request from the Hearing Office with the name and contact information of a DCF supervisor she could contact about her case, but Chianne D. did not contact the supervisor. D. Ex. 66 at DCF-005285; T3 at 35:13–36:6.

405.     Chianne D. requested that the fair hearing be rescheduled to an earlier date. D. Ex. 70; T3 at 14:20–15:6.

406.     The Hearing Office rescheduled the fair hearing to July 3, 2023, P. Ex. 46, but the July 3, 2023 hearing was ultimately rescheduled to July 13, 2023, due to a state holiday, P. Ex. 47.

407.     Chianne D. withdrew her fair-hearing request on June 28, 2023, T3 at 36:7–9; T5 at 87:2–20, more than 10 days before the fair hearing was scheduled to

occur, and before the fair-hearing packet was due, *see*, *e.g*., D. Ex. 66 (requiring the evidence be submitted to the customer seven days before the hearing); T5 at 55:8–9 (same). At the time she withdrew her hearing request, Chianne D. was represented by counsel. T3 at 36:7–12.

### ii. *Lily Mezquita.*

408.    Ms. Mezquita has requested fair hearings to contest Medicaid termination notices on at least three occasions. T3 at 143:5–7, 149:1–4, 152:24–153:3. With respect to the July 2023 NOCAs, Ms. Mezquita spoke with call-center agents several times about the basis of her eligibility determination before she requested a fair hearing on July 24—four days after she received the NOCAs. T3 at 159:15–160:23. Three days later, on July 27, Ms. Mezquita received an Acknowledgement of Hearing Request that provided the name and contact information of a DCF supervisor in case Ms. Mezquita had questions about her case. T3 at 175:12–176:12 (discussing D. Ex. 100).

409.    Each time she filed an appeal, Ms. Mezquita's Medicaid eligibility was corrected before a hearing occurred, so Ms. Mezquita did not need to complete the hearing process. With respect to the July 2023 NOCAs, Ms. Mezquita's and her son's Medicaid coverage was restored on August 10, 2023, retroactive to August 1, 2023. T3 at 145:3–9, 176:13–21. This reinstatement occurred several weeks before Ms. Mezquita's hearing date. *See also* T3 at 149:4–19 (eligibility determination corrected without hearing), 153:1–20 (same).

410.     Ms. Mezquita did not testify that she found the fair-hearing language in her NOCAs confusing or inadequate. Rather, she testified that she did not usually read the entire NOCAs when she received them. T3 at 128:8–129:6. As to the July 2023 NOCAs, she first read the fair-hearing language on the day of her deposition in this case. T3 at 177:13–178:6.

### iii.   *A.V.*

411.     Jennifer V. has seen many NOCAs over time, including the fair-hearing language. T3 at 114:18–115:5.

412.     Jennifer V. did not testify that the nature of the fair-hearing language or the absence of individualized information on her notices—such as household income amounts or prior eligibility categories—prevented her from protecting A.V.'s rights through the fair-hearing process.

413.     Instead, when she received the May 16, 2023 NOCA (P. Ex. 81), she understood that A.V.'s Medicaid was ending and that a fair hearing was available to contest that determination, but she did not request a fair hearing. T3 at 114:18–115:5. Rather, after consulting with her attorneys, Jennifer V. decided to forego a fair hearing with respect to A.V.'s termination from Medicaid. T3 at 115:18–20.

### iv.   *Kimber Taylor and K.H.*

414.     During Ms. Taylor's conversation with the call center about her June 8, 2023 NOCA, the call center informed her that she could request a fair hearing if she disagreed with the notice. T1 at 54:1–12. Ms. Taylor also learned from reading her notice that a fair hearing was available to her. T1 at 32:16–20.

84

415.    Ms. Taylor's deadline to request a fair hearing was 90 days after the date of her June 8 NOCA—or September 6. PX 112 at DCF-005667. Her deadline to request a fair hearing with continued benefits during the fair-hearing process was June 30—the effective date of her termination. PX 112 at DCF-005664, DCF-005667.

416.    Ms. Taylor testified that she did not request a fair hearing because the fair-hearing language in her NOCA stated that she "will be responsible to repay any benefits continued if the hearing decision is not in your favor." T1 at 49:21–50:7. Ms. Taylor was the only witness who testified at trial that the repayment language in the fair-hearing paragraph influenced her decision not to request a fair hearing.

417.    Ms. Taylor did not explain why she did not request a fair hearing after June 30, when her request would not have triggered a continuation of benefits.

418.    Ms. Taylor, moreover, was represented by counsel by August 2023, T1 at 58:14–24, and her counsel was aware that DCF does not seek repayment of Medicaid benefits absent fraud or an intentional program violation, *see* ECF No. 1 ¶ 90. Still, Ms. Taylor did not request a fair hearing before her September 6, 2023 deadline.

419.    In October 2023, DCF replaced the phrase "will be responsible" in the in its NOCAs with the phrase "may be responsible." T4 at 139:10–21; D. Ex. 98 at 10. In April 2024, DCF added a sentence to the fair-hearing language to specifically address repayment of Medicaid benefits. T4 at 187:24–189:1; Ex. 98 at 10; D. Ex. 121 at 3. That sentence states: "For Medicaid, you will not be responsible to repay

85

benefits unless we find that you engaged in fraud or an intentional program violation." D. Ex. 121 at 3.

## VIII. <u>DCF'S CALL CENTER.</u>

### a. <u>Overview of the Call Center.</u>

420.   DCF operates a call center as an access point that allows customers to ask questions about their public-assistance cases. T4 at 193:10–14. The call center is housed within ESS. T4 at 193:6–9.

421.   The call center has three hubs—one each in Miami, Tampa, and Jacksonville—where managers and supervisors work, but most of DCF's call-center agents are teleworkers who work from their homes around the State. T4 at 193:10–194:11.

422.   The call center's hours of operation are from 7 AM to 6 PM. T4 at 83:21–84:8, 194:12–14. The call center may be open on Saturdays during disasters. T4 at 83:23–25.

423.   Instead of calling the call center themselves, recipients can have an authorized representative call on their behalf. T4 at 94:24–95:6. For example, Mr. Ramil usually calls the call center on behalf of his clients because that is part of his job and the service provided by his employer, THE PLAYERS Center. T4 at 102:7–14.

### b. <u>Call-Center Operations.</u>

424.   Call center agents are segmented into three tiers based upon the types of calls they are trained to handle: Tier 1, Tier 2, and Tier 3. T4 at 202:3–10. The

official title of frontline call-center agents—whether Tier 1, Tier 2, or Tier 3—is Call Center Service Representative 1. T4 at 199:17–21, 203:13–17.

425.    At present, Tier 1 agents do not take Medicaid calls and are trained to conduct food-assistance interviews. T4 at 202:25–203:12, 205:4–8, 224:23–225:1. Even though Tier 1 agents currently do not take Medicaid calls, hiring Tier 1 agents who can handle Tier 1 calls enables Tier 2 and Tier 3 agents to focus on more complex calls. T4 at 253:18–254:4.

426.    To progress to Tier 2, agents must complete a one- to two-week training class. T4 at 202:25–203:12. Tier 2 agents are trained to handle Tier 1 and Tier 2 calls. T4 at 202:7–15.

427.    Finally, to progress to Tier 3, agents must complete a more comprehensive, six- to eight-week training class. T4 at 202:25–203:12. Tier 3 agents are trained to handle the most complex calls—Tier 3 calls—as well as Tier 1 and Tier 2 calls. T4 at 202:7–15. About 60 percent of call-center agents are Tier 3 agents. T4 at 202:16–19, 222:25–223:13.

428.    Separate from Call Center Service Representative 1's, the call center employs Call Center Service Representative 2's—senior workers who perform quality assurance and training and supervisor backup when supervisors are out. T4 at 203:18–24.

429.    Since September 2021, DCF has contracted with a third-party entity, Lighthouse, to assist with calls. T4 at 209:24–210:9.

430.    During the unwinding period, Lighthouse fielded some simpler Medi-
caid inquiries, such as password resets, telephonic applications, and basic case in-
quiries to enable call-center agents to focus on more complex inquiries. T4 at
210:10–211:6. Tier 1 agents also assisted with password resets and telephonic appli-
cations. T4 at 231:11–232:18.

431.    Callers who selected a prompt indicating that their question concerned
a Medicaid unwinding mailout were routed to Lighthouse, while callers who selected
other Medicaid-related prompts were routed to the call center. T4 at 233:17–235:1.

432.    If a Lighthouse representative was unable to answer a caller's inquiry,
the Lighthouse representative could transfer the call to the call center. T4 at 211:17–
22.

433.    Lighthouse's role has since been significantly decreased, as it no longer
handles Medicaid unwinding calls. T4 at 211:10–12.

434.    Evidence offered at trial showed customers being transferred to higher-
level agents to address certain questions. *See*, *e.g*., T2 at 169:25–170:3, 196:16–18;
T4 at 238:7–15; D. Ex. 80 at 7:17–25.

435.    Mr. Ramil testified that, over his more than 1,000 calls to the call cen-
ter, he has been reliably transferred between call-center agents. T4 at 87:18–24.
Given Mr. Ramil's larger sample size, Plaintiffs' individual experiences are not rep-
resentative, and do not support a finding that efforts to transfer callers to more ex-
perienced agents are ineffective.

436.   The same is true of dropped calls. Plaintiffs offered anecdotal evidence of "dropped" calls. T3 at 70:17–18. Mr. Ramil testified that only five percent of his calls with the call center over the past seven years have been dropped. T4 at 86:21–87:6, 96:9–20. Given Mr. Ramil's larger sample size, Plaintiffs' anecdotal evidence of dropped calls is not representative and does not support a finding that the call center frequently drops calls.

### c.   <u>Increase in Call-Center Staffing.</u>

437.   The number of employees who staff DCF's call center has approximately doubled since April 2023. T4 at 201:4–10.

438.   The call center now has about 960 team members and 700 allocated positions for call-center agents. T4 at 199:17–200:2. The 700 allocated positions include 200 new positions authorized by the Legislature in April 2024 and 100 new positions authorized previously. T4 at 200:3–10, 200:18–20; Ch. 2024-231, at 100, Laws of Fla.; Ch. 2023-239, at 99, Laws of Fla. Of the 700 allocated positions, 521 are currently filled. T4 at 222:25–223:9.

439.   DCF is advertising to fill the other allocated positions and received 1,200 applications in response to its most recent advertisement. T4 at 200:11–15. DCF has expedited its hiring process and is currently reviewing applications, interviewing candidates, and conducting background screenings. T4 at 200:11–15, 201:16–202:2. DCF is hiring agents at a rate of about 20 per week. T4 at 253:18–23.

### d.  __The Customer's Experience.__

440.   When a customer calls the call center, the customer is first routed to an Interactive Voice Response ("IVR") system, which allows customers to self-serve or, based on the customer's prompts, determines the best agent for the customer to speak with. T4 at 195:9–196:2.

441.   There is no wait time to use the self-service option, which a customer can navigate in two to four minutes. T4 at 196:3–6, 196:16–22.

442.   The self-service system can inform a customer, for example, whether the customer's application has been approved or denied, whether the customer is active in Medicaid, and what the customer's certification period is. T4 at 196:7–15, 196:23–197:1.

443.   The self-service system can also inform a customer of the reason the customer was determined to be ineligible for Medicaid by audibly reading the text of the reason code on the customer's NOCA. T4 at 220:1–4.

444.   The IVR system experienced instability for a few days in September and October 2023 and from mid-December 2023 to March 2024, which limited its functionality and required some customers to be provided with a simplified menu of options. T4 at 197:8–198:5.

445.   However, the instability was resolved in March 2024, and DCF transitioned to a different IVR platform in July 2024. T4 at 198:6–16.

446.   The new IVR platform informs customers of their wait times and of their place in the queue. T4 at 198:17–22; ECF No. 167-10 at 124:20–125:5. It also enables live agent chat—a feature that DCF plans to deploy. T4 at 198:17–22.

447.   Callers who wish to speak with an agent are placed in queues according to the nature of their inquiries: for example, password resets, telephonic applications, and general case inquiries. T4 at 198:23–199:16.

448.   The call center employs a dynamic closing process, which estimates the call volume that can be served by 6 PM. T4 at 194:15–23.

449.   If the dynamic closing process estimates that a caller will not be served by 6 PM, the caller is advised to call back later. T4 at 194:15–23. Callers who are in the queue, however, will be served even if the agent must continue to speak with customers past 6 PM. T4 at 194:24–195:8.

450.   Agents regularly remain on the phone until about 7 PM to answer all calls in the queue. ECF No. 167-10 at 124:2–6; T4 at 194:24–195:8. Supervisors remain available until the call center closes. T4 at 218:21–23.

451.   The call center does not limit the amount of time an agent may spend on the phone with a caller, but it encourages the efficient handling of calls to serve as many callers as possible. T4 at 209:13–19.

**e.    Call-Center Metrics.**

452.   Since redeterminations resumed after the public health emergency, the volume of calls to the call center has varied from 1.6 to 2.5 million per month. T4 at 206:1–6; P. Ex. 284.

453.    The average wait time for calls across all queues has ranged from about 33 minutes to about 45 minutes since redeterminations resumed, but declined to 20 minutes and 33 seconds by the most recent month for which data is available in the record (April 2024). T4 at 206:7–13, 207:15–18; P. Ex. 284.

454.    The number of calls answered by a live agent has ranged from 264,673 to 444,319 per month since redeterminations resumed and reached its highest level (444,319) in the most recent month for which data is available in the record (April 2024). T4 at 207:24–208:2; P. Ex. 284.

455.    The number of calls handled through the self-service option has ranged from 340,419 (during a period of IVR instability) to 968,968 and was 593,923 in April 2024. T4 at 208:3–11; P. Ex. 284.

456.    The number of "blocked" calls was 744,000 in April 2024. P. Ex. 284.

457.    A call is considered "blocked" if the customer indicates a desire to speak with an agent, but no slots are available in the queue, and the caller is informed that all representatives are busy and is advised to call back later. T4 at 218:11–20, 241:6–14, 244:1–4. The caller might need to call back to speak with an agent.

458.    "Blocked" calls also include calls made during regular business hours, but that are not placed in a queue because the dynamic closing system determines that an agent will not answer the call before 6 PM. T4 at 218:11–20. The record does not indicate what proportion of the 744,000 blocked calls were blocked because the dynamic closing system determined they would not be answered by 6 PM.

459.   Plaintiffs presented no evidence that callers whose calls were blocked were unable to call back later and reach an agent.

460.   The 744,000 figure represents the number of blocked calls rather than the number of unique callers who could not reach an agent. T4 at 244:13–15.

461.   Over time, DCF has increased the number of slots in some queues and decreased the number of slots in other queues. ECF No. 167-10 at 32:6–16.

**f.    Quality Assurance.**

462.   Nichole Solomon has served as the Director of Call Center Services since April 2023. T4 at 192:17–19, 193:1–3.

463.   Ms. Solomon attributes the improvement in call-center metrics in part to recently implemented operational changes. T4 at 211:23–212:4.

464.   In January 2024, the call center changed its approach to quality assurance and began to conduct live call monitoring instead of recorded call monitoring. T4 at 212:5–14.

465.   Each supervisor conducts random live call monitoring for members of the supervisor's team. ECF No. 167-10 at 24:12–18; T4 at 213:12–20. Live call monitoring enables supervisors to provide more coaching and feedback to call-center agents. T4 at 213:12–20.

466.   The call center also employs quality-assurance support staff who review calls and provide feedback to call-center agents and supervisors on the agents' performance. ECF No. 167-10 at 24:12–23.

467.   Call-center agents also receive support from a live chat with their supervisors through Microsoft Teams. T4 at 213:21–214:6.

468.   If an agent has a question, then the agent can enter the question into the chat feature, and the supervisor can either join the call with the customer in real time or provide a quick response through the chat. T4 at 213:21–214:6.

469.   Agents who need assistance can also place themselves in the support queue, which is a phone line that connects agents to more experienced agents. T4 at 214:7–13.

### g.   Information Available to Call-Center Staff.

470.   To assist customers, agents have access to the FLORIDA system, in which they can review case notes and screens, including the budget screen, and the ACCESS Management System, which houses customer applications. T2 at 113:9–13, 171:18–25; T4 at 214:20–215:9; ECF No. 167-10 at 52:3–56:4.

471.   Agents have access to income-verification information from third-party sources such as The Work Number, SWICA, and the Federal Data Services Hub. T4 at 215:15–25.

472.   Agents are trained to access DCF's intranet to locate job aids, guides, and other resources that can help them answer customer inquiries. T4 at 214:20–215:12; ECF No. 167-10 at 59:9–21, 75:5–22.

473.   With resources and information available to them, agents are trained and able to provide customers with their income limits, their reported income, and

their SFU sizes. T2 at 172:1–4; T4 at 84:21–85:11, 216:1–18.[9] For example, an agent can use Appendix A-7 to the Policy Manual to determine an individual's income limit. T4 at 228:16–20; ECF No. 167-10 at 65:17–66:2, 66:8–10, 67:13–68:2.

474.     If a customer receives information from the call center that differs from the information the customer reports, or that the customer believes to be inaccurate, then the customer can request a fair hearing. T2 at 176:6–11. For example, Plaintiff Chianne D. requested a fair hearing through the call center. T2 at 176:6–13.

      **h.**      **Plaintiffs' and Other Witnesses' Use of the Call Center.**

            **i.**      *Mr. Ramil.*

475.     Mr. Ramil initially testified that, over his seven years with THE PLAY-ERS Center, he has called the call center "more than multiple times," and "more than a hundred" times. T4 at 84:9–15. However, on cross examination, he acknowledged that he has called the call center more than 1,000 times during the seven years he has actively assisted families as a community health educator with THE PLAYERS Center. T4 at 54:18–55:18, 96:9–20.

476.     Mr. Ramil acknowledged that he has called the call center more than 1,000 times because he finds it beneficial to do so. T4 at 96:21–24.

477.     While Mr. Ramil testified that, out of his more than 1,000 calls to the call center over a seven-year period, he has received incorrect information about the

---

[9] However, as explained elsewhere, if the individual failed Medicaid because of income, the dollar amount retained in DCF's system is the gross income, not the countable net income. *See supra* ¶¶ 105–22.

applicable income limit, how to calculate income, and an individuals' eligibility status, he offered no specifics as to the frequency. T4 at 85:20–86:13. In fact, Mr. Ramil testified that he has received incorrect income information from the call center only a handful of times. T4 at 96:25–97:7.

478.   As it relates to this case, Mr. Ramil called the call center on Chianne D.'s behalf, obtained the income DCF had on file, and found it to be accurate. T4 at 95:13–96:3, 91:17–21.

### ii.   *Chianne D. and C.D.*

479.   Over a three day period from May 30, 2023, and June 1, 2023, Chianne D. spoke with call-center agents five times in connection with her April 24, 2023 NOCA. D. Exs. 73–77, 80–84.

480.   On at least four calls, she was informed that she and C.D. were being terminated from Medicaid and enrolled in the Medically Needy program because of income. T3 at 34:8–13.

481.   The call center provided Chianne D.—down to the penny—with the amount of income that DCF used when it determined her and C.D.'s eligibility. T3 at 34:14–17. The call center identified the income amount by weekly paychecks. T2 at 34:18–20.

482.   On the morning of May 30, 2023, Chianne D. called the call center. D. Ex. 73 (audio); D. Ex. 80 (transcript). She was informed that she and C.D. "are good, which are Medically Needy. You both have Medicaid until May of 2024." D. Ex. 73 at 2:53–3:25; D. Ex. 80 at 3:20–25.

96

483.   Later that day, in the afternoon of May 30, 2023, Chianne D. spoke with the call center again. T3 at 27:12–15; D. Ex. 74 (audio); D. Ex. 81 (transcript). Chianne D. was informed that "it actually has you in Medically Needy because it says your income is too high." D. Ex. 74 at 9:00–9:09; D. Ex. 81 at 5:6–8; T3 at 27:21–24. At another point during the same call, she was again informed that she was enrolled in Medically Needy. T3 at 28:14–16; D. Ex. 74 at 4:19–4:31; D. Ex. 81 at 3:21–23.

484.   The next day, Chianne D. spoke with a Tier 3 agent, D. Ex. 82 at 4:18–19, who likewise informed Chianne D. that her and C.D.'s coverage was terminating because of income, T3 at 28:17–21, 29:2–13; D. Ex. 75 at 11:10–11:20 ("So yeah, her Medicaid is—her Medicaid is closed, and it's because of the amount of income that you guys have coming in."); Ex. 82 at 7:1–3 (same); D. Ex. 75 at 12:25–13:02 ("So my question was to you: It was due to the income, so that's why she was removed, because you're over the income for regular Medicaid for her and they put you at medically needy, which means that every bill that you pay or every bill that you receive for her medicine, you need to send that in—report that to us so we can open her Medicaid fully."); D. Ex. 82 at 7:20–8:5 (same).

485.   Chianne D. spoke with a call-center agent again on June 1, 2023. D. Ex. 76 (audio); D. Ex. 83 (transcript); T3 at 29:14–18. The agent informed Chianne D.—down to the penny—of the amount of income that DCF had on file for Chianne D.'s husband. T3 at 30:3–6; D. Ex. 76 at 4:14–6:00; D. Ex. 83 at 5:10–6:12. The agent

even provided the dates of the weekly paychecks and the amount of each paycheck. T3 at 30:7–10; D. Ex. 76 at 4:14–6:00; D. Ex. 83 at 5:10–6:12.

486.   Chianne D. interrupted the agent and said that she (Chianne D.) did not want to talk about her husband's income anymore. T3 at 30:17–21; D. Ex. 76 at 15:27–16:12; D. Ex. 83 at 14:12–15:2.

487.   The agent informed Chianne D. of her right to request a fair hearing if she disagreed with DCF's decision that C.D. was ineligible for Medicaid because of income. T3 at 31:3–12; D. Ex. 76 at 21:33–22:46; D. Ex. 83 at 19:22–20:15.

488.   The agent informed Chianne D. again of the option to request a fair hearing and offered to submit a request for her. T3 at 32:6–9; D. Ex. 76 at 23:59–24:25; D. Ex. 83 at 21:14–21:21.

489.   The agent submitted a fair-hearing request for Chianne D. that day. T3 at 32:10–12; D. Ex. 66 at DCF-005285; D. Ex. 76 at 23:59–24:25; D. Ex. 83 at 21:14–21:21.

490.   Chianne D. had a second call on June 1, 2023, with another call-center agent. D. Ex. 77 (audio); D. Ex. 84 (transcript); T3 at 32:15–19. During this call, the agent informed Chianne of her husband's income. D. Ex. 77 at 1:51–2:11; D. Ex. 84 at 3:13–18; T3 at 32:23–25. In response to Chianne D.'s claim that her husband did not make $5,400 over a one-month period, the agent provided Chianne D. with her husband's most recent four weeks at that time of the call to compare it to the income that DCF used when processing her application to assess whether it would change

98

the outcome—which it did not. D. Ex. 77 at 5:19–6:26, 14:07–14:46; D. Ex. 84 at 5:22–7:1; T3 at 33:15–20, 34:2–7.

### iii.   *Kimber Taylor and K.H.*

491.   After receiving the June 8, 2023 NOCA, Ms. Taylor called the call center. T1 at 31:13–23. The call center informed Ms. Taylor that she and K.H. were being terminated from Medicaid, T1 at 53:16–19, because her income was too high, T1 at 32:3–6, 53:20–22, and that she could request a fair hearing if she disagreed with the decision, T1 at 54:1–12.

492.   While Ms. Taylor testified on direct examination that the call center did not provide her with her or K.H.'s income limits, T1 at 32:7–12, Ms. Taylor conceded on cross examination that she never asked the call center for that information, T1 at 53:23–25.

### iv.   *A.V.*

493.   Jennifer V.'s experience with her and her family members' enrollment in Medicaid began in 2010. T3 at 57:21–25. Since that time, she has called the call center about her family's Medicaid coverage, T3 at 59:7–19, 60:20–61:16, 103:16–104:2, 105:1–5.

494.   She has lost count of how many times she has spoken with call-center agents, but has spoken with call-center agents at least ten times. T3 at 103:16–104:2.

495.   Jennifer V. also testified about her attempts to visit what she believed to be DCF offices and to obtain information from the call center after her private health plan dropped her in 2022. However, these calls and office visits were not

related to Medicaid, nor was Jennifer V. trying to apply for Medicaid; she preferred her Florida Blue policy and could manage payments for it. T3 at 62:11–17.

### v. *Lily Mezquita.*

496.    Ms. Mezquita has contacted the call center many times over the years for information about her family's Medicaid coverage and clarification of notices. T3 at 132:25–133:1, 157:1–14. For example, Ms. Mezquita spoke to a call-center agent the same day she received her July 2023 NOCAs (P. Ex. 122 and P. Ex. 123), as well as the following day. T3 at 158:6–23. Ms. Mezquita also called and spoke to a call-center agent upon receiving her October 2023 NOCAs. T3 at 171:15–25.

497.    Regarding the July 2023 NOCAs, Ms. Mezquita explained to an agent that she received a NOCA terminating her Medicaid coverage and enrolling her in the Medically Needy program, and was advised that her Medicaid had been termi-nated because of income. P. Ex. 128; T3 at 165:14–23, 166:17–19. The call-center agent also told Ms. Mezquita the amount of income that DCF had on file for her and her husband and the income limit for a family of five. P. Ex. 128 at 7:19–8:38; T3 at 167:10–168:14. The call-center agent first gave an incorrect income limit to Ms. Mezquita, but Ms. Mezquita immediately identified the error, and the agent then provided Ms. Mezquita with the correct income limit. P. Ex. 128 at 7:19–8:38; T3 at 167:10–168:14.

498.    With respect to the October 2023 and March 2024 NOCAs, Ms. Mezquita also worked with the call center to correct an erroneous ineligibility

determination, and was able to successfully maintain her Medicaid coverage. T3 at 149:4–19, 150:1–7, 153:1–20, 173:13–21.

## IX.   OTHER PUBLICLY AVAILABLE SOURCES OF INFORMATION.

499.   The fact that certain information (such as the income amount and the income standard) does not appear in NOCAs does not mean that the information is unavailable to customers. For example, Ms. Taylor knew there was no income limit for Medicaid recipients who are infants or pregnant, despite that information not being on the notice. T1 at 51:16–23.

### a.   DCF's Website.

500.   DCF maintains a public website that provides substantial information about the Medicaid program. DCF's main Medicaid page contains links to several resources, including the Policy Manual, the Family-Related Medicaid Fact Sheet and SSI-Related Medicaid Fact Sheet, and the Medically Needy Brochure. P. Ex. 285 at 00:20–00:50; T5 at 12:10–13:11.

501.   The Medicaid page also displays high-level information about Medicaid eligibility and eligibility categories (such as parents, children, and pregnant women) and describes the Medically Needy program. P. Ex. 285 at 00:16–06:43; T5 at 13:14–14:8, 16:2–17:12. These sections of the webpage explicitly reference income as an eligibility factor and describe the Medically Needy program as a program for individuals who exceed the income limit for Medicaid. T5 at 13:14–14:8, 16:2–17:12.

502.   Mr. Ramil has found the information on DCF's general website to be generally accurate as it relates to Medicaid eligibility. T4 at 72:22–24. Mr. Ramil has

not found the information on DCF's website to be inaccurate in any instance. T4 at 72:25–73:2.

### i.    *Policy Manual.*

503.   The Policy Manual encapsulates DCF's current rules and regulations and is the chief resource for determining the correctness of eligibility decisions. T2 at 8:10–14. It is available on DCF's website. P. Ex. 285 at 23:14–25:43; T2 at 154:11–16, 165:17–24; T5 at 19:15–20:7.

504.   The Policy Manual contains the rules that determine an individual's income for Medicaid purposes, T2 at 153:21–154:2; P. Ex. 186 at DCF-002949 § 2630.0108, and the composition of each person's SFU, T2 at 172:5–12; D. Ex. 6 at DCF-003136–37 § 2230.0400.

505.   The Policy Manual is available on DCF's website, broken down by chapter. For example, one chapter discusses how to evaluate individuals' monthly income to determine whether they are over or under the income limit for a specific program. T5 at 7:14–8:8 (discussing P. Ex. 187). Another breaks down the different eligibility categories covered by different programs. T5 at 8:9–9:2. For example, it explains the eligibility categories for family-related Medicaid, including eligibility categories that cover parents and caretakers, pregnant women, and children. T5 at 8:9–9:2.

506.   Mr. Ramil uses the Policy Manual so often that he has bookmarked it on his computer. T4 at 73:3–6, 73:10–11, 99:22–25, 100:1–3. Mr. Ramil's claim that DCF's website is "very superficial" is inconsistent with his acknowledgment that he has bookmarked DCF's website for ready access and frequent use. T4 at 72:10–18.

###### ii.   *Appendix A-7.*

507.   Appendix A-7 (P. Ex. 178) sets forth the income limits for family-related Medicaid for 2023. T2 at 16:6–13. Appendix A-7 associates dollar amounts with the eligibility rules explained in detail in the Policy Manual. T2 at 154:3–10. Appendix A-7 is available on DCF's website. T2 at 154:11–16. DCF's Family-Related Medicaid Fact Sheet contains a link to Appendix A-7. T5 at 18:24–19:6.

508.   Mr. Ramil uses Appendix A-7 when he helps individuals with their Medicaid eligibility. T4 at 74:10–12.

###### iii.   *Medicaid Fact Sheets.*

509.   DCF's fact sheets are a resource available to the public to assess their eligibility for Medicaid and understand their enrollment in the Medically Needy program. D. Exs. 27, 28.

510.   DCF's fact sheets are available on DCF's website. P. Ex. 285 at 11:50–23:14; T2 at 165:25–166:7; T5 at 10:7–19.

511.   The Family-Related Medicaid Fact Sheet contains information about family-related Medicaid, including eligibility categories and eligibility requirements. T5 at 9:4–16 (discussing D. Ex. 28), 17:19–19:6. It provides information about the Medically Needy program and links to the Medically Needy Brochure. T5 at 10:7–19, 17:19–19:5.

512.   While DCF recently updated the Family-Related Medicaid Fact Sheet, both the new version and the prior version generally provided the same types of

information and were posted on DCF's website. T5 at 9:4–10:19; *compare* D. Ex. 28, *with* P. Ex. 253.

513.   Ms. Mezquita testified that she found the Family-Related Medicaid Fact Sheet through a Google search, T3 at 130:18–131:1, and used it to determine that her coverage had been incorrectly terminated given her status as a pregnant woman, T3 at 167:3–9, 168:20–169:7. Ms. Mezquita also testified that she consulted Appendix A-7, which she also found through a Google search. T3 at 156:6–16.

### iv.   *Medically Needy Brochure.*

514.   The Medically Needy Brochure is also available on the DCF website. P. Ex. 285 at 25:43–26:20. It explains what the Medically Needy program is and states that the Medically Needy program is for "individuals who would qualify for Medicaid except for having income that is too high." T5 at 14:22–15:24; D. Ex. 30.

### b.   <u>Family Resource Centers.</u>

### i.   *Overview.*

515.   Family resource centers are an option for Medicaid recipients to make inquiries concerning their applications and NOCAs. Family resource centers are physical office locations across the State that DCF's customers can visit for information about all programs for which DCF determines eligibility. T5 at 185:17–24, 197:7–15.

516.   DCF operates 40 family resource centers at locations across Florida. T5 at 187:25–188:2.

517.     Some family resource centers are located in large, urban areas: DCF has a family resource center in Jacksonville, another in Orlando, and five in Miami-Dade County. T5 at 188:9–17. Others are located in places like Bonifay, Lake City, and Okeechobee. T5 at 188:3–8.

518.     Each of the six regions in which DCF operates includes at least four family resource centers. T5 at 188:18–25.

519.     That there is not a family resource center in every city does not support a finding that family resource centers are not physically accessible. Each month, approximately 105,000 customers visit DCF's family resource centers. T5 at 189:23–190:3. Of these, about 23 percent make case inquiries. T5 at 190:4–6.

520.     Moreover, while Mr. Ramil testified that there is one family resource center—or storefront—in Jacksonville that serves a five-county area, T4 at 78:2–14, 97:19–22, roughly 500 of Mr. Ramil's clients alone have physically visited a family resource center, T4 at 97:23–25.

## ii.   *Locating and Visiting.*

521.     Customers can locate family resource centers on DCF's website. T5 at 189:1–2; D. Ex. 23; P. Ex. 290. On the website, customers can search for family resource centers by city, county, and ZIP code. T5 at 189:1–13; D. Ex. 23; P. Ex. 290. The website also contains an interactive map that identifies family resource centers by pinpoints on a map of Florida. T5 at 189:9–17; D. Ex. 23; P. Ex. 290. On the interactive map, customers can zoom in and select a pinpoint for more information about a specific family resource center location. T5 at 189:9–17; D. Ex. 23; P. Ex.

290. Online, customers can also make appointments to visit most family resource centers. T5 at 189:18–22; P. Ex. 290. The online appointment feature will soon be available for all family resource centers. T5 at 189:18–22. Family resource centers are open from 8 AM to 5 PM on business days. T5 at 197:3–6.

### iii. *Assistance.*

522.   Self-service representatives at family resource centers can assist customers who have questions about their Medicaid termination notices. T5 at 186:13–19.

523.   Each family resource center employs at least one self-service representative. T5 at 196:11–16.

524.   A customer who visits a family resource center with a case inquiry can meet with a self-service representative in a confidential area—an office or a cubicle—where the self-service representative will discuss the case with the customer and answer the customer's questions. T5 at 186:20–25.

525.   Self-service representatives are trained to access NOCAs, customer applications, the CLRC notes associated with the customer's case, budget screens in the FLORIDA system, and other information relevant to the customer's inquiry. T5 at 187:1–12.

526.   Self-service representatives have access to the FLORIDA system and can therefore provide the customer with details about the customer's case. T5 at 187:13–18.

527.   For example, a self-service representative can explain to the customer the customer's income limit and the amount of income that DCF attributed to the customer. T5 at 187:19–24.

### iv.   *Plaintiffs' and Other Witnesses' Use of Family Resource Centers.*

528.   That Mr. Ramil does not urge his clients to visit family resource centers is a fact of little significance. T4 at 76:15–77:2. After all, it is Mr. Ramil's job to contact DCF on his clients' behalf. T4 at 76:15–77:2. As Mr. Ramil explained in reference to the call center, the reason that he does not urge his clients to call the call center is that, "if they are one of our clients that we are helping, then we would . . . call the DCF call center on their behalf." T4 at 76:15–23

529.   As of March 2024, Chianne D. had not looked to see whether there was a family resource center near her. T3 at 20:17–19, 41:23–42:1.

530.   Kimber Taylor has not visited a family resource center, nor looked to see whether there is a family resource center near her. T1 at 54:25–55:4.

531.   Plaintiffs attempt to impugn DCF's family resource centers through Jennifer V., who testified that she visited three family resource centers in early 2022 but was unable to receive assistance. T3 at 61:21–64:17. The evidence makes clear, however, that Jennifer V. was mistaken, and that the office locations she visited were not family resource centers.

532.   Jennifer V. testified that she first visited a "WIC office" that was "attached to . . . a Florida Health Department office," and that they were unable to help

her. T3 at 61:21–62:5. "WIC" refers to Women, Infants, and Children—a program administered by the Florida Department of Health, which is a separate agency from DCF. T5 at 190:7–191:4.

533.   Jennifer V. testified that she next visited an office at Coral Way and 122nd Avenue in Kendall. T3 at 62:5–8. But DCF does not have—and in 2022 did not have—a family resource center at that location. T5 at 191:5–12.

534.   Jennifer V. testified that she next visited an office at Coral Way and 97th or 107 Avenue, and that staff at the office did not speak English and therefore were unable to help her. T3 at 63:3–14. But while DCF had an office in that shopping center, so did one of its contracted community partners. T5 at 191:13–192:6. While DCF does not hire staff who do not speak English, DCF did not prohibit community partners from doing so. T5 at 192:7–25. Community partners, moreover, were per-mitted to serve discrete populations, such as refugee communities. T5 at 193:1–22.

535.   Jennifer V. testified that she next visited an office across from Florida International University's main campus, where she was directed to take a ticket and wait in line. T3 at 63:16–64:17. DCF has not had a family resource center at that location in more than ten years, but a large community partner has continued to operate there. T5 at 193:23–194:11.

536.   The evidence establishes that none of the office locations that Jennifer V. visited was a DCF family resource center.

### c.   **State and Federal Law.**

537.   Lily Mezquita testified that she performed her own research, including online research, to identify Florida Statutes and United States Code provisions related to Medicaid coverage for pregnant women. T3 at 130:18–131:1, 132:2–19, 168:20–170:9. From these sources, she determined that her Medicaid coverage had been erroneously terminated given her status as a pregnant woman, which she expressed to DCF on calls and in writing. T3 at 168:20–170:9; P. Ex. 128 at 09:57–10:17.

### d.   **Acknowledgment of Fair Hearing.**

538.   As described above, *see supra* Part VII.c.3., recipients are provided with an Acknowledgment of Hearing Request that includes the contact information for a DCF supervisor. T5 at 87:21–89:2; D. Ex. 66 at DCF-005285. At any time before or after the supervisory conference, the customer may contact the supervisor if the customer has questions about the customer's case. T5 at 48:19–49:8, 60:21–61:2; D. Ex. 66 at DCF-005285.

539.   Chianne D. received an Acknowledgement of Fair Hearing Request one day after she requested a fair hearing. D. Ex. 66 at DCF-005285; T3 at 35:13–21. This document provided the name, address, phone number, and fax number of a supervisor—Ms. May—in Jacksonville whom Chianne D. was invited to contact with questions about her case. D. Ex. 66 at DCF-005285. Chianne D. did not contact Ms. May. T3 at 35:22–36:6.

### e.   <u>**Free Legal Services.**</u>

540.   Under the fair-hearing paragraph of every NOCA, the footer provides a phone number and a web address at which individuals can find free legal services. T4 at 139:22–140:17; D. Ex. 121 at DCF-007410.

541.   When deciding whether to request a fair hearing to challenge what she believed to be an incorrect eligibility determination, Ms. Taylor did not call the number or visit the website for free legal services. T1 at 54:18–24. Even after she retained counsel, Ms. Taylor did not request a fair hearing. *See supra* ¶ 418.

### f.   <u>**Advocates.**</u>

542.   THE PLAYERS Center is an advocacy center for children focused on bettering the health and wellness of children and families in Northeast Florida. T4 at 54:18–24.

543.   THE PLAYERS Center helps individuals who are enrolled in Medicaid. T4 at 94:15–17. It assists only families—not single adults without children. T4 at 82:1–10. THE PLAYERS Center tries to help families in any way it can. T4 at 82:1–10.

544.   When THE PLAYERS Center receives referrals for assistance, cases are assigned to team members, and advocacy begins. T4 at 94:18–20. Such was the case with C.D.

545.   Mr. Ramil works at THE PLAYERS Center. T4 at 54:16-24. Mr. Ramil testified that he assisted Chianne D. with respect to the NOCA that terminated C.D. from Medicaid; in doing so, Mr. Ramil found the process to be straightforward. T4

at 94:10–14. He did not encounter any challenges when he assisted Chianne D. in relation to C.D.'s Medicaid eligibility. T4 at 91:25–92:3.

546.    Within one day, Mr. Ramil spoke with Chianne D. for the first time, obtained the necessary authorized-representative paperwork to speak with DCF on her behalf, spoke with the call center, obtained from the call center the income that DCF used, and relayed that information to Chianne D. to confirm its accuracy. T4 at 96:4–8.

547.    Mr. Ramil spoke with Chianne D. for the first time on June 1, 2023, T4 at 94:21–23, and became her authorized representative on the same day, T4 at 95:7–9.

548.    Mr. Ramil spoke with the call center on June 1, 2023, to obtain the amount of income that DCF used. D. Exs. 78, 85; T4 at 95:10–19. Mr. Ramil was informed of the amount of income. T4 at 95:13–22. Mr. Ramil spoke with Chianne D. and confirmed that the amount of income used by DCF was correct. T4 at 95:23–96:3.

549.    Mr. Ramil's interactions with Medicaid recipients are limited to those individuals who need his services. Individuals who do not need his assistance do not contact him. T4 at 102:15–17.

550.    THE PLAYERS Center and Mr. Ramil are but one example. Chianne D. testified that, had she known sooner that C.D. would lose coverage, she would have called the social worker whom her daughter regularly sees and gotten help from her. T3 at 17:3–7.

## CONCLUSIONS OF LAW

### I.   INTRODUCTION.

The trial in this case was meant to resolve a narrow classwide issue:[10] whether the minimum legal standards that Plaintiffs sued to enforce—the Due Process Clause (Count I) and the Medicaid Act (Count II)—require the State's Medicaid termination notices to include specific items of information that they currently do not include when individuals are terminated from Medicaid because their income exceeds an income limit. The legal argument and evidence presented to the Court established that the notices that DCF uses to terminate individuals from Medicaid because of income are legally sufficient to comply with both due process and the Medicaid Act.

Plaintiffs failed to carry their burden for four principal reasons:

*First*, Plaintiffs failed to establish the standing of class members—including Chianne D. and C.D.—and therefore failed to demonstrate their entitlement to relief from this Court.

*Second*, DCF's Medicaid termination notices and publicly available sources of information provide notice reasonably calculated under all of the circumstances to apprise Medicaid recipients of the termination of their coverage and to afford them an opportunity to object. The challenged notices therefore comply with due process.

---

[10] Defendants preserve their contention that no class or subclass should have been certified for reasons set forth in their class-certification briefing, which was corroborated by evidence presented at trial—namely, the diverse circumstances of class members that prevent certification of a cohesive class with a common injury susceptible of classwide prospective relief.

*Third*, neither the Medicaid Act provision that Plaintiffs seek to enforce nor the Medicaid regulations issued under that provision are privately enforceable in a section 1983 action.

*Fourth*, the State's Medicaid termination notices also provide recipients with a "clear statement of the specific reasons supporting the intended action," 42 C.F.R. § 431.210(b), and inform them of their "right to a fair hearing" and "the method by which [they] may obtain a hearing," *id.* § 431.206(b), even if the notices do not recite the case-specific facts that underlie those "specific reasons"—such as the individual's SFU size and income. The notices thus comport with the Medicaid Act regulations.

## II. PLAINTIFFS' AND ABSENT CLASS MEMBERS' STANDING.

Before reaching the merits, the Court must find that the named Plaintiffs and absent class members have proven their standing under Article III. The evidence at trial established that Plaintiffs Chianne D. and C.D. lack standing, and Plaintiffs presented insufficient evidence to establish that absent class members have standing.

Resolving the standing of the named Plaintiffs and absent class members is particularly important here because of the nature of the relief requested. Plaintiffs seek person-specific relief, such as corrective notices and reinstatement to Medicaid coverage. FF ¶ 284; *see infra* Part V.[11] They do not seek unitary, indivisible relief—such as the removal of a monument, *see Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003)—achievable through a single action that yields the same outcome

---

[11] "FF" refers to the Findings of Fact set forth above.

no matter how many plaintiffs have standing. Because Plaintiffs seek *individualized* relief for every class member, one class member's standing does not prove another class member's right to relief, and this Court should assess the standing not only of the named Plaintiffs, but also of absent class members, before considering its ability to grant relief. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019).

 a. **C.D. and Chianne D.**

 First, the evidence confirms that Chianne D. and C.D. lack standing. Neither is a Medicaid recipient or claims to be eligible for Medicaid. FF ¶¶ 166–68; ECF No. 128 at 14 ¶¶ 47–49. Any threat of injury they claim to face from DCF's notices is therefore hypothetical and speculative and not a concrete, redressable injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Chianne, moreover, requested a fair hearing for herself and C.D. after learning that DCF terminated their Medicaid based on income, but then withdrew her request. FF ¶¶ 401–07. Any injury that she and C.D. suffered is traceable not to DCF, but to Chianne's voluntary decision to forego the fair hearing she had requested.

 The stress and anxiety that Chianne D. testified she experienced when her and C.D.'s Medicaid coverage was terminated does not establish standing because freedom from these harms is not the interest that due process and the Medicaid Act protect. Under Article III, only the "invasion of a *legally protected* interest"—not any conceivable harm or interest—confers standing. *Lujan*, 504 U.S. at 560 (emphasis added). "No legally cognizable injury arises unless an interest is protected by statute or otherwise." *Cox Cable Commc'ns, Inc. v. United States*, 992 F.2d 1178, 1182

(11th Cir. 1993); *accord Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005). "The interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000). Nor can prospective relief redress past stress and anxiety.

The same is true of medical bills that Chianne incurred after losing Medicaid coverage. Due process and the Medicaid regulations do not entitle Chianne or C.D. to payment of past medical expenses. Plaintiffs sought only prospective relief—not damages—and any claim for payment of past medical expenses would violate the Eleventh Amendment. *See infra* Part V.d.

### b.   Class Member Standing.

Plaintiffs also did not show at trial which absent class and subclass members have standing. Instead, the evidence showed that the circumstances of class and subclass members vary widely. For example, among the named Plaintiffs and Ms. Mezquita, the evidence revealed variations in their communications with DCF (both historically and more recently); their experiences with the DCF call center and the information they received from the call center; their reliance on publicly available sources of information; their understanding of and the basis for their own Medicaid eligibility and the eligibility of their family members; their understanding of DCF's eligibility determination; and their actual knowledge and use of DCF's fair-hearing process. There was no evidence to suggest that the circumstances of individual class members were any more uniform. But significant aspects of the relief that Plaintiffs

seek represent *person-specific* relief, including reinstatement to Medicaid and the issuance of corrective notices that display individualized facts. Standing concerns are especially acute for such relief because it must be administered on an individual basis, and each person's injury—or lack of it—therefore matters under Article III.[12]

Because Plaintiffs failed to establish, as they must, that absent class members suffered a cognizable and redressable classwide injury, classwide relief is improper. Before it may grant relief to members of a class or subclass, a court must determine which class or subclass members suffered injury and have standing to seek relief. *See Cordoba*, 942 F.3d at 1274. While *Cordoba* involved a Rule 23(b)(3) class, its reasoning related to class-member standing was based on Article III, which applies with equal force to a Rule 23(b)(2) class. *See id.* ("[A]t some point before it can award any relief, the district court will have to determine whether each member of the class has standing. As Chief Justice Roberts explained, 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not . . . .'" (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring))). As recognized in *Cordoba*, Article III requires the Court to determine whether class and subclass members have standing before the Court can grant relief.

The Court cannot conclude that the entire class and subclass have standing. Plaintiffs did not establish which class and subclass members were injured (and are

---

[12] The same variation in causation and injury also affects this Court's ability to frame a classwide injunction that would redress specific injuries suffered by class members.

therefore entitled to prospective relief) and which had actual knowledge or access to alternative sources of information. The omission of particular items of information from the challenged notices might have made no difference to many class members, who would have derived no benefit from the additional information. And the same variation in injury, or lack of injury, produces a corresponding redressability problem: if the absence of certain individualized information did not injure some class members, then an injunction compelling the inclusion of that same information cannot possibly provide redress in manner that comports with Article III. *See California v. Texas*, 593 U.S. 659, 671 (2021) ("To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered.").

No evidence was presented, for example, to suggest that any Plaintiff or class member would have been able to assert their rights if their notice had displayed their gross income; every witness either found this information out through the call center (like Chianne D., C.D., and Ms. Mezquita, FF ¶¶ 481, 485, 490, 497), knew that their income should not have mattered to their eligibility (like Ms. Taylor and Ms. Mezquita, FF ¶¶ 265, 276, 499), or never mentioned the absence of income information as a barrier to protecting their rights (like Jennifer V., FF ¶ 412). And the absence of this information certainly did not preclude any class member from requesting a fair hearing: Ms. Mezquita, Chianne D., and C.D. all submitted hearing requests. FF ¶¶ 402–03, 408. Jennifer V. decided to forego a hearing in consultation with counsel, FF ¶ 413, while Ms. Taylor purportedly elected to forego a hearing

based on a since-revised statement in her notice's fair-hearing language, FF ¶¶ 416–19; *but see* FF ¶¶ 417–18. There is simply insufficient evidence that even the named Plaintiffs suffered injury from the lack of individualized information they purport to seek, much less that the entire class and subclass suffered the same injury from the omission of this information. *See Soskin v. Reinertson*, 353 F.3d 1242, 1264 (10th Cir. 2004) (declining to grant classwide preliminary injunction aimed at the content of Medicaid notices when a lack of evidence made "it impossible to determine who, if anyone, is likely to suffer injury in the absence of better notice," and reasoning that a classwide injunction would be inappropriate if "only a fraction [of class members] are receiving improper notice").

Absent some injury from the omission of information from their notices, class members suffered at most a bare procedural violation, which is insufficient to confer Article III standing. *Spokeo*, *Inc. v. Robins*, 578 U.S. 330, 341–42 (2016); *see also Doe v. Univ. of Mich.*, 78 F.4th 929, 944 (6th Cir. 2023) ("The deprivation of process alone, without some concrete harm flowing from that deprivation, cannot constitute an injury that conveys standing."). After the conclusion of trial, the record still does not tell the Court which class members received notices that fail to comply with law; of those, which suffered a concrete injury because of an omission; or how many class members suffered no harm at all because of the alleged omission of information, as in *Spokeo*.

Class members who have no basis to contest DCF's eligibility determination—or who knew they were correctly determined to be ineligible for Medicaid—were not

harmed by the omission of information from their notices, would not benefit from the inclusion of that information, and thus lack standing to challenge the sufficiency of their notices. *See Rector v. City & County of Denver,* 348 F.3d 935, 943–44 (10th Cir. 2003). To prove standing to seek relief from the violation of a procedural right, a party must establish that "there is *some possibility* that the requested relief"—*i.e.*, enhanced process—"will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs,* 100 F.4th 1349, 1357 (11th Cir. 2024) (quoting *Cahaba Riverkeeper v. EPA,* 938 F.3d 1157, 1162 (11th Cir. 2019)) (emphasis in *Center for a Sustainable Coast*). If enhanced process will not vindicate any substantive entitlement, then the plaintiff "has no occasion to invoke" the allegedly deficient procedures and is not injured by them. *Rector,* 348 F.3d at 943–44; *accord Michael H. v. Gerald D.,* 491 U.S. 110, 127 n.5 (1989) (plurality opinion) ("We cannot grasp the concept of a 'right to a hearing' on the part of a person who claims no substantive entitlement that the hearing will assertedly vindicate."). While class members need not prove that they would prevail at a fair hearing, they must assert "some basis" to contest the challenged decision, or there is "nothing for the hearing to accomplish." *Rector,* 348 F.3d at 944–45.

Chianne D. and C.D. are prime examples: C.D. does not contest DCF's initial determination of ineligibility, FF ¶ 168, and Chianne D. acknowledges that she is no longer eligible for Medicaid, FF ¶¶ 166–67. And of course, Chianne D. requested a fair hearing when DCF terminated her Medicaid coverage, which she later cancelled

after retaining counsel. FF ¶ 407. Neither can claim an injury traceable to DCF and redressable by a prospective injunction.

Class members in similar circumstances—who concede their ineligibility, who invoked the fair-hearing process, or who have actual knowledge of the basis of DCF's decision or know how to protect their rights—suffered no injury and similarly have no entitlement to prospective relief. Because Plaintiffs offered insufficient evidence to establish which class and subclass members have standing, *Cordoba* precludes relief. However, even if Plaintiffs had established standing at trial, they nevertheless failed to carry their burden on the merits of their claims for the reasons explained below.

## III.   DUE PROCESS.

### a.   Legal Standard.

Count I of the Amended Complaint pleads a due-process claim. Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). "Due process is a flexible concept that varies with the particular circumstances of each case, and myriad forms of notice may satisfy the *Mullane* standard." *Arrington v. Helms*, 438 F.3d 1336, 1350 (11th Cir. 2006). To satisfy due process, a notice need not be "ideal," but merely "reasonable under all the circumstances." *Id.*

The adequacy of notice must be evaluated in totality, and not on the basis of one reason code or even the four corners of a single document. ECF No. 122 at 60.

Thus, in *Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005), when the court evaluated Medicaid termination notices for compliance with due process and with 42 C.F.R. § 431.210, it rejected the argument that a single notice must fulfill all requirements. The touchstone was the totality of information provided. *Id.* ("Due process does not require 'reasonably calculated' notice to come in just one letter, as opposed to two.").

In *Arrington*, the Eleventh Circuit confirmed that "myriad forms of notice" can satisfy due process and rejected a challenge that focused solely on the contents of a notice regarding child-support payments. 438 F.3d at 1349–51. In evaluating the notice, the court reviewed all sources of information available to the plaintiffs: the notice; court orders; a check stub advising parents of a hotline and webpage; the opportunity to speak with a child support worker; and the options to call, fax, write, email, or visit an office to obtain more information. *Id.* at 1350–51. Together with the notice, the court held that these sources provided "ample information with which to determine whether they have received their full child support payments in a timely manner" and were "reasonably calculated to inform parents" of the State's action. *Id.*; *accord Duffy v. Bates*, No. 1:15-cv-00037, 2015 WL 1346196 (N.D. Fla. Mar. 24, 2015) (finding no due-process violation where notice did not advise the plaintiff of the reasons that she was barred from Veterans Administration property, but provided a phone number at which the plaintiff could obtain more information).

An objective standard determines whether notice is reasonable. In *Jordan v. Benefits Review Board of United States Department of Labor*, 876 F.2d 1455 (11th Cir. 1989), the Eleventh Circuit made clear that the "question is not whether a

particular individual failed to understand the notice but whether the notice is reasonably calculated to apprise intended recipients, *as a whole*, of their rights." *Id.* at 1459 (emphasis supplied); *accord Arrington*, 438 F.3d at 1352 ("[T]he sophistication of the affected individuals and the health and safety implications of the deprivation, standing alone, are not sufficient to impose an affirmative notice obligation on government officials." (quoting *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999)) (cleaned up)); *Coleman v. Dir., OWCP*, 345 F.3d 861, 865 (11th Cir. 2003) (quoting *Jordan*'s recital of the objective *Mullane* standard). Individual confusion or inability to understand their notices is not relevant under the objective standard.

When DCF terminates a recipient's Medicaid coverage, it does so in a manner that complies with the minimum requirements of due process: by providing a written notice advising that Medicaid coverage is ending, identifying a reason why, and apprising the recipient of his or her fair-hearing rights. In addition, recipients can access ample information outside the four corners of the notices, including through statutes, rules, and regulations and DCF's website, call center, and family resource centers. Plaintiffs did not establish that the State fails to provide notice reasonably calculated under all the circumstances to advise them of the State's action and afford them an opportunity to pursue an appeal. As explained below, therefore, Defendants prevail on Count I.

### b. Standardized Notices Comply with Due Process.

First, DCF's use of notices that contain standardized information comports with due process. *See Jordan*, 876 F.2d at 1459. While Plaintiffs' focus has always

been on reason codes, DCF's termination notices must be evaluated in their entirety. ECF No. 122 at 51, 60 n.22. Here, the totality of the State's Medicaid termination notices contain ample information to advise recipients that their Medicaid is being terminated and how to challenge that decision through a fair hearing. As a matter of course, a Medicaid termination notice states that Medicaid coverage will end on a date certain, indicates the recipient's enrollment into the Medically Needy program, and provides several avenues to obtain more information, such as links to DCF's website and office locations and a phone number for DCF's call center. FF ¶¶ 238, 252–56, 299–301, 307.

Defendants comfortably satisfy the due-process standard because the face of the challenged Medicaid termination notices contains enough information to place recipients on notice of the action and of the means to obtain more information, and allows recipients sufficient time to challenge that action. DCF's use of standardized, form notices to terminate Medicaid coverage makes no difference to the due-process analysis.

Plaintiffs' position that due process requires notices to set forth case-specific, individualized facts is incorrect. Standard language satisfies due process. *Jordan*, 876 F.2d at 1459 (approving a standardized notice of denial that checked a box indicating which eligibility criterion a claimant failed to meet and referred claimants to an enclosed guide for general eligibility information); *Adams v. Harris*, 643 F.2d 995, 997 (4th Cir. 1981) (approving notices of denial that used "stock paragraphs which provide standardized reasons for denial" and rejecting argument that due

process or Social Security Act regulations required individualized facts); *Garrett v. Puett*, 707 F.2d 930, 931 (6th Cir. 1983) (holding that form notices advising individuals of a reduction or termination of benefits were sufficient and rejecting the argument that the notices violated due process "because they did not include the mathematical calculations used . . . in arriving at the amount" of available benefits); *LeBeau v. Spirito*, 703 F.2d 639, 641, 643 (1st Cir. 1983) (denying preliminary injunctive relief in a challenge to notices the court described as "cursory in language and nearly identical"); *Gaines v. Hadi*, No. 06-60129-CIV, 2006 WL 6035742, at *14 (S.D. Fla. Jan. 30, 2006) (explaining that *Jordan* found "stock paragraphs" sufficient and that *Adams* approved notices that "made no mention of the particular individual's facts and circumstances"). Due process does not require the extent of case-specific facts that Plaintiffs insist be included in Medicaid termination notices.

Plaintiffs have argued that some of these cases concerned across-the-board changes in the law and that due-process standards are relaxed in that context. But the cases themselves did not rely on that distinction—which the Eleventh Circuit has never endorsed. Nor is it obvious why a different rule would apply when a recipient is terminated from Medicaid because of a change in policy rather than application of an existing policy.

In *Hames v. City of Miami*, 479 F. Supp. 2d 1276, 1289 (S.D. Fla. 2007), a retired city employee claimed the city failed to provide notice of the "specific facts" that supported the forfeiture of his pension benefits. The court concluded that "due process does not require notice of 'specific facts,' much less a Bill of Particulars," but

was satisfied because the plaintiff "was apprised of the nature of the proceedings and was in fact on enough notice to make arguments that none of the six provisions under the forfeiture statute applied to his felony conviction." *Id.* Similarly, the notices here provide more than enough information to inform recipients of the nature of the proceeding and to allow recipients to present their claim of eligibility.

For the same reason, the standard fair-hearing language in DCF's Medicaid termination notices is adequate to apprise class members of their rights. *See infra* Conclusions of Law, Part III.e. Due process does not even require personal notice of fair-hearing rights where, as here, notice of remedies and procedures are communicated in publicly available sources like statutes, regulations, and agency materials available online, *see* FF ¶¶ 499–514, 537. *City of West Covina,* 525 U.S. at 240–42; *Arrington*, 438 F.3d at 1351–52.

In sum, the challenged notices comply with the threshold requirements of due process. Notices need not be individualized and case-specific to comply with the law.

### c.   __Duty of Inquiry and Actual Knowledge.__

Plaintiffs failed to establish their due process claim for additional reasons as well. The "entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny." *Atkins v. Parker*, 472 U.S. 115, 131 (1985). Thus, in evaluating Plaintiffs' due-process claim, the Court must also consider whether class members exercised reasonable diligence to understand their rights, and whether class members had knowledge of their rights. This is because the law assumes that individuals

will diligently seek information and charges them with knowledge of the facts that diligent inquiry would develop. On their face, DCF's notices are sufficient to "prompt an appropriate inquiry if . . . not fully understood," and therefore comply with due process. *Id.*

Where an individual fails to make diligent inquiry or has actual knowledge of their rights, no due-process claim can lie. Plaintiffs and other class members had an obligation to inform themselves using the information that DCF makes available, both on the notices themselves and through other accessible channels. The Supreme Court has recognized that publicly available information can apprise individuals of their rights, *City of West Covina v. Perkins*, 525 U.S. 234, 240–42 (1999), and the Eleventh Circuit has charged individual recipients with a burden of inquiry, *Jordan*, 876 F.2d at 1460 (finding that a plaintiff "who asserts a special problem of comprehension must take the next step to inquire," and refusing to reopen a claim for benefits on due-process grounds when the plaintiff "made no effort to inquire or otherwise make known his difficulty"). *Jordan* in turn cited *Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983), which held that "placing a burden of diligence and further inquiry on the part of a non-English-speaking individual served in this country with a notice in English does not violate any principle of due process."

In *In re Alton*, 837 F.2d 457, 460–61 (11th Cir. 1988), the court found no due-process violation where the creditor, though notified of a bankruptcy proceeding, was not notified of the deadline to file a complaint to prevent the discharge of a debt. The court explained that, if the plaintiff "had made a minimal effort . . . , he would

have realized the outside dates for the filing of his complaint." *Id.* at 461. The plaintiff "made no such effort and cannot now properly complain of the consequences of his inaction." *Id.*; *see also In re Le Ctr. on Fourth*, *LLC*, No. 19-cv-62199, 2020 WL 12604348, at *3 (S.D. Fla. June 30, 2020), *aff'd*, 17 F.4th 1326 (11th Cir. 2021) ("Once served, the creditor is the one under a duty to inquire; no due process violation exists where the creditor could have protected himself and failed to do so." (emphasis omitted)). Accordingly, "notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop." *Soberal-Perez*, 717 F.2d at 43 (quoting *Commonwealth v. Olivo*, 337 N.E.2d 904, 909 (Mass. 1975)) (internal marks omitted).

On the other side of the coin, an individual's *actual knowledge* of his or her rights also defeats any due-process claim, which precludes relief for Plaintiffs and other class members, like Lily Mezquita, who knew why their Medicaid coverage was terminated and knew—or should have known—that a fair hearing was available. *See Jordan*, 876 F.2d at 1460 (noting recipient's actual knowledge of, and participation in, administrative procedures for seeking benefits, and finding no due-process violation). When an individual has actual knowledge of his or her right to a fair hearing, no due-process claim can lie. *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 436 (2d Cir. 2011) ("Process is not an end in itself, and due process is not offended by requiring a person with actual, timely knowledge of an event that may affect [the person's] right to exercise due diligence and take necessary steps to

preserve that right." (internal marks and citations omitted)); *see also Moreau v. FERC*, 982 F.2d 556, 569 (D.C. Cir. 1993) ("[T]he Due Process Clause does not require notice where those claiming an entitlement to notice already knew the matters of which they might be notified."); *EEOC v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1508 (9th Cir. 1990) ("Actual knowledge of the pendency of an action removes any due process concerns about notice of the litigation."); *Kalme v. W. Va. Bd. of Regents*, 539 F.2d 1346, 1349 (4th Cir. 1976) ("Although the letter did not inform Kalme of his right to demand a hearing, this oversight was not prejudicial, for he already knew of this right and immediately exercised it.").

The challenged notices provided class members with enough information to protect their rights, and their questions could be answered through reasonably diligent inquiry. Indeed, some class members took immediate advantage of this available information. Chianne D.'s inquiries to DCF resulted in her learning the precise income amount that DCF used to determine that she and C.D. were ineligible for Medicaid. FF ¶¶ 481, 485, 490. DCF's call center advised Lily Mezquita that she was determined to be ineligible for Medicaid because of income, told her the income limits DCF applied, and provided the exact amount of income that DCF used to determine her eligibility. FF ¶ 497. Ms. Mezquita did not, however, read her entire notice (including its fair-hearing language) until the date of her deposition. FF ¶ 410. Still, Ms. Mezquita was able to timely request a fair hearing and get her and her son's Medicaid coverage restored without the need to go through the full hearing process. FF ¶¶ 408–09. Jennifer V. knew DCF had determined A.V. to be ineligible based on

income and that a fair hearing was available to her, and was represented by counsel—but ceased her outreach to DCF and elected not to request a hearing. FF ¶ 413.

No evidence was presented at trial to discern which class members exercised reasonable diligence to understand their rights, or which class members had actual knowledge of their rights. Even among the witnesses at trial, actual knowledge and reasonable inquiries varied from person to person. DCF's communications with a Medicaid recipient are not limited to one notice or reason code, and the frequency and substance of communications surrounding termination of Medicaid benefits differ widely from person to person. And as explained above, the frequency and substance of the communications between DCF and the Plaintiffs (and Ms. Mezquita) varied significantly. FF ¶¶ 161–86, 257–76, 398–419, 479–98, 513, 528–539. Multiple avenues of information are accessible to class members, and their knowledge of their rights—or their ability to inform themselves of their rights—precludes finding a classwide due-process violation.

The evidence also showed that many thousands of individuals have requested fair hearings related to Medicaid ineligibility since April 2023 and that fair hearings can be requested in any number of ways. FF ¶¶ 358–64, 384, 397. Those who requested hearings and others with similar, actual knowledge of their rights have no cognizable claim. Chianne D. testified that she knew why DCF terminated her benefits and availed herself of the opportunity to contest DCF's determination through the fair-hearing process. FF ¶¶ 268–70, 398–99, 402–03. Ms. Mezquita understood that her Medicaid benefits were being terminated based on her income. FF ¶ 265.

She then requested a fair hearing, and her benefits were later restored after further communications with DCF. FF ¶¶ 408–09.

A.V.'s mother, Jennifer V., likewise knew that a fair hearing was available, but with the assistance of counsel, decided not to pursue a fair hearing. FF ¶ 413. These individuals' due-process claims—and those of all similar class members—must fail. Highly individualized circumstances preclude a finding that DCF violated the due-process rights of all class members.

Finally, all class members are charged with knowledge of Medicaid eligibility requirements and DCF's fair-hearing procedures. Since the public is presumed to know the law, *Atkins v. Parker*, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law."), due process does not require States to provide personal notice of the law. Medicaid recipients—including class members—are therefore charged with knowledge not only of DCF's fair-hearing procedures, but also Medicaid eligibility requirements codified in state and federal statutes, rules, and regulations.

### d.   **Other Publicly Available Sources of Information.**

In assessing Plaintiffs' due-process claim, the Court also considers the totality of information available to Plaintiffs and the class from publicly available sources. ECF No. 122 at 51, 60. These sources of information include statutes and regulations and the information that DCF makes available through its website, call center, and family resource centers. Coupled with the contents of the notices in their entirety, these publicly available sources of information are objectively sufficient to provide

class members with notice of the termination decision and their fair-hearing rights.

Medicaid recipients who are terminated for income receive notices, but also have the call center as a resource to obtain case-specific information about DCF's determination and to exercise their right to contest that determination through the fair-hearing process. FF ¶¶ 475–98. Once invoked, the fair-hearing process includes additional, individualized interactions between the recipients and DCF regarding their eligibility leading up to a hearing. FF ¶¶ 367–81. This is sufficient to satisfy due process. *See Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (observing that the combination of a letter and a person conference with a caseworker to discuss the basis of ineligibility is permissible and "probably the most effective method of communicating with recipients").

First, DCF's call center is a viable and useful resource available to recipients. The call center staffs more than 500 agents, FF ¶ 438, and operates between the hours of 7 AM and 6 PM, FF ¶ 422 (though any calls in queue for an agent at 6 PM will still be answered even after 6 PM, FF ¶¶ 448–50). Call center agents have access to the FLORIDA system and other resources—like job aids, customer applications, Appendix A-7, and third-party income verification information—to enable them to answer questions about individual cases and explain the basis for DCF's eligibility determinations. FF ¶¶ 470–73. Like the call center, family resource centers also have access to the FLORIDA system. FF ¶¶ 525–26. Thus, self-service representatives at DCF's family resource centers are also available to Medicaid recipients who wish to

make in-person, case-specific inquiries about their cases, including questions about eligibility. FF ¶¶ 522–27.

In addition to the call center and family resource centers, the evidence at trial established that substantial information is available online to apprise individuals of their rights and responsibilities and to guide individuals to resources and assistance. Fair-hearing rights are set forth in detail in DCF's rules, *see* Fla. Admin. Code r. 65-2.042–.066, 65A-1.204, and on its website and other sources. So are Medicaid eligibility requirements. *See* 42 U.S.C. § 1396a(a)(10); Fla. Stat. §§ 409.903–.904; Fla. Admin. Code r. 65A-1.701–.716. Specifically, information about Medicaid income limits can be found in sections 409.903 and 409.904 of the Florida Statutes and rules 65A-1.707, 65A-1.713, and 65A-1.716 of the Florida Administrative Code.

To comply with due process, DCF need not reiterate in personal notices the content of publicly available laws and regulations. Thus, in *City of West Covina v. Perkins*, 525 U.S. 234 (1999), the Court held that due process does not require States to provide notice of administrative procedures set forth in laws and other available sources. When remedies "are established by published, generally available statutes and case law," due process is satisfied. *Id.* at 241. The Court found that a person whose property had been seized was not entitled to personal notice of hearing rights: "Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him. The

[State] need not take other steps to inform him of his options." *Id.* at 241.[13] And in *Arrington*, the Eleventh Circuit found due process did not require personal notice of hearing rights where the State's "statutes, regulations, and publicly available agency manuals provide custodial parents notice of their right to a hearing and the procedures for obtaining one." 438 F.3d at 1351–52; *accord Reams v. Irvin*, 561 F.3d 1258, 1265 (11th Cir. 2009).

As with statutes, rules, regulations, and judicial precedent, the public is also charged with knowledge of information contained in published, generally available sources of information, such as "agency policy manuals." *Arrington*, 438 F.3d at 1353; *see also Grayden v. Rhodes*, 345 F.3d 1225, 1241–42 (11th Cir. 2003). DCF's ESS Program Policy Manual—an agency policy manual available on DCF's public website—provides extensive information about Florida's Medicaid eligibility rules and explains how an individual's income, income limit, and SFU are calculated. FF ¶¶ 503–06. The same is true of Appendix A-7 to the ESS Program Policy Manual, the Family-Related Medicaid Fact Sheet, the SSI-Related Medicaid Fact Sheet, and the Medically Needy Brochure, which are readily accessible on DCF's public website. FF ¶¶ 507, 509–14.

---

[13] *Memphis Light, Gas, and Water Division v. Craft*, 436 U.S. 1 (1978), is inapposite for the reasons explained in *West Covina* and *Arrington*. In *Memphis Light*, hearing rights were not set forth in statutes and regulations, since publicly available documents did not describe the administrative procedures of the municipal utility at issue there. *See Arrington*, 438 F.4d at 1352 n.16.

The evidence at trial showed that Medicaid recipients, including Plaintiffs and other class members, can and do use these available resources. Ms. Mezquita consulted Appendix A-7, the Family-Related Medicaid Fact Sheet, and both Florida and federal law, FF ¶¶ 513, 537, while Mr. Ramil regularly uses Appendix A-7 and the ESS Program Policy Manual to assist his clients, FF ¶¶ 506–08. Florida does not violate due process by omitting from its notices information that is contained in state or federal law or that DCF makes publicly available. *See Atkins*, 472 U.S. at 130–31 (holding that personal notice of statutory change to benefits was unnecessary because individuals are charged with knowledge of the law); *Cole v. R.R. Ret. Bd.*, 289 F.2d 65, 68 (8th Cir. 1961) (concluding, for the same reason, that personal notice of statutory expansion of eligibility requirements was unnecessary). To the extent the information that Plaintiffs claim was omitted from DCF's notices is available through these sources, due process does not compel their inclusion in written notices. The evidence at trial established that the information available to Medicaid recipients here, including all class members, is no less robust than what the Eleventh Circuit approved in *Arrington*.

Plaintiffs spent a significant amount of time at trial attempting to cast doubt on the viability of some public sources of information—especially DCF's call center. Plaintiffs presented excerpts of Chianne D.'s and Ms. Mezquita's calls with the call center and pointed out inaccuracies communicated during those calls. FF ¶¶ 482, 497. But due process "does not require perfect process." *MedEnvios Healthcare, Inc. v. Becerra*, 23-20068-CIV, 2024 WL 1252264, at *4 (S.D. Fla. Mar. 25, 2024)

(cleaned up) (quoting *Thibodeaux v. Bordelon*, 740 F.2d 329, 338 (5th Cir. 1984)). In *Arrington*, the court emphasized that custodial parents who seek information not displayed on their notices may call the Alabama Department of Human Resources' customer service unit, *Arrington*, 438 F.3d at 1350, 1353, but never suggested that that agency's customer service unit did not make mistakes. Considering the record as a whole, it would be unreasonable to conclude, as Plaintiffs suggest, that the call center (which receives 1.6 to 2.5 million calls per month, FF ¶ 452) is an unreliable and unreachable resource based on a few contacts. Indeed, Plaintiffs themselves called the call center multiple times, reached call-center agents, and received helpful information. And even if agents sometimes make mistakes, those occasional errors do not prove a *classwide* due-process violation. Clearly, many recipients—and those who advocate for them, like Mr. Ramil—call the call center and receive information they called to request.

Moreover, DCF's evidence highlighted the accurate aspects of the call center's interactions with Chianne D. and Ms. Mezquita, which enabled them to learn the basis of DCF's eligibility determination, FF ¶¶ 480, 481, 497–98, and in Chianne D.'s case, request a fair hearing for her daughter, FF ¶¶ 402–03. DCF also presented the testimony of Ms. Solomon, DCF's call-center director, who testified about the ongoing, successful efforts to reduce wait times and to improve customer service through enhanced quality-assurance oversight and increased staffing. FF ¶¶ 437–39, 453–55, 462–69. Plaintiffs' own witness, Mr. Ramil, estimates that he has called the call center more than 1,000 times, and that only a small percentage of those calls

were ever dropped. FF ¶¶ 436, 475. Mr. Ramil routinely relies on the call center to obtain information on behalf of the hundreds of individuals he assists, including Chianne D. FF ¶¶ 476, 478.

Plaintiffs may have established that call-center agents made mistakes when communicating with Chianne D. and Ms. Mezquita, and that some individuals experienced dropped calls and long wait times when trying to reach agents—though no evidence suggested that callers whose calls are dropped or blocked cannot call back later. Even so, Plaintiffs' evidence is outweighed by other objective measures of the call center as a resource to the public: DCF publicizes the call-center number on notices and online; millions of people reach out to the call center each month, FF ¶ 452; the call center employs 521 agents and is hiring about 20 agents per week, FF ¶¶ 438–39; call-center agents have access to the FLORIDA system and can answer case-specific questions, including questions about income amounts, income limits, and SFU size, FF ¶¶ 470–73; and the call center can accept fair-hearing requests on behalf of individuals wishing to contest DCF's decisions, FF ¶ 474. Due process does not require ideal notice, nor does it require perfection from a call center that intakes two million calls per month. Alongside the other sources of information available to all Medicaid recipients, DCF's call center is a valuable resource for individuals who seek more information about, or seek to challenge, DCF's eligibility determinations.

e.    **Fair-Hearing Procedures.**

DCF's fair-hearing procedures comply with due process. First, the "footer" language that appears in every Medicaid termination notice advises recipients of

their right to a fair hearing and of the timeline to request one, and provides contact information and links to resources. FF ¶¶ 234–51, 358–59. DCF's fair-hearing processes themselves are also more than adequate. Medicaid recipients can request fair hearings through myriad channels: by mail, by email, by phone, in person, and on DCF's website. FF ¶¶ 360–64. DCF treats any statement that clearly expresses a desire for review of DCF's decision by a higher authority as a request for a fair hearing. FF ¶ 361.

Once a hearing is requested, DCF provides several resources to the requesting individual: a written acknowledgement that includes a supervisor's contact information, a pre-hearing evidence packet that contains the evidence DCF intends to use at the fair hearing, a conference between the requestor and a supervisor, and of course the fair hearing itself. FF ¶¶ 367–81. DCF's hearing process—which customers have invoked more than 11,000 times in little more than a year, FF ¶ 384—comfortably exceeds the requirements of due process as articulated in *West Covina* and *Arrington*.[14]

Plaintiffs' focus shifted away from challenging DCF's fair-hearing language, as they presented no evidence the fair-hearing language confused any person who read the notices. Instead, two Plaintiffs testified that they did not find the fair-hearing language confusing and that they understood a fair hearing was available, FF

---

[14] As explained below, this notice also satisfies the regulatory requirement to explain "in writing . . . [the] right to a fair hearing" and "the method by which [one] may obtain a hearing." 42 C.F.R. § 431.206(b)(1)–(2); *see also id.* § 431.210(d)(1).

¶¶ 398–99, 414, while Ms. Mezquita testified that she did not read the fair-hearing language at all until the date of her deposition, FF ¶ 410. The sole piece of testimony challenging the sufficiency of the fair-hearing language came from Ms. Taylor and centered on the pre-October 2023 statement that the recipient "will be responsible to repay any benefits continued if the hearing decision is not in your favor." FF ¶¶ 416–19. DCF replaced the phrase "will be responsible" with the phrase "may be responsible" nearly a year ago, FF ¶ 419, and in April 2024 added a sentence to explain that Medicaid recipients are not responsible to repay benefits absent fraud or intentional program violation, FF ¶ 419.

Ms. Taylor's testimony that the repayment language dissuaded her from requesting a fair hearing does not establish an objective deficiency that harmed the entire class, especially when weighed against the remaining testimony presented at trial, the face of the notices themselves, and DCF's recent improvements to the fair-hearing language. Nor does it establish a classwide issue that can be resolved with a prospective injunction relief in light of DCF's revisions to the fair-hearing language.

When viewed in totality, DCF's Medicaid termination notices are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane*, 339 U.S. at 314, and therefore satisfy due process. Plaintiffs are not entitled to relief on Count I.

## IV.   MEDICAID ACT REGULATIONS.

Count II of the Amended Complaint pleads a violation of the Medicaid Act—specifically, 42 U.S.C. § 1396a(a)(3). Plaintiffs allege noncompliance with two CMS regulations—42 C.F.R. §§ 431.206 and 431.210—that Plaintiffs contend implement that statutory provision.

The Medicaid Act requires each State's Medicaid State Plan to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim . . . is denied." 42 U.S.C. § 1396a(a)(3). CMS regulations provide that, when a State finds a recipient ineligible and terminates coverage, it must inform the recipient "in writing" of "his or her right to a fair hearing" and "the method by which he may obtain a hearing." 42 C.F.R. § 431.206(b)(1)–(2). The State's notice must include both a "statement of what action the agency . . . intends to take" and a "clear statement of the specific reasons supporting the intended action." *Id.* § 431.210(a)–(b).

### a.   Enforceability Under 42 U.S.C. § 1983.

#### i.   *The Medicaid Act Provision That Plaintiffs Seek to Enforce Is Not Enforceable Under Section 1983.*

42 U.S.C. § 1396a(a)(3) does not confer enforceable rights, and thus does not provide an avenue to enforce through private litigation the specific rights Plaintiffs claim.

Only statutes that confer federal rights are enforceable under section 1983. *Bowles v. DeSantis*, 934 F.3d 1230, 1239 (11th Cir. 2019). To determine whether a statute confers a federal right, courts first "identify exactly what rights, *considered*

*in their most concrete, specific form*, plaintiff is asserting." *Id.* (quoting *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1278 (11th Cir. 2019)) (emphasis supplied).

Once it identifies the precise right that the plaintiff asserts, courts determine whether Congress "intended that the provision in question benefit the plaintiff." *Id.* (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (2018)). The rules that govern this inquiry are identical to those that determine whether Congress has conferred an implied private right of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285–86 (2002).

Viewed in their most concrete, specific form, the right that Plaintiffs claim is a right to written notice of specific items of information, such as the amount of income that DCF used to determine their eligibility and the income limits that DCF applied. In enacting 42 U.S.C. § 1396a(a)(3), Congress did not unambiguously create these rights. The statute does not mention these rights or even mention notice.

The statute, moreover, does not contain the rights-creating language needed to confer a federal right. 42 U.S.C. § 1396a(a) lists 86 items that a State's Medicaid State Plan must contain. 42 U.S.C. § 1396a(b) then directs the Secretary of Health and Human Services to approve Medicaid State Plans that fulfill the conditions specified in subsection (a). Next, Congress granted the Secretary express authority to enforce compliance with 42 U.S.C. § 1396a and with the Medicaid State Plans that the Secretary has approved. *See* 42 U.S.C. § 1396c; 42 C.F.R. § 430.35. Rather than confer enforceable federal rights on Plaintiffs, the statute is phrased as a directive to the Secretary of Health and Human Services. *See California v. Sierra Club*, 451 U.S. 287, 294 (1981) ("The question is not simply who would benefit from the Act,

but whether Congress intended to confer federal rights upon those beneficiaries.").

*Armstrong v. Exceptional Child Center*, *Inc.*, 575 U.S. 320, 331–32 (2015), is an instructive analogy. There, Medicaid providers claimed that Congress granted them a private right of action to enforce 42 U.S.C. § 1396a(a)(30), which requires Medicaid State Plans to establish procedures for determining minimum provider reimbursement rates. The Court disagreed for two reasons. First, citing 42 U.S.C. § 1396a(b), it explained that the statute is "phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." *Id.* at 331. Second, it explained that Congress "explicitly conferred means of enforcing compliance" on the Secretary, which "suggests that other means of enforcement are precluded." *Id.* at 331–32; *see also Planned Parenthood of Greater Texas Fam. Plan. & Prev. Health Servs.*, *Inc. v. Kauffman*, 981 F.3d 347, 359–60 (5th Cir. 2020) (en banc) (holding that 42 U.S.C. § 1396a(a)(23) is not privately enforceable).

The same rationale applies here. Like the provision at issue in *Armstrong*, the provision that Plaintiffs seek to enforce is part of a framework that establishes conditions for the Secretary's review of Medicaid State Plans. Both provisions are directives to the Secretary and are enforceable by the Secretary. Accordingly, the statute that Plaintiffs invoke does not confer federal rights enforceable under section 1983.

### ii.   *The Medicaid Regulations That Plaintiffs Seek to Enforce Are Not Enforceable Under Section 1983.*

Even if 42 U.S.C. § 1396a(a)(3) is privately enforceable under section 1983, the regulations on which Plaintiffs rely to support their Medicaid Act claim are not. 42 C.F.R. §§ 431.206 and 431.210 impose new and distinct obligations not found in the Medicaid Act, which merely requires States to grant "an opportunity for a fair hearing before the State agency" that terminated the claim for benefits. 42 U.S.C. § 1396a(a)(3).

Agency regulations are not automatically actionable under section 1983, but only when the regulation "merely fleshes out the content" of a right conferred by statute. *Kissimmee River Valley Sportsman Ass'n v. City of Lakeland*, 250 F.3d 1324, 1326–27 (11th Cir. 2001). A regulation that "imposes new and distinct obligations not found in the statute itself . . . is too far removed from the Congressional intent to constitute a federal right enforceable under § 1983." *Id.* (internal marks omitted).

The Eleventh Circuit interprets this rule strictly. Congressional intent is the polestar: to find a regulation privately enforceable, "courts must find that Congress has *unambiguously* conferred federal rights on the plaintiff." *Harris v. James*, 127 F.3d 993, 1010 (11th Cir. 1997) (emphasis in original). When a statute does not dictate the "substance" of a written notice, for example, but merely requires that a decision be in writing, a regulation that dictates the substance of the written decision is not actionable under section 1983. *Yarborough v. Decatur Hous. Auth.*, 931 F.3d

1322, 1325–27 (11th Cir. 2019) (en banc). Similarly, while Congress required States to provide Medicaid services with reasonable promptness, a CMS regulation that required States to provide transportation to recipients who could not otherwise access services was not enforceable under section 1983. *Harris*, 127 F.3d at 1010–12. The court explained that "transportation may be a reasonable means of ensuring" that services are provided promptly, and that this nexus might sustain the validity of the regulation, but it did not "support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation." *Id.* at 1012.

Here, the Medicaid Act does not explicitly require written notice, much less specify discrete items of information that must be set forth in a notice. In enacting the Medicaid Act, Congress did not unambiguously confer a federal right to written notice of the amount of income that DCF attributed to the recipient, or the income limit that DCF applied to the recipient, or the Medicaid eligibility category to which the recipient belonged before termination. A right to personal, written notice is not necessarily implied in the opportunity for a hearing that 42 U.S.C. § 1396a(a)(3) secures. *See City of West Covina*, 525 U.S. at 241 (concluding that due process does not require personal, written notice of the right to an administrative hearing). Indeed, even CMS did not unambiguously confer a right to personal, written notice of the elements of information that Plaintiffs claim DCF's notices must include. At most, Plaintiffs *infer* a right to that information from the regulation that mandates disclosure of the "specific reasons" for the intended action. 42 C.F.R. § 431.210(b).

Congress did not unambiguously confer rights that neither the Medicaid Act nor its regulations mention, and that Plaintiffs only glean from the regulations by stacking inference upon inference: *first* inferring a right to personal written notice from the statute, and *then* inferring a right to specific items of information from CMS's regulations.

As in *Harris* and *Yarborough*, the Medicaid Act says nothing about notices, let alone the content of notices. 42 U.S.C. § 1396a(a)(3) requires States to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." No federal statute requires States to issue notices containing the specific items of information. These are distinct obligations—not rights "unambiguously conferred" by Congress.

The regulations on which Plaintiffs rely are too far removed from congressional intent to constitute an enforceable federal right. A contrary finding would mean that DCF has complied with Congress's mandate by apprising recipients of their right to a fair hearing, but is exposed to liability for not checking boxes found nowhere in the statute. *See Yarborough*, 931 F.3d at 1326 ("Ms. Yarborough's case was not a challenge to the Authority's failure to provide a written decision. . . . [T]he hearing officer violated the regulation but not the statute. Her case fails as a result."). Like the Eleventh Circuit in *Harris* and *Yarborough*, this Court should reject that result.

**b.    Compliance with 42 C.F.R. §§ 431.206(b) and 431.210(a)–(b).**

Even assuming the regulations Plaintiffs sued to enforce support a private right of action under section 1983, the challenged notices satisfy the requirements of the two regulations at issue. The notices contain (i) a statement of the intended action—*i.e.*, termination from Medicaid coverage; (ii) a clear statement of the specific reason for the intended action—*i.e.*, the recipient's income exceeds the income limits for Medicaid; and (iii) notice of the right to—and method for obtaining—a fair hearing.

**i.    *Statement of Intended Action and Clear Statement of Specific Reasons.***

Medicaid regulations require States that terminate a recipient's eligibility to disclose the "action the agency . . . intends to take" and provide a "clear statement of the specific reasons supporting the intended action." 42 C.F.R. § 431.201(a)–(b). For example, the "specific reason" for a recipient's termination might be that the individual's income exceeded applicable limits. The regulation does not, however, require DCF to recite individualized facts that support its termination decision or to provide an explanation of how DCF applied its eligibility standards to those facts. CMS could have written a regulation that requires these disclosures—but it did not.

DCF's notices therefore comply with the regulation. On August 24, 2024, DCF put into production a system change that automatically places the text of Reason Code 241—"YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM"—on notices sent to recipients who are terminated from Medicaid

because of income. ECF No. 172. Consistent with the testimony of Mr. Kallumkal, DCF has now automated the process of populating Reason Code 241 onto its notices when individuals are terminated from Medicaid because of income. FF ¶¶ 313–26. This reason code provides the "specific reason" for the termination: the specific reason is that the individual's income is too high to qualify for Medicaid. This enhancement regarding Reason Code 241 fully satisfies the requirement that notices provide a "clear statement of the specific reason" for the action and thus eliminates any prospective injury to the class or subclass—and any need for prospective injunctive relief.

Even before the Reason Code 241 enhancement, DCF's Medicaid termination notices complied with the law. First, some notices contained the text of Reason Code 241 because DCF's eligibility specialists manually placed that reason code on notices provided to class members. FF ¶¶ 163, 261, 266, 317–18. Second, all notices sent to individuals who are terminated because of income have contained the following sentences, which clearly communicate the reason for the determination of ineligibility for Medicaid: (1) "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid"; and (2) "Individuals enrolled in the Medically Needy program have income or assets that exceed the limits for regular Medicaid." FF ¶¶ 252–56, 262–65, 307. These statements clearly explain why the recipient was terminated from Medicaid

and enrolled in the Medically Needy Program instead. That is all the law requires.[15]

At bottom, the information contained in DCF's Medicaid termination notices precludes a finding that DCF has violated the Medicaid Act on a classwide basis. When a recipient is terminated because of income, the notice says so—*three times*. While Plaintiffs may believe that providing additional information on Medicaid notices might be good policy, nothing in the plain language of the Medicaid regulations *requires* States to inform recipients of the individualized facts on which DCF relied in reaching its decision, in addition to the reason for its decision. Thus, in *Adams*, the court concluded that a regulation requiring notice of the "specific reasons" that support a finding of non-disability did not require the Social Security Administration to disclose case-specific facts. 643 F.2d at 999. DCF's notices satisfy the same regulatory requirement by identifying excess income as the reason for termination.

The distinction between the *reason* for an action and the *facts* that support that action is found in other areas of the law as well. CMS's own regulations make that distinction in the context of certain Medicare provider appeals. *See* 42 C.F.R. § 405.1836(d) ("The notice must include a detailed explanation of the *reasons* for the decision . . . and the *facts* underlying the decision." (emphasis added)). Federal Rule of Civil Procedure 26(a)(2)(B) likewise requires parties to disclose an expert's

---

[15] Myriad online sources, such as the Medically Needy Brochure, also explain that the Medically Needy program is for individuals whose income exceeds the limits for full Medicaid. Likewise, resources on the DCF website set forth income limits for Medicaid programs, and the call center is another resource to obtain information about income limits and gross income information that DCF has on file. *See supra* Findings of Fact, Part IX.

opinions and the "reasons for them"—*in addition to* "the facts or data considered by the witness." The rule therefore treats the reasons for an expert's opinions as distinct from the facts considered in forming the expert's opinion—just as DCF's action and reason for the action are distinct from the facts that DCF considered in making its decision.

Nor do the regulations require States to disclose all eligibility requirements in their termination notices. The regulations' omission of eligibility requirements from the items of information that notices must contain makes sense because, as discussed above, Medicaid recipients are charged with knowledge of federal and state law. Medicaid eligibility requirements appear in federal and state law. *See* 42 U.S.C. § 1396a(a)(10); Fla. Stat. §§ 409.903–.904; Fla. Admin. Code r. 65A-1.701–.716. Moreover, a separate federal regulation requires States to disclose Medicaid eligibility requirements *only upon request*. 42 C.F.R § 435.905(a)(1). Clearly, CMS knows how to direct States to disclose Medicaid eligibility requirements—and it did not do so here. Its omission from one regulation of a requirement that appears in another regulation is presumed to be intentional. *Yonek v. Shinseki*, 722 F.3d 1355, 1359 (Fed. Cir. 2013) ("Where an agency includes particular language in one section of a regulation but omits it in another, it is generally presumed that the agency acts intentionally and purposely in the disparate inclusion or exclusion." (internal marks omitted)); *accord Newman v. FERC*, 27 F.4th 690, 698 (D.C. Cir. 2022).

Similarly, it makes little sense to require States to disclose in their Medicaid termination notices the eligibility categories for which a Medicaid recipient was

evaluated. Federal law requires States to evaluate *every* recipient for *every* eligibility category, *see* 42 C.F.R. § 435.916(d)(1) ("Prior to making a determination of ineligibility, the agency must consider all bases of eligibility . . . ."), and the evidence presented at trial shows that DCF does, FF ¶ 33. A rote statement in each notice that DCF considered all bases of eligibility is not required by the regulations and does not provide recipients with essential, useful information or the "specific reason" for their termination.

Requiring termination notices to include eligibility requirements would also exponentially increase the length of the notices—which Plaintiffs already criticize for their length—and would merely reiterate the contents of publicly available laws and regulations. Plaintiffs have not shown how it is possible to provide a complete and accurate summary of all Medicaid eligibility categories and requirements within the confines of a single notice. Generalizations about eligibility requirements, like those that Plaintiffs previously offered, *see* ECF No. 69 at 7 (suggesting in a sample notice that all children and all seniors are eligible for Medicaid), will be misleading. Federal regulations do not obligate DCF to provide overly simplified statements of eligibility categories and eligibility requirements in its notices, or to provide notices long enough to accurately delineate all Medicaid eligibility categories and requirements.

To carry their evidentiary burden at trial, it was not enough for Plaintiffs to demonstrate that DCF's notices could be improved, or that additional information might be useful to some recipients. Plaintiffs did not show that the Medicaid Act regulations they sued to enforce require States to include more than what the State's

notices already include: a statement that benefits will end, the specific reason why (*i.e.*, due to income), and a method to seek an administrative appeal of that decision.

### ii. *Right to Fair Hearing and Method of Obtaining Fair Hearing.*

Finally, for the reasons explained in Part III.e. of the Conclusions of Law, the standard fair-hearing language in DCF's Medicaid termination notices complies with the Medicaid Act. Even in their earliest iteration, DCF's notices advised recipients of their right to a fair hearing if they disagreed with DCF's decision, informed them of the timeline for requesting a hearing, and provided a phone number, website, and address. FF ¶¶ 234–51. Now, the notices provide even more information about the fair-hearing process and notify recipients of additional methods for submitting a hearing request, including an email address and a web address.[16] FF ¶¶ 243–47, 358–59. None of Plaintiffs' witnesses claimed to find the fair-hearing language unclear, and DCF's recent revisions to that language only further exceed the minimum requirements of federal regulations: that individuals be informed of their "right to a fair hearing" and "the method by which [they] may obtain a hearing." 42 C.F.R. § 431.206(b). Plaintiffs failed to establish that the fair-hearing language in Medicaid termination notices violates 42 C.F.R. § 431.206(b) on a classwide basis.

In sum, DCF is not required, in order to comply with the Medicaid Act and its regulations, to include in its notices the information that Plaintiffs request. Plaintiffs

---

[16] To be clear, the methods of requesting a fair hearing articulated in DCF's current notices are not new; only the explicit identification of certain methods in the fair-hearing paragraph were recently added. FF ¶¶ 360–64.

are not entitled to relief on Count II. However, even if Plaintiffs had established the merits of a claim, they failed to prove entitlement to the classwide, prospective relief they seek.

## V.   INJUNCTIVE RELIEF.

### a.   Legal Standard.

Plaintiffs' burden at trial included establishing the necessary prerequisites for granting prospective injunctive relief against the State. Thus, in addition to establishing the merits of their claims, Plaintiffs were obligated to prove that (1) class or subclass members will suffer irreparable injury unless a classwide injunction issues; (2) any threatened injury to class or subclass members outweighs any damage the classwide injunction may cause Defendants; and (3) the classwide injunction would not be adverse to the public interest. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

Because Plaintiffs seek relief against two state agencies, any injunction must satisfy not only the usual injunction factors, but also the limitations that comity and federalism place on injunctive remedies directed to state officials. *See Consumer Party v. Davis*, 778 F.2d 140, 146 (3d Cir. 1985). As the Supreme Court explained, "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976); *accord Morrow v. Harwell,* 768 F.2d 619, 628 (5th Cir. 1985) (explaining that injunctive relief against state officials may "intrude into state affairs no more than is absolutely necessary"). And federalism concerns are "heightened when . . . a

federal court decree has the effect of dictating state . . . budget priorities." *Horne v. Flores*, 557 U.S. 433, 448 (2009).

> **b.**      **Threat of Irreparable Injury Absent an Injunction.**

In addition to showing a likelihood of success on the merits, Plaintiffs were required to prove that class members face irreparable injury, and that the threatened injury they face would be abated by the prospective injunction they request from this Court.

Thus, any injunction would have to be narrowly tailored and necessary to avoid the classwide injuries Plaintiffs assert. A prospective injunction must be narrowly tailored to remedy only proven legal violations, must restrain no more conduct than is reasonably necessary, and must intrude into state affairs no more than is absolutely necessary. *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1280 (11th Cir. 2021); *Morrow v. Harwell*, 768 F.2d 619, 628 (5th Cir. 1985); *see also Clark v. Coye*, 60 F.3d 600, 603–04 (9th Cir. 1995) (injunctive relief against a State must "be narrowly tailored to enforce federal constitutional and statutory law only"). "The Supreme Court has cautioned that remedies should be limited to the inadequacy that produced the injury in fact that the plaintiff has established and no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (cleaned up).

Plaintiffs did not carry their burden to prove that the prospective injunction they propose would protect class members from irreparable injury.

First, Plaintiffs failed to prove what portion of class members face any likelihood of future injury at all—or what that injury will look like from person to person—considering the vastly different circumstances of all class members and the changes DCF has implemented, including a change to the FLORIDA system to include the text of Reason Code 241 on notices when an individual is terminated from Medicaid based on income. FF ¶¶ 319–26; ECF No. 172. Plaintiffs presented no evidence suggesting that DCF's use of Reason Code 241 going forward will not operate consistent with the testimony of Mr. Kallumkal.

Similarly, DCF's ongoing ACCESS Modernization Project reduces the likelihood of future injury. While DCF's Medicaid termination notices will not be replaced immediately on the Project's current timeline, FF ¶¶ 331–32, the evidence showed that notices will be replaced as soon as is practicable in light of system constraints, FF ¶¶ 331–32, 336–37, 346–48. This evidence was virtually unrebutted; Plaintiffs offered no evidence from which the Court could conclude that DCF could feasibly replace its Medicaid termination notices any earlier in the ACCESS Modernization Project, or that DCF does not in fact have concrete plans to replace those notices. The near-certainty that DCF will replace its Medicaid termination notices before the Project's conclusion sharply reduces the risk of any future injury that class members might face.

On the other side of the ledger, Plaintiffs did not establish that the prospective relief they request would thwart any future injuries. Plaintiffs did not demonstrate, for example, that the specific items of information they want included on notices

would have actually avoided harm for any Plaintiff or class member, or would likely avoid harm in the future. Plaintiffs ask that the income limit and SFU size be added to the notice, but no Plaintiff testified that the absence of this information caused their harm, or that they would have done anything differently if that information had been displayed on their notices.

Rather, the weight of the testimony showed that Plaintiffs and Ms. Mezquita knew their Medicaid benefits were about to end because of income and were able to obtain specifics about their termination—such as the gross income DCF used, the income limit applied, and to which household member the income was attributed—from the DCF call center. FF ¶¶ 481, 484–85, 490, 497, 261–65, 268–70, 274–76. Likewise, Ms. Mezquita and Ms. Taylor knew that their Medicaid eligibility was based on their pregnancy and that no income limit should have been applied to them. FF ¶¶ 265, 276. Their eligibility did not therefore turn on the specific amount of their income or the specific income limit that DCF applied. Jennifer V. also knew that her daughter, A.V., should have been Medicaid-eligible based on her age and family's income. FF ¶ 178. Plaintiffs presented no evidence from which this Court could conclude, on a classwide basis, that information such as SFU size, individual-ized income information, eligibility categories and criteria, and the like must be dis-played on notices to avoid irreparable injury to all individuals who face termination from Medicaid because of income. Many recipients might be well aware by the time of their automatic, 12-month redetermination that their income exceeds Medicaid

income limits, and have no use or need for particular income data to be displayed on their notices.

This lack of demonstrated usefulness in Plaintiffs' proposed modifications to DCF's Medicaid termination notices weighs against a conclusion that class members face a risk of irreparable injury absent the prospective injunction Plaintiffs urge this Court to issue.

Because Plaintiffs' proposed modifications to DCF's notices are not necessary to avoid classwide irreparable injury, Plaintiffs' request that DCF pause all Medicaid terminations and reinstate the entire class to Medicaid is likewise improper. The evidence does not support a conclusion that class members with no basis to contest their eligibility, who already asserted their rights through a fair hearing, who understood their notices, who would not benefit from the items of information Plaintiffs request, or who understood the precise basis of DCF's eligibility determination are entitled not only to new notices, but also to prospective reinstatement to Medicaid. That proposed remedy is not only wildly disproportionate to any proven injury, but, along with its $155-million-a-month price tag, ignores the principles of comity and federalism that should guide the issuance of equitable relief against state agencies and officials.

At bottom, any injunction here must be necessary to avoid irreparable harm. Plaintiffs did not carry their burden to establish that, absent their requested relief, the class as a whole faces an irreparable injury that the requested relief could avoid or resolve.

### c.     <u>Potential Harm to Defendants and the Public Interest.</u>

Next, the Court must assess whether the risk to class members outweighs the potential harm to the State and whether the requested relief is adverse to the public interest. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006). The evidence establishes that Plaintiffs' requested relief would impose undue and disproportionate burdens on the State that outweigh the threat of future injury to an unidentified number of class members, and is therefore also adverse to the public interest.

Any injunction against state officials should represent the least intrusive, least expensive, and least burdensome means of redressing a proven violation. *Morrow*, 768 F.2d at 628. And the public, of course, has a significant and recognized interest in the efficient allocation of the state government's finite fiscal resources and in minimizing unnecessary cost to the state treasury. *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1474 (8th Cir. 1994).

###     i.     *Reinstatement of Class Members and Pause in Terminations.*

The reinstatement of all class members to full Medicaid coverage until DCF issues new termination notices is not an available remedy. Reinstatement of the class would require the State to expend an extraordinary amount of public dollars to place millions of individuals—all of whom were determined to be ineligible—back on Medicaid for an indefinite amount of time. At an average monthly cost of $313.23

per person, and a population of about 497,918 individuals, Plaintiffs' request for re-instatement carries a price tag of more than $155 million *per month*, FF ¶¶ 188–90, without any showing that class members are eligible for Medicaid or suffered actual harm.

Based on the timeline of the ACCESS Modernization Project, this reinstatement period could last for years. FF ¶¶ 327, 331–34, 337, 348–49. Even if notices were modified within the existing limitations of the legacy FLORIDA system, depending on the extent of modifications the Court orders, this could require multiple levels of approval by the Florida Legislature and federal agencies and the appropriation of additional public funds by the Legislature, and would take time to accomplish. FF ¶ 349. Any change that requires the FLORIDA system to store information that it does not currently store would entail enormous costs and require significant time, FF ¶¶ 142–60, when the State's IT resources should be directed to the ACCESS Modernization Project rather than extensive alterations to the outdated and soon-to-be-decommissioned legacy system.

Of course, reinstatement of all class members would also require the State to pay for full Medicaid benefits for millions of individuals despite having already determined those individuals to be ineligible. A pause in Medicaid terminations would likewise require the State to pay for Medicaid benefits without regard to eligibility. Both proposed remedies are wholly antithetical to the federal Medicaid Act and its regulations.

Once a State elects to participate in Medicaid, it must comply with all federal statutory and regulatory requirements. This means that, except to the extent federal law permits a State to maintain or reinstate the Medicaid services of recipients who have been found ineligible, *see* 42 C.F.R. §§ 431.230, 431.231, the State *must* enforce its eligibility requirements and *may not* provide Medicaid services to recipients who have been found ineligible, *see* 42 U.S.C. § 1396c; 42 C.F.R. §§ 430.35, 435.930(b).

Consistent with this requirement, 42 C.F.R. § 435.930(b) provides that the State must furnish Medicaid services "to all eligible individuals until they are found to be ineligible." This regulation unsurprisingly does not contemplate the furnishing of Medicaid services to individuals found to be ineligible; instead, separate regulations describe the specific circumstances in which ineligible individuals might still receive coverage upon request for a hearing. *See* 42 C.F.R. §§ 431.230, 431.231. Most notably, 42 C.F.R. § 431.231(c) prescribes the conditions of reinstatement of Medicaid benefits in cases of inadequate notice. The broad reinstatement that Plaintiffs seek would be inconsistent with this regulation, which permits reinstatement only after the recipient requests a fair hearing and only if the termination "resulted from other than the application of Federal or State law or policy." 42 C.F.R. § 431.231(c). Here, the termination of class members resulted from the application of federal and state law or policy—*i.e.*, application of the program's income limits. An injunction that orders reinstatement of class members here, including ineligible class members and those who never requested a fair hearing, to remedy an allegedly inadequate

158

notice would be inconsistent with the specific regulation that governs reinstatement of benefits.

In support of their request for relief, Plaintiffs spent much time at trial presenting evidence of errors that DCF made in its eligibility determinations as to the Plaintiffs and Ms. Mezquita. Plaintiffs also offered evidence intended to show errors in the information provided to Plaintiffs and Ms. Mezquita. But Plaintiffs did not establish that errors made in *four* cases—out of *four million* redeterminations and a class of nearly 500,000 people—are systemic and representative of classwide harms, such that they support reinstatement of an entire class of recipients who were found ineligible, or justify a court-ordered hiatus in the eligibility redeterminations that federal law *requires* DCF to conduct for each recipient at annual intervals. 42 C.F.R. § 435.916(a)(1), (b). The only systemic error that Plaintiffs identified—errors in the determination of post-partum eligibility—affected only a fraction of the class, and has been resolved by system modifications. DCF is charged with determining the eligibility of millions of people, and errors are bound to occur. With respect to errors that DCF might have made, Plaintiffs' circumstances are not generalizable and do not support classwide relief.

As importantly, errors in eligibility determinations are not relevant to the sufficiency of DCF's notices. Neither due process nor the text of the Medicaid regulations concerns the correctness of an agency's decision, but rather the sufficiency of notice and an opportunity to test that decision. *See Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1027–28 (11th Cir. 2019) (procedural due process does not

"license review of the correctness of an agency decision," nor does it "guarantee that all decisions by state officials will be correct"). Therefore, based on the weight of the evidence and governing legal principles, Plaintiffs failed to establish that the extraordinary remedy of classwide prospective reinstatement and a pause in eligibility determinations is necessary, justified, or permissible.

### ii. *Information Plaintiffs Contend Must Be Added to NOCAs.*

Reinstatement and pausing terminations are not the only aspects of Plaintiffs' requested relief that would place an undue burden on the State. Requiring DCF to add information to the notices imposes a particularly excessive burden considering the lack of evidence that the information Plaintiffs ask the Court to require would be useful to class members—or how many class members would find that information useful. Of course, the burden is heightened significantly by requiring the State to include on its notices information that is not currently retained by the FLORIDA system—such as countable net income and the applicable income limit. FF ¶¶ 104–11, 121–23, 145–46, 151–56, 158, 160. But any effort to reprogram the system and alter the notices imposes an unwarranted burden if the information will not remedy an established, classwide harm.

Specifically, Plaintiffs seek to have some or all of the following information added to Medicaid termination notices: the applicable income limit; the income amount on which DCF relied; the SFU size; the recipient's eligibility category before termination; the eligibility criteria for that category; the eligibility categories that

160

DCF evaluated; and a description of all eligibility categories. As discussed above, neither due process nor the Medicaid Act requires these items of information to be displayed on NOCAs.

Nor have Plaintiffs established that the utility of this information to the class justifies the burdens that its inclusion on NOCAs would impose on Defendants. Plaintiffs presented little to no evidence to establish any need or demand for—or the usefulness of—including these specific items of information on NOCAs. The scant evidence of usefulness combined with the burden of modifying the existing ACCESS Florida System to populate this information tips the balance against the requested injunction.

### 1.    *The Income Limit.*

First, any change that requires DCF to modify the ACCESS Florida System to store information that it does not currently store would be an extra-large project and entail on DCF an enormous expense of time and money that must be diverted from other important agency initiatives. An individual's income limit is not stored in the FLORIDA system if the individual was terminated because of income. FF ¶ 121. The income limit is variable from person to person. Therefore, to place an individual's income limit on the notice would require a significant change to multiple modules and processes in the FLORIDA system. FF ¶¶ 146–47, 150, 154–56, 158. Mr. Kallumkal estimated that adding the income limit and countable net income to NOCAs would require 12,000 hours of labor. FF ¶ 152.

Moreover, an individual's income limit is already determinable from publicly available sources. Call-center agents and self-service representatives at DCF's family resource centers are trained to provide that information to customers. FF ¶¶ 470–73, 522–27 Income limits can also be determined by reference to the Policy Manual on DCF's website, including the income-limits chart in Appendix A-7. FF ¶¶ 503–08. Ms. Mezquita found and referenced DCF's income-limits chart, FF ¶ 513, and was also advised of her income limit when she called DCF's call center. FF ¶¶ 496–97. By contrast, Chianne D. did not take any steps to look up the income limits for various Medicaid categories, and like Ms. Taylor, did not ask the call center what the income limit for her family was. FF ¶¶ 286, 492. The income limit was irrelevant to Ms. Taylor because she understood that a recipient with post-partum coverage is not subject to an income limit. FF ¶ 276. Displaying the income limit on the notice itself is not needed to protect all class members' rights when Plaintiffs themselves either never inquired about it or learned about it through other means.

### 2.   *The Income Amount.*

Likewise, any change that requires DCF to display a customer's countable net income on NOCAs requires a change of the largest magnitude because the FLORIDA system does not retain the countable net income of recipients who are terminated from Medicaid because of income. Simply put, the income figure that is compared to the income limit—countable net income—is not available in the FLORIDA system. FF ¶¶ 105–09, 111, 116, 121–22.

Providing the MAGI amount on a notice would be confusing and unhelpful for similar reasons. The MAGI is neither the gross income that the recipients provide and that DCF uses as the starting point for its income calculations, nor is it the net figure that is compared to the income limit. FF ¶¶ 47–59, 115–16, 121–22. It is an in-between, intermediate figure that reflects some—but not all—of the income calculations that must be performed on the road from gross income to countable net income. The MAGI figure has no real-life significance to recipients except as a mid-point to countable net income—which is not stored in the FLORIDA system. FF ¶¶ 105–09, 116, 121–22. It exists only as function of the Internal Revenue Code and the Medicaid Act and does not represent a dollar figure that any ordinary person would recognize as their own income amount.

Even as to gross income, the evidence does not support a classwide injunction to require its inclusion on NOCAs. None of the Plaintiffs testified that, if only their NOCAs had displayed their gross income, they would have made different decisions or achieved different outcomes. Chianne D. does not even keep track of her families income, other than noting whether bills are paid. FF ¶ 289. Her ambivalence with respect to her ability to identify her gross income does not support a finding that including the countable net income amount on a NOCA would have made a difference to her. But even if Chianne D. and others were knowledgeable of their gross income, placing the gross income on the NOCA side by side with income limits would be misleading because eligibility is measured by comparing countable net income—not gross income—to the income limit. FF ¶ 291.

### 3.   *The SFU Size.*

The evidence did not establish that inclusion of the SFU size on notices would provide a classwide benefit, let alone a benefit meaningful enough to outweigh the burden to the State. None of the witnesses called at trial testified that the SFU size would have made a difference to them or that they ever inquired or wondered what their SFU size was.

Because it is a creature of complex federal requirements, the SFU size has the potential to confuse. It is not the same as the household size. FF ¶¶ 292–93, 296. And the SFU size alone does not indicate whose income is counted when determining a person's gross income for Medicaid eligibility purposes. Some household members are not included in the SFU at all, while the income of some household members who are included in the SFU does not count toward an individual's gross income. FF ¶¶ 292–93, 296. The SFU size does not therefore provide the information needed to enable a recipient to determine the recipient's own gross income.

The Court heard from Mr. Ramil, who serves as an advocate for families and assists them with Medicaid enrollment issues—and even he did not view the SFU size as a useful piece of information. FF ¶¶ 294–96. Nor did he inquire about Chianne's SFU size when he called DCF's call center on her behalf. FF ¶ 295. Mr. Ramil does not fully understand the meaning of SFU, even though he works with Medicaid eligibility issues on a daily basis. FF ¶ 296. It therefore comes as no surprise that Mr. Ramil does not think that including the SFU size on NOCAs would be helpful to Medicaid recipients. FF ¶¶ 294–96. And while household size is not

synonymous with SFU size, FF ¶ 296, Mr. Ramil also does not believe that including the household size on a NOCA would be useful, FF ¶¶ 296–97. There is simply no evidence in the record to support that including SFU size on Medicaid termination notices is helpful, let alone necessary, to redress a classwide injury.

### 4.   *Eligibility Categories.*

Adding a recipient's prior eligibility category before termination is duplicative of information that recipients should already know and is therefore unwarranted. Ms. Mezquita, A.V.'s mother, and Ms. Taylor all acknowledged that they understood the basis of their or their children's eligibility. FF ¶¶ 178, 189, 265, 276. And as to eligibility criteria for all categories, that information is available from multiple public sources, such as state and federal law and DCF's fact sheets and the Policy Manual. Recipients are charged with this knowledge, *see supra* Conclusions of Law, Part II.c., and therefore displaying it on a notice is unjustified in light of the burden required to modify the ACCESS Florida System. The addition of all eligibility categories to each notice would add unduly to the length of the notices, especially if eligibility categories for other public-assistance programs, such as food assistance and cash assistance, are added to the notices for the same reasons.

### 5.   *Eligibility Categories Evaluated by DCF.*

Finally, it is unnecessary to modify the ACCESS Florida System to display on notices the eligibility categories for which an individual was evaluated. Federal law requires DCF to evaluate all eligibility categories whenever it assesses an individual for Medicaid eligibility, 42 C.F.R. § 435.916(d)(1), and DCF complies with that

requirement, FF ¶ 33. A standard statement on each notice that DCF assessed all basis of potential eligibility would not provide recipients with useful information.

### d.   **Plaintiffs Sought Only Prospective Relief.**

To the extent Plaintiffs now seek classwide monetary reimbursement for past medical expenses or payment of outstanding medical bills, that relief is inconsistent with their pleading and is not obtainable from these Defendants.

Federal lawsuits for injunctive relief against state officials who are sued in their official capacities by their very nature seek prospective—not retrospective—relief. *See Johnson v. Crosby*, No. 5:06-cv-00092-RS-MD, 2006 WL 8450965, at *5 (N.D. Fla. Oct. 18, 2006) (explaining that state "officials may be sued for prospective [*i.e.*, injunctive or declaratory relief], rather than for retrospective relief").

Plaintiffs have consistently characterized their claims as claims for forward-looking injunctive relief. *See*, *e.g.*, ECF No. 132 at 29 (seeking prospective reinstatement to Medicaid); ECF No. 101 at 3 ("[P]laintiffs had standing to support prospective relief to remedy harm from the failure to provide adequate notices."); ECF No. 85 at 17 ("Plaintiffs seek prospective injunctive relief that will benefit future Medicaid enrollees."); ECF No. 77 at 44 ¶ c. (seeking prospective reinstatement to Medicaid). This Court has also recognized Plaintiffs' claims to be claims for prospective relief. *See*, *e.g.*, ECF No. 122 at 34 (contrasting an action for damages where medical bills could afford standing with "the relief sought here, [which] is prospective in nature"); ECF No. 122 at 42 n.14 ("If Plaintiffs prevail on the merits of their claims, injunctive relief may be appropriate to prevent those harms as to members of the

class whose Medicaid benefits will be terminated in the future. Indeed, such harms are otherwise irreparable in light of the State's Eleventh Amendment immunity.").[17]

Having characterized their complaint in one manner—seeking prospective relief in the form of an injunction—Plaintiffs may not transmute their complaint to seek retrospective relief, such as reimbursements for past medical bills. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that a complaint affords "fair notice of what the . . . claim is and the grounds upon which it rests" (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957))); *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992) (explaining that a complaint frames the scope of the litigation).

In addition to being incompatible with Plaintiffs' pleadings, any retrospective relief, such as payment of past medical expenses incurred while ineligible for Medicaid, would offend the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974). It is well-settled that absent "waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "*Ex Parte Young* suits like the one brought here have never been held to permit retrospective monetary damages." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *accord Stanley v. Broward Cnty. Sheriff*, 773 F. App'x 1065, 1068 (11th Cir. 2019) ("However, while damages awards against state officers sued in their

_____

[17] Tellingly, when pressed to explain the relevance of Plaintiffs' medical bills and out-of-pocket expenses, Plaintiffs' counsel argued that the bills and expenses were relevant to standing—not to the issue of Plaintiffs' remedies. T3 at 10:17–11:11.

official capacities are generally barred [by sovereign immunity, as embodied by the Eleventh Amendment], state officials may be sued in their official capacities for prospective injunctive relief, but not for retrospective relief."); *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1220 (11th Cir. 2000) ("[T]he Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages.").

Even if Plaintiffs had framed their complaint to seek payments for medical bills incurred while ineligible for Medicaid, such a claim would not have survived. *See, e.g.*, *Johnson*, 2006 WL 8450965, at *6 ("Count One requests damages, or retrospective relief, against Defendant Crosby. Therefore, Plaintiff's claim in Count One against Defendant Crosby in his official capacity under § 1983 is barred by the Eleventh Amendment."). Plaintiffs point to no abrogation or waiver of the Eleventh Amendment.

While there was testimony that, when it finds a determination of ineligibility to have been erroneous, DCF reinstates coverage retroactively, FF ¶ 165—that has not happened on a classwide basis. Indeed, Plaintiffs presented no evidence that *any* class member still suffers from an erroneous termination decision that has not been corrected—much less *every* class member. Nor do Plaintiffs' pleadings frame a challenge to the correctness of DCF's eligibility determinations, but rather to the adequacy of notice. Thus, neither the pleadings nor the record furnishes a basis for this Court to find that DCF incorrectly determined all class members to be ineligible.

To the extent Plaintiffs seek retroactive relief on the theory that Medicaid coverage must be reinstated because the challenged notices were inadequate, *see* ECF No. 101 at 3-4, that argument is misguided.

Medicaid regulations expressly address the circumstances in which inadequate notice requires reinstatement. Under those regulations, a State that fails to provide notice must reinstate coverage *only* if (1) the beneficiary timely requests a hearing; and (2) the termination "resulted from other than the application of Federal or State law or policy." 42 C.F.R. § 431.231(c). Here, termination of coverage resulted (rightly or wrongly) from DCF's application of the Medicaid program's income limits—which is clearly "the application of Federal or State law or policy." *Id.* § 431.231(c)(3); *see also Granato v. Bane*, 74 F.3d 406, 412–13 (2d Cir. 1996) ("The 'action' referred to here is the decision of the agency to treat the temporary discontinuation of home care services upon hospitalization as a termination of the recipient's entitlement to those services upon discharge from the hospital. That action was in no way required by federal or state law."); *Mahoney v. Toia*, 572 F.2d 63, 66 (2d Cir. 1978) (explaining that a State "need only provide reinstatement upon a timely request for a hearing where the issue raised is not one involving solely state or federal law"). The class and subclass members cannot therefore satisfy 42 C.F.R. § 431.231(c)(3).

In fact, nothing in 42 C.F.R. § 431.231(c) requires *retroactive* reinstatement of coverage. Medicaid regulations require retroactive reinstatement if the recipient requests a fair hearing and (1) the recipient prevails at the hearing or (2) the agency

decides in the recipient's favor before the hearing. 42 C.F.R. § 431.246. Plaintiffs offered no evidence that either of these conditions has occurred for all members of the class.

Finally, nothing in *Turner v. Ledbetter*, 906 F.2d 606, (11th Cir. 1990), alters this conclusion. First, *Turner* concerned a cash-assistance program, not Medicaid, and Medicaid regulations specifically address the circumstances in which inadequate notice requires reinstatement. Second, *Turner* concerned efforts by Georgia to recoup benefits it had already paid—not a wholesale reinstatement of benefits. *Id.* at 607. Third, the court's injunction barred recoupment only from recipients who had filed successful administrative appeals, and only of benefits paid while those appeals were pending. *Id.* at 608 ("[T]he district court concluded that the state could not recoup any funds which the recipients received while appealing their terminations."); *id.* at 609 ("[T]he recipients in this case, by successfully appealing the termination of their benefits on the basis of inadequate notice, did not receive an overpayment."); *id.* at 610 ("Funds which the recipients received while challenging their terminations were legally awarded."). None of these circumstances is present here.

## VI. <u>CONCLUSION.</u>

The evidence at trial did not establish that DCF violates due process and the Medicaid Act when it terminates individuals from Medicaid based on income. Plaintiffs did not prove their entitlement to a classwide prospective injunction as to either count of their Amended Complaint. Final judgment should be entered in favor of Defendants.

Respectfully submitted on September 18, 2024.

/s/ *Andy Bardos*

Andy Bardos (FBN 822671)
James Timothy Moore, Jr. (FBN 70023)
Ashley H. Lukis (FBN 106391)
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
tim.moore@gray-robinson.com
ashley.lukis@gray-robinson.com
*Attorneys for Defendants*