# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| Chianne D.; C.D., by and through her mother and Next Friend, Chianne D.; A.V., by and through her mother and Next Friend, Jennifer V., Kimber Taylor, and K.H., by and through his mother and Next Friend, Kimber Taylor, | Civil Case No. 3:23-cv-985 |
| Plaintiffs, | |
| v. | SECOND AMENDED COMPLAINT |
| Shevaun Harris, in her official capacity as Secretary for the Florida Agency for Health Care Administration, and Taylor Hatch, in her official capacity as Secretary for the Florida Department of Children and Families, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

## I.  INTRODUCTION

1. Defendants are terminating tens of thousands of Floridians from Medicaid coverage without providing them adequate individualized written notice of the reason for the termination and the opportunity for a pre-termination fair hearing as the Constitution requires.

2. During the COVID-19 pandemic, federal legislation made generous, enhanced federal funding available to state Medicaid programs. This funding was conditioned on states agreeing to maintain their Medicaid eligibility rolls by curtailing the eligibility redetermination procedures that would otherwise apply at least annually. The requirement to maintain coverage ended March 31, 2023. As a result, states are reinstituting Medicaid eligibility redeterminations.

3. Starting March 1, 2023, Florida began redetermining eligibility for those whose coverage was maintained during the pandemic. This process, commonly referred to as "unwinding," is scheduled to be completed by May 2024. This class action challenges the standardized notices that Defendants use to inform Medicaid enrollees that they are no longer eligible and that their Medicaid coverage will end.

4. Among other things, Defendants routinely fail to include in the Medicaid notices the legal or factual basis for the agency's decision. Instead, the notices use a set of standardized "reason codes" many of which provide little or no explanation of the actual reason for the agency's decision.

5. These standardized notices have been used for years. Since before the COVID pandemic, Defendants have been "well aware that notices sent to beneficiaries generate confusion" and that the "current notices that describe applicants as ineligible are considered to be not sufficiently explicit in terms of an explanation." State Health Access Data Assistance Center (SHADAC), *Medicaid*

*Eligibility, Enrollment, and Renewal Processes and Systems Study: Case Study
Summary Report – Florida*, 12 -13 (Oct. 19, 2018), https://www.macpac.gov/wp-content/uploads/2018/11/Florida-Summary-Report.pdf.

6. Defendants did not remedy these deficiencies before restarting eligibility determinations for Floridians after having paused redeterminations for three years during the pandemic.

7. As a result, Plaintiffs and class members are losing Medicaid coverage without meaningful and adequate notice, leaving them unable to understand the agency's decision, properly decide whether and how to contest their loss of Medicaid coverage, or plan for a smooth transition of coverage that minimizes disruptions in necessary care. Without Medicaid coverage, Plaintiffs are unable to obtain care they need, including prescription drugs, children's vaccinations, and post-partum care.

8. Absent this court's intervention, improper terminations will continue for the foreseeable future. Plaintiffs seek preliminary and permanent declaratory and injunctive relief to require Defendants to stop terminating Florida Medicaid enrollees until adequate notice and an opportunity for a pre-termination fair hearing has been provided.

## II.    JURISDICTION AND VENUE

9. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, which provides for original jurisdiction over all civil suits involving questions of federal law, and 28

U.S.C. § 1343(a)(3) and (a)(4), which grant this Court original jurisdiction in all actions authorized by 42 U.S.C. § 1983 to redress the deprivation under color of State law of any rights, privileges, or immunities guaranteed by the U.S. Constitution and Acts of Congress.

10. Plaintiffs seek declaratory, injunctive, and other appropriate relief pursuant to 29 U.S.C. §§ 2201 and 2202; Fed. R. Civ. P. 57 and 65; 42 U.S.C. § 1983; 42 U.S.C. § 12133; and the Fourteenth Amendment to the U.S. Constitution.

11. Venue for this action lies in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurs here.

### III.   PARTIES

12. Plaintiff Chianne D. is 25 years old and a resident of Jacksonville, Duval County, Florida.

13. Plaintiff C.D. is two years old and a resident of Jacksonville, Duval County, Florida. She brings this case by and through her mother and Next Friend, Chianne D.

14. Plaintiff A.V. is a one-year-old resident of Miami-Dade County. She brings this case by and through her mother and Next Friend, Jennifer V.

15. Plaintiff Kimber Taylor is 33 years old and a resident of Jacksonville, Duval County, Florida.

16. Plaintiff K.H. is eight months old and a resident of Jacksonville, Duval County, Florida. He brings this case by and through his mother and Next Friend, Kimber Taylor.

17. Defendant Shevaun Harris is the Secretary of the Florida Agency for Health Care Administration (AHCA). AHCA is designated as the "single state agency" to administer the state's Medicaid plan. 42 U.S.C. § 1396a(a)(5); Fla. Stat. §§ 409.902, 409.963 (2022). Defendant Harris is responsible for the implementation of the state's Medicaid program in compliance with the Constitution and federal law. Secretary Harris is based in Tallahassee, Leon County, Florida which is also where AHCA is headquartered. She is sued in his official capacity.

18. Defendant Taylor Hatch the Secretary of the Florida Department of Children and Families (DCF). AHCA has delegated to Ms. Hatch, as Secretary of DCF, to direct and oversee all Medicaid eligibility determinations, including issuing notices relating to Medicaid eligibility determinations. Fla. Stat. § 409.902(1). Secretary Hatch is based in Tallahassee, Leon County, Florida which is where DCF is headquartered. She is sued in her official capacity.

## IV.   CLASS ALLEGATIONS

19. Plaintiffs bring this class action on behalf of themselves and all other individuals similarly situated in the State of Florida pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

20. Plaintiffs bring this case on behalf of a statewide class with two subclasses, defined as:

All Florida Medicaid enrollees who are members of either of the two subclasses listed below and who on or after March 31, 2023, have been or will be found ineligible for Medicaid coverage.

**Subclass A**: Individuals issued a written notice that includes no reason code or only uses reason code(s) that do not identify the eligibility factor(s) Defendants relied on to determine the individual is ineligible for Medicaid. For purposes of this definition, eligibility factors are age, residency, income, assets or other non-cash resources, receipt of Social Security Administration benefits, Medicare enrollment, citizenship, immigration status, or Social Security Number, disability status, pregnancy, and incarceration status.

**Subclass B:** Individuals issued a written notice that relies on a reason code that states the individual or household is over income for Medicaid eligibility but does not identify the household income used in the eligibility determination or the applicable income standard.

21. The requirements of Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure are met for the following reasons:

a. The classes are so numerous that joinder of all members is impracticable.

  i. As of February 28, 2023, there were 4,979,982 people enrolled in Florida's Medicaid program who will go through redetermination, including receiving a notice of action, during the 12-month unwinding period. *See* Florida Unwinding Baseline Report, 2 (Mar. 8, 2023), https://www.floridahealthjustice.org/uploads/1/1/5/5/115598329/florida_unwinding_baseline_report_03.08.2023.pdf.

  ii. As of June 30, 2023, the State reported that 182,857 people had been terminated from Medicaid or CHIP (Children's Health Insurance Program) due to ineligibility. *See* Kaiser Fam. Found., Medicaid Enrollment and Unwinding Tracker (July 31, 2023), https://www.kff.org/report-section/medicaid-enrollment-and-unwinding-tracker-state-enrollment-and-unwinding-data/ (under "STATE DATA" tab, Figure 2).

  iii. Defendants continue to issue notices that rely on the standardized "reason codes" that they used before the pandemic. Data obtained through public records requests from 2017 through 2019 show that Defendants routinely include the same handful

of standardized reason codes in their notices communicating Medicaid ineligibility. For instance, during that timeframe more than 1 million individuals received a notice with the reason "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM"; more than 1.2 million received the reason "YOUR MEDICAID FOR THIS PERIOD IS ENDING"; more than 1.5 million people received notices with the reason "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM"; more than 2 million received a notice with the reason "NO HOUSEHOLD MEMBERS ARE ELIGIBLE FOR THIS PROGRAM"; and nearly 900,000 received notices stating "WE REVIEWED YOUR CASE, YOU ARE STILL ELIGIBLE FOR MEDICAID, BUT IN A DIFFERENT MEDICAID COVERAGE TYPE."

b. The claims of the named Plaintiffs and putative class and subclasses raise common questions of law and fact. The named Plaintiffs received notices with Defendants' standardized reason codes. The notices also uniformly omit information regarding the applicable standards of eligibility for an individual's current Medicaid eligibility category or any information about what additional eligibility categories Defendants

considered. Each notice also includes the same stock paragraph regarding fair hearings and appeal rights, which does not set forth complete information on how to request a fair hearing or accurately inform recipients about their appeal rights. Questions common to the class, therefore include:

i. Whether the reason codes used by Defendants satisfy the State's obligation under the constitution to provide notice "detailing the reasons for a proposed action," including the "legal and factual bases" for the decision, *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970).

A. For Subclass A, whether notices that provide no reason for the State's determination of ineligibility for Medicaid satisfy Defendants' obligations under the U.S. Constitution.

B. For Subclass B, whether a reason code that states someone is "over income" without identifying the household income or the applicable income standard satisfies the U.S. Constitution.

ii. whether the standardized language that appears in notices regarding Medicaid fair hearings accurately reflects Defendants'

policies and adequately explains the method for obtaining a

hearing as required by due process;

iii. whether Defendants' template notices create an unacceptable

risk of confusion that denies recipients their ability to appeal an

adverse action; and

iv. what administrative burden the state would face from adding

explanation to the notices. *See Mathews v. Eldridge,* 424 U.S.

319, 347 (1976).

c. The claims of the Plaintiffs are typical of the claims of the class and

subclasses in that the individual Plaintiffs and members of the class and

subclasses are all individuals whom the Defendants found ineligible for

Medicaid during the unwinding period without providing adequate

written notice, including failing to identify the underlying basis for that

determination in the notice communicating Medicaid ineligibility and

failing to adequately inform the recipient of their fair hearing rights.

d. The representative Plaintiffs will fairly and adequately protect the

rights of the class and subclasses because they suffer from the same

deprivation as the other class and subclass members and have been

denied the same constitutional and federal rights that they seek to

enforce on behalf of those other class and subclass members.

e.  The Plaintiffs' interests in obtaining injunctive relief for the violations of their rights and privileges are consistent with and not antagonistic to those of any person within the class or subclasses.

f.  The interests of the class and subclasses will be adequately protected as Plaintiffs are represented by attorneys with experience in Medicaid class action litigation.

22. Defendants have acted on grounds generally applicable to the class and subclasses by relying on notices that use standardized "reason codes" that communicate only the ultimate conclusion without an explanation of the basis for the agency's decision, contain inaccurate and incomplete explanation of how to access fair hearings and uniformly omit legally required information, thereby making it appropriate for declaratory and injunctive relief on behalf of the class under Rule of Civil Procedure 23(b)(2).

## V.  THE LEGAL FRAMEWORK

### A.  Constitutional Due Process Requirements

23. Medicaid enrollees have a statutory entitlement to Medicaid benefits protected by the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1; *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980).

24. The Due Process Clause guarantees individuals the right to a meaningful written notice of action and an opportunity for a hearing before being deprived of property. U.S. Const. amend. XIV, § 1.

25. Medicaid enrollees must be given timely and adequate notice detailing the reasons for a proposed termination and how they can challenge the action, and they must be given an opportunity to make their case before an impartial decision-maker prior to termination of their Medicaid coverage. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970).

26. Notice must be reasonably calculated, under all circumstances, to inform the recipient of the pending action and give them an opportunity to present their objections. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). To meet this requirement, a state Medicaid agency must use a method of notice that someone "who desires to actually inform the [recipient] might reasonably adopt to accomplish it." *Id.* at 315. To provide an "adequate statement of the basis," for the state's determination, the notice must "be sufficiently specific for it to enable an applicant to prepare rebuttal evidence to introduce at" the hearing. *Billington v. Underwood*, 613 F.2d 91, 94 (5th Cir. 1980).[1]

---

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing the continuing validity of *Nettles v. Wainright*, 677 F.2d 404, 409-10 (5th Cir. Unit B 1982)).

### B.  Medicaid Requirements

27. The Medicaid Act, 42 U.S.C. §§ 1396–1396w-7, establishes a medical assistance program cooperatively funded by the federal and state governments. The purpose of the Medicaid program is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id.* § 1396-1.

28. The Centers for Medicare & Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) is the agency that administers Medicaid at the federal level.

29. A state's participation in Medicaid is voluntary. Once a state elects to participate, it must adhere to the federal legal requirements, as provided by the United States Constitution, the Medicaid Act, and the regulations and guidelines promulgated by CMS.

30. Florida participates in Medicaid. Fla. Stat. §§ 409.901-.9205.

31. The Medicaid Act requires each participating state to designate a single state agency to administer and supervise the state's Medicaid program. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10. While a state may delegate certain responsibilities to other entities, such as other state or local agencies, the single state

agency remains responsible for ensuring compliance with all aspects of the Medicaid Act. *See, e.g.,* 42 C.F.R. § 438.100(a)(2), 438.100(d).

32. AHCA is the single state agency in Florida. *See* Fla. Stat. § 409.902.

33. States receive federal matching funding, called Federal Financial Participation (FFP), for Medicaid services provided to eligible enrollees. The federal government matches the state's Medicaid expenditures at a specified rate. 42 U.S.C. §§ 1396b(a), 1396d(b). Florida currently receives a federal matching rate of approximately 60% (60 cents of every dollar spent) for medical services. U.S. Dep't of Health & Hum. Servs., Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2022 Through September 30, 2023, 86 Fed. Reg. 67479, 67481 (Nov. 26, 2021).

34. Between March 31, 2023 and December 31, 2023 the federal matching rate for medical services is enhanced for states if they conduct eligibility redeterminations consistent with all federal requirements. 42 U.S.C. § 1396d note (amended by Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 5131).

35. For administrative expenses, including those related to the redetermination process, states generally receive a matching rate of 50%. 42 U.S.C. § 1396b(a)(7); 42 C.F.R. § 435.1001.

36. States receive a 75% match for expenses related to the operation of a computerized eligibility determination system. 42 U.S.C. § 1396b(a)(3)(B).

37. States must make Medicaid available to all individuals who meet the eligibility criteria. 42 U.S.C. § 1396a(a)(10).

38. The Medicaid Act lists the population groups that must be covered by the state, as well as options for states to extend Medicaid to additional population groups. 42 U.S.C. § 1396a(a)(10)(A), (C).

39. The mandatory population groups include: low-income children; parents and other caretaker relatives; pregnant women; the elderly, blind, or disabled; individuals under age 26 who were in foster care until age 18; and adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household incomes below 133% of the federal poverty level (FPL) (this last group is often referred to as the "expansion population"). 42 U.S.C. § 1396a(a)(10)(A)(i), (e)(14). In addition, individuals who receive Supplemental Security Income are automatically enrolled in Medicaid. 42 U.S.C. § 1396a(a)(10)(A)(i)(II)(aa); 42 C.F.R. § 435.120.

40. A Supreme Court decision, *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 588 (2012), bars HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population group. Florida does not cover the expansion population group.

41. In 2022, Florida elected the option to cover pregnant women for a continuous 12-months postpartum. Individuals who are enrolled in Medicaid or CHIP while pregnant are eligible for 12 months of postpartum coverage, regardless of changes in circumstances, like increases in income. *See* 42 U.S.C. § 1396a(e)(16); Letter from Danielle Daly, Dir. Div. of Demonstration Monitoring & Evaluation, Ctrs. For Medicare & Medicaid Servs., to Tom Wallace, Dep. Sec'y for Medicaid, Fla. Agency for Health Care Admin, 35 (Oct. 12, 2022), https://ahca. myflorida.com/content/download/20386/file/FLA_MMA_STCs_Oct_2022.pdf.

42. Florida also extends one-year continuous coverage, regardless of changes in circumstance, to children under age five and extends six-month continuous coverage to children under age 19. 42 U.S.C. § 1396a(e)(12); Fla. Stat. § 409.904(6).

43. In addition to fitting within a covered population group, an individual must have limited income and, for some population groups, limited resources or assets. Income consists of wages and tips earned through employment, unemployment compensation, pension benefits, interest or dividends, alimony received, tax refunds, rental income, or the taxable amount of social security benefits. Resources consist of cash or other real and personal property that can be liquidated or converted into cash.

44. Income eligibility is established using one of two sets of rules: (1) Modified Adjusted Gross Income (MAGI) rules, which count income based on

federal tax rules and does not include an asset or resource test, or (2) non-MAGI rules, which follow the Medicaid eligibility rules in place before implementation of the Affordable Care Act in 2014 and can include an asset or resource test. 42 U.S.C. § 1396a(e)(14); 42 C.F.R. § 435.603.

45. MAGI rules apply to most children, pregnant women, parents, and adults with low incomes. Income eligibility is based on taxable income, and the household size is determined based on the number of people in the tax household. 42 U.S.C. § 1396a(e)(14)(A); 42 C.F.R. § 435.603(b).

46. Non-MAGI rules apply to individuals who qualify for Medicaid based on blindness, disability, or age (65 or older), certain foster care children, and certain working individuals with disabilities. 42 C.F.R. § 435.603(j).

47. The income limits to qualify for Medicaid coverage vary between population groups. In Florida among the MAGI groups, the income limit for pregnant women is 196% of the federal poverty level (FPL), for children under age one it is 211%, for children ages one to five it is 145%, and for children ages six to 18 it is 138%. The income limit for parents and caretakers and young adults aged 19-20 is calculated based on the Aid to Families with Dependent Children payment levels in 1996 (when AFDC was repealed and replaced by Temporary Aid for Needy Families). This income limit is currently approximately 28% FPL. Fla. Admin. Code R. 65A-1.707; *see also* Dep't of Children & Families, CFOP 165-22, Economic Self

Sufficiency    Program    Policy    Manual,    Appendix    A-7    (2023)
https://www.myflfamilies.com/services/public-assistance/additional-resources-and-
services/ess-program-manual.

48. For the non-MAGI groups, the income limits range between 88% to 300%
FPL. The income-counting rules are based on the income counting rules of the cash
assistance program most closely related to the individual's status (*e.g*., disabled,
older adult). These income rules disregard some types of income, for example the
earned income of a dependent child who is a student and not a full-time employee is
disregarded before comparing a household's income against the income standard. 45
C.F.R.  § 233.20(a)(3)(xix).  The  non-MAGI  groups  are  also  subject  to  a
resource/asset limit. Fla. Admin. Code R. 65A-1.712-.713; *see also* Dep't of
Children and Families, CFOP 165-22, Economic Self Sufficiency Program Policy
Manual,  Appendix  A-9  (2023)  https://www.myflfamilies.com/services/public-
assistance/additional-resources-and-services/ess-program-manual.

49. Florida also operates a "medically needy" program for otherwise eligible
individuals whose incomes are too high to qualify for Medicaid. Individuals enrolled
in this program have a monthly "share of cost." The share of cost varies depending
on the size of the Medicaid household and their income.

50. Medically needy coverage is time limited. It does not begin in any given
month until a family provides allowable medical bills that equal or exceed the share

of cost. Once the share of cost has been met, coverage lasts through the end of that month and must be met again the following month before Medicaid coverage begins.

51. States are required to administer Medicaid in "the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

52. For most Medicaid enrollees, states are required to conduct a redetermination of their eligibility (sometimes referred to as "renewal") once every 12 months, unless there is an earlier change in circumstance affecting eligibility. 42 C.F.R. § 435.916(a)(1), (b), and (d).

53. States must ensure a streamlined process for people to remain enrolled in Medicaid. 42 U.S.C. § 18083; 42 U.S.C. § 1396w-3(3). This includes attempting to renew individuals based on information already available to the agency without requesting additional information from the individual, a process known as "ex parte" redetermination. 42 C.F.R. § 435.916.

54. When the state must ask for additional information from the enrollee, the Medicaid agency must provide assistance to aid individuals seeking help with the redetermination process. 42 C.F.R. § 435.908(a).

55. During redetermination, if the state determines an individual is no longer eligible in their current population group, then the state must evaluate the individual in all other groups before terminating coverage. This includes maintaining Medicaid

coverage while requesting additional information necessary to evaluate eligibility in other groups. 42 C.F.R. §§ 435.911(c)(2), 435.916(f)(1), 435.930(b).

56. If the state determines that the enrollee is not eligible for Medicaid on any basis, it must send advance written notice prior to termination. *Goldberg v. Kelly*, 397 U.S. 254 (1970); 42 C.F.R. § 431.205(d) (state Medicaid agency must "meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970)").

57. The notice must "detail[] the reasons for the proposed termination," including both "the legal and factual bases" for the decision. *Goldberg v. Kelly*, 397 U.S. at 267-68; 42 U.S.C. § 1396a(a)(3). *See also* 42 C.F.R. § 431.210 (notice must include a statement of what action the agency intends to take; the effective date of such action; "a clear statement of the specific reasons supporting the intended action"; and the specific regulations that support, or the change in Federal or State law that requires, that action).

58. Notices must "clearly" explain "the availability of an avenue of redress." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13-14 n.15 (1978). *See also* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.206 (notice must explain the individual's right to request a hearing; the method of requesting the fair hearing; and an explanation of the circumstances when Medicaid coverage is continued if a hearing is requested).

59. Upon timely request by the enrollee, the state must ensure that Medicaid coverage is maintained pending a pre-termination hearing. *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970); 42 C.F.R § 431.230.

60. The state must provide the individual an opportunity for a pre-termination evidentiary hearing to contest the termination. The hearing must provide an "effective opportunity" to challenge a termination "as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970). *See also* 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.205.

61. For persons who are determined ineligible for Medicaid, the agency must assess the individual's potential eligibility for other insurance affordability programs, including CHIP and as appropriate transfer the individual's account to the Marketplace. 42 U.S.C. § 18083; 42 C.F.R. § 435.1200(e).

## C.    Medicaid Redetermination in Florida

62. AHCA has delegated responsibility for eligibility determinations and redeterminations to the Department of Children and Families (DCF). Fla. Stat. § 409.902(1). DCF also has responsibility for administering other public benefits programs including Supplemental Nutrition Assistance Program (SNAP) and Temporary Assistance for Needy Families (TANF).

63. In March 2020, to obtain enhanced funding made available by the Families First Coronavirus Response Act, Defendants implemented processes to maintain Medicaid eligibility and pause annual Medicaid redeterminations for individuals enrolled in the program.

64. After the Consolidated Appropriations Act of 2023 announced that the continuous coverage requirement would end on March 31, 2023, Florida released a "redetermination plan" describing how the State would restart Medicaid redeterminations. *See* Florida's Medicaid Redetermination Plan, https://www.myflfamilies.com/sites/default/files/2023-04/Floridas-Plan-for-Medicaid-Redetermination.pdf (last visited Aug. 21, 2023).

65. The redetermination plan estimates that the State must redetermine eligibility for approximately 4.9 million enrollees between April 1, 2023 and March 31, 2024.

66. AHCA's delegee, DCF, uses a standardized notice generated by a computer system to notify an individual that she is no longer eligible for Medicaid.

67. The notices do not adequately explain the eligibility decision.

68. The notices include sections labeled either "Medicaid" or "Medically Needy."

69. Underneath each section heading is a list of household members with the word "eligible," "enrolled," or "ineligible" next to each name. A given section may

list all household members or only some household members. The notices do not

explain why particular household members are or are not listed in a given section.

70. A single notice may include multiple sections labeled "Medicaid" and

multiple sections labeled "Medically Needy." The same household member may

appear in multiple sections in the same notice. It is possible for a single notice to

indicate in different sections that an individual is both "eligible" or "enrolled", and

"ineligible" for Medicaid or Medically Needy.

71. If a particular section indicates that coverage is "approved" for some

individuals in the household, while others are listed as "ineligible," there is no reason

given for why the individuals who have been found ineligible are ineligible.

**Medically Needy**

Your application for Medically Needy dated April 21, 2023 is  **approved**.  You are enrolled with an estimated share of cost for the months listed below:

| Name | Jun, 2023 Ongoing |
|---|---|
| S███ D█ | Ineligible |
| Chianne D█ | Enrolled |
| Chandler D██ | Ineligible |
| **Share of Cost** | $4833.00 |

Did you know you now have an on-line account with us?  Go to  www.myflorida.com/accessflorida.   You will need your case number, ████████ to activate your My ACCESS Account. Then you can get into your account with a user name and password of your choice.

If members of your household are not eligible for Medicaid, they may be able to get coverage from the Florida KidCare Program for children under 19 or the Federally Facilitated Marketplace (FFM). In accordance with section 1943 (b)(1)(D) of the Social Security Act , DCF is required to forward potentially eligible applications to Florida KidCare or the FFM for review. Once your information is in the possession of the FFM the State of Florida no longer has the ability to ensure its security.  You do not need to submit a new application. Please check your My ACCESS Account at http://www.myflorida.com/accessflorida/ to see if your application has been forwarded to Florida KidCare or the FFM.

72.  If all individuals listed in a given section are ineligible, the standardized notice is populated with one or more "reason codes." The reason codes are typically a single phrase pulled from a finite list of options.

73. The reason codes do not include any placeholders for individualized information.

74. The reason codes appear after the word "Reason:" and are printed in all capital letters.

75. Some notices use the reason code: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM." Notices may also state "We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid." The notices provide no additional information, such as the calculation of income or the applicable income limit for the program.

76. Other common reason codes inform the person they have been terminated without explaining the factual basis for why the person has been found ineligible. For instance:

● "YOUR MEDICAID FOR THIS PERIOD IS ENDING"

● "NO HOUSEHOLD MEMBERS ARE ELIGIBLE FOR THIS PROGRAM"

● "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM"

● "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP."

77. Notices that state "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM" do not identify what other program is being referenced.

**Medicaid**

Your Medicaid benefits for the person(s) listed below will end on May 31, 2023.

**Name**

C█████ D███████

Chianne D███████

Chandler D███████

Reason: YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM
The law that supports this action is:
(FL Admin. Code = R) (FL Statute = S), S414.095

78. Defendant DCF has stated that the reason code "YOUR MEDICAID FORTHIS PERIOD IS ENDING" is used to cover several different circumstances but the recipient is not informed what those circumstances are. For example, DCF has stated that the meaning of the reason code "[varies] based upon each [case's] individual circumstances." DCF has also stated that this reason code is "used in cases when there are multiple reasons for the action." Most recently, DCF has stated that the code is "used because it is following prior notices. . . advising the individual to perform a certain action."

79. The termination notices do not identify any factual information regarding the household, such as the age, income, pregnancy, or disability status Defendants used when making the eligibility determination.

80. The only household-specific information Defendants include in the notice are the names of the individuals in the household and certain dates, such as, the date the notice was issued, the date the Defendants completed the eligibility determination, and dates when coverage will begin or end.

81. The termination notices do not identify the population group into which the enrollee was placed prior to the decision to terminate them or why the applicable eligibility standards for that group are no longer met.

82. Knowing the individual's population group prior to the notice of termination can be essential for the individual to understand if the termination is erroneous, particularly if the person is in a coverage group entitled to continuous eligibility for six or 12 months regardless of a change in circumstances.

83. The termination notices do not indicate that household members were evaluated to determine whether they come within any other covered population groups prior to being terminated. Without information about the population groups that the state considered when making its eligibility determination, an individual cannot identify other population groups they might now be eligible for based on new circumstances, such as birth of a child or onset of a disability.

84. The notices include standardized language regarding how to request a fair hearing: "If you want a hearing, you must ask for the hearing by writing, calling the call center or coming into an office within 90 days from the date at the top of this notice."

85. The notices do not provide a physical address for mailing the request for a hearing.

86. Call center wait times can be prohibitively long.

87. Florida is in the top three among all states for long call center wait times and has the highest call abandonment rates. The average wait time is 40 minutes, and 48% of calls are abandoned. *See* CMS, *Medicaid and CHIP CAA Reporting Metrics* (July 28, 2023), https://data.medicaid.gov/dataset/7218cbef-f485-4daa-8f69-e50472eab416. CMS has recently expressed "concerns that [Florida's] average call center wait time and abandonment rate are impeding equitable access to assistance." CMS, *Florida May 2023 Unwinding Data Letter* (Aug. 9, 2023), https://www.medicaid.gov/sites/default/files/2023-08/fl-may-2023-unwinding-data-ltr.pdf. Furthermore, the barriers are significantly higher for non-English speakers. The average Spanish-language caller has to wait nearly two and a half hours and 30% of Spanish-language calls are disconnected. *See* UnidosUS, "At Florida's Medicaid call center, long and discriminatory delays prevent eligible

families from keeping their health care" (Aug. 2023), https://unidosus.org/
publications/long-and-discriminatory-delays-at-floridas-call-center/.

88. While the notices state that a person can ask for a hearing by coming into
an office, the notices do not provide an address to a physical office where the person
should go.

89. Over the years, Florida has closed many offices. There are currently fewer
than 50 "storefronts" or service centers in the State. The majority of offices are
located in large urban areas. *See* Fl. Dep't of Child. & Fam., "ESS Storefronts and
Lobbies"      https://www.myflfamilies.com/services/public-assistance/additional-
resources-and-services/ess-storefronts-and-lobbies (last visited Aug. 21, 2023).

90. The notices do not inform individuals that they have the option to request
a hearing via email or through an online link.

91. Before October 4, 2023, the notices stated: "You will be responsible to
repay any benefits if the hearing decision is not in your favor." The notices now state
that "You may be responsible to repay any benefits if the hearing decision is not in
your favor."

92. However, DCF policy only authorizes the recovery of overpayments in
Family-Related Medicaid that are the result of "Fraud or intentional program
violation." *See* ESS Program Policy Manual, §§ 3630.0200, 3630.0300,

https://www.myflfamilies.com/sites/default/files/2023-02/3600.pdf    (last    visited

Aug. 21, 2023).

93. On information and belief, the notices read at a tenth grade level, while

the reading level of most adults in the United States is eighth grade.

94. The notices are confusing.

95. Defendants have been aware of deficiencies in the notices for years.

96. In 2018, state officials reported "being well aware that notices sent to

beneficiaries generate confusion" and that the "current notices that describe

applicants as ineligible are considered to be not sufficiently explicit in terms of an

explanation." State Health Access Data Assistance Center (SHADAC), *Medicaid*

*Eligibility, Enrollment, and Renewal Processes and Systems Study: Case Study*

*Summary Report – Florida*, 12 -13 (Oct. 19, 2018), https://www.macpac.gov/wp-

content/uploads/2018/11/Florida-Summary-Report.pdf.

## VI.    STATEMENT OF FACTS AS TO THE NAMED PLAINTIFFS

### A.    Plaintiffs Chianne D. and C.D.

97. Plaintiff Chianne D. resides in Jacksonville, Florida with her husband

Chandler and their two children, Plaintiff C.D. (age two) and S.D. (age six months).

For Medicaid eligibility purposes, this is a four-person household.

98. Plaintiff C.D. was diagnosed with Cystic Fibrosis in 2021 and has been

on Medicaid since that time.

99. C.D. requires significant medical care including expensive prescription drugs, medical daycare, physician and therapy visits, medical equipment and periodic hospitalizations.

100. Plaintiff Chianne D. was enrolled in Medicaid when she was pregnant with S.D.

101. Plaintiff Chianne D. gave birth to S.D. in February 2023. S.D. was enrolled in Medicaid at that time.

102. In February 2023, Chianne met the eligibility requirements for 12-months continuous coverage regardless of a change in income, meaning that her Medicaid coverage should have been maintained through at least February 2024.

103. Defendant DCF issued a 12-page notice to the Plaintiff Chianne D.'s family on April 24, 2023. The notice states that their "Medicaid application/review" is denied for all family members for April, May and June 2023 with the reason "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM" and "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM."

104. The April 24, 2023 notice states on page eight that Medicaid will end on May 31, 2023 for Chianne and C.D. with the reason: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM."

105. The April 24, 2023 notice did not state that either Plaintiff Chianne D. or C.D. were being referred to any other program, such as CHIP, for potential coverage and Defendants did not notify the family about any such alternative coverage.

106. The notice included three different sections labeled "Medically Needy." Two of these sections contain identical information about the eligibility status for three household members. The third section lists all four household members, but contains conflicting information about the eligibility status of the three household members identified in the other sections.

107. Plaintiff Chianne D. was utterly confused by the notice. She did not understand what action DCF was taking or why. As a result, Chianne was unable to prepare a response to the proposed termination of coverage.

108. Chianne contacted DCF multiple times. The DCF representatives were unable to answer her questions regarding the meaning of the notice. One agent told her "I'm not going to sit here and answer your questions" and "I don't know why you're not getting this." When Chianne pressed for an explanation of what "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM" meant, the agent told her "I have a rule that says I cannot talk to you for over 20 minutes." Chianne explained that C.D.'s need for coverage was urgent and ongoing.

109. If Chianne had understood the status of C.D.'s Medicaid eligibility and that C.D. would retain Medicaid coverage pending the appeal, she would have submitted an appeal on C.D.'s behalf before they lost coverage.

110. Chianne did not submit any paperwork to request an appeal, but believes that a DCF agent submitted a request on her behalf. Chianne and C.D. did not receive benefits pending the appeal. The notice did not alert Chianne that she could remain eligible for continued Medicaid through the postpartum population group. Thus, she was unaware that she could pursue a fair hearing to challenge her own loss of coverage.

111. Plaintiffs Chianne D. and C.D. lost Medicaid coverage on May 31, 2023.

112. In June, without Medicaid coverage, C.D. went without necessary medical care. Chianne had to cancel a doctor's appointment. C.D. was unable to attend medical daycare. Chianne cared for her, while also caring for her infant son and attending school full time.

113. In June, C.D. missed multiple weeks of her prescription drugs and as a result, lost her appetite and was constantly tired and moody. She developed a loud, persistent cough and had to go to the emergency room for treatment because her primary care provider would not see her without insurance coverage.

114. The hospital prescribed additional medication for C.D. Plaintiff Chianne D. has had to borrow money from a family member to pay for the prescriptions.

115. The family owes $2,800 for the hospital visit and another $1,136 for other bills, including a charge for radiology services performed by a specialist during her emergency room visit and the monthly cost of her nebulizer and related supplies.

116. The hospital bill has been sent to collections. The family is saving money to pay the bill and has had to take money out of savings to buy diapers for S.D. and delay the introduction of solid foods to S.D. because the family cannot afford them.

117. The financial burden is causing the family significant stress.

118. Plaintiff Chianne D. was able to enroll C.D. in MediKids, Florida's CHIP coverage for children ages one through four, as of July 1, 2023. This coverage costs the family $248 a month.

119. At the end of June, after confirming that C.D. would be enrolled in MediKids starting July 1, Chianne withdrew the appeal. At the time she withdrew the appeal, she was unaware that she was eligible for postpartum coverage.

120. Plaintiff Chianne D. was without coverage in June and July 2023, when she became sick multiple times but could not see a doctor.

**B.    Plaintiff A.V.**

121. Plaintiff A.V., age one, lives with her parents and five siblings (all of whom are claimed as dependents by A.V.'s parents) in Miami Dade County. For Medicaid eligibility purposes, this is an eight-person household.

122. Plaintiff A.V. has been on Medicaid since she was born in May 2022 and her Medicaid began in June 2022.  Three of her siblings who are under age 18 are on KidCare, Florida's CHIP coverage for children ages five and older. One sibling is on Medicaid because she is disabled and receives Supplemental Security Income (SSI).

123. Throughout her life, Plaintiff A.V. has relied on Medicaid to cover her medical care. This care includes all of her checkups and vaccines.

124.  Plaintiff A.V. had an appointment for a vaccination on June 6, 2023. However, on or about June 5th, her mother received a call from A.V.'s pediatrician saying that she was no longer insured and that her appointment was being canceled.

125.  Plaintiff A.V.'s mother then read through an 8-page notice from DCF dated May 16, 2023 that she had received by mail.

126. Plaintiff A.V.'s mother was confused by the May 16th notice. The notice had seven different sections labeled "Medically Needy," but each section had different information.  Different sections listed different family members and different "share of cost" amounts for the same month. She did not understand what the "share of cost" amount is, how it was calculated, or why it changes depending on which section of the notice it is listed in.

127. The notice did not mention that Medicaid was ending until the bottom of page five where it stated "your Medicaid benefits for the person(s) listed below will

end on May 31, 2023." The notice then listed everyone in the household except the child who qualifies for Medicaid because she receives SSI.

128. The reason given is: "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP."

129.  Plaintiff A.V.'s mother, Jennifer, did not understand the meaning of the phrase "REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP." She thought that A.V. should still be on Medicaid because the notice stated that she was in a "different Medicaid coverage group," and she believed that A.V. was still eligible for Medicaid because she is only one-year old. Also, based on her prior experience with Medicaid, she thought that it could mean that her daughter was being transferred to a new Medicaid managed care plan.

130. Plaintiff A.V.'s mother is also confused that other family members were listed as having "their Medicaid benefits end," because as of May 2023, only her child with SSI (who was not listed) and A.V. were enrolled in Medicaid.

131.  Plaintiff A.V.'s mother did not understand the section of the notice addressing how to request a fair hearing.

132. Plaintiff A.V.'s father also tried to find out what happened and determine whether A.V. could be covered by some type of health insurance.  He called Plaintiff

A.V.'s Medicaid managed care plan, the federally facilitated marketplace (FFM) and
the Florida Healthy Kids Corporation (FHKC) which is in charge of the KidCare
program. FHKC told A.V.'s father that the family needed to open a separate account
on ACCESS and reapply for Medicaid for A.V. Plaintiff A.V.'s parents did not
understand what was happening or what to do next.

133. A.V.'s mother is aware of the fact that children, like A.V., have
inevitable and unpredictable medical needs. Even though A.V. is currently healthy,
she could have a sudden illness or accident. A.V. also needs to have insurance so
she can go to her well-child checkups and receive necessary vaccines, including one
that she missed because of her loss of Medicaid eligibility. A.V. remains without
Medicaid coverage.

## C.  Plaintiffs Kimber Taylor and K.H.

134. Plaintiff Kimber Taylor resides in Jacksonville, Florida with her son,
Plaintiff K.H. (age eight months). For Medicaid eligibility purposes, this is a two-
person household.

135. Plaintiff Taylor was enrolled in Medicaid when she was pregnant with
K.H.

136. On April 26, 2023, Defendant DCF issued a notice to Plaintiff Taylor
stating that she was eligible for continued Medicaid. The notice also stated that

coverage for K.H., who was not yet born, would begin when DCF was notified of
the birth, and that the baby would continue to be eligible from "June 2023 ongoing."

137. Plaintiff K.H was born in May 2023 and he was enrolled in Medicaid in
June 2023.

138. In May 2023, Plaintiff Taylor met the eligibility requirements for 12-
months continuous coverage as a postpartum pregnant person, meaning that her
Medicaid coverage should have been maintained through at least May 2024.

139. In May, 2023, Plaintiff K.H. met the requirements for one-year
continuous coverage as a child under age five, meaning that his Medicaid coverage
should have been maintained through at least May 2024.

140. Plaintiff Taylor was on unpaid maternity leave from May 11, 2023
through August 1, 2023, and did not work or earn any income during this time.

141. On June 8, 2023, while Plaintiff Taylor was on unpaid leave, DCF issued
a second notice. Page two of the notice states: "We have reviewed your eligibility
for full Medicaid benefits and have determined you are not eligible because your
income exceeds the limit for Medicaid."

142. The June 8th notice states on page five that Medicaid will end on June
30, 2023 for Plaintiff Taylor and Plaintiff K.H. with the reason: "YOU OR A
MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID
UNDER A DIFFERENT MEDICAID COVERAGE GROUP."

143. The notice included two different sections labeled "Medically Needy." The first section stated that K.H. is enrolled in the Medically Needy program with a share of cost of $3644.00 from July 2023 ongoing. The second section lists both Plaintiff Taylor and K.H., but states that both household members are ineligible for the Medically Needy program for May and June, with the reason: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM."

144. The notice left Plaintiff Taylor extremely confused and upset. She did not understand how a newborn and a person who had recently given birth could lose Medicaid coverage.

145. The June 8th notice did not explain the reasons for the change in Plaintiff Taylor and K.H,'s eligibility for Medicaid. The notice did not state what income DCF believed Plaintiff Taylor had earned or how that amount was calculated.

146. Plaintiff Taylor did not understand the meaning of the phrase "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM." She did not understand what other "program" the notice was referring to.

147. Plaintiff Taylor contacted DCF to try to find out what happened and why Plaintiff Taylor and K.H. lost Medicaid coverage. It was difficult to get through to speak to an actual person, and Plaintiff Taylor was on hold for at least an hour.

Eventually, she spoke with a DCF representative who told her that she was over income. The representative said that Plaintiff Taylor could appeal, but stated that she did not qualify for Medicaid because she was over income. The representative told her to apply for health care coverage through the Marketplace.

148. The DCF representative who spoke to Plaintiff Taylor knew that K.H. was two months old. However, the representative did not inform Plaintiff Taylor that she could be eligible for postpartum coverage, or that K.H. qualified for one year of Medicaid coverage as a child under age five.

149. Plaintiff Taylor read the language in the June 8th notice regarding fair hearings, which stated "If you ask for a hearing before the effective date of this notice, your benefits may continue at the prior level until the hearing decision. You will be responsible to repay any benefits if the hearing decision is not in your favor."

150. After reading the notice and talking to the DCF representative, Plaintiff Taylor chose not to appeal. Plaintiff Taylor assumed that she would lose on appeal because the DCF representative insisted that she was over income and did not qualify for Medicaid. As a new parent, she was already in debt and did not want to risk taking on additional debt that she could not repay.

151. By the time she had her rights adequately explained to her, Plaintiff Taylor could no longer appeal and request continued benefits during the appeal.

152. The notice did not alert Plaintiff Taylor that she could remain eligible for continued Medicaid through the postpartum population group. Thus, she was unaware that she could pursue a fair hearing to challenge her loss of coverage.

153. The notice did not alert Plaintiff Taylor that Plaintiff K.H. remained eligible for continued Medicaid as a child under age five. Thus, she was unaware that she could pursue a fair hearing to challenge K.H.'s loss of coverage.

154. Plaintiff Taylor and Plaintiff K.H. lost Medicaid coverage on June 30, 2023.

155. Plaintiff Taylor applied for health care in the Marketplace. She was denied health coverage, and told that she should apply for Medicaid. She was also referred to FHKC to get insurance for K.H. However, FHKC notified her that K.H. was ineligible for the program because he was too young.

156. Being cut off from health coverage caused Plaintiff Taylor to experience anxiety and panic attacks. She felt significant stress over whether her newborn could receive necessary vaccines and medical care while she was without an income or Medicaid coverage.

157. In July, Plaintiff Taylor had to pay out of pocket for critical health coverage for her newborn son. Plaintiff Taylor took K.H. to a scheduled checkup to receive his first set of vaccines on July 19, 2023. The pediatrician agreed to see K.H.

and give him the vaccines even though he did not have health insurance. Plaintiff

Taylor received a bill for $555.00 from that appointment.

## VII.   CAUSES OF ACTION

### COUNT I
### Violation of Constitutional Due Process, U.S. Const., amend. XIV, § 1

158. Plaintiffs incorporate and re-allege paragraphs 1 through 157 as if fully

set forth herein.

159. The Due Process Clause of the Fourteenth Amendment of the U.S.

Constitution bars the state from depriving a person of their property, which includes

Medicaid benefits, without affording the individual adequate advance notice and an

opportunity to be heard prior to the termination of the benefits U.S. Const. amend.

XIV, § 1; *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970).

160. Defendants have deprived, and continue to deprive, Plaintiffs of due

process in violation of the Fourteenth Amendment by:

   a. Creating a risk of erroneous deprivation of Medicaid coverage;

   b. Failing to provide timely, effective notice of the basis for the agency's

   decision or enrollees' rights and responsibilities pertaining to their

   Medicaid coverage; and

   c. Failing to provide a meaningful opportunity for a fair hearing and

   timely corrective action as needed prior to termination of Medicaid

   coverage.

161. Plaintiffs seek relief on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their constitutional rights by persons acting under color of state law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

  a. Certify this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

  b. Enter a declaratory judgment, in accordance with 28 § U.S.C. 2201 and Fed. R. Civ. P. 57, declaring that Defendants' standardized notices communicating Medicaid ineligibility violated and continue to violate Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.

  c. Issue preliminary and permanent injunctive relief prohibiting Defendants, their agents, successors, and employees from continuing the agencies' illegal policies and practices and to prospectively reinstate Medicaid coverage to Plaintiffs and all affected class members until timely and legally adequate notice of termination has been provided to them;

d. Retain jurisdiction over this action to ensure Defendants' compliance with the mandates of the Court's Orders;

e. Award Plaintiffs costs and reasonable attorney's fees and costs as provided by 42 U.S.C. §§ 1988(b) and 12133 and 29 U.S.C. § 794a(b); and

f. Order such other, further or additional relief as the Court deems just and equitable.

Dated: 7/28/25                          Respectfully submitted,


**FLORIDA HEALTH JUSTICE PROJECT**     **NATIONAL HEALTH LAW PROGRAM**
                                       By:*/s/Katy DeBriere*
                                       **Katy DeBriere (FBN: 58506)**
**Miriam Harmatz** (Fl. Bar No. 562017)  **Sarah Grusin\*\***
harmatz@floridahealthjustice.org       **Miriam Heard\*\***
                                       **Amanda Avery\*\***
**Lynn Hearn** (Fl. Bar No. 123633)     **Jane Perkins\*\***
hearn@floridahealthjustice.org
                                       1512 E. Franklin Street, Suite 110
Jerron Wheeler (Fla. Bar No. 1032240)  Chapel Hill, NC 27541
wheeler@floridahealthjustice.org       (919) 968-6308
                                       grusin@healthlaw.org
Ronnie Graham (Fl. Bar No. 1032153)    heard@healthlaw.org
graham@floridahealthjustice.org        avery@healthlaw.org
                                       perkins@healthlaw.org


*\* Lead Counsel Designee pursuant to*   *\*\* Admitted pro hac vice.*
*M.D. Local Rule 2.02(a).*

43