## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CHIANNE D.; C.D., by and through
her mother and next friend, Chianne D.;
A.V., by and through her mother
and next friend, Jennifer V.; KIMBER
TAYLOR; and K.H., by and through his
mother and next friend, Kimber Taylor,

       Plaintiffs,

-vs-           Case No. 3:23-cv-985-MMH-LLL

SHEVAUN HARRIS, in her official
capacity as Secretary for the FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION, and TAYLOR
HATCH, in her official capacity as
Secretary for the FLORIDA
DEPARTMENT OF CHILDREN
AND FAMILIES,

       Defendants.

_____/

## FINDINGS OF FACT & CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court for the entry of findings of fact and conclusions of law.  Plaintiffs, on behalf of a class of similarly situated individuals, assert that Defendants are violating the Due Process Clause of the United States Constitution by failing to provide adequate notice prior to the termination of Medicaid benefits.  The five named Plaintiffs are current or former Medicaid enrollees who were terminated from Medicaid based upon the

State's finding that their household income exceeded the applicable income thresholds for Medicaid eligibility.    Plaintiffs represent the following Class of similarly situated individuals:

> All Florida Medicaid enrollees who on or after March 31, 2023, have been or will be found ineligible for Medicaid coverage based on a finding that the individual or household has income that exceeds the threshold for Medicaid eligibility, and were issued a written notice that does not identify the individualized income used in the eligibility determination or the income standard applied.
>
> **Subclass**: Members of the class whose written notice does not provide a Designated Reason or includes only Designated Reasons that do not identify income as the factor on which the State relied in finding the individual to be ineligible for Medicaid.

See Order (Doc. 122; Class Certification Order) at 69, entered April 23, 2024.[1] Defendants are Shevaun Harris, in her official capacity as Secretary for the Florida Agency for Health Care Administration (AHCA), and Taylor Hatch, in her official capacity as Secretary for the Florida Department of Children and Families (DCF) (collectively, the State).

The Court conducted a six-day bench trial beginning July 11, 2024, and also received additional evidentiary presentations from July 29, 2024, to August

---

[1] In the original complaint (Doc. 1) and the First Amended Complaint (Doc. 77), Plaintiffs included a second count in which they asserted a claim under the Medicaid Act.    On July 25, 2025, the Court granted Plaintiffs leave to file a Second Amended Complaint solely for the purpose of dropping the Medicaid Act claim in Count II.    See Order (Doc. 182).

2, 2024.  <u>See</u> Minute Entries (Docs. 142, 148, 149, 151, 153, 154).[2]  Numerous witnesses testified in person.   Plaintiffs called Kimber Taylor, William Roberts, Chianne D., Jennifer V., Lily Mezquita, Nathan Lewis, and Jarvis Ramil.   Plaintiffs also presented by deposition the testimony of LaQuetta Anderson, Ann Dalton, James Garren, Robyn Goins, Hari Kallumkal, Andrea Latham, Christopher Presnell, Karina Sarmiento, Nichole Solomon, and Tonyaleah Veltkamp.  <u>See</u> Joint Notice of Filing Deposition Designations and Objections (Doc. 167).[3]  The State called the following witnesses who testified

---

[2] The exhibits admitted at trial are attached to the Exhibit Lists filed on August 2, 2024.  <u>See</u> Plaintiffs' Exhibit List (Doc. 155); Defendants' Amended Final Exhibit List (Doc. 156).   The transcript of the bench trial is in the record at docket entries 143, 162-166.   The Court will cite as Transcript Volumes I-VI.

[3] The State raised extensive relevance and scope objections to Plaintiffs' Deposition Designations.  <u>See</u> Defendants' Objections to Plaintiffs' Deposition Designations (Doc. 167-13).   With respect to the State's relevance objections, the Court has considered those objections and, to the extent that in the findings below the Court cites to testimony to which the State objected, the Court finds it relevant and the objection to that testimony is overruled.

In addition, the Court is not persuaded that the State's scope objections warrant exclusion of the challenged testimony.   Pursuant to Rule 32(a)(3), Federal Rules of Civil Procedure (Rule(s)), Plaintiffs "may use for any purpose the deposition of [Defendants] or anyone who, when deposed, was [Defendants'] officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)."  <u>See</u> Rule 32(a)(3).   Plaintiffs have submitted the deposition testimony of the witnesses identified above, all of whom were the State's Rule 30(b)(6) designees on various topics when deposed.   The State contends that portions of the designated deposition testimony for each of these witnesses must be excluded because, according to the State, those portions exceed the scope of that witness's specific Rule 30(b)(6) designation. Notably, the State does not cite a single case to support the proposition that exclusion of the testimony at trial is warranted on this basis.

Regardless, the Court has reviewed the challenged testimony and determines that, to the extent the witness is able to answer the question, none of the challenged testimony is so far beyond the scope of the designations as to warrant exclusion.   Rather, the Court determines that the appropriate course is to admit the testimony and consider the State's scope objections in determining the weight to give the testimony.   Significantly, several of the witnesses are plainly directors or managing agents of the State whose depositions would be admissible under Rule 32(a)(3) regardless of their Rule 30(b)(6) designations.  <u>See</u> Deposition

in person: Matthew Cooper, LaQuetta Anderson, Nichole Solomon, William Roberts, Robyn Goins, Brandy Jones, Andrea Latham, Daniel Davis, Tonyaleah Veltkamp, and Harikumar Kallumkal.   Additionally, the Court reviewed extensive written and video evidence introduced by the parties.   With the Court's permission, on September 6, 2024, the parties also submitted into evidence a Stipulation Regarding Reason Code 241 (Doc. 172).   After the close of the evidence, the parties filed proposed findings of fact and conclusions of law.   See Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. 174; State Proposal); Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Doc. 173; Class Proposal), both filed on September 18, 2024.

Before proceeding to the Court's findings of fact and conclusions of law, two pending motions require the Court's attention.   On April 5, 2024, the American Public Health Association requested leave to file a brief as amicus

---

of Ann Dalton (Doc. 167-3; Dalton Dep.) at 5 (identifying herself as the bureau chief of the Bureau of Medicaid Policy within AHCA); Deposition of Robyn Goins (Doc. 167-5; Goins Dep.) at 6 (identifying her position with DCF as the "region director for ESS in the northwest region"); Deposition of Andrea Latham (Doc. 167-7; Latham Dep.) at 5-6 (identifying her position with DCF as the "Access director in the IT area in the office of information technology services"); Deposition of Christopher Lee Presnell (Doc. 167-8; Presnell Dep.) at 4-5 (stating that he is the director of data and information technology with ESS); Deposition of Karina Sarmiento (Doc. 167-9; Sarmiento Dep.) at 4-5 (identifying her responsibilities as oversight of the day-to-day operations of the appeal hearing section, ensuring that all policies and procedures are followed, developing policies and procedures, and overseeing all administrative functions and the hearing process); Solomon Test., Tr. Vol. IV at 192 (identifying her position with DCF as the Director of Call Center Services); Deposition of Tonyaleah Veltkamp Vol. 1 (Doc. 167-11; Veltkamp Dep.) at 6 (identifying her position as the Deputy Assistant Secretary for the Economic Self-Sufficiency Operations).   And regardless, to the extent the Court relies on any of the challenged statements in its findings below, the Court has found that the statement was made by an agent or employee of the State "on a matter within the scope of that relationship and while it existed . . . ."   See Fed. R. Evid. 801(d)(2)(D).

curiae in support of Plaintiffs' position at trial.  <u>See</u> The American Public Health Association and 102 Deans, Chairs, and Public Health and Health Policy Scholars' Motion for Leave to File <u>Amicus Curiae</u> Brief in Support of Plaintiffs' Position at Trial (Doc. 112; Amicus Motion).  The State filed a response in opposition to the Amicus Motion on April 17, 2024.  <u>See</u> Defendants' Response to American Public Health Association's Motion for Leave to File Amicus Curiae Brief (Doc. 119; Response to Amicus Motion).  Upon review of the Amicus Motion and Response, the proposed brief, and the relevant law, the Court finds that the Amicus Motion is due to be denied.  <u>See</u> <u>Save the Manatee Club v. U.S. Envmt'l Protection Agency</u>, No. 6:22-cv-868-CEM-LHP, 2022 WL 19918052, at *1 (M.D. Fla. Nov. 22, 2022) (setting forth the circumstances under which amicus curiae status is granted).[4]  The legal and factual issues in this case have been fully and skillfully addressed by counsel of record.  As such, the Court declines to consider the additional arguments and data set forth in the proposed amicus brief.

Next, the Court considers Plaintiffs' Request for Judicial Notice as to Governmental Actions, Policies, and Reports (Doc. 129; Request for Judicial Notice), filed on May 3, 2024.  The State filed a response in opposition to this

---

[4] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority.  <u>See</u> <u>Stone v. First Union Corp.</u>, 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Request on May 8, 2024.   <u>See</u> Defendants' Response to Plaintiffs' Request for Judicial Notice (Doc. 133; Response to Request).   Pursuant to Federal Rule of Evidence 201(b), the Court may take judicial notice of adjudicative facts that are "not subject to reasonable dispute," because they are "generally known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." <u>See</u> Fed. R. Evid. 201(a)-(b).   Although the Court has "wide discretion" to take judicial notice of appropriate adjudicative facts, the process of taking judicial notice is highly limited because it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." <u>See</u> <u>Lodge v. Kondaur Cap. Corp.</u>, 750 F.3d 1263, 1273 (11th Cir. 2014) (quoting <u>Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC</u>, 369 F.3d 1197, 1205 (11th Cir. 2004)).

Plaintiffs ask the Court to take judicial notice of Plaintiffs' Exhibit 238. This document is an October 19, 2018 summary report of a study commissioned by the Medicaid and CHIP Payment and Access Commission (MACPAC).   <u>See</u> Pls.' Ex. 238 at AHCA-2057.   According to Plaintiffs, MACPAC is "a non-partisan legislative branch agency that provides policy and data analysis and makes recommendations to Congress, the Secretary of the U.S. Department of Health and Human Services, and the states on issues affecting Medicaid and the State Children's Health Insurance Program (CHIP)."   <u>See</u> Request for

Judicial Notice at 4 (quotation omitted). The report itself was prepared by

researchers at the University of Minnesota, School of Public Health. See Pls.'

Ex. 238 at AHCA-2057. At the bench trial, Plaintiffs focused their request for

judicial notice on the following paragraph in the report:

> State respondents reported being well aware that notices sent to
> beneficiaries generate confusion. They emphasized the need to
> establish a new, more robust notice platform (i.e., the system that
> generates the notices) when resources become available.
> Respondents pointed out that discussions are taking place
> regarding this new platform, which would ideally allow notices to
> be more case-specific (for example, current notices that describe
> applicants as ineligible are considered to be not sufficiently explicit
> in terms of an explanation) and take into consideration notice
> readability.

See Pls.' Ex. 238 at AHCA-2071-72; see also Tr. Vol. IV at 25. Plaintiffs

contend that because the report was produced on behalf of MACPAC it

constitutes a government report whose accuracy cannot reasonably be

questioned. See Request for Judicial Notice at 4.

While the Court finds it appropriate to take judicial notice of the existence

of this report, the Court cannot take judicial notice of the truth of its contents—

that informants within DCF made the statements as characterized in the report

or that those statements are factually true. Such information is not the kind

of objective fact that is beyond reasonable dispute. Compare Shahar v.

Bowers, 120 F.3d 211, 214 (11th Cir. 1997) (describing the kinds of things about

which courts ordinarily take judicial notice such as scientific facts, matters of

geography, or matters of political history); see also Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1277-78 (11th Cir. 1999) (discussing the difference between taking judicial notice for the purpose of determining what statements a document contains and the truth of the documents' contents).   Indeed, the findings in the report are substantively different than the statistical data or governmental recordkeeping that was at issue in the cases on which Plaintiffs rely in their Request for Judicial Notice.   See Request for Judicial Notice at 3 (citing Cash Inn of Dade, Inc. v. Metro. Dade Cnty., 938 F.2d 1239, 1243 (11th Cir. 1991) (affirming judicial notice of statements recorded in the minutes of a county commission's meeting but observing that the accuracy of those statements was irrelevant to the outcome of the case); Terrebonne v. Blackburn, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) (taking judicial notice of a statistical report); and Brooks v. United States, 273 F. Supp. 619, 624 (D.S.C. 1967) (taking judicial notice of statistical reports)).   The Court rejects the proposition that any information contained in a study commissioned by the government is beyond reasonable dispute and a proper subject for judicial notice.   As such, the Court takes judicial notice of the existence of this report, but not the truth of its contents.   Limited in this way, Plaintiffs cannot rely on the report as evidence that in 2018, DCF employees believed the notice to be confusing and insufficient.   Nonetheless, the existence of the report is evidence that DCF has known of these critiques for several years.   See Lewis Test., Tr. Vol. IV at 28

(testifying that he read this report after it was released); see also Veltkamp Dep. Vol. 1 at 156-58 (testifying to DCF's awareness of this report).[5]

Plaintiffs also ask the Court to take judicial notice of Plaintiffs' Exhibit 241 titled Oregon Supplemental Income Program Medical (OSIPM) Restorations and dated November 21, 2023. This document is a statement from the Oregon Health Authority announcing that Oregon is reinstating medical benefits and pausing future closures for "people who were found over the program's income or financial resource limits" until Oregon updates its notices to provide more information. See Pls.' Ex. 241 at 1-2. According to the document, the Oregon Health Authority took these steps based on concerns that people did not understand the notices and needed more information. Id. at 1. Plaintiffs argue that this document is relevant to show that "other states have taken specific actions during the 'unwinding,' including sending corrective notice and reinstating Medicaid coverage, to remedy their own insufficient Medicaid termination notices." See Request for Judicial Notice at 4.

The State does not dispute that this document is appropriate for judicial notice, and indeed, the Court finds that its authenticity and contents are beyond reasonable dispute. Nonetheless, the State maintains that the Court should

---

[5] To the extent the State argues that its awareness of these critiques is irrelevant, the Court rejects this contention. See Response to Request at 8. While the State's awareness of these criticisms is not relevant to the merits of Plaintiffs' claims, the Court does find this to be a relevant consideration in balancing the equities.

decline to take judicial notice because the publication is irrelevant.    See
Response to Request at 8-9.   Given that this matter is before the Court on a
bench trial, the Court finds the appropriate course of action is to admit the
document.    The Court will take the State's relevance arguments into
consideration when determining the appropriate weight to give this evidence.
Accordingly, the Court will grant the Request for Judicial Notice as to Plaintiffs'
Exhibit 241.[6]

Having reviewed the pleadings, examined the evidence, observed the
witnesses, and considered the arguments of counsel, as well as the remainder
of the record, the Court makes the following findings of fact and conclusions of
law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I.    Findings of Fact

### A. Overview

1.    Medicaid is a federal-state cooperative health care program jointly funded
by the states and the federal government.   See Joint Pretrial Statement (Doc.
128; JPS), Part VIII ¶ 1.

---

[6] To the extent Plaintiffs ask the Court to take judicial notice of Plaintiffs' Exhibits 240
and 242 in the Request for Judicial Notice, the Court notes that Plaintiffs did not seek to admit
these exhibits during the bench trial nor do they rely on them in their proposed findings.   As
such, the Court will deny Plaintiffs' request as to these exhibits as moot.

2.    The Centers for Medicare & Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) is the agency that administers Medicaid at the federal level.   Id. ¶ 2.

3.    Florida participates in the federal Medicaid program.   Id. ¶ 5.

4.    States receive federal matching funding, called Federal Financial Participation (FFP), for Medicaid services provided to eligible enrollees. The federal government matches the state's Medicaid expenditures at a specified rate. Florida currently receives a federal matching rate of approximately 60% (60 cents of every dollar spent) for Medicaid services.   Id. ¶ 4.

5.    AHCA is the state agency designated to administer Florida's Medicaid program.   Id. ¶ 6.  As relevant to this case, the Florida legislature "vested DCF with responsibility for Medicaid eligibility determinations," which includes issuing the notices of those determinations.   See id. ¶ 7; Fla. Stat. § 409.902(1); see also Dalton Dep. at 9-11.

6.    DCF's Office of Economic Self Sufficiency (ESS) is responsible for administering several federal and state public-assistance programs, including cash assistance (TANF), food assistance (SNAP), and eligibility determinations for Medicaid.   See JPS, Part VIII ¶ 23.

7.    DCF's Policy and Procedures department, or Program Office, is responsible for the policies and procedures that govern the public assistance

programs throughout the state.   <u>See</u> LaQuetta Anderson[7] Test., Tr. Vol. IV at 114-15.

8.     DCF has approximately forty-one customer-service office locations across Florida known as Family Resource Centers (and formerly known as ESS Storefronts and Lobbies).   <u>See</u> JPS, Part VIII ¶ 10.

9.     DCF also operates a call center which "serves as an access point for [DCF] customers who have public assistance cases."   <u>See</u> Nichole Solomon[8] Test., Tr. Vol. IV at 193.

### B. Public Health Emergency and the Unwinding

10.     During the COVID-19 pandemic, federal legislation temporarily increased the federal medical assistance percentage, or FMAP, by 6.2 percentage points.   <u>See</u> Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008(a), 134 Stat. 178, 208 (2020).   The FMAP is the rate that determines the amount of FFP that a State receives.   <u>See</u> JPS, Part VIII ¶ 17.

---

[7] LaQuetta Anderson works in DCF's Office of Information Technology as the liaison between the IT department and the Policy and Procedures department.   <u>See</u> Anderson Test., Tr. Vol. IV at 113-14.   She has been employed by DCF for thirty-eight years, beginning as a case worker.   <u>Id.</u> at 113.

[8] Nichole Solomon is the Director of Call Center Services for DCF.   <u>See</u> Solomon Test., Tr. Vol. IV at 192.   She has held her current position since April of 2023.   <u>Id.</u> at 193.   She has worked for DCF for twenty years, beginning as an agent in the call center.   <u>Id.</u> at 192.

11.    To receive the increase in the federal matching rate, Congress required States to treat any person who was enrolled in Medicaid on March 18, 2020— or who enrolled between March 18, 2020, and the end of the month in which the emergency period ended—as eligible for Medicaid until the end of the month in which the emergency period ended (unless the person requested voluntary termination of eligibility, ceased to be a resident of the State, or is deceased).   See JPS, Part VIII ¶ 18; see also Families First Coronavirus Response Act, Pub. L. No. 116-127 § 6008(b)(3), 134 Stat. 208–09.

12.    To obtain the enhanced funding, DCF implemented processes to maintain Medicaid eligibility pursuant to the continuous enrollment condition under the Families First Coronavirus Response Act.   See JPS, Part VIII ¶ 19.

13.    In December 2022, Congress determined that the continuous enrollment condition would end on March 31, 2023. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 5131(a)(2)(C)(iv), 136 Stat. 4459, 5949 (2022). As a result, federal law required States to resume Medicaid redeterminations and otherwise return to normal eligibility and enrollment operations.   See JPS, Part VIII ¶ 20.

14.    This process is commonly referred to as the "unwinding."   Id. ¶ 21.

15.    In response to the federal directive to resume redeterminations, Florida elected to begin that process in March 2023.   Id. ¶ 22.

16.    During the unwinding, from April 1, 2023, through March of 2024, DCF redetermined the Medicaid eligibility of over four million people.    See Tonyaleah Veltkamp Test., Tr. Vol. V at 201.

### C. Eligibility

#### a. Medicaid

17.    DCF maintains a document called the Economic Self-Sufficiency Program Policy Manual (the "Policy Manual").    Among other things, the Policy Manual describes the rules that govern Medicaid eligibility determinations and defines terms used in Florida's Medicaid program.    See JPS, Part VIII ¶ 11. The primary purpose of the Policy Manual is for staff to look up rules and policies.    See Veltkamp Dep. Vol. 1 at 23.    It was not written with the public in mind.    Id.

18.    Florida's Medicaid program encompasses both "Family-Related Medicaid" and "SSI-Related Medicaid."    See JPS, Part VIII ¶ 13.    SSI-Related Medicaid (MSSI) provides Medicaid coverage to needy individuals who are aged, blind, or disabled in the community or with special living arrangements.    Id.[9]    Family-Related Medicaid (MFAM) provides Medicaid coverage to children, parents and other caretakers of children, pregnant

---

[9] DCF does not determine MSSI eligibility.    See Roberts Test., Tr. Vol. II at 28. Significantly, Plaintiffs in this case were terminated from Family-Related Medicaid coverage groups and the evidence at trial focused only on notices issued in Family-Related Medicaid cases.    As such, the Court's findings and conclusions in this Order concern only the notices issued in relation to the Family-Related Medicaid program.

women, and individuals under age 26 who were enrolled in Medicaid when they aged out of foster care.   See JPS, Part VIII ¶ 13.   These are referred to as "coverage groups" or "eligibility categories."   See Pls.' Ex. 188 (Policy Manual, Coverage Groups, Ch. 2000); see also Anderson Test., Tr. Vol. IV at 119.[10]

19.   Medicaid eligibility is determined based on technical requirements and financial factors.    The technical requirements include meeting the characteristics to fall within a coverage group, as well as additional requirements such as citizenship or immigration status and residency.   See Pls.' Ex. 192 (Policy Manual, Technical Requirements, Ch. 1400); see also Anderson Test., Tr. Vol. IV at 120 (explaining that DCF refers to eligibility requirements other than income and assets as "technical requirements"). DCF considers these technical requirements first in its eligibility determination.   See William Roberts Test.,[11] Tr. Vol. II at 11-12.   If an applicant meets the technical requirements for Medicaid, then DCF evaluates the applicant for financial eligibility.   Id. at 12-13.

---

[10]   The Court, being unfamiliar with the common terminology, referred to these categories as "population groups" in the Class Certification Order.   See Class Certification Order at 4.

[11]   William Roberts works for DCF in the Medicaid Policy Unit.   See Roberts Test., Tr. Vol. II at 7.   His job title is Government Operations Consultant II.   See id.

20.    Financial eligibility for Family-Related Medicaid is based on income standards (also referred to as an income limit).   See Pls.' Ex. 186 at DCF-2949 (Policy Manual, Calculation of Benefits, Ch. 2630.0107-.0108).   The income standards are based on a percentage of the federal poverty level.   See Roberts Test., Tr. Vol. II at 15.   Because the federal poverty level changes every year, the income standards also change every year.   Id.

21.    The Family-Related Medicaid income standards are set forth in Appendix A-7 to the Policy Manual.   See JPS, Part VIII ¶ 12; see also Pls.' Ex. 178 (Appendix A-7).[12]

22.    As shown on Appendix A-7, the income standards change depending on the coverage group.   See Roberts Test., Tr. Vol. II at 15.   The applicable income standard also depends on the size of the applicant's Standard Filing Unit (SFU).   See Appendix A-7; see also Roberts Test., Tr. Vol. II at 19.

23.    The SFU is the number of people who are counted for purposes of determining an applicant's Medicaid eligibility.   See Pls.' Ex. 189 at DCF-3136 (Policy Manual, Standard Filing Unit, Ch. 2230); see also Pls.' Ex. 181 at DCF-2712 (Policy Manual, Glossary, Ch. 4600) (defining SFU as "[a]ll individuals whose income and/or assets, and sometimes needs, are considered in the determination of eligibility for a category of assistance").   While the

---

[12] The Court includes Appendix A-7 as an attachment to this Order.

SFU is akin to an applicant's household size, the household size is not necessarily determinative or the same as the SFU.  See Roberts Test., Tr. Vol. II at 19.  For Family-Related Medicaid, whether a family member counts in the SFU largely depends on their tax relationship to the applicant.  See id.; Pls.' Ex. 189 at DCF-3136 (Policy Manual, Standard Filing Unit, Ch. 2230.0400).  Thus, an individual living in the same household as the applicant is not necessarily counted in the applicant's SFU.  See Roberts Test., Tr. Vol. II at 19-20.  Likewise, a family member who does not live in the applicant's household can, in some circumstances, still count in the applicant's SFU.  See Pls.' Ex. 189 at DCF-3137 (Policy Manual, Standard Filing Unit, Ch. 2230.0400).

24.   Significantly, it is the countable income of all members of an applicant's SFU that is compared to the appropriate income standard to determine the applicant's eligibility.  See Pls.' Ex. 187 at DCF-3042 (Policy Manual, Budgeting Income, Ch. 2430.0100) ("Eligibility for [Family-Related] Medicaid is determined by comparing the SFU's countable income to the appropriate income standard.").[13]

---

[13]  The Court notes that the individual for whom Medicaid eligibility is being determined is sometimes referred to as the "assistance group."  See Pls.' Ex. 189 at DCF-3136 (Policy Manual, Standard Filing Unit, Ch. 2230.0200).  However, throughout the evidence in this case, the meaning of the term "assistance group" is often muddled.  The Glossary in the Policy Manual defines the term as "[a]ll individuals within the standard filing unit (SFU) who are potentially eligible for benefits or services."  See Pls.' Ex. 181 at DCF-2692.  The Florida

25.    The Policy Manual defines "countable income" as the "amount of income considered in determining eligibility and/or benefits."  <u>See</u> Pls.' Ex. 181 at DCF-2695 (Policy Manual, Glossary, Ch. 4600).

26.    If income is taxable, it is counted.  <u>See</u> Pls.' Ex. 191 at DCF-3186 (Policy Manual, Income, Ch. 1830.0101).    This includes earned and unearned income.  <u>Id.</u>

27.    Certain types of income are excluded from countable income.  <u>Id.</u>  For example, in the Family-Related Medicaid Program, child support payments are excluded from countable income.  <u>See</u> <u>id.</u> at DCF-3189 (Policy Manual, Income, Ch. 1830.0700).  SSI benefits are also excluded.  <u>Id.</u> at DCF-3190 (Policy Manual, Income, Ch. 1830.0800); <u>see also</u> Roberts Test., Tr. Vol. II at

---

Administrative Code uses that definition as well but adds "[f]or Family-Related Medicaid eligibility, all applicants are considered to be an assistance group of one."  <u>See</u> Fla. Admin. Code r. 65A-1.701(6).  In the Standard Filing Unit section of the Policy Manual, under the Family-Related Medicaid section, it states that "[t]he assistance group is <u>the</u> individual for whom Medicaid eligibility is being determined."  <u>See</u> Pls.' Ex. 189 at DCF-3136 (Policy Manual, Standard Filing Unit, Ch. 2230.0200) (emphasis added).  The paragraph goes on to explain that "Eligibility of the assistance group is based on a review of the total countable income of all counted individuals in the SFU . . . .  <u>Assistance groups will consist of only one eligible individual.</u>"  <u>Id.</u> (emphasis added).  Nevertheless, some witnesses appear to use the term synonymously with SFU.  <u>See</u> Kallumkal Dep. at 107-08, 176.  And some witnesses appear to use the term "assistance group" to mean coverage group or eligibility category.  <u>See</u> Garren Dep. at 14; Goins Dep. at 25.  However, based on the Policy Manual, the Court understands these terms to have different meanings.  Regardless, what is important to understand is that while Medicaid eligibility is determined by individual, not by household, it is the size and income of the individual's household (or more precisely, SFU) that matters for his or her eligibility.  Given the confusion surrounding the term assistance group, the Court will endeavor to avoid it.  When the Court refers to an "applicant's countable income," the Court means that of the applicant and her SFU.  And in context of this case, applicants are individuals who are currently receiving Medicaid benefits but whose eligibility is under review.

28.   The Policy Manual discusses at length the types of earned and unearned income that do and do not count for purposes of determining an individual's countable income.   See Pls.' Ex. 191 (Policy Manual, Income, Ch. 1830).

28.   In addition, pretax income exclusions, such as retirement plans, life insurance, and health insurance premiums, are excluded from an applicant's countable income.   See id. at DCF-3186 (Policy Manual, Income, Ch. 1830.0101).   These are sometimes referred to as "deductions."   See Veltkamp Test., Tr. Vol. V at 199; see also Pls.' Ex. 191 at DCF-3186 (Policy Manual, Income, Ch. 1830.0101) ("Failure to deduct all pretax income exclusions will result in an incorrect calculation of income.").

29.   The income standards are based on monthly amounts.   See Roberts Test., Tr. Vol. II at 26.   Thus, if income is received more often than monthly, it must be converted to a monthly amount before it can be measured against the income standard.   See id. at 26-27; see also Pls.' Ex. 187 at DCF-3042-44 (Policy Manual, Budgeting Income, Ch. 2430.0204-.0700).   The process of taking an individual's income and converting it to a monthly amount to determine whether the applicant satisfies the income standard is referred to as "budgeting."   See Roberts Test., Tr. Vol. V at 8; see also Pls.' Ex. 187 (Policy Manual, Budgeting Income, Ch. 2400).

30.   The total countable income of an applicant's SFU constitutes the applicant's "Modified Adjusted Gross Income" (MAGI).   See Pls.' Ex. 186 at

DCF-2949 (Policy Manual, Calculation of Benefits, Ch. 2630.0108); <u>see also</u>
Roberts Test., Tr. Vol. II at 158; Veltkamp Test., Tr. Vol. V at 199 (explaining
that pretax income exclusions are deducted in determining the MAGI).   This
is also referred to at times as simply the gross income.   <u>See</u> Roberts Test., Tr.
Vol. II at 154.

31.     Next, a "standard disregard" is applied to the total countable income (i.e.,
the MAGI) for applicants in all coverage groups except children aged 6-18.
<u>See</u> Pls.' Ex. 186 at DCF-2949 (Policy Manual, Calculation of Benefits, Ch.
2630.0108).   The amount of the standard disregard varies depending on the
coverage group and SFU size.   <u>See</u> Appendix A-7.   The Policy Manual
instructs the reader to subtract the appropriate standard disregard from the
applicant's MAGI.   <u>See</u> Pls.' Ex. 186 at DCF-2949 (Policy Manual, Calculation
of Benefits, Ch. 2630.0108).   The resulting number is called the countable <u>net</u>
income.   <u>Id.</u>   The countable net income is then compared to the income
standard that applies to the applicant's coverage group based on the size of
the applicant's SFU.   <u>Id.</u>

32.     If the countable net income is beneath the income standard, then the
applicant is eligible for Medicaid.   <u>Id.</u>   If it exceeds the income standard, the
inquiry proceeds to consider application of the MAGI disregard.   <u>Id.</u>

33.     The MAGI disregard is five percent of the federal poverty limit based on
the SFU size.   <u>Id.</u>   Unlike the standard disregard, it applies to all eligibility

categories.   If an applicant's countable net income minus the MAGI disregard

is below the income standard, the applicant is eligible for Medicaid.   See id.

34.    Although the Calculation of Benefits Chapter of the Policy Manual

explains the above budget computation process, it does not tell the reader

where the income standard, standard disregard, and MAGI disregard can be

found.   See id.   This information is in a separate chapter of the Policy

Manual, titled Budgeting Income.   See Pls.' Ex. 187 at DCF-3042 (Policy

Manual, Budgeting Income, Ch. 2430.0100).    Here, the Policy Manual

informs the reader that: "Eligibility for Medicaid is determined by comparing

the SFU's countable income to the appropriate income standard. Refer to

Appendix A-7 for the standard tables."   See id.[14]   The Policy Manual does not

include instructions on how to read or apply Appendix A-7.

35.    Appendix A-7 is the public's primary source of information about income

standards.   See Veltkamp Dep. Vol. 1 at 16, 34.   However, it is plainly

designed for internal use by those who have been taught how to use it and for

whom the extraneous details may be relevant.   It defies logic to suggest that

---

[14] This statement is not accurate because it does not account for the disregards. Rather, as explained above, eligibility is determined by comparing the countable income of the applicant's SFU, less the standard disregard if applicable (to generate the countable net income) and if necessary, less the MAGI disregard, to the appropriate income standard.   The reader must know to reference the "Calculation of Benefits" chapter of the Policy Manual to find the "Budget Computation" steps which explain the application of the standard and MAGI disregards.   Yet, the "Budget Computation" chapter of the Policy Manual does not reference Appendix A-7.

a reader unfamiliar with Medicaid eligibility and the budget computation process could meaningfully apply it. Appendix A-7 does not include the budget computation steps nor does it refer the reader to that Chapter of the Policy Manual. Only having heard a significant amount of testimony about, and reviewed examples of, the application of this table during the bench trial, does the Court now understand the following about Appendix A-7.

36.    Generally, the table lists income standards by eligibility category and SFU. See Appendix A-7. Although not labeled as such on the table, the income standards reflect monthly amounts. See Appendix A-7; see also Roberts Test., Tr. Vol. II at 17 (testifying that he can tell the numbers on Appendix A-7 are monthly limits based on his experience and knowledge of Medicaid eligibility requirements). At the time of the bench trial, after the conclusion of the one-year Medicaid unwinding period, DCF had recently updated Appendix A-7 to add the word "monthly" to the title. See Roberts Test., Tr. Vol. IV at 266-67.[15]

37.    The first column of Appendix A-7 is labeled "Family Size" with rows from 1-24. See Appendix A-7. This, however, is not actually a reference to the

---

[15] Notably, DCF updated its Family-Related Medicaid Program Fact Sheet in April 2024. The Court will discuss the Fact Sheet in more detail below. However, it bears noting here that the updated version of the Fact Sheet continues to link to a version of Appendix A-7 that does not include the word "monthly" in the title or otherwise specify that the numbers reflect monthly amounts. See Defs.' Ex. 28 at 2. Moreover, because Appendix A-7 is not self-explanatory, and does not refer the reader to the sections of the Policy Manual which govern its use, a link to this table alone is relatively unhelpful to a lay reader.

size of the applicant's family or her household, it is a reference to the SFU.
<u>See</u> Appendix A-7; Roberts Test., Tr. Vol. II at 19.   The table itself does not
mention "SFU" or direct the reader to any source for how to identify an
applicant's "family size."   <u>See</u> Appendix A-7; Veltkamp Dep. Vol. 1 at 28-29.[16]

38.    The next column is titled "100% FPL."   The Court understands this to be
a reference to the federal poverty level although Appendix A-7 does not
identify it as such.

39.    The next series of columns pertain to each Family-Related Medicaid
coverage group.   Generally, the coverage group columns are subdivided into
two sub-columns, one of which appears to be the income standard (although it
is not expressly labeled as such) and the other is the standard disregard.   The
Children 6 through 18 column is not subdivided, presumably because this
Medicaid coverage group does not utilize the standard disregard.

40.    The final two columns on the table are labeled "MNIL" and "MAGI
Disregrd" [sic].   <u>See</u> Appendix A-7.   The Court will discuss the meaning of
MNIL—which stands for Medically Needy Income Limit—in the Medically

---

[16] Veltkamp testified that she does not think there is "any one clear spot that says this
is how you determine family size[,]" and could not remember if this information is in the
Medicaid Fact Sheet, which is available on DCF's website.   <u>See</u> Veltkamp Dep. Vol. 1 at 28-
29.   The Court will discuss the Fact Sheet in more detail in Part I.H., but the Court notes
here that neither the April 2024 updated version of the Fact Sheet, nor its predecessor, include
<u>any</u> information on how family size (SFU) is calculated.   <u>See</u> Defs.' Ex. 28; Pls.' Ex. 253.

Needy section below.   Although the meaning of MNIL is explained in a

footnote, MAGI is not.

41.     To use this table to determine an applicant's Medicaid eligibility, one

must know the applicant's SFU, countable income (MAGI), and coverage

group.   To find the income standard for a particular applicant, the reader

moves down the table to the row corresponding to the applicant's SFU, and

then across the table to the column representing the applicant's coverage

group.   The reader must then subtract the applicable standard disregard

from the countable income to generate the countable net income and compare

that number to the income standard.    If the applicant's countable net income

is above the income standard, the reader must then subtract the MAGI

disregard from the countable net income and compare the new number to the

income standard.

42.     Notably, in his testimony, Roberts demonstrated how this calculation can

be performed in a different manner than the budget computation steps set out

in the Policy Manual.   <u>See</u> Roberts Test., Tr. Vol. II at 17-18.   Roberts began

with the applicant's countable income (i.e., the MAGI) and compared it to the

base income standard on Appendix A-7.   If the countable income exceeded the

income standard, Roberts then <u>added</u> the standard disregard to the income

standard to generate a new income limit.   If the countable income exceeded

the new income limit, he then <u>added</u> the MAGI disregard to the income limit

and compared this new maximum income limit to the applicant's countable income to finally determine the applicant's eligibility for Medicaid.

43.    Importantly, an applicant's Medicaid benefits are the same regardless of where in the budget computation process the person is found financially eligible.  See Roberts Test., Tr. Vol. IV at 267.   When questioned by the Court, Roberts could not identify any reason why the income limit could not be stated as one number, with the applicable standard and MAGI disregards already added to the income standard, eliminating the need for the cumbersome multi-step disregard subtraction or addition process.   Id.

### b. Medically Needy

44.    Florida operates a Medically Needy Program for individuals who would be eligible for full Medicaid except that their income or assets exceed established limitations.   See JPS, Part VIII ¶ 14; see also Fla. Stat. § 409.904(2); Pls.' Ex. 190 at DCF-3170 (Policy Manual, General Program Information, Ch. 0230.0104) ("The Medically Needy Program provides coverage for individuals who meet the technical requirements for the [Family-Related Medicaid] coverage groups, but whose income exceeds the group's income standard.").

45.    There is no income limit for the Medically Needy program.  See Roberts Test., Tr. Vol. II at 31; see also Pls.' Ex. 190 at DCF-3170 (Policy Manual, General Program Information, Ch. 0230.0104).

46.     A beneficiary enrolled in the Medically Needy program does not receive Medicaid benefits unless and until the beneficiary incurs a certain amount of allowable medical expenses each month.  <u>See</u> JPS, Part VIII ¶ 14.   This amount is referred to as the "share of cost."  <u>Id.</u>  If the beneficiary submits medical bills, paid or unpaid, sufficient to meet the share of cost, DCF will "open" the beneficiary's Medicaid benefits for the month, along with other enrolled individuals in the household.  <u>Id.</u>; <u>see also</u> Defs.' Ex. 30.   The share of cost must be re-established each month to open Medicaid coverage for that month.  <u>See</u> JPS, Part VIII ¶ 14; <u>see also</u> Pls.' Ex. 186 at DCF-2953 (Policy Manual, Ch. 2630.0502: Enrollment (MFAM)).

47.     Share of cost is determined by subtracting the Medically Needy Income Limit (MNIL) from the beneficiary's countable income (the MAGI).  <u>See</u> Roberts Test., Tr. Vol. II at 67.[17]   The amount of the MNIL is based on the

---

[17] The Policy Manual instructs that the share of cost is calculated by comparing "the countable net income to the Medically Needy Income Level based on the size of the standard filing unit.   The difference is the assistance group's share of cost."   <u>See</u> Pls.' Ex. 186 at DCF-2953 (Policy Manual, Ch. 2630.0500).   However, this instruction appears to be incorrect as it is inconsistent with Appendix A-7.   As explained above, the countable <u>net</u> income is the countable income less the standard disregard.   But, when calculating share of cost, the standard disregard shown on Appendix A-7 should <u>not</u> be subtracted from the MAGI.   <u>See</u> Appendix A-7.   This is because, according to Appendix A-7, "the appropriate standard disregard" is <u>already included</u> in the MNIL.   <u>See</u> Appendix A-7.   Thus, using Appendix A-7, share of cost is calculated by subtracting the MNIL from the applicant's countable income.   <u>See</u> Roberts Test., Tr. Vol. II at 67 (calculating share of cost by subtracting MNIL from countable income).   This means that in the Medically Needy analysis, the countable income (MAGI) and the countable net income are the same.   <u>See, e.g.</u>, Pls.' Ex. 31 (showing the same value as the MAGI and the countable net income on a Medically Needy budget screen within the State's computer system).

beneficiary's SFU and is set forth in Appendix A-7.  <u>See</u> Appendix A-7.   It is important to understand that a beneficiary's SFU and countable income (MAGI) <u>are the same</u> for both the Medicaid and Medically Needy eligibility determinations.   <u>See</u> Roberts Test., Tr. Vol. II at 20-21, 30-31.   This consistency will be significant when the Court discusses DCF's technology system.

### c. Continuous Coverage

48.    Individuals receiving Medicaid under the coverage groups for pregnant women, infants, or children are eligible for continuous coverage.   <u>See</u> Pls.' Ex. 143; Pls.' Ex. 147.   This means that once eligible, individuals in these coverage groups continue receiving Medicaid benefits for a set time, regardless of a change in income that would otherwise render them ineligible.   <u>See</u> Pls.' Ex. 143; Pls.' Ex. 147.

49.    For example, once a pregnant woman is found eligible for Medicaid, she retains her Medicaid benefits until twelve months after the pregnancy ends, even if her income increases above the income limit during that time.   <u>See</u> JPS, Part VIII ¶¶ 15-16, <u>see also</u> Pls.' Ex. 143.

50.    The continuous coverage period for pregnant women in Florida previously ended at two months post pregnancy.   <u>See</u> Pls.' Ex. 143.   In 2022, Florida extended the continuous coverage period from two months to twelve months from the last day of the pregnancy.   <u>See</u> JPS, Part VIII ¶ 16.   Similarly, in a

change effective January 1, 2024, all Medicaid eligible children under age 19 are entitled to receive twelve months of continuous Medicaid coverage. See Pls.' Ex. 147. Previously, only children up to age five received twelve months of continuous coverage, while children ages five to nineteen were limited to six months of continuous coverage. Id.

### d. Family Planning Services

51.    Florida also offers family planning services "for women ages 14 through 55, who have lost their Medicaid eligibility due to postpartum coverage ending, income changes, disability ended, due to a CSE [child support enforcement] sanction, or aging out of a previous Medicaid category . . . ." See Pls. Ex. 190 at DCF-3170 (Policy Manual, Ch. 0230.0106). The services provided under family planning coverage are very limited in scope. See id.; see also Roberts Test., Tr. Vol. II at 14.

### D. Redeterminations

52.    Generally, states are required to conduct a redetermination of a Medicaid enrollee's eligibility (sometimes referred to as "renewal") once every 12 months. See JPS, Part IX ¶ 7; see also 42 C.F.R. § 435.916(a)(1), (b), and (d).

53.    However, an individual's Medicaid eligibility can also be reevaluated in between scheduled renewals when a change in circumstances is reported. See Roberts Test., Tr. Vol. II at 10; Anderson Test., Tr. Vol. IV at 121 (explaining that Medicaid enrollees are assigned a 12-month review period

but things could happen within that review period that may require an eligibility review).

54.    For example, if a Medicaid enrollee applies for food assistance or cash assistance, that application will trigger a Medicaid redetermination as well. See Roberts Test., Tr. Vol. II at 10-11.   Indeed, it is not possible to apply for food or cash assistance without triggering a reevaluation of Medicaid eligibility.   Id.   And notably, according to the Policy Manual, food assistance and cash assistance renewals generally occur every six months.   See Pls.' Ex. 179 at DCF-2629, 2633 (Policy Manual, Ch. 0810.0400; 0820.0100).   As a result, Medicaid enrollees who also receive food or cash assistance will have their Medicaid eligibility reviewed at least every six months.

55.    During the Medicaid redetermination process, DCF will evaluate whether the Medicaid enrollee remains financially eligible for Medicaid.   As described in the following paragraphs, there are numerous opportunities for error in this process.

56.    In addition to any income information provided by the applicant, DCF may also receive information about an individual's income from third-party sources.   For example, DCF has access to the Federal Data Services Hub which provides information regarding an individual's current employment. See Roberts Test., Tr. Vol. II at 9.   And DCF has access to the "SWICA" database which provides income information as well.   Id.

57.     Notably, the data from SWICA shows gross pay and does not reflect any pretax income exclusions that should not count as income.   Id. at 22, 126; see also Pls.' Ex. 191 at DCF-3186 (Policy Manual, Income, Ch. 1830.0101).   And generally, pretax income exclusions must be verified using pay stubs or tax records.   See Roberts Test., Tr. Vol. II at 23.

58.     According to DCF, it is the applicant's responsibility to report those exclusions to DCF.   Id. at 126.   But, prior to December 2023, the application completed by a Medicaid applicant did not include a prompt asking for this information.   Id. at 128; Pls.' Ex. 129 at Docs-54-65; see also Veltkamp Test., Tr. Vol. V at 194-95 (explaining that the MyACCESS application was updated in December 2023 to add a prompt for pretax deductions).   An applicant would have needed to know these exclusions existed and included the information in a comment box on the application.   See Roberts Test., Tr. Vol. II at 127-28; see also Pls.' Ex. 129 at Docs-57.

59.     Failure to deduct all pretax income exclusions could result in incorrect and inflated income calculations.   See Roberts Test., Tr. Vol. II at 126.   Thus, errors can occur if a case worker relies on SWICA data and fails to deduct pretax income exclusions reflected on the applicant's pay stubs.   See id. at 23, 126.

60.     Although the DCF computer system performs the eligibility analysis, a case worker must input the relevant data into the system.   Id.   Thus, errors

can occur if a case worker mistypes the income data into the computer system. Id. at 27.

61.    As stated above, income must be converted into a monthly amount.   See Pls.' Ex. 187 at DCF-3044 (Policy Manual, Budgeting Income, Ch. 2430.0700). If a case worker inputs the income data into the computer system and fails to correctly designate the pay period (e.g., weekly or biweekly), the computer may reach the wrong total.   See Roberts Test., Tr. Vol. II at 26-27.

62.    If an individual's income fluctuates, the case worker must average the amount across multiple pay periods.   See Pls.' Ex. 187 at DCF-3042-43 (Policy Manual, Budgeting Income, Ch. 2430.0500).   For example, the Policy Manual instructs a case worker to determine an individual's average weekly income by using "the most recent consecutive four weeks or the best available information when it is representative of the individual's future earnings." See id. at DCF-3043 (Policy Manual, Budgeting Income, Ch. 2430.0501); see also Roberts Test., Tr. Vol. II at 24.

63.    Sometimes DCF asks Medicaid enrollees for proof of income.   See Roberts Test., Tr. Vol. II at 22.   According to Roberts, whether DCF relies on the information from the applicant depends on the age of the information provided and whether the information is complete.   Id.

64.    Notably, a case worker has discretion in deciding what constitutes the best available information.   See id. at 26; see also Veltkamp Dep. Vol. 1 at

142-43 (explaining that a case worker is supposed to document how she did or did not use certain income on what is known as the CLRC screen within the computer system).

65.    Errors also can occur if a case worker relies on outdated data or overlooks changes in income reported by the applicant.   See Roberts Test., Tr. Vol. II at 47-56 (discussing errors with regard to Plaintiffs Taylor and K.H.); id. at 99-100, 108-111 (discussing errors regarding Plaintiff A.V.); id. at 125, 136-37 (discussing errors regarding Class Member Lily Mezquita).

66.    Case workers are randomly assigned such that a Medicaid enrollee is likely to have a different person working on his or her case each time it is reviewed.   See Roberts Test., Tr. Vol. II at 23.

67.    During the redetermination process, DCF does not inform the applicant of the income data in its possession or on which data it chooses to rely for the eligibility determination.

### E. DCF's Technology System

#### a. Overview

68.    The ACCESS Florida System refers to an environment of 28 interconnected software applications and components across various platforms.   See JPS, Part VIII ¶ 23.   This system "houses and determines eligibility" for the various public assistance programs administered by DCF,

including Medicaid, food assistance, cash assistance, and refugee assistance.
See Anderson Test., Tr. Vol. IV at 115-16.

69.     The primary component of the ACCESS Florida System is the FLORIDA
mainframe.   See Latham Test., Tr. Vol. V at 119-20.   FLORIDA is the legacy
mainframe system that is used by case workers to collect and verify client
information, determine benefit eligibility, and perform related functions.   See
JPS, Part VIII ¶ 24.   This legacy mainframe system is more than thirty years
old.   See id.   Indeed, the mainframe dates back to 1991 when its primary
purpose was data entry.   See Latham Test., Tr. Vol. V at 120.

70.     A major component of the FLORIDA mainframe system's functionality is
determining an individual's eligibility for Medicaid.   Id. at 121.   Indeed, the
FLORIDA system is a key source of information about an individual's case.
See Roberts Test., Tr. Vol. II at 10.   For example, it contains a record of who
is included in an individual's household, who is working, and his or her gross
income.   Id. at 9-10.   The FLORIDA system also contains the "CLRC screen"
which is the running case record where DCF processors, supervisors, and call
center staff can input notes about a case.   Id. at 10, 50; see, e.g., Pls.' Ex. 99.
In addition, the FLORIDA system contains an "IQEL screen" which is a record
of the eligibility categories in which an individual has been found eligible.
See Roberts Test., Tr. Vol. II at 33-34 (explaining that the IQEL screen shows
"a history of each household member's benefits, what they've been eligible for

and what they've been counted in"); Kallumkal Test., Tr. Vol. VI at 54-55; see, e.g., Pls.' Ex. 103.

71.    Because the functionality of the mainframe is limited, other ancillary systems have been built around and connected to the mainframe, resulting in the twenty-eight interconnected systems that comprise the ACCESS system. See Latham Test., Tr. Vol. V at 120.

72.    One such connected system is the Client Notices (ExStream) System, which is used to create, manage, and deliver printed customer notifications, such as a Notice of Case Action (NOCA).    See JPS, Part VIII ¶ 25.    As relevant to this case, DCF uses NOCAs to notify Medicaid beneficiaries of actions taken related to their Medicaid benefits, including eligibility or ineligibility determinations.    Id. ¶ 9.

73.    Another connected system is the MyACCESS Customer Portal which is intended to enable users to apply online for benefits, view NOCAs and other notices, report changes to their household circumstances, renew benefits, apply for new benefits, upload documents, and request Medicaid cards.    Id. ¶ 26.

74.    In addition, the ACCESS Management System (AMS) is a system used by DCF staff to track assignments and progress of work items throughout the eligibility process.    Id. ¶ 28. It contains new, recertification, and additional-

benefit applications; reported changes; calls; notices; and other links and data to support work management.   Id.

**b. Eligibility Determinations**

75.    Within the larger ACCESS Florida system, the FLORIDA mainframe system determines eligibility.   See Kallumkal Test.,[18] Tr. Vol. V at 221.

76.    The FLORIDA system contains three large modules that play a role in the eligibility determination.   Id.   These three modules are: the SFU module, the Eligibility Determination and Benefit Calculation (EDBC) module, and the Authorization module.   Id. at 222.

77.    When an applicant completes an application online, an automated process enters that information into the FLORIDA system.   See Anderson Test., Tr. Vol. IV at 116.   The FLORIDA system receives data from other sources as well, such as the Federally Facilitated Marketplace (FFM) and the Florida Healthy Kids Corporation (FHKC).   See Kallumkal Test., Tr. Vol. V at 223-24.

78.    A case worker, also referred to as an eligibility specialist, will review the information for accuracy and completeness.   See Anderson Test., Tr. Vol. IV at 116.   The case worker is also responsible for engaging with the applicant

---

[18] Harikumar Kallumkal is a managing director at Deloitte Consulting responsible for the operations, maintenance, and enhancements contract with DCF concerning the ACCESS Florida system.   See Kallumkal Test., Tr. Vol. V at 204-05.

to obtain necessary information.   Id.   If the FLORIDA system does not receive all the information it needs to complete an eligibility determination, it will alert a case worker to resolve the issue.   See Kallumkal Test., Tr. Vol. V at 224-25.

79.    After collecting the data, the FLORIDA system begins the eligibility determination process with the SFU module.   This module builds the SFU— the group of people in the household that must be tested together for eligibility—along with all of the data related to the individuals that comprise the SFU.   See id. at 225-26.

80.    In a single household, there could be multiple SFU groups.   For example, a mother with two children will require an SFU group for the mother's eligibility, an SFU group for one child, and an SFU group for the other child. See Deposition of Hari Kallumkal (Doc. 167-6; Kallumkal Dep.) at 107-08.

81.    Once these SFU groups are created, the SFU module then engages the EDBC module to read the data for each SFU grouping and determine eligibility for each applicant.   See Kallumkal Test., Tr. Vol. V at 226-27.

82.    The system evaluates whether an applicant is eligible with respect to all coverage groups.   See Anderson Test., Tr. Vol. IV at 123.

83.    In conducting the eligibility analysis, the system evaluates the technical, i.e. non-financial, factors first.   See id. at 121.   If an applicant does not meet the technical criteria, the system will stop at that point and will not proceed

to analyze income.  Id. at 121-22.  If the applicant satisfies the technical factors, the system then looks at income and, for SSI-related Medicaid, assets. Id.

84.    The EDBC Module's eligibility determination is visible on what is known as the "Budget" screen in the FLORIDA system.  See Roberts Test., Tr. Vol. II at 32; see also Pls.' Ex. 157 at 262.  For a Medicaid determination, the Budget screen shows the applicant's earned and unearned income, the MAGI, any applicable disregards, the countable net income (MAGI minus disregards), the SFU size, and the income standard.  See Pls.' Ex. 157 at 78, 262.  The Budget screen also contains the program code that represents the Medicaid coverage group in which the applicant was tested.  See, e.g., Pls.' Ex. 74 (showing MMC which represents Children Age 1 to 19 in the "Cat:" field); see also Pls.' Ex. 254 (Policy Manual, App'x A-13: Active Medicaid Program Codes).

85.    If the EDBC module determines that the applicant is not eligible for Medicaid based on income, the case worker will see a screen showing that the applicant failed for Medicaid.  See Kallumkal Test., Tr. Vol. V at 231. When the case worker hits enter, it will trigger the system to send the applicant back to the SFU module which will then test for Medically Needy eligibility and calculate the share of cost.  See id. at 228-231; see also Anderson Test., Tr. Vol. IV at 122.

86.    Significantly, when the FLORIDA system builds the alternative Medically Needy coverage, it deletes the failed Medicaid eligibility determination that was generated by the EDBC module.  See Kallumkal Test., Tr. Vol. V at 221, 231-32; see also Kallumkal Dep. at 184-85.  This means the Medicaid "Budget" screen displaying the EDBC module's calculation of the countable net income and the income standard it applied to make the Medicaid eligibility determination is automatically deleted.  See Kallumkal Test., Tr. Vol. V at 232; see Roberts Test., Tr. Vol. II at 32; see also Pls.' Ex. 157 at 78 (table showing the budget calculations performed by the EDBC Module).   The underlying data that was used to make those calculations, however, remains stored in the system.  See Kallumkal Dep. at 184-85.

87.   To make the Medically Needy determination, the FLORIDA system generates a new Budget screen.   Like the Medicaid Budget screen, this Budget screen shows the applicant's earned and unearned income, the MAGI, and the SFU size.   See, e.g., Pls.' Exs. 31, 100; see also Roberts Test., Tr. Vol. II at 160-61.   As noted above, these values are the same as those used during the Medicaid eligibility determination.   See Roberts Test., Vol. II at 30-31, 157-58, 177-78.

88.   The Medically Needy Budget screen also displays a "countable net income" which is the same value as the MAGI.   See Pls.' Exs. 31, 100; see

supra note 17. Significantly, this "countable net income" number will be different from the countable net income that was calculated when the system tested the applicant for Medicaid. The countable net income on the Medicaid Budget screen factors in the Standard and MAGI disregards while the "countable net income" for purposes of the Medically Needy analysis does not include those deductions. See Roberts Test., Tr. Vol. II at 159-62, 178; see supra note 17.

89.    The Medically Needy Budget screen will also display the applicable MNIL and the Share of Cost. See Pls.' Ex. 100; see also Roberts Test., Tr. Vol. II at 67; Pls.' Ex. 31. It will not display an income standard because there is no income standard for the Medically Needy program. See Roberts Test., Tr. Vol. II at 31.

90.    When an individual is found ineligible for Medicaid due to income, it is the Medically Needy Budget screen that is stored in the FLORIDA system. See Kallumkal Dep. at 186-87; see also Roberts Test., Tr. Vol. II at 32-33.

91.    When the SFU and EDBC processes are complete, a case worker must approve, deny, or close the benefits. See Kallumkal Test., Tr. Vol. V at 235; see also Kallumkal Dep. at 174. This occurs in the Authorization Module. See Kallumkal Test., Tr. Vol. V at 235. The action taken is reflected in the FLORIDA system on the AWAA screen. See Deposition of LaQuetta Anderson (Doc. 167-1; Anderson Dep.) Vol. 1 at 20-21; see also Pls.' Ex. 170.

92.     When a case action occurs—approval, denial, closure—the Authorization Module writes a record to the database with the assistance group name, case number, and action code, i.e., approval, denial, or closure.  See Kallumkal Test., Tr. Vol. V at 240.  The action code triggers the creation of a NOCA. Id.; see also Anderson Test., Tr. Vol. IV at 122-23.

93.     A nightly process within the FLORIDA system finds and extracts all the "triggers."  See Kallumkal Test., Tr. Vol. V at 241-42.  Then, using the trigger, the FLORIDA system is programmed to gather the information that is needed for a notice from the other databases within the system.  Id.

94.     Once the extract process has gathered the relevant data into a file, it sends this data to the notices system.  Id. at 243-44.  Within the notices system, the data file goes through the consolidation process.  Id. at 244.

95.     Specifically, DCF sends its notices to the person designated as the payee within the system.  Id. at 245.  One individual could be the payee for several beneficiaries (such as a mother for her children), as well as across multiple programs, e.g., Medicaid, food assistance, and cash assistance.  Id.  The consolidation process ensures that any actions taken on a particular day concerning any individuals and any programs related to a single payee are consolidated into one notice.  Id.  The rationale appears to be that receiving one consolidated notice would be less confusing for customers than receiving

multiple letters—one for Medicaid, one for SNAP, etc.   See Latham Test., Tr. Vol. V at 154.   The evidence in this case reflects the fallacy of that logic.

96.   The next step is the formatting process.   See Kallumkal Test., Tr. Vol. V at 245.   The formatting process is done by software called ExStream.   Id. at 245-46.   ExStream uses numerous templates to format notices.   The formatting process takes the output from the consolidation process and translates it into a form that can be understood by ExStream to generate a NOCA.   Id. at 246; see also Anderson Test., Tr. Vol. IV at 167.

97.   The last process is the Client Notices History Process which determines whether the notice is printed and mailed, or whether it is provided to the individual electronically.   See Kallumkal Test., Tr. Vol. V at 246-47.

98.   If an individual has opted to receive email notifications, the system will send an email notifying the individual that a new NOCA has been posted to her MyACCESS account.   See Anderson Test., Tr. Vol. IV at 123.   Otherwise, the NOCA will be mailed to the individual.   Id.

### c. Modernization

99.   DCF has undertaken a modernization project to incrementally replace the ACCESS Florida System. The overall project roadmap timeline is reflected in Version 3.0 of DCF's Operational Work Plan for ACCESS Florida System Modernization Project, which is the latest Operational Work Plan submitted

to the Florida Legislature for the modernization project.   See JPS, Part VIII ¶ 32; Defs.' Ex. 33 at 4-5.

100.   The current ACCESS modernization project has been funded since 2022. See JPS, Part VIII ¶ 33.   It is funded by state and federal partners on an annual basis.   See id.   Each year, DCF must request funding from the Florida legislature, and must seek approval from the federal partners to obtain the federal funding.   See Latham Test., Tr. Vol. V at 129-30.   Thus far, the state and federal partners have fully funded the project each year. Id. at 131.   Nevertheless, there is no guarantee that the project will be funded in the future.   Id. at 164.

101.   The goal of the modernization project is to replace the FLORIDA mainframe with a more modern, streamlined system.   See id. at 123-24. Overall, the modernization project is expected to take six years and cost an estimated $183 million.   Id. at 125, 132.   The federal government provides 90 percent of the funding.   See Latham Dep. at 12-13.

102.   The six-year roadmap of the modernization project is broken into twenty-two major modules, as well as numerous sub-modules, each of which must go through the software development lifecycle[19] as improvements are made.

---

[19] The software development lifecycle includes: 1) planning, analysis, and design, 2) testing, 3) deployment, and 4) maintenance.   See Latham Test., Tr. Vol. V at 136-37; see also Kallumkal Test., Tr. Vol. V at 253-54; Defs.' Ex. 39 at 2.

See Latham Test., Tr. Vol V at 135-138; Defs.' Ex. 33 at 4-5.  Incremental improvements to these modules and submodules must be sequenced in such a manner as to ensure that enhanced modules will continue to work with the remaining legacy (i.e., old) components of the system, as well as the future enhancements.  See Latham Test., Tr. Vol. V at 137-38.

103.  Changes to the eligibility notices at issue in this lawsuit are scheduled to be completed in year six of the project.  See id.  The eligibility notices draw on data from other parts of the ACCESS system, such that comprehensive changes to the eligibility notices are dependent on updates to these other components first.  Id. at 150-51.  Because DCF has not reached that phase of the project, it does not know what specific changes will be made to the eligibility notices as part of the modernization project.  Id. at 152. Nevertheless, as with the other modules in the modernization project, it is not DCF's intent to merely replicate what currently exists.  Id. at 155-56.

104.  At the time of the bench trial, DCF had completed two years of the project, was beginning year three, and was working on enhancements to the AMS system.  See id. at 130, 139-40.

105.  On December 5, 2023, DCF released a new MyACCESS Customer Portal. See JPS, Part VIII ¶ 34.  This Portal replaces the legacy ACCESS Self-Service Portal used by customers to apply for and manage their benefits.  See id.  In addition, the first phase of a new Management Portal was released for

staff, with the remaining phases of the new portal to be implemented later in the ACCESS modernization project.   See id.

### F. Notice of Case Action (NOCA)

106.   As described above, DCF uses NOCAs to notify Medicaid beneficiaries of actions taken related to their case.   See id. ¶ 9.

107.   DCF generates on average approximately 100,000 printed notices a day. See Latham Test., Tr. Vol. V at 148.

108.   A NOCA is the only written communication that DCF provides to a beneficiary of its final eligibility decision and is the only communication that DCF affirmatively sends to a beneficiary to explain its decision.   See Roberts Test., Tr. Vol. II at 34-35.

109.   DCF notices are based on templates.   See Anderson Dep. Vol. 1 at 5. The templates were created in 2009 when DCF began using ExStream.   See id. at 9.

110.   DCF uses the NOCA template for all of the benefit programs for which it determines eligibility, including the Medicaid, Medically Needy, food assistance and cash assistance programs.   Id. at 5; see also JPS, Part VIII ¶ 9.   And actions taken with regard to any household member and concerning any of these programs are consolidated into a single NOCA that is sent to the associated payee.   See Anderson Test., Tr. Vol. IV at 129.

111.   There are approximately 50 different English-language NOCA templates covering approvals, denials, changes, and terminations. <u>See</u> JPS, Part VIII ¶ 35.   Each NOCA template contains the same "footer" text, which includes a paragraph concerning fair hearings.   <u>See id.</u>

112.   Within a template, there is both static language and dynamic language. <u>See</u> Anderson Dep. Vol. 1 at 13.   Static language is language that is consistent "in every notice, regardless of who gets it." <u>Id.</u>  Dynamic language is case specific.   <u>Id.</u>   For information to appear in a notice, it must either be contained in static language, or there must be a placeholder for it to appear as dynamic language.   <u>Id.</u> at 15.   Generally, where a placeholder is used, the data to which the placeholder refers must be stored in the FLORIDA system so that it can be extracted.   <u>See</u> Kallumkal Dep. at 69.

113.   As stated above, when a case worker takes an action in a case, the action triggers the NOCA.   <u>See id.</u> at 174-75.   The templates that are used in the NOCA depend on what actions were taken by the case worker, for example a denial or a termination.   <u>See</u> Anderson Dep. Vol. 1 at 19.   As such, it is possible for an individual to receive a NOCA that contains language from multiple templates.   <u>Id.</u> at 26-27.

114.   These actions are reflected in the AWAA screen of the FLORIDA system. <u>Id.</u> at 20; <u>see also</u> Pls.' Ex. 170.   The column labeled "AG STAT" reflects the action.   <u>See</u> Anderson Dep. Vol. 1 at 20-21; <u>see also</u> Pls.' Ex. 170.   "CL" means

a closure that could generate either a closure or a termination notice, "D" results in a denial notice, "EN" is enrolling in the Medically Needy category with a Share of Cost that has not been met yet, and "Open" means eligible for Full Medicaid, or enrolled in Medically Needy with the Share of Cost met. <u>See</u> Anderson Dep. Vol. 1 at 22-23.

115.   NOCAs are divided into separate sections with general headings labeled by program, e.g., Cash Assistance, Food Assistance, Medicaid, or Medically Needy.   <u>See, e.g.</u>, Pls.' Ex. 40, 112, 118, 130.   A single notice may contain multiple medical benefit sections, each titled "Medicaid" or "Medically Needy." <u>See, e.g.</u>, Pls.' Ex. 40, 130.

116.   Although not apparent from the face of the NOCA, the separate sections may reflect different eligibility categories (i.e., coverage groups) within the Medicaid program.   <u>See</u> Anderson Dep. Vol. 1 at 29-30; <u>see also</u> Roberts Test., Tr. Vol. II at 145-46.   Generally, other than distinguishing between Medicaid and Medically Needy,[20] the NOCAs do not specify the particular Medicaid

---

[20] DCF sometimes refers to the Medically Needy program as a "coverage group," "coverage type," or "coverage category" within Medicaid.   <u>See</u> Veltkamp Dep. Vol 1 at 116-17. And parts of the Florida Administrative Code refer to Medically Needy as a coverage group. <u>See</u> Fla. Admin. Code r. 65A-1.703(3).   However, other parts of the Florida Administrative Code refer to the "Medically Needy Program."   <u>See</u> Fla. Admin. Code r. 65A-1.702(1)(d).   The Policy Manual also refers to Medically Needy as a "Program."   <u>See</u> Pls.' Ex. 190 at DCF-3170 (Policy Manual, General Program Information, Ch. 0230.0104) ("The Medically Needy <u>Program</u> provides coverage for individuals who meet the technical requirements for the above <u>coverage groups</u>, but whose income exceeds the group's income standard." (emphasis added)). Indeed, the Policy Manual specifically identifies "the Medicaid coverage groups" in Chapter 2030.0200.   <u>See</u> Pls.' Ex. 188 at DCF-3078 (Policy Manual, Coverage Groups, Ch. 2030.0200).

eligibility category (i.e., coverage group) a given section pertains to, such as Parents and Caretakers (MAR) or Children Ages 1-19 (MMC). [21]     See Anderson Dep. Vol. 1 at 33-34; see also Roberts Test., Tr. Vol. II at 146; Veltkamp Test., Tr. Vol. IV at 182.     Thus, a reader cannot tell from the NOCA that the identically titled sections actually refer to different Medicaid eligibility categories, much less which one.     See Roberts Test., Tr. Vol. II at 42 (reviewing the NOCA at Plaintiffs' Exhibit 112 and stating that he cannot tell from the face of the NOCA which eligibility category DCF applied to the child).

117.    As a result, the notices are, in Veltkamp's words, "very chunky," they do not "flow," and a recipient "can't like on the first page answer what's going on. They have to read and read."    See Veltkamp Dep. Vol. 1 at 160.

---

This list of coverage groups includes "Parents and other caretaker relatives," "Infants and children under age 19," and "Emergency Medical Assistance to Noncitizens," among others, but notably does not include "Medically Needy."    Id.    And, the brochure DCF provides to the public to explain Medically Needy also identifies it as the "Medically Needy Program."    See Defs.' Ex. 30.    Thus, in the Court's view, referring to Medically Needy as a "coverage group" is confusing.    Rather, as the Policy Manual explains, one must fall within a coverage group— parents, children, etc.—in order to participate in the Medically Needy Program.    Notably, at the time of the bench trial, DCF had recently added the word "Program" to the Medically Needy heading such that those sections of a NOCA are now titled "Medically Needy Program."    See Anderson Test., Tr. Vol. IV at 148.

[21] One exception appears to be Medicaid for Unborn Babies and Medicaid for Newborn Babies.    Although the Court did not hear testimony on this point, the Court does see examples in the record of NOCAs where sections are specifically labeled as Medicaid for Unborn Babies or Medicaid for Newborn Babies.    See, e.g. Pls.' Ex. 40 at DCF-5277.

118.   Medicaid or Medically Needy sections typically begin with a statement
that "[y]our application" or "[y]our application/review" has been approved or
denied for the months listed below.[22]   One or more household members are
then listed by name and marked as eligible, ineligible, or enrolled for
particular months as shown below from the NOCA issued to Plaintiff Chianne
D. dated April 24, 2023:



See Pls.' Ex. 40 at DCF-5272.

---

[22] The reference to an "application" does not necessarily mean that the individual
submitted an application for Medicaid benefits.   See Roberts Test., Tr. Vol. II at 179-80.   It
could be a reference to a change in circumstances reported by the individual, i.e., a change
report, or it could be a reference to some other reason that prompted DCF to review the case.
See id.; see also Lewis Test., Tr. Vol. IV at 20 (explaining that DCF treats change reports from
the customer as applications); but see Deposition of James Garren (Doc. 167-4; Garren Dep.)
at 17 (asserting that a reported change is not considered an application).   The date is
populated by the FLORIDA system which defaults to the date that either a case worker or an
automated system began processing the case.   See Kallumkal Dep. at 94-96.   A case worker
can modify the date to that of the customer's application.   See id. at 95-96.   But according to
Roberts, the "application" date provided in the NOCA may be the date that DCF made a
change or "for whatever reason" ran the case.   See Roberts Test., Tr. Vol. II at 179-80.   The
point being—a recipient cannot necessarily determine what prompted DCF to reconsider her
eligibility from the reference to an application or the date provided.

119.   As explained at trial, the reader should infer from the word "denied" that
the decision being communicated here is a denial (as opposed to a termination
of open benefits).   See Anderson Test., Tr. Vol. IV at 181-82; Roberts Test.,
Tr. Vol. II at 116-17.   It is unclear how the reader is supposed to know that
such a distinction exists.

120.   Significantly, the names listed in a given section are not necessarily
limited to the particular applicant whose eligibility was tested in the eligibility
category covered by that section.   See Roberts Test., Tr. Vol. II at 118.
Rather, a given section may also name members of the applicant's assistance
group or SFU.   See Anderson Dep. Vol. 1 at 29-30, 32-33; Kallumkal Dep. at
106-08, 110-11; see also Roberts Test., Tr. Vol. II at 86, 89.[23]

121.   This means there may be individuals listed for whom the decision being
communicated in that section is not pertinent.   See Roberts Test., Tr. Vol. II
at 86, 117-18, 142-43.   For example, a child may be listed as ineligible for
Medicaid in a section because that section evaluated the parent/caretaker

---

[23] Nevertheless, the number of names listed is not a reliable indicator of the size of the
SFU.   See Roberts Test., Tr. Vol. II at 89 (testifying that he believes the seven people listed
in a particular NOCA Medicaid section indicates an SFU of seven but acknowledging that he
is not "confident" of that and would prefer to look at the Budget screen); id. at 91 (reviewing
the associated Budget screen and acknowledging that the NOCA listed seven people, the
Budget screen identified an SFU of six, and the correct SFU size at the time should have been
eight); see also id. at 42-43 (reviewing a NOCA and testifying that he does not know the SFU
size used and would need to look at the Budget screen to determine the SFU size applied); id.
at 104-05 (agreeing that he cannot infer the SFU size from the number of individuals listed in
the   sections   being   discussed).   Indeed, according to Kallumkal, at least in some
circumstances, the people listed may have been pulled from different assistance groups and
consolidated into one section.   See Kallumkal Dep. at 115-17.

coverage group, but the same child is actually eligible for Medicaid when evaluated in the appropriate coverage group for children. Indeed, in the section depicted above, despite what is shown, DCF did not find S.D. ineligible for Medicaid. Compare Pls.' Ex. 40 at DCF-5272 with id. at DCF-5277.

122. The NOCAs do not state which person (or persons) listed in a given section is the applicant under evaluation. According to Anderson, one could determine which individual is the applicant under review based on which coverage group is being evaluated. See Anderson Dep. Vol. 1 at 33-34. For example, if the reader knows the coverage group is Parents and Caretakers, then even though an adult and children are listed in the section, the reader would know that only the adult's eligibility was evaluated. Id. at 33. Likewise, if the category is Children Ages 1-19, the adult would be listed as a member of the SFU, but the reader would know that only the child's eligibility was evaluated. Id. The glaring problem with this approach, however, is that the NOCAs do not specify the coverage group under consideration in each Medicaid section.

123. Although difficult to follow, Anderson's testimony appears to be that one can also determine who the applicant evaluated in a given section is based on who is found eligible in that section. See Anderson Dep. Vol 1 at 34-35.

124. During his testimony at trial, Roberts appeared to rely on this approach to interpret a NOCA. For example, Roberts reviewed a NOCA with a

Medicaid section that lists three individuals as ineligible, and one individual (E.M.) as eligible.  See Pls.' Ex. 122 at DCF-5393.   According to Roberts, the purpose of this section is only to inform that E.M. is eligible.  See Roberts Test., Tr. Vol. II at 117-18.   He knows this "[j]ust from the way it's laid out. It only refers to E.M. as being eligible." Id. at 118.   Notably, the NOCA does not provide a reason for why the other three individuals are ineligible.  See Pls.' Ex. 122 at DCF-5393.

125.   Likewise, in a different NOCA, Roberts reviewed a "Medicaid" section that lists two adults as ineligible and one child (I.M.) as eligible.  See Pls.' Ex. 130 at 6.   Again, Roberts explained that this section "would be for the child I.M." See Roberts Test., Tr. Vol. II at 144-45; Pls.' Ex. 130 at 6.[24]

126.   But nothing in the NOCA explains this to the reader.   And regardless, in a NOCA where everyone in a section is ineligible, no witness explained how the reader is supposed to determine the eligibility category to which that section pertains, or more importantly, which person listed in the section is the

---

[24] Notably, a different "Medicaid" section of that NOCA lists I.M. as ineligible for the same timeframe.  See Pls.' Ex. 130 at 5.   Roberts explained that this section was a "different type of coverage that the system looked at that she was not eligible for."  See Roberts Test., Tr. Vol. II at 144-45.   The coverage group is not specified in the NOCA and, looking at the NOCA, Roberts could only guess, based on his knowledge and expertise with Medicaid eligibility, what coverage groups were at issue that generated the different results in each section. Id. at 145-46.

applicant whose eligibility was evaluated.   See Anderson Dep. Vol. 1 at 34-

35.

127.  If DCF intends to terminate Medicaid benefits for any household member,

the NOCA will include a single termination section at the end after any other

Medicaid approval, denial, or Medically Needy sections.   As shown here, this

section begins with a statement that Medicaid benefits will end on a particular

date for the people listed in that section:



See Pls.' Ex. 40 at DCF 005278.   This language indicates a termination

decision.   See Anderson Test., Tr. Vol. IV at 182.   Unlike the previous

medical benefit sections, termination decisions do not appear to be separated

by coverage group.   Id. (testifying that she cannot determine from the NOCA

whether or not these three individuals were being terminated from the same

Medicaid category).   However, as with prior sections, individuals may be

listed in the termination section as members of the applicant's SFU to whom

the termination decision does not apply.   See Roberts Test., Tr. Vol. II at 86.

### a. Reason Codes

128.   When DCF takes a negative action—a denial, termination, or closure—the section of the NOCA pertaining to that action will include a line marked "Reason" underneath the list of names.   <u>See</u> Anderson Dep. Vol. 1 at 17.   As in the Class Certification Order, the Court will refer to this as the Designated Reason.

129.   For example, returning to Chianne D.'s April 24, 2023 NOCA, the Designated Reasons following the Medicaid denial section depicted above in paragraph 118 are:

> Reason: YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM
> YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM

<u>See</u> Pls.' Ex. 40 at DCF-5272.

130.   The Designated Reason in the Medicaid termination section of Chianne D.'s NOCA, shown above in paragraph 127, is:

> Reason: YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM

<u>See</u> <u>id.</u> at DCF-5278.

131.   DCF only provides Designated Reasons for negative actions.   <u>See</u> Anderson Dep. Vol. 1 at 17.   A Designated Reason will not appear where the action taken is an approval or otherwise a positive action.   <u>Id.</u>; <u>see also</u> Kallumkal Dep. at 122-23.   Indeed, in the Class Certification Order, the Court observed that Designated Reasons are not provided in sections where

one person was listed as enrolled, and the others were listed as ineligible.   <u>See</u> Class Certification Order at 8 n.4.   Given the testimony above, the Court's observation was accurate.   If any one individual in the section is found eligible and the others are listed as ineligible, DCF views the section as communicating only the eligibility approval decision, a positive action, such that a reason is not provided.   For example, no Designated Reason is provided following this section of a NOCA:



<u>See</u> Pls.' Ex. 86 at DCF-5877.

132.   When Designated Reasons are provided, they are generated from reason codes which are "numbers that correspond to common or standard reasons for actions taken by DCF, including, but not limited to, eligibility determinations."   <u>See</u> Pls.' Ex. 8: Declaration of Kait Zumaeta (Zumaeta Decl.) ¶ 2. "DCF uses approximately 576 reason codes in relation to the Medicaid program," and "86 of these reason codes" are used "to inform

recipients of their ineligibility for Medicaid." <u>Id.</u> ¶ 3. The reason codes and the associated text are found at Plaintiffs' Exhibit 210.

133. Which of the standard reasons appear in a NOCA as the Designated Reason will depend on which reason codes are displayed on the AWAA screen of the FLORIDA system. <u>See</u> Anderson Dep. Vol. 1 at 36. The AWAA screen allows for the use of up to three reason codes. <u>See</u> Pls.' Ex. 206 at DCF-6138; <u>see also</u> Pls.' Ex. 170.

134. Some reason codes are only system-generated, while others must be manually selected by DCF's eligibility specialists. And some reason codes can be either system-generated or manually selected. <u>See</u> JPS, Part VIII ¶ 37.

135. A case worker can add a reason code if there is space available on the AWAA screen, or if all three spaces are filled, the case worker can replace one of the system-generated reason codes. <u>See</u> Kallumkal Dep. at 132. But a case worker cannot modify the text associated with a reason code or create a new code. <u>See</u> <u>id.</u>

136. Significantly, the case workers "don't really receive a lot of training" on the meaning of the reason codes. <u>See</u> Veltkamp Dep. Vol. 1 at 122. When a case worker is first hired, the "preservice" training teaches case workers where to find the reason code tables, "[b]ut that's pretty much the extent," aside from information shared in memos or policy transmittals. <u>See</u> <u>id.</u> at

122-23.   DCF may also provide one-time trainings in connection with a policy transmittal.   Id. at 124-25.

137.   Although the reason codes used will vary between NOCAs, the text associated with each reason code is generic and set forth in a table.   See Pls.' Ex. 210; see also Kallumkal Dep. at 219; Anderson Dep. Vol. 1 at 37.   The FLORIDA system is programmed to take the text associated with the selected reason codes from the table and place it in the NOCA.

138.   The Designated Reason does not necessarily apply to each person listed in a section.   See Roberts Test., Tr. Vol. II at 88 (explaining that he could not tell from the NOCA whether the reason code applied to everyone in the section or only a subset).   Likewise, where multiple reasons are provided, it is unclear if the Designated Reasons apply to all those listed, or whether one reason pertains to one listed individual and another reason pertains to a different person.   See Veltkamp Dep. Vol. 1 at 119-21; see also Ramil Test., Tr. Vol. IV at 62.

139.   Nevertheless, DCF primarily relies on the text associated with these reason codes to explain why DCF is taking a particular action.   See Roberts Test., Tr. Vol. II at 35.

140.   DCF does not provide any publicly available explanations or definitions of the Designated Reasons that are used in the NOCAs.   See Veltkamp Dep.

Vol. 1 at 43. Nor is DCF aware of any publicly available explanation of the Designated Reasons from a source other than DCF. Id. at 43-44.

141. The Court will discuss the reasons codes used for income terminations in Part I.G. below.

142. In the NOCAs, DCF does not provide any other case-specific information to explain its decision. For example, NOCAs do not contain any information concerning the amount of income it attributed to the household, the SFU size, or the applicable income standard. Also, NOCAs generally do not contain any information on the eligibility category evaluated either, with very limited exceptions.

### b. Statutory and Regulatory Cites

143. Medicaid termination notices have dynamic placeholders for statutory and regulatory citations. See Anderson Test., Tr. Vol. IV at 162. These are populated from a table called the TSRC table. Id. at 62-63; see also Pls.' Ex. 158 (TSRC Table). If a citation is included, it will appear in the NOCA after the Designated Reason and following standard text which reads "The law that supports this action is: . . . ." See, e.g., Pls.' Ex. 40 at DCF-5271, 5275; Pls.' Ex. 81 at DCF-5728; Pls.' Ex. 112 at DCF-5663, 5664.

144. The citation that appears depends on the benefit program in question and the reason code used. See Anderson Test., Tr. Vol. IV at 163-64.

145.   The TSRC table contains rows of reason codes and three Medicaid related columns.   One column is labeled "SSI-MA" for SSI Medicaid, and the other two are "ADC-MA" and "DA-MA" which pertain to Family-Related Medicaid. See Pls.' Ex. 158; Anderson Test., Tr. Vol. IV at 163-64; see also Anderson Dep. Vol. 1 at 68-69.   At present, the statutory citations for Family-Related Medicaid are primarily drawn from the DA-MA column.   See Anderson Dep. Vol. 1 at 69-70.

146.   On the TSRC table, the citation contained in the cell where the applicable reason code row and program column intersect is the citation that appears in the NOCA.   See Anderson Test., Tr. Vol. IV at 164.   If the cell is blank, there will be no corresponding citation in the NOCA.   Id. at 165; see also Pls.' Ex. 122 at DCF-5389.   If the cell contains X's, then the NOCA will contain X's where the statutory citation would otherwise appear.   See Anderson Test., Tr. Vol. IV at 165; see also Pls.' Ex. 122 at DCF-5390.

147.   Troublingly, the citations do not reliably relate to the reason for termination.   For example, the citation which corresponds to Reason Code 241 (Your Household's Income is Too High to Qualify for This Program) under the DA-MA column on the TSRC table is: "S65A-4.220."   See Pls.' Ex. 158. Despite the S, this appears to be a regulatory citation as no such statutory cite exists.   But Chapter 65A-4 of the Florida Administrative Code concerns Temporary Cash Assistance, not Medicaid.   And specifically, rule 65A-4.220

of the Florida Administrative Code concerns the amount and duration of cash payments under the Temporary Cash Assistance program.   It sheds no light on income eligibility for Medicaid.

148.   Similarly, the citation which corresponds to Reason Code 249 (You Are Receiving the Same Type of Assistance from Another Program) under the DA-MA column is "S414.095."   <u>See</u> Pls.' Ex. 158.   Section 414.095 of the Florida Statutes governs eligibility for temporary cash assistance and is thus completely irrelevant to an individual's termination from Medicaid.   Notably, the record contains at least one example of a Plaintiff in this case who was terminated from Medicaid based on income and received a NOCA with Reason Code 249 and a citation to S414.095.   <u>See</u> Pls.' Ex. 40 at DCF-5278.

149.   The citation which corresponds to Reason Code 249 under the ADC-MA column is "R65A-1.702."   <u>See</u> Pls.' Ex. 158.   The Court finds examples in the record of NOCAs with the text of Reason Code 249 and this regulatory citation. <u>See</u> Pls.' Ex. 112 at DCF-5663 (Medically Needy denial); Pls.' Ex. 116 at DCF-5641 (Medicaid denial).   The same regulatory citation is provided in association with Reason Code 227 under the DA-MA and ADC-MA columns. <u>See</u> Pls.' Ex. 158.   And the record also contains examples of NOCAs listing this citation in connection with a variation of Reason Code 227.   <u>See</u> Pls.' Ex. 112 at DCF-5664.

150.    As explained below, both Reason Code 249 and Reason Code 227 can be used when an individual is terminated from full Medicaid due to income and moved to the Medically Needy program.    See <u>infra</u> Part I.G.b-c.    The Court has reviewed rule 65A-1.702 of the Florida Administrative Code and although this citation at least does pertain to the Medicaid program, the Court cannot discern any portion of this rule that would explain or support DCF's decision to terminate full coverage due to income.    See Fla. Admin. Code r. 65A-1.702. At best, this citation appears to relate to Reason Codes 227 and 249 because it contains the directive that "[w]hen a recipient's eligibility for Medicaid ends under one coverage group, the Department must evaluate their eligibility, using available information, under any other Medicaid coverage group before terminating Medicaid coverage."    <u>See</u> Fla. Admin. Code r. 65A-1.702(3)(a). Thus, while it would explain why an individual's eligibility was tested under another coverage group, it would not tell the individual or help the individual understand the reason for DCF's denial.

### c.  Standard Text

### 1.  Heading

151.    The first page of every NOCA includes a heading with the address for the ACCESS Central Mail Center.    <u>See</u> Anderson Test., Tr. Vol. IV at 125; <u>see, e.g.</u>, Pls.' Ex. 40.    An individual can send a fair hearing request to this address and it will be routed to the appropriate place, although nothing in the NOCA

informs the recipient of this fact.    See Anderson Test., Tr. Vol. IV at 126; see also Pls.' Ex. 40.

152.    The heading also identifies the case number which is associated with the individual's case record where all of his or her information is contained.    See Anderson Test., Tr. Vol. IV at 126.

153.    In addition, the heading includes an unlabeled phone number.    See Defs.' Ex. 121.    In some instances, this phone number is that of the call center.    See Anderson Test., Tr. Vol. IV at 169-71 (testifying that the phone number in the heading of Plaintiffs' Exhibits 105, 32, 20, 120, 121, 85-87 is the call center).

154.    In other instances, this phone number is that of a case worker.    See Anderson Test., Tr. Vol. IV at 127-28; Pls.' Ex. 40; see also Anderson Test., Tr. Vol. IV at 189 (testifying that the phone number on the NOCAs at Plaintiffs' Exhibits 17, 18, 19, 21, 122, and 123 is not the call center).    According to Anderson, where a case worker's phone number is provided, such as on Plaintiffs' Exhibit 40, an individual can call that number and speak to someone who would be able to provide case-specific information about DCF's eligibility determination.    See Anderson Test., Tr. Vol. IV at 128.    However, nothing in the NOCA identifies this phone number as belonging to a case worker or informs the recipient that she can call the phone number to speak with a case worker for assistance.    See Pls.' Ex. 40.    Neither party presented

any evidence to explain when or why a NOCA will display a case worker's

number in the heading and when or why it will display the call center number.

## 2. Medically Needy

155.   As previously explained, individuals terminated from Medicaid due to

income are enrolled in the Medically Needy program.   The NOCA will include

a Medically Needy section with standardized text from the Medically Needy

approval template.   The Medically Needy approval template begins with the

statement:

> We have reviewed your eligibility for full Medicaid benefits and have determined you are not eligible because your income exceeds the limit for Medicaid.

See Pls.' Ex. 112 at DCF-5661; Pls.' Ex. 40 at DCF-5275.   The Court will refer

to this as the "Income Exceeds Sentence."   Whenever a Medicaid recipient is

terminated from Medicaid due to income and enrolled in the Medically Needy

program, this sentence will appear in the NOCA.   See Anderson Test., Tr.

Vol. IV at 133.

156.   At the outset of this lawsuit, the Income Exceeds Sentence was located

directly above the "Medically Needy" header.   Id. at 133.   As such, in a

NOCA with multiple sections, the Income Exceeds Sentence appeared to be

part of the decision in the preceding section.   See, e.g., Pls. Ex. 40 at DCF-

5275.   At the time of the bench trial, DCF had recently moved the placement

of the Income Exceeds Sentence to directly below the "Medically Needy"

header.   See Anderson Test., Tr. Vol. IV at 133-34.

157.   The Medically Needy template also includes several paragraphs about the Medically Needy program, including an explanation of the share of cost and how the program works.   See id. at 134-35; Pls.' Ex. 40 at DCF-5275-76. Within this block of text, DCF includes the explanation that "[i]ndividuals enrolled in the Medically Needy Program have income or assets that exceed the limits for regular Medicaid."   See Pls.' Ex. 40 at DCF-5275.

### 3. Medicaid

158.   Where Medicaid benefits are denied, the NOCA sometimes includes the following block of generic text:

**If you are no longer eligible for Medicaid**
You are receiving this notice because the State of Florida Department of Children and Families reviewed your eligibility for Medicaid. You have been found to be ineligible for Medicaid, or the Department has been unable to determine your eligibility.

If the reason you were found ineligible is because the Department needed information from you, you can still complete your review.  You have 90 days from the date your Medicaid ends to complete your review or return all the required information.  After reviewing the information, we may be able to determine that you are eligible, and you will not have to file a new application.

An interview is required if you requested Medicaid and a disability decision is still needed.  If this applies to you, you should have received a notice stating that.  If you completed the interview by the end of the eligibility period, your household has until the 30th day after the end of the eligibility period to return the verifications. However, if your case is already denied or closed because you missed your interview, you must reapply.

See Pls. Ex. 258 at DCF-7416.

159.   It is unclear why this generic text is sometimes present with Medicaid denials, see Pls.' Ex. 118 at DCF-6364-65 and Pls.' Ex 131 at 2, and sometimes not, see Pls.' Ex. 40.

### 4. Footer

160.   All Medicaid termination NOCAs include the same "footer" which provides information about DCF Services and Fair Hearings.   See Anderson

Test., Tr. Vol. IV at 136; <u>see also</u> Pls.' Ex. 40 at DCF-5280.   At the outset of

this lawsuit, the footer appeared in relevant part as follows:

**DCF Services:**
For information about your case, you may access your case information quickly and securely:
- through My ACCESS Account at www.myflorida.com/accessflorida,
- receive email notifications by signing up through your MyACCESS Account, or
- call the ACCESS Customer Call Center at (850) 300-4DCF (4323).

**Fair Hearings:** If you disagree with the decision we have made, you have the right to ask for a hearing before a state hearings officer. You may be represented at the hearing by a lawyer, relative, friend or anyone you choose. If you want a hearing, you must ask for the hearing by writing, calling the call center or coming into an office within 90 days from the date at the top of this notice. If you ask for a hearing before the effective date of this notice, your benefits may continue at the prior level until the hearing decision. You will be responsible to repay any benefits if the hearing decision is not in your favor.

If you need information about free legal services, call the ACCESS Customer Call Center toll free at (850) 300-4DCF (4323) for a listing of legal services in your area or you can visit www.floridalawhelp.org.

Information on other services that may be helpful to you can be found at www.dcf.state.fl.us/programs/access/. Local community partner agencies are available to help you apply for services. To find one near you, go to www.myflorida.com/accessflorida under "Find Us". You can search by zip code or county.

<u>See</u> Pls.' Ex. 40 at DCF-5280.   Significantly, this footer incorrectly cautioned

recipients that "You will be responsible" for repaying "any benefits" if the

hearing decision is not in the person's favor.   <u>Id.</u>   This was not and is not an

accurate statement of DCF policy with regard to Medicaid benefits.

161.   On October 4, 2023, after Plaintiffs filed this lawsuit challenging the

misleading language, DCF changed the footer language concerning fair

hearings.   <u>See</u> Pls.' Ex. 12 ¶ 4.   Specifically, in the sentence shown above that

reads "You will be responsible to repay any benefits if the hearing decision is

not in your favor," DCF replaced the word "will" with the word "may."   <u>See</u>

Pls.' Ex. 12 ¶¶ 4-5.

162.   In April of 2024, DCF again modified the footer language.   See Anderson

Test., Tr. Vol. IV at 142-43.   At the time of the bench trial, DCF was using

the following footer in its NOCAs:

**DCF Services:**
For information about your case, you may access your case information quickly and securely:
∞   through My ACCESS Account at www.myflorida.com/accessflorida ,
∞   receive email notifications by signing up through your MyACCESS Account, or
∞   call the ACCESS Customer Call Center at (850) 300-4DCF (4323).
∞   For more information about Medicaid eligibility and applying for Medicaid, please go to
    https://www.myflfamilies.com/medicaid .

**Fair Hearings: If you disagree with our decision** , you have the right to ask for a hearing before a state hearing
officer. You may be represented at the hearing by a lawyer, relative, friend, or anyone you choose. If you want a
hearing, you must ask for the hearing within 90 days from the date at the top of this notice. You may ask for a hearing
by emailing us at appeal.hearings@myflfamilies.com ; by making a request online at
https://www.myflfamilies.com/fairhearings ; by writing to us at Appeal Hearings Section, 2415 North Monroe Street, Suite
400-I, Tallahassee, Florida 32303-4190; by calling the call center; or by coming into a DCF office. If you ask for a
hearing before the date your benefits are scheduled to end or change, your Medicaid benefits will continue at the prior
level until the hearing decision; for all other programs, your benefits may continue at the prior level until the hearing
decision. You may be responsible to repay any benefits if the hearing decision is not in your favor. For Medicaid, you
will not be responsible to repay benefits unless we find that you engaged in fraud or an intentional program violation.
Your appeal will be decided within 90 days of your request. For Medicaid, if you have an urgent health care need (one
that would result in serious harm to your health if not treated soon), you can ask for a faster appeal. Proof of your urgent
health care need may be requested.

If you need information about free legal services, call the ACCESS Customer Call Center toll free at (850)
300-4DCF (4323) for a listing of legal services in your area or you can visit  www.floridalawhelp.org.

Information on other services that may be helpful to you can be found at
https://www.myflfamilies.com/services/public-assistance .
Local community partner agencies are available to help you apply for services. To find one near you, go to
www.myflorida.com/accessflorida under "Find Us". You can search by zip code or county.

See Defs.' Ex. 121 at DCF-7410; see also Anderson Test., Tr. Vol. IV at 142-

43.

163.   As to the Fair Hearings section, the revised footer now informs the reader

that he or she may request a fair hearing via email or online, and it identifies

the address where the reader can send an appeal request.   In addition, it

informs the reader how to request a faster appeal if the beneficiary has an urgent health care need.   See Defs.' Ex. 121 at DCF-7410.[25]

164.   Most significantly, DCF revised the footer language regarding the continuation and repayment of benefits pending the outcome of a fair hearing. The revised language clarifies the limited circumstances in which a Medicaid beneficiary may have to repay benefits.   The Court discusses these changes in the Fair Hearings section below.   See infra Part I.I.

165.   DCF also made changes to the DCF Services section of the footer. Specifically, DCF includes new text advising the recipient that he or she can go online to learn more about Medicaid eligibility and provides a link.   See Defs.' Ex. 121; see also Anderson Test., Tr. Vol. IV at 144.   The link connects to the DCF Medicaid homepage which contains links to Medicaid Fact Sheets about SSI-Related and Family-Related Medicaid, as well as a link to the Policy Manual.   See Anderson Test., Tr. Vol. IV at 144-45.   The Court will discuss the information available on the website and Fact Sheets in Part H. of these findings.

---

[25] Notably, following this change, the Office of Appeal Hearings has seen an influx of requests for expedited hearings.   See Jones Test., Tr. Vol. V at 90.   According to Brandy Jones, a Senior Management Analyst Supervisor with the Office of Appeal Hearings (OAH), OAH previously received "maybe one or two per month," but at the time of the bench trial, was "receiving up to about ten a week."   See id. at 74-75, 91.

### G. Reason Codes for Income Terminations

#### a. Reason Code 241

166.  Reason Code 241 generates the following text: "YOUR HOUSEHOLD INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM."  <u>See</u> Pls.' Ex. 210.  This reason code should be used when the household income is over the income standard for the program in question.  <u>See</u> Veltkamp Dep. Vol. 1 at 113.  According to Anderson, this text should appear in a NOCA every time an individual is found over the income standard for full Medicaid.  <u>See</u> Anderson Dep. Vol. 1 at 50.

167.  Indeed, Anderson testified to her belief that Reason Code 241 is populated by the system whenever it considers eligibility for full Medicaid and determines that the applicant exceeds the income standard for full Medicaid. <u>Id.</u> at 49-50.  However, despite her position and her thirty-eight years of experience at DCF, <u>see</u> <u>supra</u> note 6, Anderson's belief is incorrect.

168. Kallumkal explained at the bench trial that when the system redetermines the eligibility of a person currently receiving Medicaid and finds that the applicant is no longer eligible based on income, it is incumbent upon the case worker to input the appropriate reason code.  <u>See</u> Kallumkal Test., Tr. Vol. VI at 16-19; <u>see also</u> <u>id.</u> at 85 (testifying that he thought the case workers "always" manually input the reason codes in this circumstance).  It is necessary for the case worker to manually input the reason code because,

as explained above, when the EDBC module determines that an individual is ineligible for full Medicaid based on income, it automatically tests the individual for Medically Needy and in doing so, deletes the prior Medicaid determination (the Budget screen)—including Reason Code 241. Id. at 18-19. Because the beneficiary is losing full coverage Medicaid, the case worker must close the beneficiary's full coverage Medicaid in the authorization screen and in doing so, the case worker is expected to input Reason Code 241. Id. at 18, 85-86.

169. However, the evidence at trial demonstrated that the Designated Reason associated with Reason Code 241 does not always appear in the NOCA when a recipient is terminated on the basis of income. See, e.g., Pls.' Ex. 81 at DCF-5728-29; Pls.' Ex. 112 at DCF-5664.

170. At the time of trial, DCF was in the process of enhancing the system to retain Reason Code 241 when it is present on the Medicaid Budget screen and automatically apply it to the individual's open Medicaid in the AWAA screen. See Kallumkal Test., Tr. Vol. VI at 17-18. This enhancement would eliminate the reliance on the case worker to input the code. Id. at 18. Instead, when the case worker closes the open Medicaid group, Reason Code 241 will already be in place. Id. at 18-19.

171. DCF put this enhancement into production on August 24, 2024. See Stipulation Regarding Reason Code 241 (Doc. 172). Because this occurred

after the conclusion of the bench trial, the Court has no evidence regarding

whether this enhancement is functioning as intended.

### b. Reason Code 227

172.     Prior to December 2023, Reason Code 227 generated the following text:

"YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE

FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP."

See Defs.' Ex. 123.[26]   DCF allows case workers to use Reason Code 227 when

an individual is terminated from Medicaid based on income and moved to the

Medically Needy program.   See Veltkamp Dep. Vol. 1 at 82-83.

173.     Despite this, Roberts testified that Reason Code 227 should not be used

to communicate that someone is over income for full Medicaid.   See Roberts

Test., Tr. Vol. II at 36, 38.   Nathan Lewis[27] agreed that the meaning of "You

---

[26] In other places, the text associated with Reason Code 227 is slightly different: "WE
REVIEWED YOUR CASE, YOU ARE STILL ELIGIBLE FOR MEDICAID, BUT IN A
DIFFERENT MEDICAID COVERAGE TYPE."   See Pls.' Ex. 158.   The discrepancy appears
to be the result of the existence of two different reason code tables.   See Kallumkal Dep. at
50-53; see also Anderson Dep. Vol. 1 at 37; Veltkamp Dep. Vol. 1 at 62-63; Pls.' Ex. 210.   One
table exists in the FLORIDA system.   See Anderson Dep. Vol. 1 at 37; see also Kallumkal
Test., Tr. Vol. VI at 36-37; Pls.' Ex. 158.   Another table was created later to allow for more
text and this table exists in a database called Oracle.   See Kallumkal Dep. at 50-53; Anderson
Dep. Vol. 1 at 37-38.   The NOCAs pull from the Oracle database.   See Anderson Dep. Vol. 1
at 37-38.   Regardless, the different variations of Reason Code 227 have the same meaning.
See Veltkamp Dep. Vol. 1 at 81-82.   There is no significant difference between the terms
"coverage group" and "coverage type."   See Veltkamp Dep. Vol. 1 at 81-82.

[27] Nathan Lewis works for DCF as a business analyst.   See Lewis Test., Tr. Vol. IV at
7-8.   He has worked for DCF for over thirty-six years.   Id. at 8.   Of the ten or twelve
positions he has held with DCF over the course of his career, seven or eight related to Florida's
Medicaid program.   Id.

are still eligible for Medicaid but in a different Medicaid coverage type" does not include being moved from full Medicaid to the Medically Needy program. <u>See</u> Lewis Test., Tr. Vol. IV at 13-14.

174.   Indeed, a DCF document titled "Medicaid Unwinding Updates & FAQs" appears to instruct that Reason Code 227, as well as 249 discussed below, are to be used to close continuous coverage Medicaid when the individual is "in another FULL Medicaid AG."   <u>See</u> Pls.' Ex. 161.   Likewise, another DCF document, titled "Medicaid Unwinding Reason Codes," instructs that Reason Code 227 is to be used when "[m]oving individual to a different <u>full coverage</u> AG."   <u>See</u> Pls.' Ex. 169 at DCF-2186 (emphasis added).

175.   And still another DCF document states that Reason Code 227 should be avoided "*unless* you are moving the individual into a comparable category." <u>See</u> Pls.' Ex. 166 at DCF-2057 (Reason Code Lesson). [28]   According to Veltkamp, Medically Needy is <u>not</u> a comparable category to a full Medicaid coverage group, nor is Family Planning Medicaid a comparable category to a full Medicaid coverage group.   <u>See</u> Veltkamp Dep. Vol. 1 at 109.

176.   Nevertheless, Veltkamp maintains that case workers <u>can</u> use Reason Code 227 to move an individual from Medicaid to Medically Needy.   <u>Id.</u>

---

[28] This document was part of DCF's Medicaid unwinding plan to train staff on how to determine eligibility correctly given that after three years of the public health emergency, new staff may not have been aware of the eligibility rules.   <u>See</u> Veltkamp Dep. Vol. 1 at 108.

Veltkamp explains that while DCF would prefer case workers use a more specific reason code, case workers have historically relied on Reason Code 227 and "so sometimes your fingers do the talking, and those are the codes they enter." See Veltkamp Dep. Vol. 1 at 109-10.

177.   In June of 2023, a policy team with DCF did an analysis stemming from news articles and calls to the call center to understand common customer complaints and how DCF could improve.   See Veltkamp Dep. Vol. 1 at 53-55, 148-49.   Based on this June 2023 review, DCF distributed a document to case workers titled "Medicaid Closure Codes: Error Prone Codes."   See Veltkamp Dep. Vol. 1 at 80, 149; Pls.' Ex. 160.   Remarkably, this document endorses the misleading use of Reason Code 227 for income terminations.   It instructs case workers not to use Reason Code 227 unless the individual is moving to another full coverage category or is being moved to Medically Needy.   See Pls.' Ex. 160 ("If the individual is not moving to another full coverage category, or not being moved to Medically Needy, do not use this code."); see also Veltkamp Dep. Vol. 1 at 80, 149.

178.   In December 2023, DCF revised the Designated Reason associated with Reason Code 227 such that the text now reads: "We reviewed your case, you are still eligible, but in a different Medicaid coverage type.   In most cases, your income exceeds the income limits for full coverage, check your MyAccess account to see if you qualify for the Medically Needy program."   See Defs.' Ex.

123.   The usage of Reason Code 227 has not changed.   See Veltkamp Dep. Vol. 2 at 71, 83.[29]

179.   Veltkamp testified that, both before and after the change in verbiage, Reason Code 227 can encompass moves from full Medicaid to full Medicaid, or moves from full Medicaid to a more limited form of coverage such as Medically Needy or Family Planning.   See Veltkamp Dep. Vol. 1 at 83-85.   Veltkamp explains that case workers should use another, more specific reason code, along with Reason Code 227.   See id. at 112.   Although at the time of her deposition, DCF policy allowed case workers to use Reason Code 227 alone, Veltkamp testified that DCF has plans to change that policy.   Id. at 86.

180.   Veltkamp acknowledges that a person cannot tell from Reason Code 227 whether they are staying in full Medicaid or moving into a more limited form of coverage such as Medically Needy or Family-Planning Medicaid.   See id. at 84.   According to Veltkamp, a person could figure that out by contacting a

---

[29] Veltkamp testified that Reason Code 350 is a duplicate of Reason Code 227.   See Veltkamp Dep. Vol. 2 at 70.   The text associated with Reason Code 350 is: "AN INDIVIDUAL IS IN THE SAME CASE BUT A DIFFERENT CATEGORY."   See Pls.' Ex. 210.   Both Reason Codes are still in use.   See Veltkamp Dep. Vol. 2 at 70.   It appears that Reason Code 350, at least in some circumstances, may be used when an individual is moved from full Medicaid coverage to the Medically Needy program.   See Pls.' Ex. 161 (Medicaid Unwinding Updates & FAQs).   This document appears to instruct users to use Reason Code 350 in combination with Reason Code 241 to terminate Medicaid when an individual's continuous coverage period is ending and the person is no longer eligible for Medicaid due to income.   Id.   The document titled "Medicaid Unwinding Reason Codes" instructs that Reason Code 350 is to be used when an "[i]ndividual is moved to a different coverage [sic]."   See Pls.' Ex. 169 at DCF-2186.   And the Reason Code Lesson teaches that Reason Code 350, like Reason Code 227, should be avoided unless the individual is moving into a "comparable category."   See Pls.' Ex. 166 at DCF-2057.

case worker, calling the customer call center, or visiting a local office.    Id. at
84-85.    Of course, the evidence discussed later in these findings reflects the
inadequacy of these methods of communicating the reason for a decision.

### c. Reason Code 249

181.    Prior to December 2023, Reason Code 249 explained that: "YOU ARE
RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER
PROGRAM."    See Defs.' Ex. 123.

182.    The Medicaid Unwinding Reason Codes document instructs that this
Reason Code is to be used when an "[i]ndividual is active on another case."
See Pls.' Ex. 169 at DCF-2186.    It is unclear what this means.    But as with
Reason Code 227 above, the Reason Code Lesson instructs that Reason Code
249 should be avoided "*unless* you are moving the individual into a comparable
category."    See Pls.' Ex. 166 at DCF-2057.    The document titled Medicaid
Unwinding Updates & FAQs appears to instruct that, as with Reason Code
227, Reason Code 249 is to be used to close continuous coverage Medicaid
when the individual is "in another FULL Medicaid AG."    See Pls.' Ex. 161.
And the Error Prone Codes document instructs that Reason Code 249 should
"not be used when moving an individual from full coverage to Medically
Needy."    See Pls.' Ex. 160.

183.    Nevertheless, according to Veltkamp, DCF permits the use of Reason
Code 249 when an individual moves from full Medicaid to Medically Needy.

See Veltkamp Dep. Vol. 1 at 50; Veltkamp Dep. Vol. 2 at 67-68.  Veltkamp
acknowledges that full Medicaid and Medically Needy are not the "same type
of assistance" but maintains that use of this Reason Code is permissible in
that circumstance "[b]ecause it's another coverage group."  See Veltkamp
Dep. Vol. 1 at 56, 58.[30]

184.  Notably, when asked why the Error Prone Codes document states
otherwise, Veltkamp asserted that this document is inconsistent with her
understanding of how Reason Code 249 should be used and, as to that
particular sentence, "we should have, you know, probably vetted this out a
little bit more before it went out."  See id. at 151.  According to Veltkmap, it
is DCF's position that Reason Code 249 can be used to move an individual
from full Medicaid to Medically Needy but DCF recommends that case
workers use it with another Reason Code.  Id.

185.  In December 2023, DCF revised the text associated with Reason Code 249
such that it now informs the reader: "You are receiving the same type of
assistance from another program. You or a household member already qualify
for this requested benefit in another case or another category. Examples:
receiving TCA or SNAP in a different case, Medicaid eligibility continues in
another category, etc."  See Defs.' Ex. 123; Latham Test., Tr. Vol. V at 167.

---

[30] Veltkamp also testified that Reason Code 249 can be used when an individual is
moved from full Medicaid to family planning coverage.  See id. at 50-51.

186.  Despite the change in verbiage, Veltkamp maintains that this Reason Code is still intended to be used where an individual moves from full Medicaid to full Medicaid, from full Medicaid to Medically Needy, and from full Medicaid to Family Planning.  See Veltkamp Dep. Vol. 1 at 56.  DCF encourages its staff to use this Reason Code in conjunction with other reasons, but DCF policy, at least as of March 2024, does allow Reason Code 249 to be used by itself.  See id. at 52-53.

187.  Significantly, myriad DCF officials testified that, unlike the circumstances described by this Reason Code, and contrary to the practice described by Veltkamp, full Medicaid and Medically Needy do not provide the "same type of assistance."  Id. at 56; see also Roberts Test., Tr. Vol. II at 13, 64, 146; Anderson Test., Tr. Vol. IV at 183-84.  Nor are Full Medicaid and Family-Planning Medicaid the "same type of assistance." See Veltkamp Dep. Vol. 1 at 57-58.

188.  Indeed, Lewis testified that this Reason Code is referring to eligibility categories with "comparable" coverage.  See Lewis Test., Tr. Vol. IV at 17. And he does not view full Medicaid and Medically Needy as comparable forms of coverage.  See id. at 13.

### d. Reason Code 290

189.  Prior to December 2023, the text associated with Reason Code 290 was "ELIGIBILITY REQUIREMENTS NOT MET."  See Defs.' Ex. 123.  This

text was changed in December 2023 and now reads: "Eligibility requirements

not met.   You do not or no longer qualify for this benefit due to income and/or

a change in your household circumstances."   See id.

190.     Both Roberts and Lewis testified that this Reason Code should not be

used to communicate a termination based on income.   See Roberts Test., Tr.

Vol. II at 36, 38; Lewis Test., Tr. Vol. IV at 19 (testifying that Reason Code

290 is used when a person does not meet a technical factor and income is not

a technical factor).   Nevertheless, Veltkamp testified that, in addition to

terminations based on technical factors, this Reason Code is used to terminate

Medicaid due to income.   See Veltkamp Dep. Vol. 1 at 60-61, 64.   Reason

Code 290 has been used in this manner both before and after the change to

the text.   Id. at 60-61, 63-64.

191.   Even when used to communicate the failure to meet a technical factor, an

individual is not able to determine what eligibility requirement he or she

failed to meet unless the individual takes additional steps to speak to a case

worker, and the case worker provides accurate information.   See id. at 61.

### e.  Reason Code 374

192.   Prior to December 2023, Reason Code 374 generated the following text:

"NO HOUSEHOLD MEMBERS ARE ELIGIBLE FOR THIS PROGRAM."

See Defs.' Ex. 123.   According to Lewis, this Reason Code should be used

when a person does not meet a technical factor for Medicaid eligibility.   See

Lewis Test., Tr. Vol. IV at 19.   Lewis could not think of a circumstance where it would be appropriate to use this Reason Code for an individual over the income limit.   Id.

193.   However, in December 2023, DCF modified the text associated with Reason Code 374 to explicitly mention income.   The associated text now states: "No household members are eligible for this program.   You do not or no longer qualify for this benefit due to income and/or a change in your household circumstances."   See Defs.' Ex. 123.   When asked how an individual who receives a NOCA with this Reason Code can discern which requirements they no longer meet, Veltkamp candidly responded that "[t]hey wouldn't be able to know."   See Veltkamp Dep. Vol. 1 at 72.

### f. Reason Code Oversight

194.   Case workers handle approximately 600 individual cases per month. See id. at 145.   Indeed, case workers are evaluated on the number of cases handled with a target of around 400 to 600 cases per month.   Id.

195.   Because NOCAs are auto-generated, case workers do not review NOCAs before they are sent to the beneficiary.   See id. at 125-26.

196.   DCF does not engage in any regular monitoring or review of NOCAs to ensure that case workers are using appropriate reason codes.   See id. at 136-37.   Indeed, after distributing the June 2023 memo on Error Prone Codes, Veltkamp is unaware of DCF conducting any follow up analysis on

implementation of that memo.  Id. at 154-55.  She conceded that DCF does not know if case workers are continuing to use the problematic codes in isolation, that is, without an additional, more specific reason code as recommended.  See id.

197.   Although DCF had not resumed the practice at the time of her testimony, Veltkamp testified that DCF previously engaged in monthly case reviews across all programs to evaluate whether the correct decision was reached and whether a notice was sent in the correct language for the individual.  See id. at 136-38, 142-44.  Case reviews did not include a review of whether the correct reason code was used.  Id. at 139.

198.   In sum, the NOCAs point the reader to the Designated Reason as the primary explanation for DCF's intended action.  Yet, DCF provides case workers with limited training, confusing guidance, and minimal oversight on the use of Reason Codes.  Moreover, and most concerningly, DCF affirmatively permits the use of reason codes for income-based terminations that are incorrect, confusing, misleading, and often so vague and general as to provide no reason at all.

## H. Other Sources of Information

199.   The footer of every NOCA informs the recipient that she can receive more information about her case through her My ACCESS Account, or by calling the ACCESS Customer Call Center at (850) 300-4323.  See supra Part I.F.c.4.

As recently revised, the footer also advises the reader that more information

on Medicaid eligibility is available on the DCF website at

https://www.myflfamilies.com/medicaid.    Id.    In addition, the footer

references the availability of "free legal services," and informs the reader that

"community partner agencies" can assist with applying for services.    Id.    As

mentioned above, the footer also notifies the reader of the fair hearing process.

As such, the Court will next address these other sources of information.

### a. MyACCESS Account

200.    Individuals are encouraged throughout the NOCAs to review their

MyAccess account for more information.    See, e.g., Pls.' Ex. 40 at DCF-5272-

78, 5280.

201.    However, the MyACCESS account does not provide any explanation or

information about the reason for DCF's eligibility decision aside from what is

in the NOCAs which are stored in the account.    See Deposition of James

Garren[31]  (Doc. 167-4; Garren Dep.) at 20-21.

202.    DCF updated the customer portal, previously known as the "self-service

portal" and the "ACCESS account" to the modernized "customer portal" and

"MyACCESS account" in December of 2023.    Id. at 6-7.    In doing so, DCF did

---

[31] Garren works for DCF in the IT office.    See Garren Dep. at 4.    He is the ACCESS
business architect, meaning he is "a subject matter expert on business solutions to
technological problems."    Id.

not make any changes to the information available to customers about DCF's
eligibility decision.   Id. at 20.

203.   The MyAccess account shows an applicant's prior applications, which
reflect the information the applicant provided to DCF.   See id. at 11-12.   The
MyAccess account does not show the applicant the other information DCF
received, the specific information DCF used to determine eligibility, or DCF's
calculation of the individual's countable income.   Id.

204.   For example, the account does not display the information, if any, that
DCF received from the Federal Data Services Hub or SWICA.   Id.[32]   Nor will
it show the calculations DCF made, if any, to convert a weekly or biweekly
income to a monthly amount.   Id.   The specific income standard that DCF
applied to the applicant is not shown in the account, nor is there a statement
of the applicant's SFU.   Id. at 12-13.[33]

205.   The account does list household members and displays a set of icons
alongside the names, but there is no explanation of what those icons mean.
Id. at 12-13, 21-22.

_____

[32] DCF employees have access to a different version of the application than that
submitted by the applicant.   See Roberts Test., Tr. Vol. II at 21-22, 65-66 (comparing Pls.' Ex.
37 and Pls.' Ex. 66).   The version the DCF employees use contains the income data from third-
party electronic databases.   See Roberts Test., Tr. Vol. II at 66.   This version is contained in
DCF's Access Management System.   Id. at 52, 66, 98.

[33] In contrast to the Medicaid program, a case-specific income threshold for the food
assistance (SNAP) and cash assistance programs is provided on the myACCESS account.
See, e.g., Pls.' Ex. 279A at 35:56; Pls.' Ex. 281A at 39:35.

206.   The coverage group (i.e., eligibility category) for each household member
is not identified anywhere in the account.   Id. at 22.

207.   Within the MyAccess account, the health coverage status for each
household member is listed under the heading "Medicaid Details."   See Pls.'
Ex. 278A at 46:24-47:20; Pls.' Ex. 279A at 36:16-50.   According to Garren, this
heading covers "information about the programs that are considered to be a
part of Medicaid, which includes the Medically Needy or share of cost
program."   See Garren Dep. at 22-23.

208.   Beneath this heading, if an individual is receiving full coverage Medicaid,
her "Status" will be "Open" as shown here:



Pls.' Ex. 279A at 36:21 (redacted).

209.  For individuals in the Medically Needy program, beneath the same "Medicaid Details" heading, the "Status" will say "Enrolled" and a Share of Cost will be listed, as shown here:



See Pls.' Ex. 278A at 47:04 (redacted).

210.  The term "Medically Needy" is not present anywhere on this screen, nor does this screen provide an explanation of the difference between the terms "Open" and "Enrolled."  See, e.g., Pls.' Ex. 278A at 46:24-47:34; Pls.' Ex. 281A at 39:50-40:37; see also Garren Dep. at 9, 28-29.

211.  MyAccess accounts also include a Program History for individual household members.  See, e.g., Pls.' Ex. 278A at 47:38.  However, this history does not appear to be a reliable record of the individual's actual coverage history.  See Pls.' Ex. 280A at 31:01-33:35, 34:42-36:14 (recording of Chianne D. and C.D.'s program history); Ramil Test., Tr. Vol. IV at 68-69, 70 (discussing inaccuracies in history); see also Pls.' Ex. 278A at 50:14-50:47

(recording of N.C.'s program history); Jennifer V. Test., Tr. Vol. III at 81-82

(discussing inaccuracies in this history).[34]

212.    Under an individual's program history, the MyAccess account shows

coverage begin and end dates.    See, e.g., Pls.' Ex. 278A at 47:28-48:38.    These

dates do not necessarily correlate to the dates an individual's Medicaid

coverage actually began or is slated to end.    See Ramil Test., Tr. Vol. IV at

68.    Rather, what is shown is "the current period of eligibility, which is in

many cases a single month."    See Garren Dep. at 24.    "[I]t is the most recent

coverage period," which means it "is more often than not going to begin with

the first of the month of the current calendar month and end with the last day

of the current calendar month."    Id. at 24-25.[35]    The Medicaid Details screen

includes a renewal date for each program member which is when coverage is

actually set to end.    See id. at 25; see also Pls.' Ex. 278A at 49:58.    The

---

[34] The Court notes that unlike the Medicaid Details screen, the individual Program
History screen does sometimes list Medically Needy coverage.    For example, Medically Needy
is listed in Chianne D.'s program history.    See Pls.' Ex. 280A at 31:07.    But, A.V.'s Program
History lists only "Medicaid" coverage despite at times using the status "Enrolled" which, as
explained above, is supposed to indicate that she was in the Medically Needy program at the
time.    See Pls.' Ex. 278A at 47:41-48:31.    Yet, the Program History for a member of A.V.'s
family, N.C., does use the term Medically Needy.    See Pls.' Ex. 278A at 50:21.    The Court
was provided with no evidence to explain the reason for these discrepancies.

[35] Garren explains that the month-to-month coverage is listed on the account to
support the customer's ability to print a Temporary Medicaid card from the screen.    See
Garren Dep. at 26-27.    These cards can only be issued for a one-month period.    Id. at 27.
This design decision was carried over from the previous account system.    Id. at 26-27.    But
this explanation does not appear to be provided anywhere on the MyAccess account.

parties do not cite the Court to any location on the MyAccess account where the distinction between a renewal date and a coverage end date is explained to the user.

### b. Call Centers

### 1. Overview

213.   The Office of Economic Self Sufficiency within DCF operates a customer call center.   See Solomon Test., Tr. Vol. IV at 193.

214.  The call center serves as an "access point" for customers who have questions about their public assistance cases, such as Medicaid, food assistance, and cash assistance.   Id.; see also Remote Deposition of Nichole Solomon (Doc. 167-10; Solomon Dep.) at 21.

215.   The hours of operation are 7 a.m. to 6 p.m., Monday through Friday.   See Solomon Test., Tr. Vol. IV at 194, 218.   Generally, the call center does not operate on the weekends.   Id. at 218.

216.   Between April 2023, when redeterminations resumed, and April 2024, the last month of data presented at trial, the call center received between 1.6 to 2.5 million calls each month.   See Solomon Test., Tr. Vol. IV at 206; see also Pls.' Ex. 284.

217.   The call center has about 960 employee positions.   See Solomon Test., Tr. Vol. IV at 199.   Approximately 700 of those positions are allocated to "frontline agents" who answer calls, known as a Call Center Service

Representative 1 (CSR1).   Id. at 199-200.   The minimum qualifications for a CSR1 are a high school diploma or GED and one year of customer service experience.   See Solomon Dep. at 11.

218.   Of the 700 authorized CSR1 positions, approximately 200 of those positions were added in April of 2024.   See Solomon Test., Tr. Vol. IV at 200. At the time of the bench trial, only 521 of the 700 frontline agent positions were filled, although DCF was actively working to hire people for those positions.   Id. at 200, 223.

219.   Calls to the call center, and the CSR1s equipped to handle them, are segmented into three levels, Tier 1, Tier 2, and Tier 3.   See id. at 202.   Tier 3 calls are the most complex, and Tier 3 agents are the most highly trained CSR1 employees.   Id. at 202-03.   Approximately 60% of the 521 frontline workers were Tier 3 trained at the time of trial.   Id. at 223.

220.   After a CSR1 agent is hired, the new agent receives a one-week interview training class, called the Tier 1 training class.   See id. at 202-03. [36] Specifically, Tier 1 agents are trained to perform the interviews that are required in food assistance cases.   Id. at 204.   Tier 1 training does not include Medicaid.   Id.

---

[36] It appears the call center did not train agents solely at the Tier 1 level until recently. See Solomon Test., Tr. Vol. IV at 232; Solomon Dep. at 16 (explaining at her March 2024 deposition that newly hired agents immediately attend Tier 2 training and that exclusive Tier 1 training does not exist).

221.   After an agent has handled Tier 1 calls for a while, DCF sends the agent
back for Tier 2 training.   Id. at 203.   Tier 2 training is one or two weeks.   Id.
If an agent demonstrates strong performance with DCF, then the person is
sent back for Tier 3 training.   Id.   This training is more comprehensive and
takes about six to eight weeks to complete.   Id.   Tier 2 and Tier 3 training
includes training on the Medicaid program.   Id. at 205.

222.   Tier 2 agents are "responsible for handling general inquiry questions from
customers who would like to get the status of their pending case" as to any of
the public benefit programs—Medicaid, food assistance or cash assistance.
See Solomon Dep. at 15.   A Tier 2 agent can also assist with any of the
functions of a Tier 1 agent.   Id.

223.   In addition to performing the functions of a Tier 1 and Tier 2 agent, a Tier
3 agent can "answer more escalated questions from customers" such as
reviewing the case's budget to determine why benefits were approved for a
certain amount.   See id.   A Tier 3 agent can also escalate to DCF's processing
team and can input a change in household circumstance to "determine ongoing
benefits."   Id. at 16.

224.   Generally, call center agents have the information and training to provide
customers with their reported income, SFU size, and income limit.   See
Solomon Test., Tr. Vol. IV at 216.   Nevertheless, call center agents "are not
eligibility specialists."   See Veltkamp Dep. Vol. 1 at 39.

225.  The call center also employs supervisors, as well as Call Center Representative 2s, referred to as senior workers, who handle quality assurance, some training, and provide back up to the supervisors.  <u>See</u> Solomon Test., Tr. Vol. IV at 203.  Supervisors conduct random call monitoring for each member of their team to: ensure that agents are following procedures correctly, assist newer agents, and provide additional coaching or mentoring.  <u>See</u> Solomon Dep. at 23-24.  In 2024, the supervisors began conducting the call monitoring on live calls.  <u>Id.</u> at 24.  Previously, monitoring was accomplished primarily through review of recorded calls.  <u>Id.</u> DCF also employes quality assurance support staff who review calls and provide feedback to agents and their supervisors.  <u>Id.</u>

226.  The number of an agent's calls that are monitored is based on the agent's performance.  <u>See id.</u> at 45.  Newer agents or those who are not meeting certain standards may have additional calls monitored.  <u>Id.</u>  But generally, three to five calls per agent are monitored in a month, with more for those that are newer or learning.  <u>Id.</u> at 45-46.[37]

---

[37] As a rough estimate, this means that of the 444,319 calls answered in the month of April 2024, less than one percent of those calls (521 agents x 5 = 2,605) are monitored.

227. Since September 2021, DCF has contracted with a third-party entity called Lighthouse to handle some of the simpler calls. <u>See</u> Solomon Test., Tr. Vol. IV at 209-10.[38]

228. In March of 2023, DCF also began using Lighthouse to assist with Medicaid unwinding calls. <u>Id.</u> at 210. Callers who affirmatively responded to an initial prompt asking whether the call concerned a Medicaid unwinding mailout were routed to Lighthouse. <u>Id.</u> at 233-37.[39] Callers who selected subsequent prompts concerning other types of Medicaid-related questions were routed to the call center. <u>Id.</u> at 234.

229. During the unwinding, wait times for a Lighthouse agent varied from as short as two minutes to as long as an hour. <u>See id.</u> at 211. The Lighthouse agent can assist with basic Medicaid tasks such as very general inquiries about the status of the caller's case, assistance with a telephonic application for Medicaid, or performing a simple password reset. <u>Id.</u> at 210-11, 233. But Lighthouse agents do not have access to the same data and resources that CSR1s have, discussed in more detail below. <u>Id.</u> at 233. If the Lighthouse

---

[38] At the bench trial, Solomon described the Lighthouse agents as handling "the Tier 1 call types." <u>See</u> Solomon Test., Tr. Vol. IV at 210. However, given her description of the Tiers and the tasks that Lighthouse agents handled, the Court finds that Lighthouse agents are best characterized as Tier 2 level agents. Indeed, Veltkamp describes Lighthouse agents as Tier 2. <u>See</u> Veltkamp Dep. Vol. 1 at 40.

[39] More specifically, DCF sent customers a letter in a yellow-striped envelope with information about Medicaid unwinding. <u>See</u> Solomon Test., Tr. Vol. IV at 255. It appears the call prompt referred to this mailing. <u>Id.</u> at 233-34. NOCAs concerning a Medicaid termination are not sent in yellow-striped envelopes. <u>Id.</u> at 255.

agent is unable to assist, the agent can transfer the caller back to one of the call center queues.  Id. at 211; see also Veltkamp Dep. Vol. 1 at 40 ("And if [the Lighthouse agent] can't answer the question, then they can transfer them to the [T]ier 3.").

230.  At the time of the bench trial, DCF had significantly decreased Lighthouse's role and no longer used Lighthouse for Medicaid unwinding calls. See Solomon Test., Tr. Vol. IV at 211.

## 2. IVR

231.  When a customer calls the call center, the customer is first routed to an Interactive Voice Response (IVR) system.  Id. at 195.  The IVR system allows the customer to "self-serve," or, if the customer wants to speak with an agent, the customer's answers in the IVR system help direct the customer to the appropriate agent.  Id.

232.  There is no wait time to access the IVR system, which a customer can navigate in two to four minutes.  Id. at 196.

233.  The IVR system can inform the caller whether the caller's application has been approved or denied, whether the caller is active in Medicaid, and if approved, when the caller's certification period will end.  Id.

234.  If a customer is found to be ineligible for Medicaid, the IVR system can recite to the customer the same reason that was provided in the NOCA, i.e., the text generated from the reason codes.  See id. at 220.

235.  If a caller "self-serves" by using the IVR system without asking to speak

to a live agent, the call is tracked as a "contained" call.  See id. at 243.  In

April of 2024, about 30% of the calls to the call center were contained.  See

Pls.' Ex. 284.[40]

### 3.  Hold Queues

236.  If the caller requests to speak to an agent and no agents are available,

the system will play a hold message while the caller waits in a queue to speak

to a live agent.  See Solomon Dep. at 29.[41]

237.  Callers are placed in a queue based on the caller's specific need, such as

a password reset, telephonic application, or general questions, as well as the

caller's requested language—English, Spanish, or Creole.  See Solomon Test.,

Tr. Vol. IV at 199. The agent assigned to that queue is trained to handle that

work.  Id.

---

[40] In January and February of 2024, the percentage of contained calls had dropped to 18.7% and 13.8% which may be attributable to an instability with the IVR system.  See Pls.' Ex. 284; Solomon Test., Tr. Vol. IV at 221.  The instability occurred for a few days in September and October of 2023, and then continuously from mid-December through March 25, 2024.  See Solomon Test., Tr. Vol. IV at 197.  Due to the instability, some callers could not use the full functionality of the IVR and were routed to a more simplified menu.  Id. at 197-98.

[41] DCF moved the IVR system to a new platform in July of 2024.  See Solomon Test., Tr. Vol. IV at 198.  Unlike the prior platform, on the new IVR platform callers who are in a queue can hear their estimated wait time to speak to a live agent.  See id. at 198, 221-22. Solomon testified that the new platform will also offer a "live agent chat" with a Tier 2 or Tier 3 agent depending on the queue, although this enhancement had not been implemented at the time of the bench trial.  Id. at 222.

238.   At the start of the unwinding in April 2023, the average wait time to
speak to an agent once a caller was placed in a queue was 41 minutes and 41
seconds.   See id. at 207, 253; see also Pls.' Ex. 284 (reflected in the ASA
column meaning Average Speed to Answer).   A year later, in April of 2024,
the average wait time was 20 minutes and 33 seconds.   See Pls.' Ex 284.
These average hold times do not include the time a caller spends on hold if he
or she needs to be transferred to a supervisor.   See Solomon Test., Tr. Vol. IV
at 239.

239.   Wait times vary and can sometimes be quite lengthy.   See id. at 249.
Solomon is aware of hold times as long as 2 hours and 20 minutes.   Id.   One
witness testified that, on more than one occasion, he has waited on hold with
the call center up to six hours.   See Ramil Test., Tr. Vol. IV at 86, 97.   This
witness, Jarvis Ramil, is a community health educator who has assisted more
than 500 people over the course of seven years with Medicaid eligibility issues.
Id. at 55-56.   He has called the call center more than one thousand times, id.
at 96, and estimates the average wait time to be at least an hour, id. at 103-
04.

240.   Significantly, DCF manages hold times by limiting the number of callers
that can be placed in a queue on any given day.   See Solomon Test., Tr. Vol.
IV at 240-41.   If the system has reached the maximum allotment for the
queue relevant to the caller, the caller will receive a message that all lines are

busy and to try again later.  See Solomon Dep. at 30-33; see also Solomon

Test., Tr. Vol. IV at 241.   At that point, the call will be disconnected.   See

Solomon Test., Tr. Vol. IV at 241.

241.   Callers will receive the same busy message if they call at a time when

there are more callers in the relevant queue than can be served by the 6 p.m.

closing time.   See id. at 194, 218.   But if a customer is already in a queue

waiting to speak to an agent, the agent will continue to answer calls in the

queue past 6 p.m. and the customer will not be disconnected.   Id. at 194-95;

see also Solomon Dep. at 124 (noting that agents are on the phones until about

7:00 p.m. "clearing out the queues of customers that are waiting").

242.   Callers who request to speak to an agent but receive the busy message

and get disconnected are tracked as "blocked" calls.   See Solomon Dep. at 37;

see also Solomon Test., Tr. Vol. IV at 218, 241.   In January and February of

2024, the number of blocked calls exceeded one million.   See Pls.' Ex. 284.

243.   In April of 2024, the last month for which the Court had data at the time

of the bench trial, DCF blocked 744,000 calls before they could be placed in a

queue to wait for an agent.   See Solomon Test., Tr. Vol. IV at 244; Pls.' Ex.

284.   On a percentage basis, this means that more than half—53.9 percent—

of callers who asked to speak to an agent were blocked in April 2024.   See

Solomon Test., Tr. Vol. IV at 245-47.   Indeed, between May 2023 and April

2024, the number of callers who were blocked exceeded the number of callers

who were placed in a queue to speak to an agent every single month.  <u>See</u> Pls.' Ex. 284.

244.  DCF does not have any performance standard or goal for minimizing the number of blocked calls.  <u>See</u> Solomon Test., Tr. Vol. IV at 247.  Notably, unlike hold times and abandoned calls, DCF is not required to report the number of blocked calls to CMS.  <u>See</u> <u>id.</u> at 242.

245.  DCF also tracks calls that disconnect while the caller is on hold in a queue.  <u>See</u> <u>id.</u> at 241-42; <u>See</u> Pls.' Ex. 284.  This could occur if a caller will not or cannot wait on hold any longer and hangs up, or if the call is dropped for some reason.  <u>See</u> Solomon Test., Tr. Vol. IV at 241-42, 249.  These are considered abandoned calls.  <u>See</u> <u>id.</u> at 241-42.

246.  In April of 2024, of the 46.1% of callers who asked to speak to an agent and were placed in a queue (i.e., those that were not blocked), 31.3% abandoned the call while waiting on hold.  <u>See</u> Pls.' Ex. 284; <u>see also</u> Solomon Test., Tr. Vol. IV at 253.  Indeed, since the start of the unwinding, the percentage of calls that were placed in a queue but abandoned has never fallen below 30%, and it routinely exceeds 40%.  <u>See</u> Pls.' Ex. 284; <u>see also</u> Solomon Test., Tr. Vol. IV at 250.  As with blocked calls, DCF does not have any specific performance standard for minimizing the number of abandoned calls. <u>See</u> Solomon Test., Tr. Vol. IV at 250.

## 4. Live Agents

247.  If a customer calls with questions about the reason she was terminated from Medicaid, the customer would need to speak to a Tier 3 agent as someone trained to answer more specific Medicaid questions.  <u>See</u> Solomon Test., Tr. Vol. IV at 238; Solomon Dep. at 15; Veltkamp Dep. Vol. 1 at 39-40.

248.  At the time of trial, there were approximately 313 agents trained at the Tier 3 level in the entire State.  <u>See</u> Solomon Test., Tr. Vol. IV at 223.  And not all of those agents would be available at any given time to take a call.  <u>See</u> Solomon Dep. at 27-28 (acknowledging that the number of agents available depends on who is present that day and actively taking calls at a particular time interval).

249.  Nevertheless, if a caller is able to reach an agent, the agents have access to various tools and resources through DCF's intranet that can assist the agent in answering a question about a Medicaid NOCA.  <u>See</u> Solomon Test., Tr. Vol. IV at 214-15.  The agents have access to the FLORIDA system, the CLRC screen, the Budget screens, the ACCESS Management System, as well as the customer's application.  <u>Id.</u> at 215, 227.

250.  If the customer has a question about her income, the agent can review the customer's income in the Budget screen within the FLORIDA system, as well

as the third-party database sources such as SWICA and the Federal Data Services Hub.   Id. at 227-28.[42]

251.   In addition, the intranet system has resources on Medicaid policy that agents can access such as policy transmittals, "job aids," and training materials.   Id. at 227; see also Solomon Dep. at 59, 65-67, 73.

252.   If the customer has a question about the income limit, the agent can look at Appendix A-7, discussed at length above, to calculate the applicable limit. See Solomon Test., Tr. Vol. IV at 228;[43] see also Solomon Dep. at 68.

253.   Depending on the circumstances, the agent may need to consult other resources for specific Medicaid policies, such as whether an unborn child is included in an SFU, the appropriate application of the standard and MAGI disregards, and the continuous coverage policies for pregnant and postpartum women, and children.   See Solomon Test., Tr. Vol. IV at 228-29; see also

---

[42] It is important to reiterate, however, that where an individual is terminated based on income, the Budget screen reflecting that decision is deleted by the system and thus would not be available to the call center agent.   See Kallumkal Test., Tr. Vol. VI at 43-44. Presumably, as Roberts did during trial, the agent would need to use the Medically Needy Budget screen to extrapolate the data that formed the basis of the ineligibility finding.   Thus, for example, a call center agent would not be able to provide a caller with the countable net income used to determine the caller's ineligibility for Medicaid unless the agent knows when and how to apply the standard and MAGI disregards and performed those calculations herself using Appendix A-7 during the call.

[43] Solomon incorrectly suggested in her testimony that the agent can look at the Budget screen for the income standard.   See Solomon Test., Tr. Vol. IV at 228.   But, as discussed above, if the individual was terminated from Medicaid due to income, the Budget screen showing the income standard that the system applied is not saved in the FLORIDA system.   See supra Part I.E.b.   Only the Medically Needy Budget screen would be available, which does not reflect any income standard.   Thus, to determine the income standard, the agent would need to know how to correctly apply Appendix A-7.

Solomon Dep. at 70, 72-73.   DCF does not provide agents with any scripts for
explaining the continuous coverage policies pertaining to pregnant and
postpartum women or children.   <u>See</u> Solomon Test., Tr. Vol. IV at 231.

254.   The call center does have a script for agents that walks through the
screens to check a customer's verified income.   <u>See</u> Solomon Dep. at 71.   But
Solomon is unaware of any script that walks an agent through the steps for
determining the appropriate income standard using Appendix A-7.   <u>Id.</u> at 70-
71.

255.   Indeed, given the unique circumstances of each household, DCF does not
have, nor could it have, a standard script to be used with every Medicaid
caller.   <u>See</u> Solomon Test., Tr. Vol. IV at 255-56.   As such, there will
inevitably be variations in how each agent handles the response to any given
question.   <u>See</u> Solomon Dep. at 76.

256.   If the agent cannot answer the caller's question, the agent can use a chat
dialogue box to seek support from a supervisor.   <u>See</u> Solomon Test., Tr. Vol.
IV at 213-14, 216.   A supervisor is on call every day until the call center
closes.   <u>See</u> <u>id.</u> at 218-19.   The agent can also call a "support queue" and
place him or herself in line to talk to a more experienced agent for guidance
on a call.   <u>See</u> <u>id.</u> at 214, 216; <u>see also</u> Solomon Dep. at 40, 140 (explaining as
corrected on the Errata Sheet that Tier 3 agents work the support queue).

257.   However, DCF monitors the length of time an agent spends speaking with

a customer—tracked as the Average Handle Time (AHT).   See Solomon Test.,

Tr. Vol. IV at 208; see also Pls.' Ex. 284.   DCF tracks this metric to "coach

[its] agents on efficiency of calls."   See Solomon Test., Tr. Vol. IV at 208.

Notably, the AHT metric includes not only the time spent talking to the caller,

but also any after-call time the agent spends taking notes on the case or any

other work around the interaction.   Id. at 209; Solomon Dep. at 46-47.   The

AHT metric also includes any time during the call when the agent needs to

place the caller on hold, for example, if the agent needs to look something up.

See Solomon Dep. at 46-47.   DCF wants its agents to be as efficient as

possible so that they can answer as many calls as possible.   See Solomon

Test., Tr. Vol. IV at 209.

258.   DCF does not place a limit on the amount of time an agent can spend on

the phone with a caller.   Id.   Nevertheless, DCF does have a performance

expectation that agents will meet an average handle time of 6-7 minutes.   See

Solomon Dep. at 47.   Solomon expects this standard to be raised "slightly."

Id. at 48.

259.   The number of blocked or abandoned calls shows that obtaining

assistance through the call center is challenging at best.   But overcoming

that challenge does not mean the caller will obtain the information needed to

understand DCF's decision.   Given the complexity of Medicaid eligibility

rules, the lack of detailed information in the NOCAs or to which the agents have access, the antiquated technology of the FLORIDA system, the immense time pressure on agents and their limited training, and the minimal oversight, it is not surprising that the evidence shows that callers with Medicaid eligibility questions likely receive confusing, inaccurate, incomplete, or contradictory information from call center agents on a regular basis.

260.  Indeed, Plaintiffs presented ample evidence at trial that call center agents provide erroneous information to callers.  See Ramil Test., Tr. Vol. IV at 83 (explaining that he does not advise individuals to contact the call center to resolve their Medicaid questions because "they may sometimes come out more confused than they are going in"); id. at 85-86, 96-97 (testifying that he has received inaccurate Medicaid information from the call center a handful of times); Solomon Dep. at 24-25 (acknowledging that she is aware of occasions when incorrect information was given to a caller); compare Defs.' Ex. 77 (audio recording of June 1, 2023 call between Chianne D. and call-center agent) with Roberts Test., Tr. Vol. II at 72 (acknowledging that the agent gave the caller incorrect information regarding how the share of cost is calculated); compare Defs.' Ex. 73 (audio recording of Chianne D.'s first call to the call center on May 30, 2023) with Roberts Test., Tr. Vol. II at 78-79 (testifying that the agent gave the caller conflicting, confusing, and inaccurate information); compare

Pls.' Ex. 128 at 7:50-8:08, 15:59-16:14 (audio recording of call between Lily

Mezquita and call center agent) with Roberts Test., Tr. Vol. II at 131-32.

261.   Notably, the call center recording at Plaintiffs' Exhibit 128 is astounding

in its inaccuracies.   The agent miscalculates the income standard in two

different ways and appears to be completely unaware of continuous coverage

Medicaid for pregnant women.   Even after Mezquita informs the agent of the

relevant policy, citing the DCF website, statute, and factsheet, the agent

incorrectly tells her that her information was out of date and that Mezquita

was now subject to an income limit due to the end of the "COVID mandate."

See Pls.' Ex. 128 at 4:39-5:10; 9:33-17:02.   The fact that the agent provided

such inaccurate information is particularly troubling given that the agent

indicates throughout the call that she is conferring with her "support queue"

for assistance.   See Pls.' Ex. 128 at 4:19-36; 6:12-7:06; 10:32-45; 16:03-07;

17:05-10.

262.  Over the course of his career assisting individuals with Medicaid

eligibility, Ramil has learned to use specific language with the call center to

get the information he needs.   See Ramil Test., Tr. Vol. IV at 85, 103.

According to Ramil, he has learned to ask for "income included in the income

budget" because it "seems to lead [the agent] to the right place of where to

look," specifically, the word "budget."   Id. at 85, 105.

### 5. Call Center Data

263.   To summarize, using April of 2024 as an example, the call center received
1,974,382 calls, of which 593,923 were resolved within the IVR self-service
system, leaving 1,380,459 calls with callers who asked to speak with an agent.
See Pls.' Ex. 284.   Of those 1.38 million calls, less than half, 652,994, were
placed on hold in a queue to speak with an agent.   Id.; see also Solomon Test.,
Tr. Vol. IV at 247-48.   The other calls were blocked.   Callers placed in a
queue spent an average of 20 minutes waiting on hold, during which time,
nearly a third, 31.3%, of the calls were abandoned.   See Pls.' Ex. 284.
Ultimately, only 444,319 callers of the 1.38 million callers (32%) who asked to
speak to a live agent succeeded in doing so.   Id.   Upon reaching an agent,
those interactions lasted for an average of 9 minutes and 28 seconds, including
the time the agent spent working on the case after the call ended.   Id.

264.   Plainly, the call center receives far more calls with requests for live agents
than it is equipped to handle.   See Solomon Test., Tr. Vol. IV at 241; see also
Solomon Dep. at 110-11 ("[W]e are just not able to serve—we're not able, based
on our capacity, to—to answer as many calls as we would like to be able to
answer.").   Although the data presented at trial predates the addition of 200
additional CSR1 positions, Solomon agreed that 200 new employees will not
solve the problem of 744,000 blocked calls in a month.   See Solomon Test., Tr.
Vol. IV at 256.

### c. DCF Website

265.  DCF maintains a public website where information about the Medicaid eligibility requirements is available.  <u>See</u> Pls.' Ex. 285; <u>see also</u> Veltkamp Dep. Vol. 1 at 10-11.

266.  As stated above, in April 2024, following the end of the Medicaid unwinding, DCF revised the NOCA footers to instruct readers that more information about Medicaid eligibility is available on the DCF website.  <u>See</u> Anderson Test., Tr. Vol. IV at 142-44; Defs.' Ex. 121.  Prior to these changes, NOCAs did not identify the DCF website as a source of information about Medicaid eligibility.  <u>See, e.g.</u>, Pls.' Ex. 40.

267.  Of relevance here, the Medicaid homepage includes a section titled Medicaid Eligibility which provides an overview of the eligibility requirements for each coverage group.  <u>See</u> Pls.' Ex. 285 at 8:51-11:38.  Under the Parent/Caretaker and Pregnant Women headings, the text states that people in these groups may be eligible for Medicaid if the "family's countable income" does not exceed the "income limits."  <u>See</u> <u>id.</u> at 9:12, 9:52.  For Children, the text informs that "the family income" must be "under the limit for the age of the child."  <u>Id.</u> at 9:32.

268.  This section of the website does not provide, or link to, a definition of "countable income" or "family income," nor does it identify, or link to, the

income limits.   Id. at 9:12, 9:32, 9:52.   This section also does not inform the reader where to find that information.   Id.

269.   Notably, under the heading for Children, the description does not mention the existence of continuous coverage Medicaid for children.   Id. at 9:32. Under the Pregnant Women heading, the text does inform that "[o]nce eligible, a pregnant woman remains eligible throughout her pregnancy and for a twelve-month post-partum period, regardless of a change in income."   Id. at 10:02.   However, the reference to postpartum coverage was a recent addition at the time of trial.   See Veltkamp Dep. Vol. 1 at 18 (testifying at her deposition in March of 2024 that the section does not mention postpartum coverage).

270.   The Medicaid homepage also identifies other healthcare options including the "Medically Needy Program" described as a "program that allows Medicaid coverage after a monthly 'share of cost' is met. Those who are not eligible for 'full' Medicaid because of income or asset limits, may qualify."   See Pls.' Ex. 285 at 7:41.

271.   The sidebar on the Medicaid homepage contains a list with, among other things, hyperlinks to the following information: the Family-Related Medicaid Program Fact Sheet (Defs.' Ex. 28), the SSI-Related Medicaid Program Fact Sheet (Defs.' Ex. 27), the Policy Manual, and the Medically Needy Program brochure (Defs.' Ex. 30).   See Pls.' Ex. 285 at 00:35; see also Roberts Test., Tr.

Vol. V at 11-12.   Notably, the links to the Fact Sheets, Policy Manual, and Medically Needy brochure were added in the spring of 2024, <u>after</u> the end of the unwinding period.   See Roberts Test., Tr. Vol. V at 12-13, 33.

272.   The Family-Related Medicaid Program Fact Sheet contains "general information about the Family-Related Medicaid programs, [and] the requirements for eligibility, including technical requirements."   <u>See</u> Roberts Test., Tr. Vol. V at 9; Defs.' Ex. 28.   The Fact Sheet identifies the coverage groups and lists common factors for Medicaid eligibility with links to the Policy Manual.   <u>See</u> Defs.' Ex. 28 at 3, 6; Roberts Test., Tr. Vol. V at 18.   A link to the Appendix A-7 income table is included as well.   <u>See</u> Defs.' Ex. 28 at 6; <u>see also</u> Roberts Test., Tr. Vol. V at 18-19.   The Fact Sheet also describes the Medically Needy Program with a link to the Medically Needy brochure. <u>See</u> Defs.' Ex. 28 at 5.

273.   DCF updated the Family-Related Medicaid Program Fact Sheet in April 2024.   <u>See</u> Defs.' Ex. 28.   The changes include updates for current policy information, fixing broken links, providing new links to the Policy Manual, and adding page ten which identifies other options for healthcare.   <u>See</u> Roberts Test., Tr. Vol. V at 9-10, 30; <u>see also</u> Defs.' Ex. 28 at 6, 10.

274.   Notably, prior to the updates in April 2024, the Family-Related Medicaid Program Fact Sheet incorrectly stated that "Medicaid is provided for the pregnant woman for the duration of her pregnancy and two months

postpartum," rather than the correct information—twelve months.   <u>See</u> Veltkamp Dep. Vol. 1 at 20-21; Mezquita Test., Tr. Vol. III at 130-31; Pls.' Ex. 253 at 2.   In addition, the link to the Appendix A-7 income table did not work. <u>See</u> Veltkamp Dep. Vol. 1 at 22.   Nor did the link to the Community Partner network.   <u>See</u> Roberts Test., Tr. Vol. V at 30-31.

275.   As stated above, the Medically Needy brochure is also linked on the Medicaid homepage.   This brochure explains that the Medically Needy Program "assists individuals who would qualify for Medicaid except for having income that is too high."   <u>See</u> Defs.' Ex. 30 at ECF p. 4.   It explains the "share of cost" requirement, expenses that can and cannot be used to meet the share of cost, and how to submit proof of medical expenses.   <u>See id.</u>   It also states that the "share of cost is determined by household size and gross monthly income."   <u>Id.</u>

276.   Notably, Ramil, who has a master's degree, required "a few months" and the assistance of colleagues experienced in Medicaid eligibility, as well as legal counsel, to learn how to use the Policy Manual and Appendix A-7.   <u>See</u> Ramil Test., Tr. Vol. IV at 73-75.

277.   As described by the Court in the Eligibility section above, the Policy Manual would be very difficult, if not impossible, for a lay person to decipher without assistance from someone well-versed in Medicaid policy and practice.

### d. Family Resource Centers, Community Partners, & Free Legal Services

278. DCF maintains physical office spaces known has Family Resource Centers. <u>See</u> Veltkamp Test., Tr. Vol. V at 185. Standardized language in the NOCAs suggests that an individual can visit a Family Resource Center for "help completing your review online . . . ." <u>See</u> Pls.' Ex. 40 at DCF-5278. The NOCAs do not advise individuals to visit a Family Resource Center for help understanding the NOCA or the reasons for their termination.

279. The Family Resource Center page on DCF's website does not mention Medicaid. <u>See</u> Pls.' Ex. 290. Likewise, the Contact Us page on DCF's website lists offices and contacts for a variety of services, but Medicaid is not one of them. <u>See</u> Pls.' Ex. 286; <u>see also</u> Anderson Test., Tr. Vol. IV at 176.

280. Nevertheless, Family Resource Centers are available to assist an individual who has questions about a Medicaid termination NOCA. <u>See</u> Veltkamp Test., Tr. Vol. V at 185-86. Indeed, aside from the call center, a Family Resource Center is the only other source an individual can turn to for information directly from DCF about his or her specific case. <u>See</u> Ramil Test., Tr. Vol. IV at 77.

281. There are forty of these Family Resource Centers, sometimes referred to as storefronts or lobbies, throughout the entire state of Florida. <u>See</u> Veltkamp Test., Tr. Vol. V at 185, 187-88, 195.

282.   Family Resource Centers are open from 8 a.m. to 5 p.m. on weekdays only. See id. at 197.

283.   According to DCF's website, an individual may visit a Family Resource Center without an appointment to drop off any documentation, provide identification for authentication, use a computer to apply for government assistance, or receive Refugee Assistance Program forms.   See Pls.' Ex. 290 at 1:35, 4:15, 4:26, 5:28.   All other services are by appointment only.   Id.

284.   Most Family Resource Centers allow customers to make appointments online.   See Veltkamp Test., Tr. Vol. V at 189.

285.   Family Resource Centers are equipped with computer stations and staff to assist individuals with submitting an application, multi-function devices where individuals can scan in documentation to the Centralized Mail Scan Center, and phone lines available for individuals who need to have an interview.   See id. at 186.   For individuals with questions, Family Resource Centers have "self-service representatives" (SSR).   Id.   An SSR can assist an individual with questions about their Medicaid NOCA.   Id.

286.   SSR's receive training on the various programs that DCF operates.   Id. at 196-97.   SSR's have access to the FLORIDA system and can provide customers with details about their case.   Id. at 187.   With regard to case-specific Medicaid questions, the SSR's training includes teaching an SSR to look at the NOCA, the information submitted in the individual's application,

the verifications DCF used as reflected in the CLRC screen, and the Budget screen.  <u>Id.</u>  This training is shorter than that which a Tier 3 agent at the call center receives.  <u>Id.</u> at 196.

287.  According to Veltkamp, there is at least one SSR working at each Family Resource Center.  <u>Id.</u>

288.  Approximately 105,000 people statewide visit the Family Resource Centers in a typical month.  <u>Id.</u> at 190.  Twenty-three percent of those customers inquire about their case status.  <u>Id.</u>

289.  The NOCA footers also advise that "[l]ocal community partner agencies are available to help you apply for services," or assist with completing a review, and directs the reader to a website to locate one.  <u>See</u> Pls.' Ex. 40 at DCF-5278, 5280; <u>see also</u> Defs.' Ex. 121 at DCF-7410.  NOCAs do not suggest contacting a community partner for help understanding the reason for DCF's decision.  <u>See</u> Anderson Test., Tr. Vol. IV at 172.

290.  Community partners can "assist customers in applying for benefits."  <u>See</u> Veltkamp Test., Tr. Vol. V at 193; Ramil Test., Tr. Vol. IV at 78.  Community partners have computer access.  <u>See</u> Veltkamp Test., Tr. Vol. V at 193; Ramil Test., Tr. Vol. IV at 78.  Some community partners only serve specific populations such as refugees or senior citizens.  <u>See</u> Veltkamp Test., Tr. Vol. V at 193.  Community partners do not have access to the FLORIDA system. <u>See</u> Ramil Test., Tr. Vol. IV at 81.

291. NOCAs also inform recipients that they can obtain information about "free legal services" by calling the call center or visiting a website. <u>See</u> Pls.' Ex. 40 at DCF-5280. The link provided connects to a page where an individual can find legal assistance and legal assistance offices. <u>See</u> Anderson Test., Tr. Vol. IV at 140.

### e. Statutes and Regulations

292. Lengthy and complex federal statutes and regulations govern Medicaid eligibility. <u>See</u> 42 U.S.C. § 1396 <u>et seq.</u>; <u>see also</u> 42 C.F.R. Ch. IV, Subch. C, Pt. 435. The Florida Statutes and Florida Administrative Code (F.A.C.) also contain provisions governing Medicaid eligibility. <u>See</u> Fla. Stat. §§ 409.901-409.904; <u>see also</u> Fla. Admin. Code r. 65A-1.701—65A-1.716.

293. Notably, however, the Florida Statutes and Administrative Code are not always consistent with each other or current policy. For example, section 409.903(5) of the Florida Statutes specifies the continuous coverage twelve-month postpartum period for pregnant women, which is consistent with current policy as of 2022. <u>See</u> Fla. Stat. § 409.903(5); <u>see also</u> JPS, Part VIII ¶ 16. Yet, rule 65A-1.703 of the Florida Administrative Code states that Medicaid for pregnant women extends "through the month of birth and the <u>two</u> post-partum months regardless of changes in the income for the filing unit/family size." <u>See</u> Fla. Admin. Code rule 65A-1.703(2)(f)4. (emphasis added).

294.  In addition, rule 65A-1.716 purports to set forth the "monthly federal poverty level figures based on family size . . . ."  <u>See</u> Fla. Admin. Code r. 65A-1.716(1).  However, the figures set forth in this table are not consistent with Appendix A-7 and do not appear to have been updated since 2021.  <u>Compare</u> <u>id.</u> <u>with</u> Appendix A-7.

295.  Indeed, due to changes in federal law, the Florida Statutes themselves have provisions inconsistent with current practice.  For example, section 409.903(6) of the Florida Statutes states that the income standard for children ages six through eighteen is less than 100 percent of the federal poverty level (FPL).  <u>See</u> Fla. Stat. § 409.903(6).  However, current federal law places the income standard for this age bracket at 133 percent of the FPL.  <u>See</u> 42 U.S.C. § 1396a(a)(10)(A)(i)(VII).  And accordingly, DCF applies an income standard of 133 percent of the FPL for this age group, as reflected in rule 65A-1.707(5) and Appendix A-7.

296.  Section 409.904(6) of the Florida Statutes addresses continuous coverage Medicaid for children.  The statute provides for six months of continuous Medicaid coverage for children ages five to eighteen.  <u>See</u> Fla. Stat. § 409.904(6).  However, in light of changes to federal law, the current policy provides continuous coverage for twelve months to all children under the age of nineteen.  <u>See</u> Pls.' Ex. 147; <u>see also</u> Pub. L. No. 117-328, § 5112(a), 136 Stat. 4459, 5940 (2022) (amending 42 U.S.C. § 1396a(e)(12)).

## I. Fair Hearings

297.   A customer who disagrees with DCF's decision may have the decision reviewed through an administrative process known as a fair hearing.   See Goins Test., Tr. Vol. V at 43.

298.   The parties to a fair hearing are the Medicaid customer and DCF.   Id. at 76.   The regional operations teams within ESS represent DCF in the fair hearing process.   See id. at 42-43.

299.   The Office of Appeal Hearings (OAH) within DCF's Office of Inspector General conducts the hearings.   See Jones Test., Tr. Vol. V at 74-75.   The OAH is independent from ESS and reports directly to the Inspector General. Id. at 75-76.

300.   DCF considers a fair hearing request to be "any clear expression, oral or written, by an applicant/recipient or designated representative that he disagrees with the actions, decisions or requirements imposed by the Department or authorized community partner, and that the individual wishes to present his case to a higher authority."   See Pls.' Ex. 182 at DCF-2741 (Policy Manual, Administrative Policy, Ch. 0430.0602); see also Jones Test., Tr. Vol. V at 79-80.

301.   Customers can make this request in a variety of ways.   Customers can call or email the OAH.   See Jones Test., Tr. Vol. V at 80.   They can use an online form to submit a request or send a request to the OAH in the mail.   Id.

Customers can also make a request for a fair hearing through the DCF Call
Center, at a DCF Office, or by mailing a request to the Central ACCESS Mail
Center.   Id.

302.   In addition, a customer can request a fair hearing by writing a letter and
uploading it to his or her MyACCESS account, although nothing in the
MyAccess account informs the customer of this option.   See Garren Dep. at
17-18.   Rather, an individual must infer that the option to submit a hearing
request "in writing" includes uploading a letter the My Documents page of the
MyACCESS account.   Id. at 31-32.

### a. Notice of the Right to a Fair Hearing

303.   Medicaid customers are notified of the ability to request a fair hearing in
several ways.   See Jones Test., Tr. Vol. V at 78.

304.   Individuals receive notice of their right to a fair hearing in the
standardized footer of every NOCA.   See id.; see also Pls.' Ex. 40 at DCF-5280;
Pls.' Ex. 12; Defs.' Ex. 121.   As described above, DCF revised the footer in
April of 2024 to provide more detailed information on how to submit a request
for a fair hearing.   See supra Part I.F.c.4.

305.   Individuals are also informed of their right to a fair hearing in the "Rights
and Responsibilities" document they receive when they complete an
application.   See Jones Test., Tr. Vol V at 78-79; see also Defs.' Ex. 38.
Applicants are required to review and acknowledge this document when

submitting an application.   See Jones Test., Tr. Vol. V at 79.   An individual's

right to a fair hearing is described in this document as follows:

> • Ask for a hearing before a state hearings officer.  You can bring with you or be represented at the hearing by a lawyer, relative, friend or anyone you choose.  If you want a hearing, you must ask for the hearing by writing, calling the Customer Call Center or coming into the office within 90 days from the mailing date of your notice of case action.  If you ask for a hearing by the end of the last day of the month prior to the effective date of the adverse action, your benefits may continue at the prior level until the hearing decision.  You will be responsible to repay any benefits continued if the hearing decision is not in your favor.  If you need information about how to receive free legal advice, you can call the ACCESS Florida Customer Call Center toll free at 1-866-762-2237 for a listing of free legal agencies in your area.

See Defs.' Ex. 38 at 1.

306.   DCF also displays a pop-up screen with these Rights and Responsibilities,

including the fair hearing information set forth above, whenever an individual

logs into his or her MyAccess account.   See, e.g., Pls.' Ex. 278A at 00:10-2:54;

Pls.' Ex. 279A at 00:12-2:43.

307.   The Help Center of the MyAccess Account includes the Rights and

Responsibilities information as well, including this same paragraph on fair

hearings.   See, e.g., Pls.' Ex. 279A at 31:00, 31:34-34:14.

308.   Information about the fair hearing procedures is publicly available in

Chapter 65-2 of the Florida Administrative Code.

309.   The Policy Manual contains information about fair hearings in the

chapter titled "Administrative Policy."   See Pls.' Ex. 182 at DCF-2717.

310.   The DCF website includes a page on Appeal Hearings.   See Defs.' Ex. 24;

see also Pls.' Ex. 291.   The sidebar of the Appeal Hearings page contains a

link to a page titled "How to Request a Public Assistance Hearing."   See Defs.'

Ex. 24.   The "How to Request" page provides a mailing address, a phone number, an email address, and an online request form.   <u>See</u> Defs.' Ex. 25.

### b. Repayment of Benefits

311.   If a customer seeks a fair hearing before the effective date of the adverse action, the customer can continue receiving benefits until the outcome of the hearing decision.   <u>See</u> Pls.' Ex. 182 at DCF-2742 (Policy Manual, Administrative Policy, Ch. 0430.0604).

312.   As such, the NOCA footer informs customers that they can receive continued benefits if they ask for a hearing before the effective date of the notice.   <u>See</u> Pls.' Ex. 40 at DCF-5280; <u>see also</u> Defs.' Ex. 121 at DCF-7410.

313.   As depicted above, the NOCA footer in use at the outset of this lawsuit and through at least half of the Medicaid unwinding period also cautioned recipients that "[y]ou will be responsible to repay any benefits if the hearing decision is not in your favor."   <u>See, e.g.</u>, Pls.' Ex. 40 at DCF-5280.

314.   Following the modifications in October 2023 (changing "will" to "may"), and most recently in April 2024, the NOCA footer in use at the time of the bench trial explains that: "For Medicaid, you will not be responsible to repay benefits unless we find that you engaged in fraud or an intentional program violation."   <u>See</u> Defs.' Ex. 121 at DCF-7410; <u>see also</u> <u>supra</u> Part I.F.c.4.

315.   Despite this change to the fair hearing information in the NOCA, the Rights and Responsibilities document still informs recipients that "[y]ou will

be responsible to repay any benefits continued if the hearing decision is not in your favor." <u>See</u> Defs.' Ex. 38 at ECF p. 1.

316.   This language also remains in the Rights and Responsibilities pop-up window that appears when a customer logs into the MyAccess account, as well as in the MyAccess account Help Center.   <u>See, e.g.</u>, Pls.' Ex. 278A at 2:50; Pls.' Ex. 279A at 2:40; Pls.' Ex. 279A at 34:14.

317.   In addition, and concerningly, the NOCA that DCF sends to individuals confirming the continuation of benefits pending a fair hearing includes the following warning: "Important: If you lose the hearing, you will have to pay us back the benefits."   <u>See</u> Anderson Test., Tr. Vol. IV at 159-60; Pls.' Ex. 251.

318.   And, the subsection of the Policy Manual concerning fair hearings for Family-Related Medicaid includes a provision on the Continuation of Benefits which instructs that DCF should "[i]nform recipients that they are liable for any overpayment caused by the continuation of benefits, pending the hearing decision."   <u>See</u> Pls.' Ex. 182 at DCF-2742 (Policy Manual, Ch. 0430.0604). Similarly, the ESS Statewide Fair Hearings Procedural Guide also instructs supervisors to inform customers that "they are responsible for any overissuance of benefits if benefits are restored pending the hearing decisions."   <u>See</u> Defs.' Ex. 10 at DCF-2439.

## c. Supervisory Review & Fair Hearing Packets

319.  When DCF receives a request for a fair hearing, ESS policy is to first conduct a supervisory review and conference with the petitioner.  <u>See</u> Goins Test., Tr. Vol. V at 44, 56; Defs.' Ex. 10 at DCF-2438-39.

320.  Supervisory reviews are completed by supervisors or hearing designees that have a higher-level position and larger knowledge base than the case workers who make initial eligibility determinations.  <u>See</u> Goins Test., Tr. Vol. V at 44.

321.  DCF conducts supervisory reviews to help the petitioner understand the decision that was made and the reason for the action taken, as well as to ensure that DCF took the correct action.  <u>Id.</u> at 45.

322.  A supervisory review should happen as soon as possible after an appeal is requested to make sure DCF is addressing the petitioner's concerns and took the correct action.  <u>See id.</u> at 47, 55; Defs.' Ex. 10 at DCF-2438.

323.  To conduct a supervisory review, the supervisor first performs an independent review of the eligibility determination.  <u>See</u> Goins Test., Tr. Vol. V at 46, 56.  In doing so, the supervisor looks at various resources such as the petitioner's application, the NOCAs, the Budget and other FLORIDA screens, applicable policies in the Policy Manual as well as any policy transmittals (i.e., policy updates or special exceptions), the income table, CLRC screen, and the third-party income verifications.  <u>Id.</u> at 56-58.

324.   Then, the supervisor contacts the petitioner to go over the determination process, how the decision was made, the reason for the decision, and the facts used to make the decision.   Id. at 45-47.   This conversation may include a review of the income that was used, any policies applied, income tables, or anything else relevant to the decision.   Id. at 47.

325.   Following the supervisory review, the supervisor compiles the fair hearing packet.   See id. at 48, 49, 55.   A fair hearing packet is the packet of documents that make up the evidence DCF will use in the fair hearing process. Id. at 48.

326.   Notably, DCF does not provide the petitioner with these documents as part of the supervisory review.   Id. at 54-55, 58; see also Defs.' Ex. 10 at DCF-2438-39.   A petitioner can have access to these documents during the supervisory review but would have to know to ask for them.   See Goins Test., Tr. Vol. V at 48, 58.   A petitioner may be able to see the documents if the supervisory review conference is conducted in person, or if the supervisor is able to share his or her screen with the petitioner .   See Goins Dep. at 31-32. But most of the time in practice, petitioners do not have the written materials during the supervisory review.   See Goins Test., Tr. Vol. V at 54; Goins Dep. at 17.

327.   DCF provides the fair hearing packet to the petitioner "as soon as possible but no later than seven days prior to the scheduled hearing."   See Goins Test.,

Tr. Vol. V at 48.   The fair hearing packet is also provided to the Office of Appeals Hearings.   Id.; Defs.' Ex. 10 at DCF-2439.

328.   The information included in the fair hearing packet depends on the issue in the case.   See Goins Dep. at 12.   The supervisor putting the packet together determines what the issue is by reviewing "the issue in the household situation" meaning, the reason the petitioner was denied.   Id. at 12-13.   To determine the basis of the denial, the supervisor looks at the reason code in the NOCA, the comments in the CLRC screen, the Budget screen, and the income provided.   Id. at 13-14.

329.   Common components of the fair hearing packet include the petitioner's application, the NOCA, the CLRC screen, screen prints from the FLORIDA system such as the Budget screen, the earned income or unearned income screens, income verifications such as pay stubs or third-party data, the income table, as well as policies and transmittals.   See Goins Test., Tr. Vol. V at 49-51; Goins Dep. at 11-12; see also Defs.' Ex. 10 at DCF-2439, 2453 (ESS Statewide Fair Hearings Procedural Guide); Pls.' Ex. 129 (Mezquita fair hearing packet).

330.   The income data and the pay period frequency in DCF's possession would be reflected in documents within the fair hearing packet.   See Goins Dep. at 36-39.   But the actual calculations performed to generate the MAGI or countable net income used in the eligibility determination are not shown in

the fair hearing packet. <u>See</u> <u>id.</u> at 39. The supervisor can explain the income calculations during the supervisory review process but, as stated above, this is generally before the petitioner has received the documents. <u>Id.</u> at 16-17.

331. According to Goins, a petitioner could look at the Budget screen to determine the eligibility category under which he or she was evaluated. <u>See</u> <u>id.</u> at 25. In addition, Goins asserts that if a petitioner wanted to know what income standard DCF applied to her case, it would be reflected in the Budget screen. <u>See</u> <u>id.</u>

332. The Court rejects this testimony to the extent Goins was discussing petitioners whose Medicaid benefits were terminated based on income. As explained above, where a petitioner is found ineligible due to income, the Budget screen where that determination was made is deleted by the FLORIDA system. A Medically Needy Budget screen takes its place. Because there is no income standard for the Medically Needy program, there is no income standard reflected in the Medically Needy Budget screen. And the Medically Needy Budget screen will show a Medically Needy category, not the Medicaid eligibility category in which the petitioner's eligibility for full Medicaid was tested. <u>See, e.g.</u>, Pls.' Ex. 29, 31, 100; <u>see also</u> Pls.' Ex. 254.

333. Moreover, the Budget screen relies on abbreviations, acronyms, and Medicaid terms of art that would make it difficult for an untrained person to

understand the information being conveyed.    See, e.g., Pls.' Ex. 101, 104, 133-36; see also Pls.' Ex. 206 at 121.    Indeed, petitioners often have questions about these screens.    See Goins Dep. at 29; Goins Test., Tr. Vol. V at 61. Goins does not expect a petitioner to be able to understand the Budget or income screens from the FLORIDA system without an explanation.    See Goins Dep. at 16-17.    This explanation could be provided during the supervisory review, but again, the supervisory review typically occurs before the petitioner has seen the documents.    Id. at 17.

334.    For Family-Related Medicaid, the applicable SFU is shown on the Budget screen as well as in the comments on the CLRC screen.    See id. at 20-21.

335.    If there was a question about who was counted in the SFU, a screen within the FLORIDA system which shows who is counted and who was excluded could be included in the fair hearing packet.    See id. at 23-24, 33-34, Pls.' Ex. 206 at 106 (showing the AGCD SFU Composition Display screen). Notably, however, Goins has never seen that happen.    See Goins Dep. at 23-24.[44]    Moreover, this screen also uses internal DCF acronyms such that for an untrained viewer it would be impossible to understand without an explanation.    See Pls.' Ex. 206 at 106; see also Goins Dep. at 34.

---

[44] It is not surprising that Goins has never seen this happen given that NOCAs do not inform the enrollee what SFU or household size DCF applied to her case.    Indeed, the NOCAs do not reference household size as a factor in the eligibility determination.    As such, absent some independent understanding of the Medicaid eligibility rules, enrollees would have little reason to raise an issue regarding an SFU determination they know nothing about.

336.  The CLRC screen is routinely included in the fair hearing packet because the CLRC is used to document all actions in the case and would explain DCF's position on the issue in dispute.  <u>See</u> Goins Dep. at 28, 42.  However, Roberts acknowledged that these screens are only sometimes helpful in understanding the eligibility decision, depending on the quality of the comments.  <u>See</u> Roberts Test., Tr. Vol. II at 50.

337.  And like the Budget screen and the AGCD SFU Composition Display screen, the comments on the CLRC screen are replete with acronyms such that they are exceedingly difficult to understand for someone unfamiliar with interpreting them.  <u>See, e.g.</u>, Pls.' Ex. 25, 99, 127; <u>see</u> Goins Dep. at 28-29, 32 (acknowledging that the CLRC comments contain a lot of acronyms and that to her knowledge a glossary of acronyms is not provided in the fair hearing packet); <u>see also</u> Roberts Test., Tr. Vol. II at 54, 57, 81-83, 136-37, 138-39 (discussing meaning of comments in CLRC screens).  Indeed, petitioners often have questions about this screen.  <u>See</u> Goins Dep. at 29; Goins Test., Tr. Vol. V at 61.

338.  After the supervisory review, DCF does not require supervisors to further discuss the contents of the fair hearing packet with petitioners.  <u>See</u> Goins Test., Tr. Vol. V at 60-61.

339.  Nevertheless, a petitioner can call her assigned DCF contact to ask questions at any point.  <u>Id.</u> at 60-61.  Indeed, upon filing a fair hearing

request, the petitioner will receive an "Acknowledgment of Hearing Request" which includes the name and phone number of a "Department/Agency contact." <u>See</u> Defs.' Ex. 66; <u>see also</u> Goins Test., Tr. Vol. V at 48-49, 60-61; Jones Test., Tr. Vol. V at 88-89. The petitioner is told to contact this person with "any questions about your case . . . ." <u>See</u> Defs.' Ex. 66.

### d. Outcomes

340.   When a petitioner requests a fair hearing in a Medicaid case, DCF must hold the hearing and issue a final order within ninety days. <u>See</u> Jones Test., Tr. Vol. V at 86.

341.   The OAH uses a case management system to track all fair hearings. <u>See</u> <u>id.</u> at 82. Once a hearing request is received, it is docketed within the case management system and any actions taken on the case are notated on the case record. <u>Id.</u>

342.   The possible case dispositions are: denied, granted, partially denied and partially granted, dismissed, abandoned, or withdrawn. <u>See</u> <u>id.</u> at 83; <u>see also</u> Pls.' Ex. 283.

343.   A case is denied when the OAH has found that DCF's determination in the case was correct. <u>See</u> Jones Test., Tr. Vol. V at 83. A case is granted when the hearing officer determines that DCF has done something incorrect that needs to be corrected. <u>Id.</u>

344.   A request is considered abandoned when the petitioner fails to appear at the scheduled hearing.   <u>Id.</u> at 85.   A case is withdrawn when the petitioner states that they no longer wish to pursue their fair hearing request.   <u>Id.</u> at 84.

345.   A petitioner may withdraw the request for any reason.   <u>Id.</u>   Often, a petitioner will withdraw the request because her benefits were reinstated through the supervisory review process.   <u>Id.</u>   Alternatively, a petitioner may withdraw because having gone through the supervisory review process and considered DCF's evidence, the petitioner concludes the decision is correct and no longer wishes to pursue the case.   <u>Id.</u> at 84-85.

346.   Although a petitioner does not have to give a reason for a withdrawal, the OAH does notate in its case management system if a petitioner reports that she is withdrawing the appeal following a change to her case.   <u>Id.</u> at 100-01.

347.   Withdrawals are the most common outcome.   <u>See id.</u> at 85.   The office also sees slightly more abandoned cases than actual hearings held.   <u>Id.</u>

348.   DCF received 11,134 fair hearing requests regarding Medicaid between April of 2023, when redeterminations resumed, and May 1, 2024.   <u>Id.</u> at 97-98; Pls.' Ex. 283.

349.   Based on DCF's data, 7,874 of these appeals were withdrawn, and 1,978 of these appeals were abandoned.   <u>See</u> Jones Test., Tr. Vol. V at 102-04; Pls.'

Ex. 283.   Notably, DCF data shows that most of the withdrawals (5,415 cases) occurred <u>with</u> a reported change.   <u>See</u> Jones Test., Tr. Vol. V at 104.

350.   Fair hearings were conducted in 484 of the 11,134 requests.   <u>See</u> <u>id.</u> at 85.   Of the 484 fair hearings that were held, 52 were granted in favor of the petitioner, and 17 were partially granted, partially denied.   <u>Id.</u> at 98-99; Pls.' Ex. 283.

351.   Thus, based on the number of final hearing decisions granting or partially granting relief, combined with the reports of a withdrawal with change, nearly half of the requests for a fair hearing in this time period resulted in a change to the petitioner's eligibility status in some way.   <u>See</u> Jones Test., Tr. Vol. V at 104-05.

## J. Plaintiffs and Class Members

352.   DCF records show that 497,918 individuals were terminated from Medicaid based on income between March 2023 and March 2024, and had not been reinstated as of March 2024.   <u>See</u> Davis Test., Tr. Vol. V at 178; Defs.' Ex. 132.   Based on data in its possession, DCF can determine the identity of all these individuals.   <u>See</u> Davis Test., Tr. Vol. V at 181.

353.   DCF presents evidence that the average monthly cost of the Medicaid benefits provided to these individuals during the six-month period prior to their termination was $313.23 per person.   <u>See</u> Cooper Test., Tr. Vol. III at 185, 187-89.   As such, DCF estimates that the cost of reinstating Medicaid

benefits for this entire group of people would be $155 million per month.   <u>See</u> State Proposal at 41.   Significantly, however, this estimate includes the share of Medicaid benefits that is paid for by the federal government.   <u>See</u> Cooper Test., Tr. Vol. III at 188.   The federal share would cover over half the cost. <u>See</u> <u>id.</u> at 204-05; <u>see also</u> JPS, Part VIII ¶ 4 ("Florida currently receives a federal matching rate of approximately 60% (60 cents of every dollar spent) for Medicaid services.").

354.   The Court next discusses the experiences of the named Plaintiffs and Class Member who testified in this case.   Their experiences demonstrate how the flaws in the State's notice practices discussed above are more than just academic.   The vague, convoluted, and misleading NOCAs cause real harm in the form of lost time, stress, anxiety, and in some cases, the erroneous termination of benefits.   Moreover, their experiences show how the call center is difficult to access and unreliable, and the other sources of information are inadequate to alleviate the harm caused by the nonsensical NOCAs.

### a. Chianne D. and C.D.

355.   Plaintiff Chianne D. is married with two children, Plaintiff C.D. (age three), and S.D. (age one).   <u>See</u> Chianne D. Test., Tr. Vol. II at 182.

356.   Her husband works in construction, and she works in life enrichment at a senior independent living facility.   <u>Id.</u> at 182-83.

357. C.D. has cystic fibrosis which requires routine visits with a team of doctors as well as extensive medications.  <u>Id.</u> at 183-84.

358. Chianne D. and her daughter, C.D., were first enrolled in Medicaid at some point before February 2023.  <u>See</u> JPS, Part VIII ¶ 40.

359. On March 20, 2023, DCF sent a renewal request to Chianne D. explaining that it was time to review her case to determine if her household was still eligible for Medicaid and/or Medically Needy.  <u>See</u> Chianne D. Test., Tr. Vol. II at 189; Pls.' Ex. 36.

360. Accordingly, Chianne D. submitted a renewal application on March 21, 2023.  <u>See</u> Chianne D. Test., Tr. Vol. II at 189-90; Pls.' Ex. 66 at 3.

361. On April 4, 2023, DCF asked Chianne D. to provide proof of loss of income concerning her husband's former job.  <u>See</u> Chianne D. Test., Tr. Vol. II at 191-92; Pls.' Ex. 38.  After calling DCF for clarification, Chianne D. provided the requested proof on April 11, 2023.  <u>See</u> Chianne D. Test., Tr. Vol. II at 192-93; Pls.' Ex. 39; Defs.' Ex. 72.

362. DCF terminated Chianne D. and C.D.'s Medicaid coverage, effective May 31, 2023, after determining that their household income exceeded the applicable income limit for each of them.  <u>See</u> JPS, Part VIII ¶¶ 44-45, 48.

363. As a result, on April 24, 2023, DCF issued a NOCA to Chianne D.  <u>See</u> Pls.' Ex. 40.  Chianne D. first recalls seeing this NOCA in her MyAccess account around May 29 or May 30.  <u>See</u> Chianne D. Test., Tr. Vol. III at 37.

364.  But Chianne D. first learned that she and C.D. would be losing their Medicaid coverage when she called her health insurance provider, United Healthcare, about an unrelated issue.  <u>See</u> Chianne D. Test., Tr. Vol. II at 193-94.

365.  As a result of this call with United Healthcare, Chianne D. called the DCF call center on May 30, 2023, to find out more information.  <u>Id.</u> at 194-95; Defs.' Ex. 73 (audio).

### 1. First Call

366.  On this call, Chianne D. speaks to a call center agent who tells her that S.D.'s Medicaid will end on April 30, 2024, and that she and C.D.'s Medicaid "are good, which are Medically Needy, you both have Medicaid until May of 2024." <u>See</u> Defs.' Ex. 73.  Neither Chianne D., nor the call center agent, appear to appreciate the distinction between Medically Needy and full Medicaid.  <u>Id.</u>  When Chianne D. explains what she was told by UnitedHealthcare, the agent sounds very confused about the "conflicting" information she is seeing on the screen.  <u>Id.</u>

367.  The call center agent states that she is reviewing Chianne D.'s information and "trying to figure this out."  <u>Id.</u>  Eventually, the agent concludes that "yes, the Medicaid has been extended," but it was not updated in the system.  <u>Id.</u>  The agent tells Chianne D. that she's going to transfer the call so that the Medicaid system can be updated and "the benefits will

continue." <u>Id.</u>   The agent then attempts to transfer her to a "senior agent"
who can make the "corrections" and "get everything continued the way it needs
to be." <u>Id.</u>

368.   The call center agent's statements about Chianne D. and C.D.'s eligibility
for Medicaid are wrong.   <u>See</u> Roberts Test., Tr. Vol. II at 78-79.

369.   Upon transfer, Chianne D. recounts her conversation with the first agent.
<u>See</u> Defs.' Ex. 73.   The second call center agent explains that he is a Tier 1
agent and cannot assist her.   The agent must reverify her identity, and then
attempts to transfer Chianne D. to a Tier 3 agent.   At this point, the recording
ends.   Chianne D. was unable to speak to a Tier 3 agent on this call.   <u>See</u>
Chianne D. Test., Tr. Vol. II at 195.

## 2. Second Call

370.   Chianne D. places another call to the call center later that same day, May
30, 2023.   <u>See</u> Defs.' Ex. 74 (audio); <u>see also</u> Pls.' Ex. 62 at DCF-3937 (Phone
Call (1) Tr.)   At this point, the call center agent tells Chianne D. that she and
C.D. are in Medically Needy and that "what you'll have to do is go ahead and
reapply.   That's probably why they got you in the medically needy." <u>See</u>
Phone Call (1) Tr. at DCF-3940.   Chianne D. does not appear to understand
what Medically Needy means and the agent does not explain it. <u>Id.</u>; <u>see also</u>
Chianne D. Test., Tr. Vol. II at 198 (explaining that she thought her daughter
being medically needy meant needing extra medical assistance).

371. Having spoken to the first agent, Chianne D. does not accept the suggestion that she needs to reapply and explains "the first lady that I talked to, she said that someone from tier three would be able to edit something in the system if something is an error." See Phone Call (1) Tr. at DCF-3941. The agent responds that Chianne D. and C.D. are in medically needy "because it says your income is too high." Id. But, given her conversation with the first agent, Chianne D. asserts that her income was too high for food assistance, but not for medical assistance, and asks the agent to just transfer her to a Tier 3 agent. Id. Although the agent says he is transferring her as requested, the transfer was unsuccessful. Id.; see also Chianne D. Test., Tr. Vol. II at 196.

### 3. Third Call

372. Chianne D. calls again the next day, May 31, 2023, and is able to speak to a Tier 3 agent. See Defs.' Ex. 75 (audio); Pls.' Ex. 62 at DCF-3944 (Phone Call (2) Tr.). She explains that her MyAccess account shows that Medicaid is ending for her and C.D., but that other agents have told her it was active for another year. See Phone Call (2) Tr. at DCF-3947.

373. The Tier 3 agent explains that "your regular Medicaid" is ending and explains that due to the end of the COVID public health emergency, DCF is reevaluating Medicaid beneficiaries based on the regular eligibility requirements. Id. at DCF-3948-49.

374.   The call center agent informs Chianne D. that Medicaid for the "newborn baby" is open, but that Chianne D. and C.D. are now in Medically Needy.   Id. at DCF-3950-51.   She states that C.D.'s Medicaid is closed because of the amount of income.   Id. at DCF-3951.   When Chianne D. expresses her concerns about the cost of C.D.'s medications and her confusion over the decision, the agent repeats that it was due to income and explains how the Medically Needy program works.   Id. at DCF-3951-56.   The agent also tells Chianne D. about the NOCA in her MyAccess account and explains that there is important information regarding the Medically Needy program in that letter.   Id. at DCF-3953-54.

375.   The agent explains that she should have received a NOCA "letting [her] know that [her] medical plan had changed and that [she was] no longer eligible for Medicaid and that [she was] under medically needy."   Id. at DCF-3953.

376.   Chianne D. then asks why her newborn son is ineligible, and there is a long pause as the Tier 3 agent looks for the answer in the NOCA.   See Defs.' Ex. 75 at 19:49-19:59.   She reads out loud "ineligible for Medically Needy," but apologizes "I'm going backwards so bear with me," and then appears to answer the question with the statement "[h]ousehold income is too high," and

then repeats "your household income is too high for this Medicaid." Id. at
19:59-20:28.[45]

377.   Chianne D. then asks in frustration, "do I basically have to be dirt poor
in order for my medically needy daughter to get correct assistance?" See id.
at 20:31-40; see also Phone Call (2) Tr. at DCF-3955.   The agent responds
that she is "not qualified to answer that question." See Phone Call (2) Tr. at
DCF-3955.

378.   Chianne D. stayed awake late into the night reviewing this NOCA and
"writing a question for every single thing that was on that notice." See
Chianne D. Test., Tr. Vol. II at 199-200; Pls.' Ex. 40.[46]

---

[45] This is a compelling example of the problem with the NOCAs and the limitations of
the call center.   As discussed in detail below, the first Medicaid section of the April 24, 2023
NOCA reflects a determination that S.D. is ineligible for Medicaid due to income.   See Pls.'
Ex. 40 at DCF-5272.   It is this section of the NOCA that the call center agent appears to reach
when she confidently, but incorrectly, answers "household income is too high." Id.   The Tier
3 agent appears to have missed a different section of the NOCA, on page seven, which states
that S.D. is eligible for "Medicaid for Newborn Babies." Id. at DCF-5277.   The call center
agent misunderstood the NOCA due to its multiple sections and gave Chianne D. the wrong
answer here.   The agent made this error despite having recognized earlier in the call that
S.D.'s Medicaid was open.   This exemplifies how the organization and structure of the NOCAs
are confusing to even trained DCF employees.

In addition, this call demonstrates that call center agents, even Tier 3 agents, are not
Medicaid eligibility specialists and thus unlikely to detect mistakes.   For example, although
the agent knew S.D. was a newborn, she did not realize that "household income is too high"
would not apply to S.D. as an infant eligible for continuous coverage.   The agent also did not
piece together that S.D.'s status as a newborn would mean that Chianne D. should be eligible
for continuous postpartum coverage.   As is exemplified in this and the other calls discussed
below, the information a caller receives from the call center is only as good as the questions
she asks.   But the more confusing the NOCA, the less likely the caller will be able to ask the
right questions.

[46] It is unclear when Chianne D. first read the NOCA.   She first recalls seeing the
NOCA on May 29th or May 30th.   See Chianne D. Test., Tr. Vol. III at 37.   She may have

**4. The April 24, 2023 NOCA (Pls.' Ex. 40)**

379.  The April 24, 2023 NOCA referenced on the call contains eight different sections concerning health benefits, as well as a section on food assistance. <u>See, e.g.</u>, Pls.' Ex. 40.  Specifically, the NOCA has four "Medically Needy" sections, two "Medicaid" sections, a section on "Medicaid for Unborn Babies," and a section on "Medicaid for Newborn Babies."  <u>See id.</u>  The section of the NOCA which is supposed to convey that Chianne D. and C.D.'s Medicaid benefits will be terminated is on page eight of the eleven-page NOCA.  <u>Id.</u> at DCF-5278.

380.  The first Medicaid section states that "[y]our Medicaid application/review dated April 21, 2023 is denied" and lists all four members of the household as "[i]neligible" for the months of April, May, and June 2023.  <u>See</u> Pls.' Ex. 40 at DCF-5272.  The Designated Reason is: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM."  <u>Id.</u> No legal citation is provided.  <u>Id.</u>

381.  Presumably, this reference to assistance from another program means the Medically Needy program, which is mentioned later in the NOCA.  This is incorrect for at least three reasons.  One, the Medically Needy program is

_____

seen it in April when it was issued but just skimmed it at the time.  <u>Id.</u>  Based on her testimony, and the content of her conversations with the call center, the Court finds that Chianne D. first read the NOCA in detail on this occasion.

not "the same type of assistance" as full Medicaid.    See Roberts Test., Tr. Vol. II at 64.    Two, as shown elsewhere in the NOCA, Chianne D. and C.D. are enrolled in the Medically Needy program, but that is not one of the reasons for their termination from full Medicaid.    And three, Chandler D. (Chianne D.'s husband) is listed in this section but, according to other sections of the NOCA, is not enrolled in Medically Needy or any other program.

382.    In addition, despite listing S.D. as ineligible in this first Medicaid section, DCF had not found S.D. ineligible for Medicaid.    A later section of the NOCA states that S.D. is eligible for Medicaid as a newborn, and his Medicaid benefits were not terminated at this time.    See Pls.' Ex. 40 at DCF-5277-78.

383.    The next section of the NOCA is labeled "Medically Needy" and states that the application for Medically Needy is approved.    See id. at DCF-5273. This section lists Chianne D. as "Enrolled" for June 2023, and ongoing.    Id. S.D. and Chandler D. are both listed as ineligible.    Id.    The Income Exceeds Sentence is placed above the Medically Needy header.    See id. at DCF-5273. And the standard Medically Needy information is included in this section.    Id. at DCF-5273-74; see also supra Part I.F.c.2.    While S.D. is presumably ineligible for the Medically Needy program because he will continue receiving full Medicaid benefits, the Court cannot determine why Chandler D. is found ineligible for the Medically Needy program here.

384.   This section is followed by another "Medically Needy" section which states that the Medically Needy "application/review" is denied.   See Pls.' Ex. 40 at DCF-5274.   All four members of the family are listed as "Ineligible" for the months of April and May 2023.   Id.   The Designated Reason in this section is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM."   Id.   Presumably, this Designated Reason is a reference to the family's continued receipt of Medicaid benefits in April and May 2023.   But this interpretation is far from intuitive given that the first Medicaid section had just informed the reader that these same four individuals were ineligible for Medicaid in April and May 2023.   The NOCA includes a citation to rule 65A-1.702 of the Florida Administrative Code in this section.   It is unclear to the Court why this regulation is cited.   The regulation requires that when an individual becomes ineligible under one coverage group DCF must consider eligibility under other coverage groups. See Part I.F.b.   It does nothing to shed light on the reason for the decision reflected in this section of the NOCA.

385.   The third Medically Needy section identifies C.D. as enrolled for June 2023, with S.D. and Chandler D. listed as ineligible.   See Pls.' Ex. 40 at DCF-5275.   And the fourth Medically Needy section again lists all four family members as ineligible for April and May of 2023, repeating the inaccurate Designated Reason that "YOU ARE RECEIVING THE SAME TYPE OF

ASSISTANCE FROM ANOTHER PROGRAM," with the same unhelpful regulatory citation.   Id. at DCF-5276.

386.   The four Medically Needy sections are followed by a Medicaid for Unborn Babies section and a Medicaid for Newborn Babies section.   Id. at DCF-5277. The Medicaid for Newborn Babies section lists S.D. as "Eligible" for June 2023 and ongoing, and Chianne D. as "Ineligible."   Id.

387.   The last program section of the NOCA advises that "Your Medicaid benefits for the person(s) listed below will end on May 31, 2023."   Id. at DCF-5278.   This section lists C.D., Chianne. D. and her husband, but not S.D.   Id. The Designated Reason provided in this section is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]"   Id. Although this is the section of the NOCA intended to convey the termination of Medicaid benefits, it does not reference income at all.   Id.   Despite what is stated in the Designated Reason, none of the individuals listed in this section were receiving "the same type of assistance" from another program.   Nor would this have been the reason benefits were terminated.   The supporting law cited is section 414.095 of the Florida Statutes which pertains to temporary cash assistance and is completely irrelevant.   Id.

388.   The tenth page of the NOCA has the standard footer language—"You will be responsible to repay any benefits"—that was in use at the time.   See id. at DCF-5280; see also supra Part I.F.c.4.

389.   In reviewing this NOCA, Chianne D. understood that Medicaid benefits for her and C.D. were ending, the date on which their benefits would end, and that their benefits were being terminated because their income was too high. See Chianne D. Test., Tr. Vol. III at 21-23.   Chianne D. also understood that she had a right to request a fair hearing.   Id. at 25-26, 31.

390.   Nevertheless, Chianne D. had questions about why her income was too high, and what amount of income was reported.   See Chianne D. Test., Tr. Vol. II at 201.   She also had questions about what it meant to receive the same assistance from another program and what the "mystery program" was from which they were receiving the same assistance.   Id.   And she questioned the reason for the back-and-forth approvals and denials.   Id.

### 5. Fourth Call

391.   With her list of questions, Chianne D. called the call center again on May 31, 2023.   Id. at 199, 201-02; see also Pls.' Ex. 62 at DCF-3959 (Phone Call (3) Tr.).   On this twenty-eight-minute call, Chianne D. attempted to go through her list of questions about the NOCA.   See Chianne D. Test., Tr. Vol. II at 202.

392.   Notably, Chianne D. asks what "other program" they were receiving assistance from as reflected in the Designated Reason for the Medicaid denial on page two.   See Phone Call (3) Tr. at DCF-3962-63.

393.    The call center agent responds: "There's no other program.    It's basically—the full Medicaid that she had was the other program, the full Medicaid ended [so] she's now enrolled into Share of Cost.    That's what that means."    Id.    When Chianne D. presses that it "says specifically that we were receiving the same assistance from another program," the agent explains again, "[t]hat's what that means.    Receiving the benefits from another program means she's now under Share of Cost."    Id. at DCF-3963.    Chianne D. could not hear the answer so the agent repeats, "[r]eceiving benefits from another program means she's now under a different Medicaid category."    Id. This prompts Chianne D. to ask what Medicaid category and the agent answers: "Share of Cost.    I said she was under a different category, which was full Medicaid, now she's under Share of Cost Medicaid.    That's what the other program is referring to."    Id.

394.    The call center agent's answer is insufficient to clarify the misleading and inaccurate Designated Reason provided in the NOCA.    The agent tells Chianne D. that the reference to "another program" in the Designated Reason does not actually mean another program, but instead means C.D. is now under a "different Medicaid category," specifically, Medically Needy (share of cost). This explanation is unhelpful because, as previously noted, referring to the Medically Needy program as a "Medicaid category" is confusing in that it conflates the distinct Medically Needy program with the Medicaid coverage

groups.   See supra note 20.   Likewise, the agent's explanation that "[r]eceiving the benefits from another program means [C.D. is] now under Share of Cost," while technically accurate in terms of what action DCF had taken, fails to acknowledge or explain the inaccurate statement in the NOCA that advises C.D. that she is receiving the "same type of assistance" from the other program.   The Medically Needy program is unequivocally not the "same type of assistance" as Medicaid.   Given this confusing and contradictory information, Chianne D. must decide whether to believe what is written in the NOCA, what this call center agent is telling her, or what a previous call center agent has told her.

395.   The agent's answer is also misleading and confusing to Chianne D. since the NOCA identifies "receiving the same type of assistance from another program" as a reason for the denial of C.D.'s Medicaid benefits.   Id. at DCF-3963-64.   When Chianne D. responds "okay, so she got denied because she was on Medicaid originally," the agent cuts her off with "That's not what I said.   I said she was under a different Medicaid category, which was full Medicaid.   So now she's under a new category, Share of Cost, due to income." Id. at DCF-3964.

396.   At this point, Chianne D. moves on to her next question—how the income was determined.   Id.   The call center agent explains generally how income is calculated and provides Chianne D. with the specific amount of income DCF

attributed to her household, including the dates and amounts of the pay stubs

on which it was based.   See id. at DCF-3964-65.

397.   Chianne D. asks about the back-and-forth Medically Needy approval and

denials reflected in the NOCA.   Id. at DCF-3965-66.   The agent explains that

these sections govern different time periods, and that Medically Needy was

denied for April and May because C.D. had full Medicaid those months.   Id.

at DCF-3966.   But this answer confuses Chianne D. because the NOCA states

that C.D. was ineligible for Medicaid in April and May.   Id.

398.    Chianne D. asks for the name of the case worker who worked on her case

and the call center agent tells her that she cannot give out the case worker's

name.   Id. at DCF-3972.

399.   In addition, Chianne D. asks whether her daughter was transferred to

Florida KidCare.[47]   Id. at DCF-3976.   The call center agent tells her that

DCF referred C.D. to KidCare on April 24, which Chianne D. does not accept

given a previous conversation she had with KidCare.   Id.   Chianne D. tells

the agent that KidCare does not have C.D.'s information and the agent

responds "[t]he system automatically sends it over.   We can send out another

one."   Id. at DCF-3977.

---

[47] Florida KidCare is Florida's CHIP program for children ages five and older.   See
Class Certification Order at 5 n.3.

400.   Ultimately, Chianne D. expresses her view that "something was done incorrectly," and the call center agent explains the fair hearing process.   Id. at DCF-3979.

401.   Chianne D. is frustrated and angry about the termination of her disabled daughter's Medicaid without, what she feels, was proper notice.   Id. at DCF-3977-80, DCF-3984.[48]   And she points out that she was told by the first agent she spoke to that she and C.D. "were still cleared for insurance through 2024." Id. at DCF-3980.   The call center agent is also audibly frustrated as Chianne D. persists with her questions and will not accept the agent's explanations.

402.   The call center agent continues to point Chianne D. to the hearing process in an attempt to end the call and informs Chianne D. that someone will call her to go over her application with her.   Id. at DCF-3980-84.

### 6. Fifth Call

403.   On June 1, 2023, Chianne D. receives a call from an individual who identifies herself as "Ms. Morrison" from DCF.   See Defs.' Ex. 77 (audio); Pls.' Ex. 62 at DCF-3988 (Phone Call (4) Tr.) at DCF-3991.   She does not state her position with DCF but at the end of the call identifies herself as being with the call center.   See Phone Call (4) Tr. at DCF-4003.

---

[48] The Court uses the term disabled because Chianne D. refers to her daughter as disabled and there is no dispute that C.D. has significant medical needs.   But C.D. was not enrolled in SSI-Medicaid, i.e., disability-based Medicaid, and SSI-Medicaid is not at issue here.

404.   Morrison explains in more detail how DCF calculated Chandler D.'s income based on pay stubs from February and March to reach $5,418.28.   Id. at DCF-3991-94.   When Chianne D. asserts that Chandler D. does not currently make that much, Morrison is able to pull more recent data from April and May.   Id. at DCF-3994-95.   This more recent data showed that Chandler D.'s income had decreased slightly, so Morrison explains that Chianne D.'s share of cost would also decrease.   Id. at DCF-3995.

405.   Chianne D. does not understand why the share of cost is nearly equal to her family's total income and asks Morrison to explain the formula for calculating share of cost.   Id. at DCF-3997.   Morrison then explains:

> [W]e take based on his pay frequency, based on date of app, based on the current four weeks of pay your husband made, it looks at that income, adds it all together, where that income amount is, then it looks at whatever the state standard is, it puts you in a Share[] of Cost program.   Your income is too high to receive full Medicaid.   What it does is it takes your gross income of [Chandler D.] income and the state adjusts $20, they call it disregard, and the difference will be the Share[] of Cost amount.   That's how it's calculated.

See id. at DCF-3997-98.

406.   Morrison's explanation of how the Share of Cost is calculated is incorrect.   See Roberts Test., Tr. II at 67, 72.

407.   Chianne D. also expresses concern over DCF's apparent failure to transfer C.D. to Florida KidCare.   See Phone Call (4) Tr. at DCF-4001-02.

408.   There are long pauses in the conversation as Morrison looks for
information, moments where the connection is garbled or the two individuals
speak over each other, and interruptions as Chianne D. attends to the needs
of her children.   <u>See generally</u> Defs.' Ex. 77.

409.   As in the prior call, this call is also contentious.   Both Chianne D. and
the agent quickly grow frustrated with each other.   From the audio, it is
apparent the agent is annoyed that Chianne D. will not accept her
explanation.   And Chianne D. sounds angry and frustrated that DCF would,
in her mind, leave a child who has complex medical needs without medical
insurance.

### 7. Sixth Call

410.   Chianne D.'s representative, Jarvis Ramil, also called the call center on
June 1, 2023.   <u>See</u> Pls.' Ex. 62 at DCF-4008 (Phone Call (5) Tr.); <u>see also</u>
Chianne D. Test., Tr. Vol. III at 42.   He inquires whether C.D. was referred
to KidCare.   <u>See</u> Phone Call (5) Tr. at DCF-4009.   The agent cannot tell
whether DCF did or did not send the application and she tells him she will
send it over.   <u>Id.</u> at DCF-4009-10.   He also asks "what's being counted for
income and what sources of income are in the budget."   <u>Id.</u> at DCF-4010.
The agent explains DCF relied on Chandler D.'s income of $5,418.   <u>Id.</u>

## 8. Fair Hearing

411.   On June 1, 2023, DCF call center staff submitted a fair hearing request on Chianne D.'s behalf.   See JPS, Part VIII ¶ 50.   DCF scheduled Chianne D.'s fair hearing for July 20, 2023, to be conducted by telephone.   See Chianne D. Test., Tr. Vol. III at 14; Pls.' Ex. 43.   At Chianne D.'s request, the hearing was moved up to July 3, 2023.   See Chianne D. Test., Tr. Vol. III at 14-15; Pls.' Ex. 46.

412.   Chianne D. did not receive a call from DCF concerning her appeal.   See Chianne D. Test., Tr. Vol. III at 16.   Nor did she receive a fair hearing packet. Id.

413.   On June 28, 2023, the OAH emailed Chianne D. to notify her that the July 3, 2023 hearing was cancelled because state offices would be closed for the July Fourth holiday, and that the hearing was rescheduled for July 13, 2023.   See JPS, Part VIII ¶ 53; see also Chianne D. Test., Tr. Vol. III at 15-16; Pls.' Ex. 47.   That same day, Chianne D. emailed the OAH to withdraw her appeal.   See JPS, Part VIII ¶ 54.

## 9. Outcome

414.   Chianne D. could not afford to have KidCare insurance activated for C.D. in June because, for unknown reasons, DCF had not submitted the application until after the start of the month.   See Chianne D. Test., Tr. Vol. III at 43. According to Chianne D., once the month had started, "[i]t would have cost

double to have it activated in June . . . ."  Id.  Thus, C.D. was not enrolled in

KidCare until July.  Id. at 10, 43.  During the month of June, C.D. incurred

medical expenses, most notably for a visit to an emergency room.  Id. at 10-

13.  C.D. also missed one of her prescription medications for two weeks.  Id.

at 13.

415.  As to Chianne D.'s eligibility, when she withdrew her appeal she was

around four months postpartum following the birth of S.D.  See id. at 16-17.

She did not know at the time that she was eligible for continued Medicaid

coverage during the postpartum period.  See id.

416.  Due to a reoccurring error in the FLORIDA system, DCF had closed

Chianne D.'s postpartum continuous coverage after only two months, rather

than twelve months, and improperly evaluated her in the parent/caretaker

category where income limits apply.  See Roberts Test., Tr. Vol. II at 63-64,

147.

417.  Nothing in the NOCA informed Chianne D. that DCF had terminated her

postpartum continuous coverage and evaluated her under the

parent/caretaker category.  See generally Pls.' Ex. 40.  Indeed, although

DCF's determination that Chianne D.'s postpartum continuous coverage

period had ended was a significant reason for the termination of her benefits,

this reason is not referenced anywhere in the NOCA.  None of the call center

agents mentioned this change in Chianne D.'s coverage group either.

418.  Chianne D. later learned from her legal team that she was eligible for Medicaid.  <u>See</u> Chianne D. Test., Tr. Vol. III at 18.  And DCF learned of the error from this lawsuit.  <u>See</u> Roberts Test., Tr. Vol. II at 83.  In September 2023, DCF reinstated Chianne D. to Medicaid, retroactive to June 1, 2023, based on its determination that her coverage was erroneously terminated.  <u>See</u> JPS, Part VIII ¶ 46.

419.  DCF's standard practice when it terminates someone in error is to provide retroactive coverage back to the month that coverage was erroneously closed.  <u>See</u> Roberts Test., Tr. Vol. II at 84.

420.  Chianne D.'s eligibility for Medicaid ended as of March 1, 2024, and at the time of the bench trial, she remained ineligible for Medicaid.  <u>See</u> JPS, Part VIII ¶ 47.

### b. Kimber Taylor & K.H.

421.  At the time of trial, Plaintiff Kimber Taylor was thirty-eight weeks pregnant with her second child.  <u>See</u> Taylor Test., Tr. Vol. I at 17.  She had some college education and professional certifications, and had worked in a group home for individuals with psychological and mental disabilities since March of 2019.  <u>See</u> <u>id.</u> at 15-16.

422.  Taylor first applied for Medicaid in November 2022, while pregnant with Plaintiff K.H.  <u>See</u> <u>id.</u> at 18-19.  Her application was approved.  <u>Id.</u> at 18; <u>see also</u> JPS, Part VIII ¶ 61.

423.   On March 20, 2023, she received a Notice of Eligibility Review from DCF informing her that her food assistance and cash assistance benefits would end in April 2023 unless she reapplied.   See Taylor Test., Tr. Vol. I at 19-21; Pls.' Ex. 105 at DCF-5656.   Notably, the document informed her that if a member of her household was on Medicaid, "your review may be due at a future date." See Pls.' Ex. 105 at DCF-5656.   Thus, Taylor did not believe her Medicaid benefits were subject to renewal at that time.   See Taylor Test., Tr. Vol. I at 20.

424.   Taylor submitted a renewal as instructed.   Id. at 21.   She subsequently received a NOCA dated April 26, 2023, informing her that her food assistance application was denied.   See Pls.' Ex. 108.   The NOCA also included sections for "Medicaid," "Medicaid for Unborn Babies," and "Medicaid for Newborn Babies."   See id. at DCF-5671.   In the Medicaid section, the NOCA stated that Taylor was eligible for "continued Medicaid coverage" but did not explain what "continued" coverage meant or provide a timeframe.   Id.   In the Medicaid for Newborn Babies section, it stated that her newborn baby "is eligible for Medicaid starting June 01, 2023."   Id.

425.   On May 8, 2023, Taylor submitted a change report to DCF in which she explained that due to her high-risk pregnancy, she was starting FMLA maternity leave and would be out longer than six weeks.   See Taylor Test., Tr. Vol. I at 22-24; Pls.' Ex. 106.   Because the FMLA leave would be unpaid,

Taylor reported her amount of pay as zero.    See Taylor Test., Tr. Vol. I at 24; Pls.' Ex. 106.    Taylor also submitted a benefits application to DCF on May 8, 2023.    See Pls.' Ex. 109.    She reported both her amount of pay and her hours worked per month as zero.    Id. at DCF-5991.    Under the "Benefit Information" section of this application, the "Cash assistance for myself and my family," and the "Family Medicaid" boxes are selected.    See id. at DCF-5988-89.[49]

426.    Due to her pregnancy and the physically demanding nature of her employment, Taylor stopped working on May 11, 2023.    See Taylor Test., Tr. Vol. I at 18, 23.

427.    K.H. was born in May 2023.    See id. at 19, 25.    A few days after he was born, Taylor checked her MyAccess account and found that it had already been updated with his birth.    Id. at 25.    K.H. was enrolled in Medicaid on May 22, 2023.    See JPS, Part VIII ¶ 62.

---

[49] Taylor appears to believe this application was for cash assistance only, not Medicaid. See Taylor Test., Tr. Vol. I at 27.    The version of the application in the record is the one contained within DCF's internal ACCESS Management System, which is different than the version that Taylor completed.    See Pls.' Ex. 109; see Roberts Test., Tr. Vol. II at 52, 65-66, 98 (acknowledging the two versions of the applications).    Thus, it is unclear whether Taylor checked the Medicaid box or if it was automatically populated based on the benefits she was already receiving.    As explained above, the system automatically reevaluates an individual's Medicaid benefits when an individual applies for cash or food assistance.    See Roberts Test., Tr. Vol. II at 10-11; Anderson Test., Tr. Vol. IV at 121.

### 1. The June 8, 2023 NOCA (Pls.' Ex. 112)

428.  After K.H.'s birth, Taylor received a NOCA from DCF dated June 8, 2023. See Taylor Test., Tr. Vol. I at 26; Pls.' Ex. 112.  The first page of the NOCA stated that Taylor and K.H. were ineligible for cash assistance based on income.  See Pls.' Ex. 112 at DCF-5660.

429.  The next three pages of the NOCA contain two sections labeled "Medically Needy."  Id. at DCF-5661-63.  The first Medically Needy section states that "Your application for Medically Needy dated May 08, 2023 is approved[,]" and identifies K.H. as enrolled in July 2023 and ongoing.  Id. at DCF-5661. The section identifies Taylor as ineligible, but no Designated Reason is provided. Id.  This section has the standard Medically Needy template information, including the Income Exceeds Sentence directly above the Medically Needy header.  Id. at DCF-5661-62.  But this statement does not appear to apply to Taylor as she is listed as ineligible for Medically Needy.

430.  The second "Medically Needy" section states that "Your Medically Needy application/review dated May 8, 2023" is denied for May and June 2023, and lists K.H. and Taylor as "Ineligible" for those months.  Id. at DCF-5662-63. The Designated Reason listed is "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM" and a citation to Florida Administrative Code rule 65A-1.702 is provided.  Id. at DCF-5663.  The Court cannot discern any provision of rule 65A-1.702 that explains or supports

the decision here.  Presumably, K.H. and Taylor were found ineligible for Medically Needy in May and June of 2023 because they were both receiving full Medicaid benefits at that time.

431.     This section includes two paragraphs titled in bold "If you are no longer eligible for TCA (Cash Assistance)" and "If you are no longer eligible for Medicaid."  Id.  The block of text is that copied above in Part I.F.c.3., including the explanation that "[y]ou have been found to be ineligible for Medicaid, or the Department has been unable to determine your eligibility." Id.  It is unclear why these provisions would be included in a section communicating that K.H. and Taylor are ineligible for Medically Needy coverage.  The placement of this information is particularly confusing given that their ineligibility for Medically Needy coverage communicated in this section is presumably due to their eligibility for Medicaid during those months.

432.  Finally, on page five, the NOCA has a section labeled Medicaid.  This section states that "Your Medicaid benefits for the person(s) listed below will end on June 30, 2023[,]" and names K.H. and Taylor.  Id. at DCF-5664.  The Designated Reason provided is: "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP."  Id.  The NOCA again inaccurately lists Florida Administrative Code rule 65A-1.702 as the law

supporting this action.   The <u>reason</u> Taylor and K.H. are found ineligible for Medicaid is not discernible from the Designated Reason or the statutory citation.[50]   Indeed, although this section of the NOCA is intended to convey the termination of K.H. and Taylor's Medicaid benefits, it does not mention income at all.   This section also repeats the "If you are no longer eligible for Medicaid" paragraph, along with a paragraph labeled "If you are no longer eligible for SNAP (Food Assistance)."   <u>Id.</u>   Page eight of the NOCA contains the standard footer in use at the time.   <u>See id.</u> at DCF-5667.

433.   As to the first Medically Needy section, Taylor did not understand what Medically Needy meant and assumed at first that K.H. was still enrolled in regular Medicaid until she "later found out that he wasn't."   <u>See</u> Taylor Test., Tr. Vol. I at 28, 57.   As to the second Medically Needy section, Taylor did not understand what the Designated Reason meant when it said she was receiving the same type of assistance from another program and assumed it meant Medicaid.   <u>Id.</u> at 29.

---

[50] A savvy reader could perhaps piece together that if Medicaid ends June 30, 2023, then the "different Medicaid coverage group" referenced here on page five, relates back to the Medically Needy section on page two which covers July 2023 and ongoing.   But significantly, this Medically Needy section states that Taylor is <u>ineligible</u>.   Thus, even if it is possible to glean from the NOCA that K.H. is ineligible for Medicaid because he is eligible for Medically Needy and he is eligible for Medically Needy because his income exceeds the limit for Medicaid, there is nothing in the NOCA that explains why Taylor is ineligible for both Medically Needy <u>and</u> Medicaid.

434.    And as to the Medicaid section on the last page, she understood this to

mean that her family's Medicaid was being canceled.  <u>Id.</u>   But she could not

understand why their Medicaid benefits were ending when benefits had been

approved in April and K.H. was only just born.  <u>Id.</u> at 30.   Ultimately, Taylor

could not be certain from the notice whether or not she or K.H. still had

Medicaid benefits.   <u>Id.</u>[51]

435.    Taylor called DCF and although "it took a while[,]" when she did get

through, the call center agent told her that her income level was too high.    <u>Id.</u>

at 32.   Taylor did not ask for, and was not told, the Medicaid income limits

that applied to her or K.H.   <u>Id.</u> at 32, 53.   And Taylor was not told the income

that DCF attributed to her in determining her eligibility.   <u>Id.</u> at 32.

---

[51] On cross-examination, Taylor responded affirmatively when asked whether she
understood the June 8, 2023 NOCA to mean that she and K.H. were losing Medicaid coverage.
<u>See</u> Taylor Test., Tr. Vol. I at 51.   She also answered affirmatively when asked if she believed,
upon reading the NOCA, that the statement that her income was too high was incorrect.   <u>Id.</u>
      The Court notes that Taylor was thirty-eight weeks pregnant at the time of her
testimony.   <u>See</u> <u>id.</u> at 17.   She was visibly tired and easily confused on the witness stand.
Having observed her demeanor, and reviewed her testimony as a whole, the Court finds that,
at the time she received the June NOCA, Taylor understood that parts of it indicated their
Medicaid coverage was ending, but she was nonetheless uncertain of their status because she
did not understand the other sections of the NOCA, and because the termination of her
benefits did not make sense to her under the circumstances.
      In addition, Taylor responded affirmatively when asked whether she understood
"[w]hen [she] reviewed the June 2023 notice," that a pregnant Medicaid recipient is not subject
to an income limit, and that there were no income restrictions for K.H. because he was a baby.
<u>See</u> Taylor Test., Tr. Vol. I at 51.   Given the wording of the question, and having observed her
on the stand, the Court finds that Taylor was confused about the timeframe in question when
she provided her answer.   The Court credits Taylor's other testimony that she learned this
information only later, after speaking with family, friends, and a Healthy Start nurse.   <u>Id.</u> at
57-58.

436.  Upon re-reading the NOCA, Taylor learned that she could request a
hearing to challenge the decision.   Id.   The call center agent also told Taylor
about her option to request a fair hearing.   Id. at 54.   But Taylor elected not
to pursue a fair hearing based on the language cautioning her that she would
have to pay back benefits if she lost.   Id. at 32-33.

437.  Newly postpartum and caring for a weeks-old infant, Taylor did not
attempt to visit a DCF office for help.   Id. at 54-55.   Nor did Taylor seek
information about "free legal services" as mentioned in the footer of the NOCA.
Id. at 54.

438.  When she read the notice, Taylor felt confused, frustrated, and irritated.
See id. at 27, 31.   Taylor did not understand the reason her Medicaid was
denied, and why Medicaid would be denied when she thought the request she
had made was for cash assistance.   See id. at 27; see supra note 49.   She was
also concerned about her newborn son and his upcoming medical appointment.
See Taylor Test., Tr. Vol. I at 31.

439.  What Taylor did not know was that her application for cash assistance on
May 8, 2023, had triggered a review of her Medicaid benefits which occurred
on June 7, 2023.   See Roberts Test., Tr. Vol. II at 51, 53-54; see also Pls.' Ex.
99 at DCF-6349.

440.  Taylor also did not know that, due to the error in the FLORIDA system,
DCF had prematurely terminated her postpartum continued coverage.   See

Roberts Test., Tr. Vol. II at 40. The system then incorrectly tested her eligibility in the parent/caretaker (MAR) category. See id. at 39-40. For an unknown reason, the FLORIDA system also failed to recognize that K.H., as an infant born to a mother on Medicaid, was automatically eligible for twelve months of continuous Medicaid coverage following his birth, regardless of income. Id. at 41-42. Instead, DCF tested K.H. in the infant category. See id. at 42. None of this information is reflected in the NOCA. See Pls.' Ex. 112.

441. In addition, Taylor did not know that in testing her eligibility in the parent/caretaker category, the case worker did not rely on her report of zero income and zero hours worked and instead chose to rely on third-party electronic data sources. See Roberts Test., Tr. Vol. II at 46-48, 55-56, 58; Pls.' Exs. 100, 110.

442. As a result, DCF determined that Taylor and K.H. were over the income limits that applied to the parent/caretaker and infant eligibility categories. See Roberts Test., Tr. Vol. II at 42, 49. Notably, had the case worker entered zero income as Taylor reported, DCF would have found Taylor and K.H. eligible, despite using the incorrect coverage groups. Id. at 56.

443. Nothing in the NOCA informed Taylor that DCF had relied on third-party income sources to calculate her income. Id. at 58. Nor does the NOCA inform Taylor that DCF did not credit her report of unpaid leave. Id.

444.  Because DCF found Taylor to be over income in the parent/caretaker eligibility group, "she was moved into Medically Needy."  See id. at 40.

445.  According to Roberts, the NOCA is referring to the Medically Needy program when it states that Medicaid benefits for Taylor and K.H. would end on June 30, 2023, because "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP."  See id. at 58-59; see also Pls.' Ex. 112 at DCF-5664.

446.  Notably, however, the June 8, 2023 NOCA lists Taylor as ineligible for Medically Needy for July 2023 and ongoing.  See Pls.' Ex. 112 at DCF-5661, 5663.  No explanation for this decision is provided.

447.  Taylor and K.H. lost full Medicaid coverage in July.  See Taylor Test, Tr. Vol. I at 34.

448.  Taylor applied for health insurance on the Federally Facilitated Marketplace (FFM) but was told she should qualify for Medicaid.  Id.  She attempted to get insurance for K.H. through Florida KidCare but was denied because he was under one year of age.  Id.

449.  Taylor reached out to a Healthy Start nurse who was working with her and learned that she should be receiving one year of postpartum care through Medicaid.  See id. at 34-35, 57-58.  She also learned about the Florida Health Justice Project.  Id. at 35.  Attorneys from the Florida Health Justice Project

represent Taylor in this case and have worked with her from that time through the present.  Id. at 35, 58-59.

450.  In August, with help from a family friend, Taylor obtained insurance for K.H. and herself through Blue Cross and Blue Shield.  Id. at 35.

451.  On August 5, 2023, DCF reinstated Taylor and K.H.'s Medicaid coverage retroactive to July 1, 2023, because it determined that their Medicaid coverage had been erroneously terminated.  See JPS, Part VIII ¶ 67.  At that point, Taylor and K.H.'s coverage should have continued through at least May of 2024 pursuant to DCF's continuous coverage policies for infants and postpartum women.  See Roberts Test., Tr. Vol. II at 60.

### 2. The August 7, 2023 NOCA (Pls.' Ex. 116)

452.  DCF issued a NOCA to Taylor dated August 7, 2023.  See Pls.' Ex. 116; Taylor Test., Tr. Vol. I at 35-36.

453.  This NOCA contains two sections, both labeled "Medicaid."  See Pls.' Ex. 116.  The first section states that "[y]our application for Medicaid dated June 29, 2023 is **approved**[,]" and lists K.H. and Taylor as eligible for July, August, and September 2023, ongoing.  Id. at DCF-5640.  The second section states that "[y]our Medicaid application/review dated June 29, 2023 is **denied**" for the month of June 2023, and lists Taylor as "Ineligible" for that month.  Id. at DCF-5641.  The Designated Reason is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM."  Id.

454. Upon first reading this NOCA, Taylor believed that K.H.'s Medicaid benefits, as well as her own, had been reinstated.   See Taylor Test., Tr. Vol. I at 36.   However, "going from the first to the second page," it was unclear to her whether DCF had actually reinstated her benefits.   Id.

455. Taylor became pregnant in December 2023 and reapplied for Medicaid in January 2024.   Id. at 37.   Despite the August NOCA, Taylor reapplied out of concern that she may not have Medicaid coverage because K.H. had received updated medical cards and she had not.   Id.   Taylor had also received a medical bill from an obstetrics visit prompting her to think she may not be covered by Medicaid.   Id. at 38-39; Pls.' Ex. 119.

### 3. The February 15, 2024 NOCA (Pls.' Ex. 118)

456. Taylor received a NOCA dated February 15, 2024.   See Pls.' Ex. 118. This NOCA includes a Medicaid section which states that Medicaid coverage for K.H. and Taylor had "been reviewed" and lists them both as "eligible for continued Medicaid coverage."   Id. at DCF-6363.   It does not provide a time frame or any standardized language explaining what "continued" Medicaid coverage means.   Id.

457. On the following page, the NOCA has another Medicaid section.   This section states that Taylor's "Medicaid application/review dated January 16, 2024" was denied and lists her as Ineligible for December 2023.   See id. at DCF-6364.   The Designated Reason provided is that "[y]ou are receiving the

same type of assistance from another program" with examples such as
"Medicaid eligibility continues in another category, etc." Id.  And the
statutory cite is again to rule 65A-1.702 which does not provide a reason for
denial.  Id.  Roberts does not know why Taylor was found ineligible here but
theorized that it could be that "when [DCF] ran the case it tried to build
December again.  But she was ineligible for it because she already had it."
See Roberts Test., Tr. Vol. II at 168.  Thus, Taylor is supposed to understand
from this NOCA that in December 2023, she was ineligible for Medicaid
because she was eligible for Medicaid.

458.  The next page of the NOCA has two sections – Medicaid for Unborn
Babies, and Medicaid for Newborn Babies.  See Pls.' Ex. 118 at DCF-6365.
Notably, the Medicaid for Newborn Babies section provides that Taylor's
"newborn baby is eligible for Medicaid starting January 01, 2024[,]" and lists
"Babyofkimber Taylor" as eligible for the months of January, February, and
March 2024, ongoing.  Id.

459.  However, the following page includes a Medicaid section that begins:
"[w]e have reviewed your eligibility and have determined that an individual
has been removed from your assistance group as of June 30, 2023 and is no
longer receiving Medicaid benefits." Id. at DCF-6366.  This section
identifies "Babyofkimber Taylor" as Ineligible.  Id.  No Designated Reason
is provided and the legal citation is merely a series of Xs.  Id.  According to

Roberts, this section pertains to the Baby A designation that previously belonged to K.H.    <u>See</u> Roberts Test., Tr. Vol. II at 167.

460.    Taylor's January 2024 application was approved, and at the time of her testimony in July 2024, she testified that to the best of her knowledge she was still eligible for Medicaid.    <u>See</u> Taylor Test., Tr. Vol. I at 39, 56; <u>see also</u> Roberts Test., Tr. Vol. II at 168 (testifying at the time of the bench trial that Taylor and K.H. were presently covered by Medicaid).

461.    Taylor testified that she found the language in the notices to be confusing "because it seems that it states one thing and it does another . . . ."    <u>See</u> Taylor Test., Tr. Vol. I at 50.    She emphasized that the notices "make[] people feel very uneasy, especially when you need health insurance for yourself or for a child, you know.    It makes it unreliable."    <u>Id.</u>

### c. A.V.

462.    At the time of the bench trial, Plaintiff A.V. was a two-year old child.    <u>See</u> Jennifer V. Test., Tr. Vol. III at 51.    She was represented at trial by her mother, Jennifer V.    <u>Id.</u>

463.    A.V. is the youngest of Jennifer V.'s seven children.    <u>Id.</u>    A.V's siblings are: J.C. (age 25), A.C. (age 23), N.C. (age 20), D.C. (age 18), J.C. (age 14), and L.V. (age 7).    <u>Id.</u> at 52.    Two of Jennifer V.'s children, specifically N.C. and D.C., are on the autism spectrum and require emotional/behavioral support. <u>Id.</u>    N.C. receives SSI Medicaid benefits.    <u>Id.</u>

464.   Jennifer V. lives with her husband, Henry V., and all of her children except J.C. and A.C.   Id. at 53-54.   A.C. previously lived at home as well but had moved out at the time of the bench trial.   Id. at 54.

465.   In May of 2022, shortly after A.V.'s birth, Henry V. applied for medical assistance benefits for A.V. and she was approved for Medicaid beginning in May 2022.   See Pls.' Ex. 97 at ECF pp. 1, 7-8; see also JPS, Part VIII ¶ 55.

466.   On April 3, 2023, Jennifer V. submitted another application for medical assistance.   See Pls.' Ex. 97 at ECF p. 56.   According to Jennifer V., she submitted this application to adjust their health coverage because one of her adult children had left the home.   See Jennifer V. Test., Tr. Vol. III at 65.[52]

467.   DCF terminated A.V.'s Medicaid coverage effective June 1, 2023, because DCF determined that A.V.'s household income exceeded the applicable income limit.   See JPS, Part VIII ¶ 57.

468.   In June 2023, Jennifer V. learned that A.V.'s Medicaid coverage was ending based on a conversation she had with her pediatrician's office.   See Jennifer V. Test., Tr. Vol. III at 67, 106.

469.   A.V.'s parents called her HMO insurance plan, as well as KidCare and other entities, to try and understand the status of A.V.'s health coverage with

---

[52] For an unknown reason, A.V. is not listed as a household member in this application, although she was living in the home at that time.   See Jennifer V. Test., Tr. Vol. III at 53-54, 66; Pls.' Ex. 97 at ECF pp. 56-62.   There is no evidence that this omission caused any of the errors discussed in this section.

little success.   See id. at 68-69, 106.   At some point, Jennifer V. checked her
MyAccess account where she found a NOCA dated May 16, 2023.   See id. at
71-72, 106-07; Pls.' Ex. 81.

### 1.  The May 16, 2023 NOCA (Pls.' Ex. 81)

470.   The first five pages of the May 16, 2023 NOCA contain seven different
Medically Needy sections.   See Pls.' Ex. 81 at DCF-5724-28.   A single
Medicaid section begins on page five and the standard footer is found on page
seven.   See id. at DCF-5728-30.

471.   The first five Medically Needy sections convey that the share of cost has
decreased for the individual listed.   Id. at DCF-5724-26.   Each of these
sections lists A.C. as "[i]neligible," and another member of the household—a
different person in each section—is marked "[e]nrolled."   Id.   Presumably,
this is the person whose share of cost has decreased.

472.   A.V. is first mentioned in the sixth "Medically Needy" section where she
is listed as "Enrolled" and A.C. is again listed as "Ineligible" for June 2023 and
ongoing.   Id. at DCF-5726.   Rather than convey an adjustment to the share
of cost, this section states that "[y]our application for Medically Needy dated
April 7, 2023 is approved."   Id. at DCF-5726.   The Income Exceeds Sentence
is placed directly above this "Medically Needy" heading.   Id.   This section
also includes the standard explanation of how the Medically Needy program
works, discussed in Part I.F.c.2. above.

473.   The seventh Medically Needy section also lists A.V. and A.C.   See id. at DCF-5728.   But this section concerns April and May of 2023, and states that their Medically Needy "application/review dated April 7, 2023" is denied.   Id. The Designated Reason provided is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]"   Id.

474.   DCF's decision to terminate Medicaid benefits is reflected in the last program section, found on pages five and six of the eight-page NOCA, and labeled "Medicaid."   Id. at DCF-5728-29.   This section begins with a statement that "[y]our Medicaid benefits for the person(s) listed below will end on May 31, 2023.   Id. at DCF-5728.   The following people are listed: A.V., Henry V., Jennifer V., A.C., D.C., J.C., and L.V.   Id. at DCF-5728-29.   The Designated Reason is: "YOU OR A MEMBER(S) OF YOUR HOUSEHOLD REMAIN ELIGIBLE FOR MEDICAID UNDER A DIFFERENT MEDICAID COVERAGE GROUP[.]"   Id. at DCF-5729.   The NOCA unhelpfully identifies rule 65A-1.702 as the law that supports the action.   Id.

475.   When Jennifer V. first read this NOCA, she understood it to mean that DCF was changing the amount of their Medically Needy share of cost.   See Jennifer V. Test., Tr. Vol. III at 73.   She did not see at first where the NOCA was informing her that A.V. was ineligible for Medicaid but eventually she "figured it out . . . ."   Id. at 74.   At the time she read the NOCA, Jennifer V. thought A.V. should still be eligible for Medicaid, although she was not certain

and wanted clarification.  Id. at 113-14.  And based on prior experience, she thought DCF was moving A.V. from Medicaid to KidCare.  Id. at 74.

476.  Jennifer V. found the layout of the NOCA redundant and confusing.  Id. And she did not understand the Designated Reason because she was unfamiliar with the different types of Medicaid coverage groups.  Id. at 76-77.

477.  Jennifer V. called DCF two or three times regarding A.V.'s Medicaid coverage.  Id. at 70, 105.  She experienced long hold times—at least forty-five minutes—as well as dropped calls.  Id. at 70.  She did not succeed in talking to a person.  Id.  Jennifer V. found the time spent making phone calls and waiting on hold overwhelming given her other responsibilities and asked her husband for help making calls.  Id. at 70-71, 105.  She did not attempt to visit a DCF office location.  Id. at 104.  Eventually, she asked for guidance from the Florida Health Justice Project.  Id. at 71.

478.  Although frustrated when she first read the NOCA, Jennifer V. was not scared or worried because she thought DCF was transferring A.V. to KidCare. Id. at 77.  But after attempting to ensure that A.V. had health insurance with no success, she became concerned and very upset.  Id.

479.  Jennifer V. knew about the availability of a fair hearing but did not pursue one at that time.  Id. at 114-15.  She made the decision to forego a fair hearing after consulting with her attorneys.  Id. at 115.

480.   What Jennifer V. did not know at the time she read the NOCA was that DCF had failed to properly determine the size of her household.   See Roberts Test., Tr. Vol. II at 90-92.   As reflected in the Budget screen, DCF used an SFU of six to determine the income standard applicable to A.V.   See id. at 91; Pls.' Ex. 70.   Roberts explained at trial that the correct SFU should have been eight.   See Roberts Test., Tr. Vol. II at 91.   According to Roberts, one child should have been coded as a tax dependent and was not, and another child was an SSI recipient who should have been included and was not.   Id. at 93-94.

481.   As a result of this error, DCF applied an income standard of $4,868 to determine A.V.'s eligibility.   Id. at 92.   Had DCF used the correct SFU size, the income standard would have been $6,110.   Id.

482.   In addition, Jennifer V. did not know that in evaluating the May 2023 application, DCF had calculated the total earned income for her household as $6,456.99.   Id. at 94; Pls.' Ex. 70.   This total earned income was significantly different than the $4,727.10 in earned income that Jennifer V. and Henry V. had reported on their application.   See Roberts Test., Tr. Vol. II at 98-99; Pls.' Ex. 78 at DCF-5799, 5801.   Rather than use the self-reported income, DCF determined Henry V.'s income, in May of 2023, based on SWICA data from October, November, and December of 2022.   See Roberts Test., Tr. Vol. II at 96; Pls.' Ex. 79.   DCF calculated Jennifer V.'s income based on data in the

FDSH database from February and March 2023.  <u>See</u> Roberts Test., Tr. Vol.
II at 96-97; Pls.' Ex. 80.

483.  Given the significant discrepancy between the client-reported income and
the electronic data sources, DCF should have asked the family for more recent
pay information.  <u>See</u> Roberts Test., Tr. Vol. II at 99.  It failed to do so.  <u>Id.</u>
at 99-100.  The family's income as reported on their application was well
under the income limit for the correct SFU of eight, and indeed, was even
under the income limit for the incorrectly applied SFU of 6.  <u>Id.</u> at 99.

484.  Because DCF did not ask for more information, DCF does not know
whether the household's earned income was in fact lower in April and May of
2023 than it had been earlier in the year and at the end of 2022.  <u>Id.</u> at 100.

485.  DCF did not inform Jennifer V. what income standard it applied or the
SFU it used to make its eligibility determination in May of 2023, nor did the
NOCA identify the pay dates from which DCF calculated the family's income.
<u>Id.</u> at 100-01.

486.  Notably, despite his expertise, Roberts could not determine why DCF
found A.V. ineligible for Medicaid based on her family's income by looking at
the NOCA, MyAccess account, or the DCF website.  <u>Id.</u> at 90.  To understand
DCF's decision, Roberts needed to review the information on the Budget
screen, to which Medicaid recipients do not have access.  <u>Id.</u>

487.    After A.V. lost Medicaid coverage, Jennifer V. used credit cards to pay for
A.V.'s medical needs, including a trip to an after-hours clinic when A.V. got
sick.    See Jennifer V. Test., Tr. Vol. III at 84.    She also skipped one of A.V.'s
regular screenings, as well as one of her vaccinations due to the cost.    Id.
Jennifer V. was worried that incurring this additional debt would make it
harder to keep up with their bills.    Id. at 85.

488.    In December of 2023, Jennifer V. applied for health coverage through the
FFM for all the individuals living in the household at the time, including A.V.
Id.

489.    At some point, she received a letter from KidCare dated January 9, 2024,
which told her that A.V. did not qualify for health services through KidCare
because she had been referred to Medicaid.    See id. at 86-88; Pls.' Ex. 95.

### 2. The January 18, 2024 NOCAs (Pls.' Exs. 83 & 84)

490.    DCF issued a NOCA addressed to Henry V. dated January 18, 2024.    See
Pls.' Ex 84.    This NOCA includes six Medically Needy sections, the last of
which pertains to A.V.    Id.

491.    This section lists A.V. as "Enrolled" in Medically Needy and states that
her share of cost was increasing as of February 1, 2024.    Id. at ECF p. 4.    It
lists A.C. and N.C. as "Ineligible."    Id.    The Designated Reason is: "Your
child(ren) are not eligible for Medicaid due to your family¿s [sic] income but
they may be able to get health insurance through Florida KidCare. . . . Florida

KidCare is already processing an application for your child(ren). To learn how you can enroll them, please call 1-800-821-5437. Make this call soon since their Medicaid is ending." Id. No law supporting the action is provided. Instead, that section of the NOCA has a row of X's. Id.

492. Upon reading this section, Jennifer V. was not sure to whom the Designated Reason applied given that three of her children are listed. See Jennifer V. Test., Tr. Vol. III at 89.

493. DCF also issued a NOCA to Jennifer V. dated January 18, 2024. See Pls.' Ex. 83. This NOCA has only one "Medically Needy" section. Id. at ECF p.1. It states that the Medically Needy benefits for A.C. and N.C. will end on January 31, 2024. Id. The Designated Reason is: "You are receiving the same type of assistance from another program. You or a household member already qualify for this requested benefit in another case or another category. Examples: receiving TCA or SNAP in a different case, Medicaid eligibility continues in another category, etc." Id. The supporting law is Florida Administrative Code rule 65A-1.702. Id.

494. Jennifer V. was confused about the conflicting messages between KidCare and Medicaid. See Jennifer V. Test., Tr. Vol. III at 91-92. It was unclear to Jennifer V. what was happening from these two NOCAs. See id. at 91. She also did not understand why N.C. is included in the Medically Needy section of the second NOCA because N.C. was receiving SSI Medicaid at the time. Id.

495.   Jennifer V. did not know that DCF had made a mistake in finding that A.V. was ineligible for Medicaid.   DCF used an SFU of seven to calculate the income standard when it should have used eight.   See Roberts Test., Tr. Vol. II at 103-04.   In addition, to determine their income in January 2024, DCF had used third-party income information for Henry V. from September of 2023, and third-party income information for Jennifer V. from November of 2023.   Id. at 107-09.

496.   Possibly because of this lawsuit, Roberts personally evaluated A.V.'s eligibility in late January of 2024.   Id. at 109-10.   In doing so, he applied an SFU of eight, and requested more recent pay stubs for Henry V.   Id. at 110. Applying the higher income limit based on the correct SFU and a lower income as shown in the more recent pay stubs led Roberts to conclude that A.V. was eligible for Medicaid.   Id. at 110-11.

497.   A.V.'s Medicaid coverage was restored, effective December 2023.   See JPS, Part VIII ¶ 60.

### 3.  The February 2, 2024 NOCA (Pls.' Ex. 86)

498.   DCF issued another NOCA on February 2, 2024, making this the third NOCA sent to Jennifer V. in just nine months.   See Pls.' Ex. 86.   This NOCA included six Medically Needy sections, followed by one Medicaid section on page five.   Id.   Notably, the sixth Medically Needy section states that Medically Needy benefits would end on February 29, 2024, for A.V., A.C., and

N.C.  Id. at DCF-5875-76.  The Designated Reason was: "We reviewed your case, you are still eligible, but in a different Medicaid coverage type. In most cases, your income exceeds the income limits for full coverage, check your MyAccess account to see if you qualify for the Medically Needy program."  Id. at DCF-5876.  The law cited is again the unhelpful Florida Administrative Code rule 65A-1.702.  Id.  At best, this Designated Reason is a confusing choice for the termination of Medically Needy benefits given that there is no income limit for the Medically Needy program.  Indeed, at least as to A.V., the reason she is no longer eligible for the Medically Needy program is exactly the opposite of what is suggested by the Designated Reason—her income does not exceed the income limit for full coverage.  The instruction that the recipient check her MyAccess account "to see if you qualify for the Medically Needy program" is equally confusing as this Medically Needy section of the NOCA advises that the Medically Needy benefits are ending.  The Court presumes that N.C. is listed as ineligible for Medically Needy benefits because she receives SSI-related Medicaid.  But the Court cannot determine why A.C. is being found ineligible.

499.  The Medicaid section states that "[y]our application for Medicaid dated January 30, 2024 is approved," and lists A.V. as "Eligible" for December 2023, as well as January, February, and March 2024, ongoing.  Id. at DCF-5877. Henry V., Jennifer, V., A.C., N.C., D.C., J.C., and L.C. are listed in this section

as well but are all marked as ineligible. <u>Id.</u> No Designated Reason or supporting law is provided for their ineligibility. <u>Id.</u>

500. DCF did not inform Jennifer V. of the error it had made concerning A.V.'s eligibility and at the time of the bench trial, Jennifer V. did not know what the error was. <u>See</u> Jennifer V. Test., Tr. Vol. III at 95.

501. At the time of the bench trial, A.V. was enrolled in Medicaid. <u>Id.</u> at 96; JPS, Part VIII ¶ 60. Jennifer V. felt intimidated and anxious about having to go through the renewal process again when the time comes. <u>See</u> Jennifer V. Test., Tr. Vol. III at 96. She finds the process overwhelming and is afraid of making mistakes. <u>Id.</u> at 96-97.

### d. Lily Mezquita

502. Lily Mezquita is a married mother of three. <u>See</u> Mezquita Test., Tr. Vol. III at 118. She has a master's degree in behavior analysis and is a registered behavior technician. <u>Id.</u> She works with children on the spectrum as a behavior technician. <u>Id.</u>

503. Her three children are: G.M. (age ten), E.M. (age six), and I.M. (age ten months). <u>Id.</u> at 119.

504. Mezquita first obtained Medicaid coverage when she was pregnant with her oldest child. <u>Id.</u> at 156. Each of her children were enrolled in Medicaid at the time they were born. <u>Id.</u> Thus, Mezquita has about ten years of

experience reviewing NOCAs.    Id. at 157.    She also has experience

contacting DCF when needed and visiting DCF office locations.    Id.

505.  At the time of the bench trial, Mezquita and her children had full

Medicaid coverage.    Id. at 156.

506.  Mezquita became pregnant with her youngest child, I.M., in December of

2022.    Id. at 120.    She was approved for Medicaid coverage at the time.    Id.

Her sons, G.M. and E.M. were also enrolled in Medicaid at that time.    Id.

507.  Around March of 2023, DCF informed Mezquita that she was required to

complete a renewal.    Id. at 120-21.    She submitted the renewal application

in May and was approved for continued pregnancy Medicaid.    Id. at 121; JPS,

Part VIII ¶ 68.    DCF also approved E.M.'s eligibility for Medicaid, but found

G.M. to be ineligible.    See Mezquita Test., Tr. Vol. III at 121.    G.M. was not

automatically transferred to KidCare.    Id. at 122.

508.  Mezquita understood that DCF had found G.M. to be ineligible based on

income but questioned whether that decision was correct.    Id. at 121.

509.  To get clarification, Mezquita called the call center and visited a DCF

office in person.    Id. at 121-22.    The people she spoke to confirmed that G.M.

was ineligible, although they did not provide clarification on the decision.    Id.

at 122.    At that point, Mezquita accepted the finding and applied to KidCare.

Id.

510.  G.M. was approved for KidCare, but at the same time, DCF terminated Mezquita's pregnancy Medicaid coverage.  Id.  Mezquita, who was seven months pregnant at the time, did not know that applying for KidCare would trigger a reevaluation of her own Medicaid coverage.  Id. at 123.

511.  DCF terminated Mezquita's Medicaid coverage effective July 31, 2023, because DCF found that Mezquita's household income exceeded the applicable income limits for a person newly applying as pregnant.  See JPS, Part VIII ¶ 70.  This was an error.  See Roberts Test., Tr. Vol. II at 115.  DCF knew that Mezquita had Medicaid coverage while pregnant and thus, DCF should have placed her in continuous Medicaid coverage.  Id.  DCF's failure to properly apply the postpartum coverage is due to the same known error in the FLORIDA system that impacted Chianne D. and Kimber Taylor.  Id.

512.  Notably, when it made this determination, DCF also had Lily Mezquita's pay stubs from June of 2023.  See id. at 123-24, 126; see also Pls.' Ex. 129 at 74-75.  The paystubs reflect a gross income of $1415.15.  See Roberts Test., Tr. Vol. II at 124.  However, according to the Budget screen in the FLORIDA system, DCF did not use Mezquita's pay stubs to calculate her income.  See id. at 134-35; Pls.' Ex. 136.  Instead, DCF attributed to Lily Mezquita an income of $1862.26.  See Pls.' Ex. 136; see also Roberts Test., Tr. Vol. II at 134.  It is unclear from the records how DCF came up with this number and

there is no entry on the CLRC screen to explain it.    <u>See</u> Roberts Test., Tr. Vol. II at 129, 134-35; Pls.' Ex. 127.

513.    Had DCF used Mezquita's income as reflected on her pay stubs, she would have satisfied the income standard for pregnancy Medicaid, even aside from her entitlement to continuous coverage.    <u>See</u> Pls.' Ex. 136; Pls.' Ex. 178; Roberts Test., Tr. Vol. II at 132 (testifying that the income limit for pregnancy Medicaid with an SFU of 5 is $5,740).[53]

### 1. The July 20, 2023 NOCAs (Pls.' Exs. 122 & 123)

514.    Mezquita received two NOCAs concerning this decision, one addressed to her and the other addressed to G.M., both dated July 20, 2023.    <u>See</u> JPS, Part VIII ¶ 69; Mezquita Test., Tr. Vol. III at 123; Pls.' Exs. 122, 123.

515.    Mezquita read the sections of these two NOCAs pertaining to her medical coverage carefully but did not read the information in the fine print that is included in every NOCA.    <u>See</u> Mezquita Test., Tr. Vol. III at 128-29.

516.    The NOCA addressed to Mezquita has only one section and it is labeled Medicaid.    This section begins: "Your Medicaid benefits for the person(s) listed below will end on July 31, 2023[,]" and lists Mezquita, her husband Jimardo Mezquita, and G.M.    <u>See</u> Pls.' Ex. 123 at DCF-5403.    The

---

[53] The Budget screen shows that DCF calculated Jimardo Mezquita's income as $3913.80.   Thus, $1415.15 + $3913.80 = $5,328.95, which is under the applicable limit. Indeed, as discussed below, when DCF reconsidered Mezquita's case on appeal, it used the pay stub information and as a result, found that both Lily Mezquita and G.M. were eligible for Medicaid.

Designated Reason is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]"  Id.  The law cited is rule 65A-1.702.  Id.  The NOCA also includes the generic "If you are no longer eligible for Medicaid" text copied above in Part I.F.c.3. as well as the standard footer in use at the time.  See id. at DCF-5404, 5406.  None of this information actually advised Mezquita of the reason for DCF's decision.

517.   Nowhere in this NOCA is there any reference to Mezquita's income.   Nor does it discuss the Medically Needy program, or a change in Mezquita's eligibility category.

518.   Mezquita had no idea what the stated Designated Reason meant and did not know from what other program she was purportedly receiving assistance. See Mezquita Test., Tr. Vol. III at 124.   Indeed, contrary to what is stated in the Designated Reason, Lily Mezquita was not receiving the same type of assistance from another program.   See Roberts Test., Tr. Vol. II at 116.   And although the NOCA states that Medicaid benefits for Jimardo Mezquita would end on July 31, 2023, he had not been receiving Medicaid benefits.   See Mezquita Test., Tr. Vol. III at 123-24.

519.   The NOCA addressed to G.M. has five sections.   See Pls.' Ex. 122.   The first section is labeled Medicaid and states that "[y]our Medicaid application/review dated June 19, 2023 is denied" for the months of June, July, and August 2023.   Id. at DCF-5389.   It lists Jimardo Mezquita, E.M., G.M.,

and Lily Mezquita as "Ineligible." Id. The Designated Reason provided is: "YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]" Id. No supporting law is cited. Id.

520. Although the NOCA lists Lily Mezquita as ineligible for Medicaid in June and July of 2023, she had received Medicaid coverage in those months. See Mezquita Test., Tr. Vol. III at 125. At trial, Roberts explained that this section does not convey a retroactive termination but rather indicates a denial. See Roberts Test., Tr. Vol. II at 116-17. He posits that the section could be referring to a different Medicaid coverage group than the one in which she had qualified. Id. at 117. But because the coverage group is not reflected on the NOCA, he would need to look at the IQEL screen in the FLORIDA computer system to determine what happened. Id.

521. The next section is labeled Medically Needy and begins: "Your Medically Needy Share of Cost will increase from $4859.00 to $5092.00 as of August 01, 2023." See Pls.' Ex. 122 at DCF-5390. It lists E.M. as "Ineligible" and G.M. as "Enrolled." Id. The Designated Reason is "Account Transfer to Florida Healthy Kids/Federally Facilitated Marketplace[.]" Id. The supporting law is a row of X's. Id. As presented, it is unclear whether this Designated Reason speaks to why E.M. is ineligible for Medically Needy, or whether it

explains why G.M.'s share of cost increased.  Regardless, it does not make sense as a <u>reason</u> for either decision.

522.  The third page begins with the Income Exceeds Sentence followed by a Medically Needy section.  This section states that "Your application for Medically Needy dated June 19, 2023 is approved" and lists E.M. as "Ineligible" and Lily Mezquita as "Enrolled" for August 2023, ongoing.  <u>Id.</u> at DCF-5391.  It includes the standard explanation of the Medically Needy program.  <u>Id.</u>

523.  The fourth section is also labeled Medically Needy and states that the "application/review dated June 19, 2023 is denied" for the months of June and July 2023 as to E.M. and Lily Mezquita, both listed as "Ineligible."  <u>Id.</u> at DCF-5392.  The Designated Reason here is: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]"  <u>Id.</u>[54]  No legal citation is provided.  <u>Id.</u>

---

[54] Thus, on the first page of this NOCA, Lily Mezquita is informed that she was ineligible for Medicaid in June and July of 2023, because her household income was too high and she was receiving the same type of assistance from another program.  Given the reference to income, one would think the other program referenced here is the Medically Needy program.  Yet, on page four of the same NOCA, Lily Mezquita is told that she was ineligible for Medically Needy in June and July of 2023 because she was receiving the same type of assistance from another program.  The other program being Medicaid for which she was told three pages earlier that she was ineligible.  <u>See</u> Mezquita Test., Tr. Vol. III at 164.

524. Mezquita did not understand what this meant and found it confusing given that the previous section had said she was approved for Medically Needy for August of 2023.   See Mezquita Test., Tr. Vol. III at 127.

525. The last section is labeled Medicaid.   It states that "[y]our Medicaid has been reviewed and the members listed below are eligible for continued Medicaid coverage."   See Pls.' Ex. 122 at DCF-5393.   It lists Jimardo Mezquita, G.M. and Lily Mezquita as "Ineligible," and lists E.M. as "Eligible." Id.   No Designated Reason or legal citation is provided.   Id.   There is no explanation of the meaning of "continued" Medicaid coverage.   Id.   And there is no reason given for why three of the four people listed are ineligible.   Id.

526. According to Roberts, the purpose of this section is only to inform that E.M. is eligible.   See Roberts Test., Tr. Vol. II at 118.

527. In reviewing this NOCA, it was notable to Mezquita that her unborn child was not mentioned anywhere because in her prior experience with pregnancy Medicaid, the NOCAs always included "Baby of Lily Mezquita."   See Mezquita Test., Tr. Vol. III at 124-25, 129.

528. After reviewing the two NOCAs, Mezquita understood that she was losing her Medicaid coverage but was not sure of the reasons that were given on the NOCA or what they meant.   Id. at 157-58.   She believed DCF had made a mistake but was not sure what kind of mistake.   Id. at 129-30.   She thought

perhaps DCF did not realize she was pregnant or had failed to include her unborn baby.  Id. at 130, 162.

529.  Upon receiving these NOCAs, Mezquita was "[c]onfused, scared, and desperate to find out or fix it because [she] was so far along in [her] pregnancy."  Id. at 130.

530.  Mezquita searched online regarding the eligibility requirements for pregnancy Medicaid and found the DCF Fact Sheet, and the Florida statutes. Id. at 130.  She also found something which led her to believe that as a pregnant woman she should retain Medicaid coverage unless she moved out of state.  Id. at 132.

## 2. Call Center

531.  On July 20, 2023, Mezquita called DCF seven times beginning at 6:28 a.m., right after she first received the NOCAs.  Id. at 133.  The longest call that day lasted over two and a half hours.  See Defs.' Ex. 105 at 2.  Another call that same day lasted over two hours.  Id.  Mezquita asked her manager if she could come in to work later so she could continue to wait on hold.  See Mezquita Test., Tr. Vol. III at 134.

532.  She also called several times in the days that followed.  See Defs.' Ex. 105.  On at least one occasion, she was unable to even enter the hold queue. See Mezquita Test., Tr. Vol. III at 134.

533.  According to Mezquita, every time she spoke to a live agent, the person was unable to answer her questions.  Id. at 135.   The call center agent told Mezquita that the reason for her loss of coverage was because the COVID mandate had ended.  Id.  The agent also advised her that Mezquita's household income was too high for full Medicaid.  Id. at 158, 160.  Although Mezquita tried to explain that she had previously been approved for pregnancy Medicaid and referenced the information she had found about continued pregnancy coverage, the call center agent continued to insist that she was losing coverage because the COVID mandate had ended.  Id. at 135.

534.  A recording of one such call is in the record at Plaintiff's Exhibit 128.  As described above, the call center agent makes numerous inaccurate statements on this call.  See supra ¶ 261.  The call center agent misunderstands the relationship between the end of the COVID emergency and continuous pregnancy coverage, the agent uses the wrong coverage group to determine the applicable income standard before later correcting herself, but regardless, miscalculates the income standard both times.  See Pls.' Ex. 128.  As a result of this call, Mezquita began to doubt the accuracy of the information she had found about continuous coverage.  See Mezquita Test., Tr. Vol. III at 138.

535.  Mezquita also spoke to a supervisor on one occasion who told her that despite what was in the NOCA, her Medicaid was not being terminated.  Id. at 135-36.  On another occasion, the agent tried to transfer her to a supervisor

but "it was too late in the day and there was no supervisor available." Id. at 136; see also Pls.' Ex. 127 at DCF-6335 (showing an entry on the CLRC for Mezquita that she was "told to call back tomorrow due to no supervisers [sic] present").

536.    As instructed by a call center agent, Mezquita wrote a letter to DCF about her high-risk pregnancy and financial constraints. See Mezquita Test., Tr. Vol. III at 140; Defs.' Ex. 102. She wrote another letter to DCF about her pregnancy in which she recounted the information she had found regarding continuous coverage for pregnant women, including a citation to 42 U.S.C. § 1396a(e)(6). See Mezquita Test., Tr. Vol. III at 141; Defs.' Ex. 103.

537.    She did not receive any response from DCF regarding these letters. See Mezquita Test., Tr. Vol. III at 141.

538.    Mezquita learned about the Florida Health Justice Project from a Facebook group for moms. Id. at 142. After contacting the Florida Health Justice Project, Mezquita gained confidence that DCF's decision was wrong, despite what the call center agents were telling her. Id. at 170.

539.    On July 24, 2023, with the assistance of counsel, Mezquita requested a fair hearing to dispute DCF's determination. See id. at 142-43, 159-60; Defs.' Ex. 101 at DCF-5521; JPS, Part VIII ¶ 71. In her request, she only challenged DCF's decision to terminate her Medicaid coverage. She did not appeal the decision as to G.M. because she had accepted that he could not get

Medicaid and enrolled him in KidCare.  <u>See</u> Mezquita Test., Tr. Vol. III at 143.

540.   Although Mezquita requested continued coverage pending her appeal, DCF terminated Mezquita's Medicaid coverage on July 31, 2023.  <u>See</u> Defs.' Ex. 101 at DCF-5521; JPS, Part VIII ¶ 72; <u>see also</u> Mezquita Test., Tr. Vol. III at 143-44.   Prior to the actual hearing, DCF determined that Mezquita's termination was in error and reinstated Mezquita's coverage on August 10, 2023, retroactive to August 1, 2023.  <u>See</u> JPS, Part VIII ¶ 73; Mezquita Test., Tr. Vol. III at 176.   During the gap in coverage, Mezquita experienced preterm labor and had to pay for medications out-of-pocket.  <u>See</u> Mezquita Test., Tr. Vol. III at 143-44.

541.   Notably, in addition to restoring Mezquita's pregnancy coverage, DCF also reassessed her income using the pay stubs Mezquita had provided and found that G.M. had been eligible for Medicaid as well.  <u>See</u> Roberts Test., Tr. Vol. II at 136-37; <u>see also</u> Pls.' Ex. 127 at DCF-6333.

542.   Mezquita's daughter was born in September 2023.  <u>See</u> Mezquita Test., Tr. Vol. III at 147.

### 3.  October 19, 2023 NOCAs (Pls.' Exs. 120 & 121)

543.   In October of 2023, DCF reviewed Mezquita's eligibility again and the same FLORIDA system error failed to properly provide Mezquita with twelve

months of postpartum coverage.  See Roberts Test., Tr. Vol. II at 139.[55]  She was again moved to Medically Needy.  Id.  Mezquita received two NOCAs, one addressed to her, and the other addressed to G.M.  See Pls.' Exs, 120, 121.

544.  The NOCA addressed to Lily Mezquita includes a Medically Needy section which lists Lily Mezquita as "Enrolled" for November 2023, ongoing, and her three children as "Ineligible."  See Pls.' Ex. 120 at DCF-5340.  The Income Exceeds Sentence is directly above the heading and the standard information about the Medically Needy program is also included, but no Designated Reason is provided.  Id.  This NOCA does not include any Medicaid section pertaining to Lily Mezquita.

545.  The October 19, 2023 NOCA addressed to G.M. begins on the first page with a "Medicaid" section that states "[y]our application for Medicaid dated September 28, 2023 is approved" and lists Lily Mezquita as "Eligible" and all other members of the family as "Ineligible," for November 2023, Ongoing. See Pls.' Ex. 121 at DCF-5349.  Confusingly, the next page then explains that Lily Mezquita is not actually eligible for Medicaid but in fact has "recently lost [her] Medicaid coverage" and was instead enrolled in "a special Medicaid program that provides family planning services."  Id. at DCF-5350.  The

---

[55] It is unclear why DCF reviewed Mezquita's eligibility at this time.  See Roberts Test., Tr. Vol. II at 138-39; Pls.' Ex. 127 at DCF-6332.  It appears that Mezquita may have applied for food assistance and updated DCF that she was not working anymore.  See Mezquita Test., Tr. Vol. III at 149.

NOCA then explains the limited services that family-planning Medicaid covers.  Id.

546.  This section is followed by three more "Medicaid" sections.  The next section states that Medicaid is denied for September and October of 2023 and lists all five members of the family as "Ineligible."  Id.  The Designated Reason incorrectly states: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]"  Id.  No legal citation is provided.  Id.

547.  The following section states that the members listed below are eligible for "continued Medicaid coverage" with G.M. and E.M. listed as "Eligible," and Jimardo Mezquita as "Ineligible."  Id. at DCF-5351-52.  No legal citation is provided.  Id.

548.  And the last section states that the Medicaid benefits for Jimardo Mezquita will end on October 31, 2023.  Id. at DCF-5352.  The Designated Reason again incorrectly states: "YOU ARE RECEIVING THE SAME TYPE OF ASSISTANCE FROM ANOTHER PROGRAM[.]"  Id.  Florida Administrative Code rule 65A-1.702 is the law that purportedly supports the action.  Id.

549.  Mezquita understood from these NOCAs that DCF was again terminating her Medicaid coverage.  See Mezquita Test., Tr. Vol. III at 147-48.  She believed this was a mistake because she now knew she was eligible for twelve-

months of postpartum coverage.   Id. at 148.   She was frustrated and confused as to why this was happening again.   Id.

550.   Mezquita contacted DCF and her Medicaid coverage remained in place. Id. at 149, 171-73.

### 4. March 29, 2024 NOCAs (Pls.' Ex. 130 & 131)

551.   DCF reviewed Mezquita's eligibility again in March of 2024, and once again terminated her postpartum Medicaid coverage.   See Roberts Test., Tr. Vol. II at 142; Mezquita Test., Tr. Vol. III at 150.   It appears this review was prompted by Mezquita's request to renew her food assistance benefits.   See Mezquita Test., Tr. Vol. III at 150.

552.   Mezquita received another set of NOCAs, both addressed to her and dated March 29, 2024.   See Pls.' Exs. 130, 131.   She found these NOCAs to be particularly confusing.   See Mezquita Test., Tr. Vol. III at 151.

553.   The longer of the two NOCAs begins with three sections labeled Food Assistance.   See Pls.' Ex. 130 at ECF p. 1-4.

554.   The first of five sections labeled "Medicaid" starts at the very bottom of page four.   Id. at ECF pp. 4-5.   This section states that the "application/review dated February 08, 2024 is denied" and lists all five members of the Mezquita family as ineligible for February, March, April, and May of 2024.   Id.   The Designated Reason and supporting laws are:

> Reason: YOUR HOUSEHOLD'S INCOME IS TOO HIGH TO QUALIFY FOR THIS PROGRAM
> You are receiving the same type of assistance from another program. You or a household member already qualify for this requested benefit in another case or another category. Examples: receiving TCA or SNAP in a different case, Medicaid eligibility continues in another category, etc.
>
> The law that supports this action is:
>
> (FL Admin. Code = R) (FL Statute = S), R65A-1.703 R65A-1.702

Id. at ECF p. 5.[56]

555.    Page six has two Medicaid sections.   One "Medicaid" section states that the application is approved.  Id. at ECF p. 6.  It lists I.M. as eligible and Jimardo Mezquita and Lily Mezquita as ineligible for May 2024 and ongoing. Id.  The next "Medicaid" section states that "the members listed below are eligible for continued Medicaid coverage" and lists I.M. as eligible and Jimardo Mezquita and Lily Mezquita as ineligible.  Id.  No Designated Reason or supporting law is provided in either of these sections.   Id.

556.    When asked about the apparent conflict in the eligibility findings concerning I.M. between the first Medicaid section and the second and third Medicaid sections, Roberts explained that it is "possible" that the sections relate to different coverage groups.  See Roberts Test., Tr. Vol. II at 144-45. Roberts offered a "guess," based on his expertise, that the system found I.M.

---

[56] Rule 65A-1.703 of the Florida Administrative Code sets forth various requirements related to the Family-Related Medicaid Coverage Groups.  Given the breadth of eligibility requirements covered by this rule, it is unclear which provision, if any, supports the decision reflected in this section.   Notably, this rule has not been updated to incorporate the extension of the post-partum continuous coverage period from two months to twelve months.  See Fla. Admin. Code r. 65A-1.703(2)(f)4.  The rule incorrectly identifies the post-partum continuous coverage period as two months.  Id.

and the rest of the family ineligible for infant Medicaid coverage based on income, as reflected on page five, but then found that, regardless of income, I.M. was eligible for presumptively eligible newborn coverage in the section on page six.  Id. at 145.

557.  On page seven, the fourth Medicaid section states that the "application review dated February 08, 2024 is denied" and lists both Lily Mezquita and Jimardo Mezquita as Ineligible for February, March, April, and May of 2024. See Pls.' Ex. 130 at ECF p. 7.  The Designated Reason in this section is that:

Reason: You are receiving the same type of assistance from another program. You or a household member already qualify for this requested benefit in another case or another category. Examples: receiving TCA or SNAP in a different case, Medicaid eligibility continues in another category, etc.
THE MEDICAID COVERAGE FOR YOUR PREGNANCY HAS ENDED

Id.  The supporting law is Florida Administrative Code rule 65A-1.702 and section 409.903 of the Florida Statutes.  Id.  Yet, section 409.903 of the Florida statutes sets forth the twelve-month postpartum continuous coverage period for pregnant women making Lily Mezquita eligible.  See Fla. Stat. § 409.903(5).

558.  The last Medicaid section states: "Your Medicaid benefits for the person(s) listed below will end on April 30, 2024[,]" and lists Jimardo Mezquita and Lily Mezquita.  See Pls.' Ex. 130 at ECF p. 8.  The Designated Reason is: "THE MEDICAID COVERAGE FOR YOUR PREGNANCY HAS ENDED" and section 409.903 is again cited.  Id.

559.    According to Roberts, the last "Medicaid" section is distinct from the first "Medicaid" section of this NOCA.    See Roberts Test., Tr. Vol. II at 144. Roberts explained that the first "Medicaid" section is a denial of full coverage for all five family members, whereas the final "Medicaid" section is a termination of Lily Mezquita's pregnancy-related Medicaid.    See id. at 144. But Roberts did not know why Jimardo Mezquita is listed in a section that purportedly terminates pregnancy coverage.    Id. at 142-43.    And Jimardo Mezquita was not receiving Medicaid benefits at the time.    See Mezquita Test., Tr. Vol. III at 151.    Roberts also could not tell from the NOCA why DCF determined that Mezquita's pregnancy coverage should end in March 2024, when her baby was born in August of 2023, nor could he tell "why the case was run in the first place."    See Roberts Test., Tr. Vol. II at 143.

560.    The second May 29, 2024 NOCA begins with the same Medicaid section that was found on page four of the first May 29, 2024 NOCA.    Compare Pls.' Ex. 131 at ECF p. 1 with Pls.' Ex. 130 at ECF pp. 4-5.    It lists all five members of the family as ineligible for Medicaid in February through May of 2024, and provides Designated Reasons referencing household income and the "same type of assistance from another program."    See Pls.' Ex. 131 at ECF p. 1.    The following three sections of this NOCA are labeled "Medically Needy."    See Pls.' Ex. 131 at ECF pp. 2-5.    The first Medically Needy section lists I.M., E.M., and G.M. as "Ineligible," and Lily Mezquita as "Enrolled" for "May 2024,

- 185 -

Ongoing." Id. at ECF p. 2.   It includes the Income Exceeds Sentence directly above the header, and the standard information on the Medically Needy program.   Id. at ECF pp. 2-3.

561.  The second "Medically Needy" section states that the application/review is denied and lists I.M., E.M., G.M. and Lily Mezquita as "Ineligible" for February, March, and April of 2024.   Id. at ECF p. 4.   The Designated Reason is: "You are receiving the same type of assistance from another program.   You or a household member already qualify for this requested benefit in another case or another category. Examples: receiving TCA or SNAP in a different case, Medicaid eligibility continues in another category, etc." Id.   Florida Administrative Code rule 65A-1.702 is the law that purportedly supports the action.   Id.

562.  The last "Medically Needy" section states that benefits will end on April 30, 2024 for I.M., E.M., and G.M.   Id. at ECF p. 5.   The Designated Reason here is: "We reviewed your case, you are still eligible, but in a different Medicaid coverage type. In most cases, your income exceeds the income limits for full coverage, check your MyAccess account to see if you qualify for the Medically Needy program."   Id.   Once again, Florida Administrative Code rule 65A-1.702 is the law supporting the action.   Id.   This Designated Reason makes no sense in a section terminating Medically Needy benefits

because there is no income limit for the Medically Needy program and the reference to rule 65A-1.702 is meaningless.

563.    Thus, page one of this NOCA informs the reader that I.M., E.M., and G.M. are ineligible for Medicaid because their household income is too high, and page five informs that they are also ineligible for Medically Needy likely because their "income exceeds the income limits for full coverage . . . ."  Id. at ECF p. 1, 5.    The Medicaid section on page one tells the reader that I.M., E.M., and G.M. are receiving the "same type of assistance from another program," but the Medically Needy sections on pages four and five also inform that these three children are "receiving the same type of assistance from another program," or "still eligible . . . in a different Medicaid coverage type." Id.    Nothing in the NOCA clarifies what this other program or coverage type might be.

564.    The last section in the NOCA is labeled "Medicaid."  Id. at ECF p. 6. Here, the NOCA states that Medicaid benefits for Lily Mezquita will end on April 30, 2024.  Id.  The Designated Reason is the same "still eligible . . . in a different Medicaid coverage type" form language as provided in the previous section.  Id.

565.    After receiving these NOCAs, Mezquita contacted DCF and the Florida Health Justice Project.  See Mezquita Test., Tr. Vol. III at 152.  She then submitted a fair hearing request.  Id.  After doing so, she received a call from

DCF.  Id. at 153.  The caller explained that the system did not have a way to automatically renew Mezquita's pregnancy Medicaid when she submits applications so that the case worker reviewing the case must continue the coverage manually and failed to do so.  Id.  Mezquita believes that following this phone call her Medicaid was restored without any gap in coverage.  Id.

### K. Feasibility of Revisions to the NOCAs

566.  It is possible for DCF to make changes within the existing ACCESS system separate from the modernization project discussed above.  See Latham Test., Tr. Vol. V at 157.

567.  Specifically, DCF has contracted with Deloitte to perform maintenance, operations, and enhancements for the ACCESS Florida System.  See JPS, Part VIII ¶ 30.

568.  Changes to the NOCAs would constitute an enhancement under DCF's contract with Deloitte.  See Kallumkal Test., Tr. Vol. V at 213.

569.  For enhancements, the contract allows for 3,150 enhancement hours per quarter, for a total of 12,600 enhancement hours annually.  See Latham Test., Tr. Vol. V at 158.

570.  These enhancements are generally devoted to necessary changes such as new policies or new laws that must be implemented.  Id. at 158-59.  Indeed, given the ongoing modernization project, legacy enhancements are "very well-controlled to essentials."  Id. at 165.

571. If DCF seeks to make legacy enhancements necessitating additional hours beyond those allocated in the contract, DCF must seek an amendment to the contract to add more money. See id. at 160. Such a change would require approval on both the state and federal level. Id. at 161-62. Obtaining approval from the federal partners takes months. Id. at 162.

572. At the time of the bench trial, DCF had recently made some legacy enhancements to the NOCAs such as the change in the fair hearing language of the footer, the addition of a hyperlink to the DCF Services section of the footer, the relocation of the Income Exceeds Sentence, and the modification of six DCF reason codes. Id. at 166-67.

573. A few weeks after the bench trial, DCF implemented the Reason Code 241 enhancement discussed above. See supra Part I.G.a. The Reason Code 241 enhancement required over 500 hours of work to implement and took Deloitte approximately a month to accomplish. See Kallumkal Test., Tr. Vol. VI at 75-76. Notably, this enhancement required Deloitte to reprogram the system to save reason code data that the system was previously deleting when it ran the Medically Needy determination. See id. at 18-20, 27.

574. On October 3, 2023, DCF requested a "rough order of magnitude" (ROM) estimate from Deloitte on the number of hours it would take to modify the denial and termination Medicaid NOCAs to "include eligibility information used in making the Medicaid determination. i.e.: Income, Assets, Age,

Citizenship, etc.   The information should be included at the individual and assistance group levels."  <u>See</u> Defs.' Ex. 40 (October 3, 2023 ROM); <u>see also</u> Kallumkal Test., Tr. Vol. V at 215-16.

575.   DCF asked Deloitte to prepare this estimate on an expedited basis.  <u>See</u> Kallumkal Test., Tr. Vol. V at 218.   As such, Deloitte did not have time to go through its normal technical analysis in preparing the estimate.   <u>See</u> Kallumkal Test., Tr. Vol. VI at 25.

576.   In reviewing the October 3, 2023 ROM request, Deloitte determined that the requested changes would impact multiple systems and require programming dynamic data into the NOCA, i.e. information that varies from case to case.  <u>See</u> Kallumkal Test., Tr. Vol. V at 219-20.   And significantly, the system currently deletes the total computed income (countable net income) and the income limit that was used for an individual who is found ineligible for Medicaid based on income.  <u>Id.</u> at 232.   As such, including those data points in the NOCA would require Deloitte to make significant changes to the SFU, EDBC, and authorization modules within the FLORIDA system.   <u>Id.</u> at 235-36.   Deloitte would also have to design a new database within the FLORIDA system to hold the data that the system currently deletes, and then add other processes to extract that data and place it in the NOCAs.  <u>Id.</u> at 236.

577.  Once the processes are in place to save the data and extract it from the system, Deloitte would need to modify the actual notice templates within ExStream to create a place for the dynamic data (e.g., income and income limit) to be inserted along with additional static language explaining those numbers.  Id. at 258.

578.  Deloitte estimated that making the changes contemplated in the October 3, 2023 ROM would require "somewhere close to or over 28,000 hours" and constitute what Deloitte classifies as an "extra-large" request.  Id. at 234, 250-52; see also Defs.' Ex. 41.

579.  Deloitte also analyzed the number of hours it would take to implement a more limited enhancement—adding to the NOCAs only the income and income standard used in the Medicaid eligibility calculation.  See Kallumkal Test., Tr. Vol. V at 257.  This change would require over 12,000 hours.  Id.

580.  However, a major factor in the size of both estimates is Deloitte's understanding that the requested enhancements would require it to modify the system to store data that is currently deleted by the system.  See Kallumkal Test., Tr. Vol. VI at 45-46, 73.

581.  Significantly, other options exist for modifying the NOCAs that would not require Deloitte to reprogram the system to save data that is currently deleted.

582.  For example, including a hyperlink in the NOCA to a table of income limits is relatively easier and requires less hours than reprogramming the FLORIDA system to save and extract the specific income limit applied to an individual's case.  Id. at 44.

583.  Moreover, any information that is currently stored in the FLORIDA system can be extracted and populated into a NOCA.  See id. at 47.

584.  Significantly, as discussed above, the countable income (MAGI) and SFU size from the Medically Needy Budget screen are stored in the FLORIDA system.  Id. at 55-57.  Similarly, for an individual whose Medicaid is terminated, the IQEL screen in the FLORIDA system saves the Medicaid eligibility category in which that individual was previously enrolled.  Id. Indeed, the FLORIDA system saves and displays the eligibility category and the people who are part of the SFU.  See Kallumkal Dep. at 191-92.  The system also stores the identity of the individual whose eligibility is being determined.  See Kallumkal Dep. at 234.

585.  Deloitte does not know how much time it would take to add the MAGI and the SFU from the Medically Needy Budget screen to the NOCA because it has never been asked to conduct that analysis.  See Kallumkal Test., Tr. Vol. VI at 95-96.  Nevertheless, Deloitte acknowledges that this change would be simpler than trying to retain and extract data points from the Medicaid

Budget screen that is currently deleted when an individual fails eligibility due to income.   Id. at 96.

## II.    Conclusions of Law

### A. Applicable Law

In Count I of the Second Amended Complaint, Plaintiffs assert that the State has deprived Class Members of their right to due process in violation of the Fourteenth Amendment.   See Second Amended Complaint (Doc. 183) at 41. The standard for a constitutional violation under the Due Process Clause is well known:

> There can be no doubt that, at a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950).

Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).   To state a claim under § 1983 for denial of procedural due process, a plaintiff must allege: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process."   Id. (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994)).   In this case, it is undisputed that Class Members have a constitutionally protected property interest in their Medicaid benefits, and that the State's termination of those benefits is a deprivation of that interest.   Thus, the issue in resolving this claim is whether or not the State provides constitutionally adequate process.

"To determine what type of notice is adequate to satisfy the Due Process Clause," the Eleventh Circuit instructs courts to apply the test set forth in Mullane. See Arrington v. Helms, 438 F.3d 1336, 1349 (11th Cir. 2006). Under this standard, "notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Id. at 1349-50 (quoting Mullane, 339 U.S. at 314). Significantly, "[d]ue process is a flexible concept that varies with the particular circumstances of each case, and myriad forms of notice may satisfy the Mullane standard." Id. The question is not whether the notice is "ideal under all the circumstances, but rather whether the notice [Class Members] currently receive is reasonable under all the circumstances." Id. at 1350. Moreover, the relevant question "is not whether a particular individual failed to understand the notice but whether the notice is reasonably calculated to apprise intended recipients, as a whole, of their rights." See Jordan v. Benefits Rev. Bd. of U.S. Dep't of Labor, 876 F.2d 1455, 1459 (11th Cir. 1989).

## B. Standing

Prior to discussing the merits, the Court turns to the issue of standing. In the Class Certification Order, the Court determined that Named Plaintiffs A.V., Kimber Taylor, and K.H. have standing to assert the claims raised in this

action.  See Class Certification Order at 29-35, 42-46.[57]   The facts developed at trial are consistent with the Court's findings in the Class Certification Order and as such, it is unnecessary to revisit the standing of these Plaintiffs. Indeed, in the State Proposal submitted after the bench trial, the State does not specifically challenge the standing of these individuals.   See State Proposal at 113.   The State does reassert its contention that Plaintiffs Chianne D. and C.D. lack standing.  See State Proposal at 114-15.   However, the Court does not find it necessary to resolve this issue for the reasons explained in the Class Certification Order.   See Class Certification Order at 28-30; see also Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006) ("So long as one party has standing, other parties may remain in the suit without a standing injury.").

The State also continues to challenge the standing of the individual Class Members.   See State Proposal at 113.   According to the State, it is "particularly important" for the Court to consider each Class Member's individual standing due to "the nature of the relief requested."   Id.

---

[57] More specifically, the Court found that Named Plaintiffs A.V. and K.H. were threatened with a real and immediate risk of future harm because their Medicaid benefits were subject to annual review.  See Class Certification Order at 33-35.  In addition, the Court found that Taylor was suffering from ongoing harm because she remained confused about whether her Medicaid benefits had been restored, continued to assert her eligibility for benefits, and was anxious about not having full healthcare coverage.  Id. at 35.  Notably, at the time of trial, Taylor was receiving Medicaid benefits and thus subject to annual review. Moreover, although the modernization project is ongoing, the State has no immediate plans to alter its notice practices and there is no evidence that the modernization project will correct the alleged deficiencies challenged in this lawsuit.

Specifically, the State points to Plaintiffs' request for prospective reinstatement and corrective notices for all Class Members whose benefits have been terminated and not subsequently reinstated.  See id.  The State argues that such classwide relief is improper because Plaintiffs have not demonstrated that "absent class members suffered a cognizable and redressable classwide injury . . . ."  Id. at 116.  According to the State, Plaintiffs must show how each Class Member was injured by the omission of particular items of information from the notices such that an injunction requiring the State to provide a new notice with the missing information would redress that specific injury.  Id. at 117.  The State maintains that:

> [c]lass members who have no basis to contest DCF's eligibility determination—or who knew they were correctly determined to be ineligible for Medicaid—were not harmed by the omission of information from their notices, would not benefit from the inclusion of that information, and thus lack standing to challenge the sufficiency of their notices.

Id. at 118-19.  In the State's view, these Class Members have suffered "at most a bare procedural violation, which is insufficient to confer Article III standing."  Id. at 118.[58]

---

[58] To the extent the State asserts that there is insufficient evidence of any injury to the Named Plaintiffs from "the lack of individualized information they purport to seek," the Court rejects this argument.  Id. at 117-18.  For purposes of standing, the Court must assume Plaintiffs will prevail on the merits of their claim.  See Polelle v. Fla. Sec'y of State, 131 F.4th 1201, 1211 (11th Cir. 2025).  This means Plaintiffs are entitled as a matter of due process to the detailed notice they seek.  Although the State argues that Plaintiffs were not injured by any missing information, even if required, this harmless error argument is inapposite here

Significantly, although the State argues that class standing is lacking based on the nature of the relief requested, the State makes no attempt to address the other relief Plaintiffs seek—a declaratory judgment and an injunction prohibiting the State from terminating future Class Member Medicaid benefits without adequate notice.    Indeed, the State's class standing arguments do not appear to relate to those forms of relief.    Regardless, the Court considered the State's class standing arguments during the class certification stage of these proceedings and found them unavailing.    See Class Certification Order at 42-46.    For the reasons stated in that Order, the Court

where Plaintiffs seek prospective relief.    See Ortiz v. Eichler, 616 F. Supp. 1046, 1062 (D. Del. 1985) (rejecting argument premised on a lack of harm from alleged due process violations where "Plaintiffs are seeking to compel [the State] to obey the law, not to recover compensation for harm done to them."), on reargument, 616 F. Supp. 1066, aff'd, 794 F.2d 889 (3d Cir. 1986).

    Regardless, the State's rose-colored view of the evidence on past harm is factually incorrect.    For example, the State argues that Kimber Taylor "knew that [her] income should not have mattered to [her] eligibility . . . ."    See State Proposal at 117.    However, as set forth above, Taylor did not understand at the time she read the NOCA that her postpartum status gave her continuing coverage regardless of income.    See supra Part I.J.b. ¶ 434 n.51.    And, had the State correctly determined Taylor's income, she would have remained eligible regardless of the State's erroneous termination of her postpartum continuing coverage.    Id. ¶¶ 439-40.    Indeed, one of the errors the State made in Taylor's case was incorrectly attributing income to Taylor that she was not receiving due to her maternity leave.    See id. Had the NOCA reflected the State's determination of her countable income, Taylor could have readily identified this error.    Similarly, the State incorrectly terminated A.V.'s Medicaid coverage on two separate occasions due in part to its miscalculation of her SFU, such that inclusion of this information in the NOCA may have allowed Jennifer V. to realize the State had made an error.    See supra Part I.J.c. ¶¶ 480-81, 495-96.    The State also incorrectly assessed A.V's eligibility on at least one, and possibly two, occasions based on outdated income data.    Id. ¶¶ 480-82, 493-94.    Thus, while Jennifer V. may not have "mentioned the absence of income information as a barrier to protecting her rights," see State Proposal at 117, the evidence shows that she would have benefitted from the inclusion of this information in the NOCA.    Moreover, the State ignores the stress, confusion, and lost time endured by all Named Plaintiffs from the vague and confusing notices.    To the extent the Named Plaintiffs were able to identify and correct the State's errors, it was only through enormous effort, perseverance, and ultimately, the assistance of counsel.    This is hardly harmless error.

remains convinced that Plaintiffs have standing to pursue declaratory and injunctive relief on behalf of the entire Class, all of whom have or will suffer the constitutional injury at issue in this case.  Id.; see also Polelle v. Fla. Sec'y of State, 131 F.4th 1201, 1209 (11th Cir. 2025) ("Constitutional injuries are prototypical concrete injuries.").[59]

The State's contention that corrective notice is a "person-specific" form of relief which requires an individualized inquiry on standing is unpersuasive. See State Proposal at 115-16.[60]   The flaw with the State's argument is two-fold:

---

[59] Notably, the Court limited the Class to those individuals whose Family-Related Medicaid benefits have been or will be terminated based on a finding of financial ineligibility. As limited, the Court is satisfied that Plaintiffs may represent the entire Class, regardless of whether, for example, it is the missing income information that injures one Class Member but the confusing structure of the NOCA that injures another.   The State does not argue, and the Court cannot discern, any basis to conclude that the different alleged flaws in the NOCAs implicate a significantly different set of concerns such that class treatment is inappropriate. See Gratz v. Bollinger, 539 U.S. 244, 265 (2003).   Indeed, all Class Members have the same interest in receiving adequate notice and suffer the same constitutional injury by the lack thereof.   See Fox v. Ritz-Carlton Hotel Co., L.L.C., 977 F.3d 1039, 1047 (11th Cir. 2020). Thus, whether framed as a standing issue or one of class certification, the Court has carefully considered the question of disjuncture and finds no problem here.   See 1 Newberg and Rubenstein on Class Actions § 2:6 (6th ed.).

[60] The State's contention that prospective reinstatement requires an individualized showing may have more heft.   See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 366 (2011) (characterizing reinstatement as "individual relief"); see also Whalen v. Mas. Trial Ct., 397 F.3d 19, 29 (1st Cir. 2005) ("A plaintiff's entitlement to more than nominal damages in a procedural due process case turns on whether the constitutional violation—the failure to provide a pre-termination opportunity to contest termination—did in fact cause the harm asserted—the loss of the [property interest].   If [the plaintiff] would have been terminated even after a proper hearing, he would not be eligible for . . . reinstatement . . . ."); Galbreath v. Hale Cnty., Ala. Comm'n, No. 15-308-CG-N, 2017 WL 3402964, at *2-5 (S.D. Ala. Aug. 8, 2017) (surveying caselaw on the availability of reinstatement as a remedy in due process cases).   However, the Court need not reach this argument.   For the reasons set forth in Part III, the Court declines to order classwide reinstatement under the circumstances of this case.

it is backward looking, and it misapprehends the nature of the injury.  The

claim here is not that the Class has suffered a past injury that could have been

avoided with adequate notice.  Compare Rector v. City & Cnty. of Denver, 348

F.3d 935, 940, 945 (10th Cir. 2003) (finding no standing for compensatory claims

where, even if procedures were inadequate, plaintiff had no basis to challenge

the fine).  The claim is that Class Members are suffering an ongoing injury

because they are entitled to adequate notice of the reasons for the termination

of their Medicaid benefits, and they have not received it.  In the State's view,

a Class Member does not have standing to pursue a claim seeking the notice to

which she is constitutionally entitled unless she establishes that she does not

otherwise know what will be in the notice, and that upon receipt of adequate

notice she will have some basis to challenge the decision.  See State Proposal

at 118-19.  This argument puts the cart before the horse.  Until the Class

Member receives the constitutionally required notice, how does she know what

it will say, whether her understanding of the State's decision is correct, or

whether she has a basis to challenge the decision?[61]  The injury here is the

---

[61] Indeed, as discussed below, numerous courts have recognized that adequate notice
is necessary in this context so that enrollees can detect errors and decide whether to challenge
the decision.  Thus, many Class Members may be unaware of the harm caused by the
deficient notice until they receive constitutionally adequate notice.  Given the variable and
heavily fact dependent nature of the eligibility determination, there is plainly "some
possibility" that adequate notice will reveal errors in those determinations.  See Ctr. for a
Sustainable Coast v. U.S. Army Corps of Eng'rs, 100 F.4th 1349, 1357 (11th Cir. 2024).
Stated another way, it is enough that the eligibility of the Class Members is "open to some
dispute" because the termination decisions at issue here require the State to show that the

State's failure to provide constitutionally adequate notice and that injury is plainly redressable through injunctive relief requiring the State to provide adequate notice.   See Ouachita Watch League, 463 F.3d at 1173 ("As the injury [plaintiff] asserts is the [government's] failure to comply with [procedural rules], that injury is plainly redressable."); Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs, 100 F.4th 1349, 1357 n.7 (11th Cir. 2024).   As such, the Court is satisfied that all Class Members have standing to pursue corrective notice as a form of prospective procedural relief.   See Ctr. for a Sustainable Coast, 100 F.4th at 1359 ("A procedural violation is remedied by process, and so long as that process protects a concrete interest, the plaintiff has shown redressability.").[62]

Undoubtedly, some Class Members may have no need for the information which a corrective notice might contain, but this does not preclude classwide relief.   As explained in the Class Certification Order, in a Rule 23(b)(2) class action such as this, it is not necessary for all Class Members to be aggrieved by the challenged practice.   See Class Certification Order at 61-62, 67-68.   "The

_____

enrollees are ineligible as a factual matter.   See Fuentes v. Shevin, 407 U.S. 67, 87 & n.17 (1972).

[62] The State's reliance on Soskin v. Reinertson is also misplaced.   See State Proposal at 118.   Here, the record amply establishes the contents of the NOCAs, which individuals received the challenged NOCAs, the circumstances under which those NOCAs are sent, and the other information available to enrollees.   Cf. Soskin, 353 F.3d 1242, 1264 (10th Cir. 2004). Thus, the Court has an adequate record on which to determine whether the State's NOCAs comply with the Constitution and which individuals received an unconstitutional NOCA.

key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360 (2011) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." Id.

The indivisibility requirement is satisfied here. All Class Members are entitled to constitutionally adequate notice, the objective meaning of which is the same as to all Class Members. If the State's NOCAs fail to meet that standard as to one Class Member, they fail to meet that standard as to all Class Members making class relief "peculiarly appropriate." See Califano v. Yamasaki, 442 U.S. 682, 701 (1979) (approving class treatment of procedural claims where the questions of law apply in the same manner to each member of the class and "[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue"). Moreover, each Class Member is entitled to the same notice such that any declaratory and injunctive relief concerning the form and contents of the constitutionally required notice will be the same as to all Class Members. Stated another way, no individual Class Member would be entitled to a "different injunction or declaratory judgment

against the defendant."  See Wal-Mart Stores, Inc., 564 U.S. at 360.[63]   And a

single injunction requiring the State to provide the required constitutionally

adequate notice—which no Class Members have received or will receive

otherwise—provides relief to each member of the Class in the form of a new

notice.   This relief ensures that all Class Members will have a meaningful

opportunity to determine whether to challenge the State's termination decision.

Although the degree to which each Class Member benefits from this relief may

differ, such differences do not undermine the indivisibility of the relief.   See

Barrows v. Becerra, 24 F.4th 116, 132 (2d Cir. 2022); Amara v. CIGNA Corp.,

775 F.3d 510, 522 (2d Cir. 2014).   As such, the Court proceeds to the merits of

the case.

### C. Summary of the Arguments

Plaintiffs contend that the NOCAs are inadequate as a matter of

constitutional due process for two reasons.   First, Plaintiffs argue that the

NOCAs do not clearly communicate the State's intended action because of their

vague language, confusing structure, and reliance on misleading Designated

---

[63] The State appears to suggest that indivisibility in this context means relief that if
ordered as to one will necessarily operate as to all, such as the removal of a monument.   See
State Proposal at 113 (citing Glassroth v. Moore, 335 F.3d 1282, 1293 (11th Cir. 2003)).   The
Court rejects such an interpretation because it would render Rule 23(b)(2) a dead letter.
What purpose would be served by going through the difficult exercise of seeking Rule 23(b)(2)
class certification if it is only authorized in cases where total relief can be accomplished
through a single plaintiff?   Indeed, courts have declined to certify Rule 23(b)(2) classes as
unnecessary for this very reason.   See, e.g., M.R. v. Bd. of Sch. Com'rs of Mobile Cnty., 286
F.R.D. 510, 519-20 (S.D. Ala. 2012) (citing United Farmworkers of Fla. Hous. Project, Inc. v.
City of Delray Beach, Fla., 493 F.2d 799, 812 (5th Cir. 1974)).

Reasons.   <u>See</u> Class Proposal at 119-20.   Second, Plaintiffs maintain that

where the State terminates critical public benefits such as Medicaid, due

process requires the State to provide notice with case-specific reasons in

sufficient detail to allow the enrollee to "challenge a decision as 'resting on

incorrect or misleading factual premises or on misapplication of rules'" to the

enrollee's case.   <u>Id.</u> at 116-17 (quoting <u>Goldberg v. Kelly</u>, 397 U.S. 254, 267-68

(1970)).     According to Plaintiffs, the necessary case-specific information

includes the amount of income attributed to the applicant, the SFU, and the

income limit applied for the eligibility category and SFU size.   <u>Id.</u> at 121-22.

It also includes, in Plaintiffs' view, identification of the eligibility category in

which the individual was previously enrolled and the eligibility categories for

which the individual "could establish eligibility."   <u>See id.</u> at 125.   Plaintiffs

assert that such information is necessary to understand the reason for the

intended action and the standards applied.   <u>Id.</u>   Because the State-issued

NOCAs do not include this case-specific information, Plaintiffs maintain that

the State is failing to comply with the requirements of due process.[64]

---

[64] As summarized above, Plaintiffs premise their due process claim on a failure to
inform recipients of the action taken and a failure to explain the reasons for the State's action.
<u>See</u> Class Proposal at 115-40; <u>see also</u> Plaintiffs' Trial Brief (Doc. 132) at 20-22, 29.   And
Plaintiffs seek relief tailored to address these alleged deficiencies.   <u>See</u> Class Proposal at 156-
57.   Plaintiffs do not argue that the NOCAs are constitutionally insufficient based on any
perceived inadequacies in the fair hearing language.   <u>See id.</u> at 119-126.   As such, the Court
does not address whether the State adequately informs enrollees of their fair hearing rights.

Plaintiffs argue that other communications before and after the State's termination decision cannot supply adequate notice. Id. at 126. In Plaintiffs' view, any communication sent before the NOCA does not supply the necessary information because DCF has not yet made a final decision. Id. at 126-27. And any information supplied after an individual files an appeal is too late, according to Plaintiffs, because it "is not timed to allow the individual to make an informed choice about whether to appeal in the first place." Id. at 127.

Plaintiffs also maintain that other sources of case-specific information such as the call center and Family Resource Centers are insufficient as a matter of due process because these sources are not "reasonably certain to inform those affected." Id. at 128 (quoting Mullane, 339 U.S. at 315). According to Plaintiffs, these sources are difficult to access and subject to errors. Id. at 128-133. And regardless, Plaintiffs maintain that the State cannot satisfy its constitutional obligation to provide adequate notice to the Class Members by placing the burden on Class Members to acquire the necessary notice themselves. Id. at 129.

In addition, Plaintiffs assert that the State's reliance on publicly available sources of information such as statutes, regulations and the Policy Manual is misplaced. Id. at 134-35. Plaintiffs point out that these sources by their very nature cannot provide case-specific information. Id. And Plaintiffs maintain that it is unreasonable to require Class Members to locate and interpret the

complex Medicaid rules and regulations, particularly because the available information on eligibility requirements "must be compiled from many different locations, is sometimes conflicting, and requires piecing together disparate information and making numerous inferences about a complex program." Id. at 135-36.

In the State Proposal, the State contends that the NOCAs contain sufficient information "to advise recipients that their Medicaid is being terminated and how to challenge that decision through a fair hearing." See State Proposal at 123. Specifically, the State points to: the section of the NOCA that states Medicaid will end on a specific date, the standardized text in the Medically Needy template, and the standardized text in the footer explaining how to obtain more information. Id. According to the State, this is adequate to meet the requirements of due process. Id.[65] In addition, the State argues that other publicly available sources of information, coupled with the NOCA, "are objectively sufficient to provide class members with notice of the termination decision and their fair-hearing rights." See id. at 130-31.

---

[65] The State also appears to contend that for Plaintiffs to prevail on their due process claim the Court must determine "whether class members exercised reasonable diligence to understand their rights, and whether class members had knowledge of their rights." See State Proposal at 125. But these questions are irrelevant to the issue of whether the State's ongoing notice practices are constitutionally adequate and have no bearing on whether Plaintiffs are entitled to an injunction against the use of the purportedly inadequate procedures going forward. To the extent the State argues that this inquiry is necessary before the Court can grant prospective reinstatement to all Class Members, the argument goes to the appropriate scope of any relief, not the merits of the claim.

Specifically, the State relies on the availability of the call center, Family Resource Centers, DCF website, Policy Manual, Medicaid Fact Sheets, and Medically Needy Brochure, as well as the relevant statutes, rules, and regulations.  Id. at 130-33.[66]

## D. Adequate Notice

To determine the adequacy of the State's notice practices under the Due Process Clause, the Court will conduct the analysis in two parts.  First, the Court will consider whether the NOCAs provide reasonable notice of the State's decision to terminate Medicaid benefits based on financial ineligibility.  And second, the Court will analyze whether the State provides reasonable notice of the reasons for an income-based termination decision.  The second part of the analysis involves two questions: 1) what information is required, and 2) under all the circumstances, does the State provide reasonable notice of the required information.  For the reasons discussed at length below, the Court finds that the NOCAs do not provide reasonable notice of termination decisions based on income because they are vague, confusing, and often inaccurate and misleading. In addition, the Court determines that under the circumstances of this case,

---

[66] The State does not identify the MyAccess account as one of the other viable sources of information.  As such, the Court will not discuss it any further.  Regardless, the Court notes that, as set forth in the factual findings, the MyAccess account is confusing in its use of unexplained symbols and failure to clearly distinguish between full Medicaid coverage and the Medically Needy program.  Moreover, the MyAccess account does not provide any additional information beyond what is stated in the NOCAs.

due process requires the State to provide enrollees with the reasons for its termination decision in sufficient detail to allow the recipient to assess the accuracy of the decision. And having reviewed the entire body of evidence in this case, the Court is convinced that neither the NOCAs nor the other available sources of information provide enrollees with sufficiently specific reasons in a timely and adequate manner.

Although the discussion that follows is lengthy, the ultimate question before the Court is straightforward: prior to terminating Medicaid benefits based on a finding of financial ineligibility, does the State provide Medicaid enrollees with notice that is objectively "reasonable under all the circumstances"? See Arrington, 438 F.3d at 1350. Having heard extensive testimony concerning the State's Medicaid system and notice practices, and having reviewed the entire body of evidence in this case, the Court is wholly convinced that the answer is plainly, No.

### a. Termination Decision

The Court first discusses the question of whether the NOCAs are reasonably calculated to provide enrollees with notice of the State's decision to terminate Medicaid benefits based on financial ineligibility. Notably, at the outset of this case, the undersigned reviewed the NOCAs in the record at that time and found their construction and content confusing and contradictory. See Transcript of December 13, 2023 Preliminary Injunction Hearing (Doc. 64)

at 4-5, 24-25, 31-32, 72-73, 91.   Nevertheless, the Court recognized that its impression of the NOCAs was based on very limited information and could change when viewed under the totality of the circumstances.   Now, having reviewed additional NOCAs, heard and read hours of testimony about the meaning of the NOCAs, familiarized itself with the requirements for Family-Related Medicaid eligibility, been educated on the operation of the FLORIDA system, and otherwise carefully considered the evidence in this case, the Court is convinced that the NOCAs are, in fact, exceedingly confusing and contradictory in their language and construction.   Indeed, the testimony from DCF witnesses, who themselves could not consistently or definitively interpret the NOCAs, only confirmed that the NOCAs lack any discernible logic in their content and structure.

As described in the Court's factual findings, the State divides its decision across multiple "Medicaid" or "Medically Needy" sections in a single NOCA without explaining how or why the decisions in each section are distinct.   See supra Part I.F.   The State also lists varying combinations of household members in each section without explaining the reason for these seemingly random groupings and without identifying which individual's eligibility was reviewed in that section or to whom the Designated Reason applies.   Indeed, some Designated Reasons reflect and exacerbate this lack of clarity with language that states "you or a member of your household" are the person to

whom the decision applies.   The reader must sort through this morass before she finds the termination section near the end and then must endeavor to reconcile the information in that section with all that came before.   Such an unreasonably vague and convoluted structure injects ambiguity into the notices, obscures the State's ultimate decision on eligibility and the reason for that decision as to each impacted enrollee, and, in the end renders the notices incomprehensible for an average Medicaid recipient.

For example, a recipient may understandably assume, as the Court did, that the eligibility decision reflected in each section is relevant to the individuals listed in that section.   But this assumption is wrong.   Individuals are routinely included in sections of the NOCA that do not pertain to them.   As a result, the Designated Reasons explaining why the pertinent individual is ineligible may or may not apply to the others listed.   And there is no indication of who among those listed is the pertinent individual.   The Court learned during the bench trial that the groupings may sometimes relate to an enrollee's SFU, but even that explanation is not always accurate.   Remarkably, not one DCF witness was able to provide this Court with a universal rule for how the groupings are constructed.   But even if such a rule does exist, it is not explained to the recipient to aid in her interpretation of the NOCA.   As a result, it is difficult, if not impossible, for the recipient to understand the State's intended action as to each enrollee or the reasons for that action.

Likewise, the State's eligibility findings are conveyed across multiple, medical benefit sections such that the State's ultimate termination decision and the reasons for that decision as to any specific enrollee is not readily apparent. Based on the evidence presented at trial, it appears the separate medical benefit sections <u>may</u> reflect differences in the eligibility category or specific individual under consideration. But the sections are not labeled by person or eligibility category so there is no apparent way for the reader to discern from the NOCA which eligibility category was reviewed or to which of the individuals listed in a particular section the decision actually applies.[67] As a result, NOCAs may indicate in one Medicaid section that a person is <u>ineligible</u> for Medicaid where that person is in fact <u>eligible</u> for Medicaid but in a different coverage group than the one tested in that section. NOCAs may also confusingly indicate that benefits are ending for a person who was not previously receiving benefits. And troublingly, NOCAs may indicate that benefits are ending for a person whose benefits are not in fact ending. Placed into the context of a particular eligibility category, each stated decision may be accurate. But without the relevant context, recipients are left guessing as to how to reconcile what appear to be contradictory determinations.

---

[67] Based on the testimony at trial, it does appear that if an individual is found <u>eligible</u> for Medicaid in a section, then one can infer that the eligible individual was the person assessed and perhaps determine the eligibility category that likely applied to that individual. But nothing in the NOCA explains that to the recipient.

The Designated Reasons only further confuse the matter. When an individual is terminated from full Medicaid based on income and moved to the Medically Needy program, the State permits the use of Designated Reasons which do not inform the reader that financial ineligibility is the reason for the State's decision and often affirmatively mislead the reader about the decision that was made. For example, the State allows case workers to use Designated Reasons in this circumstance which tell the reader that the individuals listed will continue to receive the "same type of assistance" in a different program or group. This statement is both untrue and actively misleading. Receiving the same type of assistance is <u>not</u> a <u>reason</u> for the termination of benefits. And it is not true that receiving assistance under the Medically Needy program is "the same type of assistance" as full Medicaid. Indeed, multiple DCF witnesses agreed that the Medically Needy program is unequivocally not the "same type of assistance" as full Medicaid. Similarly, prior to December 2023, the State allowed the use of a Designated Reason in this circumstance which told the reader that the individuals listed <u>remain eligible</u> for Medicaid, but in a different coverage group. Again, not only was this Designated Reason not an actual

<u>reason</u> for the decision, it misled the reader into believing that the Medicaid benefits for the household member would "remain" in place.[68]

The evidence shows that the State also uses Reason Codes 290 and 374 when an individual is terminated from Medicaid based on income. These Reason Codes simply state that the eligibility requirements are not met, or that no one in the household is eligible. Although the State revised these Reason Codes in December 2023, the revised language does not resolve the problem. Rather, the revised language states that the lack of eligibility may be due to income, or it may be due to some other change in household circumstances. Thus, the revised language provides no reason at all. An individual cannot know that financial ineligibility is the reason for the ineligibility finding unless he or she contacts DCF to inquire, and even then, only if the individual succeeds in reaching a person who can provide accurate information.

To the extent the State believes it has resolved this issue through the Reason Code 241 enhancement, the Court is not persuaded. The Court has no evidence concerning how this change is working in practice. For example, if Reason Code 241 is populated automatically but case workers are still adding

---

[68] In December 2023, DCF changed the wording of Reason Code 227 from "remain eligible" to "still eligible" and added a sentence that: "In most cases, your income exceeds the income limits for full coverage, check your MyAccess account to see if you qualify for the Medically Needy program." <u>See</u> Part I.G.b. While this second sentence tempers to some degree the misleading "still eligible" message conveyed in the first sentence, an individual still cannot determine, from this Designated Reason alone, the actual basis for the State's decision.

Reason Code 249 along with it, then recipients will still be left confused and
uncertain about what action DCF is taking and the reason for the action.   And
regardless, the addition of Reason Code 241 does not resolve the ambiguity
created by the structure of the NOCA itself.   Adding Reason Code 241 in the
termination section at the end of the NOCA will not remedy the confusion first
created by the inclusion of various Medicaid or Medically Needy sections which
may have contradictory Reason Codes.   Nor does it remedy the State's failure
to identify the individual or individuals in each section to whom the Designated
Reason applies.

In addition, the statutory and regulatory citations in the NOCAs often
further confuse and mislead the recipient as to the State's decision and the
meaning of the Designated Reason.   The NOCAs inform the recipient that a
particular statute or regulation supports the decision, but the citation provided,
if one is provided, does not reliably relate to the reason for termination.   For
example, the evidence demonstrates that some NOCAs, intended to convey the
termination of Medicaid benefits due to income, identify an irrelevant Florida
statute concerning temporary cash assistance as the authority supporting the
action.   And the NOCAs discussed at trial frequently included a citation to rule
65A-1.702 of the Florida Administrative Code.   As described above, this rule
covers various aspects of the Medicaid program in Florida but does not include

any provisions which would constitute <u>support</u> for a termination decision.[69]   By pointing the recipient to irrelevant or unhelpful legal authority as the law that supports the State's decision, the State affirmatively undermines the recipient's ability to use these publicly available sources to decipher the meaning of the NOCA.

The State asks the Court to disregard all of this incoherency and focus instead on particular isolated sentences in the NOCAs that reflect the State's actual decision and the reason for it.   But the State does not explain how the Medicaid beneficiaries who receive these NOCAs are supposed to know which statements to focus on and which to ignore.   To fully understand a NOCA's meaning, the recipient must carefully cross-reference each section of the NOCA against the others, identifying similarities and differences to attempt to extrapolate the decision reflected in each separate section and the reason for it. The reader must figure out what portions of the NOCA convey pertinent information and what statements the reader should disregard.   This includes scrutinizing the standardized fine print in the Medically Needy sections for

---

[69] It is worth noting that the State's reliance on broad and unhelpful citations is not for lack of other options.   For example, the Code of Federal Regulations includes separate provisions regarding the coverage requirements for specific eligibility categories.   <u>See, e.g.</u>, 42 C.F.R. § 435.110 (Parents and other caretaker relatives); § 435.116 (Pregnant women); § 435.118 (Infants and children under age 19).   And 42 C.F.R. § 435.603 sets forth the MAGI standards for calculating income.   While these regulations are undoubtedly confusing and complex, a citation to specific provisions such as these would at least signal to the reader that the State's decision was based on the application of income rules to a particular eligibility category.

clues, while ignoring the prominent Designated Reasons in the Medicaid sections that may be inconsistent.   As noted, even experienced DCF witnesses struggled at times to interpret the meaning of provisions in the NOCAs reviewed at trial.   See Veltkamp Dep. Vol. 1 at 75-77 (reviewing the NOCA at Plaintiffs' Exhibit 17 and testifying that she would need to see non-public information in the case file to determine the meaning of the Reason Code and whether the individual's Medicaid was ending); Roberts Test., Tr. Vol. II at 142 (testifying that he does not know why two people are listed in a particular section of the NOCA at Plaintiffs' Exhibit 130); Roberts Test., Tr. Vol. II at 88 (testifying that he could not tell whether the Reason Code applied to everyone listed in a particular section of the NOCA at Plaintiffs' Exhibit 81); Anderson Test., Tr. Vol. IV at 183 (testifying that she "can't say for sure" whether a Reason Code referring to "another program" in the NOCA at Plaintiffs' Exhibit 40 meant the Medically Needy program).

In considering whether the NOCAs reasonably convey the State's termination decision, the Court finds it helpful to compare the State's NOCA to the notice evaluated in the Eleventh Circuit's Jordan decision.   The plaintiff in Jordan challenged the adequacy of a form notice denying black lung benefits.[70]

_____

[70] Given the context-specific nature of the due process analysis, it is important to recognize that the notice challenged in Jordan was one issued after the applicant had already gone through several rounds of administrative review and denials.   See Jordan, 876 F.2d at 1457-58.   Indeed, the applicant's first claim for benefits had been denied three times—upon

The Eleventh Circuit summarized the contents of the challenged notice in relevant part as follows:

> The letter specifically stated that [the plaintiff's] claim had been denied because the evidence in his file failed to show that he was totally disabled by black lung disease.   It defined 'totally disabled' and explained that the claimant could submit additional evidence or request a hearing within sixty days.   The three elements for proving entitlement were listed along with the specific type of medical or other evidence needed for each element of proof.

See Jordan, 876 F.2d at 1458.   Importantly, the notice enumerated the conditions a claimant must show to qualify for black lung benefits and included a checklist indicating which of the three conditions the claimant failed to demonstrate.   Id. at 1459.   The notice also referred the claimant to an enclosed guide "which discusses the type of evidence that could be used to meet the eligibility criteria."   Id.   The Jordan court found this information provided "sufficient detail to pass the notice requirement of due process."   See Jordan, 876 F.2d at 1459.

As evident from the Court's discussion above, the standardized NOCAs that the State uses to terminate Medicaid benefits for financial ineligibility are far more complex, far less informative, and in some circumstances, actively misleading.   Unlike Jordan, the NOCAs do not plainly and succinctly state the

---

initial review, following a request for reconsideration, and then after a hearing with an administrative law judge.  Id. at 1457.   The applicant submitted a second claim for benefits which was also denied.  Id.   The applicant then supplemented his application, prompting another review which ultimately resulted in the allegedly inadequate denial notice.  Id. at 1458-59.

decision and the reason for the decision as to each enrollee.  Moreover, the
NOCAs do not identify the requirements an enrollee must meet to establish
entitlement to Medicaid benefits, much less the type of evidence used or needed
to satisfy those requirements.  Indeed, in stark contrast to the succinct
checklist in <u>Jordan</u>, the NOCAs are constructed in a convoluted, vague, and
confusing manner that severely undermines their effectiveness as notice.
Thus, even accepting the State's position that a standardized notice is sufficient
to notify enrollees of the State's termination decision, the NOCAs fall far short
of the mark.[71]

In light of the foregoing, the Court finds that the NOCAs as currently
constructed are not a reasonable means of notifying a Medicaid enrollee that
his or her benefits will be terminated for financial ineligibility.  The NOCAs
are far too vague and confusing to reasonably inform recipients of the action the
State intends to take, or to whom that action applies, and fail to reliably identify
the reason for that action as to each enrollee.  To decipher a NOCA, one must
know what information to credit, what information to disregard, and how to

---

[71] A one-to-one comparison of <u>Jordan</u> to this case is difficult given the differences in
how eligibility is determined for each type of benefit.   Nonetheless, in the Court's view, to be
analogous to the notice in <u>Jordan</u>, a standardized Medicaid notice terminating an individual
based on income would, at least, explain how DCF determines financial eligibility, i.e., by
comparing the household income to the income limit applicable to the individual based on her
household size and eligibility category.   It would also explain the evidence that DCF uses to
make this determination, namely, information submitted with the application as well as data
from third parties.   None of this information is in the NOCA.

read between the lines.   Although State employees, who are familiar with the
FLORIDA system, the general construction of the NOCAs, and the complex
rules of Medicaid eligibility, are generally able to discern the meaning of the
NOCAs, even they are not always able to do so.   But the Court must determine
if the notices are an objectively reasonable form of notice as to their intended
recipients.   See Jordan, 876 F.2d at 1459.[72]   The NOCAs can be described in
many ways—confusing, vague, convoluted, antiquated, contradictory,
inaccurate, and ambiguous—but they are unequivocally not an objectively
reasonable form of notice.

### b. Reasons

### 1. What information is required?

The Court next discusses whether principles of due process require the
State to provide enrollees with case-specific, individualized reasons detailing
the basis for the termination decision.   In doing so, the Court returns to the
Mullane standard that "notice must be 'reasonably calculated, under all the
circumstances, to apprise interested parties of the pendency of the action and
afford them an opportunity to present their objections.'"   See Arrington, 438
F.3d at 1349-50 (quoting Mullane, 339 U.S. at 314).   Because due process is a

---

[72] The Court notes that this case does not involve a special problem of comprehension
specific to the recipients.   Cf. Jordan, 876 F.2d at 1460; Soberal-Perez v. Heckler, 717 F.2d
36, 43 (2d Cir. 1983).

flexible concept, what constitutes reasonable notice will vary under the circumstances of a given case.  Id. at 1350.  Significantly, the circumstances of this case concern the termination of critical, need-based, public benefits.  In this context, the Supreme Court has held that due process principles "require that a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." See Goldberg v. Kelly, 397 U.S. 254, 267-68 (1970) (emphasis added).  Indeed, the Goldberg Court reasoned that satisfaction of these requirements is important in cases "where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases."  Id. at 268.  The Supreme Court found the state's notice practices in Goldberg to be constitutionally sufficient where the state used both a letter and a personal conference with a caseworker to inform the enrollee whose benefits may be terminated "of the precise questions raised about his continued eligibility," as well as "the legal and factual bases for [the state's] doubts."  Id.[73]

---

[73] Specifically, the Supreme Court summarized the notice procedures in Goldberg as follows:

> A caseworker who has doubts about the recipient's continued eligibility must first discuss them with the recipient.  If the caseworker concludes that the recipient is no longer eligible, he recommends termination of aid to a unit

Decisions by courts in public benefits cases differ on the degree to which the government must explain its reasons in a written notice.   The State points the Court to cases where courts found standardized notice to be sufficient.   See Jordan, 876 F.2d at 1459 (finding standardized denial notice for black lung benefits satisfied requirements of due process); Adams v. Harris, 643 F.2d 995, 998-99 (4th Cir. 1981) (finding notices denying Social Security disability benefits at reconsideration stage using stock reasons satisfied due process and the applicable regulations); Garrett v. Puett, 707 F.2d 930, 931 (6th Cir. 1983) (finding reduction/termination notices regarding AFDC[74] benefits following a change in the law satisfied due process and regulatory requirements); LeBeau v. Spirito, 703 F.2d 639, 644-45 (1st Cir. 1983) (same).   However, courts in other cases have opined that individualized details are required in the context discussed here.   See, e.g., Ortiz v. Eichler, 794 F.2d 889, 892-93 (3d Cir. 1986) (finding notices of adverse actions regarding AFDC, food stamp, and Medicaid benefits violated requirements of due process and the relevant regulations for

_____

> supervisor.   If the latter concurs, he sends the recipient a letter stating the reasons for proposing to terminate aid and notifying him [of the review process.]

Id. at 258-59.   The Supreme Court viewed the combination of a letter and personal conference as "probably the most effective method of communicating with recipients."   Id. at 268.

[74] AFDC stands for Aid to Families with Dependent Children.   This was a cash assistance program for underprivileged families which Congress replaced with TANF in 1996. See Arrington, 438 F.3d at 1338.

- 220 -

those programs); <u>Dilda v. Quern</u>, 612 F.2d 1055, 1056-57 (7th Cir. 1980) (finding AFDC reduction/termination notices violated due process); <u>Rodriguez ex rel. Corella v. Chen</u>, 985 F. Supp. 1189, 1194-95 (D. Ariz. 1996) (finding Medicaid termination/denial notices violated due process and applicable regulations); <u>Barry v. Lyon</u>, 834 F.3d 706, 719-20 (6th Cir. 2016) (finding SNAP termination notices violated due process); <u>Kapps v. Wing</u>, 404 F.3d 105, 123-26 (2d Cir. 2005) (finding denial notices for heating benefits violated due process); <u>see also</u> <u>Billington v. Underwood</u>, 613 F.2d 91, 94 (5th Cir. 1980) (finding statement of ineligibility for public housing "must be sufficiently specific for it to enable an applicant to prepare rebuttal evidence to introduce at his hearing appearance").[75]

Courts that require more detailed notice often invoke <u>Goldberg</u> and reason that adequate notice must provide sufficient information "to protect claimants against proposed agency action 'resting on incorrect or misleading factual premises or on misapplication of rules [or] policies [to] the facts of particular cases.'" <u>See Ortiz</u>, 794 F.2d at 893 (quoting <u>Goldberg</u>, 397 U.S. at 268); <u>Kapps</u>, 404 F.3d at 124 ("In order to be constitutionally adequate, notice of benefits determinations must provide claimants with enough information to

---

[75] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

understand the reasons for the agency's action." (citing Goldberg, 397 U.S. at
267-68)); Vargas v. Trainor, 508 F.2d 485, 490 (7th Cir. 1974) ("Unless the
welfare recipients are told why their benefits are being reduced or terminated,
many of the mistakes that will inevitably be made will stand uncorrected, and
many recipients will be unjustly deprived of the means to obtain the necessities
of life."); see also Schroeder v. Hegstrom, 590 F. Supp. 121, 128 (D. Or. 1984)
(collecting cases finding that "notices to welfare recipients were inadequate
because the notice at issue failed to include sufficient detail to enable a recipient
to determine whether an error had been made"); Febus v. Gallant, 866 F. Supp.
45, 46 (D. Mass. 1994) ("[The notice] fails to provide the welfare recipient with
an adequate basis to contest the termination of benefits and, for that reason,
does not comport with the minimum requirements of constitutional due
process."); Allen v. State, Dep't of Health & Human Svcs., Div. of Pub.
Assistance, 203 P.3d 1155, 1168 (Alaska 2009) ("If a major purpose served by
benefit change or denial notices is protecting recipients from agency mistakes,
then it stands to reason that such notices should provide sufficient information
to allow recipients to detect and challenge mistakes.").   Indeed, in a Medicaid
notice case akin to the facts in this action, a district court determined that
standardized reasons such as "net income exceeds maximum allowable" were
too vague "in as much as they fail to provide any basis upon which to test the
accuracy of the decision."   See Rodriguez, 985 F. Supp. at 1194.

Significantly, courts have reasoned that without detailed notice the recipient will be unable to determine whether to challenge the decision.  See Kapps, 404 F.3d at 124 ("Claimants cannot know whether a challenge to an agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action."); see also Gaines v. Hadi, No. 06-60129-CIV, 2006 WL 6035742, at *13 (S.D. Fla. Jan. 30, 2006) ("The notice requirement is vital not only to communicate what action the state plans to take, but to provide the individual with adequate reasons so that he or she can evaluate whether or not to challenge the state's decision.").  For example, in Barry, the Sixth Circuit held that notices which stated only the general reason for the termination, without individualized details, were insufficient because the recipient "has no basis for making an informed decision whether to contest the disqualification, nor what issues need to be addressed at a hearing."  See Barry, 834 F.3d at 719-20.

In weighing the persuasive value of these cases, the Court observes that the standardized notice cases on which the State relies concern circumstances distinguishable in key ways from the matter at hand.  Significantly, LeBeau and Garrett concern agency actions that were prompted by an across-the-board change in the law.  See LeBeau, 703 F.2d at 641, 644; Garrett, 707 F.2d at 931.  As such, these cases do not speak to the level of detail that is required where

the agency action is based on "changes in individual circumstances, or . . . based on individual factual determinations . . . ."  See Atkins v. Parker, 472 U.S. 115, 131 n.35 (1985); see also Ortiz, 794 F.2d at 894; Schroeder, 590 F. Supp. at 129-30 (distinguishing Garrett and LeBeau because those cases concerned across-the-board changes).  Indeed, the LeBeau court expressly recognized this distinction explaining that for across-the-board reductions mandated by a statutory change "due process may set a lower standard for determining a notice to be adequate than where the reduction or termination of aid is on an individual basis."  See LeBeau, 703 F.2d at 644-45.[76]

The State also relies on the Adams decision to contend that stock paragraphs and standardized reasons are sufficient.  See State Proposal at 123-24 (citing Adams, 643 F.2d at 997).  The Adams case involved a class of claimants seeking disability benefits under the Social Security Act.  See

---

[76] It is also worth noting that the notices approved in LeBeau and Garrett are both far more detailed than the NOCAs at issue here.  The notice in LeBeau included "a quantitative presentation under the heading 'Grant Explanation', purporting to be a calculation of each recipient's grant and listing figures for the recipient's gross earned income, gross unearned income, deductions allowed, total deductions, net income, other adjustments and the standard of assistance for the recipient's family . . . ."  See LeBeau, 703 F.2d at 641.  In Garrett, although the Sixth Circuit held that the notices need not include the state agency's mathematical calculations, the notices did provide individualized reasons for the reduction or termination of benefits.  See Garrett, 707 F.2d at 931; see also Garrett, 557 F. Supp. 9, 11-12, 14 (M.D. Tenn. 1982) (summarizing the content of the challenged notices); Schroeder, 590 F. Supp. at 129 (discussing the individualized notices in Garrett).  Indeed, in the Barry case cited above, the Sixth Circuit relied on the standards described in Garrett and emphasized that due process requires the state agency to provide "specific, individualized reasons for the agency action" prior to terminating SNAP benefits.  See Barry, 834 F.3d at 719-720.

Adams, 643 F.2d at 997.   The plaintiffs challenged the notices sent to applicants who were "denied benefits at the reconsideration stage of the administrative process."   Id. at 996.   As described in Adams, the notices were "composed of stock paragraphs that are used in various combinations to inform applicants of the determination of their claim."   See id. at 997.   The plaintiffs argued that the notices were inadequate under the Constitution and the relevant regulations because "they do not contain individualized medical or vocational reasons the claim was denied."   Id. at 998.   Significantly, Adams involved the denial of benefits to applicants, not the termination of benefits from those who were already receiving them.   Id. at 997.

The Fourth Circuit affirmed the district court's determination that the denial notices satisfied the requirements of due process.   In doing so, the Adams court acknowledged that the notices "'may not be helpful to claimants trying to decide whether to request a hearing,'" but nevertheless found that the notices do "serve [their] limited constitutional purpose," citing the underlying decision of the district court.   Id. at 998 (quoting Adams v. Califano (Adams I), 474 F. Supp. 974, 985 (D. Md. 1979)).   Significantly, the district court had specifically rejected the plaintiffs' reliance on Goldberg v. Kelly, explaining that "Kelly involved the termination of ongoing welfare payments, while the plaintiffs here have not even begun to receive benefits."   See Adams I, 474 F. Supp. at 985.   The district court also found that "[c]learly, Social Security

claimants are not constitutionally entitled to the full due process protections outlined in Kelly." Id.[77] Thus, by its own terms, the reasoning in Adams does not apply to a case such as this where the termination of Medicaid benefits is at issue. For the same reason, the State's reliance on Jordan to support its use of standardized reasons is unconvincing. See State Proposal at 122-23. As with Adams, Jordan does not concern Medicaid or other need-based benefits, it does not involve benefit termination, and it does not apply Goldberg. See Jordan, 876 F.2d at 1457-59.[78]

Here, where the State intends to terminate an enrollee's Medicaid benefits based on an individualized finding that the enrollee is no longer eligible for financial reasons, the Court finds the cases applying Goldberg to be the more

---

[77] Notably, in Mathews v. Eldridge, the Supreme Court explained that the process due in disability benefit cases is something less than that which is due in welfare assistance cases. See Mathews v. Eldridge, 424 U.S. 319, 340-43 (1976). The Mathews Court emphasized that "welfare assistance is given to persons on the very margin of subsistence," whereas "[e]ligibility for disability benefits . . . is not based upon financial need." Id. at 340. Like the AFDC benefits in Goldberg, eligibility for Medicaid benefits is based on financial need and limited to the most vulnerable members of society. The State makes no attempt to argue that Goldberg does not apply to this case.

[78] The State also cites Hames v. City of Miami, 479 F. Supp. 2d 1276, 1289 (S.D. Fla. 2007), see State Proposal at 124-25, the circumstances of which are markedly different than those presented here. See Hames, 479 F. Supp. 2d at 1282-83. In Hames, a retired city police officer brought a challenge to the constitutionality of pension forfeiture proceedings that were initiated against him after he was convicted of a felony. See id. at 1280. Notably, the forfeiture proceedings at issue consisted of two phases—a preliminary probable cause hearing and a subsequent full hearing—both of which took place prior to the deprivation of the plaintiff's pension benefits. See id. at 1289. Although the Hames court found under the circumstances that the plaintiff was not entitled to notice of "specific facts," it also reasoned that "the results of the preliminary hearing gave [the plaintiff] the specific notice of the board's basis for seeking forfeiture in the later full hearing." Id. No such two-tiered hearing system is provided here.

applicable and persuasive authority.  As set forth in <u>Goldberg</u>, under these circumstances, due process requires the State to provide notice to the enrollee detailing the reasons for that action.  <u>See Goldberg</u>, 397 U.S. at 267-68. Specifically, the enrollee must have sufficient information to evaluate the accuracy of the State's decision and make an informed decision whether to challenge it.  <u>See Ortiz v. Eichler</u>, 616 F. Supp. 1046, 1062 (D. Del. 1985) ("[D]etailed information is needed to enable claimants to understand what the agency has decided, so that they may assess the correctness of the agency's decision, make an informed decision as to whether to appeal, and be prepared for the issues to be addressed at the hearing."), <u>on reargument</u> 616 F. Supp. 1066, <u>aff'd</u> 794 F.2d at 892-94 (3d Cir. 1986); <u>Barry</u>, 834 F.3d at 719-20; <u>Kapps</u>, 404 F.3d at 124; <u>Billington</u>, 613 F.2d at 94; <u>Gaines</u>, 2006 WL 6035742, at *13; <u>see also</u> <u>Perdue v. Gargano</u>, 964 N.E. 2d 825, 835-38 (Ind. 2012) ("Merely offering applicants information from which they could potentially deduce the reasons for a denial is no process at all.  Notice must be unambiguous so that applicants can know the precise reason for which they were denied benefits and can determine the accuracy of the State's determination.").  To constitute sufficient information to allow an enrollee an opportunity to determine whether to object to a termination decision, an enrollee must know the State's determination of his or her household size and countable income (i.e., modified adjusted gross income).  The enrollee also must know the eligibility category

from which he or she was terminated and the reason why. And the enrollee must have sufficient information to determine the eligibility categories in which his or her income was tested and the income standards the State applied.

Nonetheless, while due process requires the State to give the enrollee notice of this information, it does not necessarily follow that the NOCA itself must include all of these details. Rather, it is only necessary for the State to provide the specific, individualized reasons for its intended action "in some form." See Barry, 834 F.3d at 720. Thus, the Court turns to the question of whether the State employs notice methods "reasonably calculated, under all the circumstances," to provide the intended recipients, i.e., the Class Members, with the necessary information described above. See Jordan, 876 F.2d at 1459 (quoting Mullane, 339 U.S. at 313). Stated another way, the Court must determine whether the State uses means "of such nature as reasonably to convey the required information . . . ." See Mullane, 339 U.S. at 314. The answer to this question is an objective one, based on the totality of the circumstances.

### 2. Does the State provide reasonable notice of these reasons?

It is undisputed that the NOCAs themselves do not contain the case-specific, individualized reasons for a termination decision. Nonetheless, the State maintains that the NOCAs are sufficient when viewed in combination

with the other publicly available sources of information.   <u>See</u> State Proposal at

121 (citing <u>Arrington</u>, 438 F.3d at 1349-51).   According to the State, "recipients

can access ample information outside the four corners of the notices, including

through statutes, rules, and regulations and DCF's website, call center, and

family resource centers."   <u>See</u> State Proposal at 122.

In support of its reliance on other sources of information, the State cites

to the Eleventh Circuit's decision in <u>Arrington.</u>   <u>See</u> State Proposal at 133-35.

However, rather than support the State's notice practices, a close reading of

<u>Arrington</u> highlights the inadequacy of the State's reliance on other sources of

information to compensate for the deficient NOCA.   The plaintiffs in <u>Arrington</u>

alleged that the State of Alabama "fails to provide adequate notice pertaining

to its collection, distribution, and disbursement of their . . . child support

payments."   <u>See Arrington</u>, 438 F.3d at 1339, 1347.   Specifically, the plaintiffs

argued that the notices failed to contain sufficient information to allow

recipients to "determine the timing and accuracy of their child support

payments."   <u>Id.</u> at 1349.   Notably, in rejecting this argument, the Eleventh

Circuit did not hold that such information need not be included in the written

notice.   Rather, the court explained in detail how the state's written notices <u>did</u>

contain sufficient case-specific information to allow the recipients to confirm the

accuracy of the state's payments by cross-referencing it with information in

their possession.   <u>Id.</u> at 1350.   After reviewing this information, parents who

still had questions could get more information from the state's hotline, web page, or child support workers.   Id.

Here, unlike Arrington, the NOCAs do not provide enough information to allow a recipient to independently assess the accuracy of the State's determination.   For example, the NOCAs do not specify the income the State attributes to the enrollees such that a recipient could compare this information to her household finances to determine its accuracy.   Nor does the NOCA include the State's determination of the enrollee's SFU or eligibility category which a recipient could evaluate based on her knowledge of the enrollee's personal circumstances.   Whereas in Arrington, parents could contact the state to ask questions about the case-specific information they had received in their notice, here, recipients must contact the State to obtain that case-specific information in the first place.

Moreover, it is important to reiterate that for purposes of the due process analysis, context matters.   As such, it is significant that Arrington does not involve the termination of critical need-based benefits.   See Arrington, 438 F.3d at 1347.   Indeed, the Arrington court does not discuss or apply the "detailed notice" requirements of Goldberg.   Id. at 1349-50.[79]   Notably, where

---

[79] For the same reason, the Court finds the State's reliance on In re Alton, 837 F.2d 457, 460-61 (11th Cir. 1988) (addressing a due process challenge by a creditor in a bankruptcy proceeding) and In re Le Ctr. on Fourth, LLC, No. 19-cv-62199, 2020 WL 12604348, at *3 (S.D. Fla. June 30, 2020) aff'd 17 F.4th 1326 (11th Cir. 2021) (same) to be unpersuasive.   See State

the termination of critical public benefits is at issue, a number of courts have explicitly held that the State cannot satisfy due process by placing the burden on individuals to affirmatively seek out the reasons for their termination.   See Barry, 834 F.3d at 720 ("But defendant cannot satisfy due process by requiring notice recipients to call elsewhere." (quotation omitted)); N.B v. District of Columbia, 244 F. Supp. 3d 176, 182 (D.D.C. 2017) ("Both [the D.C.] Circuit and other courts around the country have held that requiring individuals to undertake an affirmative inquiry to learn the reasons for their denial is constitutionally insufficient, and thus, the fact that a Medicaid plaintiff could conduct such an inquiry is irrelevant to the constitutional analysis."); Ortiz, 616 F. Supp. at 1062; see also Vargas, 508 F.2d at 489-90; Kapps, 404 F.3d at 125-26; Schroeder, 590 F. Supp. at 128; see also Rodriguez, 985 F. Supp. at 1195. "Under such a procedure only the aggressive receive their due process right to be advised of the reasons for the proposed action.   The meek and submissive remain in the dark and suffer their benefits to be reduced or terminated without knowing why the [agency] is taking that action."   Vargas, 508 F.2d at 490. Although these authorities are not binding, the Court finds the reasoning persuasive in this context.   As aptly stated in Ortiz, "the burden of providing adequate notice rests with the state, and it cannot shift that burden to the

---

Proposal at 126-27.   The Court also observes that neither case involved a request for injunctive relief to obtain notice that was not provided.

individual by providing inadequate notice and inviting the claimant to call to receive complete notice." See Ortiz, 616 F. Supp. at 1062; see also Schroeder, 590 F. Supp. at 128.  In light of the foregoing, the Court is convinced that to satisfy the requirements of due process in this context, the State must affirmatively provide an enrollee with the case-specific reasons for his or her termination in sufficient detail to allow the recipient to assess the accuracy of the termination decision and decide whether to challenge the decision.

However, even if other sources of information can constitute a reasonable means of notice in some circumstances, the evidence establishes that the State has not employed reasonable means here.  Specifically, prior to filing a request for a fair hearing, the only available means by which an individual can learn the details supporting the State's termination decision are through the call center or a Family Resource Center.[80]  Having heard extensive testimony

---

[80] To the extent the State relies on the supervisory review as part of the totality of circumstances, the Court finds that this procedure does not alleviate the problems with the State's NOCAs.  See State Proposal at 131, 137.  Significantly, the review occurs only after an individual has made the decision to appeal.  Thus, it comes too late in the process to provide the enrollee with the information she needs to decide whether to appeal.  See Kapps, 404 F.3d at 124; Barry, 834 F.3d at 719-20; Gaines, 2006 WL 6035742, at *13.  This is especially problematic given the State's practice of informing Medicaid enrollees that they will be required to repay benefits if they decide to appeal and do not prevail, thereby discouraging individuals from appealing a decision they do not understand.  Although this language in the NOCAs was softened in October 2023, and further clarified in April 2024, it remains in the Rights and Responsibilities document provided to all Medicaid enrollees and is present on the MyAccess accounts.  Moreover, the State cites no evidence, and the Court has found none, that enrollees are informed of the existence of the supervisory review process.  So, in deciding whether to appeal, the NOCA recipient does not know that a DCF supervisor will contact her to go over the decision in detail before the hearing.

about the operation of these resources, the Court is convinced that neither option is a reliable means of notice nor a means of notice "reasonably certain to inform those affected . . . ." See Mullane, 339 U.S. at 315.

As to the Family Resource Center, neither the NOCAs nor the DCF website advise enrollees to visit a Family Resource Center for assistance interpreting a NOCA or for more information.  Thus, individuals have no reason to know that there are self-service representatives at the Family Resource Centers who can look up the case-specific information supporting the State's Medicaid decision in their case.  Moreover, the hours and locations of the Family Resource Centers are so limited as to be impracticable.

While the call center is ostensibly more convenient than visiting a Family Resource Center, it receives far more calls than it is equipped to handle, even considering recent hiring efforts.  The evidence shows that most calls to the call center are blocked before an individual can even be placed in a queue. Callers who succeed in entering a queue face lengthy hold times to speak to an agent.  And those who succeed in speaking to an agent may or may not receive

---

Contrary to the State's argument, this is distinctly and meaningfully different from the notice procedure approved in Goldberg.  See State Proposal at 131.  In Goldberg, if a caseworker had doubts about an enrollee's continued eligibility, the caseworker was required to "first discuss them with the recipient," prior to recommending termination of aid.  See Goldberg, 397 U.S. at 258 (emphasis added).  After this personal conference, if the caseworker concluded that the enrollee was no longer eligible, he sent a letter to the enrollee "stating the reasons for proposing to terminate aid" and informing him of his right to request higher review.  Id. at 258-59.  Thus, enrollees were told "the legal and factual bases for the Department's doubts" through a personal conference and letter prior to deciding whether to challenge the termination of benefits.  Id. at 267-68.

accurate or helpful information.   Significantly, a call center agent is <u>not</u> a case worker who makes Medicaid eligibility determinations.   Indeed, call center agents are not Medicaid specialists.   Even Tier 3 agents receive only minimal training on Medicaid eligibility rules.   And while agents do have access to resource materials, they are under pressure to minimize call times and subject to only limited oversight or quality assessment.   Under the circumstances, mistakes are inevitable and likely quite common.[81]

Moreover, whether a caller will succeed in obtaining useful and accurate information depends in part on the caller's ability to ask the right questions. But the vague, confusing, and misleading nature of the NOCAs makes it difficult for callers to know what questions to ask and undermines the usefulness of the call center.   As in the case of Chianne D., callers may focus on the wrong sections of the NOCA, or struggle to accept information provided by the agent that appears to conflict with what is stated in the NOCA.   The

---

[81] The Court is particularly disturbed by the egregious errors made by agents who spoke to Chianne D. and Lily Mezquita.   While the Court recognizes that these are only two callers out of millions, there is no evidence to suggest that their experiences with the call center were unusual.   Indeed, the State presents no evidence to suggest that the mistakes made on these calls were surprising or outside the norm.   The Court finds it significant that when Medicaid is terminated for financial reasons, the FLORIDA system deletes the Budget screen such that there is no clear record of the basis for the ineligibility determination to guide the call center agent.   Instead, the agent must piece the decision together herself—including by recalculating the applicable income standard from Appendix A-7.   Given the limited training provided to call center agents, the antiquated FLORIDA system, and the complexity of Medicaid eligibility requirements, the Court finds that mistakes by call center agents faced with questions like those of Chianne D. and Lily Mezquita are very likely common occurrences.

evidence concerning call center operations demonstrates precisely why written notice with the relevant details is necessary. Otherwise, whether an individual receives the notice to which she is constitutionally entitled depends on whether she can devote the time and effort necessary to seek it out and obtain it, and whether she understands Medicaid well enough to ask the right questions. And even then, the information she receives may or may not be accurate. Under such a system, the problem is not just that only the aggressive receive notice, but also that the most vulnerable are the ones least likely to receive sufficient information. In light of the foregoing, the Court finds that the call center and Family Resource Centers are not a reasonable or reliable means of fulfilling the State's due process obligation to provide detailed reasons for its termination decisions.

To the extent the State relies on the general information available on the DCF website, in public statutes or regulations, or set forth in the Manual, these sources are plainly insufficient to convey the substance of the State's decision as to any specific individual. While these resources may inform a reader of the relevant rules and policies, they do not explain how the State applied these rules to an individual's case. Moreover, an individual's ability to use these sources to understand the meaning of the NOCA is often undermined by the NOCAs themselves. In the NOCAs, the State specifies the "law that supports this action" but then routinely points the reader to rules which are inapplicable,

inaccurate, or irrelevant as the <u>reason</u> for the State's decision.   In doing so, the

State misleads, or at the very least confuses, a reader who seeks to rely on public

statutes and regulations to ascertain the meaning of the NOCA.   And some

NOCAs provide no supporting citation at all.

The implication from the State's argument appears to be that individuals

are charged with knowledge of the law, and are aware of their own

circumstances, such that upon receipt of a NOCA, individuals can use these

sources to decide for themselves whether they qualify for Medicaid and thus,

whether they agree with the State's ultimate decision to terminate.   This is not

the law.[82]   As set forth above, an enrollee is unequivocally entitled to notice of

the State's reasons for finding her no longer eligible and that notice must be

sufficient to allow her to determine whether to challenge the decision.   <u>See</u>

<u>supra</u> Part.II.D.b.1.

While publicly available information is routinely found to be adequate to

inform an individual of the available <u>procedures</u> for protecting his or her rights,

---

[82] The argument also defies reality.   "The Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction . . . makes the Act 'almost unintelligible to the uninitiated.'"   <u>See</u> <u>Schweiker v. Gray Panthers</u>, 453 U.S. 34, 43, 101 S. Ct. 2633, 2640, 69 L. Ed. 2d 460 (1981).   Moreover, the other sources of general Medicaid eligibility information provided by the State are flawed in numerous ways as described above in the Court's factual findings.   <u>See</u> <u>supra</u> Part I.C.a. (discussing the Policy Manual) and Part I.H.c. & e. (discussing the website and statutes).   Not only are the citations sometimes inaccurate or inapplicable, at times they are contradictory or misleading.   And none of the publicly available resources fully and coherently explain how to calculate an enrollee's MAGI and apply it to Appendix A-7 as would be necessary to determine the accuracy of a finding that an enrollee is financially ineligible.

the State cites no authority for the proposition that this information obviates the need for the State to provide notice detailing the <u>reasons</u> for its decision to deprive an individual of a property interest.  <u>Cf.</u> <u>City of West Covina v. Perkins</u>, 525 U.S. 234, 241 (1999) (holding that the Due Process Clause does not require individualized notice of state-law <u>remedies</u> which are published in generally available state statutes and case law); <u>Grayden</u>, 345 F.3d at 1238 (discussing whether statutory notice of the <u>right to a hearing</u> was sufficient under the circumstances); <u>Arrington</u>, 438 F.3d at 1351-53 (explaining that state "statutes, regulations and publicly available agency manuals" provide "notice of [the] right to a hearing and the procedures for obtaining one").  Indeed, where critical need-based public benefits are concerned, such a proposition conflicts head on with the Supreme Court's assessment in <u>Goldberg</u> that due process principles require "timely and adequate notice <u>detailing the reasons</u> for a proposed termination."  <u>See</u> <u>Goldberg</u>, 397 U.S. at 267-68 (emphasis added). The State also cites authority for the proposition that the public is charged with knowledge of changes in law or policy that may affect them.  <u>See</u> State Proposal at 130 (citing <u>Atkins</u>, 472 U.S. at 131).  But even so, the instant case does not involve a change in law or policy, it involves the termination of benefits based on changes in individual circumstances and individualized determinations. The Supreme Court in <u>Atkins</u> specifically noted that such a circumstance would, "of course," present a different case.  <u>See</u> <u>id.</u> at 131 n.35.

To satisfy due process, the State must employ means of notice "such as one desirous of actually informing the [recipient] might reasonably adopt to accomplish it." See Mullane, 339 U.S. at 315. Having reviewed the NOCAs and heard all the evidence, the Court cannot conclude that the State's chosen methods of notice are sufficient to meet the requirements of due process under the circumstances. The NOCAs do not unambiguously communicate the State's decision to terminate benefits, the reason for that decision, or to whom it applies. The pertinent information that is provided is buried and obscured by the confusing structure of the document. Moreover, neither the NOCAs nor any other written notice details the reasons for the State's decision as necessary to allow the effected individuals to assess the accuracy of the decision and decide whether to appeal. The call center and other sources of information do not cure these deficiencies. The State cannot satisfy its due process obligations by placing the burden on enrollees to obtain adequate notice for themselves. And regardless, the other methods by which an enrollee might be able to acquire the needed information are neither timely provided nor reasonably certain to inform those affected. See Mullane, 339 U.S. at 315. As such, the Court is convinced that the State's ongoing notice practices are not "reasonably calculated, under all the circumstances, to apprise [the Class Members] of the pendency of the action and afford them an opportunity to present their objections." See Arrington, 438 F.3d at 1349-50 (quoting Mullane, 339 U.S. at

314).   In light of the foregoing, Plaintiffs and the Class are entitled to judgment in their favor as to the due process claim asserted in Count I of the Second Amended Complaint.

## III.   Relief

Having determined that Plaintiffs prevail on the merits of their due process claim, the Court proceeds to consideration of the appropriate remedy. Plaintiffs seek the following injunctive relief.   First, Plaintiffs request an injunction requiring the State to modify the notices it issues when it decides to terminate an individual's Medicaid benefits due to income.   See Class Proposal at 156.   Specifically, Plaintiffs ask the Court to require, at a minimum, that the notices:

> clearly state the action the state is taking with respect to each household member and explain: (1) the individualized income and SFU size DCF used to find the individual ineligible; (2) what eligibility category the member was previously enrolled in; (3) the applicable income limit for that category and SFU size; and (4) a short description of the other population groups under which an individual might establish eligibility.

See Class Proposal at 156.   Second, Plaintiffs ask for an injunction prohibiting the State from terminating any future Medicaid benefits based on income until it amends its notices to comply with the forgoing.   Id. at 158.   Third, Plaintiffs seek the prospective reinstatement of Medicaid benefits to all previously terminated Class Members, who have not otherwise regained Medicaid coverage, until adequate notice is provided.   Id. at 159.   And fourth, Plaintiffs

request an injunction requiring the State to provide previously terminated

Class Members with a Quern[83] notice which:

> (1) explains that they received inadequate notice previously when their benefits were terminated and were, thus, unlawfully denied the opportunity to pursue a fair hearing, (2) supplies the missing individualized information regarding the income, SFU size, and population group used to effectuate the termination, and (3) explains that, if they believe the initial termination was wrong, the state has existing administrative procedures—including the fair hearing process and DCF's separate 'standard practice'—that permit retroactive restoration of coverage which enables past medical bills to be reimbursed.

See Class Proposal at 163-64.   The State opposes the entry of any injunction

which pauses terminations, requires more detailed notice, or reinstates

Medicaid benefits.   See State Proposal at 152-170.   Notably, the State does not

propose any alternative form of relief should the Court find in Plaintiffs' favor.

## A. Permanent Injunctive Relief

According to "well-established principles of equity," a plaintiff seeking a

permanent injunction must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

---

[83] Quern v. Jordan, 440 U.S. 332, 347-49 (1979).

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see also Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008). Where the government is the party opposing the injunction, the third and fourth factors merge. See Gonzalez v. Governor of Georgia, 978 F.3d 1266, 1271 (11th Cir. 2020) (discussing elements of a preliminary injunction against a government entity); see also KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006) (explaining that the standards for a permanent injunction are essentially the same as a preliminary injunction except the movant must establish actual success on the merits).

The "essence of equity jurisdiction" is the Court's power to "do equity and to [mold] each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)). In crafting the injunction, the Court must ensure that it is "narrowly tailored to the proven legal violations" and restrains "no more conduct than reasonably necessary." Fin. Info. Tech., LLC v. iControl Sys., USA, LLC, 21 F.4th 1267, 1280 (11th Cir. 2021). "In other words, the injunction 'must be no broader than necessary to remedy the constitutional violation.'" Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth., 89 F.4th 1337, 1351 (11th Cir. 2024). In addition, the Court must "describe the restrained acts in reasonable detail

such that there is no uncertainty or confusion as to the conduct proscribed."
Fin. Info. Tech., LLC, 21 F.4th at 1280.

In the sections that follow, the Court will first discuss the relevant factors governing permanent injunctive relief. Then, the Court will discuss the appropriate scope of that relief. For the reasons set forth below, the Court finds injunctive relief is necessary and appropriate here. As to the scope of that relief, the Court determines that the only means of protecting Class Members' constitutional rights is to enjoin the State from terminating any Class Members' Family-Related Medicaid benefits on the basis of financial ineligibility without first providing constitutionally adequate notice. A constitutionally adequate notice must unambiguously identify the State's decision to terminate full Medicaid benefits based on a finding of financial ineligibility, the person or persons to whom that decision applies, and the reasons for that decision. The reasons must be set forth in sufficient detail to allow the recipient to assess the accuracy of the decision and decide whether to challenge the determination. At a minimum, a notice sufficiently detailing the reasons for a termination based on financial ineligibility must include: the enrollee's countable income (MAGI) and household size (SFU), the eligibility category in which the enrollee had been receiving benefits, and if it changed,

the reason for the change.[84]    And the State must provide the enrollee with
sufficient information for the enrollee to determine the eligibility categories in
which his or her income was tested and the income limits that apply.

As to Plaintiffs' request for wholesale reinstatement of the Class, the
Court finds such broad relief to be inappropriate under the circumstances of
this case.    Instead, the Court will require the State to provide corrective notice
to any Class Members who are not currently enrolled in full Medicaid.    In
addition to the foregoing information, this notice must also advise these Class
Members of the Court's ruling and the available administrative remedies,
including the opportunity to seek a fair hearing and request reinstatement
pending the outcome of the hearing.    And the Court will require the State to
inform the Class Members that if they prevail at the hearing, State policy may
permit reimbursement for, or payment of, past medical bills.

### a. Irreparable Harm

The Court has no difficulty finding that Plaintiffs have established
ongoing irreparable harm.    As set forth above, the State is unlawfully
terminating the Medicaid benefits of Class Members because it fails to provide
constitutionally adequate notice.    Although the State presented evidence that

---

[84] For example, if the State terminates an enrollee's Medicaid benefits because it
determines that her postpartum continuous coverage period has ended and she is not
financially eligible in the parent/caretaker coverage group, the NOCA must inform the
enrollee that she was receiving benefits in the postpartum continuous coverage category and
the continuous coverage period has ended.

it intends to modify its notices in the future as part of its modernization project, it has no immediate plans to correct the serious flaws in the NOCAs and offered no evidence as to what information would be included in the modernized NOCAs.   As such, absent injunctive relief, the State will continue to violate the constitutional rights of the Class Members.

Significantly, although the rights at issue here are procedural, they protect Class Members' concrete interest in their Medicaid benefits.   The State's failure to provide adequate notice deprives Class Members of a meaningful opportunity to challenge the State's ineligibility determination. Indeed, without adequate notice, the opportunity for a pre-termination hearing is meaningless.   See Kapps, 404 F.3d at 124 ("In the absence of effective notice, the other due process rights afforded a benefits claimant—such as the right to a timely hearing—are rendered fundamentally hollow.").   Given the ample opportunities for errors—both human and machine—during the eligibility determination process, and the egregious flaws in the NOCAs, the risk that the State's inadequate and unlawful notices to members of the Class will result in the erroneous deprivation of Medicaid benefits is not hypothetical and speculative, but real and immediate.[85]   And plainly, the erroneous deprivation

---

[85] Indeed, the Court heard ample evidence about known recurring errors in the FLORIDA system such as the premature termination of continuous pregnancy coverage at two rather than twelve months postpartum, and the improper exclusion of household members receiving SSI benefits from an SFU.   See Roberts Test., Tr. Vol. II at 92-93, 147-50 (identifying those two system errors and acknowledging his belief that there are others).

of Medicaid benefits results in significant and irreparable harms.    See Crawley

v. Ahmed, No. 08-14040, 2009 WL 1384147, at *28 (E.D. Mich. May 14, 2009)

("[I]t is undeniable that the unpaid bills, loss of needed medical assistance, and

ultimately poor health suffered by Plaintiffs, cannot be adequately addressed

by the promise of future Medicaid coverage.    In the same vein, the state's

Eleventh Amendment Immunity bars any award of monetary damages against

the Defendants.").

Of course, the State's termination of Medicaid benefits will not be

incorrect as to all Class Members.    But the evidence demonstrates that even

where the ultimate ineligibility finding is correct, the lack of clear notice

threatens irreparable harm.    As evidenced in the experiences of the Named

Plaintiffs and witnesses at trial, the NOCAs cause confusion, frustration,

stress, anxiety, and lost time.    See Carey v. Piphus, 435 U.S. 247, 263-64 (1978)

(holding that mental and emotional distress caused by the denial of procedural

due process itself is compensable under § 1983 so long as there is proof of such

injury); Stallworth v. Shuler, 777 F.2d 1431, 1435 (11th Cir. 1985) ("The injury

in civil rights cases may be intangible . . . .    It need not be financial or physical

but may include damages for humiliation and emotional distress.").    Given the

State's Eleventh Amendment immunity for any damages caused by the lack of

adequate notice, these harms are all irreparable.    The lack of adequate notice

also threatens to deprive Class Members of the ability to plan for the loss of

benefits.   See Kimble v. Solomon, 599 F.2d 599, 604 (4th Cir. 1979); Davis v. Shah, 821 F.3d 231, 254 (2d Cir. 2016) (discussing harms from lack of notice even where there is no dispute as to ineligibility).   And because Class Members are not adequately advised of the reason for their termination, they will lack the information necessary to know if or when they should reapply if their circumstances change.

To the extent the State argues that Plaintiffs have failed to establish classwide injury as to those Class Members whose benefits have already been terminated, the Court rejected this argument in its standing analysis above. See supra Part II.B; see also Class Certification Order at 42-43; 61-62.   These Class Members are suffering ongoing irreparable harm because they remain without Medicaid benefits and have not yet received the written notice, to which they are constitutionally entitled, that explains the reasons for that decision. While it may be that some Class Members have actual knowledge of the information which an adequate notice will provide, Class Members do not know whether this understanding is accurate until they receive the State's written notice. [86]   Regardless, Plaintiffs are not required to show that all Class Members have been aggrieved by the State's unconstitutional practice.

---

[86] The Court also rejects the State's contention that Class Members are not harmed because the information is available from other sources.   See Febus, 866 F. Supp. at 47 ("The possibility of an oral clarification (assuming the recipient is able to contact a welfare worker) and the existence of an appeals procedure are not enough to undo the mischief caused by the

### b. Balance of Harms and Public Interest

As a final consideration in determining the need for injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)); see also Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (noting "[i]t is ultimately necessary ... to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large" before ruling on the necessity for a preliminary injunction).   In the exercise of this "sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (quoting Weinberger, 456 U.S. at 312).

The State asserts that the relief Plaintiffs seek is extraordinarily expensive.   Most significantly, the State estimates that reinstatement of the nearly 500,000 people terminated since the beginning of the unwinding would cost the State approximately $155 million per month.   See State Proposal at 156-57.   Given the timeline of the modernization project and the limitations

---

defective notice."); Vargas, 508 F.2d at 489-90 (discussing the problem with a procedure where recipients must call elsewhere to receive adequate notice); see also Rodriguez, 985 F. Supp. at 1195 (rejecting contention that a case worker's phone number can "be a substitute for the required written reasons").   Indeed, the Court discussed the inadequacy of these other sources in its analysis of the merits.   See supra Part II.D.b.2.

existing in the current FLORIDA system, the State posits that the reinstatement period "could last for years." Id. at 157.   The State emphasizes that these benefits would be paid to individuals all of whom the State has found ineligible for Medicaid.   Id.   In addition, the State contends that "[a] pause in Medicaid terminations would likewise require the State to pay for Medicaid benefits without regard to eligibility."   Id.

As to Plaintiffs' request that the Court require the State to update the notices to include additional information, the State maintains that such relief would also place an "undue burden" on the State.   Id. at 160.   In terms of the burden, the State focuses on the "extra-large" nature of any project that would require the State to include information in the NOCA that is not currently stored in the FLORIDA system.   According to the State, requiring the NOCAs to include the income limit applied to the individual or the individual's countable net income would constitute an "extra-large project and entail on DCF an enormous expense of time and money that must be diverted from other important agency initiatives."   Id. at 161.   Notably, the State opted not to address the extent of the burden caused by adding information that is stored in the FLORIDA system such as the countable (MAGI) income, the SFU, or the eligibility category from which an enrollee is terminated.   See State Proposal at 163, 164-66.   Instead, the State argues that such information is not useful to the Class, will be confusing, will not redress a classwide injury, or is

otherwise available to Class Members, such that any burden to the State outweighs the benefit to Plaintiffs.   Id. at 161.

The Court has carefully considered the State's arguments and the burden on the public fisc of imposing injunctive relief.   The Court does not weigh the costs lightly.   Nevertheless, the cost to the State is significantly lessened because, as discussed below, the Court will not require the wholesale reinstatement of the Class Members.   Moreover, the Court finds appropriate relief can be fashioned that does not require the State to include in the NOCAs information which is not currently stored in the FLORIDA system.   As such, the two most significant and costly burdens identified by the State will not be mandated.

What remains is the cost to the state of updating the NOCA templates, adding information that is currently stored in the FLORIDA system, pausing income-based Medicaid terminations until those updates are achieved, and reissuing proper notice to Class Members whose benefits were terminated without adequate notice.   While these costs are significant, the Court is convinced that they do not outweigh the substantial irreparable harm caused to Class Members by the loss of Medicaid benefits without constitutionally adequate notice.   Notably, the State does not cite any case where a court has found such cost arguments to outweigh the harm caused by an ongoing unconstitutional policy or practice.   In contrast, numerous courts "have

granted class-wide relief enjoining state welfare officials from termination or reduction of welfare benefits pending pretermination notice and hearing, despite similar equitable arguments by defendants." See Turner v. Walsh, 435 F. Supp. 707, 716 (W.D. Mo. 1977) (collecting cases).   Thus, the undersigned rejects any suggestion that the State must be allowed to continue violating the constitutional rights of its citizens because compliance is too expensive.

As noted, the State also contends that injunctive relief is not warranted because the additional information Plaintiffs seek will not be useful to the Class, will not redress any harm, will be confusing to Class Members, or is otherwise available to Class Members.   However, the Court previously rejected many of these same arguments in its analysis on standing. See supra Part II.B.   Indeed, the evidence shows that this information would have been enormously beneficial to the NOCA recipients who testified at trial.   A plain, unambiguous statement of the decision and to whom the decision applied, as well as the case-specific findings on which that decision was made, would have removed the uncertainty these witnesses experienced trying to discern the ultimate decision conveyed in the NOCA and the reasons for that decision.   It would have saved them substantial lost time spent calling the call center, as well as the frustration, uncertainty, and anxiety they felt over the contradictory information and lack of clear answers.   With proper notice, these individuals quickly could have understood the import of the NOCA, assessed whether they

agreed with the State's decision, and then focused their efforts on either appealing the decision or, if they agreed with it, making alternative healthcare arrangements.    Moreover, the fact that these particular NOCA recipients, who were savvy and tenacious enough to obtain legal counsel, were ultimately able to obtain the necessary information and correct the State's errors does not negate the harm they experienced from the lack of clear and specific information in the notices.    Nor does it persuade the Court that other less resourceful Class Members are not harmed by the absence of this information.

The Court also rejects the State's contention that the Court should not require the additional information because it will confuse Class Members. Throughout this lawsuit, the State has argued that Class Members are presumed to know the law and thus can determine for themselves whether the State made a mistake in its eligibility determination.    The State points to the publicly available Policy Manual, as well as the complex maze of Medicaid statutes and regulations, and argues that Class Members have all the information they need to determine if the State's termination decision is incorrect.    If the State does not believe that these sources of information are too confusing for Class Members to decipher, then certainly a plain statement of the State's decision and the case-specific details on which the State relied to make its decision will not be unduly confusing.    To the contrary, a clear statement of the State's decision detailing the reasons for that decision will

allow the Class Members to better utilize these other sources of information through focused, specific questions.

In addition, the State contends that any pause in terminations is "wholly antithetical to the federal Medicaid Act and its regulations" because it would require the State to continue paying benefits to individuals that it has determined are ineligible.   See State Proposal at 157-58.   The State maintains that "it must comply with all federal statutory and regulatory requirements," which means, according to the State, that it may not provide Medicaid services to recipients who have been found ineligible.   Id.   But this argument is self-defeating because the State violates the Medicaid Act every time it terminates the Medicaid benefits of a Class Member with constitutionally inadequate notice.   See 42 U.S.C. § 1396a(a)(3) (imposing a "fair hearing" requirement).[87] Thus, allowing the State to continue terminating benefits in violation of the law undermines, rather than supports, the Medicaid Act.[88]

---

[87]   Plainly, a fair hearing requires notice at least sufficient to meet the requirements of due process.   See, e.g., Fed. Trade Comm'n v. Nat'l Lead Co., 352 U.S. 419, 427 (1957) ("It goes without saying that the requirements of a fair hearing include notice of the claims of the opposing party and an opportunity to meet them."); Billington, 613 F.2d at 93-94; see also 42 C.F.R. §§ 431.205(d), 431.210.   Nevertheless, in light of Plaintiffs' decision to drop their Medicaid Act claim following the Supreme Court's decision in Medina v. Planned Parenthood South Atlantic, the Court expresses no opinion on whether this provision of the Medicaid Act and the implementing regulations are privately enforceable under 42 U.S.C. § 1983.   See 606 U.S. 357, 145 S. Ct. 2219 (June 26, 2025).

[88]   Notably, the State has had notice of concerns regarding the vague and confusing nature of the NOCAs since at least 2018.   See Pls.' Ex. 238 at AHCA-2071-72; Lewis Test., Tr. Vol. IV at 28; Veltkamp Dep. Vol. 1 at 156-58.   In balancing the equities, this fact also weighs against allowing the State to continue its unconstitutional notice practices.

Finally, the Court finds that the public interest weighs in favor of injunctive relief. Significantly, the public interest is supported by upholding the law. Indeed, the Eleventh Circuit has held "the public interest is served when constitutional rights are protected." Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1327 (11th Cir. 2019). Enforcing procedures which ensure that individuals who are eligible for Medicaid do not have their benefits erroneously terminated also serves the public interest. See Goldberg, 397 U.S. at 266 ("[T]he interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens."); see also Crawley, 2009 WL 1384147 at *29 ("It is evident that the public interest would be served if individuals who were rightfully entitled to Medicaid benefits actually received those benefits without unwarranted interruption or unnecessary delay."). As the State correctly recognizes, "DCF is charged with determining the eligibility of millions of people, and errors are bound to occur." See State's Proposal at 159. This is precisely the point of providing adequate notice so that those errors can be detected and corrected before eligible

recipients lose the vital medical benefits to which they are entitled.[89]   As such, the Court is convinced that the balance of harms and public interest weigh in favor of injunctive relief.

### B. Scope of Relief

#### a. Reinstatement

Plaintiffs ask the Court to require the State to reinstate Medicaid benefits for previously terminated Class Members until the State provides the constitutionally required notice.   Having carefully considered Plaintiffs' request, and the cited authorities, the Court is not persuaded that this extraordinary relief is appropriate under the circumstances of this case. Plaintiffs contend that because Class Members' Medicaid benefits were terminated without adequate notice, the termination was not legally effective such that Class Members are entitled to reinstatement pending adequate notice.   See Class Proposal at 160.   However, the authorities on which

---

[89] The State attempts to minimize the potential for error by asserting that the erroneous terminations discussed at trial are merely four cases out of four million.   See State Proposal at 159.   Of course, this argument ignores the fact that at least some of the erroneous terminations identified at trial were caused by known reoccurring mistakes in the FLORIDA system that undoubtedly affected numerous Class Members.   Moreover, having heard extensive testimony about the way eligibility determinations are made, the Court is convinced that a significant risk of error exists throughout the process.   Indeed, the State offered no evidence to suggest that the mistakes which occurred in the cases presented to the Court were atypical.   Regardless, the State cannot fail to provide the notice that recipients need in order to detect errors and then assert that adequate notice is not necessary because more recipients did not detect the errors.

Plaintiffs rely do not support the extraordinary reinstatement relief Plaintiffs

seek here.

Plaintiffs cite <u>K.W. ex rel. D.W. v. Armstrong</u> (<u>K.W. II</u>), 789 F.3d 962, 974

(9th Cir. 2015) <u>aff'g</u>, <u>K.W. ex rel. D.W.</u> (<u>K.W. I</u>) 298 F.R.D. 479, 494 (D. Idaho

Apr. 21, 2014), <u>M.A. ex rel. Avila v. Norwood</u>, Case No. 15 C 3116, 2016 WL

11818203, at *11 (N.D. Ill. 2016), <u>Haymons v. Williams</u>, 795 F. Supp. 1511, 1525

(M.D. Fla. 1992), and <u>Kimble</u>, 599 F.2d 599 (4th Cir. 1979) to argue that the

Class Members are entitled to reinstatement pending adequate notice.  <u>See</u>

Class Proposal at 159-60.   And indeed, in each of these cases, the court ordered

the reinstatement of Medicaid benefits to their prior levels pending adequate

notice of the reduction or termination of the benefits.   Significantly, however,

the reduction or termination of benefits in these cases resulted from a classwide

decision, such as a change in the state's policy or practice concerning the types

of services provided or the calculation of benefits.   <u>See</u> <u>K.W. II</u>, 789 F.3d at 967-

68, 974; <u>M.A.</u>, 2016 WL 11818203, at *2, *11; <u>Kimble</u>, 599 F.2d at 601;

<u>Haymons</u>, 795 F. Supp. at 1525; <u>see also</u> <u>Banks v. Trainor</u>, 525 F.2d 837, 838,

840 (7th Cir. 1975).[90]

---

[90]    Plaintiffs also cite <u>Febus v. Gallant</u> to support reinstatement relief.   <u>See</u> Class
Proposal at 162 (quoting <u>Febus</u>, 866 F. Supp. at 47).   Although <u>Febus</u> does not involve a
change in state policy on services or benefits, it does concern a change in the state's methods
for determining ineligibility.   <u>See</u> <u>Febus</u>, 866 F. Supp. at 46.   Indeed, the flawed notices in
this case stemmed from the implementation of a new computer program that had generated
erroneous termination decisions "in a significant number of cases . . . ."   <u>See</u> <u>id.</u>

For example, <u>Kimble</u> concerned the State of Maryland's decision to institute an across-the-board reduction in Medicaid benefits.    <u>See Kimble</u>, 599 F.2d at 601.    In <u>M.A.</u>, the State of Illinois implemented a new eligibility standard for in-home shift nursing care, and in <u>K.W.</u>, the State of California made "dramatic" changes to its budget tool that led to decreases in the individual budgets of numerous class members.    <u>See M.A.</u>, 2016 WL 11818203, at *2; <u>K.W. II</u>, 789 F.R.D. at 967-68.[91]    Although each state had reduced benefits and services pursuant to the new policy or practice, it was undisputed that the class members were nonetheless eligible for the Medicaid program. <u>See K.W. I</u>, 289 F.R.D. at 486 (explaining that, by definition, the class includes only individuals "whose financial eligibility for Medicaid has been verified . . ."); <u>M.A.</u>, 2016 WL 11818203, at *11 (setting forth a class definition which begins "[a]ll Medicaid-enrolled children . . ."); <u>Haymons</u>, 795 F. Supp. at 1519, 1523

---

[91] <u>Haymons</u> is on slightly different footing than the other cases cited here.    In <u>Haymons</u>, the state decided to terminate two home health care service providers from participation in the Medicaid program based on a finding that they were billing for services not covered by Medicaid.    <u>See Haymons</u>, 795 F. Supp. at 1514-15.    Specifically, the state had analyzed a portion of these providers' claims and determined that the providers were providing services to individuals who were not eligible for those services.    <u>Id.</u> at 1515.    When these providers were terminated from the Medicaid program, the individuals who received services from those providers lost their services as a result.    <u>Id.</u> at 1515.    The <u>Haymons</u> court found that the state's decision effectively operated as a finding that the class members were ineligible for those benefits, entitling the class members to pre-termination notice and an opportunity for a hearing.    <u>Id.</u> at 1522.    While <u>Haymons</u> does not involve the implementation of a new policy or practice as in <u>K.W.</u>, <u>M.A.</u>, and <u>Kimble</u>, it nonetheless involved what amounted to an across-the-board decision that anyone receiving home health care benefits from those two providers was not eligible for those benefits, rather than a specific, individualized finding of ineligibility as to each class member.

("[Defendant] readily admits that plaintiffs are Medicaid-eligible . . . ."); <u>Kimble</u>,
599 F.2d at 605-06.

Indeed, the court in <u>Kimble</u> specifically fashioned the reinstatement
remedy such that it would benefit only individuals who, at the time of the
Court's ruling, were still eligible for Medicaid.  The <u>Kimble</u> court instructed
that "while pre-1976 state law will govern [the benefit levels] during the period
of reinstatement of benefits, <u>the eligibility of each plaintiff to receive such
benefits will depend on his Current [sic] needs</u>."  <u>See</u> <u>Kimble</u>, 599 F.2d at 605-
06 (emphasis added).  As such, "a plaintiff who has acquired enough assets
since 1976 that he is no longer financially eligible for any benefits . . . should
not receive benefits simply because he was financially needy . . . in early 1976."
<u>See</u> <u>id.</u> at 606.  According to the <u>Kimble</u> court, "[t]o base the state's current
Medicaid obligations on financial and medical needs as they existed [at the time
of the inadequate notice] would constitute retrospective rather than prospective
relief."  <u>Id.</u>  Thus, <u>Kimble</u> does not support the wholesale prospective
reinstatement of benefits to Class Members regardless of their current financial
eligibility to receive those benefits.

Plaintiffs also rely on <u>Turner v. Ledbetter</u>, 906 F.2d 606 (11th Cir. 1990)
to support their request for reinstatement.  <u>See</u> Class Proposal at 160-61.
However, <u>Turner</u>, is an exceedingly thin reed on which to support such broad
and exceptional relief.  <u>Turner</u> does not address reinstatement as a remedy for

a procedural violation at all.   Rather, the question in <u>Turner</u> was whether the state could <u>recoup</u> from recipients the funds they received in excess of the current program requirements, but to which they had been entitled under the previous law.   <u>See</u> <u>Turner</u>, 906 F.2d at 608.   Specifically, following a change in the law, the state terminated public benefits to certain families who no longer qualified under the new law, but failed to provide adequate notice.   <u>See</u> <u>id.</u> at 607-08.   Some of these families appealed their termination and continued to receive funds while their appeals were pending.   <u>Id.</u> at 608.   The state sought to recoup those funds from the recipients as an overpayment.   <u>Id.</u>

The <u>Turner</u> court held that because the state had not provided recipients with sufficient notice, "the state's attempted termination of the recipients' [public] benefits became invalid."   <u>Id.</u> at 608-09 (citing <u>Kimble</u>, 599 F.2d at 604).   As such, the court reasoned that "any benefits that the recipients received must be examined under pre-1981 law to determine whether recipients were eligible to receive such funds."   <u>Id.</u> at 609.   And significantly, "[n]either party suggests that the recipients received funds to which they would not be entitled under pre-1981 law."   <u>Id.</u>   Thus, <u>Turner</u>, like <u>Kimble</u>, involved the state's failure to provide adequate notice of an across-the-board change in policy which resulted in the loss of benefits.   These cases hold that an individual is entitled to receive or retain benefits to which they <u>were eligible under the prior policy</u> when the state fails to provide adequate notice of the change in policy.

Here, all Class Members are not, by definition, eligible for the Medicaid program. Moreover, this case does not involve a change in state policy or practice that was implemented without adequate notice to the individuals affected.[92] While the Court has no doubt that the State has erred as to some portion of the Class Members, to reinstate all 500,000 of the terminated Class Members would result in benefit payments to numerous individuals who are not, and do not purport to be, eligible for Medicaid benefits. See Strouchler v. Shah, 891 F. Supp. 2d 504, 527 (S.D.N.Y. Sept. 4, 2012) (denying reinstatement where "it is likely that at least some of those recipients [whose services were terminated] did not request fair hearings because they agreed or did not object to the City's determination"); see also Kimble, 599 F.2d at 605-06 ("[A] plaintiff who has acquired enough assets since [termination] that he is no longer financially eligible for any benefits . . . should not receive benefits simply because he was financially needy [at the time of termination]."). Such an overinclusive remedy would not be in the public interest. The Court is also concerned about the confusion and disruption automatic reinstatement may

---

[92] The Court has considered whether the end of the public health emergency constitutes an across-the-board change in policy that would bring this case within the purview of Kimble, K.W., and the other cases discussed above. However, this change does not support the requested relief because the claim here is not premised on a failure to give adequate notice of the end to the public health emergency.

cause to Class Members who know they are ineligible for Medicaid and have made other arrangements for healthcare.[93]

Under the circumstances of this case, the Court finds that the appropriate remedy is to require the State to issue corrective notice to the previously terminated Class Members.  As discussed above, Plaintiffs have established a classwide procedural harm which is appropriately remedied by providing the Class with the requisite process, i.e., the notice to which they are constitutionally entitled and have not received.  Such notice will ensure that all Class Members have the information needed to determine whether the State's decision to terminate their Medicaid benefits was correct.  Class Members who believe the State made an error may then pursue the available administrative remedies to correct that error.  Significantly, the administrative remedies include the opportunity to request a hearing and have benefits reinstated and continued pending the outcome of the hearing.  See 42 C.F.R. § 431.231(c).  The Court finds this manner of proceeding to be the better course of action under the circumstances.  See Hill v. O'Bannon, 554 F. Supp. 190, 199 (E.D. Pa. 1982).

---

[93] Notably, the regulations implementing the Medicaid Act do not require automatic reinstatement where a termination occurs without adequate notice.  See 42 C.F.R. § 431.231(c).

In fashioning this relief, the Court rejects the State's contention that 42 C.F.R. § 431.231(c) does not require reinstatement of Class Members who seek a fair hearing upon receipt of the corrective notice.   See State Proposal at 169. This regulation requires the State to

> Reinstate and continue services until a decision is rendered after a hearing if—
>
> (1) Action is taken without the advance notice required under § 431.211 or § 431.214 of this subpart;
>
> (2) The beneficiary requests a hearing within 10 days from the date that the individual receives the notice of action. . . . ; and
>
> (3) The agency determines that the action resulted from other than the application of Federal or State law or policy.

See 42 C.F.R. § 431.231(c).   The State asserts that reinstatement is not required here because the terminations resulted from "the application of Federal or State law or policy" within the meaning of § 431.231(c)(3).   See State Proposal at 169.   The State appears to interpret this phrase to mean any eligibility decision pursuant to the Medicaid program requirements.   See id. at 169.   However, such an interpretation would mean that, in nearly all cases, when the state mistakenly fails to provide an individual with proper notice prior to termination, the individual will lose the ability to receive continuing benefits pending the outcome of a hearing.   See Schroeder, 590 F. Supp. at 131 (acknowledging that "[a]ny legal action might be said to have 'resulted from the

application of State or Federal law'" and interpreting an analogous provision to mean only "across-the-board changes implementing state or federal law"). Indeed, the State's interpretation would contradict the due process requirements set forth in Goldberg, which are expressly incorporated into the regulations. See Goldberg, 397 U.S. at 264 ("[W]hen welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process."); Granato v. Bane, 74 F.3d 406, 413 (2d Cir. 1996) ("Although the precise meaning of the regulation is unclear, there can be no question that this provision must be read narrowly—otherwise, the due process interests animating the regulations could be completely circumvented by any state policy, however arbitrary."); see also 42 C.F.R. § 431.205(d).

To understand the meaning of the phrase, the Court looks to the provision which governs the continuation of benefits when the State does provide the required notice. See 42 C.F.R. § 431.230(a). If a duly-notified enrollee requests a fair hearing, this provision requires the State to maintain benefits pending the outcome of the hearing unless "[i]t is determined at the hearing that the sole issue is one of Federal or State law or policy . . . ." Id. Thus, where the State provides proper notice, and the enrollee timely requests a fair hearing, he or she is entitled to continued benefits pending the outcome of the hearing unless the "sole issue" on appeal is a question of Federal or State law

or policy.  As such, where the recipient raises a factual dispute, benefits will continue.

Correspondingly, where the State <u>fails</u> to send proper notice, a recipient is entitled to reinstated benefits pending the outcome of the hearing if, upon receipt of the required notice, the recipient timely requests a hearing and "the action resulted from other than the application of Federal or State law or policy."  Viewed in conjunction with § 431.230(a)(1), the Court interprets this phrase to mean that where the termination resulted from a change in the individual's factual circumstances reinstatement of benefits during the pendency of the fair hearing process is required.  <u>See</u> <u>Schroeder</u>, 590 F. Supp. at 131.  To hold otherwise would reward the State for failing to provide the required notice by allowing it to deny the continued benefits to which the enrollee would have been entitled had she received proper notice.  Here, the State terminated the Medicaid benefits of the Class Members based on factual determinations that their household circumstances or income had changed. Thus, any Class Member who timely requests a fair hearing and reinstatement following receipt of adequate notice must be reinstated pending the outcome of the hearing as required by 42 C.F.R. § 431.231(c).  <u>See</u> <u>Hill</u>, 554 F. Supp. at 198.

### b. Injunctive Relief

For the reasons set forth above, the Court will also enjoin the State from any future terminations of Class Members without providing constitutionally adequate notice.  At a minimum, the notice must include an unambiguous statement of the State's termination decision, to whom that decision applies, and must detail the reasons for that decision sufficient to allow the recipient to assess the accuracy and decide whether to request a fair hearing.  Because the terminations at issue in this case are premised on income, the detailed reasons must, at a minimum, include the enrollee's household size (SFU) and countable income (i.e., the Modified Adjusted Gross Income) as determined by the State. The notice must specify the eligibility category in which the enrollee had been receiving benefits, and if it changed, the reason for the change.[94]   The notice

---

[94] The State argues that it need not identify the eligibility category from which an individual is terminated in the NOCA because this information is "duplicative of information that recipients should already know and is therefore unwarranted."  See State Proposal at 165.  But this ignores the fact that the purpose of the NOCA is to allow the enrollee to determine if the State has made a mistake.  Other than where Medicaid coverage for a new baby is identified in the NOCAs, the State presents no evidence that it ever informs an enrollee of the eligibility category in which she qualified for Medicaid.  Thus, while an enrollee may know the category under which she should be assessed, she does not know the category in which the State has actually placed her.  Moreover, without this information, the enrollee will not know whether the State's decision is premised on a perceived increase in her income or on a change in her eligibility category subjecting her to a higher income standard.  For example, as highlighted at the bench trial, where the State mistakenly terminates a postpartum woman's Medicaid benefits prematurely "based on income," the failure to disclose the change in eligibility category obscures the actual reason for the State's eligibility determination.

In addition, the need to identify the eligibility category is particularly great given the form of notice currently employed by the State.  The NOCAs are divided into multiple Medicaid and Medically Needy sections which govern different eligibility categories pertaining

must also provide the enrollee with sufficient information for the enrollee to ascertain the eligibility categories in which his or her income was tested and the income limits the State applied.   However, it appears that neither the other eligibility categories in which an enrollee's income may have been tested and failed, nor the income standard applied, are saved in the FLORIDA system.   As such, the Court will not require this information to be specifically included in the notice.   Instead, the State can provide this information via a link to a table which identifies the eligibility categories and related income standards based on the size of the SFU.   To ensure that the table correctly corresponds with the information provided in the notice, the table must display the income limit with any applicable Standard and MAGI Disregards already incorporated into the income standard.[95]   With this information together, an enrollee can assess the accuracy of the State's termination decision.

### c.  Corrective Notice

As discussed above, to remedy the ongoing constitutional violation, the State must also provide this notice to any Class Members whose benefits were

---

to different household members, and yet these differences are not labeled.   Thus, it is difficult if not impossible for the reader to understand how the multiple sections fit together into a coherent decision.

[95]  This simple solution resolves the State's too-convenient argument that the countable income has no "real-life significance" because it is the countable <u>net</u> income that is compared to the income standard.   <u>See</u> State Proposal at 162-63.   Basic principles of mathematics, and the testimony at trial, establish that the disregard can be subtracted from the countable income <u>or</u> added to the income limit, and the result is the same.

terminated without adequate notice and who have not been reinstated. [96] Moreover, as ancillary to this injunctive relief, the corrective notice must advise Class Members of the available administrative remedies.    See Quern v. Jordan, 440 U.S. 332, 347-49 (1979).    Specifically, the notice sent to these Class Members must advise them that: 1) the Court has found that the NOCAs they received prior to the termination of their Family-Related Medicaid benefits were constitutionally inadequate, 2) the Court has ordered the State to provide this corrective notice detailing the reasons for the termination of benefits as set forth in this Order, 3) they may request a fair hearing following the receipt of this notice, and 3) they may request the reinstatement of benefits pending the outcome of the hearing, see 42 C.F.R. § 431.231(c).    The notice must also advise Class Members of the deadlines for seeking a fair hearing and reinstatement, as well as any administrative procedures available under state law by which they may seek payment of, or reimbursement for, any past medical bills that should have been covered by Medicaid if an error is found to have occurred. See 42 C.F.R. §§ 431.231 and 431.246; see also Quern, 440 U.S. at 347-49.

---

[96] In the Class Certification Order, the Court excluded from the Class "any individual who has already requested and received a fair hearing."    See Class Certification Order at 59 n.19.    At the time, the Court stated that it would consider whether individuals "who merely engaged in the prehearing conferral process" should also be excluded once the factual record was more fully developed.    Id.    Having now heard testimony on the prehearing conferral process, the Court finds that the confusing and inadequate NOCAs may have impacted an enrollee's ability to meaningfully engage in the process.    As such, the Court declines to exclude these individuals from the Class.

Because the Court declines to order wholesale reinstatement, and recognizing the ongoing harm to Class Members, the Court will require the State to issue this corrective notice within sixty days of this Order and file a notice on the docket when it has done so.   Any Class Members who have not been sent the corrective notice within this timeframe must be reinstated pending adequate notice.

### IV.   Conclusion

Individuals receiving Family-Related Medicaid in Florida are among the State's most vulnerable citizens.   They are primarily pregnant and postpartum women, infants, and children.   And as is evident from the applicable income standards, these individuals are the poorest of the poor.   Prior to terminating the Medicaid benefits on which these individuals depend, the Constitution requires the State of Florida to provide them with adequate notice.   The State of Florida is violating this constitutional requirement.

The Court finds that the NOCAs used by the State of Florida to terminate an individual's Family-Related Medicaid benefits for financial reasons border on the incomprehensible.   They are vague, confusing, and often incorrect and misleading.   The NOCAs are structured based on an internal logic that is indecipherable to a reader inexperienced with Medicaid and unfamiliar with the operation of the State's FLORIDA system.   Indeed, even those who are well-versed in the FLORIDA system and Medicaid eligibility requirements

struggle at times to explain the meaning of the NOCAs.   At the outset of this
lawsuit, the Court carefully reviewed the NOCAs and was unable to make
coherent sense of the myriad sections, seemingly random groupings of family
members, and vague Designated Reasons.   Now, having heard the State's
explanations, or lack thereof, for the separate sections, random groupings and
generic Designated Reasons, the Court is convinced that the NOCAs do not
provide reasonable notice.

The length of this Order might suggest that the question before the
Court—whether the State's notices are constitutionally adequate—is overly
complex or a razor close call.   It is neither.   The length of this Order is not
reflective of the complexity of the legal issue, it is reflective of the complexity
and unreasonably confusing nature of the notices.   It is driven by the need to
address the complete inadequacy and borderline incomprehensibility of the
notices and the inadequacy of the other resources identified as remedying the
failure of the NOCAs at issue.   As detailed in this Order, the Court's review of
the evidence and the notices—their structure, the confusing, contradictory, and
often misleading reasons they provide, and the lack of alternate available
sources for the necessary information—inescapably leads to the conclusion that
the State's notices are fundamentally insufficient to satisfy the requirements of
due process.

Significantly, without proper notice, Class Members struggle to decipher the State's ultimate decision in their case and the reasons for that decision. The inadequate notices cause tremendous confusion, lost time, stress and anxiety.   But more importantly, the lack of the constitutionally required notice deprives Class Members of a meaningful opportunity to challenge the decision. Because Class Members cannot understand what the NOCAs mean, they cannot determine whether the State has made a mistake.   This increases the likelihood that when the State makes an error, which is inevitable in a program of this size and complexity, impoverished parents, children, pregnant women, and infants will lose vital medical benefits for which they are eligible.   This causes tremendous harm not only to these individuals, but to society at large. Indeed, it is in the public interest to require the State to comply with its constitutional obligations and ensure that individuals eligible for Medicaid receive those benefits without interruption.   Injunctive relief is entirely warranted and necessary in this case.   In light of the foregoing, it is

ORDERED:

1.    The American Public Health Association and 102 Deans, Chairs, and Public Health and Health Policy Scholars' Motion for Leave to File Amicus Curiae Brief in Support of Plaintiffs' Position at Trial (Doc. 112) is **DENIED**.

2.    Plaintiffs' Request for Judicial Notice as to Governmental Actions, Policies, and Reports (Doc. 129) is **GRANTED**, in part, and **DENIED**, in part.

    A.    As to Plaintiffs' Exhibit 238, the Request is **GRANTED, in part, and DENIED, in part,** to the extent the Court takes judicial notice as to the existence of Plaintiffs' Exhibit 238, but not the truth of its contents.

    B.    As to Plaintiffs' Exhibit 241, the Request is **GRANTED**.

    C.    As to Plaintiffs' Exhibits 240 and 242, the Request is **DENIED as moot**.

3.    The Clerk of the Court is directed to enter **JUDGMENT** in favor of Plaintiffs and against Defendants Shevaun Harris, in her official capacity as Secretary for the Florida Agency of Health Care Administration, and Taylor Hatch, in her official capacity as Secretary for the Florida Department of Children and Families, on Count I of the Second Amended Complaint.  The Clerk is further directed to terminate any pending motions and close the case.

4.    Defendants have violated and continue to violate the Due Process Clause of the United States Constitution by terminating the Family-Related Medicaid benefits of Class Members due to a finding of financial ineligibility without adequate notice.  The Notices of Case

Action currently used by Defendants for this purpose are constitutionally inadequate.

5.    Defendants, their officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them, who receive actual notice of this Order, are **PERMANENTLY ENJOINED** from terminating the Family-Related Medicaid benefits of any Class Member based on a finding of financial ineligibility unless the State provides written notice which unambiguously informs the intended recipient of the State's intent to terminate Medicaid benefits, the person or persons whose benefits will be terminated, and detailing the reasons for that decision as to each person. The reasons detailed must include sufficient case-specific information to allow the recipient to assess the accuracy of the State's decision and decide whether to request a fair hearing. In this context, such information must include, at a minimum: the enrollee's household size (SFU) and countable income (i.e., the Modified Adjusted Gross Income) as determined by the State; the eligibility category in which the enrollee had been receiving benefits, and if it changed, the reason for the change. As set forth in this Order, the notice must also provide the recipient with sufficient information for

the recipient to ascertain the eligibility categories in which the enrollee was tested and the income limits the State applied.

6. Within **SIXTY DAYS** of this Order, the State must provide notice of the Court's ruling and a constitutionally adequate termination notice in compliance with this Order to any Class Members whose Family-Related Medicaid benefits were terminated during the class period and have not been reinstated.   As to these Class Members, the notice must also advise of their ability to request a fair hearing and the means and timeframes for doing so, their ability to seek reinstatement of Medicaid benefits pending completion of the fair hearing process, and the availability of State administrative procedures permitting the payment of past medical bills if an error is found.

7.      On or before **March 17, 2026**, the State must file a notice on the docket advising the Court of its compliance with this Order.  Any Class Members who have not received corrective notice by this date must be reinstated to full Medicaid until the State provides the notice required in this Order.  The State must notify these Class Members of the Court's decision in this case and that the State will be providing a corrective notice.

**DONE AND ORDERED** in Jacksonville, Florida this 6th day of January, 2026.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record

Attachments: Appendix A-7