**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHIANNE D.; C.D., by and through
her mother and next friend, Chianne D.;
A.V., by and through her mother
and next friend, Jennifer V.; KIMBER
TAYLOR; and K.H., by and through his
mother and next friend, Kimber Taylor,

               Plaintiffs,

-vs-                               Case No. 3:23-cv-985-MMH-LLL

SHEVAUN HARRIS, in her official
capacity as Secretary for the FLORIDA
AGENCY FOR HEALTH CARE
ADMINISTRATION, and TAYLOR
HATCH, in her official capacity as
Secretary for the FLORIDA
DEPARTMENT OF CHILDREN
AND FAMILIES,

               Defendants.
_____/

## O R D E R

**THIS CAUSE** is before the Court on Defendants' Time-Sensitive Motion

to Stay Pending Appeal and Alternative Motion for Extension of Time and

Clarification (Doc. 193; Motion), filed on February 18, 2026.  In the Motion,

Defendants Shevaun Harris, in her official capacity as Secretary for the Florida

Agency for Health Care Administration (AHCA), and Taylor Hatch, in her

official capacity as Secretary for the Florida Department of Children and Families (DCF) (collectively, the State) ask the Court to stay the injunctive provisions set forth in the Court's Findings of Fact and Conclusions of Law (Doc. 186; Final Order) pending resolution of the State's appeal.  See Motion at 1; see also Final Order at 271-73, entered January 6, 2026; Defendants' Notice of Appeal (Doc. 191), filed February 5, 2026.   Alternatively, the State asks for an extension of time from March 9 to April 29, 2026, to send the corrective notices mandated by the Final Order.  See Motion at 1-2.   The State also seeks clarification on whether a 90-day regulatory deadline to resolve a fair hearing request applies to Class Members who make the request based on the corrective notices.  Id. at 2.  On February 23, 2026, the Court entered an Order (Doc. 195) taking the Motion under advisement, directing Plaintiffs to file a response, and extending the deadline to provide corrective notice to April 3, 2026, and the deadline to reinstate Class Members absent corrective notice to April 7, 2026. See Order (Doc. 195).   In accordance with the Court's Order, Plaintiffs filed a response on March 2, 2026.   See Plaintiffs' Response to Defendants' Motion for Stay Pending Appeal (Doc. 196; Response).   Accordingly, this matter is ripe for review.

## I.    Standard of Review

Rule 62(d), Federal Rules of Civil Procedure (Rule(s)), provides that "[w]hile an appeal is pending from an interlocutory order or final judgment that

grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."   See Rule 62(d).   Courts consider the following factors to determine whether a stay pending appeal is warranted:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

See Nken v. Holder, 556 U.S. 418, 434 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)); see also Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1317 (11th Cir. 2019)).   The party seeking the stay bears the burden and "must show more than the mere possibility of success on the merits or of irreparable injury."   See Democratic Exec. Comm. of Fla., 915 F.3d at 1317 (emphasis added).   Indeed, "[t]he first two factors are the most critical."   Id. Nevertheless, "the movant may also have [its] motion granted upon a lesser showing of a substantial case on the merits when the balance of the equities identified in factors 2, 3, and 4 weighs heavily in favor of granting the stay." Fla. Immigrant Coalition v. Att'y Gen., State of Fla., No. 25-11469, 2025 WL 1625385, at *2 (11th Cir. June 6, 2025) (quoting Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)); see also Naples Pride, Inc. v. City of Naples, No. 25-11756, 2025 WL 2382975 (11th Cir. June 6, 2025); League of Women Voters of Fla., Inc. v. Fla. Sec'y of State, 32 F.4th 1363, 1370 (11th Cir. 2022).

## II.    Analysis[1]

### A. Likelihood of Success

The Court begins with consideration of the State's likelihood of success on the merits.    In the Motion, the State argues that it is likely to succeed on appeal because its notice practices comply with the minimum requirements of due process.    See Motion at 16.    The State contends that it provides sufficient notice of a Medicaid termination because it issues written notice which, in the State's view, "advis[es] that Medicaid coverage is ending, identif[ies] a reason why, and appris[es] the recipient of his or her fair-hearing rights."    Id.    In addition, the State points to other resources "outside the four corners of the notices" that purportedly provide "ample information . . . ."    Id.    Thus, according to the State, "Plaintiffs did not establish that the State fails to provide notice reasonably calculated under all the circumstances to advise them of the State's action and afford them an opportunity to pursue an appeal."    Id. at 16.

These conclusory assertions are nothing more than a general restatement of the State's theory of the case.    Rather than identify any factual or legal error in the Final Order, the State simply ignores the Court's two hundred-seventy-three-page discussion of all the reasons why the State's theory is factually unsupported and legally unavailing.    In the Final Order, the Court described

---

[1] In the interest of expediency, the Court presumes the reader is familiar with the underlying decision in this case and adopts its defined terms.    See Chianne D. v. Harris, ___ F. Supp. 3d ___, 2026 WL 32126, at *1 (M.D. Fla. Jan. 6, 2026).

at length the facts which show that, contrary to the State's position, the written notice of case action (NOCA) it provides does not advise the recipient that Medicaid coverage is ending much less the reason why.  See Final Order at 44-78.  The State does not identify any error, or even a substantial question, in those factual findings.  Indeed, the State does not discuss them at all.  The Court also made extensive factual findings about the information available to enrollees outside the four corners of the NOCAs and described the many reasons why those resources are inadequate to fill the void left by the vague, confusing, and often misleading NOCAs.  See id. at 78-109.  Again, the State points to no factual error in the Court's discussion of those resources.

As to the Court's legal analysis, the State maintains that "[d]ue process requires reasonableness under the totality of the circumstances—not comprehensive, individualized facts contained within a single notice."  See Motion at 18.  Based on this premise, the State argues that the "Court erred in imposing a higher, individualized standard."  Id.  But in making this conclusory assertion of error, the State entirely fails to engage with the Court's legal analysis.  In the Final Order, the Court carefully considered each of the cases on which the State relies for the proposition that standardized notices are sufficient to satisfy due process and found them to be distinguishable from the circumstances of this case.  See Final Order at 220-26.  The Court explained that other cases, where courts found that due process requires more detailed

- 5 -

notice, are more persuasive in the specific context of the individual Medicaid termination decisions at issue here.   See id. at 223-28.   In the Motion to Stay, the State does not identify any flaw in the Court's reasoning or even acknowledge this analysis.   As such, the State has not demonstrated a substantial case on the merits, much less made a strong showing that it is likely to succeed on this issue.

However, even if a substantial case could be made that standardized notices are sufficient in this context, success on this issue alone would not warrant a stay.   In the Motion, the State fails to recognize that there were two parts to the Court's analysis of the NOCAs.   See Motion at 19 (identifying the serious legal issue on appeal as whether standardized notice is sufficient). Prior to addressing whether the State must provide individualized details of the reasons for the termination decision, the Court separately considered whether the NOCAs constitute reasonable notice of the State's termination decision itself.   See Final Order at 206.   In this portion of the analysis, the Court found that "[t]he NOCAs are far too vague and confusing to reasonably inform recipients of the action the State intends to take, or to whom that action applies, and fail to reliably identify the reason for that action as to each enrollee."   Id. at 217.   Indeed, the Court determined that the NOCAs are inadequate to satisfy the minimum requirements of due process, even under the standardized notice authority on which the State relies.   See id. at 217 ("[E]ven accepting

the State's position that a standardized notice is sufficient to notify enrollees of the State's termination decision, the NOCAs fall far short of the mark."); see also id. at 224 n.76.  In the Motion to Stay, the State does not address this aspect of the Court's decision, and makes no attempt to identify a legal or factual error, or even a substantial question, as to that determination.[2]  Thus, even if the State had shown that is likely to prevail on its argument that individualized details are unnecessary, and it has not, a stay of the injunction is not warranted given the other more fundamental flaws with the NOCAs.[3]

Ultimately, the State offers nothing more than the mere possibility that it may prevail on appeal.  The State's failure to meet its burden on this critical factor weighs heavily against a stay.  See Nken, 556 U.S. at 434 (explaining that "more than a mere possibility of relief is required" (emphasis added and quotation omitted)).  Indeed, the Motion is due to be denied on this basis alone. See Alabama State Conf. of NAACP v. Allen, No. 25-13007, 2025 WL 3091433,

---

[2] The State includes a footnote which vaguely asserts that the Court gave "insufficient weight" to the State's actual knowledge and duty of inquiry cases.  See Motion at 18 n.6. However, the State does not develop these arguments beyond one sentence and one legal citation.  Id.  Because the State does not acknowledge the Court's analysis on these points or point to any flaw in its reasoning, it is entirely unclear what the State means by this assertion.  Conclusory, undeveloped arguments which are buried in a footnote plainly fail to satisfy the State's burden of showing more than the mere possibility of success on the merits.

[3] Notably, the State does not assert that adding individualized details significantly increases the time required to revise the NOCAs, or the expense of doing so, beyond that which is necessary to correct the structural flaws.  Indeed, it appears from the Motion that addressing the structural flaws is the more difficult task.  See Motion at 6 (explaining that modifications to correct the layout of the NOCAs "are not simple and will require an investment of considerable resources").

at *2 n.2 (11th Cir. Oct. 30, 2025) (finding it unnecessary to address the other Nken factors where the movant failed to show a likelihood of success on the merits); see also Democratic Exec. Comm. of Fla., 915 F.3d at 1327 ("But even assuming [defendants will be forced to expend unrecoverable resources], that injury is not enough to overcome [defendant's] inability to show likelihood of success on the merits."). Nevertheless, the Court will proceed to discuss the remaining factors.

**B. Irreparable Harm**

The State devotes most of the Motion to its arguments on the irreparable harm factor. According to the State, compliance with the Final Order "will impose enormous and irrevocable costs on taxpayers, to the detriment of needy people and deserving public-assistance programs." See Motion at 3. The most significant cost the State identifies is the cost of reinstating Medicaid benefits to Class Members should the State fail to issue timely corrective notices. Specifically, the State points to logistical difficulties posed by reinstatement, as well as an enormous cost—well over $300 or $400 million for a single month of reinstated benefits to the 1.2 million Class Members previously terminated without adequate notice. See Motion at 13. The State also explains that reinstatement is a "labor-intensive process and will take months of work" to complete. See Motion at 12, Ex. A: Declaration of Andrea Latham (Latham Decl.) ¶ 10 and Ex. C: Declaration of Bridget Royster (Royster Decl.) ¶ 9. Even

automating reinstatement would require several months of work and "[t]he DCF and vendor staff who would complete [the IT enhancements for automating reinstatement] are the same staff who would otherwise be working on developing corrective notices and revised NOCAs."  See Latham Decl. ¶ 11.

The State's arguments on reinstatement are well-taken.  Indeed, for the reasons expressed in the Final Order, the Court found corrective notice, rather than wholesale reinstatement, to be the more appropriate form of relief, in part due to the enormous cost and confusion that wholesale reinstatement would generate.  See Final Order at 259-60.  Nevertheless, the Court was cognizant of the ongoing harm to Class Members and endeavored to fashion relief that would ensure the State provided corrective notice as quickly as possible.  Id. at 267.  Although the State maintains that it is unable to meet the original or extended deadline for issuing corrective notice, see Motion at 9; see also Defendants' Notice of Compliance (Doc. 197) at 2, it seeks only a modest extension of time to complete the task.  Specifically, the State asks the Court to extend the corrective notice deadline to April 29, 2026.  See Motion at 1, 24; see also Latham Decl. ¶ 8.  Given that the time it would take to implement reinstatement appears to far exceed the time needed to issue the corrective notices, and in light of the cost, confusion, and logistical difficulties presented by reinstatement, the Court will grant the State's request for an extension of

time to provide corrective notice.[4]   The Court grants the request with the understanding that this will allow the State to focus its resources on revising the NOCAs and providing the corrective notice.   See Latham Decl. ¶¶ 10-11. Because the Court will grant this extension, the reinstatement costs will be avoided and do not support a stay of the injunctive relief provided in the Final Order.[5]

As to the remaining costs of compliance with the Final Order, the State presents evidence that revising the NOCAs "will require 2,368 hours at a cost of $370,899.84," and creating the necessary corrective notices will require "824 hours at a cost of $116,686.64."   Id. at 6, 9; see Latham Decl. ¶¶ 3, 7.   The State asserts that mailing the corrective notices will cost $936,000 in postage. See Motion at 9; see also Royster Decl. ¶ 6.   In addition, the State calculates the cost of pausing terminations until the NOCAs are revised to be upwards of $14 to $16 million in the first month.   See Motion at 7-8.   The State appears to believe that the pause in terminations will last at least six months such that

---

[4] The Court is satisfied that it retains the authority to grant this extension, as well as the other minor modification the State requests, despite the pendency of the appeal.   See Rule 62(d).   Plaintiffs do not argue otherwise.

[5] The State also raises a concern about its ability to conduct fair hearings within the 90-day regulatory period following the issuance of the corrective notices.   See Motion at 10-11.   The Court finds these points well-taken and will grant the request to clarify that the 90-day period does not apply to individuals seeking a fair hearing in response to the corrective notice.   Notably, Plaintiffs do not address this request in their Response.   And given that a Class Member may seek reinstatement pending the outcome of the fair hearing, the Court finds no harm to the Class Members from a delay in completion of the fair hearing process. See Final Order at 263, 272.

it "will likely cost taxpayers well in excess of $300 million."   Id. at 8.   Because

the costs of complying with the Final Order are unrecoverable, the Court is

satisfied that the State has demonstrated irreparable harm absent a stay.   See

Georgia v. President of the United States, 46 F.4th 1283, 1302 (11th Cir. 2022)

("Th[e] [Eleventh] Circuit has recognized that unrecoverable monetary loss is

an irreparable harm.").[6]

Nonetheless, the Court observes that the State has significant control

over the extent of the harm.   Indeed, while the State estimates the cost of

pausing income-based terminations over a six-month period, it is unclear how

the State calculates the six-month timeframe.   For example, while the State

presents evidence that the necessary revisions will require 2,368 hours of work,

the evidence does not include any estimate on how quickly it can accomplish

---

[6] It warrants noting, however, that at least a portion of these costs will inure to the benefit of the State because the money will be spent on improving its NOCAs.   Indeed, the State planned to update the NOCA as part of its modernization project.   If the State prevails on appeal, the State is left with a NOCA which contains more information than is required by due process, although arguably, no more than what the State is otherwise required to include pursuant to Medicaid Act regulations.   See 42 C.F.R. § 431.210(b).   This irreparable harm is a far cry from the "pointless endeavor" of spending millions to dismantle a facility only to spend millions to rebuild it again in the event of success on appeal.   See Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec., No. 25-12873, 2025 WL 2598567, at *11 (11th Cir. Sept. 4, 2025).   While it undoubtedly costs the State more to update the NOCAs on an expedited schedule while terminations are paused, this is the result of the State's decision to ignore the flaws in the NOCAs, a problem it has known about since at least 2018. See Final Order at 6-9, 252 n.88.   The State also has had ample opportunity since the outset of this case to plan for the possibility that the Court would enjoin terminations until the State revised the NOCAs.   Indeed, the Court expressed serious concerns about the confusing composition of the NOCAs at the preliminary injunction hearing on December 13, 2023.   See Transcript of December 13, 2023 Preliminary Injunction Hearing (Doc. 64) at 4-5, 24-25, 31-32, 72-73, 91.

that work.   See Motion at 6-7; Latham Decl. ¶ 3.   The State also describes a budget approval process that must take place before the work can begin, but does not specify how long that process takes, and whether or when the State started the process.   See Motion at 6-7; see also Latham Decl. ¶ 4.   Notably, the State does not address whether it is able to expedite any of these processes to limit the mounting costs from the pause in terminations.   Thus, while the State will undoubtedly incur some unrecoverable costs to comply with the Final Order, the State has the power to mitigate those harms by revising the NOCAs as expeditiously as possible.[7]

### C. Balance of Equities & Public Interest

Finally, the Court considers the balance of equities and the public interest.   "Where the government is the party opposing the . . . injunction, the balance of the equities and the public interest 'merge.'"   See Friends of the

---

[7] The Court also rejects any suggestion that compliance with the Final Order necessarily requires DCF to divert resources from other planned enhancements, that "could expose Florida to an otherwise avoidable penalty, adding another $1 billion to the monumental cost of the Injunction."   See Motion at 23-24.   Significantly, the State does not provide any evidence that diverting funds from these other planned enhancements is the only available funding option.   Indeed, the State explains a process for seeking additional funding in the Motion.   See id. at 6-7.   Given the enormous potential penalty described in the Motion, it appears the State would be incentivized to provide sufficient funding for DCF to complete both projects.   Because it is within the State's power to prevent this outcome, the Court does not credit this worst-case hypothetical.

It is also notable that the State waited until the thirty-day deadline had nearly run before filing its Notice of Appeal, and then almost two weeks after that to file the Motion to Stay.   See Notice of Appeal (Doc. 191), filed February 5, 2026; Motion to Stay (Doc. 193), filed February 18, 2026.   This delay in filing their appeal and seeking a stay "vitiates much of the force of their allegations of irreparable harm."   See Beame v. Friends of the Earth, 434 U.S. 1310, 1313 (1977).

<u>Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.</u>, No. 25-12873, 2025 WL 2598567, at *10 (11th Cir. Sept. 4, 2025) (quoting <u>Nken</u>, 556 U.S. at 435).   For the reasons set forth below, and consistent with the Court's findings in the Final Order, the balance weighs against a stay.

Class Members are suffering ongoing irreparable harm.   <u>See</u> Final Order at 243-46.   The State's termination of Medicaid benefits without adequate notice not only violates Class Members' constitutional rights, it also deprives them of "a meaningful opportunity to challenge the State's ineligibility determination."   <u>See</u> <u>id.</u> at 244.   And as the Court previously explained:

> [g]iven the ample opportunities for errors—both human and machine—during the eligibility determination process, and the egregious flaws in the NOCAs, the risk that the State's inadequate and unlawful notices to members of the Class will result in the erroneous deprivation of Medicaid benefits is not hypothetical and speculative, but real and immediate.   And plainly, the erroneous deprivation of Medicaid benefits results in significant and irreparable harms.

<u>Id.</u> (footnote omitted).   Moreover, even where the termination decision is correct, the failure to provide adequate notice causes "confusion, frustration, stress, anxiety, and lost time."   <u>Id.</u> at 245.   It also deprives Class Members of the ability to plan for the loss of benefits.   <u>Id.</u> at 246.   These harms are all irreparable.   <u>Id.</u> at 245.

In the Motion, the State does not address the Court's irreparable harm findings.   Nor does it weigh the ongoing irreparable harms to the Class

Members against its own.  Instead, the State ignores the analysis in the Final Order and brushes away any concern about the Class Members by repeatedly asserting that they are individuals who "have been determined to be ineligible . . . ."  See Motion at 7, 8; see also id. at 22 ("The Injunction's costs will accumulate rapidly, without providing benefits to a single person found to be eligible for Medicaid.").[8]  Of course, the fact that the State has determined an individual to be ineligible does not mean the individual actually is ineligible for Medicaid.  The Court discussed in the Final Order the many ways the State can and does err in determining financial eligibility.  See Final Order at 29-32, 123, 143-44, 151-54, 162-63, 166, 171, 178-79, 244 n.85.  Indeed, the State itself recognized that errors are inevitable.  See id. at 253.  The substantial risk of error is a significant reason why due process—reasonable notice and a meaningful opportunity to be heard—is critically important before the State terminates an individual's Medicaid benefits.  Weighing these harms against

---

[8] On this point, it bears noting that the Class covers only past and future Medicaid enrollees, not applicants.  Indeed, only current enrollees benefit from the pause in terminations.  Given the annual redetermination process, these are individuals the State found both technically and financially eligible for Medicaid at some point in the last year.  See Final Order at 28.  The State's repeated use of passive voice notwithstanding, it is the State that has determined that these individuals are now ineligible for Medicaid.  And the State's confidence in the correctness of its own decisions, which is belied by the evidence, does not obviate the need for due process.

The State also erroneously asserts that it must maintain benefits "without regard to whether class members have become ineligible for technical reasons."  See Motion at 21.  This is flatly incorrect.  The Final Order only enjoins the State from terminating Medicaid benefits of Class Members "based on a finding of financial ineligibility . . . ."  See Final Order at 271.

the financial cost to the State, the balance does not tilt in the State's favor. Indeed, as the Court observed in the Final Order, "the State does not cite any case where a court has found such cost arguments to outweigh the harm caused by an ongoing unconstitutional policy or practice." See Final Order at 249. The State cites no such case in the instant Motion either.[9]  Thus, the Court continues to reject the proposition that "the State must be allowed to continue violating the constitutional rights of its citizens because compliance is too expensive." Id. at 250.[10]

Aside from the cost of compliance, the State also contends that the balance of harms and public interest weigh in its favor because "[t]he Injunction frustrates the State's interest in enforcement of duly enacted state and federal laws." See Motion at 21.  This contention may have had some heft had the State made a strong, or even substantial showing on the merits.  "But because [its] success is quite uncertain, this particular harm is less relevant." See Fla.

---

[9] The State relies on Friends of the Everglades to support its contention that the unrecoverable costs at issue here warrant a stay.  See Motion at 21-22.  Significantly, Friends of the Everglades is not a due process case, and most importantly, the Eleventh Circuit found that the movants were substantially likely to succeed on the merits of their appeal.  See Friends of the Everglades, 2025 WL 2598567, at *5, *9.  Indeed, the Eleventh Circuit had "no trouble concluding" that the district court's finding on a key issue of fact was "clearly erroneous." Id. at *8.  Here, the State does not argue, much less make a substantial showing, that any of the Court's findings are clearly erroneous.

[10] The Court is also not persuaded that the State should be allowed to continue violating the constitutional rights of its citizens because it plans to correct the problem eventually, "perhaps" next year.  See Motion at 22.

Immigrant Coalition, 2025 WL 1625385, at *5.   As it stands, the Court does not weigh the State's interest in enforcing state and federal law over the constitutional rights of its citizens.   Indeed, "the public interest is served when constitutional rights are protected."   Democratic Exec. Comm. of Fla., 915 F.3d at 1327.   Moreover, as explained in the Final Order, the State's argument "is self-defeating because the State violates the Medicaid Act every time it terminates the Medicaid benefits of a Class Member with constitutionally inadequate notice."   See Final Order at 252.   Thus, for the reasons set forth in the Final Order, the Court is convinced that the balance of harms and public interest weigh against a stay.   See id. at 247-54.

Finally, the Court firmly rejects the State's suggestion that "[t]his case presents no emergency."   See Motion at 24.   The harms to the Class Members from lack of adequate notice, particularly those whose Medicaid benefits are erroneously terminated, are urgent and severe.   Recognizing these harms, as well as the public importance of the case and the significant costs involved, the Court endeavored to reach a final resolution in this case as expeditiously as possible.   A variety of factors—including the Court's heavy docket, the complex, voluminous record, and intervening Supreme Court authority—meant the case could not be resolved overnight.[11]   But the Court's effort to carefully

---

[11] And as counsel is aware, the sudden and unexpected death of a member of this judge's immediate family caused additional unavoidable delay.

and comprehensively determine the facts and apply the law in no way supports allowing the State to further delay an end to its unconstitutional practices until after the appeals process is complete, particularly absent any showing that the State is likely to succeed in that appeal.   In light of the foregoing, it is

**ORDERED:**

1. Defendants' Time-Sensitive Motion to Stay Pending Appeal and Alternative Motion for Extension of Time and Clarification (Doc. 193) is **GRANTED, in part, and DENIED, in part.**

   A. The Motion is **GRANTED** to the extent the Court extends the deadline to provide corrective notices, as set forth in paragraph 6 on page 272 of the Court's Findings of Fact and Conclusions of Law (Doc. 186) to **May 1, 2026.**   The deadline for reinstatement absent corrective notice, as set forth in paragraph 7 on page 273 of the Court's Findings is extended to **May 8, 2026.**

   B. The Motion is further **GRANTED** to the extent the Court clarifies that the State is not required to conduct a fair hearing within 90 days of a request from a Class Member, if such Class Member requests the fair hearing in response to a corrective notice.   The State shall provide the Court with status reports on DCF's progress in conducting fair hearings in response to the

corrective notices.   The status report shall identify the number of fair-hearing requests received, the number of individuals reinstated pending the outcome of the fair hearing, the number of requests resolved, and the number of hearings held.   The status reports are due on **August 3, 2026,** and every **30 days** thereafter.

      C.     The Motion is otherwise **DENIED**.

2.     On or before **May 8, 2026**, the State must file a notice on the docket advising the Court of its compliance with this Order.

     **DONE AND ORDERED** in Jacksonville, Florida this 18th day of March, 2026.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record

- 18 -